Pages 1  -  115

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CR 16-0440 WHA |
| | ) | |
| YEVGENIV ALEKSANDROVICH NIKULIN, | ) | |
| | ) | San Francisco, California |
| Defendant. | ) | Tuesday |
| | ) | April 30, 2019 |
| | ) | 9:00 a.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          DAVID L. ANDERSON
                        United States Attorney
                        1301 Clay Street
                        Suite 340S
                        Oakland, California 94612
                  BY:   **MICHELLE J. KANE**
                        **ASSISTANT UNITED STATES ATTORNEY**

                        U.S. ATTORNEY'S OFFICE
                        150 Almaden Boulevard
                        Suite 900
                        San Jose, California 95113
                  BY:   **MATTHEW A. PARRELLA**
                        **ASSISTANT UNITED STATES ATTORNEY**

For Defendant:          BUKH LAW FIRM, PLLC
                        1123 Avenue Z
                        Brooklyn, New York 11235
                  BY:   **GEORGE CHARLES GRASSO, ESQ.**

*Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR*
              Official Reporter - US District Court
              Computerized Transcription By Eclipse

PROCEEDINGS

| | |
|---|---|
| 1 | **Tuesday - April 30, 2019**                                    **9:34 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | (Defendant present, in custody.) |
| 5 | **THE CLERK:**  Calling criminal case No. 16-440 United |
| 6 | States of America versus Nikulin. |
| 7 | Will counsel please step forward and state your |
| 8 | appearances for the record. |
| 9 | **MS. KANE:**  Good morning, Your Honor.  Michelle Kane |
| 10 | and Matthew Parrella for the United States. |
| 11 | **THE COURT:**  Welcome to you both. |
| 12 | **MR. GRASSO:**  Good morning, Your Honor.  George C. |
| 13 | Grasso of Bukh Law Firm, Brooklyn, New York for Mr. Nikulin. |
| 14 | **THE COURT:**  All right.  Are you admitted to practice |
| 15 | here? |
| 16 | **MR. GRASSO:**  I am.  Pro hac vice, yes. |
| 17 | **THE COURT:**  All right.  Great.  Welcome to you. |
| 18 | **MR. GRASSO:**  Thank you. |
| 19 | **THE COURT:**  And our interpreters, please. |
| 20 | **INTERPRETER BRODSKAYA:**  Marina Brodskaya, certified |
| 21 | Russian interpreter. |
| 22 | **THE COURT:**  Are you sworn in this case? |
| 23 | **INTERPRETER BRODSKAYA:**  Yes. |
| 24 | **THE COURT:**  And? |
| 25 | **INTERPRETER ENTCHEVITCH:**  And Maria Entchevitch, as |

**PROCEEDINGS**

1   well served by the State boards and also I have been sworn in

2   this case a year ago.

3          **THE COURT:**  Thank you.  Welcome to you, too.

4      So is the defendant hooked up with the equipment?  Looks

5   like he is.

6      All right.  So we're ready to proceed.  We're here for an

7   evidentiary hearing on the issue of mental competency.  We've

8   received two written reports by competing experts.

9      So are we ready to proceed with the testimony?

10         **MS. KANE:**  Yes, Your Honor.

11         **THE COURT:**  All right.  Let's be clear on the ground

12  rules.

13     Do you two want -- I don't care which way we do it, but we

14  need to be -- the written reports usually do not come into

15  evidence, but if you both stipulated that they are in evidence,

16  I will be happy to let you do that.

17         **MS. KANE:**  Your Honor, the United States would

18  stipulate to admitting the reports into evidence.

19         **MR. GRASSO:**  And I would, also, stipulate to having

20  them in evidence.

21         **THE COURT:**  All right.  So the two written reports,

22  that includes any attachments, anything that is attached to the

23  expert's report will be deemed in evidence.

24     Agreed?

25         **MR. GRASSO:**  Agreed.

PROCEEDINGS

1          **MS. KANE:**  Yes, Your Honor.

2          **THE COURT:**  All right.  Nevertheless, I think it

3    would be useful to have the experts give a short direct

4    testimony before we turn to the cross.  I do know what's in the

5    reports.  However, I think it will help the record if we have a

6    direct examination first.

7          So the two experts are both here.  That's the Government

8    expert; right?

9          **MS. KANE:**  Yes, Your Honor.

10          **THE COURT:**  And is the defense expert here?

11          **MR. GRASSO:**  Yes.

12          **THE COURT:**  So is it okay if both experts stay in the

13    room at the same time?

14          **MS. KANE:**  Yes, Your Honor.

15          **MR. GRASSO:**  Yes.

16          **THE COURT:**  All right.  So be it.

17          Okay.  You may call your first -- your only witness, I

18    guess.  All right.

19          **MS. KANE:**  Thank you, Your Honor.  The United States

20    calls Dr. Lesli Johnson.

21          **THE COURT:**  Very well.  Come forward, please.

22          And, Mr. Grasso, you may have a seat.

23          **MR. GRASSO:**  Thank you, Judge.

24

25

1          **LESLI JOHNSON**,

2    called as a witness for the Government, having been duly sworn,

3    testified as follows:

4               THE WITNESS:  I do.

5               THE CLERK:  Please be seated and state your full name

6    for the record and spell your last name, please.

7               THE WITNESS:  Lesli Johnson, J-O-H-N-S-O-N.

8                    **DIRECT EXAMINATION**

9    BY MS. KANE

10   **Q.**   Dr. Johnson, because I know it's not the standard

11   spelling, could you also spell your first name, please?

12   **A.**   Yes.  It's L-E-S-L-I.

13   **Q.**   Thank you.

14              MS. KANE:  Your Honor, I have marked exhibit copies

15   of both of the reports.

16        If the Court would like, I can pass those up.  In

17   particular, because I have added page numbers to the defense

18   report.

19              THE COURT:  Sure.

20        (Whereupon document was tendered to the Court.)

21              THE COURT:  And how about the witness?  Does she get

22   a copy?

23              MS. KANE:  Yes, Your Honor.

24              THE COURT:  So you've given me now both -- I guess

25   both sets; right?

 1          Do you need a cough drop?  I notice you're coughing a lot.

 2              THE WITNESS:  I'll just drink a lot of water.

 3              THE COURT:  I have a ton of cough drops.

 4              THE WITNESS:  Sure.

 5              THE COURT:  This will come in handy.

 6              THE WITNESS:  Thank you.

 7              THE COURT:  Anybody back there need a cough drop?  I

 8  have one.

 9              MS. KANE:  No thank you, Your Honor.

10              THE COURT:  All right.  Proceed.

11  BY MS. KANE

12  Q.   Good morning, Dr. Johnson.

13  A.   Good morning.

14  Q.   Could you please tell us about your educational

15  background?

16  A.   Sure.  I received my Bachelor of Arts in psychology from

17  Texas Tech University in 2004.

18       My Master of Arts in clinical psychology from Ball State

19  University in 2016.

20       My PhD in counseling psychology from Oklahoma State

21  University in 2010.

22              THE COURT:  Is Texas Tech in Fort Worth?  Is that

23  where it is?  Where is Texas Tech?

24              THE WITNESS:  In Lubbock.

25              THE COURT:  Lubbock, okay.  What's in Fort Worth?

1          THE WITNESS:  Oh, Fort Worth...

2          THE COURT:  TCU.  TCU.

3          THE WITNESS:  TCU.

4          THE COURT:  Okay.  So Texas Tech is in Lubbock.

5          MS. KANE:  The Red Raiders, I believe.

6          THE COURT:  Red Raiders, that's right.

7          THE WITNESS:  Absolutely.

8          THE COURT:  Okay.

9    BY MS. KANE

10   Q.   All right.  And in addition to your academic work, did you

11   complete any internships related to psychology?

12   A.   I did.  I completed a one-year full-time APA accredited

13   doctoral internship at the Federal Medical Center in Devens,

14   Massachusetts from 2009 to 2010.

15   Q.   And what does APA stand for?

16   A.   American Psychological Association.

17   Q.   And are you -- do you hold any professional licenses?

18   A.   Yes.  I'm a licensed psychologist in the State of

19   New York.  I was licensed in 2012.

20   Q.   And where do you work now?

21   A.   I currently work at the Metropolitan Detention Center in

22   Los Angeles.

23   Q.   Have you worked at any other prison facilities?

24   A.   I have.  I did my internship at a federal prison in

25   Massachusetts and following that, I was hired as a staff

1  psychologist at the Federal Correctional Institution in

2  Danbury, Connecticut between 2010 and 2013.

3  **Q.**   And since then you have been a -- working as a

4  psychologist, forensic psychologist; is that correct?

5  **A.**   Yes.  At MDC since June 2013.

6  **Q.**   And that's the Metropolitan Detention Center in

7  Los Angeles; right?

8  **A.**   That's correct.

9  **Q.**   Okay.  And what -- what do you do as a forensic

10 psychologist?

11 **A.**   My primary role at MDC is to conduct federal court ordered

12 evaluations.  Namely, that is comprised of competency to stand

13 trial evaluations, although I sometimes complete Court ordered

14 reports for criminal responsibility.

15      Treatment needs.  Does the defendant require

16 hospitalization after sentencing?

17      Dangerousness.  Risk of recidivism for violence and/or sex

18 offenders and sometimes diminished capacity.

19 **Q.**   Okay.  How many -- approximately how many Court ordered

20 federal forensic evaluations have you completed?

21 **A.**   Approximately 140.

22 **Q.**   And you would say that most of those were regarding

23 competency to stand trial?

24 **A.**   The majority of our referral questions are competency, so

25 yes.

1  **Q.**   And when you complete a Court ordered federal forensic

2  evaluation, does that include a written report?

3  **A.**   Yes.

4  **Q.**   And have you previously testified regarding the

5  evaluations that you completed?

6  **A.**   Yes.  I have testified in federal court in numerous

7  districts 13 times prior to today.

8  **Q.**   And how many of those were regarding competency to stand

9  trial?

10  **A.**   Eleven.

11  **Q.**   Now, in evaluating competency to stand trial specifically,

12  what is your process?

13  **A.**   At MDC we use the entirety of the evaluation, so we -- the

14  evaluation really begins the day the defendant steps into our

15  doors.

16      Because of that we take into account the observation of

17  other staff outside of the psychology department.  So that

18  would include officers, anybody that the defendant would deal

19  with, medical staff, and we to ask for their feedback about the

20  defendant's behavior while at our facility.

21      In addition, we review any discovery, mental health or

22  medical records that are received.

23      We, also, call the attorneys involved in the case to

24  include both defense and prosecuting attorney, specifically to

25  ask if they have any specific concerns regarding the referral

1    question.

2         If there are any phone calls made while at our facility,

3    we do listen to a sample of those, and we also read any emails

4    sent to or from the defendant while at our facility.

5         If the defendant sees a medical provider at our facility,

6    we would also review those records or the notes that our

7    medical doctors might provide.

8         In addition to all of that information, we also meet with

9    the defendant for several hours to include a background

10   interview.  In that background interview we obtain information

11   regarding childhood, history, relationship, medical, mental

12   health, substance use, legal history and military history as

13   well.

14        In addition to that interview, we might also do testing.

15   We always try to do cognitive functioning testing and a

16   personality assessment, if necessary.

17        In addition, we can do other testing, but that also

18   depends on the defendant's presentation and what their symptoms

19   are or what maybe attorneys are saying the difficulties are

20   with.  We can do other testing as well.

21        We also conduct a legally focused interview as well.

22   **Q.**  And after you have done all of those things, do you

23   prepare a written report?

24   **A.**  I do.  I prepare -- I write a report and provide that to

25   the Court.

1   **Q.**   And in the process of the evaluation and writing the

2   report do you consult with other members of the MDC staff?

3   **A.**   I do.  Our department is made up of six psychologists and

4   three doctoral interns.  Our department meets daily to discuss

5   inmates and also, in addition, to discuss our study cases,

6   which is what we call people who are there for evaluations.  We

7   discuss these people as they come up, as we're going through

8   the evaluation.

9        In addition to daily rounds, I also consult with the other

10  two forensic psychologists, as well as my chief psychologist,

11  who is a forensic psychologist.  Discuss, as I go through the

12  evaluation, what I think needs to happen next and also discuss

13  my working hypothesis with regard to diagnoses and what I think

14  my recommendation will be.  Again, it's kind of a working

15  hypothesis and discuss that with the other staff as I go

16  through the evaluation.

17       At the end of that I write the report and the chief

18  psychologist reviews all of the forensic evaluations, both to

19  edit for grammar and punctuation, but also to make sure that we

20  have fluidly answered the referral question.

21  **Q.**   And the referral question would be the question, for

22  example in this case, of whether the defendant is competent to

23  stand trial?

24  **A.**   That's correct.

25  **Q.**   All right.  And is that the process that you followed in

1  evaluating Mr. Nikulin?

2  **A.**   Yes.

3  **Q.**   And I've put in front of you two documents, one of which

4  is marked United States Exhibit 1.  Is that the report that you

5  prepared in this case?

6  **A.**   Yes.

7  **Q.**   So tell us how you evaluated Mr. Nikulin?

8  **A.**   Well, with Mr. Nikulin, I met with him and conducted a

9  background interview.  I conducted a legally focused interview,

10  and I also administered a nonverbal test of his intelligence,

11  the CTONI or the Comprehensive Test of Nonverbal Intelligence,

12  second edition.

13  **Q.**   And so first off, approximately how long did you

14  interview -- total, about how long were you able to interview

15  Mr. Nikulin?

16  **A.**   Nine hours to include the background, the legally focused

17  interview and the CTONI.

18      I also briefly met with him for his intake, which was

19  about 20 minutes long.  So just over nine hours.

20  **Q.**   And that was over several different occasions; right?

21  **A.**   Yes.  I saw him on four different occasions.

22  **Q.**   And this evaluation began in December of 2018; right?

23  **A.**   Yes.  He arrived at our facility on December 6, 2018 and

24  he was seen for his forensic intake on December 11, 2018.

25  **Q.**   Could you describe the CTONI?  That's C-T-O-N-I; right?

1   A.   That's correct.

2   Q.   Could you describe what that test involves?

3   A.   So we typically give another cognitive functioning test,

4   but because Russian is his first language, he doesn't speak

5   English and was not raised in the United States, we gave a

6   culturally appropriate test, which is the CTONI, which looks at

7   nonverbal intelligence.

8        It has three different sections where it looks at

9   analogies, categories and sequences.  Each category has two

10  sub-tests, one being for pictures and one with geometric

11  designs.

12  Q.   Could you give an example of one of the CTONI evaluation

13  questions?

14  A.   Sure.  You provide the individual with an easel that has

15  items on it.  Everything can be done pantomime, again, so not

16  to distract the individual with a language that is not their

17  own, and you show them items on a page.

18       For example, they will be shown a sequence of a big

19  circle, a little circle, a big circle, a little circle, a big

20  circle, and then the last item would be blank.  You then ask

21  the individual to pick the item below that best fits that

22  sequence.

23  Q.   And is the CTONI something that you can numerically grade?

24  A.   Yes.

25  Q.   And you also mentioned a legal focused interview.  Is that

1  a standard widely-used measure in competency evaluations?

2  **A.**   It is.  It's widely used in the forensic community.  It's

3  a semi-structured interview.  It doesn't provide you a score,

4  but it does provide you information to be able to answer the

5  referral question regarding competency to stand trial.

6  **Q.**   And that's the RCAI; is that correct?

7  **A.**   That's correct.

8  **Q.**   Okay.  And can you give some examples of how the -- how

9  you would conduct an RCAI interview?

10  **A.**   Sure.  There are a lot of questions in the RCAI and it

11  goes through a lot of different aspects of what might be

12  necessary for an individual to go through a court case.

13       For example, it asks who the different players are in the

14  courtroom during a trial, what is their job.  It asks what they

15  are charged with.  Is that a felony or misdemeanor?  What

16  somebody might have to do to be charged with that.

17       We also ask them about their arrest.  Did they confess?

18  Did they speak to the police?  What did they say?  And to give

19  us their side of the story.

20       We ask about different -- the pleas that are available to

21  them and what each of them means.

22       We even ask what they expect to plead in this case and

23  why.  Do they think that -- well, what do they think their

24  chances are of being found not guilty.

25       And we also ask them about their relationship with the

 1   attorney.

 2        So that's just as brief snapshot of the interview, but ask

 3   a lot of different questions.

 4   **Q.**   And in asking those questions is it just a simple test of

 5   their knowledge?

 6   **A.**   No.  When evaluating competency to stand trial what's

 7   really important to remember is it's not about the defendant's

 8   current level of knowledge.  It's about their level of

 9   knowledge now, but also are they able to learn and retain

10   information.  What is their ability.  In fact, most defendants

11   don't answer every question correctly.  That's quite the norm.

12   So we don't expect that.

13        What we do is we use Socratic questioning.  We query.  If

14   a defendant gives a vague answer or, you know, they are not

15   quite there, we might ask, "Well, what else?  Tell me more."

16        We ask them to define other words that maybe they are

17   close, but not quite there.  For example, "What does not guilty

18   by reason of insanity mean?"  A common answer is, "Somebody is

19   crazy."  So I would ask, "Well, what does crazy mean?"  And we

20   use Socratic questioning in that way.

21        In addition, if a defendant does not understand after I've

22   tried to query in several ways or change the language of the

23   question to fit where they are at, I then will just provide

24   education.  So they do then have an understanding of that

25   question asked.  At that point I have them repeat the

1   question -- or, sorry.  Repeat the answer to me to make sure

2   that they understood what I said, what I educated them on.  I

3   then move forward in the interview.

4        So I then purposefully have some distracter variables

5   there.  And at some point later on in the interview I come back

6   and I ask the question again to ensure that they have learned

7   and retained the information.

8   **Q.**   Can you give an example of something, of how you might use

9   the education technique that you just described?

10  **A.**   Sure.  For example, if I asked a defendant to define what

11  guilty means and they say "I have no idea," I might try, "Well,

12  what do you think?  Give me your best guess."  Because

13  sometimes we find that they do know the answer.  They are just

14  often resistant to providing it outright.

15       But after I've tried numerous times, I will then say,

16  "Guilty means somebody committed the crime.  Can you tell me in

17  your words what I just said?"

18       I would then -- assuming that they would then provide me

19  the answer that I gave them, I would say, "Okay.  Remember that

20  answer.  We're going to come back to it later."

21       I would then go through and ask subsequent questions and

22  then at some point say, "Actually, let's go back.  What does

23  guilty mean?"  And then have them provide the answer.

24       We would repeat that course if they continued to give me

25  the wrong answer.  We would continue to do that until they were

1  able to provide the correct answer.

2  **Q.**   In addition to the interviews and the testing that you

3  did, did you review discovery provided by the Government in

4  this case?

5  **A.**   I did.

6  **Q.**   Okay.  And that's all described by Bates number in your

7  report; right?

8  **A.**   Yes.

9  **Q.**   And that included translations of some of the defendant's

10  recorded calls; is that right?

11  **A.**   That's correct.

12  **Q.**   Did you also review communications that he conducted while

13  he was at MDC?

14  **A.**   Yes.  I reviewed emails.

15  **Q.**   Did you review medical records from Santa Rita jail?

16  **A.**   I did.

17  **Q.**   And what about from the defendant's stay in the Czech

18  Republic?

19  **A.**   I did not have a record specifically from the

20  hospitalization in Prague.  What I had was a letter or a

21  declaration written by the Prague attorney and I summarized

22  that letter in the report.

23  **Q.**   Did you also get information from other staff at MDC

24  regarding the defendant's behavior?

25  **A.**   Yes.

1   Q.   And how was the defendant housed when he was there?

2   A.   So of note, the facility that I work at is a regular

3   federal pretrial facility.  And Mr. Nikulin, when he came in,

4   it was deemed appropriate for him to be housed in a general

5   population unit with about 120 inmates who were there for

6   various reasons, most of them awaiting to see what was going to

7   happen with their case.  He had a cellmate and was housed in

8   general population.

9   Q.   And did you hear of any concerns regarding his behavior in

10  general population?

11  A.   No.  The officers indicated that he had appropriate

12  behavior.

13       During the intake, he had been there about five days, he

14  was refusing to speak with the intern that went to see him, at

15  which time another inmate walked up and assured the intern that

16  he had plenty of friends on the unit as well.

17  Q.   Did you speak to any of the defendant's family members in

18  developing your evaluation?

19  A.   I did not.

20  Q.   And why not?

21  A.   We find that often calling family members -- we focus --

22  when we do that, we focus on background information.  And

23  competency is about here and now.  We're really wanting to

24  better understand their current level of functioning.

25       While family can provide some relevant information with

1    regard to background, if we already have enough information to

2    answer those questions, it's not always necessary or helpful to

3    call family.

4        The reason is because family has an intrinsic automatic

5    bias.  Parents and spouses, they want the best for us and they

6    want to provide information that they think is going to best

7    help their loved one.

8        So sometimes consciously, sometimes unconsciously, family

9    can provide information that can be somewhat exaggerated

10   because they think that that's what's best going to help their

11   loved one get medication, get treatment.  Sometimes family

12   tries to get them out of charges.  They are just trying to do

13   what they think is best for their loved one.

14       What we found is actually more helpful is to review phone

15   calls and emails that are made between spouses and family

16   members and the defendant because it is a more genuine

17   representation of their actual interaction with that less

18   intrinsic bias there.

19   **Q.**   And did you do that in this case?

20   **A.**   I did.  I reviewed the translated phone calls that were

21   provided to me from Santa Rita jail, and those were between

22   Mr. Nikulin, his mother, stepfather and girlfriend at the time.

23       And I also reviewed the emails that were sent and received

24   by him at MDC.  Most of those were between Mr. Nikulin and

25   members of his legal team, but he also emailed with his

 1  girlfriend at the time.

 2  **Q.**   And I just want to go back and clarify one thing.  You

 3  mentioned that the CTONI can be done nonverbally, but the rest

 4  of your evaluations and meeting with the defendant were done

 5  through a Russian translator; is that right?

 6  **A.**   Yes.  We hired a court certified Russian interpreter, who

 7  was there for all the interactions except for the intake,

 8  interview which is very brief, just to make sure that they are

 9  appropriate for general population.

10      For that interview I used a staff member at our

11  institution that spoke Russian fluently.

12  **Q.**   Now, if you could discuss your evaluation findings from

13  your report.  So if you want to look at Page 11 of your report?

14  **A.**   So Page 11 is really referring to the defendant's mental

15  status and presentation while at our facility, the behaviors

16  that we saw.

17      So he was housed in general population.  This is really

18  significant because what we find in a general population unit

19  is other inmates tend to be pretty intolerant of people that

20  they view as different, difficult or mentally ill.  And at no

21  point did any inmate come forward.  And I assure you they come

22  forward very quickly when they want somebody off their unit.

23  At no time did that happen.  Nor did officers ever observe any

24  odd or bizarre behavior.

25      Mr. Nikulin, when meeting with me, he denied any delusions

1  or hallucinations or seeing things that aren't there or hearing

2  things that aren't there.

3      And he also didn't appear to respond to internal stimuli,

4  which is what we mean when we say that they are actually

5  hearing and responding to the voices in their head or they are

6  actually seeing something and they are responding to seeing

7  something that's not there.

8      Now, he did have very vacillating eye contact.  When

9  meeting with him, he either stared at the wall or he -- well,

10  actually he often was staring at a picture in the office that

11  he said reminded him of some mountains in Russia, and so he was

12  often staring at that picture; or he was staring pretty

13  intensely at me, often smirking or widening his eyes, sitting

14  forward, moving his head up and down almost to mock me.  That

15  often seemed to happen when he did not agree with something

16  that I said, when I challenged him in some way or when he

17  thought that something that I asked was stupid, which was

18  something that he referenced quite a bit.

19      In the interviews in general he often asked why the

20  evaluation was necessary.  He indicated that the case was

21  nonsense, which is not uncommon for an offender population to

22  say or to think.

23      He often -- he often said, "I know this already."  And

24  almost to say this is -- take me for my word.  I already know

25  this.  Let's move forward.  Of course, we can't do that.

1    So he seemed to be somewhat resistant at times to provide

2    information.  However, he was ultimately cooperative and

3    provided the necessary information to conduct the evaluation.

4    **Q.**   And could you summarize your findings as a result of

5    administering the CTONI?

6    **A.**   Sure.  So the CTONI -- before I discuss the results, I

7    have to discuss his presentation and behavior during

8    administration.

9         So the individual is asked to go through three different

10   easels in which they are shown these signs that I discussed

11   earlier.  And on the first two easels he slouched over the desk

12   and appeared to haphazardly flick his finger at the items

13   almost as quickly as I turned the page.  Didn't appear to be

14   putting forth adequate effort.  Had poor motivation.

15        After completing that first book, I asked him, "Are you

16   putting forth your best effort?  Are you trying?"  And he said

17   yes.

18        After that his performance was markedly different, which

19   is actually shown in and evidenced in the scores themselves.

20   On those first two sub-tests he scored in the very poor range.

21   After asking if he was giving his best effort, he scored in the

22   below average, average and above range.  That indicated to me

23   that overall he did not put forth his best effort.

24        As a result, those first two sub-tests brought the overall

25   full scale I.Q. down.  In fact, making it an invalid score

1  because there was so much variance.  But overall his full scale

2  I.Q. was a 76, which fell in the poor range.

3  **Q.**  And given that score, what was your conclusion regarding

4  his cognitive functioning?

5  **A.**  My conclusion was that score did not represent his overall

6  presentation.

7      Mr. Nikulin, again, was able to take care of himself.  He

8  maintained good hygiene.  He cleaned his cell.  He was able to

9  eat meals, get along well with other inmates on the unit with

10  no problems.

11      Somebody with a 76 would likely have some difficulty

12  communicating or doing routine type things on their own without

13  some assistance.

14      He also, when speaking with the interpreter, she at no

15  time said that his vocabulary was lacking or that she had an

16  difficult time working with him.  She did say that sometimes

17  his voice was muffled and he was hard to understand because of

18  his volume of speech, but at no time did his speech or his

19  behaviors reflect somebody who was scoring in a poor range of

20  intellectual functioning.

21      He really appeared to score more at least -- I could say

22  at least in the average range of cognitive functioning, not the

23  poor range.

24  **Q.**  And in your report you also come to a diagnosis regarding

25  mental condition.  Can you describe that?

1   A.   Yes.   I diagnosed the defendant with other specified

2   personality disorder with narcissistic traits.

3   Q.   And what's that mean?

4   A.   Well, first, a personality disorder is a pervasive pattern

5   of interacting and understanding the world that is maladaptive

6   and inflexible across time and situations, typically beginning

7   in late adolescence or early adulthood and continuing on

8   through a person's life.

9        Narcissistic personality disorder specifically is a

10  pattern -- a pervasive pattern of a grandiose sense of self in

11  need for admiration and lack of empathy.   These individuals

12  often appear arrogant or have haughty behaviors.

13       They are entitled and due to that sense of entitlement and

14  low sensitivity to others, they often are interpersonally

15  exploitative.

16       They also believe that they are special, that they are the

17  top or the best and because of that they also want to surround

18  themselves with other top or best people or things.

19       In addition, they tend to fantasize about unlimited

20  success, unlimited power, the best love and often think that

21  other people are jealous of them as well.

22  Q.   And that diagnosis was based on criteria in the *Diagnostic*

23  *and Statistic Manual of Mental Disorders*, fifth edition; is

24  that right?

25  A.   That's correct.

1   **Q.**   And that's known as the DSM-5?

2   **A.**   Yes.

3   **Q.**   And is that the most current version of the DSM?

4   **A.**   It is.

5   **Q.**   Is that considered the standard by which mental health

6   professionals compare diagnostic criteria today?

7   **A.**   Yes.  I would say it's the gold standard.  It's the

8   standard that if you're currently practicing you should be

9   using.

10  **Q.**   Given that diagnosis, what was your conclusion as to

11  whether the defendant was able to understand the nature and

12  consequences of the proceedings against him?

13  **A.**   He appeared to be able to understand the nature and

14  consequences of the proceedings against him.

15  **Q.**   And, again, given that diagnosis, what was your conclusion

16  regarding his ability to assist -- ability to assist properly

17  in his defense?

18  **A.**   My opinion is that while he may be a difficult client to

19  work with and will likely continue to demonstrate some

20  difficult characteristics, that he is ultimately able to

21  adequately aid and assist in his defense, if he so chooses.

22  **Q.**   And with regard to that second -- second prong of the

23  language of Section 4241, did the defendant tell you anything

24  specific about his lack of communication with his attorneys?

25  **A.**   He did.  And I can give you a direct quote if I could turn

 1   to a page in my report.

 2   **Q.**   Yes, you may.  I believe it's Page 19.

 3   **A.**   Oh, okay.  In -- when conducting the RCAI, that

 4   semi-structured legally focused interview, as I said before, in

 5   that we do ask about the relationship with the attorneys and

 6   how that's going.  Does he have confidence in his attorneys?

 7   What -- how can he help his attorneys?  To which he was able to

 8   answer those questions.

 9        But of note, when I asked him about his lack of

10   cooperation with his attorneys to this point, he stated, and I

11   quote:

12            "I'm always capable of participating in

13        conversations, but depending on the situation, the

14        ambience and the people."

15   **Q.**   Thank you.

16        Now, Dr. Johnson, have you reviewed the report by

17   Dr. Grinberg that was prepared for this case?

18   **A.**   I did.

19   **Q.**   In looking at his report, did Dr. Grinberg use any of the

20   tools that you're familiar with that are widely used to

21   evaluate the competency of defendants to stand trial?

22   **A.**   I didn't see any widely used measures among the forensic

23   community listed in his report.

24   **Q.**   He does describe some tests or examinations on Page 10 of

25   his report under the "Insight and Judgment" section.  And

1    that's in front of you, as you see, marked Exhibit 2.

2          So that includes the Hamilton Anxiety Rating Scale, Big

3    Five Personality Test and several others.  What is your opinion

4    of using those tools to evaluate competency?

5    **A.**    While these tools could be used, I would say that there

6    are more widely-used measures in the forensic community that

7    have been held up in federal court for competency trial -- or

8    competency hearings.

9          These measures appear to be more useful in a therapeutic

10   or a treatment setting because they are self -- self-report

11   mental health screeners, if you will.

12   **Q.**    And of the reports listed here, at least those that you're

13   familiar with, are those administered typically in English?

14   **A.**    Yes.  My understanding is each of these inventories was

15   normed in the United States in an English speaking population.

16   **Q.**    And so what would the significance be of Dr. Grinberg

17   translating those questions into Russian?

18   **A.**    Ultimately, plainly you're not supposed to do that because

19   it invalidates the scores.  It makes it to where quantitatively

20   we can't use those scores any more.

21         If scores were normed in an English speaking United States

22   population, what that means is statistically they are then no

23   longer generalizable outside of that group.

24         Now, you could speak to the information that you obtained

25   from those measures quantitatively, but that's not what was

1   done here.  So we can't use the scores to make any basis with

2   regard to diagnoses or symptoms.

3        You really are not supposed to translate into another

4   language yourself.  Some of the reason for that is there are

5   culture aspects that are sometimes in different tests.

6        In addition, sometimes there is not a direct translation

7   between English and other languages.  So some words may be

8   misinterpreted or may be different.

9   **Q.**   With regard to Dr. Grinberg's conclusions, do you have an

10  opinion regarding his diagnosis of post-traumatic chronic

11  stress disorder?

12  **A.**   Yes.

13  **Q.**   What is your opinion?

14  **A.**   I did not agree with the diagnosis while at the MDC, as

15  well as Santa Rita jail.  As far as the records that I

16  reviewed, Mr. Nikulin consistently denied experiencing

17  distress, experiencing anxiety.  He didn't report any of these

18  symptoms.

19       For PTSD especially, the criteria is that somebody is

20  currently experiencing distress.  They are currently reporting

21  nightmares, flashbacks.  They are actively trying to avoid

22  thinking about, talking about the specific trauma that they

23  experienced.  They might be hypervigilant, have increased

24  anxiety, poor concentration.  Again, directly related to a

25  trauma.

1    So if Mr. Nikulin across situations and different mental

2 health providers has denied experiencing any distress, he then

3 inherently would not meet the criteria for PTSD.

4    It seemed that largely much of this diagnosis was based on

5 reports by the defendant's mother and just because somebody has

6 experienced some traumatic events in their life does not then

7 mean that they automatically meet criteria for PTSD because,

8 again, they have to currently be experiencing those symptoms

9 and have distress.

10 **Q.**   And what about Dr. Grinberg's diagnosis of -- I apologize,

11 psychotic disorder not otherwise specified?

12 **A.**   What I would first say is that psychotic disorder not

13 otherwise specified is not included in the DSM.  This is an

14 outdated diagnosis.  And per the report he used the DSM-4,

15 which was two editions ago.

16    But with regard to the diagnosis itself, while at the MDC

17 and at Santa Rita jail at no time did any staff, mental health

18 providers, including myself, observe any psychotic symptoms.

19 He did not appear to be responding to internal stimuli.

20    He was able to maintain his hygiene, take care of his

21 cell.  He was able to function well on a general population

22 unit.

23    He did not exhibit any delusions.  He also did not exhibit

24 any disorganized speech or disorganized behavior.  In fact, he

25 was able to communicate in a clear goal-directed logical

 1    manner.

 2        So over the course of at least 11 months no mental health

 3    providers have seen any psychotic symptoms.  And, again, the

 4    defendant also denied any of those symptoms.

 5    **Q.**    And what about Dr. Grinberg's diagnosis of dissociative

 6    syndrome not otherwise specified -- I'm sorry, dissociative and

 7    conversion disorder not otherwise specified?

 8    **A.**    So I would similarly say that it is called something

 9    different now in the DSM-5, but I did not see any signs of

10    dissociation while at the MDC.

11        Dr. Grinberg indicates that he made this diagnosis because

12    the defendant experienced derealization, which means feelings

13    of unreality or detachment.

14        So similarly, the defendant denied having any of these

15    kinds of experiences.  At least from what I can tell from the

16    report, it appears that Dr. Grinberg made this diagnosis

17    largely based on a third party, Mr. Nikulin's mother, who

18    reported that the defendant seemed different from himself.

19    But, again, the defendant denied this.

20        At no time did he appear to disassociate while at MDC.  He

21    just didn't exhibit any of these symptoms, nor did he report

22    them.

23    **Q.**    On Page 14 of Dr. Grinberg's report in the section on the

24    dissociative disorder there is a reference to Ganser's

25    syndrome.  Can you describe what you know about Ganser's

1   syndrome?

2   **A.**   So Ganser's syndrome, to my knowledge, used to be in the

3   DSM, but is now no longer with the current DSM.   It's not

4   listed and is not acknowledged in the DSM-5.

5        But in looking at Ganser's syndrome it used to be part of

6   a factitious disorder.   And what is interesting about that is a

7   factitious disorder is thought of as when an individual

8   knowingly makes up physical and psychological symptoms when

9   there is not secondary gain.

10        So, for example, they might make up symptoms, medical or

11  mental health symptoms, so they can be a victim.   So they can

12  get some attention from other people.   But the key word there

13  is making up; that they are reporting symptoms that they are

14  not actually experiencing.

15        So the interesting thing about that is that if the

16  defendant did have Ganser's syndrome, then we would think that

17  he was making up his symptoms, which then essentially negates

18  Dr. Grinberg's other diagnoses in which he believes that the

19  defendant has symptoms.

20  **Q.**   Dr. Grinberg describes some behavior by the defendant,

21  including on Page 6 being tearful while on the phone and saying

22  that he feels sad and hopeless.

23        What is your experience with other inmates and that type

24  of behavior?

25  **A.**   It's very normal.   You know, especially in a pretrial

1    facility, most of our inmates at our facility are facing

2    federal charges and going through with court.

3        If you then add to Mr. Nikulin's current experience, he

4    was extradited here to a country that he had not been to, where

5    they speak a language that he does not know.  And I would

6    actually find it very unusual if he was not sad or feeling

7    helpless and crying about his current situation.  It's a very

8    normal human experience and it's normal among an offender

9    population.

10   Q.    Thank you.

11           MS. KANE:  I have no further questions for Dr.

12   Johnson.

13           THE COURT:  All right.  Cross examination.

14           MR. GRASSO:  Yes.

15                       CROSS EXAMINATION

16   BY MR. GRASSO

17   Q.    Good morning, Ms. Johnson.  How are you?

18   A.    Good.  How are you?

19   Q.    Good.

20        So you are a psychologist and it sounds like you have

21   quite a few degrees.  You're very educated and I don't think

22   that anybody is questioning that.

23        Can you just explain what the difference is between a

24   psychologist and a psychiatrist at the outset?

25   A.    Sure.  A psychiatrist goes to medical school, just like

1    any other health medical doctor.  The difference would be that

2    their specialty would be in psychiatry, but they do have an

3    M.D.

4        In addition to the difference, major difference in their

5    training is they also have the ability to prescribe medication.

6        For a psychologist, somebody with a Ph.D or a Psy.d, your

7    education looks different.  We don't go to medical school.  I

8    am not able to prescribe medication.  And the focus tends to be

9    more on diagnosing mental disorders as well as providing

10   treatment specific to those mental disorders.

11   Q.   So if the -- okay.  What's the import of going to med

12   school?  Why go through all that extra work in the same field?

13   A.   Well, the fields are actually -- as far as practicing, are

14   actually pretty different.  But one would go to medical school

15   because there is a lot of medical basis behind providing

16   medication, the way that medications interact with other

17   medical disorders or ailments, the way that psychotropic

18   medication, which would be a medication for mental health, the

19   way that might interact then with other medical prescriptions.

20   That has a much more medical basis than what I do, and so

21   because of that it would be necessary to go to medical school.

22   Q.   Aside from medication though, isn't it true that anything

23   psychological is simultaneously biochemical, physiological and

24   that that is a very important reason to have a background in

25   med school, in order to do a -- let's say a more thorough

1   psychiatric evaluation?

2   **A.**   I think it's different information.  I don't think it's

3   better or worse.

4        Yes, there are some diagnoses that do have a genetic

5   component, that have a strong genetic component.  But when I

6   was in school and getting my Master's and my Doctorate degree

7   we also learn about those disorders as well.

8        So I don't think you need to know about every specific

9   medical issue to be able to appropriately diagnose based on

10  observable and reported symptoms.  That's really what you look

11  at.

12  **Q.**   But it is true that everything psychological is

13  simultaneously physiological as well, correct?

14  **A.**   I would say that's debatable because there are a lot of

15  disorders that people say yes, there is a predisposition for

16  this.  And it is only due to then environmental triggers that

17  cause something to become a disorder.

18       And there are some disorders that are not necessarily --

19  don't necessarily have a biological basis and maybe there is no

20  family history of disorders.  That doesn't mean that you can't

21  get that.

22  **Q.**   Okay.  You mentioned family history.  Earlier you

23  testified that several of the tests referred to in

24  Dr. Grinberg's report as being less than reliable because they

25  are self reporting.

1      Yet, isn't that -- isn't that the main basis of most of

2   the tests that you conducted as well?

3   **A.**   No.  I didn't do -- I didn't provide any self-report

4   measures.  I only administered the CTONI.  Other things were

5   just self-report interviews.

6      The reason that there was a problem with the measures that

7   were administered is because they were translated into Russian.

8   So while Dr. Grinberg could have discussed the results and

9   maybe the specific symptoms that Mr. Nikulin reported, speak

10  about those things qualitatively, so what did he actually say,

11  he instead discussed them from what it seemed like scores.  And

12  that is what is then invalid because the defendant speaks

13  Russian, however, the measures were normed in the United States

14  with English speaking populations.

15     So statistically the numbers don't really now mean

16  anything and are invalid.

17  **Q.**   Okay.  So the numerical question aside, one of the things

18  that you just said is very interesting to me; that you're

19  not -- earlier you testified you're not really supposed to

20  translate into another language yourself.  Do you speak

21  Russian?

22  **A.**   I do not.

23  **Q.**   Okay.  And would you say that it -- it's possible, at the

24  very least, for there to be something lost in translation

25  between your communications with the defendant because of the

1   language barrier?

2   **A.**   Well, I did have a court certified interpreter, just like

3   we have in the room today.

4   **Q.**   Sure.

5   **A.**   With regard to the tests, one thing I'll say, you asked

6   earlier about the difference between psychiatrists and a

7   psychologist, is that psychiatrists are not trained in

8   psychological assessments.  It's not a course that they take

9   and they to not administer these things.

10       So when taking a psychological assessment course in

11  graduate school, you do learn that you cannot change the

12  standardization of a test.  If you change the standardization

13  of any test for any reason, even in English, if I changed a

14  word in a test, you can't do that.

15       So certainly then translating into Russian you invalidate

16  the numbers of the tests.  Again, what should have maybe

17  happened is that he spoke qualitatively about the symptoms that

18  he learned about from these tests.

19  **Q.**   I'm not talking about that.  I'm talking about the course

20  of interviews that you had conducted and something possibly

21  being lost in translation along those lines.

22       Given the fact that you had an interpreter, but you stated

23  yourself that one of the reasons that you don't want to

24  translate these -- one of the reasons that the numbers are

25  invalidated because of the translation is because there are

1   cultural differences and something can be lost in translation.

2       So isn't that possible, that during the course of your

3   interview something was lost in translation and that you may

4   not have been getting the full picture?

5   **A.**   I think that's always possible, but notable is that when

6   doing a comprehensive evaluation, no evaluator should ever look

7   at one point of data.

8       And I didn't look at only the self-reported interviews.

9   I looked at several other pieces of information.  That's one

10  point of data in a bigger, more comprehensive evaluation.

11  **Q.**   Sure.  And as to one of the specific tests, the CTONI-2,

12  does that require certification?

13  **A.**   Certification in that you go to a class?  No.

14  **Q.**   No.  Certification that in order to conduct the test, you

15  know, and have the results validated, so to speak, in the

16  psychological community, do you need to be certified for that?

17          **THE COURT:**  Who certified, the doctor or the person

18  administering the test?

19          **MR. GRASSO:**  The person administering the test.

20          **THE COURT:**  All right.

21  **A.**   So as I said, there is not a direct certification in

22  giving tests, but as long as you understand psychometrics of a

23  test, that you read the manual, that you understand how the

24  test is supposed to be administered and you do that in a

25  standardized way, you can administer the test.

1        And, yes, usually a manual would indicate a level of

2   education for that.

3   **BY MR. GRASSO**

4   **Q.**   But you're not certified in administering the CTONI-2;

5   correct?

6   **A.**   There is not a certification to administer the CTONI-2, to

7   my knowledge.

8   **Q.**   Okay, moving on.  Let's put the test aside for a second.

9        There are several things within Dr. Grinberg's report

10  pertaining to the defendant's family history that are

11  completely absent from your report.  And it seems that many of

12  these things, some of which may have come from interviews with

13  the defendant's mother, some of which came from medical records

14  and other sources, but some of these things seem to be of

15  substantial import in making a psychological diagnosis.

16       Just starting with one of the most basic things.  Were you

17  aware at the time that you wrote this report that the defendant

18  had suffered a substantial physical trauma to the brain at the

19  age of 22?

20  **A.**   No.

21  **Q.**   Okay.  Does a physical trauma to the brain change the

22  brain psychologically?

23  **A.**   It can.  It can certainly change certain aspects of an

24  individual's functioning.

25       What we also find is that sometimes individuals can also

1  come back from that, bounce back or at least come close to

2  original functioning.

3  **Q.**   Isn't it true that there is a very strong correlation

4  between a physical head trauma and the development or

5  exacerbation of mental illness?

6  **A.**   I don't know if I would say that's very strong.  I think

7  it's possible.

8  **Q.**   Okay.  Were you aware that the defendant didn't start

9  speaking until the age of six?

10  **A.**   No.  He indicated to me that he started school a year late

11  due to difficulty pronouncing Rs.  But as far as not speaking

12  until age six, he did not report that to me.

13  **Q.**   Okay.  If you had known that, is that something that you

14  would have included in the report?  Whether or not it would

15  have affected your -- the final outcome of anything, is that a

16  fact that you would have included?

17  **A.**   Oh, yes.  Any information that I had I would include it.

18  **Q.**   And isn't it true that such developmental incapacities

19  also correlate with sort of mental illness?

20  **A.**   Can you say that again?

21  **Q.**   Isn't it true that certain developmental issues, such as

22  not being able to speak until the age of six, correlate with

23  having serious mental illness?

24  **A.**   It's possible, but just because somebody has developmental

25  delays we can't say that they then will absolutely eventually

1    have a mental illness.

2    **Q.**    Right.  But at least as far as you know, there is a

3    correlation in the science that shows that exists; correct?

4    **A.**    It can exist.

5    **Q.**    It can, but there is a correlation; correct?

6    **A.**    Yes, but it doesn't always happen.

7    **Q.**    Right.  But there is a correlation.  And just like there

8    is a correlation with sustaining a severe head trauma and that

9    exacerbating mental illness, it's a correlation.

10   **A.**    Yes.

11   **Q.**    Right.  Thank you.

12        As to Dr. Grinberg's diagnosis of PTSD, you said that one

13   of the reasons that you disagree with the diagnosis is because

14   patients tend to exhibit certain symptoms in the present

15   moment; correct?

16   **A.**    Well, I --

17   **Q.**    That you didn't see?

18   **A.**    Yeah.  I don't know if I would say "tend."  It's

19   diagnostic criteria, that they are currently experiencing

20   distress and that then they evidence certain criteria and

21   symptoms related to PTSD.

22   **Q.**    And you are aware that the defendant's brother committed

23   suicide in 2018, correct?

24   **A.**    He told me that his brother committed suicide in May 2016.

25   **Q.**    I'm sorry, 2016.  Yes.

1    **A.**    Yes.  I was aware of that.

2    **Q.**    And that would generally be described as a traumatic

3    event?

4    **A.**    It is certainly a sad event.  When we're talking about

5    PTSD, PTSD typically talks about a trauma in which an

6    individual, their own life is at imminent risk or somebody

7    else's life is at imminent risk that they witnessed.

8    **Q.**    Maybe generally, but exclusively?

9    **A.**    It is what the criteria in the DSM-5 indicates.

10   **Q.**    Are you saying that it precludes the trauma of a sibling's

11   suicide?

12   **A.**    It certainly does not diminish that that is a traumatic

13   moment and very sad that would cause most people to have a very

14   strong reaction and maybe feel depressed and grieve for a

15   longer period of time.

16   **Q.**    Right.  But it's not precluded by the standard of the

17   diagnosis; correct?

18   **A.**    The DSM indicates, again, that an individual would need to

19   experience an event in which they felt like their own life was

20   at imminent risk and/or they witnessed an event in which

21   somebody else's life was at imminent risk.

22   **Q.**    And wouldn't a sibling's recent suicide qualify as that?

23   **A.**    My understanding is he didn't witness the suicide.

24   **Q.**    Not witness, but do you just categorize as the -- the

25   standard seems to -- seems to fit?

1   **A.**   That you witnessed somebody else's life being at imminent

2   risk.

3   **Q.**   That you have a trauma because of that exposure?

4   **A.**   Again, I would say that it is a very sad, horrible event

5   that most people would experience.

6   **Q.**   Okay.

7   **A.**   Depression, I would expect that.  It would be a normal

8   reaction for anybody.

9   **Q.**   Okay.  In addition to that, there is obviously other

10  family history that's included in Dr. Grinberg's report that --

11  that seems was not reported by the defendant himself in his

12  interviews with you.

13       Had you known of the defendant's -- the defendant's

14  mother's history of depression, would you have included that in

15  your report?

16  **A.**   I do not -- yes.  Had I known that, of course, I would put

17  that in my report.

18  **Q.**   And had you known of the defendant's father's violent

19  outbursts and probable multiple personality issues, would you

20  have included that in your report?

21  **A.**   I don't remember reading that he had multiple personality

22  issues in the report.  In fact, I'm not sure that that is in

23  the report.

24       But had I known that there was a physical abuse history,

25  absolutely, I would add that.  Any relevant historical

 1  information would absolutely go into a report.

 2  **Q.**   And that would have an impact on the ultimate diagnosis?

 3  **A.**   As I said previously during any direct testimony, with

 4  PTSD it's important to remember that somebody can experience

 5  trauma earlier in life and exhibit symptoms of PTSD.

 6      And it sounds like from his mother's report he had

 7  enuresis until age 11.  That he isolated.  Maybe there were

 8  some depressive symptoms.  It sounds like maybe he did have a

 9  trauma-related reaction to the physical abuse.

10      However, just because somebody earlier in their life

11  experienced PTSD possibly, we can't say that then they

12  absolutely now have it for several reasons.  PTSD can get

13  better.  Individuals learn to cope differently.  They push

14  things down.  They compartmentalize.  They don't want to think

15  about it.  There are several reasons.

16      But we can't -- it's not just because you had a trauma,

17  now you experience PTSD.  And we can't say just because you

18  previously had symptoms, that now you're exhibiting symptoms.

19  It doesn't work that way.

20  **Q.**   You can't say the converse either.  You can't say the

21  converse is true?

22  **A.**   Sure.  You couldn't say that just because somebody

23  experienced PTSD earlier in their life, that they would not

24  experience it now.

25  **Q.**   Right.  And --

1   A.   However, the -- the defendant is not reporting any

2   PTSD-related symptoms.

3   Q.   Right.  And I understand that you were limited to what the

4   defendant was reporting to you and the information that you had

5   available, but Dr. Grinberg's report seems to reflect many

6   different traumas on many different levels throughout the

7   defendant's life.

8        So wouldn't you say that that's of some import in -- in

9   the diagnosis of PTSD?  I mean, from his childhood, to the

10  accident, to his incarceration, all of these various traumas

11  that you were not otherwise aware of, that by your own

12  testimony you would have included and considered on a

13  professional level as -- you know, as were considered by Dr.

14  Grinberg.

15       In your opinion, these would not have had any effect on

16  your ultimate final report?

17  A.   Knowing the information and seeing it in Dr. Grinberg's

18  report, no.  It does not change my ultimate opinion regarding

19  the diagnosis.  Because, again, the defendant did not report

20  any of these symptoms.  And it's more than just a self-report.

21  It is --

22  Q.   The answer is no.  Okay.  Okay.

23       But doesn't it sort of beget a question in and of itself,

24  the kind of trauma that the defendant sustained as a child,

25  with his father in particular, between the verbal, emotional,

1  sexual abuse, physical abuse, coming home and firing an

2  automatic weapon around the house in front of the entire

3  family, you know, without regard for anybody's life, wouldn't

4  you say that that is pretty significant?

5  **A.**   It could be.

6  **Q.**   Okay.  You said that part of the records that you

7  reviewed, you had a letter from the prior attorney?

8  **A.**   Yes.

9  **Q.**   Did you also speak with the prior attorney?

10  **A.**   No, I did not.  I just read the letter.

11  **Q.**   You mentioned earlier that genetics could be a component

12  to mental illness.  Isn't it a -- pretty much a given in the

13  scientific community that mental illness is very strongly

14  correlated with genetics?

15  **A.**   Yes.  There is a correlation between --

16  **Q.**   A very strong correlation; correct?

17  **A.**   Yes, but, again, it doesn't mean somebody is going to

18  experience that mental illness --

19  **Q.**   No.  Of course.  I'm not saying that correlation means

20  causation, but I'm just -- I'm saying there is a very strong

21  correlation; correct?

22  **A.**   Yes.

23  **Q.**   Okay.

24  **A.**   There are a lot of other factors at play --

25  **Q.**   Right.

1    **A.**    But, yes, there is a stronger correlation --

2            **THE COURT:**  Let her finish the answer.

3        All right.  Finish your answer without interruption,

4    please.

5    **A.**    There are a lot of factors at play with regard to somebody

6    developing a mental illness.

7        So as I said before, people do, with some diagnoses, tend

8    to have a predisposition.  When we say "predisposition," that

9    means a genetic disposition for certain mental illness.  And

10   it's not until they have potentially certain environmental

11   triggers that that mental illness then comes to fruition.

12   **BY MR. GRASSO**

13   **Q.**    And an example of this would be schizophrenia; correct?

14   Schizophrenia is known to lie dormant?

15   **A.**    Lie dormant?  No.  I --

16   **Q.**    And not -- I'm sorry.  And not manifest until later in

17   one's life?

18   **A.**    Actually -- well, it depends on what you mean by "later in

19   one's life."

20       But in males what we find is that if they are going to

21   have a psychotic episode, that they would -- that would first

22   have an onset in their early 20s.  With females it's their late

23   20s.

24   **Q.**    Okay.  And were you aware that the defendant's brother was

25   diagnosed with schizophrenia?

1   **A.**    No.  He did not tell me that.

2   **Q.**    Okay.  So, again, you know, I don't want to be redundant,

3   but just, you know, bringing out these different facts as they

4   pertain to the defendant and his mental health one by one, his

5   brother, his mother, his father, and given this strong

6   correlation between genetics and mental illness I ask it again:

7   Your report would not have changed?

8   **A.**    No.  Because, again, there were no observable signs of any

9   mental illness at my facility or in the Santa Rita jail

10  records.

11         Even according to the Prague attorney's letter when

12  discussing the five days of hospitalization, they also did not

13  diagnose him with a psychotic disorder.  In fact, they said

14  that this was an acute stress response, which is similar to the

15  diagnoses provided by Santa Rita jail when they said an

16  adjustment disorder and rule out narcissistic personality

17  disorder, and it's similar to my experience with the defendant

18  at the MDC.

19         So there are also a lot of other people and observations

20  who have not observed these mental illness symptoms related to

21  a psychotic disorder or a dissociative disorder.  And we can't

22  dismiss that information either.

23         Again, it's comprehensive and not just one data point.  We

24  can't only look at a defendant's family history for mental

25  illness.  We have to look at everything.

1  **Q.**   And that's not what I'm saying.  I'm saying that

2  everything should be looked at and I --

3  **A.**   Sure.

4  **Q.**   So we agree on that.  The more information the better?

5  **A.**   You can always make use of information, yes.

6  **Q.**   Right.  So just as to some of the objective -- you know,

7  strictly objective information that you had pertaining to the

8  defendant when you composed your report, you had known that he

9  was on suicide watch; correct?

10 **A.**   Yes.  My understanding about Santa Rita jail, which would

11 have been handled similarly or the same way at my facility, was

12 he was placed on suicide watch because he refused to cooperate.

13 That's normal jail procedure, if you will.

14     If a defendant, any defendant comes into our facility and

15 they refuse to answer questions about suicide, whether they are

16 suicidal or not, we will put them on suicide watch and they

17 will remain on suicide watch until they are able to provide

18 information essentially denying -- as well as other risk

19 factors, but until they deny suicidal ideation.

20         **THE COURT:**  Done?

21         **MR. GRASSO:**  I'm sorry?

22         **THE COURT:**  It looks like you're done.

23         **MR. GRASSO:**  No, I'm not.  I'm sorry.  I'm scanning

24 through my notes.

25         **THE COURT:**  Okay.  Keep going.

BY MR. GRASSO

Q.   Given the information that you had about suicide watch,
you know, all speculation as to the reason aside, because you
really can't know --

A.   I believe it was actually stated in the records, that he
was placed because he was nonresponsive.

Q.   Because he was nonresponsive; right.  But, I mean, you
really can't know what that meant; correct?

A.   I guess I don't know that individual.  I just -- I've
worked in a prison setting for ten years and I do know prison
procedures.

Q.   Okay.

A.   And that is a very standard procedure when somebody
refuses to answer any questions, more importantly answer a
question regarding their current suicidal state.

Q.   Okay.  So given that, given the information that you did
obtain from the defendant himself, as well as the Prague
attorney, through the letter and all of the other information
that you had access to, you know, the initial objective
information and then nine hours of -- approximately nine hours
of interview, as per your testimony, is there a reason that you
did not conduct the MMPI-2 test?

A.   Yes.  And we actually used the updated version, the
MMPI-2-RF, the restructured form.  That's the most updated.
And we did not give that for the same reason that I testified

1    about Dr. Grinberg translating measures into Russian.  We only

2    have the MMPI-2 in English and in Spanish and we did not want

3    to inappropriately translate the test as such.  We did not give

4    the MMPI-2-RF.

5    **Q.**   How about the RCAI?  Was that translated?

6    **A.**   Yes.  It's an interview so it does not have scores.  It

7    doesn't qualify in the same -- you can't translate it because

8    it then invalidates the scores kind of issue.  It's simply a

9    semi-structured interview.  So that can be done in numerous

10   languages.

11   **Q.**   Okay.  Language barriers aside, the MMPI-2 test is in the

12   scientific world colloquially like the -- the be-all and

13   end-all of these tests; right?  I mean, it's like the golden

14   standard?

15   **A.**   I would say it is probably the most widely used measure.

16   Again, the MMPI-2-RF is the most widely used measure and very

17   widely used in the forensic community, yes.

18   **Q.**   Okay.

19   **A.**   But, again, you cannot translate it, because then the

20   numbers -- you're invalidating the whole test.  It goes against

21   psychometrics.

22   **Q.**   But isn't it possible to sort of make up for that in a

23   way?  You know, to conduct the test through an interpreter and

24   translate it?

25   **A.**   No.  It would be deemed unethical to do that.  You're

1  invalidating.  You're doing something that you are not supposed

2  to do, because the numbers then mean nothing.

3       When doing a competency evaluation, there is nothing in

4  the research that says you have to do testing.

5  **Q.**   Of course.

6  **A.**   So testing is also not necessary.  Of course, it can give

7  you additional information.  It can be great information, but

8  it is not necessary.

9       And I would rather maintain doing a valid evaluation and

10  not giving an MMPI-2-RF and translate it than translate it.

11  Because that would be inappropriate.

12  **Q.**   I just don't understand why it would be inappropriate or

13  unethical.  And as we agreed before, the more information the

14  better.

15  **A.**   Not when it comes to that.  Again, as far as

16  psychometrics, statistics, numbers, it's no longer

17  generalizable.  That's the way that research works.

18       If research is conducted on anything, even -- not even

19  including a test.  If research is done on one group of

20  individuals, you can't then go and generalize the statistics to

21  a different group.  The numbers no longer make sense.

22       So if your only option is to do no MMPI-2-RF or to

23  translate the MMPI-2-RF in Russian, the answer is always don't

24  give it because then you can maintain a valid evaluation

25  methodology.

1  Q.   I just have a few more questions.  So one of your final

2  diagnoses was narcissism?

3  A.   My only diagnosis was the other specified personality

4  disorder with narcissistic traits, yes.

5  Q.   Just to be clear, those diagnoses are not mutually

6  exclusive with any other diagnosis; correct?

7  A.   I don't know if I understand your question.

8  Q.   You can be narcissistic and have another disorder at the

9  same time?

10  A.   Yes, of course.

11  Q.   Okay.  Just to be clear.

12       As to the RCAI, do you know if a certification is required

13  to administer that test?

14  A.   No.  It's a semi-structured interview.  Again, it's not a

15  test.  It is an interview, question and answer format.  There

16  is no scoring.

17       So, no, there is not certification in the way that I think

18  you're asking.

19  Q.   Okay.  Have you -- you have been in this business for a

20  long time and in past cases you said that you've testified, I

21  believe, 11 times in competency hearings; right?

22  A.   Yes.

23  Q.   To the best of your recollection, out of those 11 times in

24  addition to speaking with the defendant, how many times did you

25  also speak with members of the defendant's family?

1  A.   Of the 11 times that I testified?

2  Q.   Yes.

3  A.   I'm -- I really could not answer that.  Most of the time

4  in doing a competency evaluation I do not call family members.

5  When conducting criminal responsibility, I would always contact

6  a family member, an arresting officer or a spouse.

7       With competency to stand trial, it is not always necessary

8  because the crux of a competency evaluation is here and now.

9  Q.   Right.

10  A.   How is the defendant currently presenting?  What is their

11  current ability as it refers to the nature and consequences of

12  the proceedings against them and their ability to aid and

13  assist.

14       Calling family often gives you background information.

15  Yes, it can be relevant.  Absolutely.  But the most important

16  information is the here and now when we're talking about a

17  competency evaluation.

18       So I don't call family members, I would say, most of the

19  time.  Of those 11 times I can off the top of my head think of

20  at least two.

21  Q.   Okay.  And that's -- that's your personal practice because

22  you believe that you're going to -- that mainly background

23  information, like you said, and you wanted to try to avoid

24  bias.  But at the same time it seems that in this particular

25  case there is a lot of information of serious medical import.

1    You know, as basic as a substantial physical brain trauma that

2    would have otherwise been obtained and considered; is that

3    correct?

4    **A.**    Even if there was a traumatic brain injury, when we're

5    talking about competency to stand trial, we're still talking

6    about the here and now.

7    **Q.**    Sure.

8    **A.**    So his presentation or his ability prior to the brain

9    event would not need to be discussed as it would relate to

10   competency to stand trial.  So I would say having the

11   information is good information.  It always is.

12       But specific to a TBI, after the brain event, the

13   individual performs how they perform.  So what you still need

14   to focus on is the present here and now and not prior to

15   traumatic brain injury.

16   **Q.**    So are you saying that the present here and now is not

17   influenced medically by these things that have happened in the

18   past, such as traumatic brain injury?

19   **A.**    If there some a traumatic brain injury, it may or may not.

20   I don't have records.

21   **Q.**    It may or may not?

22   **A.**    May or may not --

23   **Q.**    It sounds like you're saying it just doesn't.

24   **A.**    What I'm saying is that there is a current consistency of

25   presentation.  What we know about traumatic brain injuries and

1   strokes and other types of medical issues that affect the brain

2   is that they don't tend to fluctuate up and down.

3       An individual starts up here, for example.  They have the

4   brain event and they come down in functioning.  They might come

5   back up and plateau or they might come all the way back up to

6   original functioning.  But after the brain has recovered and

7   come back up to whatever level it's going to come up to, we see

8   consistency across time.

9       So, yes, the current functioning is what is impactful as

10  we talk about competency to stand trial.

11  **Q.**  But, again, we're not just talking about the brain injury.

12  That's one example.  It's a very basic example.

13      We're also talking about his brother's suicide.  His

14  mother's history of depression.  His father's erratic

15  personality disorders.  Firing a machine gun in front of him.

16  The fact that he didn't start speaking until he was six.  All

17  of these things.

18      And, again, yes, they are in the past, but to me what --

19  what it sounds like you're saying that because these events

20  were in the past they don't affect who he is today.

21  **A.**  What I'm saying is that even if these events did occur and

22  they have affected him, regardless, we're still looking at

23  current functioning.

24      So we're currently looking at the way all of those things

25  have affected his life.  And even with all of those things

1    currently affecting his life, he is still able to understand

2    the nature and consequences of the proceedings against him.

3         Even if all of those things have happened and are

4    currently affecting his life, he is still able to adequately

5    aid and assist in his defense if he chooses to do so.

6    **Q.**   I understand that that's your opinion.

7              **MR. GRASSO:**  And I have no further questions.  Thank

8    you, Judge.

9              **THE COURT:**  I've got a couple of questions.

10        Do you have any information from the defendant as to what

11   he was doing in Prague?

12             **THE WITNESS:**  I did ask him that.  He indicated that

13   he didn't remember.

14        He told me that he lived in Moscow.  That's where he lived

15   his whole life.  I asked him if he was vacationing in Prague.

16   He said he wasn't sure.  Maybe.

17             **THE COURT:**  Do you know if he was with his girlfriend

18   in Prague?

19             **THE WITNESS:**  In reviewing discovery I know that his

20   girlfriend was with him.  I'm not sure if he told me that.

21             **THE COURT:**  How long has he had the relationship with

22   his girlfriend?

23             **THE WITNESS:**  He told me that they began dating when

24   he was 23.  However, while he was at MDC I don't know his

25   current status with his girlfriend.  It sounded on the phone

1   that maybe the relationship was coming to an end or there was

2   some discord in the relationship.  But maybe they were together

3   about eight years.

4           **THE COURT:**  Okay.  Thank you.

5       All right.  Anything more, Ms. Kane?

6           **MS. KANE:**  No, Your Honor.  We have no further

7   questions.

8           **THE COURT:**  You may step down and stay in the room

9   while we proceed to the next witness.

10      Do you have anything more on the Government's side?

11          **MS. KANE:**  No, Your Honor.  Thank you.

12          **THE COURT:**  Hand those to the Government, please.

13      (Whereupon documents were tendered to counsel.)

14          **THE COURT:**  Let's have Dr. Grinberg come up here.

15      At 11:30 I'm going to have to take a break.  We'll get

16  started with Dr. Grinberg and then take a break for not long at

17  11:30.

18      Welcome, Dr. Grinberg.  Please raise your right hand.

19          **THE WITNESS:**  Good afternoon.

20                  <u>**ALEXANDER GRINBERG**</u>,

21  called as a witness for the Defendant, having been duly sworn,

22  testified as follows:

23          **THE WITNESS:**  Yes, I do.

24          **THE CLERK:**  Please be seated.

25          **THE COURT:**  Okay.

1          THE CLERK:  Please state your full name for the

2    record and spell your last name, please.

3          THE WITNESS:  My first name is Alexander.  Last name

4    is Grinberg, G-R-I-N-B-E-R-G.

5          THE COURT:  Okay, great.

6       Be sure to pull this microphone closer to your voice.  It

7    will move all around.  So we can all hear you in the whole

8    courtroom.

9       Okay.  First question.

10                      **DIRECT EXAMINATION**

11   **BY MR. GRASSO**

12   **Q.**   Good morning, Dr. Grinberg.  How are you?

13   **A.**   Good morning.

14   **Q.**   So you were approved by this Court specifically to conduct

15   this evaluation; correct?

16   **A.**   Yes, I was.

17   **Q.**   Okay.  And you are a licensed psychiatrist?

18   **A.**   Yes, I am.

19   **Q.**   Okay.  And would you tell me in your own words the

20   difference between a psychologist and a psychiatrist?

21   **A.**   A psychiatrist gets training like any other physicians.

22   Go to medical school.  That means they study basic sciences

23   like biochemistry, physiology and, also, clinical sciences

24   ranging from surgery to psychiatry.

25   **Q.**   And aside from understanding the prescription of

1    medications as Ms. Johnson was so focused on, can you tell me

2    why that's important?

3    A.    That's not only prescribing medications, but also being

4    able to make a comprehensive diagnosis based on a combination

5    and integration of all factors, biological, psychological,

6    psychiatric and medical, to be able to include all of them in

7    making diagnosis.

8    Q.    Thank you.

9          In your -- prior to producing your report, you spoke with

10   the defendant; correct?

11   A.    Yes, this is correct.

12   Q.    And you spoke with members of the defendant's family?

13   A.    Yes, I did.

14   Q.    And you spoke with the defendant's attorney in Prague?

15   A.    Yes, I did.

16   Q.    And you spoke with the defendant's current legal team?

17   A.    That's correct.

18   Q.    What other information have you reviewed prior to

19   preparing your report?

20   A.    I've also reviewed documents that have been provided to me

21   about facts that I learned from different people that I

22   interviewed.

23   Q.    And I understand it might be quite a narrative in this

24   case, but to the extent that you can tell us, as briefly as

25   possible, throughout the course of your research and your

1    background check of the defendant in order for the purpose of

2    making a diagnosis what did you learn?

3    **A.**    Should I give a narrative of --

4    **Q.**    Yeah.

5    **A.**    -- particularly his entire psychiatric history?

6    **Q.**    As briefly as you can.

7    **A.**    In the process of interviewing people who knew the

8    defendant, I learned about his early childhood history and

9    developmental history.

10        I also learned about the family history of mental illness.

11   I learned about Mr. Nikulin, later he started when he was also

12   hospitalized and consulted by a mental health professional.

13        I also learned about his condition and treatment and care

14   in the Czech Republic jail.

15        Later I learned about specifics of his communication with

16   his family members and his legal defense team.

17        I also conducted two diagnostic psychiatric interviews

18   with Mr. Nikulin.  I met twice with him and spent about two

19   hours every time.

20   **Q.**    And do you speak Russian?

21   **A.**    Yes, I do.

22   **Q.**    And your communications with the defendant were in

23   Russian; correct?

24   **A.**    This is correct.

25   **Q.**    Do you think that this is important in terms of making a

1   psychiatric diagnosis?

2   **A.**    I think this is important as it gives more understanding

3   of subtleties of speech, of consistencies between age, level of

4   education, socioeconomic situation and lexicology, use of

5   words, and also self expression.

6   **Q.**   And are there cultural differences that may have an effect

7   on a conversation that would lead to a diagnosis in a medical

8   setting?

9   **A.**    Definitely they are and they recognize in the psychiatric

10  community.  There is a specific science called cross cultural

11  psychiatry that teaches us to take into consideration cultural

12  backgrounds and differences.

13  **Q.**   And would you say that those differences were pertinent or

14  had any sort of an effect in the case as it pertains to the

15  defendant?

16  **A.**    I believe so.

17  **Q.**   Can you give me an example?

18  **A.**    The example would be the interpretation of what he says or

19  emails.  And it may sound close to normal, taking out of

20  context of culture.

21      But in a cultural context some of Mr. Nikulin's

22  communications with his family members, girlfriend and defense

23  team would be substandard or below an expected level of

24  functioning, use of words and expressing his thoughts.

25  **Q.**   So your -- your reading of the emails is very different

1  from what the Government's interpretation of the emails is;

2  correct?

3  **A.**  They are different and in different degree, depending on

4  each particular conversation or communication.

5  **Q.**  And would you say that that is of import in making a

6  psychiatric diagnosis in this case?

7  **A.**  Yes, it is.

8  **Q.**  Okay.  The fact that the defendant did not start speaking

9  until the age of six, would you say that that is of import in

10  consideration of any psychiatric diagnosis?

11  **A.**  Well, this is important psychiatric history.  Information

12  that can make any psychiatrist think about some already

13  developed diagnostic -- diagnosable conditions, like thinking

14  about autistic spectrum disorders, particularly in context of

15  Mr. Nikulin being very self-isolative and avoiding interactions

16  with peers til even later period of his life.

17  **Q.**  And on that same token would you say that the defendant's

18  parents' history of mental illness is of import in making a

19  diagnosis as to the defendant himself?

20  **A.**  Definitely.  It's a well-known fact that first degree

21  relative history of mental illness, particularly of Axis I

22  disorders that -- examples of which are depressive disorder or

23  psychotic disorder, have strong genetic impact on probability

24  of developing mental conditions in the kids.

25  **Q.**  So it is a well-known fact and extremely strong

1   correlation?

2   A.   This is a well-known fact and there is specific statistics

3   for disorders, for psychotic disorders.  If they are in parents

4   or siblings, giving specific percentage of probability that

5   they may develop in the offspring.

6   Q.   And is there also an increase in that probability when

7   there is a suicide in the immediate family?

8   A.   The suicide in the immediate family, if it's related to

9   mental illness, then the probability of developing mental

10  illness is based on the fact of what kind of mental illness the

11  sibling had.

12       But a suicide is definitely a traumatic event that may

13  trigger or aggravate manifestation of mental illness in the

14  close relative.

15  Q.   And if that mental illness underlying or causing a suicide

16  or schizophrenia, then that would also have this genetic

17  component?

18  A.   Yes.

19  Q.   Okay.  The fact that the defendant was hospitalized after

20  a severe vehicle accident in 2009 at the age of 22 where his

21  lung was penetrated, he broke his leg, he had multiple

22  concussions and traumas to the brain, is this of import in

23  making a psychiatric diagnosis?

24  A.   This is also very important and it's a well-known fact

25  that people who were predisposed to mental illness had trauma,

1    may also trigger aggravation, worsening of the symptoms.  So

2    first manifestation of mental illness.

3    **Q.**   So just based on all of this so far, if you didn't know

4    anything about the defendant and somebody just introduced him

5    to you, just knowing this about his family and his history,

6    would you at least want to have a conversation with him?

7    **A.**   Definitely.

8    **Q.**   Would you say, in your opinion, that it -- it would be

9    likely that he suffered from some sort of mental illness?

10   **A.**   I would say that there is high probability that the person

11   may suffer from mental illness or may develop mental illness.

12   **Q.**   And that's without even knowing him?

13   **A.**   Excuse me?

14   **Q.**   That's a hypothetical without even knowing him to begin

15   with?

16   **A.**   This is correct.

17   **Q.**   Do you agree with Ms. Johnson's assertion that it would

18   have been improper, unethical or useless to conduct an MMPI-2

19   test?

20   **A.**   An MMPI-2 test is a more objective test that would at

21   least give indications of what psychiatric pathology

22   Mr. Nikulin could suffer from.  And even without consultative

23   evaluation, it could be of value to understand such complex

24   case in which we could have an assumption that we don't know

25   enough history.

1  Q.   Okay.  Would that be a reasonable assumption, that you

2  don't know enough history having not spoken to the family?

3  A.   Yes.

4  Q.   Is there a reason that you didn't conduct the MMPI-2 test?

5  A.   I'm not -- I'm a psychiatrist and usually we refer

6  patients to psychologists to conduct this testing because we

7  are not trained to conduct this complex testing.

8  Q.   And is that something that you would have done in this

9  case?

10  A.   I would.

11       THE COURT:  Wait a minute.  Nobody -- did anybody ask

12  me to -- I might have approved it.  Did you ask me to approve

13  such a test, referral to a psychologist for such testing?  I

14  don't think so.

15     I think I approved the psychiatrist.  And if you had asked

16  me, I might have approved doing these tests on his

17  recommendation.  Did you ask me for that?

18       MR. GRASSO:  Well, I don't believe my office did.

19       THE COURT:  Why are you bringing this up?

20       MR. GRASSO:  I'm bringing it up --

21       THE COURT:  You're acting like somebody did something

22  wrong here.

23       MR. GRASSO:  No, I'm not saying that, but I'm saying

24  outside the context of this case, in general it would be -- the

25  point that I'm getting at is that Ms. Johnson's assertion that

1    it would have been improper or unethical is not correct.

2           THE COURT:  All right.  Okay.  That's a different --

3    that's a different point.

4         All right.  Thank you.

5    BY MR. GRASSO

6    Q.    In your report, based on some of your reviews from the

7    phone calls involving the defendant in Prague, he stated that

8    they were exposing him to radiation.  Is this of any sort of

9    diagnostic import?

10   A.    Well, this is of diagnostic importance, and I believe any

11   psychiatrist in similar situation would do further evaluation

12   to assess this as a possible psychotic or symptom as the

13   patient could have been expressing his delusions.

14   Q.    Do you also believe that just having known that the

15   defendant was on suicide watch for being -- even if the reason

16   was that he was not responsive, but just the fact alone that he

17   was on suicide watch, that that would justify further inquiry,

18   such as an MMPI-2 or, you know, further background research?

19   A.    The fact that he was on suicide watch in context with the

20   fact that he had at least five days of a condition that was

21   diagnosed differently as some description from Czech Republic

22   came as a dissociative catatonia and, also, diagnosis of

23   reactive stress episode that could also represent reactive

24   psychosis, could trigger more cautiousness and more attention

25   to his symptoms.

1        In this context his nonresponsiveness could signify the

2    beginning of another reactive stress or reactive psychosis

3    episode and could require more attention.

4            THE COURT:  Could I ask a question?

5            MR. GRASSO:  Of course.

6            THE COURT:  What do you think are the main one or two

7    reasons that lead you to conclude that he's not competent to

8    stand trial?  I'm going to preface it with a comment.

9        We have plenty of people who are on suicide watch from

10   time to time.  Been on this job 20 years.  I've seen a number

11   of those people.  They are perfectly competent to stand trial.

12   The fact that somebody is on a suicide watch might be a point

13   for inquiry, but it doesn't prove much.

14       All right.  So you have reached the conclusion that he is

15   not competent to stand trial.  Okay.  I've got this long thing

16   from you, but it just goes on and on.

17       Tell me what your main points are as to why he's

18   incompetent to stand trial.

19           THE WITNESS:  Being on suicide watch is only a small

20   fraction of symptoms --

21           THE COURT:  What is the big fraction?

22           THE WITNESS:  The big fraction is, first, Mr. Nikulin

23   very significant formal psychiatric history before he got into

24   attention of court and legal system.

25       So also based on further evaluation of Mr. Nikulin and

1    reports about his communication with defense team and, also,

2    specifically discussing with him different aspects of legal

3    proceedings, I came to conclusion that his pre-existing

4    history, his pre-existing symptoms, in combination with

5    stressor of prolonged incarceration, trigger such phenomenon as

6    fluctuation of his cognitive emotional psychological

7    functioning.

8         And in my professional opinion, while he may function

9    relatively adequately in the milieu of a forensic facility,

10   that reminds me of my psychiatric patients that do relatively

11   well while in hospital and have structured environment.  At the

12   same time dealing with the stress -- stressful situations and

13   moments when he feels it's high stake and this is a decision

14   for his life or in his appealing for his survival, based on his

15   history, he may develop either psychotic regression or

16   dissociative episodes or extreme overwhelming anxiety that

17   interferes with his realtime or on-spot decision making, while

18   he may function and respond relatively normally in different

19   milieus.

20            THE COURT:  Thank you.

21        Keep going.

22            MR. GRASSO:  Thank you, Judge.

23   BY MR. GRASSO

24   Q.   Just to follow up on that and your answer to Your Honor's

25   question, would you say that it's possible or probable that the

1  defendant's failure to adequately communicate in pretty much

2  any way with defense counsel is a result of psychotic

3  regression?

4  **A.**   I believe so.  And even based on his performance on the

5  quoted CTONI test, where it could be interpreted where he

6  applied low effort or it could be another situation where his

7  cognitive functioning fluctuated and he functioned in the lower

8  range of I.Q.

9       Same thing happens when he interacts with defense counsels

10  and his interactions are childish.  Express wishful thinking

11  versus any reality based conversation, any reality based

12  responses and interactions.

13       **THE COURT:**  How many -- to your understanding, how

14  many times has defense counsel actually met one-on-one with the

15  defendant?

16       **THE WITNESS:**  I don't have specific information.  I

17  know they have -- they have been having a number of phone calls

18  and that defendant, Mr. Nikulin, was also making phone calls

19  any hour of night to defense team.

20       And I also know that -- I believe he met with attorney in

21  the courtroom here when he had the previous court hearing.

22       **THE COURT:**  Well, meetings in the courtroom, all

23  right.  I've seen at least one myself.

24       But how many times did defense counsel go to Santa Rita or

25  go to the jail in Los Angeles to physically meet with the

 1    defendant?

 2              THE WITNESS:  I can't answer this question.  I'm not

 3    sure.

 4              THE COURT:  All right.

 5              MR. GRASSO:  I might be able to answer that.

 6              THE COURT:  Yes.  What is the answer?

 7              MR. GRASSO:  I believe that one or another attorney

 8    from my office has met with the defendant at least four or five

 9    times.  That's upon information, that's what I've been told.

10              THE COURT:  That's over a year.  That's over a year.

11    And so he's been in jail for over a year and there has only

12    been four or five times?

13              MR. GRASSO:  Again, it's been -- so there are --

14              THE COURT:  Maybe that's why he's frustrated.

15              MR. GRASSO:  There are attorneys at my firm that are

16    fluent in Russian and these are the attorneys that up til now

17    have always met with the defendant and --

18              THE COURT:  Well, maybe if I ordered you to meet with

19    him every week in person --

20              MR. GRASSO:  I like --

21              THE COURT:  -- maybe he would have a better attitude.

22              MR. GRASSO:  I like San Francisco.

23              THE COURT:  Maybe he's so upset that he never sees

24    his lawyer.  I'm -- I would be upset if my lawyer didn't come

25    to see me but four times in one year.

1        MR. GRASSO:  I -- I understand what you're saying.

2        THE COURT:  All right.  We've reached a good breaking

3   point.  We're going to continue -- I'm sorry, Tracy.

4        Okay.  I've got to -- we're going to take a 30-minute

5   break.  I'm sorry.  And we'll be able to continue until 1:30?

6        THE CLERK:  Yes.

7        THE COURT:  So I'll still have an hour and a half to

8   try to finish this hearing up when I come back at noon.

9        Thank you.

10        (Whereupon there was a recess in the proceedings

11         from 11:28 a.m. until 12:07 p.m.)

12        THE COURT:  Thank you for letting me take that break.

13        The witness should resume the stand and, Mr. Grasso,

14   you're -- please be seated.

15        Are you ready?

16        MR. GRASSO:  Yes.  And I only have a few more

17   questions.

18        Just to follow up on your question though, Judge.  I

19   checked with my office.  I'm new to this firm.  An attorney

20   from the office has met with the defendant at least seven

21   times, not including the times in court.

22        THE COURT:  Personally met with?

23        MR. GRASSO:  Personally.  In person.  And there have

24   been dozens of telephonic communications as well.

25        THE COURT:  All right.  Thank you.

1        Go ahead.

2   **BY MR. GRASSO**

3   **Q.**    So just sort of following up on that.  Can you tell me

4   Dr. Grinberg why, in your opinion, the defendant's

5   communication with defense counsel has been so arduous?

6   **A.**    I believe that there could have been possibly a few

7   reasons for this.

8        First, his lack of trust.  In interviews with Mr. Nikulin

9   asking him about what's happening to him now and what's

10  happened to him when he was detained, he was giving back

11  references.  As he described, he's been part of some ridiculous

12  nonsense.

13       He also described his defense seem as part of this

14  ridiculous nonsense and was saying that they are useless

15  because no one can tell him when he's going to get out.

16       I believe that in general he has lack of trust to people

17  he interacts with in the process of his current incarceration

18  and legal proceedings.  And I believe that based on his history

19  and psychiatrist dynamics he might have been having significant

20  lack of trust since his early childhood, when his father

21  personality or behavior was changing dramatically between

22  hugging him and then suddenly throwing him on the floor and

23  expressing delusions that he's not his child.  He could have

24  very deeply rooted lack of trust in general.

25       Secondly, I believe that if there is a probability, and

1    there is based on his history and family history of having

2    psychotic disorder or at least predisposition, the stress of

3    incarceration could trigger more paranoid thoughts and fears,

4    at least thoughts if not very delusions about his legal defense

5    team being part of a conspiracy against him.

6    **Q.**    In your professional medical opinion, would these thoughts

7    and these things affect his ability to make the decisions

8    necessary or that he's constitutionally entitled to make in

9    this court proceeding, such as even his right to remain silent

10   or his right to counsel or his right to a jury?  Is he

11   competent to make these decisions?

12   **A.**    I believe that these symptoms, these beliefs or irrational

13   thoughts or delusions significantly affect his ability to do

14   so, and it was evidenced in further interviewing him and

15   getting more information from him.

16        When I confronted him and told him that he is not

17   cooperating and at the same time expressing desire to know

18   what's going to happen to him or if he's going to ever get out

19   of jail, he's not cooperating with his legal defense team, he

20   responded that he believes that only he, himself, can defend

21   himself and he just needs a little bit more coaching in

22   learning about American Constitution.

23        When I again confronted him and explained to him that this

24   is a complex issue, that people spend years studying this, he

25   said that that's not true; that he watched some program on

1    Russian TV when he was in Russia about U.S. Constitution and he

2    just needs to clarify a few questions to be able to defend

3    himself.

4         To me, it signified his regressive cognitive functioning

5    or regress to primitive wishful thinking versus reality based

6    objective adequate understanding of his reality.

7    **Q.**   Okay.  And you stand by your diagnosis -- diagnoses in

8    your report of PTSD and psychosis and disassociative disorder;

9    correct?

10   **A.**   Yes, I do.

11   **Q.**   And these conditions, how would his incarceration have

12   affected these conditions?

13   **A.**   It might have had dual effect on his conditions.

14        First, as we saw, and it was documented in Czech Republic,

15   he had reactive episode, possibly of psychotic nature or stress

16   reaction, that necessitated five days of getting very

17   aggressive treatment with injectable strong psychotropic

18   medications and being for five days in four-point restraints.

19        Definitely it could have triggered or rekindled his past

20   traumas.  When he was a child he also felt total loss of

21   control.  When their father locked them in the house or was

22   shooting there randomly or was threatening to lock them and

23   burn them in the house.

24        And, obviously, his feeling of losing control and being

25   in four-point restraints could at least rekindle his past

1    traumas.

2         So -- sir, what was your question?

3    **Q.**   The question was whether these diagnoses in particular

4    inhibit his ability to stand trial competently?

5    **A.**   Definitely he manifested symptoms of avoidance of

6    traumatic -- even of recollecting traumatic events.  That's why

7    I believe he was not revealing this information about his

8    childhood or about real reason for his brother's suicide; that

9    actually was the fact that the brother was notified by a

10   physician that he has schizophrenia and it made him feel

11   extremely hopeless and obviously triggered suicide.

12        Also, Mr. Nikulin told me that his brother was a role

13   model for him and he always wanted to follow him and to be like

14   him.  So I believe that placing him on suicide watch in this

15   context would be also a good idea and it was done.

16        His functioning in the jail is very similar to functioning

17   of mentally ill people when they are institutionalized.  When

18   they feel there is a structure, they are in a structure in the

19   milieu, they can follow the rules.  They can have relatively

20   good hygiene or make their bed.  And even with low I.Q. they

21   may not stand out from average population around them.

22   **Q.**   Ms. Johnson had testified that she thought it was

23   indicative of his ability to stand trial or at least went

24   against your diagnoses, the fact that he did not cause any

25   problems with the other inmates at Santa Rita.

1     Do you know -- would you happen to know approximately what

2  percentage of prisoners in the United States are mentally ill?

3  **A.**    I believe that the fact that -- the fact that I described,

4  more reflective of his ability to blend into general jail

5  population, whereby statistics at least 50 percent of people

6  have mental illness.

7  **Q.**    At least 50 percent.  And you had also in your report

8  referred to Ganser's syndrome, which, as Ms. Johnson mentions,

9  is not in the DSM-5.

10     First of all, just because something is not in the DSM-5,

11  does that mean anything medically, professionally?

12  **A.**    No.  DSM is still widely used for different administrative

13  purposes and communication between physicians and health care

14  providers and insurance companies.

15  **Q.**    And for diagnostic purposes as well?

16  **A.**    For diagnostic purposes, yes.

17  **Q.**    So can you just explain a little bit what Ganser's

18  syndrome is?

19  **A.**    So here I want to clarify that in my report I refer to

20  Ganser's syndrome not as a diagnosis.  Ganser's syndrome is a

21  group of signs that -- exhibited by patients who suffer from

22  different disorders, but most commonly described in a jail

23  population when people give approximate answers.

24     So his tendency to provide incomplete or approximate

25  answers could represent the Ganser's syndrome that, again, is

1   one of the symptoms we observed when people have dissociative

2   disorder.

3       So I didn't make statement that his diagnosis is Ganser's

4   syndrome.  Rather, it's a sign or group of symptoms that could

5   be indicative of him suffering from dissociative disorder.

6   **Q.**   So it stands to reason that it's almost a little

7   counterintuitive because you've had somebody that is suffering

8   from mental illness, but almost pretending not to, because they

9   think that it's going to help them; is that essentially...

10  **A.**   This is true.  And this can be explained with cross

11  cultural psychiatry, as mental illness is still extremely

12  stigmatized in the Russian Federation and in Russia, in

13  particular such serious conditions as schizophrenia or other

14  serious and chronic mental conditions.  And some of the

15  patients prefer to hide their mental problems and mental

16  diagnosis even at the expense of suffering consequences of

17  other things.

18  **Q.**   And my last question -- I'm sorry, two more questions.

19      Anything he has or hasn't hidden aside, his failure to

20  cooperate with defense counsel and the emails that you read and

21  some of the -- the comments that he's made about, you know,

22  living in a fantasy and everything being nonsense and giggling

23  inappropriately, are these things -- are these -- these are all

24  obviously symptoms that you considered in making your

25  diagnoses, but to what extent do they go to the competency of

1 the defendant to stand trial?

2 **A.** Well, the symptoms get along and consistent with the

3 possible diagnosis of psychotic disorder.

4 Also, Mr. Nikulin spends a lot of time in solitary

5 confinement where he describes he lives in the fantasy and

6 daydreams that may also describe his hallucinating. It's

7 possible.

8 Also, his lack of desire to cooperate and his -- he also

9 reported that he has low energy and apathy and lack of

10 motivation to do anything. So those symptoms may represent

11 so-called negative symptoms of psychotic disorder in contrast

12 to active symptoms or active hallucinations or delusions.

13 People have apathy, lack of willpower or lack of interest to do

14 anything on their behalf.

15 **Q.** Okay. And my last question. What is your opinion of the

16 Government's report?

17 **A.** Unfortunately, in such complex cases, as the case of

18 Mr. Nikulin, the report didn't have an opportunity to evaluate

19 and assess very significant information, very significant

20 amount or very significant information that would, I believe,

21 affect diagnostic thinking and conclusions.

22 And that's why the report, some of the conclusions made on

23 assumptions and -- example, his diagnosis of narcissistic

24 traits while a full diagnosis of personality disorder. It's

25 very important to know pre-existing pattern of someone's

1   functioning.  His object relations, how they think, how they

2   perceive, how they feel.

3        And obviously for Mr. Nikulin, who has a history of having

4   friends, experiencing love to his brothers and having very

5   significant -- suffering a lot and experiencing a loss and

6   grieving about his brother, it's not typical for narcissistic

7   traits.

8        Also, the fact that -- reflected in the report that

9   Mr. Nikulin preferred and was more eager to talk to

10  psychiatrist than to psychologist, an assumption that he feels

11  entitled to have highest level of services, is questionable

12  because from a cultural point of view in Russia laypeople don't

13  know much distinction between psychologists and psychiatrists.

14  And it's unlikely that Mr. Nikulin would make such distinction

15  and would base his behavior based on this.

16       So I believe that, unfortunately, the Government report

17  just didn't have enough information and that's why

18  interpretation of certain behaviors and facts lacks

19  understanding of his psychodynamic.

20  **Q.**   Okay.  And that concludes my questioning for now.  Thank

21  you.

22            **THE COURT:**  All right.  Cross examination.

23                      <u>**CROSS EXAMINATION**</u>

24  **BY MR. PARELLA**

25  **Q.**   Good afternoon, Mr. Grinberg.  How are you doing?  My name

1   is Matt Parrella.  I'm an attorney for the Government.  Okay?

2   You understand that?

3        All right.  Thank you.  So by the way, do you have your

4   report with you?

5   A.   Yes.

6   Q.   Could you take it out?  We may need to refer to it.

7        (Witness complied.)

8   Q.   I'll direct you to a page if we get that far.

9        So first, as a general matter, I want to make sure that it

10  is not your opinion that mental illness automatically equals

11  legal incompetence?

12  A.   This is correct.

13  Q.   So you agree that a person can be mentally ill and yet be

14  legally competent?

15  A.   I agree.

16  Q.   Okay.  So you commented about the defendant's speech delay

17  and was it -- is it correct to say that the only source of that

18  information was from the defendant's mother?

19  A.   This information came from defendant mother, but it also

20  confirmed by Mr. Nikulin's school records.

21  Q.   Okay.  And that was -- if you look at Page 2 of your

22  report, you state that it's the -- direct cause of the speech

23  delay was the father throwing Mr. Nikulin on the ground?

24  A.   Not only this incident, but Mr. Nikulin mother reported

25  that there were a number of similar incidents and, also,

1  Mr. Nikulin was subjected or exposed to constant negative

2  emotions, swearing and screaming at him from their father, from

3  his father.

4  Q.   So your report states that Mr. Nikulin's mother believes

5  that it was a direct cause of the speech delay of her child.

6      I should have read:

7          "Around age three while his father was playing

8      with him he suddenly picked him up and threw him with

9      force to the floor.  Mr. Nikulin's mother believes

10     that it was a direct cause of the speech delay of her

11     child."

12  A.   That's what she told me.

13  Q.   All right.  And that's -- that's the -- while the school

14  records might have indicated a speech delay, this was the

15  foundation for why there was a speech delay; correct?

16  A.   This is correct.

17  Q.   Now, you don't specialize in treating children, do you?

18  A.   Not specifically treating children.  I am not a child

19  psychiatrist, but we all have training for --

20  Q.   Right, right.  So you know most children by age three have

21  some expressive language; correct?

22  A.   Correct.

23  Q.   So a speech delay -- if he wasn't speaking at age three,

24  there already was a speech delay; correct?

25  A.   Actually, I clarified with his mother.  He started

1   speaking, but after this happened and after a number of

2   incidents happened around this time, he stopped speaking.

3   **Q.**   Okay.  I didn't understand you, but you're saying that the

4   mother actually told you that Mr. Nikulin was speaking.  This

5   incident with getting thrown on the floor happened and then he

6   stopped?

7   **A.**   Yes.

8   **Q.**   Okay.  That's not in your report; fair to say?

9   **A.**   Yes.

10  **Q.**   Correct?

11  **A.**   Correct.

12  **Q.**   All right.  The -- the mother also reported that the --

13  excuse me one minute.

14      (Brief pause.)

15  **Q.**   I'm sorry.

16      Mr. Nikulin's mother also reported to you about the motor

17  vehicle accident, correct?

18  **A.**   Correct.

19  **Q.**   And did you have any other records about the -- or data

20  about the motor vehicle accident?

21  **A.**   There are hospital records that can be available upon

22  request.

23  **Q.**   Did you see them?

24  **A.**   I've seen a number of records and I don't remember if I've

25  seen this particular one.

1  Q.  Okay.  So are you saying you didn't see the hospital

2  records or are you saying you don't remember seeing them?

3          MR. GRASSO:  Objection.

4          THE COURT:  That's a fair question.  Overruled.

5  Please answer.

6  A.  I don't remember that I've seen this particular record.

7  BY MR. PARELLA

8  Q.  Okay.  These would be important records; correct?

9  A.  Correct.

10  Q.  Especially for your report?

11  A.  I got an explanation that this is an equivalent of health

12  privacy protected information in Russian Federation and they

13  still are getting some of the reports from the hospitals.

14  Q.  So there might be a legal reason in Russia why you didn't

15  get them?

16  A.  This is correct.

17  Q.  But the point is, you didn't get them?

18  A.  I didn't did get this one.

19  Q.  Okay.  So we're back to the factual basis for the injuries

20  from the motor vehicle accident was from the mother?

21          MR. GRASSO:  Objection.  Misstates the testimony.

22          THE COURT:  No.  This is cross examination.

23  Overruled.  Please answer the question.

24  A.  Actually, it wasn't only from mother because I wanted to

25  verify this information and when I interviewed Mr. Nikulin, I

**GRINBERG - CROSS EXAMINATION / PARRELLA**

1    asked him about a particular year and asked him if he had any

2    accident.  And then he gave me the same information that I got

3    from his mother.  So it was consistent with the mother's

4    information.

5    **Q.**    So the mother and Mr. Nikulin?

6    **A.**    Yes.

7    **Q.**    And that's the source?

8    **A.**    Source of information.

9    **Q.**    Okay.  So now you heard Dr. Johnson testify that sometimes

10   family members, when they give information they are trying to

11   help, or what they perceive to be help, their family member.

12   And maybe it's not correct, but is that something you've

13   experienced in your practice in the past?

14   **A.**    I do.

15   **Q.**    So occasionally, especially a mother, is going to try to

16   say something to help her child?

17   **A.**    It may happen.

18   **Q.**    It may happen.  And in this case, if you look at Page 4 of

19   your report, where Mr. Nikulin's mother was talking about

20   the -- hold on one moment.  Sorry.

21        (Brief pause.)

22   **Q.**    Where Mr. Nikulin's mother was talking about the motor

23   vehicle accident.  If you look under the paragraph headed

24   "Substance Use History," it's about six lines down, it talks

25   about some of the injuries he got in that motor vehicle

 1  accident; correct?

 2  **A.**   Yes.

 3  **Q.**   And it says that he suffered -- as a result of that single

 4  motor vehicle accident, he suffered multiple concussions?

 5  **A.**   Correct.

 6  **Q.**   And that's what she told you?

 7  **A.**   Yes.

 8  **Q.**   Okay.  So can you explain how someone can suffer multiple

 9  concussions from one motor vehicle accident?  Isn't it -- well,

10  withdrawn.  I'll let you answer that.

11  **A.**   I guess if someone flips in his car, then he hits his head

12  a number of times and it can traumatize different parts of the

13  skull and different cerebral lobes in the same accident.

14  **Q.**   And was that --

15  **A.**   It's either repetitive punches or impact means multiple

16  concussions.

17  **Q.**   And did we have -- is there any lab reports or physical

18  examination reports to verify that?

19  **A.**   It's part of the report we're talking about, about the

20  hospitalization related to this motor vehicle accident.

21  **Q.**   That you don't have?

22  **A.**   That I don't have.

23  **Q.**   Okay.  And isn't that something where -- by the way, you

24  spoke to the mother on the phone; correct?

25  **A.**   I spoke?

1  **Q.**   To the mother on the phone?

2  **A.**   Correct.

3  **Q.**   Right.  And is she a medical professional in any way or

4  sense?

5  **A.**   No.  She's not a medical professional.

6  **Q.**   So she's a --

7         **THE COURT:**  Can I ask you to please pull the

8  microphone back so that it catches your voice a little bit

9  more, please?  So that it -- yes.  That will be good.  Thank

10 you.

11     All right.  Next question.

12 **BY MR. PARELLA**

13 **Q.**   So she's a layperson?

14 **A.**   She is a layperson.

15 **Q.**   And wouldn't that be an example of the family member, the

16 mother, exaggerating a report to try and help her son?

17 **A.**   I don't think so, and I can explain why.

18 **Q.**   Isn't it possible that it could be an example of the

19 mother exaggerating a report?

20 **A.**   Unlikely, because based on her level of education, I

21 wouldn't expect her to understand such correlations and

22 connections.

23 **Q.**   So what was her level of education, by the way, if you

24 recall?

25 **A.**   High school education.

1  Q.    So no college and no medical training?

2  A.    No.

3  Q.    Okay.  So your response was that she wasn't educated

4  enough to try to manipulate you; correct?

5  A.    Based on my communication with her, I had a hard time to

6  getting -- getting information from her.  So only after asking

7  her did he have any head traumas or any accidents, she recalled

8  this and was giving me more specific information.  The same --

9  Q.    I'm sorry.  Go ahead.

10  A.    The same is a few other issues, including talking about

11  his brother illness.  I had really questioned her and convinced

12  her to give me information that she knows.

13  Q.    So would it be fair to say that it was difficult to

14  communicate with the mother; is that a fair statement?

15  A.    It wasn't difficult, but I had impression that she tried

16  to cover significant issues from Mr. Nikulin's mental health

17  history.

18  Q.    So what do you mean by "cover"?

19  A.    She took a -- example, she didn't want to tell me why his

20  brother died and what's happened to him.  Because family and

21  common accepted legend there was that he had a break up.  He

22  had broken up, broke up with his girlfriend and that's why he

23  killed himself.

24        And she mentioned that also he probably had some problems

25  with his head.  And then I tried to make her elaborate on this

1    and then she gave me this information.

2        She also was extremely concerned that I will share this

3    information with Mr. Nikulin because it's a painful family

4    issue.

5        So my interviewing her, I had the feeling of genuine

6    exchange of information and not -- I didn't feel she was making

7    up any information.

8    Q.   Okay.  So I notice you focused mainly on

9    Mr. Nikulin's brother's suicide in that answer.

10       Let's focus on the motor vehicle accident.  Did you feel

11   that she was trying to cover in that sense, in that area?

12   A.   As a layperson, she told me that he had some car accident

13   and was in the hospital.  So I had to make her to elaborate,

14   ask her if he had any physical injuries, if he had any head

15   injuries, if he had any complications afterwards.  So many

16   questions that I was able to get answers for.

17   Q.   So it's -- from your answer it sounds like the motor

18   vehicle accident, she was not trying to cover something up?

19   A.   This is correct.

20   Q.   As opposed to the suicide, where maybe she was trying to

21   protect Mr. Nikulin or she didn't want an embarrassing secret

22   out; fair to say?

23   A.   To be more accurate, about motor vehicle accident, she

24   almost disregarded it because for her it was just a motor

25   vehicle accident and as a layperson, she didn't understand any

1    specifics of information about injuries and their specifics.

2         While the tragedy with her older son was a very sensitive

3    family issue and it was different response.

4    **Q.**   Okay.  So did you receive or view any documentation,

5    whether it was from Russia or from the jail or from Prague,

6    that this defendant had a traumatic brain injury?

7    **A.**   So far I don't have any specific documentation.

8    **Q.**   Okay.  So you say in your report, if you turn to Page 15,

9    in the first paragraph about five lines down -- 15 is the last

10   page, by the way.

11        You state in relevant part:

12            "It is also possible that more diagnostic

13        entities can be considered as there is also history of

14        traumatic brain injury."

15        That's correct, what your report says?

16   **A.**   This is correct.

17   **Q.**   And that history comes purely from the mother; is that

18   fair to say?

19   **A.**   Not only from mother, but also I was able to discuss this

20   with Mr. Nikulin.

21   **Q.**   Okay.  So other than those, no other sources?

22   **A.**   Not yet.

23   **Q.**   Okay.  By the way, could you turn to Page 4 and look on

24   the very first line?  I want to clear something up.

25        (Witness complied.)

GRINBERG - CROSS EXAMINATION / PARRELLA

1    Q.   It says -- top line says:

2            "Mr. Nikulin did serve in military."

3       Is that correct?

4    A.   This is a typo.  He didn't serve in military.

5    Q.   Okay.  So she said "did not"?

6    A.   "Did not."

7    Q.   Okay, thank you.

8       And did you dictate this report or do you hand write it or

9    how is it --

10   A.   I dictate them and get them transcribed.

11   Q.   Okay.  And then you read it over before you --

12   A.   Correct.

13   Q.   So if you turn to Page 5, there is -- under the paragraph

14   that says "Summary for the Information Above" there is a ine

15   which states:

16           "His mother suffered from depression during the

17       pregnancy, was physically and psychologically abused,

18       and the injuries might have affected the fetus."

19       That's what's in there?

20   A.   Yes.  This is correct.

21   Q.   All right.  So do you have any scientific or medical

22   evidence or records that show that the injuries to the mother

23   affected the fetus, which is Mr. Nikulin?

24   A.   This is a general knowledge that injuries, particular to

25   abdomen of pregnant women, may affect the fetus.

1    Q.   Right.  That makes sense.  My question is:  Do you have

2    any specific tie to Mr. Nikulin?  Is there any record or

3    documentation or anything that says the abuse his mother

4    suffered at the hands of his father actually injured, affected

5    the fetus?

6    A.   I'm making here, this is history and potential for

7    possible influence on the early child development.

8         And I also reviewed documents that described

9    Mr. Nikulin's father behavior and -- in the house and in the

10   village surrounding it and also legal documents, that he was

11   sentenced to 12 years for violent crimes and then again came

12   back and was threatening his mother with knife and was jailed

13   again.

14        So based on what Mr. Nikulin mother told me, based on the

15   relation of the documents, I just give it high probability that

16   it might have affect Mr. Nikulin early development.

17   Q.   By the way, the documents you reviewed, those were like --

18   withdrawn.

19        Those were legal documents from Russia about

20   Mr. Nikulin's father's incarceration?

21   A.   This is correct.

22   Q.   All right.  And so did any of them say anything about that

23   his conduct injured the baby that Mr. Nikulin's mother was

24   carrying, which turned out to be Mr. Nikulin?

25   A.   It describes his conduct for continuous period of time,

1  and it describes incidents where he would lock Mr. Nikulin, his

2  brothers and mother in the house and use the barbed wire and

3  also threatened them to burn them when they were locked.  Also,

4  that he was shooting around and terrorizing the village around.

5       So based on these descriptions and what I learned from

6  mother, I didn't see much inconsistency between this

7  happenings.

8       As for influence on Mr. Nikulin's development, I just give

9  probability of fetal injury because of beatings of pregnant

10  woman.

11  **Q.**   I'm sorry.  I missed that last line.  You didn't see any

12  documentation of that?

13  **A.**   No.  I've seen the recommendation of this crimes that

14  Mr. Nikulin's father committed and his behaviors, yes.

15  **Q.**   You didn't see documentation that one of these things

16  directly caused an injury to the fetus?

17  **A.**   That's correct.

18  **Q.**   Okay.  So, by the way, what psychotropic medications was

19  the defendant getting in Prague, do you recall?

20  **A.**   Almost importantly, an antipsychotic medication Olanzapine

21  that was injected.  Olanzapine, O-L-A-N-Z-A-P-I-N-E.

22       In addition to this, he was getting Diazepam medication.

23  Diazepam.

24  **Q.**   Okay.  And those are powerful antipsychotics?

25  **A.**   Olanzapine is an antipsychotic medication and Diazepam is

1  benzodiazepine medication.  Both of them are powerful in their

2  fields.

3  **Q.**  And that was for five days?

4  **A.**  This was for five days.

5  **Q.**  And after -- and that was October 2016?

6  **A.**  I believe so.

7  **Q.**  And anything since that time of those medications?

8  **A.**  No.  The medication regimen was adversely stopped when

9  Mr. Nikulin was discharged from this facility.

10  **Q.**  Is there anything about that medication history in Prague

11  in October of 2016 that carries over here now?

12     In other words, is the medication still working on him now

13  two and a half years from then?  Is it still in his system, in

14  other words?

15  **A.**  The medication is not in the system.  There are certain

16  half life and double life periods for this medications that are

17  usually not more than two weeks after the treatment is

18  cessated.

19  **Q.**  So even the metabolites are gone?

20  **A.**  This is correct.

21  **Q.**  And in your examination of him and your view of the jail

22  records, did the -- has the defendant complained of any

23  auditory or visual hallucinations?

24  **A.**  While he was in Czech Republic, he complained of being

25  under the influence of radiation.  So I didn't interview him

1  back then and I don't know what sensory input he got to come to

2  this conclusion, so it could have represent some kind of

3  hallucinations.

4  Q.   Okay.  So that's a possible one.  Any -- anything else?

5  A.   As an example of delusional thinking --

6  Q.   Let's -- I'm sorry to interrupt you, but let's stay with

7  hallucinations right now before we move on to delusional

8  thinking.

9  A.   For hallucinations Mr. Nikulin told me that being in

10  solitary confinement makes him live in the what he calls

11  imaginary world almost most of the time.  He wasn't able to

12  specify on this.  If it's -- if he feels it's real or not, he

13  just stopped talking.  That could represent thought blocking.

14  Q.   So he actually -- sorry.

15       (Brief pause.)

16  Q.   He actually I think -- in your report you used the

17  words -- on Page 8 sort of the thought content, he talks about

18  fantasies most of the time when he is awake; right?

19  A.   Right.

20  Q.   So he's in solitary confinement and he is talking about in

21  fantasies.  Was there -- but a fantasy is not a hallucination;

22  is that fair to say?

23  A.   We can say so in psychiatry.  Frequently patients with

24  psychotic disorders like to describe their symptoms as

25  fantasies, as loud thoughts or as something else that wouldn't

1  expose them as people who have illness.

2  Q.   Right.  So sometimes patients try to hide their symptoms

3  from the psychiatrist to not seem crazy?

4  A.   And also for many patients the voices appear to be real

5  and they believe that what they experience is real.  So they

6  may not describe it as hallucinations.

7  Q.   So, but that's not what happened here.  He didn't say he

8  heard voices; correct?  He didn't say he saw things; correct?

9  A.   Well, for fantasies, Mr. Nikulin told me that they were

10 visual.

11 Q.   So he sees them in his head?

12 A.   That he sees something.

13 Q.   In his head?

14 A.   He wasn't able to specify.

15 Q.   Okay.  There is nothing in your report about seeing

16 things; is that correct?  If you want to look at Page 8?

17 A.   This is correct.

18 Q.   Okay.  So if you look at Page 10, you -- in the middle

19 paragraph there there is a list of tests that you gave, which

20 we won't go over.

21      I'm directing you to the last part of that where it says

22 "autism spectrum quotient coma screening."  And what is that

23 exactly?

24 A.   My apology.  Before we get to this, could I comment more

25 about visual -- possible visual hallucinations?

1   Q.   So let me ask a question so it's legal.

2        Do you have anything further on the visual -- reports of

3   visual hallucinations?

4   A.   So reviewing the Government report, I saw that Mr. Nikulin

5   manifested such behaviors as changing direction of his eyesight

6   or eye contact, looking to the sides.  This, in context of

7   knowing his family history of having psychotic disorder, could

8   actually be described as internal preoccupation.

9        I also observed this behavior and this changes of eye

10  contact.  And frequently they are indicative of people seeing

11  something, but I just make a --

12  Q.   Okay.  So to be clear, when you say "internal

13  preoccupation," when you mean when a patient is responding to

14  something that's coming from inside their head?

15  A.   This is correct.

16  Q.   As opposed to something outside?

17  A.   Right.

18  Q.   And the defendant's eyes sort of shifting back and forth

19  sometimes -- well, not the defendant's.  A patient's eyes

20  shifting back and forth can be a symptom of somebody tracking a

21  hallucination?

22  A.   This is correct.

23  Q.   But you -- you don't have -- you can't specifically say it

24  was a symptom from Mr. Nikulin?

25  A.   That's correct.

1   Q.    Okay.  Does that satisfy your explanation?

2   A.    Thank you.

3   Q.    Okay.  So where were we?  The "autism spectrum quotient

4   coma," what is that?

5   A.    This is a group of disorders that may manifest with the

6   symptoms, such as difficulties in expressive speech,

7   difficulties in communication, difficulties in forming normal

8   age appropriate behaviors.

9         There is a significant and wide group of autistic spectrum

10  disorders that we usually have to suspect when we get a history

11  that someone had delayed speech development or was reluctant to

12  get out and play with kids in the yard until he was age 11.

13  Q.    So you felt it was relevant because of -- mainly because

14  of the speech delay, maybe there is some autism spectrum

15  reflection?

16  A.    This is correct.

17  Q.    Okay.  Is that a specific test or is that just a

18  determination you make?

19  A.    There are specific psychological tests that may be more --

20  may have more diagnostic value that can be done.  But here I

21  made this -- this is just description of probability or what

22  conditions we may be dealing with --

23  Q.    Okay.

24  A.    -- based on the history.

25  Q.    So is it fair to say that you didn't give him a specific

1    test for autism spectrum quotient coma screening.  These were

2    your general impressions from the time you spent together?

3    A.    One of the self-administered questions that we worked on

4    with Mr. Nikulin was for revelation of autistic spectrum

5    disorders.  And I want to comment that I realize that

6    translating them into Russian and conducting them in such way

7    has very limited diagnostic scope, but at least they have

8    organized groups of questions that help to enhance diagnostic

9    impression.

10   Q.    So, I'm sorry.  You say you realize that by translating

11   these -- some of the tests that Dr. Johnson talked about into

12   Russian they lose their statistical value?

13   A.    I'm talking about the tests that I was administering to

14   Mr. Nikulin.

15   Q.    Right.  But you -- do you agree with that?  That by

16   translating them they can lose their statistical value?

17   A.    They may lose their quantitative value, but they still are

18   indicative and helpful in diagnostic impression.

19   Q.    Okay.  Stay on Page 10 and look at the last line.  The

20   defendant asks you, "Am I going to get out of here ever?"  Do

21   you see is that?  Page 10, last line.

22         Do you have a copy with page numbers?

23   A.    No page numbers.

24              MR. PARELLA:  Here.  Judge, if I may?

25         (Whereupon document was tendered to the witness.)

1           THE COURT:  All right.  He's waiting for the

2   question.

3           MR. PARELLA:  Okay.  I'm sorry.

4   BY MR. PARELLA

5   Q.   Does that indicate the defendant knew he was in jail?

6   A.   Yes.

7   Q.   So it showed an awareness of his surroundings?

8   A.   It indicates that he knows that he's in jail.

9   Q.   Okay.  And now let's turn to Page 11, where if you look

10  under "Abilities Relevant to Competence to Stand Trial."  It

11  says:

12           "Defendant understanding of what the charges are

13       called.  He has been able to say that he's accused of

14       breaking into someone's computer."

15       Do you see that?

16  A.   Yes.

17  Q.   And did you have the opportunity to review the indictment

18  in this case?

19  A.   Yes, I did.

20  Q.   The charge.  And that, in fact, is a good summary, isn't

21  it true, of what he's accused of doing?

22  A.   Yes.

23  Q.   So he's aware of the charges.  Maybe not legally, but he's

24  aware of the factual basis; wouldn't you agree with that?

25  A.   His response to this question was that it's all nonsense

 1  and -- that they say that I broke into someone's computer.

 2  **Q.**   All right.  He might be denying it, but he knows what they

 3  say he did?

 4             **MR. GRASSO:**  Objection.

 5             **THE COURT:**  Overruled.  Please answer.

 6  **A.**   At least to some degree.

 7             **THE COURT:**  How much longer do you have?

 8             **MR. PARELLA:**  Not very much longer, Judge.

 9             **THE COURT:**  I would like to -- 20 minutes I've got to

10  bring it to an end because I've got a 1:30 calendar.

11             **MR. PARELLA:**  I understand.

12             **THE COURT:**  So you need to leave some time for your

13  opponent to ask follow-up.

14             **MR. PARELLA:**  Let me move right on.

15  **BY MR. PARELLA**

16  **Q.**   So now we heard some testimony before about the DSM-5-RF,

17  as opposed to the DSM-4; correct?  Do you recall that?

18  **A.**   Correct.

19  **Q.**   And you used in your report the DSM-4, but I would like to

20  direct your attention to the DSM-5, which requires for post

21  traumatic stress disorder recurrent voluntary and intrusive

22  distressing memories of traumatic events; is that correct?

23       I can give you...

24             **MR. PARELLA:**  Judge, if I may, I will put the...

25             **THE COURT:**  Please.

1          (Whereupon a book was tendered to the witness.)

2    **BY MR. PARELLA**

3    **Q.**   Isn't that one of the requirements in order -- under the

4    DSM-5 in order for there to be a diagnosis of post traumatic

5    stress disorder?

6    **A.**   This is correct.

7    **Q.**   And nowhere in your report do you state that the defendant

8    ever reported any recurrent voluntary and intrusive distressing

9    memories of these traumatic events?

10   **A.**   Actually, my understanding of his psychodynamic was that

11   he experienced so many traumas and traumatization that he tries

12   to ignore these thoughts and hide them.

13   **Q.**   Okay.  But if you look, there is another element required

14   for a diagnosis of post traumatic stress disorder.

15          And for the record, this is under DSM-5 309.81.  It's

16   dissociative reactions in which the individual feels traumatic

17   event recurring.  In other words, i.e., flashbacks.  That's a

18   requirement; correct?

19   **A.**   This is a requirement.

20   **Q.**   And there is nothing in your report that the defendant

21   suffered or reported suffering flashbacks; correct?

22   **A.**   I believe that I described that when that happened in the

23   Czech Republic when he was hospitalized, that might have

24   represented such a dissociative episode.

25   **Q.**   But no flashbacks to the father's throwing him on the

1    floor?  No -- nothing in your report about a flashback about

2    the father throwing him on the floor?

3    **A.**   My report describes that I believe that Mr. Nikulin is

4    minimizing and hiding his symptoms.

5         And when I was talking to him about this event that

6    happened to him in childhood, he told me that he always

7    remembers them and was reluctant to talk about them.

8    **Q.**   So my question though is:  Is there is nothing in your

9    report about the defendant suffering from flashbacks on any of

10   those events?

11   **A.**   Correct.

12   **Q.**   And if you look at Page 13 of your report -- I'm sorry.

13   You state that:

14           "Mr. Nikulin experienced episodes of

15       derealization."

16       Do you see that?  At the bottom of 13, the last paragraph?

17   **A.**   Yes.  I found that.

18   **Q.**   Okay.  So, and is it fair to say that that comes -- that

19   statement comes from the defendant telling you about having

20   fantasies while he's in solitary?

21   **A.**   Not only this.

22   **Q.**   What else?

23   **A.**   Also his behavior and acting out with different parts of

24   legal teams.

25   **Q.**   So his eye movements, is that what you mean by "behavior"?

1   **A.**   Not only this, but episodes when he becomes extremely

2   uncooperative or his behavioral extremes when he's called to

3   court or to the hearings.  And, also, episodes when his

4   behavior and entire presentation changed dramatically when

5   something related to his case is discussed, even with his

6   defense team.

7   **Q.**   And that -- the occurrences that you just talked about, in

8   your opinion, did they rise to the level of a persistent or

9   recurrent experiences of unreality of surroundings?  Is that --

10  **A.**   This is correct.

11  **Q.**   So your conclusion was based on his eye movements and some

12  of the statements he made.  Anything else?

13  **A.**   Not only this.  It was based on the history of his

14  condition.  Based on history of specific symptoms.

15       Also, important example is that when he was arrested in

16  Czech Republic, he had very significant somatic symptoms,

17  severe abdominal pain.  No physical impairments or problems

18  were found.  Obviously, it was a psychosomatic or conversion

19  reaction that led to developing worse episodes of either

20  reactive psychosis or even prolonged dissociative episode.

21       Also, interviewing his Czech Republic attorney, I learned

22  that correlating the stressors he experienced there, his

23  behavior significantly changed almost to the point that he was

24  a different person.  And, also, he expressed thoughts that the

25  situation is not real.  The same thoughts were expressed when I

1    interviewed him.

2    **Q.**   So it's not unusual for a person who is placed under

3    stress, for example, being arrested in a foreign country, in

4    the Czech Republic, to have their behavior suddenly change;

5    fair to say?

6    **A.**   Unless this is in context of telling that he gets

7    irradiated and, also, tells his parents that they would be

8    killed by explosion and grimacing and manifesting other more

9    specific possibly psychotic related symptoms.

10   **Q.**   So fair to say that the change in behavior by itself is

11   not enough to cause you to think that he was in a --

12   experienced derealization?

13   **A.**   This was a combination of changes of behavior and related

14   information.

15   **Q.**   Okay.  So the DSM also defines derealization as for the

16   patient, the world is unreal, dream-like, distant or distorted.

17   Do you see that?  It's also in the DSM.

18   **A.**   Yes, yes.

19   **Q.**   And nowhere in your report do you state that the defendant

20   reported that the world appeared to him to be unreal,

21   dream-like, distant or distorted; is that fair to say?

22   **A.**   No.  Because he was saying about living in the fantasy and

23   this was one of the other synonyms he used.  Like, everything

24   unreal.

25   **Q.**   So he did use those terms?

1    **A.**    He did.

2    **Q.**    Okay.  But those terms don't make it -- didn't make it

3    into your report?

4    **A.**    Yes.

5    **Q.**    Correct?

6    **A.**    This is correct.

7    **Q.**    I want to move on now so we can finish.  You can...

8         (Whereupon the book was returned to counsel.)

9    **Q.**    So, Dr. Grinberg, you're actually -- as a result of a

10   stipulated settlement with the California Medical Board, your

11   Physicians and Surgeons Certificate was revoked --

12        **MR. GRASSO:**  Objection.  The doctor was approved by

13   this Court.

14        **THE COURT:**  What?

15        **MR. GRASSO:**  The doctor was approved by this Court.

16        **THE COURT:**  Well, maybe, but I would like to hear

17   what this is.  So for the time being I'm going to overrule it.

18      Go ahead.

19        **MR. PARELLA:**  Thank you.

20   **BY MR. PARELLA**

21   **Q.**    So on September 15th, 2016 your Physicians and Surgeons

22   Certificate was revoked by the Medical Board of California.

23   That revocation was stayed and you were placed on probation for

24   five years; correct?

25   **A.**    Correct.

1    Q.   And so as you sit here now, you're actually still under

2    probation?

3    A.   Correct.

4    Q.   And there are certain conditions which you've -- some have

5    been completed and some have not; correct?  Like education --

6    A.   All conditions were completed.

7    Q.   The probation is not complete?

8    A.   Yes.

9    Q.   All right.  And that -- the charges charged you with --

10             MR. GRASSO:  Objection.  Relevancy.

11             THE COURT:  Was he convicted on those charges?

12             MR. PARELLA:  This was a stipulated settlement in

13   which the defendant agreed that the Medical Board could prove

14   and establish a factual basis for the charges and accusations.

15             THE COURT:  All of the accusations?

16             MR. PARELLA:  Correct.

17             THE COURT:  If that's true, go ahead.  You can ask

18   the question.

19   BY MR. PARELLA

20   Q.   So by the way, for the record, you did sign that

21   stipulated settlement; correct?

22   A.   Correct.

23   Q.   And in that settlement you agreed that the Medical Board

24   could prove and establish a factual basis for the charges in

25   the accusation?

GRINBERG - CROSS EXAMINATION / PARRELLA

1    **A.**    Yes.

2    **Q.**    Okay.  And there were five separate patients that were

3    referenced in that accusation?

4    **A.**    Yes.

5    **Q.**    And for all of them the accusations charged you with

6    unprofessional conduct, gross negligence, repeated negligence

7    acts -- negligent acts, incompetence and inadequate records; is

8    that correct?

9    **A.**    This is correct.

10    **Q.**    And taking Patient MM, I have a copy of it if you would

11    like to have it in front of you?

12            **THE COURT:**  Just make one point because we've got to

13    bring this to a close.

14            **MR. PARELLA:**  Okay.  I'll try to just summarize it,

15    Your Honor.

16            **THE COURT:**  All right.

17    **BY MR. PARELLA**

18    **Q.**    So the various patients, the grounds stated in the -- in

19    the accusation had to do with prescribing without medication;

20    correct?

21    **A.**    No.  This is not correct.  Not without medication.

22    **Q.**    I refer you to Patient SG, where you failed to document

23    medication for approximately 37 prescriptions.

24            **MR. GRASSO:**  Objection.

25

GRINBERG - REDIRECT EXAMINATION / GRASSO

1    BY MR. PARELLA

2    Q.    Do you recall that?

3              THE COURT:  Well, what's that got to do with this

4    problem?

5              MR. PARELLA:  Well, your Honor, we have a

6    circumstance where this witness has testified on direct to many

7    things which he did not provide documentation for and have no

8    basis for.  These individual acts in this accusation show that

9    that is the way he practices medicine and I think it bears on

10   his ability.

11             THE COURT:  I think you've already made your general

12   point, so I'm going to sustain the objection at this point.

13             MR. PARELLA:  Okay.

14             THE COURT:  Is that it?

15             MR. PARELLA:  That is it, Your Honor.

16             THE COURT:  Do you have anything more?

17             MR. GRASSO:  Very briefly.

18             THE COURT:  All right.  Please come ask your

19   questions.

20                      REDIRECT EXAMINATION

21   BY MR. GRASSO

22   Q.    First of all, just to -- to counter the very last thing

23   that was said by the Government, you had various sources on

24   which you based all of your conclusions in your report and

25   everything that was in your report; correct?

**GRINBERG - REDIRECT EXAMINATION / GRASSO**

1   **A.**   Correct.

2   **Q.**   Okay.  The Government referred to the DSM and the DSM's

3   requirements were elements for PTSD.  We have been talking a

4   lot about cross cultural impact in these sorts of situations.

5         Are you familiar with the section of the DSM regarding

6   cultural -- cultural formulation?

7   **A.**   Yes.

8             **MR. GRASSO:**  Judge, can I hand this to the witness in

9   order to just read two lines?

10             **THE COURT:**  Is that from the same book that counsel

11   used?

12             **MR. GRASSO:**  Yes.

13             **THE COURT:**  Of course.  Go ahead.

14             **MR. PARELLA:**  Can you give us a cite?

15             **MR. GRASSO:**  Sure.  It's DSM-5, Page 749.

16         (Whereupon a book was tendered to the witness.)

17   **BY MR. GRASSO**

18   **Q.**   If you could read into the record the very first line of

19   that paragraph on that page and then the very last line of the

20   paragraph on that page?

21   **A.**   (As read)

22             "Understanding the cultural context the illness

23         experienced is essential for effective diagnostic

24         assessment and clinical management."

25   **Q.**   That's the first line; correct?

PROCEEDINGS

1   **A.**   And the last line is:

2          "Cultural, ethnic and racial identities can be

3      sources of strengths and the group support that

4      enhances resilience, but they may also lead to

5      psychological, interpersonal and intergenerational

6      conflict or difficulties in adaptation that require

7      diagnostic assessment."

8          **MR. GRASSO:**  Thank you.  No further questions.

9          **THE COURT:**  All right.  May the witness step down?

10   I'm going to let the witness step down.

11      Thank you.

12          **THE WITNESS:**  Thank you.

13      (Witness excused.)

14          **THE COURT:**  Is there any more evidence by the

15   defense?

16          **MR. GRASSO:**  Not at this time, Judge.

17          **THE COURT:**  Thank you.

18      All right.  Any rebuttal by the Government?

19          **MS. KANE:**  No, Your Honor.  Thank you.

20          **THE COURT:**  All right.  So the evidentiary record is

21   now complete.

22      How do you propose that we deal with briefing it or

23   arguing it?  What are your druthers.

24          **MR. PARELLA:**  Maybe we could confer?  I think if he

25   we're going to brief it, it would require us to order the

PROCEEDINGS

1   transcript.

2           THE COURT:  Yes, it would.  And we need to get it all

3   done before my most excellent Law Clerk leaves in about six

4   weeks -- or five weeks.

5           MR. PARELLA:  We can do that.

6           THE COURT:  Not just briefed.  You need to leave me

7   some time to go through it all.

8       So I'm thinking one week for the Government.  One week

9   after that for the other side.  Then one week for you to -- or

10  even less to reply.  That will give me enough time to get an

11  order out before my Law Clerk leaves.

12      Is that doable on your side?

13          MS. KANE:  Well, your Honor, it will take at least a

14  day for us to get the transcript.

15          THE COURT:  Yes, it would.  At least a day.  That's

16  all.  This is the most excellent court reporter here.  She can

17  do that.

18      (Brief pause.)

19          MS. KANE:  We're just going to look at the calendar,

20  Your Honor.

21          THE COURT:  Today is April 30.

22          MR. PARELLA:  Could we have until May 10th to file?

23          THE COURT:  No.  That's ten days.  I don't have that

24  much luxury.

25      I'll give you until May 8th.  Then the other side gets

1  until May 15th.  And then you get not a full week, but you get

2  until May 20th for a reply.  And then no further argument on it

3  unless I think it's necessary.  And that will give me enough

4  time to get an order out.

5      Does that work for you, Mr. Grasso?

6          **MR. GRASSO:**  That sounds excellent, Judge.

7          **THE COURT:**  All right.  That's the way it's going to

8  be.

9      So then we ought to set -- I'll just -- I'm not going to

10  set another hearing date unless I'm required to.  I'll set one

11  later.

12          **MR. PARELLA:**  Sounds good.

13          **THE COURT:**  All right.  We don't even have a trial

14  date any more, do we?

15          **MS. KANE:**  No, Your Honor.

16          **THE COURT:**  Okay.  I need to run.  Is there any more

17  business?  Do I have to exclude time?  Do I need to do anything

18  more?

19          **MS. KANE:**  Your Honor, time has been excluded through

20  today for proceedings having to do with the mental competency

21  of the defendant.

22      Given the continued briefing, I think it's appropriate to

23  continue to exclude time for proceedings to be concluded.  As

24  well, the Court previously found this matter was complex and

25  unable to be brought to trial within the Speedy Trial time:

PROCEEDINGS

1          **THE COURT:**  Okay.

2          **MS. KANE:**  But I think we need an end date for the

3    exclusion.  So perhaps we should set -- I know the Court said

4    it was not going to set a hearing, but I think perhaps --

5          **THE COURT:**  Give me a date that you want me to set a

6    hearing on.

7          **MS. KANE:**  The Court noted that -- I think there were

8    six weeks.

9          **THE COURT:**  I'm going to set it for June 11th.

10   June 11th 2:00 p.m.

11         **MS. KANE:**  That's fine, Your Honor.

12         **THE COURT:**  And I will exclude time up until

13   June 11th, in addition to all the other exclusions.

14         **MS. KANE:**  Thank you, Your Honor.

15         **THE COURT:**  All right.  Counsel, thank you.  I want

16   the lawyer -- Mr. Grasso.

17         **MR. GRASSO:**  Yes.

18         **THE COURT:**  I'm strongly encouraging you to start

19   meeting way more often with your client in person.  Get on an

20   airplane in Brooklyn.  Fly across all those square states and

21   land in our state and go see him in person.

22         **MR. GRASSO:**  Duly noted.

23         **THE COURT:**  That's what I think should be done, even

24   if it's not productive.  And I think it might be productive.

25   But seven times in one year, maybe not too often.

PROCEEDINGS

1          MR. GRASSO:  Plus every time in court.  So just to be

2    clear.

3          THE COURT:  Yeah, but I want him -- I want your

4    client to feel that you're on his case 100 percent.

5       Okay.  We're done for today.  Thank you.

6          MR. GRASSO:  Thank you, Your Honor.

7          MS. KANE:  Thank you, Your Honor.

8       (Proceedings adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## **I N D E X**

Tuesday, April 30, 2019 - Volume 1

| **GOVERNMENT WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **JOHNSON, LESLI** | | |
| (SWORN) | 5 | 1 |
| Direct Examination by Ms. Kane | 5 | 1 |
| Cross Examination by Mr. Grasso | 32 | 1 |

| **DEFENDANT'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **GRINBERG, ALEXANDER** | | |
| (SWORN) | 57 | 1 |
| Direct Examination by Mr. Grasso | 58 | 1 |
| Cross Examination by Mr. Parrella | 79 | 1 |
| Redirect Examination by Mr. Grasso | 108 | 1 |

—   —   —

## CERTIFICATE OF OFFICIAL REPORTER


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*Debra L. Pas*

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, May 1, 2019