IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>YEVGENIY ALEKSANDROVICH NIKULIN,<br><br>Defendant. | No. CR 16-00440 WHA<br><br>**ORDER DETERMINING COMPETENCY** |

## INTRODUCTION

In this prosecution for computer intrusion, identity theft, and related crimes, defendant moved for a hearing to determine his competency to stand trial. Following competency evaluations by two experts and an evidentiary hearing at which both experts testified, this order finds that defendant is able to understand the nature and consequences of the proceedings against him and is able to assist properly in his defense.

## STATEMENT

An October 2016 indictment charged defendant Yevgeniy Nikulin with three counts of computer intrusion, in violation of 18 U.S.C. § 1030(a)(2)(C), two counts of intentional transmission of information, code, or command causing damage to a protected computer, in violation of 18 U.S.C. § 1030(a)(5)(A), two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), one count of trafficking in unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(2), and one count of conspiracy, in violation of 18 U.S.C. § 371.

Officials in the Czech Republic arrested defendant in October 2016 and extradited him to the United States in March 2018 (Dkt. No. 4).

Defense counsel first raised concerns regarding defendant's mental competency during a status conference in June 2018. In August 2018, defendant, through counsel, moved for a psychiatric evaluation and a mental competency hearing. The government did not oppose the motion. At the next hearing in this case, the undersigned judge waived defendant's appearance because, in part, defendant refused to leave his cell at the Santa Rita Jail. After tentatively granting defendant's motion for a mental competency hearing, the undersigned directed the parties to meet and confer regarding a qualified examiner. Defense counsel later proposed Dr. Alexander Grinberg. After asking for further comment from counsel regarding Dr. Grinberg's probationary status, an order granted defendant's motion for a mental competency hearing and appointed Dr. Grinberg to conduct the examination (Dkt. Nos. 37, 49–52, 55, 58–60).

In October 2018, defense counsel filed a notice explaining that Dr. Grinberg had not conducted the examination because defendant refused to meet with him. With the agreement of the parties, an order committed defendant to the custody of the Bureau of Prisons for purposes of completing the examination. Defendant was then transferred to the Metropolitan Detention Center in Los Angeles where Dr. Lesli Johnson and her team observed and evaluated defendant over a period of eight weeks. Dr. Johnson submitted her evaluation to the Court in February 2019. In her report, Dr. Johnson opined that defendant was competent to stand trial (Dkt. Nos. 63, 70; Gov't Exh. 1).

Due to delays in defendant's return to this district from BOP custody, the parties next appeared for a status conference in March 2019. At that conference, defense counsel explained that she wanted to challenge Dr. Johnson's report and would be submitting a competing report from Dr. Grinberg. The defense submitted Dr. Grinberg's report in April 2019. At an evidentiary hearing later that month, both Dr. Johnson and Dr. Grinberg testified and were

1    cross-examined.  The parties stipulated to both expert reports coming into evidence and have

2    since submitted supplemental briefing (Dkt. Nos. 79, 82, 90–93; Gov't Exh. 2).[1]

## ANALYSIS

A defendant is competent to stand trial if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). "Whether a defendant is capable of understanding the proceedings and assisting counsel is dependent upon evidence of the defendant's irrational behavior, his demeanor in court, and any prior medical opinions on his competence." *Miles v. Stainer*, 108 F.3d 1109, 1112 (9th Cir. 1997). The government must demonstrate by a preponderance of the evidence that defendant is competent to stand trial. *United States v. Frank*, 956 F.2d 872, 875 (9th Cir. 1991).

Dr. Johnson — who holds a Ph.D. in counseling psychology and who has completed approximately 140 court-ordered forensic evaluations over the past ten years — submitted a thorough report and credibly testified as to her findings. In evaluating defendant, Dr. Johnson conducted a legally-focused interview designed to assess defendant's ability to articulate an understanding of the charges against him and his ability to assist counsel in presenting a defense. She also administered a nonverbal test of defendant's intelligence. Dr. Johnson's evaluation and report relied on her own observations as well as those of detention officers and medical staff who interacted with defendant during his eight weeks in BOP custody. She also reviewed discovery, defendant's mental health and medical records, defendant's email communications with friends and family, and transcripts of defendant's phone calls. Dr. Johnson also considered input from colleagues and spoke with defense and government counsel (Tr. at 6:14–21, 8:19–21, 9:13–20:11; Gov't Exh. 1).

Dr. Johnson concluded that no objective evidence indicates that defendant suffers from a major mental disorder or organic disorder that would impair his present ability to understand the

---

[1] Defendant has moved for leave to file a sur-reply (Dkt. No. 93). The motion is unopposed and is accordingly **GRANTED**.

United States District Court
For the Northern District of California

3

nature and consequences of these proceedings or properly assist counsel in his defense. She opined that defendant instead suffers from "Other Specified Personality Disorder (Narcissistic Traits)," as specified in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"), essential features of which are "a pervasive pattern of grandiosity, need for admiration, and lack of empathy." Dr. Johnson found that defendant's lack of communication with his attorney was "directly related to narcissistic traits" but concluded that defendant "is ultimately able to adequately aid and assist in his defense, if he so chooses." Indeed, defendant told her that he is "always capable of participating in conversations, but depending on the situation, the ambience and the people." Moreover, defendant accurately described the charges against him, possible pleas, and his attorneys' role in the proceedings (Gov't Exh. 1 at 13–20; Tr. at 25:18–26:14).

Defendant's expert, by contrast, concluded that defendant suffered from "Posttraumatic Chronic Stress Disorder (DSM IV code 309.81)," "Psychotic Disorder, Not Otherwise Specified (DSM IV 298.9)," and "Dissociative and Conversion Disorder, Not Otherwise Specified (DSM IV 300.15)." Based on these diagnoses, Dr. Grinberg opined that defendant is not competent to stand trial and that his "prognosis for recovery" is "poor" even with therapy and medication (Gov't Exh. 2 at 12–15). For the reasons now explained, this order finds Dr. Grinberg's conclusions significantly less credible than those of Dr. Johnson.

Much of Dr. Grinberg's report focused on defendant's family history of mental illness and trauma without a clear connection to defendant's current level of competence. Regarding defendant's prior brain injuries, Dr. Grinberg, who speaks Russian, relied on reports from defendant and defendant's mother rather than medical records or other corroborating evidence. Dr. Grinberg also arrived at his diagnoses via less reliable methods. For example, Dr. Grinberg used the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, which is not the current edition. He also failed to use evaluation measures widely utilized in the forensic community, electing instead to use tools more often used in a therapeutic setting. Lastly, as far as the record shows, Dr. Grinberg has never performed a formal competency evaluation of a defendant prior to this case (Tr. at 26:15–27:11, 60:17–19, 82:15–89:22).

4

As to Dr. Grinberg's diagnosis of post-traumatic stress disorder, he agreed on cross-examination that defendant does not currently have nightmares, flashbacks, or other signs of distress, which are required symptoms for a diagnoses of PTSD in the DSM-5. Dr. Grinberg also opined that defendant "would tend to avoid mentioning of names, dates, place that may trigger traumatic memories," but defendant ultimately showed some willingness to discuss his father's abuse and his brother's suicide. And, most notably, Dr. Grinberg fails to explain how post-traumatic stress disorder based on defendant's brother's suicide or his father's abuse would prevent him from talking with his attorneys regarding the seemingly unrelated charges against him in this case (*id.* at 28:13–29:9, 101:7–102:11; Gov't Exh. 2 at 3, 15).

Dr. Grinberg's diagnoses of psychotic disorder and dissociative and conversion disorder also lack credibility. Defendant has not been medicated since his brief hospitalization in the Czech Republic in October 2016. He has nevertheless functioned suitably in custody and no mental health provider — whether in the Czech Republic, Los Angeles, or Santa Rita Jail — has observed psychotic symptoms or dissociation. As Dr. Johnson credibly testified, a defendant experiencing such symptoms would have problems in a general prison population. While Dr. Grinberg reported observing "disorganized speech," he provided no details as to when and to what extent this occurred. He further explained that defendant was delusional because "he believes that only he, himself, can defend himself" and defendant's mother and attorneys reported "irrational behavior," such as defendant saying that he was poisoned with radiation in the Czech Republic. Dr. Grinberg's conclusion that defendant "experienced episodes of derealization," in turn, appears to be based on defendant's statements that he has "fantasies" while in solitary confinement and his mother's statements that he seems like a "different person." Defendant, however, has denied "seeing things" or having feelings of unreality or detachment. Even accepting Dr. Grinberg's characterization, moreover, he has not connected defendant's purported delusions or disassociation with the inability to understand the proceedings in this case or to communicate with defense counsel (Tr. at 20:14–22:3, 29:10–30:22, 47:8–25, 73:12–74:6, 92:18–94:3; Gov't Exh. 2 at 13–14).

5

Defendant's remaining arguments do not compel a contrary result.  *First*, defense counsel emphasizes that in the past year, counsel or their staff met with defendant "at least eight (8) times" outside of court and had dozens of phone calls, during which defendant "always acted very strangely."  Defense counsel states that when he attempted to explain the purpose of the competency hearing to defendant in the courtroom at the beginning of the hearing, defendant did not appear to understand and "said that he didn't want to do this anymore and that we should just plead guilty for him."  Counsel also notes that defendant refused to speak with medical staff at Santa Rita Jail (Dkt. No. 91 at 5–6, 18–19).  Nothing in these descriptions undercuts Dr. Johnson's credible opinion that defendant's failure to communicate is his intentional choice.  The undersigned judge was present in the courtroom during the brief conference between defense counsel and his client at the competency hearing.  If this was the only attempt counsel made to explain the nature of the proceedings, it is unsurprising if defendant failed to understand.

*Second*, defendant argues that Dr. Grinberg's report should be afforded more weight because Dr. Grinberg is a psychiatrist whereas Dr. Johnson is a psychologist.  According to defendant, "[t]here are extremely important distinctions between psychologists and psychiatrists."  But beyond arguing that "there is clearly an undisputed genetic component (i.e. Defendant's brother's suicide)" in this case, defendant fails to explain why Dr. Johnson is any less qualified than Dr. Grinberg to opine on defendant's competency (*id*. at 10–11).  This order therefore declines to afford Dr. Johnson's findings less weight on that basis.

*Third*, defendant faults Dr. Johnson for not including information from defendant's family in her report, namely, defendant's prior brain injuries from a car accident, his history of not speaking between the ages of three and six years old, his family's history of mental illness, and his father's abuse.  As Dr. Johnson explained, however, it is often unnecessary to speak with a defendant's family to determine competency to stand trial.  Not only does the family's interest in the outcome of the proceedings undercut the reliability of the information provided, but the information may not be helpful because a competency evaluation is about the "here and now."  Dr. Johnson therefore credibly testified that the information defendant's mother

6

provided to Dr. Grinberg would not change her diagnosis or conclusions because her determinations were based on defendant's *present* condition and presentation (Tr. at 18:17–19:18, 43:2–48:9).

Moreover, although Dr. Johnson did not speak with defendant's family, she did review defendant's mental health records, including a letter from defendant's attorney in the Czech Republic who described defendant's five-day hospitalization following his arrest in October 2016 and the related diagnosis of "acute stress response." The attorney, who was assigned defendant's case in February 2017, generally denied observing evidence of a poor mental state but did explain that in the two months preceding defendant's extradition "it was very difficult to have conversation with [defendant], to get some answer from him and his moods were changing a lot during a short time." Records from Santa Rita Jail explained that defendant's refusal to answer medical questions resulted in a suicide watch and led staff to believe he had an "adjustment disorder." Dr. Johnson concluded from these records that defendant appeared to have suffered from an adjustment disorder at the time of his arrest but that the symptoms had remitted (Gov't Exh. 1 at 8–9, 15–17).

*Fourth*, defendant argues that Dr. Johnson failed to provide adequate reasons for her conclusion that defendant's poor IQ score does not "represent his overall presentation." To the contrary, Dr. Johnson explained in her report and on cross-examination that defendant's low scores for intellectual functioning were due to a lack of effort, not a lack of capacity. During the first part of the exam defendant would "haphazardly flick his finger at the items almost as quickly as [she] turned the page" and "[d]idn't appear to be putting forth adequate effort." On these initial parts, defendant scored in the "poor" range. After Dr. Johnson admonished him, however, defendant improved to the "low average" range, which indicated "mostly intact abilities in managing and manipulating non-verbal information." Dr. Johnson credibly testified that she believed that the score did not represent his overall presentation because, in her experience, a defendant with such poor functioning would likely have difficulty communicating or doing routine tasks (Gov't Exh. 1 at 12–13; Tr. at 22:9–23:23).

7

*Fifth*, defendant argues that the value of Dr. Johnson's report should be discounted because she conducted her examination through a translator whereas Dr. Grinberg conducted his examination in Russian. This order disagrees. Dr. Johnson carefully considered defendant's language skills in tailoring her examination. For example, because defendant does not speak English and was not raised in the United States, she used a culturally appropriate test to measure defendant's non-verbal intelligence. Dr. Grinberg, by contrast, admittedly translated diagnostic tests from English to Russian, thereby rendering those tools useless as quantitative measures of defendant's functioning. While Dr. Grinberg opined that he would have picked up on "cultural differences" in defendant's communications that Dr. Johnson may have missed, he does nothing more than generically describe defendant's communications as "substandard or below an expected level of functioning" (Tr. at 12:25–13:11, 27:12–28:8, 60:22–62:7, 98:15–18).

*Sixth*, defendant notes that the undersigned judge has permitted, at the request of the United States Marshals Service, the use of physical restraints on defendant during court proceedings. While defendant's reported behavior in custody is certainly relevant to the competency inquiry, the conduct described by the Marshals Service demonstrates nothing more than defendant's unwillingness to cooperate. His demeanor and behavior in court has otherwise been appropriate.

In sum, the government has proven by a preponderance of the evidence that defendant's mental disorder does not render him incompetent and that any refusal to participate in his own defense is due to his own choice. The law is clear that "mental illness does not necessarily equate to incompetence." *Grant v. Brown*, 312 Fed. Appx. 71, 73 (9th Cir. 2009). While all agree that defendant is currently suffering from some form of mental disorder, the record demonstrates that defendant is still able to understand the nature and consequences of these proceedings and assist his attorneys in his own defense.

8

**CONCLUSION**

For the foregoing reasons, this order finds that defendant is able to understand the nature and consequences of the proceedings against him and is able to assist properly in his defense. The parties should be prepared to set a schedule for this case at the June 11 status conference.

**IT IS SO ORDERED.**

Dated: May 29, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

9