Volume 4

Pages 212 - 368

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

UNITED STATES OF AMERICA,    )
                             )
          Plaintiff,         )
                             )
  VS.                        )     NO. CR 16-00440 WHA
                             )
YEVGENIY ALEKSANDROVICH      )
NIKULIN,                     )
                             )
          Defendant.         )
_____)
                             San Francisco, California
                             Monday, July 6, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    DAVID L. ANDERSON
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
              BY:   **KATHERINE L. WAWRZNIAK**
                    **MICHELLE J. KANE**
                    **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                    LAW OFFICE OF ADAM G. GASNER
                    345 Franklin Street
                    San Francisco, California  94102
              BY:   **ADAM GASNER**
                    **VALERY NECHAY**
                    **ATTORNEYS AT LAW**

Interpreters:       Maria Entchevitch and Marina Brodskaya

Reported By:  Marla F. Knox, RPR, CRR, RMR
              United States Official Court Reporter

# I N D E X

Monday, July 6, 2020 - Volume 4

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| | | |
| **KRISHNAN, GANESH** | | |
| (SWORN) | 286 | 4 |
| Direct Examination by Ms. Wawrzyniak | 286 | 4 |
| Cross-Examination by Mr. Gasner | 297 | 4 |
| Redirect Examination by Ms. Wawrzyniak | 310 | 4 |
| | | |
| **MLAKER, ANTON** | | |
| (SWORN) | 325 | 4 |
| Direct Examination by Ms. Kane | 326 | 4 |
| Cross-Examination by Ms. Nechay | 332 | 4 |
| | | |
| **LATULIP, RICHARD** | | |
| (SWORN) | 335 | 4 |
| Direct Examination by Ms. Wawrzyniak | 336 | 4 |
| Cross-Examination by Ms. Nechay | 341 | 4 |
| Redirect Examination by Ms. Wawrzyniak | 350 | 4 |
| | | |
| **ROMANENKO, ANDRE** | | |
| (SWORN) | 352 | 4 |
| Direct Examination by Ms. Kane | 353 | 4 |

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 74 | | 328 | 4 |
| 75 | | 330 | 4 |

PROCEEDINGS

1   <u>**Monday - July 6, 2020**</u>                              <u>**8:46 a.m.**</u>

2                          <u>**P R O C E E D I N G S**</u>

3                              **---oOo---**

4        (Proceedings were heard outside the presence of the jury:)

5        **THE CLERK:**  Calling criminal case number 16-440,

6   Yevgeniy Alexandrovich Nikulin -- United States of America

7   versus Yevgeniy Alexandrovich Nikulin.

8        Will Counsel please state your appearances for the record.

9        **MS. KANE:**  Thank you.  Michelle Kane and Katherine

10  Wawrzyniak for the United States.

11       **MR. GASNER:**  Good morning, Your Honor, Adam Gasner and

12  Valery Nechay on behalf of Mr. Nikulin, who is present sitting

13  to the side of the courtroom currently before the Court.

14       **THE COURT:**  Mr. Nikulin, welcome back.

15       All right.  Everyone is present and do you -- we were

16  beginning to discuss logistics, problems.

17       I will just say for the record and someone in the future

18  reading this, the trial was interrupted back in March on

19  account of COVID-19 lockdowns and shelter-in-place orders; and

20  we have been trying to find a time to -- where the jury would

21  be willing to resume and we would be willing to resume.

22       And, finally, it's July 6th, four months later -- or three

23  and a half months later -- and we are going to try to resume

24  today.

25       The jury is now in a different room waiting to be called

**PROCEEDINGS**

1  in, but the lawyers are asking questions now about logistics.

2       And for those who can't see, we are all spread out wearing

3  masks.  Protective things are set up in the courtroom.  It is a

4  much different scene than it was when we broke in March.

5       Mr. Gasner, you were about to ask a question.  Please go

6  ahead.

7       **MR. GASNER:**  No, Your Honor.  I was saying good

8  morning.  The Defense is ready and I understand there are

9  logistics that will come up from time to time.

10      I just want to make sure that everybody can hear.

11 Everybody, maybe we can do a sound check and make sure that the

12 interpreters, the Defendant and all the parties can hear.

13      **THE COURT:**  Okay.

14      **MS. NECHAY:**  Your Honor, I also wanted to briefly add

15 something.  This is Valery Nechay on behalf of Mr. Nikulin.

16      I second the request to the Government to have a little

17 bit of deference in terms of our advocacy in the courtroom.

18      I understand that there have been great lengths that

19 everybody -- including the Clerk of the Court -- have taken to

20 administer these proceedings safely.

21      I just want to make sure that in terms of having us on

22 Zoom here, I just want to make sure that my advocacy for

23 Mr. Nikulin doesn't take a second seat to all these

24 technological issues and the way that we are trying to do

25 things in the court.

1      I think that if there are times where we need to get up or
2  move around, as long as we are at a minimum of 6 feet away from
3  others, I would just be asking the Court to give us some
4  deference.
5      Certainly this is probably a strange and new experience
6  for everybody, and I certainly appreciate that.  Those are just
7  comments that I had for Your Honor.
8      **THE COURT:**  Well, I very much want you to have as much
9  flexibility as possible to be a good advocate.  And if you need
10 to get up and move around and stay 6 feet away from everyone
11 else, I guess that's okay.  I don't see a problem with that.
12     **MS. NECHAY:**  Thank you.
13     **THE COURT:**  Also I should say for the record that
14 the -- instead of the jury box -- there will only be four in
15 the jury box, and then other jurors will be spread out in the
16 rest of the courtroom.  And in the back there is some public
17 seating areas.  We don't have any members of the public here
18 today, I don't think; but they are welcome to come, but we are
19 using Zoom to supplement so that members of the public could
20 tune in and see the proceedings so that this will be a, quote,
21 public trial.
22     All right.  Let me turn to some business now.  I saw a
23 stipulation that basically says that if we have to dismiss for
24 good reasons more jurors than would normally be allowed to
25 dismiss, that you are willing to go down to 11, 10, 9, 8, 7 or

1   6 persons on the jury after a finding of good cause to excuse a

2   juror.

3        And this, I believe, is a wise stipulation by both sides.

4   And do you want me to voir dire the Defendant to see if he is

5   agreeable to this?

6        **MS. KANE:**  Yes, Your Honor.  We have spoken with

7   Defense Counsel on this issue, and we both agree that the Court

8   should conduct a colloquy with the Defendant on this topic.

9        **THE COURT:**  All right.  Mr. Gasner, have you -- let me

10  ask preliminarily, have you gone over with your client the

11  stipulation?

12       **MR. GASNER:**  Yes, Your Honor, the Defense has gone

13  over this with Mr. Nikulin.

14       **THE COURT:**  And have you thoroughly explained to him

15  his rights as he agreed to the stipulation?

16       **MR. GASNER:**  Your Honor, specifically Ms. Nechay has

17  gone over those because of --

18       **THE COURT:**  All right.  Then I will address Ms.

19  Nechay.  Have you done that and has he agreed?  And then I'm

20  going to ask him specific questions.

21       **MS. NECHAY:**  Yes, Your Honor.

22       **THE COURT:**  All right.  Thank you.

23       Okay.  So, Mr. Nikulin, for your protection I need to ask

24  you some questions; and I need to make sure you understand your

25  rights before we accept this stipulation which your lawyers

1   have explained to you about the numbers of jurors, the minimum

2   number, that we would need in order to go forward.

3          So I need for you to raise your right hand and take an

4   oath to tell the truth and the clerk will now administer the

5   oath.

6          (Defendant duly sworn)

7                THE COURT:   Thank you.   You can put your hand down.

8   Mr. Nikulin, what is your full and correct name?

9                THE DEFENDANT:   Nikulin, Yevgeniy Alexandrovich, 1987.

10               THE COURT:   Say that last part again.

11               INTERPRETER:   1987.

12               THE COURT:   You were born in 1987?

13               THE DEFENDANT:   Yes.

14               THE COURT:   All right.   Thank you.   And are you

15   thinking clearly today?

16               THE DEFENDANT:   Yes.

17               THE COURT:   Are you under the influence of anything?

18               THE DEFENDANT:   No.

19               THE COURT:   Okay.   Have you discussed with your

20   lawyers this stipulation to reduce the number of possible

21   jurors all the way down to 6 people instead of 12?

22               THE DEFENDANT:   Yes, we have.

23               THE COURT:   And which lawyer did you discuss this

24   with?

25               THE DEFENDANT:   Adam wrote to me and I wrote back to

1  him.  I also spoke to Valery and gave her oral answers.

2       **THE COURT:**  Okay.  All right.  Now, you have a right

3  in a criminal case like this to be tried by 12 people in the

4  jury.  That is a right that you have.  And if you did not -- if

5  you insisted on 12, then you have the right to insist on 12

6  because that's provided to you by the statutes that govern our

7  criminal procedure.  Do you understand that?

8       **THE DEFENDANT:**  Yes, I understand this.  I also

9  understand that a final decision lies with the Judge in any

10  case.

11       **THE COURT:**  Say that last part again.

12       **INTERPRETER:**  I also understand that the final

13  decision lies with the Judge in any case.

14       **THE COURT:**  No, that's not correct.  The Judge has the

15  final say on some things.  But on whether or not you are guilty

16  or innocent, that is up to the jury.  And only in very narrow

17  circumstances can the Judge set aside what the jury verdict is.

18       You -- I need to make sure you understand that.  Do you

19  understand what I just said?

20       **THE DEFENDANT:**  Yes, I understand all that; but I also

21  understand that you could have released me a very long time

22  ago.

23       **THE COURT:**  That I could what?

24       **INTERPRETER:**  I also understand -- I will start from

25  the beginning, Your Honor.

1          Yes, I understand all that.  I also understand that you

2     could have released me a very long time ago.

3          **THE COURT:**  Well, even that is not correct; but that

4     has nothing to do with the jury part.  I just want to focus on

5     the jury part.

6          Let me put it this way:  If the jury finds you innocent, I

7     cannot overrule that.  The jury's verdict would stand if they

8     found you innocent.

9          On the other hand, if the jury found that you were guilty,

10    I could not overrule that either except in very narrow

11    circumstances where the evidence presented was totally

12    insufficient to support a guilty finding.

13         So, basically, the jury verdict will stand as the final

14    decision on whether you are innocent or guilty.  Do you

15    understand what I have just said about the jury?

16         **THE DEFENDANT:**  Yes, I do.

17         **THE COURT:**  All right.  Now, understanding what I just

18    said, are you willing to waive your right to a jury of 12 and

19    to agree that the jury in this matter may consist of 11, 10, 9,

20    8, 7 or 6 persons after a finding of good cause to excuse

21    jurors?

22         **THE DEFENDANT:**  Yes, I'm willing to continue even with

23    6 jurors.

24         **THE COURT:**  All right.  Anything further that the

25    parties wish for me to -- Counsel wishes me to ask?

PROCEEDINGS

1          **MS. NECHAY:**  No, Your Honor.

2          **MS. KANE:**  No, Your Honor.  Thank you.

3          **THE COURT:**  All right.  Thank you, Mr. Nikulin.

4      I find that Mr. Nikulin is capable of making an informed

5  decision and that he has made an informed decision; that he is

6  aware of his rights to a jury of 12, and he is willing to waive

7  that voluntarily and freely; and that we may, therefore,

8  proceed with the stipulation.  And I approve the stipulation

9  that Counsel and the parties have entered into.

10     All right.

11         **MR. GASNER:**  Thank you, Your Honor.  Adam Gasner here.

12  May I make a comment, please --

13         **THE COURT:**  Sure.

14         **MR. GASNER:**  -- with regard to that stipulation?

15         **THE COURT:**  Of course.

16         **MR. GASNER:**  Thank you.  I wanted the Court to

17  understand -- and, as you said, whomever may read this if they

18  do understand -- that we are in a very unusual situation.  It

19  was very difficult for the Defense to come to this conclusion

20  that we could go below 12.

21     I will tell the Court that it was a hard fought and hard

22  gut-wrenching decision to do this, but I understand that

23  because Mr. Nikulin is in pretrial detention for four years now

24  that were we not able to reassemble a jury or were this jury to

25  hang and a mistrial be declared, the prospects in the COVID-19

1   era of getting to a new trial or a retrial or that to be

2   required seemed very bleak to me on behalf of Mr. Nikulin.

3          It appears that that wouldn't occur any time soon.  So it

4   is with every concern with regard to getting this case to a

5   verdict and finding resolution for Mr. Nikulin that the Defense

6   makes this unusual decision and stipulated with the Government.

7          With that, I have nothing further.

8          **THE COURT:**  Thank you.  I believe that is a very

9   useful statement for the record.

10         In that connection I need to say to you-all that over the

11  weekend, we have had a flurry of requests -- and late last

12  week -- that involve three jurors, all of which are -- militate

13  toward their wanting to be excused.

14         I will start with the most pertinent, a woman named Anna

15  Vasquez, who was, I believe, Number 6 in the front row of the

16  jury.  She informed us that her husband has a co-worker who has

17  tested positive for COVID-19 and that she and her husband have

18  both been ordered by her doctor -- or their doctors and his

19  employer to be tested.  And she inquired of what should be

20  done.

21         Initially I thought that she should try to get tested

22  before today because maybe she is completely safe.  However,

23  her doctor then ordered -- could not test her until, I think,

24  tomorrow.  And so she is -- I told her not to come in because

25  there is a chance that she is -- has been exposed.  And,

1   therefore, it would expose everyone else.  So I thought that

2   was -- that is the only way to go.  So she won't be here today.

3       Now, we have two others whose names I don't have in front

4   of me.  Maybe one of my helpers can bring it to me -- who one

5   of them has a family problem with someone who is dying and in

6   hospice care; and another one is -- I'm blanking on what her

7   problem was -- do you have it here?

8       Okay.  So, okay.  Cynthia Chang is our juror, she was

9   Number 8 in the jury box.  And according to the doctor, she is

10   residing with her brother-in-law Matthew Khun, who was admitted

11   to Mission Hospice on June 28th.  And Ms. Chang is part of

12   her -- part of his caregiving team.

13       The family has been recommended by their medical team to

14   avoid community activity due to the immune-compromised status

15   of Matthew Khun.  And they respectfully requested that she be

16   dismissed or deferred to avoid her exposure to any and all

17   germs including COVID-19.

18       Now, I said no, she had to come in.  So she -- so -- I

19   felt like this was a possible case, and I did not want to

20   dismiss her without you lawyers being able to possibly quiz

21   her.

22       But she has -- it sounds like a pretty good excuse to me

23   if all this is true.

24       **MR. GASNER:**  Your Honor, will you remind Counsel what

25   juror number you are talking about?

1    **THE COURT:**  Yes.  Her name is Cynthia Chang and on our

2    original chart she was Number 8.

3         And there was a second one too.  Tracy, do you have that

4    one?

5    **THE CLERK:**  I don't, Your Honor.  This is the only

6    one.

7    **THE COURT:**  Maybe this is the only other one then.  I

8    don't know if she is coming in or not.  They have all assembled

9    in another courtroom and are spread out in courtroom number 8.

10        So I think our first order of business today is to see if

11   we can even get six to serve, and I propose that we bring

12   everyone in who has come and I welcome them back and I explain

13   to them the safeguards that we would be employing for their

14   protection and our own protection.  And then let them raise

15   their hand if they want to be excused on account of COVID-19 or

16   for, I guess, if they -- we can also inquire whether -- if they

17   have heard anything about the case.

18        And if it turns out that, let's say, we have five or six

19   people or ten people -- I don't know how many -- we -- I think

20   the best thing to do then is to make a list.  Send everyone

21   back but one person to the other assembly room, and then we

22   will go through and quiz each one individually.

23        So -- but I'm open to better ideas.  So if you have a

24   better way to proceed, what do you think?  Start with the

25   Government.

1           **MS. KANE:**  Your Honor, that sounds like a reasonable

2    procedure to the Government.

3           **THE COURT:**  Thank you.  Defense?

4           **MR. GASNER:**  Your Honor, let's see how it goes.

5           **THE COURT:**  Okay.  Will do.  All right.  It's now time

6    to see if we -- how many we have and we will slowly bring them

7    in, not in one big herd because I don't want to do that to

8    them; but we will bring them in in small groups.

9           And it will take a few minutes to get them seated.  And

10   our Clerk of Court is right here, and she is going to go and

11   try to get that done.

12          **MS. SOONG:**  Counsel, do you want me to move the

13   podium?

14          **THE COURT:**  Yes, okay.  Please go ahead.

15          **MS. KANE:**  It sounds like we have quite a bit of time

16   between bringing the jury in now and when we will do our brief

17   re-opening.  It sounds like we will have a brief break so --

18          **THE COURT:**  We don't need the podium for at least an

19   hour, probably two.

20          **MS. KANE:**  Yes, thank you.

21          **MS. SOONG:**  Thank you.

22                  (Recess taken at 9:09 a.m.)

23                  (Proceedings resumed at 9:11 a.m.)

24          **MS. KANE:**  Your Honor, I apologize.  We just

25   identified an issue over here which is that the outlet doesn't

1    appear to be working.

2        There is another outlet; but we need to try switching our

3    devices here, the power source, to see if this other outlet is

4    working or if there might be a circuit issue.  So I'm going to

5    step around here.

6            THE COURT:  Yeah.  Okay.  I need one of the IT people.

7    Sue, they have identified some snafu with the outlets.  But I

8    don't think you are going to be needing that for a while

9    anyway.

10           MS. KANE:  Well, Your Honor, the devices that we are

11   using for Zoom will not continue working.

12           THE COURT:  Oh, you mean, you need a power supply?

13           MS. KANE:  Yes, yes.

14           THE COURT:  All right.  Well, show Sue Soong what it

15   is that your problem is; and she will have an IT person come in

16   here and help.

17                   (Pause in proceedings.)

18           THE COURT:  First four jurors are coming in now,

19   everyone.  Welcome in.  The Clerk will show you where to sit.

20                 (Recess taken at 9:12 a.m.)

21             (Proceedings resumed at 9:20 a.m.)

22      (Proceedings were heard in the presence of the jury:)

23           THE COURT:  All right.  Welcome back to our Members of

24   the Jury.  You will recall that this is a case called United

25   States versus Nikulin, and we were several days into the trial

1  back in March when the COVID-19 shelter-in-place orders came

2  down and which interrupted the trial; always hoping things

3  would get better, and gradually they did get better though most

4  recently they are not -- they may be getting worse.

5       But we are now in the month of July, and we want -- we

6  have gone to some considerable study and contemplation on how

7  we can protect the jury as well as everyone else in the

8  courtroom and still be able to conduct trials in criminal

9  cases.

10      You -- this trial will be the first in our district to

11  resume.  And at the same time in our Oakland federal courthouse

12  today a second criminal trial will be starting.  So you will be

13  one of two in our entire district to resume.  That's a --

14  that's a pretty important historical step.

15      Of course, we have already gone through how important it

16  is for the jury system and to have jury trials in cases where

17  the Government accuses someone of a crime.  I don't need to

18  repeat all of that.

19      Let me tell you what we are going to do this morning and

20  then we will proceed to do it.  I want to first go over with

21  you the precautions that we have taken.  I will come back to

22  that.

23      Secondly, I want to give you each a chance to say to us

24  and ask if you have -- if you feel you should be excused on

25  account of hardship relating to COVID-19.  Then I want to give

**PROCEEDINGS**

1    you that chance.

2        I -- COVID-19 was not something that was on the table --

3    well, it was on the table, but it was not as on the table as

4    much as it is now whenever you were selected for jury service.

5        So in fairness to you, I want to give you that chance

6    to -- to explain why it would be a hardship on you to serve or,

7    perhaps, for whatever other reason.  Maybe you feel that you

8    just could not be fair in these circumstances.  I don't know.

9        I'm not suggesting that's the way you should feel, but I

10   am -- I do feel it is important to hear you out if you wish to

11   be heard on this point.  So this will take some time this

12   morning.

13       And then I need to meet with the lawyers while you are in

14   another room to go over whether or not we have enough jurors

15   willing to serve to finish this case as opposed to declaring a

16   mistrial and asking a brand new jury to start all over again

17   some time in the future.

18       So you can see that's where we are.  All right.  Now,

19   again, welcome back.  I think it would be nice to reintroduce

20   the lawyers and the Defendant in the case.

21       I will start with the United States.  Please reintroduce

22   yourselves.

23           **MS. WAWRZYNIAK:**  Good morning, Your Honor, ladies and

24   gentlemen.  I'm Katherine Wawrzyniak, and sitting at the table

25   with me is Michelle Kane.  In the back of the room we have our

1   paralegal Helen Yee --

2           **THE COURT:**  Are you raising your hand because you

3   can't hear?  Yeah, let's start over.

4           **MS. WAWRZYNIAK:**  Good morning.  I'm AUSA Katherine

5   Wawrzyniak.  With me at the table is AUSA Michelle Kane.  In

6   the back of the room we have our paralegal Helen Yee and our

7   case agent Jeffrey Miller.

8           **THE COURT:**  All right.  Welcome to all of you.  And --

9           **MR. GASNER:**  Good morning, everybody.  This is strange

10  to say but hello again.  My name is Adam Gasner, and I'm here

11  with Valery Nechay.

12      We represent Mr. Nikulin who is sitting now over in the

13  corner of the courtroom next to the wall rather than at the

14  table so we can socially distance as we all must do.  Good

15  morning.

16          **THE COURT:**  Okay.  And you may -- I'm sure you have

17  forgotten my name.  My name is Judge Alsup, A-L-S-U-P.  I was

18  the Judge back then, and I will be the Judge as we go forward.

19  And, again, I welcome you back.

20      The court reporter is the same but we got a new deputy

21  here who is going to be doing most of the clerk part.

22      Okay.  Now, what have we done to try to make this safe?

23  Let's go over that.  First, you should be aware that the --

24  there is no recycling of air.  The building pumps in fresh air.

25  And unlike a lot of other buildings that you may be familiar

 1   with, this is 100% fresh air that comes in.  So we don't

 2   recycle the old air in this building.

 3        Secondly, we have social distancing of everybody in the

 4   courtroom, in the courtroom as well as in -- out in the

 5   lobbies.  And there is only one trial at a time, so you would

 6   not have to worry about other -- running into other jurors on

 7   other cases.  There is only one jury in the courthouse at a

 8   time.

 9        One person, I believe, is -- I believe is allowed in each

10   elevator.  That is a bit of a bummer but we get used to it.

11        Everyone must wear a mask except for one person, the

12   witness.  That's why the witness box is surrounded by that

13   plastic.  And why, you might say?  Well, it is so that the jury

14   cannot only hear better but also see their face because if you

15   think they are lying, that's what the whole purpose of a jury

16   is.  You decide is that person lying.

17        And it happens.  I have seen it.  I have been on this job

18   21 years.  Some people sit in that box and they just lie.  So I

19   want the jury to see the face so you can decide are they lying.

20   Got it?  Okay.  So that's the only exception.

21        Now, I have been coming to court for some months now, and

22   we wear masks.  This is the first trial, but I have had other

23   kinds of proceedings; and you just get used to it.

24        At first it looks kind of strange, but I promise you after

25   a few hours you will get used to it; and it won't -- it won't

1  interfere with our ability to do our job.

2      We will have hand sanitizer, Lysol cleaning agents in the

3  courtroom and also in the room that you gather in.

4      This courtroom will be cleaned and sanitized at the end of

5  each day.

6      We have these plastic visors that really are just extra

7  precautions.  The lawyers will be speaking almost always from

8  the Counsel table as opposed to coming up closer though there

9  will be a few times where they have to hand me a document and

10 they will come closer or hand the witness a document.

11     You can wear gloves if you want to.  I have a pair of

12 gloves right here, and I will probably wear them a few times.

13 The gloves, of course, are for your own protection if you think

14 you need them.

15     We will not be passing around a portable microphone like

16 we did last time.  Instead, if you need to use a microphone, we

17 will have one -- it's right there, yes, and you will just speak

18 into the microphone.  I'm talking about the jurors.  And, of

19 course, when you use the microphone, you must use your mask.

20     The cafeteria is back up and running, but it is running

21 under kind of what I call take out circumstances.  You put your

22 order in at one end and you pick it up at the other end and

23 everything is sanitized in between.  And the public doesn't get

24 to go inside the cafeteria, but we do have the cafeteria.

25     And I had hoped -- I hope they brought the coffee into you

1    this morning.  Did they?

2                    (Non-verbal responses)

3         **THE COURT:**  Okay.  Good.  There are some other

4    safeguards but these are the main ones.

5         We think -- in our judgment, we can conduct this trial

6    with your complete safety.  I can't guarantee that.  You know

7    that I can't guarantee that.

8         Let me just give you one example.  Some of you will have

9    to get here through public transit.  Well, maybe you don't

10   trust the public transit.  We can't do anything about the

11   public transit part, but what we can do is try to minimize the

12   risk here in the courtroom.

13        We will spread you out.  So let's say that -- let's just

14   say everybody wanted to serve.  We have an empty seat here.  I

15   will come to that in a minute.  Let's say we would spread you

16   out pretty much the way you are now so that you will be 6 feet

17   at least away from anybody else and that will work.  We will

18   make that work.

19        Okay.  Now, this weekend I had to make an executive

20   decision on Ms. Vasquez.  She, we hope, is not sick but her

21   husband at work was exposed last week to somebody at work who

22   is -- who has COVID-19.  And both of them are in the process --

23   husband and wife are being tested and hopefully the answer is

24   going to come back no problem, but the test can't be

25   administered until tomorrow; but we don't have time to wait

 1   until tomorrow.  So I told her not to come in because it is

 2   conceivable that she could expose some of you, and I didn't

 3   want that to happen so we told her out of safety not to come

 4   in.  So that's the -- that's why that seat is empty.

 5        But we have 15 of the 16.  And our next order of business

 6   is to give you a chance to tell me if you are willing to serve

 7   or whether or not you wish to be -- wish to present facts and

 8   circumstances that in your judgment -- or maybe my judgment

 9   too -- would warrant your being excused from the trial.  And,

10   again, one of my primary goals today is to see if we can seat

11   enough jurors to complete this trial.

12        Failing which, we will have to start all over again with a

13   brand new jury and start all over with the evidence and -- at

14   some future date.  Not this week.

15        So here is what we are going to -- I want you to raise

16   your hand if you feel you want to be excused on account of

17   COVID-19.  I want you to raise your hand.  And I will

18   eventually get around to asking you some specific questions.

19        And, I believe, just to break the ice a little bit, we

20   have -- where is Ms. Chang, Cynthia Chang?  Are you still

21   wishing to be excused?

22            JUROR CHANG:  Yes.

23            THE COURT:  We will come to you.  I have the letter

24   that you have sent in.  But I'm confused.  Are you Number 8?

25            JUROR CHANG:  Yes.

1      **THE COURT:**  Now, that's the only one that I think I

2  know about.  But let's start over here in the jury box with you

3  three.  Do any of f you three wish to have a say on this and to

4  be excused?  If so, raise your hand.

5                          (No response.)

6      **THE COURT:**  Okay.  All three of you willing to serve

7  okay.  Great.  Thank you.

8      Let's start with my right, over here, any jurors seated in

9  that half if you wish to be excused, raise your hand.  Okay.

10  Raise your hand high.  Okay.  I see three hands.

11      **JUROR TATUM:**  Are you talking about vacation or just

12  COVID-19 right now?

13      **THE COURT:**  Okay.  If you want to be excused for any

14  reason, raise your hand.  I can't tell you that I'm going to

15  let you out on vacation, but I will hear that out.  Okay.  All

16  right.  What is your name?

17      **JUROR TATUM:**  I'm Karen Tatum.

18      **THE COURT:**  Tatum?

19      **JUROR TATUM:**  Yes, Number 11.

20      **THE COURT:**  And you are?

21      **JUROR SESSIONS:**  Glenn Sessions, Number 2.

22      **THE COURT:**  Give me that name again.

23      **JUROR SESSIONS:**  Sessions.

24      **THE COURT:**  And back in the back.

25      **JUROR WORKER:**  Steven Worker, Number 16.

1      **THE COURT:**  Worker, all right.   Okay.   Did you raise

2  your hand as well Number 6?

3      **JUROR MORALES:**  No.

4      **THE COURT:**  Again, I want to make sure I have all the

5  hands.   For any reason you want to be excused, raise your hand.

6  I have three of you.   Raise it again.   Just do it again.   All

7  right.   I got them.

8      Now, let's go back to the jury box because I only asked

9  about COVID-19.   Does anyone in the jury box, you three, do you

10  wish to be excused for any reason?

11                     (No response.)

12      **THE COURT:**  Just not COVID-19, any other reason?

13  Raise your hand if so.

14                     (No response.)

15      **THE COURT:**  Okay.   No one is raising their hand.   All

16  right.   Now, we go to my left side of the room.   Raise your

17  hand if you want to be heard for being excused for any reason

18  at all, raise your hand.

19      Ms. Chang, I know about you.   Anyone else?

20                     (No response.)

21      **THE COURT:**  All right.   Okay.   Now, we are going to

22  come to listening to what you have to say in a minute.

23                   (Pause in proceedings.)

24      **THE COURT:**  I'm sorry.   I'm -- there was something

25  that I wanted to ask you, and I just blanked on it.   It will

1    come back to me.

2        I have a different question now.  Raise your hand if you

3    are willing to serve and complete this trial.  I will just tell

4    you what I think -- the trial -- we will have to start about an

5    hour later each day for logistical reasons that I can't go

6    into -- or I could go into, but it is really not worthwhile to

7    go into -- and we will then go until 2:00 o'clock instead of

8    1:00 o'clock.  So you would get here by 8:45 and go to

9    2:00 o'clock rather than 7:45 and go to 1:00 o'clock.

10        I am hoping that all the evidence will be in by the end of

11   this week and that -- that the case could go to you for

12   decision, but I have set aside all of next week just in case

13   I'm wrong because sometimes the lawyers are -- need more time

14   than they tell me they need.

15        So conceivably you would be here through the end of next

16   week; but for certain it is going to be over by the end of next

17   week.  Everybody agree with that on the Counsel --

18        **MS. WAWRZYNIAK:**  Yes, Your Honor.

19        **MR. GASNER:**  Your Honor, the Defense believes

20   certainly the evidence will be concluded by then.

21        **THE COURT:**  Well, but -- I'm talking about

22   deliberations too and verdict.

23        **MR. GASNER:**  I have no way to determine that,

24   Your Honor, but I believe so.

25        **THE COURT:**  All right.  Well, it's up to the jury to

 1  decide how long to deliberate, of course.  So Mr. Gasner is

 2  being careful.  He might decide to -- you might decide to

 3  deliberate a week.  You can see that might push it out further.

 4  I'm just going by what is normal and what is average which is

 5  what I got -- I got to make some judgment calls based on that.

 6     All right.  Now, that having been said, raise your hand --

 7  affirmatively raise your hand if you are willing to serve and

 8  try to complete this case and -- in the timeframe that I have

 9  described.  Raise your hand.  Everybody in the jury box, 1, 2,

10  3, 4 over there.

11     And then how about over here.  Everybody but Ms. Chang; am

12  I right?  Did I say that correctly?  I think so.

13     Okay.  Keep your hands up high.  I just want to make a

14  count.  1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11.  Am I counting that

15  right?

16           **MR. GASNER:**  The Defense thinks so.

17           **THE COURT:**  All right.  You can put your hands down.

18  Okay.

19                (Pause in proceedings.)

20           **THE COURT:**  A different question.  It is important for

21  us to know whether or not you have continued to abide by the

22  admonition not to speak to anybody about this case.  It is okay

23  to say that you are on a jury and you might have to go back to

24  federal court.  That's okay.  I'm talking about substantive

25  discussions about the case.

PROCEEDINGS

1    Have any of you had any substantive discussions about this

2 case with anybody since we broke last?  If so, raise your hand.

3         (No response.)

4    **THE COURT:**  All right.  No one has raised their hand.

5 Have you read anything about this case?  If so, raise your

6 hand.

7         (No response.)

8    **THE COURT:**  Have you heard anything on TV about this

9 case?  If so, raise your hand.

10        (No response.)

11    **THE COURT:**  No one.  Has anyone tried to talk to you

12 about this case but you said no, no, I can't talk to you about

13 this case?  Did that ever happen?

14        (No response.)

15    **THE COURT:**  All right.  I think the answer is negative

16 on all of that.  So good.

17    Okay.  What I want to do now -- I'm going to ask Counsel

18 for their guidance on this.  What I propose to do now is to

19 excuse you back to the jury room where you were a minute ago

20 and to ask -- Ms. Chang, we will start with you, ask you to

21 stay and all the other -- what would it be, 14, I guess --

22 return to that jury room.  It is not a jury room.  It is a

23 whole courtroom, but I'm calling it the jury room.  And then

24 spread out -- by the way, did you get your notes back?  Did

25 everyone get their notepads back?  Okay.  Great.

1    So everybody but Ms. Chang follow Tracy, 6 feet apart,

2    back to the other courtroom; and we will call you in as --

3    yeah, we will call you in one at a time as we need to.  Okay.

4    So everyone please follow Tracy.

5        (Proceedings were heard outside presence of entire jury:)

6        **THE COURT:**  Ms. Chang, please come up here and use

7    this microphone.  And I want to -- first, I want to thank you

8    for your -- you -- your family circumstances, it's -- it's --

9    you are in a sad situation.  So I -- my sympathies to you

10   for -- but I need to do this the formal way.  So would you

11   summarize for us what your reason is wishing to be excused.

12       **JUROR CHANG:**  Sure.

13       **THE COURT:**  Speak more into the microphone.

14       **JUROR CHANG:**  All right.  So when we were doing the

15   jury selection, I had indicated during the questions that I had

16   a family member, brother-in-law, who was terminal and at the

17   time he was getting treatment for his condition.

18       He has glioblastoma, multi form, which is one of the worst

19   cancers you can ever have.  Since that time, he has been

20   undergoing treatment but his health has digressed.  About a

21   week ago his neuro-oncology team at Stanford stated there is no

22   further treatment that he could have because it is getting --

23   the tumors were too progressive, and they spread from the brain

24   all the way down to his spine.

25       So he was discharged to hospice last week.  And right now

**PROCEEDINGS**

1    I live with him, since his diagnosis last year, to be able to

2    help out with his care needs because he could potentially have

3    seizures and other things and this is pre -- you know,

4    pre-treatment.

5         So now he is currently in a very bad state.  Chances are

6    he will pass this month.  He might pass this week or next week.

7    He -- he is blind from the tumors.  He can't speak well.  He

8    can't walk.  My sister is 4 feet 10.  She has a herniated disk.

9    She can't really lift him, so we need at least three adults to

10   move him and to provide just basic things like bathing,

11   bathroom issues.

12        So it's really difficult for me to be here because in the

13   absence of what I call reliable people, who aren't COVID

14   exposed, it is up to our family to stay vigilant to keep him

15   from being at risk to ourselves as well as to him because we

16   want to be able to have the last transition of his life to be

17   as comfortable and as dignified as possible.  And we can only

18   do that if we are -- if the immediate family is able to take

19   care of him at home.

20        So the goal is to keep him home and let him remain because

21   a skilled nursing facility is too dangerous and at risk.  And

22   once he goes in, there will be no more further access to the

23   family and he will die alone.

24             **THE COURT:**  You are living with him now?

25             **JUROR CHANG:**  Uh-huh.

PROCEEDINGS

```
 1            THE COURT:  Is anyone else living with him?

 2            JUROR CHANG:  His wife.

 3            THE COURT:  Okay.  All right.  Any questions by any of

 4    the lawyers?

 5            MS. WAWRZYNIAK:  No, Your Honor.

 6            MR. GASNER:  No, Your Honor.

 7            THE COURT:  Okay.  Can I -- I want to give you a

 8    decision soon, like within an hour or so.  But I want to do all

 9    the decisions at once.  So can I ask you to go back into the

10    other room.  Tracy will take you in there and let's bring

11    Mr. Sessions in.

12            JUROR CHANG:  Thank you, Your Honor.

13            THE COURT:  You are most welcome, Ms. Chang.  You have

14    our utmost condolences.

15            JUROR:  Thank you.

16       (Juror Chang exits)

17       (Juror Sessions enters)

18            THE COURT:  Mr. Sessions, welcome back.  You see the

19    microphone right here in front of the court reporter.  Adjust

20    it so it will catch your voice.  You are pretty tall to speak

21    into it.  I don't know if you want to raise it up but try.  I

22    tell you what, just point it towards your voice.

23            JUROR SESSIONS:  How is that?

24            THE COURT:  That's great.

25            JUROR SESSIONS:  I have a loud voice.
```

1          **THE COURT:**  Okay.  Mr. Sessions, tell us why you

2      should be excused.

3          **JUROR SESSIONS:**  Well, a couple of reasons.  The main

4      reason is my health.  I have -- I will be 70 at the end of the

5      month, 26th.  And I have some chronic conditions, blood

6      pressure, hyperlipidemia, some mild COPD, emphysema; and I have

7      been sheltering at home since March 15th.  This is the first

8      time I have come out any -- rather than going to the

9      supermarket, this is it.

10         And I'm very concerned.  It seems like there have been --

11     a lot of precautions here have been taken, but you are in a

12     public parking lot.  You are walking through -- well, the --

13     anyways, I don't think it is a particularly safe neighborhood

14     and I'm very concerned.

15         You know, after what I have been doing for four months and

16     now I'm putting myself, I think, at risk.  I'm also -- I'm a

17     nurse and that's the main reason also.

18         I'm going to have trouble hearing by the way.  I don't

19     know -- I have some mild hearing loss.  And that's not a major

20     thing, though.  I think I could accommodate that.

21         I also, I am a nurse and I work for the Department of

22     Public Health; but I want to reiterate my main concern is my

23     health -- but I work for the Department of Public Health

24     remotely from home since about March 18th, I think it is.

25         I work with a -- in the hotel -- in the COVID-19

1   containment program in which we get referrals from emergency

2   rooms, homeless shelters, street medicine, which is people that

3   work out in the streets; and then we try to place them if they

4   are appropriate into hotels that are sponsored by the city.

5        It would -- I mean, yeah, I don't know where to start.  It

6   would probably put a burden on the other people -- we have been

7   minimizing the staff.  It was -- we had a staff of 8 nurse.

8   Now it is down to about 5 or 6.  So it will put a burden on the

9   other people that I work with if I'm going to be here for a

10  week, two weeks, whatever it may be.

11       But, again, my main concern is my health.  And working

12  in -- with COVID-19, I don't feel comfortable.  You know, I

13  mean -- and that's about it.

14            **THE COURT:**  Any questions by the lawyers?

15            **MS. NECHAY:**  No questions from the Defense.

16            **MS. WAWRZYNIAK:**  Mr. Sessions, you filled out a couple

17  of written surveys previously.

18            **JUROR SESSIONS:**  I sure did and I mentioned the same

19  thing.

20            **MS. WAWRZYNIAK:**  Right.

21            **JUROR SESSIONS:**  And here I am.

22            **MS. WAWRZYNIAK:**  On the second one, you said you

23  didn't really remember the first couple days of testimony.

24  Could you elaborate on that comment?

25            **JUROR SESSIONS:**  Well, that -- well, I mean it is four

**PROCEEDINGS**

1   months ago.  You know what I mean?  I mean, maybe there is an

2   extreme -- if there is a refresher, if there is a summary,

3   perhaps; but I don't -- I mean, that is the other thing.  You

4   expect people to know four months ago from what went down?

5        I'm sorry.  I just -- you know, I don't want to -- yeah, I

6   mean, if there was a refresher, I probably would be okay.

7             **MS. WAWRZYNIAK:**  Okay.  Thank you.

8             **JUROR SESSIONS:**  I resent a lot of this.

9             **MS. WAWRZYNIAK:**  Nothing further from the Government,

10  Your Honor.

11            **THE COURT:**  Okay.

12            **JUROR SESSIONS:**  I'm sorry to be so blunt, but that's

13  just how I feel.

14            **THE COURT:**  You raise very reasonable points.  You

15  see -- I'm sure you see it from --

16            **JUROR SESSIONS:**  I'm sorry.  I can't hear you.

17            **THE COURT:**  I'm sure you see it from the point of view

18  of the criminal justice system too?

19            **JUROR SESSIONS:**  Yeah.

20            **THE COURT:**  We can't just shut down trials because of

21  COVID-19.  People have the right to due process.

22            **JUROR SESSIONS:**  Yeah, I respect that.  Sure.

23            **THE COURT:**  So -- all right.  Anything more you want

24  to say?

25            **JUROR SESSIONS:**  No.  I think I have said it all.  I

**PROCEEDINGS**

1    don't mean to be disrespectful.  I'm just --

2         **THE COURT:**  Okay.  Possibly I will have some more

3    questions, but I can't think of any right now.

4         So I'm going to ask Tracy to take you back and bring in

5    Mr. Worker, please.

6         **JUROR SESSIONS:**  Okay.  Thank you.

7         **THE COURT:**  Tracy, when you do it, you might get

8    Ms. Tatum too to stand out here in the hall, so she will be

9    ready to go.

10        (Mr. Sessions exits)

11        (Mr. Worker enters).

12        **THE COURT:**  Mr. Worker, welcome back.  And please

13   stand right there so we can all hear you.  Just point the

14   microphone at your voice.  You are a tall guy.  Why don't you

15   say your name so I can make sure that we can hear you.

16        **JUROR WORKER:**  Yes.  It is Steven Worker.

17        **THE COURT:**  Very good.  Please tell us why you should

18   be excused.

19        **JUROR WORKER:**  Sure.  So I have an underlying medical

20   condition that may increase my risk of severe COVID symptoms.

21   I'm type 1 diabetic.

22        **THE COURT:**  Okay.

23        **JUROR WORKER:**  I also have a note from my doctor

24   confirming that.

25        **THE COURT:**  I'm sorry.  What about your doctor?

PROCEEDINGS

1      **JUROR WORKER:**  I have a note from my doctor confirming

2   I have type 1 diabetes.

3      **THE COURT:**  Just read the note into the record if you

4   don't mind.

5      **JUROR:**  Got it.

6      It says (reading):  "Steven Worker is a patient under my

7   care.  It is my medical opinion that the above-named patient's

8   present health should preclude him from serving jury duty as he

9   is a type 1 diabetic.  With the current COVID-19 outbreak, it

10  is best he minimizes exposure outside the home."

11      It is signed by Sarah Cerrona, Nurse Practitioner, Sutter

12  Health.

13      **THE COURT:**  All right.  Do you have any reason to

14  believe, though, that you are ill at the moment?

15      **JUROR WORKER:**  I do not.

16      **THE COURT:**  Okay.  So are you sheltering in place at

17  home?

18      **JUROR WORKER:**  I'm working from home.  That's correct.

19      **THE COURT:**  What do you go outside the home for?

20      **JUROR WORKER:**  This, today.  Dropping off my child

21  with my parents for childcare.  We get groceries delivered.

22  Yeah, that's about it.

23      **THE COURT:**  What town do you live in?

24      **JUROR WORKER:**  Sonoma County.

25      **THE COURT:**  Any questions from the lawyers?

**PROCEEDINGS**

```
 1           MS. NECHAY:  No questions from the Defense,
 2  Your Honor.
 3           MS. WAWRZYNIAK:  Or from the Government, Your Honor.
 4           THE COURT:  Okay.  Thank you, please take -- keep your
 5  note.  And Ms. Tatum can come in now.
 6        (Mr. Worker exits).
 7        (Ms. Tatum enters).
 8           THE COURT:  Good morning, Ms. Tatum.
 9           JUROR TATUM:  Hello.
10           THE COURT:  Please point the microphone at your voice.
11           JUROR TATUM:  Hello.  Good morning.
12           THE COURT:  Very good.  Please explain to us why you
13  should be excused.
14           JUROR TATUM:  I had put on the jury response form that
15  I had vacation all of next week.  I did bring a copy of my
16  reservation that shows that it was made last August for the
17  whole week.  So I did bring a copy of that if you need to see
18  it.
19           THE COURT:  Why didn't you bring it today?
20           JUROR TATUM:  I'm sorry?
21           THE COURT:  Why didn't you bring it today?  I may need
22  to see it.
23           JUROR TATUM:  I didn't know if you needed to see it.
24        Anyway, that is why I'm asking because you said it was
25  supposed to go until -- for two weeks.  So -- and I did have
```

PROCEEDINGS

1    plans next week so --

2           THE COURT:  Tell us about your planned vacation.

3    Where is it going to be?

4           JUROR TATUM:  It is a private beach house down in the

5    Monterey area that we go to every summer.  It is a family

6    vacation.

7           THE COURT:  Have you already paid for it?

8           JUROR TATUM:  Yes.

9           THE COURT:  And that starts next, when, Monday?

10           JUROR TATUM:  It is from the 12th through the 19th,

11    which is Sunday through Sunday.

12           THE COURT:  When did you put the money down?

13           JUROR TATUM:  We have been paying it since last

14    August.

15           THE COURT:  I don't understand what you mean.

16           JUROR TATUM:  Well, we confirmed the reservation in

17    August, and then we made payments throughout the year.  So it

18    is paid in full now for us to go next week.

19           THE COURT:  Any questions by the lawyers?

20           MS. NECHAY:  Not from the Defense, Your Honor.

21           MS. WAWRZYNIAK:  Is there anything that would prevent

22    you from sitting this week?

23           JUROR TATUM:  This week, no.

24           MS. WAWRZYNIAK:  Just next week?

25           JUROR TATUM:  Just next week, yes.

PROCEEDINGS

```
1           THE COURT:  Okay.  Thank you.  Tracy, will take you

2      back to the other room.

3           JUROR TATUM:  Thank you.

4        (Juror Tatum exits)

5           THE COURT:  I think we have now gone through everyone

6      who wished to be excused, have we?

7           MR. GASNER:  The Defense thinks so, yes.

8           MS. WAWRZYNIAK:  Yes, Your Honor.

9           THE COURT:  All right.  Let's start with Ms. Tatum.

10     What do you lawyers think?

11          MS. NECHAY:  From the Defense perspective, Your Honor,

12     I believe that these are -- these individuals that requested

13     hardships, I believe that they are legitimate hardships.  And

14     I believe we are still in a position where we can move forward

15     with 11 jurors and I --

16          MR. GASNER:  Your Honor, specifically with regard to

17     Ms. Tatum, I believe that, you know, a prepaid trip typically

18     is a hardship.  We did not hardship this jury for this amount

19     of time, but I know it is an unusual circumstance.

20        So of the four, if we were to keep somebody, I think

21     Ms. Tatum would be likely the one we would keep given what the

22     others have said.

23          MS. NECHAY:  I will add just one more comment,

24     Your Honor.  I'm just hesitant to keep a juror that -- that

25     does not wish to be seated and has an obligation because
```

1    oftentimes that results in a jury wanting to rush a verdict.

2    And so I just would not want to put her in that situation.

3          THE COURT:  What does the Government say?

4          MS. WAWRZYNIAK:  I think we agree with Mr. Gasner's

5    comments.  Of the four, Ms. Tatum might be someone that we

6    consider keeping for this week; but I take the point that

7    Ms. Nechay just made.  So I think we are fine with all four of

8    them being excused.

9          MR. GASNER:  I would -- Your Honor, may I just have a

10   moment to confer with Counsel?

11         THE COURT:  Sure.

12               (Pause in proceedings.)

13         MR. GASNER:  Your Honor, thank you.  Certainly with

14   regard to Ms. Tatum, I believe she is available this week.

15   Given the amount of evidence we anticipate, I anticipate the

16   jury getting the case this week.

17       If we were to keep her and excuse the other three, I think

18   that we would have 12 jurors, which I vastly -- from the

19   Defense perspective -- prefer.  We do understand that the rules

20   allow to go to 11 during deliberations even without the Defense

21   acquiescence if the Court found there was good cause.

22       I wouldn't object to her being excused next week

23   necessarily if that was necessary were the jury to be

24   continuing deliberating or were the case yet -- not yet to the

25   jury.

PROCEEDINGS

 1          I will submit it on that.  But my consideration is that

 2     with her, we have 12.  Without her, we have 11.  I understand

 3     we have stipulated to possibly getting to below 11 -- excuse

 4     me -- 12 all the way down to possibly 6.  But certainly keeping

 5     12 would be the Defense's preference understanding that the

 6     Defense would not object to her being excused during

 7     deliberations, frankly, or even -- even where evidence was

 8     still coming in given the stipulation that we have.  But I'm

 9     endeavoring to maintain a whole jury of 12.

10          **THE COURT:**  I think what you are saying is that as

11     long as there is a plausible chance to get a verdict by the end

12     of this week, you would like to keep her.

13          **MR. GASNER:**  I think she is available, and that would

14     be the Defense preference.

15          **THE COURT:**  All right.  And if, on the other hand, if

16     it becomes clear that we are going to go into next week no

17     matter what, you would be willing to excuse her at that point?

18          **MR. GASNER:**  Yes, Your Honor.  You have the Defense

19     position correct.

20          **THE COURT:**  But with respect to the others, you would

21     say go ahead and dismiss them?

22          **MR. GASNER:**  I believe they presented a sufficient

23     hardship that the Defense would submit it to the Court and have

24     no objection.

25          **THE COURT:**  All right.  Okay.  Let me hear from the

**PROCEEDINGS**

1  Government.

2  **MS. WAWRZYNIAK:**  With respect to Ms. Tatum, we are

3  concerned that she will be distracted this week given the

4  vacation next week.  So on balance, we favor excusing her now.

5  **THE COURT:**  All right.  Before I make a ruling, I want

6  to make sure you are all in agreement with respect to

7  Ms. Vasquez that I told not to come in today because her

8  husband had been exposed and maybe she too.  Can we all agree

9  to excuse her?

10  **MS. NECHAY:**  Yes, Your Honor.  The Defense agrees to

11  excuse Ms. Vasquez.

12  **MS. WAWRZYNIAK:**  The Government also agrees to excuse

13  Ms. Vasquez.

14  **THE COURT:**  All right.  So the Court is going to

15  excuse Chang, Worker and Sessions.  And we will do what the

16  Defense has suggested as our plan for Ms. Tatum is to try to

17  finish the case this week and get it to the jury.  But if it

18  becomes clear that is not going to work, then we will re-visit

19  her and maybe excuse her at that time even if it's, say,

20  Thursday we might know for sure it is not going to work.

21  So that -- that's what we will do on Ms. Tatum.  We will

22  have 12 exactly.  Yes?

23  **MS. WAWRZYNIAK:**  Your Honor, we have one other jury

24  issue that we want to raise right now.

25  **THE COURT:**  Okay.

PROCEEDINGS

 1          MS. WAWRZYNIAK:  So in the prior written responses,

 2   which were filed on the public docket, there were five other

 3   jurors that from the Government's view raised concerns.  And we

 4   think that it would be prudent to voir dire those five jurors

 5   so as to effectively rehabilitate them on the record before we

 6   resume trial.

 7      If you would like I can go through the five.

 8          THE COURT:  Yes, I think you should.  I don't remember

 9   it.

10          MS. WAWRZYNIAK:  Okay.  So the first one is juror

11   Nancy Serpa.  She is the one who is a frontline physician.

12          THE COURT:  What is her number?

13          MS. WAWRZYNIAK:  She is listed as --

14          THE CLERK:  7.

15          MS. WAWRZYNIAK:  As juror Number 7.  And I think we

16   should just voir dire her about does she believe that she is

17   continuing to be exposed; what precautions is she proposing to

18   take; just make sure that we get that sort of cleaned up on the

19   record given the prior written responses.

20          THE COURT:  I don't get it.  What is the problem?  She

21   says she is willing to serve now.  Why should I open up that

22   can of worms?

23          MS. WAWRZYNIAK:  Well, I think it is already on the

24   record in the written responses.  And so from our perspective,

25   I think it just makes it cleaner if she is has addressed the

 1 │ concerns rather than having -- you know, there wasn't a prior

 2 │ opportunity to directly voir dire these people on the points

 3 │ that they raised.  So I think it might give more comfort for

 4 │ the record rather than leaving it hanging there.

 5 │         THE COURT:  I don't know.  Give me another example.

 6 │         MS. WAWRZYNIAK:  Juror Number 4, Alyssa Zhen, in the

 7 │ second response she said that she currently had symptoms.  Her

 8 │ mom is a nurse and may have been exposed and that she has

 9 │ opinions about the case.

10 │         THE COURT:  Everyone is entitled to an opinion about

11 │ the case.  The question is whether -- I mean, you can't -- no,

12 │ we are not going to get back into that opinion -- opinions are

13 │ okay.  What matters is whether or not they will be fair and

14 │ impartial and be able to listen to all the evidence.  Be fair

15 │ and impartial.  Follow the law.  But you can't ask somebody not

16 │ to have opinions about the case.

17 │         MS. WAWRZYNIAK:  Right.  If we were at voir dire at

18 │ the beginning of the case, Your Honor, and a juror raised a

19 │ concern like this, that's exactly what we would do.  We would

20 │ say:  Given that you have raised this point, can you still be

21 │ fair and impartial?  And if they affirmed, we would all move

22 │ on.  I'm proposing that that's what we do here.

23 │         THE COURT:  All right.  Give me your next one.

24 │         MS. WAWRZYNIAK:  Miguel Moreno had previously raised

25 │ the concern that his wife has asthma and was very concerned

 1   about her exposure even with precautions.

 2          **THE COURT:**  That's Number 3?

 3          **MS. WAWRZYNIAK:**  Yes, Your Honor.  The next one is

 4   Number 9, Bradley Thaute.  He previously said that he considers

 5   himself high risk.  He stated:  My health is more important

 6   than anything.  That was on the first questionnaire.  He didn't

 7   respond to the second.

 8          And then lastly juror Number 10, Jacques Campos,

 9   previously said he had concerns about himself and his spouse

10   and that resuming was, quote, greatly concerning regardless of

11   precautions.

12          **MS. NECHAY:**  Your Honor, may the Defense respond to

13   the Government's request?

14          **THE COURT:**  Of course.

15          **MS. NECHAY:**  While I think that juror -- the physician

16   juror Serpa, while I think it is reasonable to voir dire her on

17   the subject of whether she continues to be exposed.  I think

18   that is reasonable.

19          I think we are just getting into a can of worms, like you

20   said, with the other jurors.  They had an opportunity in court

21   just a few minutes ago to voice these concerns.

22          Everybody has concerns about their family in the age of

23   COVID, but I don't think that rises to a hardship; and I don't

24   see how that would benefit us moving forward -- to move forward

25   by continuously addressing these issues given that we already

**PROCEEDINGS**

1  have.  They have chosen to affirmatively say that they wanted

2  to continue as jurors.

3        **THE COURT:**  Well, that's my thinking too; but what is

4  it that you think we should ask Ms. Serpa?

5        **MS. NECHAY:**  If she continues to be engaged with

6  patients that are exposed to COVID and how frequently and what

7  type of PPE is used in her job.

8        **THE COURT:**  Is she a nurse?

9        **MS. NECHAY:**  I believe she is a physician.

10        **THE COURT:**  All right.  So both sides want to quiz

11  her; is that right?

12        **MS. NECHAY:**  I believe so.

13        **MS. WAWRZYNIAK:**  Yes, Your Honor.

14        **THE COURT:**  All right.  So let's bring Ms. Serpa in.

15        **INTERPRETER:**  Your Honor, may the interpreter ask the

16  attorneys to speak into the microphone.

17        **THE COURT:**  Please, lawyers, talk into your

18  microphones.  I thought they were but apparently not.

19        **INTERPRETER:**  We are having trouble hearing the U.S.

20  Attorneys' table.

21        **THE COURT:**  The U.S. Attorney is not talking into the

22  mic so --

23        **MS. NECHAY:**  Sorry, Your Honor.  The Defense has a

24  request; just after Ms. Serpa be voir dired, that we can recess

25  for a short bathroom break after that point?

1              **THE COURT:**  Yes.   Okay.

2         (Juror Serpa enters)

3              **THE COURT:**  Come on in.   Welcome back.   It is

4    Dr. Serpa; right?

5              **JUROR SERPA:**  Yes.

6              **THE COURT:**  How are you today?

7              **JUROR SERPA:**  Okay.

8              **THE COURT:**  On -- you raised your hand that you are

9    willing to serve.

10             **JUROR SERPA:**  Yes.

11             **THE COURT:**  And very much appreciate that.   Thank you.

12        We noted, though, that you had said in one of your

13   questionnaires a few times back that as a doctor, you were

14   being exposed to COVID-19 patients, something like that.

15             **JUROR SERPA:**  Uh-huh.

16             **THE COURT:**  So that's got some people worried that

17   maybe you are exposed yourself and I guess could expose the

18   rest of us.   So help us understand your situation with respect

19   to that risk.

20             **JUROR SERPA:**  Certainly.   So I am still going into

21   clinic every day.   We have our temperatures screened on the way

22   in the door.   We wear masks while we are there.

23        I change my clothes before I leave the clinic or as soon

24   as I arrive home to not carry it in.

25        I live alone.   I do -- I am the primary provider for my

1    parents.  So I wear a mask when I go to see them, and I wipe

2    everything down from the grocery store.

3        I still do hospital work.  I have cared for a few COVID

4    patients remotely, so I have found ways now to try to minimize

5    my exposure not just to my parents but also to bring it to the

6    jury.  So I have cared for them remotely, telemedicine or

7    contacting people around them.

8        I have tried to stay out of the hospital specifically with

9    the jury in mind and my parents.

10        **THE COURT:**  Let me elaborate on that.  When is the

11   last time you were physically in the presence of somebody who

12   is a COVID-19 patient?

13        **JUROR SERPA:**  Known, I have stayed away since March.

14        **THE COURT:**  Say what?

15        **JUROR SERPA:**  I have stayed away since March, a known

16   patient.

17        **THE COURT:**  All right.  So what is the last time you

18   were in physical contact with somebody who in turn might have

19   been exposed?

20        **JUROR SERPA:**  Well, that's every day I go to clinic.

21   So I'm exposed to physicians and nurses there I share an office

22   with.

23        **THE COURT:**  Okay.  And there do you wear the PPE and

24   the mask and so forth?

25        **JUROR SERPA:**  So there are -- our respiratory clinic

**PROCEEDINGS**

1  that takes care of COVID patients is in the garage, but they

2  come in -- they wear PPE there.  We do not wear anything other

3  than our masks, and then some -- and then I wear my glasses to

4  prevent anything going in my eye.

5      So I always cover my hair and -- I look similar to this

6  except I'm normally in scrubs and shoe covers and whatnot.

7          **THE COURT:**  Well, you tell us.  You are a professional

8  so you know more than anybody in the room.

9          **JUROR SERPA:**  Yeah.

10         **THE COURT:**  What is the risk that you -- now or during

11  the course of the next two weeks would present any material

12  COVID-19 risk to the rest of the jury?

13         **JUROR SERPA:**  Very low.

14         **THE COURT:**  Very low meaning less than 1 percent?

15         **JUROR SERPA:**  As non-existent as I could possibly make

16  it.

17         **THE COURT:**  Say it again.

18         **JUROR SERPA:**  As non-existent as I could possibly make

19  it.

20         **THE COURT:**  I know that is what you are trying to, but

21  in your professional judgment it is a very low risk --

22         **JUROR SERPA:**  Yes.

23         **THE COURT:**  -- that you would contaminate someone

24  else?

25         **JUROR SERPA:**  Yes.

```
 1              THE COURT:  All right.  And if we were to try to
 2   isolate the pathway that -- the scenario, would it be to
 3   somebody in the garage gets -- comes up and after they -- even
 4   though they have shedded, I guess, their PPE; and they come up,
 5   they somehow have residual COVID-19 on their body someplace and
 6   that gets out into the workplace and gets through your mask.
 7   Is that the risk that we are worried about?
 8              JUROR SERPA:  Yes.
 9              THE COURT:  And you say that's a very low risk?
10              JUROR SERPA:  I can say with all certainty that the
11   three months we have been there no one has been infected.
12              THE COURT:  Okay.  Is the -- I understand the patient
13   load is reduced now; is that correct?
14              JUROR SERPA:  No.  As of June 1st we are now seeing
15   patients pretty consistently back in the clinic.  Prior to
16   that, I was doing a lot of telemedicine.  I still do a fair
17   amount of telemedicine, but we are seeing patients in the
18   office.  They are screened at the door with questions and
19   temperatures and they are given masks.
20              THE COURT:  Okay.  Now, if you resume on the jury,
21   would you be willing to stay away from the clinic until --
22              JUROR SERPA:  Yes.
23              THE COURT:  -- until we are done in the courtroom?
24              JUROR SERPA:  Yes.  I blocked three weeks to not go
25   back in.
```

1          **THE COURT:**  All right.  Do the lawyers have any

2    questions?

3          **MR. GASNER:**  No Your Honor.  Thank you very much,

4    Doctor.

5          **MS. WAWRZYNIAK:**  No, Your Honor.

6          **THE COURT:**  I do have one other question, Dr. Serpa.

7    When is the last time you were at the clinic itself?

8          **JUROR SERPA:**  What is today, Monday?  Friday.

9          **THE COURT:**  When?

10         **JUROR SERPA:**  No.  I'm sorry.  Thursday.

11         **THE COURT:**  Thursday.  Okay.  And you don't have any

12   symptoms of any type I assume?

13         **JUROR SERPA:**  No.  And I checked my temperature.

14         **THE COURT:**  Okay.  You know, we thank your profession.

15         **JUROR SERPA:**  Thank you.

16         **THE COURT:**  Really.  Thank you.  Okay.  Go back to the

17   other room.

18       (Juror Serpa exits)

19         **THE COURT:**  Okay.  What do you lawyers think?

20         **MS. WAWRZYNIAK:**  The Government is fine with Dr. Serpa

21   continuing to serve, Your Honor.

22         **MS. NECHAY:**  The Defense has the same position.

23         **THE COURT:**  Great.  Yeah, I think she will be fine.

24     I don't think there was a good enough reason to bring any

25   of those other people back in here to quiz them, but give me

1    your best other case and let me think about it again.

2                        (Pause in proceedings.)

3            **MS. WAWRZYNIAK:**  I think the best other case would be

4    Alyssa Zhen, juror Number 4.

5            **THE COURT:**  Number 4?

6            **MS. WAWRZYNIAK:**  Just because she reported previously

7    that she had symptoms, I think we would just want to follow up

8    if she did -- if she had a COVID-19 test and if so, what the

9    results were and to make sure she is feeling fine now.

10           **THE COURT:**  What was it she said on the questionnaire

11   that was troubling?

12           **MS. WAWRZYNIAK:**  She said she currently has symptoms.

13   Her mom is a nurse and may have been exposed.

14           **THE COURT:**  Okay.  Bring Ms. Zhen in.

15           **MS. NECHAY:**  Your Honor, pardon the interruption but

16   we do need a bathroom break at this time.

17           **THE COURT:**  All right.  We will do that but who is

18   your next -- after Zhen, who did you have in mind?

19           **MS. WAWRZYNIAK:**  I think maybe the other one would be

20   Number 9, Bradley Thaute, who had the -- he, himself, he said

21   he reported that he considers himself high risk.

22           **THE COURT:**  All right.  Those will be the only two.

23   Tracy, fish those two out.  Have them stand by in the hallway.

24   We will take a 15-minute bathroom break.

25       By the way, when we do resume the trial, I'm going to give

PROCEEDINGS

1   each side 15 minutes to summarize the evidence.  Fifteen.  I

2   think that will be plenty.  And then we are going to start with

3   a real witness.

4        So 15-minute break.  Thank you.

5                    (Recess taken at 10:26 a.m.)

6                (Proceedings resumed at 10:46 a.m.)

7        THE COURT:  Back on the record, everyone is here.  We

8   are going to bring in those two, one at a time.

9        THE CLERK:  Okay.

10                   (Pause in proceedings.)

11       THE COURT:  While she is getting it, will you read

12  from Mr. Zhen (sic) what his problematic statement was that you

13  are concerned about.

14       MS. WAWRZYNIAK:  Ms. Zhen reported in May that she had

15  symptoms.  Her mom is a nurse and may have been exposed.

16       THE COURT:  All right.

17    (Juror Zhen enters)

18       THE COURT:  Welcome.

19       JUROR ZHEN:  Hello.

20       THE COURT:  How are you doing?

21       JUROR ZHEN:  Good.

22       THE COURT:  Great.  I don't -- I don't know if there

23  is a problem or not.  I don't think so because you raised your

24  hand that you were willing to continue and to serve.

25       But out of caution, we noted that in one of your earlier

**PROCEEDINGS**

1  questionnaire answers some months back, you stated that you

2  might have been exposed.  Your mother was a nurse and at that

3  time you thought you might have symptoms.

4      So obviously you are here today and you look perfectly

5  healthy, and maybe there is no problem; but we just want to

6  clear that up and see.  So is everything good with you now?

7          **JUROR ZHEN:**  Yeah, I don't have any symptoms right

8  now.

9          **THE COURT:**  All right.  So that was just out of excess

10  caution you told us that in the past, but you are fine to go

11  now?

12          **JUROR ZHEN:**  Yeah.

13          **THE COURT:**  Yes?

14          **JUROR ZHEN:**  Yeah.

15          **THE COURT:**  Any questions by the lawyers?

16          **MS. WAWRZYNIAK:**  No.

17          **THE COURT:**  Does your mother work with any COVID-19

18  patients?

19          **JUROR ZHEN:**  Well, she is a nurse so yes.

20          **THE COURT:**  You are sure of that.  I mean, there are a

21  lot of nurses who don't work with COVID-19.  Do you -- there

22  are -- in other words, it just depends on their assignment.

23          **JUROR ZHEN:**  Yeah, I don't know.  She works in the

24  hospital.

25          **THE COURT:**  All right.  Which hospital is it?

1          **JUROR ZHEN:**  Chinese Hospital in San Francisco.

2          **THE COURT:**  Now, just out of caution while the trial

3    is underway, would you be able to stay away from your mom or do

4    you live with your mom?  Is it possible for you to stay away

5    from her?

6          **JUROR ZHEN:**  It is possible.

7          **THE COURT:**  Would you be willing to help us out on

8    that?

9          **JUROR ZHEN:**  Yes.

10         **THE COURT:**  And so somebody won't worry that she is

11   bringing home COVID-19.

12         **JUROR ZHEN:**  Uh-huh.

13         **THE COURT:**  All right.  Thank you.  Anything the

14   lawyers want to ask?

15         **MS. WAWRZYNIAK:**  No, Your Honor.

16         **MS. NECHAY:**  No, Your Honor.

17         **THE COURT:**  All right.  Please go back into the other

18   room.  Thank you, Ms. Zhen.

19      (Juror Zhen exits)

20      (Juror Moreno enters)

21         **THE COURT:**  Mr. Moreno, welcome back.  I have a

22   question for you.  You said something -- one of the lawyers,

23   read it out loud again on one of your earlier questionnaires.

24   I know you raised your hand you are willing to serve and that's

25   great, but we just want to clear up something from one of your

1    earlier questionnaire answers.  If one of the lawyers will read

2    it out to me now.

3            **MS. WAWRZYNIAK:**  Yes.  You previously said that you

4    consider yourself high risk, I think, of developing

5    complications should you contract COVID-19.

6        And you wrote on the questionnaire:  "My health is more

7    important than anything."

8        So I think we just wanted to check in with you to see how

9    you were feeling about your own health situation having heard

10   all the precautions that are going to be in place.

11           **JUROR MORENO:**  Yeah, but still it is kind of -- you

12   know, worries me being this close proximity.

13           **THE COURT:**  You have to talk into the microphone.  I

14   didn't hear you.

15           **JUROR MORENO:**  It still bothers me being this close

16   and being close to everybody here.  You know, I have been

17   sequestered.  You know, I haven't been exposed to anybody that

18   I know of; but this still does concern me greatly.  And I

19   understand the precautions and everything, and I appreciate

20   that; but I'm concerned greatly.

21           **THE COURT:**  Well, what do you -- during the daytime,

22   what do you do?

23           **JUROR MORENO:**  I'm a general contractor.

24           **THE COURT:**  What?

25           **JUROR MORENO:**  I'm a home builder.

**PROCEEDINGS**

```
 1          THE COURT:  Do you go out and work?

 2          JUROR MORENO:  Pardon?

 3          THE COURT:  Do you go out and work?

 4          JUROR MORENO:  Yes.  But I'm -- you know, I social

 5   distance.  I don't get near my guys.  And I have a project at

 6   the end, and I have nothing so far so -- it is just -- it just

 7   concerns me.

 8          THE COURT:  Well, yes, everyone of us is concerned.

 9          JUROR MORENO:  I understand that.

10          THE COURT:  I'm a lot older than you.  I'm more

11   vulnerable than you.  I'm concerned.  Everyone is concerned.

12   But if you are going out and working on the job-site every day,

13   then this is not going to be any worse.  You are going to be at

14   least 6 feet away from everybody here.

15       Now, I need, though, to ask you a question.  You raised

16   your hand that you were willing to serve despite COVID-19, and

17   you are not asking to be relieved from jury service.  Is

18   that -- did I understand you correctly?

19          JUROR MORENO:  Yes, sir.

20          THE COURT:  All right.  So I'm going to just leave it

21   at that.  Does anybody else have a question for the juror?

22          MR. GASNER:  No, Your Honor.

23          MS. WAWRZYNIAK:  No further questions, Your Honor.

24          THE COURT:  All right.  Thank you, Mr. Moreno.  Please

25   go back to the other room.  And, again, as you said, maintain
```

PROCEEDINGS

 1   your social distancing.

 2       (Juror Moreno exits)

 3       **THE COURT:**  All right.  I don't think we should

 4   continue with this.

 5       I think it's -- what I'm going to do is bring everybody

 6   back in.  I'm going to excuse those that we have said that we

 7   would excuse.

 8       I'm going to remind everyone about their oath and their --

 9   what their duties are and give them one last chance to raise

10   their hand to say, okay, about any issue.  And then we are

11   going to -- you know, because we have a snaggle-tooth

12   arrangement now, we will re-seat people to fill in in the most

13   efficient manner since we will be down to 12, I guess; right?

14       **MR. GASNER:**  That is correct, Your Honor.  The Defense

15   would inquire with regard to the juror that has the vacation

16   scheduled whether she is going to be -- whether it is going to

17   be explained to her that we are keeping her on for this week

18   and we will readdress it if necessary, so that she is aware

19   that we are taking into consideration her travel plans.

20       **THE COURT:**  What I plan to say to Ms. Tatum when she

21   is here --

22       **MR. GASNER:**  Yes.

23       **THE COURT:**  -- is that we have a reasonable chance of

24   finishing this case this week with a verdict.  And because of

25   that, we think it's -- we want her to stay.

1    But if it becomes clear to us that we will not be able to

2    get a verdict this week, then we are going to re-visit her -- I

3    will just say that we are going to excuse her.

4         **MR. GASNER:**  Yeah, I think we could -- I think we

5    could re-visit her with the intention that excusing her were

6    she to say at that time that she was unable to serve further,

7    perhaps she will be invested and wish to serve once she has

8    heard the balance of the evidence.  I'm flexible with either

9    way, but I would certainly leave it to her if the time came.

10        **THE COURT:**  All right.  I suppose there is a chance

11   that she would change her mind.  That's possible.

12        Okay.  Does anyone have any other comments on my proposed

13   mode of proceeding?

14                          (No response.)

15        **THE COURT:**  All right.  So we need to re-seat our

16   jurors and bring everyone in this time, okay.

17        (Proceedings were heard in the presence of the jury:)

18        **THE COURT:**  All right.  We made progress.  Welcome

19   back.

20        And let me go through these one at a time.  Ms. Chang, you

21   are excused and, again, with our condolences for your family

22   situation.  You are free now to go.  You have no longer any

23   obligations to serve on the jury, and you may go back to your

24   family care responsibility.  All right.  So you may just exit

25   now.

1      Mr. Sessions, on account of your peculiar health situation

2  that you are in, we are going to excuse you.  So you are free

3  to go as well.

4      Mr. Worker, same for you.  You are excused.  The Clerk

5  will want to collect your badges.  Thank you.  Good luck

6  everyone.  Thank you.

7      All right.  Now, Ms. Tatum, Ms. Tatum, we think there is a

8  reasonable chance but not a certainty that the case will be

9  over this week including verdict.  So we are going to not

10 excuse you for the time being.  But if it turns out that we are

11 wrong on that, and it becomes clear that we have to go into

12 next week, then I want you to raise it again if you wish; and

13 we are sympathetic to your problem with the conflict.

14      **JUROR TATUM:**  Okay.

15      **THE COURT:**  All right.  Very good.  Thank you.  I

16 appreciate your patience with us.

17      Also, you -- even though she is not here, Ms. Vasquez,

18 because her husband was exposed and she has to take a test

19 herself tomorrow, we have all agreed to excuse her even though

20 she may not be sick at all but we can't wait.  We just cannot

21 postpone everything until we get the results of the tomorrow.

22 In fact, we might not get the tests -- the results for another

23 day after that.  So meanwhile you would all have to wait.  So

24 that's not going to work.  So she is excused.

25      So now, we are down to 12 people; and I -- I think what we

1    are going to do in a bit is to rearrange ourselves so that --

2    we will leave everybody seated where they are for now, okay.

3    But we may rearrange it so that more of you are over there and

4    less -- and fewer of you are over on my left, but let's not --

5    let's not do that yet.

6        Now, I -- I want to be as cautious as I can on this.  I

7    want to remind you of what your duty is as a jury and to make

8    sure that you feel after this long delay that you are still

9    able to do your job as a jury.

10       Under our system, which is right there in the Constitution

11   and the Bill of Rights, the jury decides the case, not the

12   Judge.  And that's a good thing because we want our -- that

13   protection in our system.

14       So you decide the case, not me.  What I have to do is tell

15   you what the law is, what the elements of proof are that the

16   Government must meet.  And then you decide if the Government

17   has proven those beyond a reasonable doubt.

18       And in doing that, you must follow my instructions of law.

19   I haven't given those to you yet, but I will give those to you

20   before you go to deliberate; and I will give it to you in

21   writing as well.

22       And you must follow those instructions, but it is up to

23   you to decide whether the Government has proven it or not

24   proven it.  That's always the jury's call.

25       But you have got to do that fair and square.  You have to

1    be fair to both sides; pay attention to the evidence and

2    deliberate fairly.   Listen to the other -- what other points of

3    view within the jury room and to be conscientious as a jury.

4    So you must follow the law.   You must be fair and pay attention

5    to the evidence as it comes in.

6         I'm also going to let these lawyers give you a short

7    summary of the evidence to date of what has happened so far.

8    That may help refresh your memory, and, of course, you have

9    your notes and your own memory.   So that will help too.

10        So with the -- with that admonition in mind about what it

11   is that you, the jury, does, I want you to raise your hand if

12   you -- and re-promise to me once again that you are able and

13   willing to follow the instructions and to be fair and square to

14   both sides and to be a good juror in this case.   And by good

15   juror, I don't mean which way you come out.   I just mean decide

16   it fairly.

17        So -- and if you feel you cannot give me that promise, we

18   are going to have a further discussion; but if you can, then I

19   want you to raise your hand.   So please hold it up high so I

20   can make sure that everybody is raising their hand.

21        (Jury complying)

22           THE COURT:   Is there any juror who did not raise their

23   hand?

24                         (No response.)

25           THE COURT:   All right.   Now, good.   Now, we have a --

1   what I would call -- a formality that I have to observe now

2   which is some of you were alternate jurors, but I'm going to

3   swear you into the main jury.

4         And let's see if I got this right.  Numbers 13, 14, and

5   15, who are they?  Those would be -- okay, 13, 14, 15.  I want

6   you three to stand.  The Clerk will now administer the oath to

7   you as regular jurors in the case so you will now become not an

8   alternate but will become a regular juror in the case.  The

9   Clerk will now do that.

10        (Jurors 13, 14 and 15 sworn)

11            **THE COURT:**  Thank you.  Be seated.

12        All right.  So now we have a jury of 12.  And I think it's

13   time to go back to the -- resume the trial after all this time.

14   And, again, welcome back.  Thank you for your service.

15        At this time I'm going to give 15 minutes to the United

16   States and then 15 minutes to the Defense to summarize the

17   evidence.  This is not a closing argument.  And this is their

18   version of the summary, and it is not itself evidence.

19        Nothing the Government says now is evidence nor is

20   anything the Defense says evidence.  What it is meant to be is

21   a summary to refresh your memory of what actually was the

22   evidence.  Okay.  Ms. Kane, 15 minutes, the floor is yours.

23            **MS. KANE:**  Thank you, Your Honor.

24        Good morning, ladies and gentlemen.  We are very happy to

25   be back here before you after our long break.

PROCEEDINGS

1          As the Court has told you, I'm here to give you a brief

2    summary of the evidence introduced so far.  You will recall

3    that the Defendant has been charged with computer intrusion,

4    damaging computers, using other people's identities in

5    furtherance of the computer intrusions and conspiracy to

6    traffic in stolen user credentials and trafficking in those

7    stolen user credentials.

8          And you will recall, the boards that are -- we have

9    here -- I know some of you may not be able to see them now.  We

10   will make sure during the course of trial that you-all get a

11   chance to review these -- but you will recall that the three

12   companies that were involved as victims are LinkedIn, Dropbox,

13   and Formspring.

14         You heard from seven witnesses, six of them from those

15   three companies and one FBI agent.

16         So, first, you heard from Bruno Connelly who was the

17   LinkedIn Director of Engineering back in 2012 when all of this

18   happened.  He told you that LinkedIn is a network for

19   professional contacts and job finding.  He explained that in

20   2012 LinkedIn learned that something known as password hashes

21   had been posted publicly on the internet.

22         And I will just take a break right here because I want to

23   let you know that this is as strange and awkward for us as it

24   is for you, so I'm doing my best to talk through this mask.  I

25   hope you can all understand me.  If at any point anyone has

**PROCEEDINGS**

 1   trouble understanding, please let us know because we are

 2   figuring this out as we go.

 3        As you can see, we are socially distancing here at our

 4   Counsel tables.  So you may see some strange movement around

 5   the courtroom for us all to keep separate.

 6        And, in addition, the Court has arranged for us to be in

 7   front of computers; and that's why you will see the various

 8   attorneys glued to their computers in ways that, perhaps, we

 9   weren't before.

10        So back to Bruno Connelly, he explained to you that a

11   hash -- a password hash, means a password that has been passed

12   through an algorithm that hides the password.  It's similar to

13   encryption.  And he explained that the first thing LinkedIn did

14   when it heard this terrible news was to confirm that what it

15   had been told was LinkedIn data was actually LinkedIn data.

16   And they did confirm that.

17        He told you that the company then moved to containment

18   mode.  They set up a war room to handle what he described as an

19   existential threat to the company, what they called a code red.

20        They immediately began searching through the log files

21   generated by their systems to try to figure out what had

22   happened.  The first clue they found was what he called an

23   anomaly in the Virtual Private Network or VPN logs.  And the

24   VPN system is what employees used to connect from home to

25   LinkedIn corporate systems.  And you saw many excerpts from

1   those logs.

2        They determined that there had been access to LinkedIn's

3   corporate system through an employee's account -- an employee

4   named Nick Berry -- and that that access had come from IP

5   addresses that traced back to Russia.

6        And you will recall that this is what an IP address looks

7   like.  It is a string of numbers that identifies a computer

8   connected to the internet.

9        And these Russian IP addresses were anomalous because Nick

10  Berry was an employee located in the United States, and they

11  saw access from Russia very close in time to access from

12  computers in the United States.  So once they identified that

13  anomaly, they pivoted to take those IP addresses they had

14  identified and searched again through their systems to see

15  where else they showed up.

16       And what they were able to do was identify other instances

17  of those IP addresses accessing the consumer side of the system

18  where LinkedIn users could access the system and look at

19  profiles and that those accesses by those Russian IP addresses

20  were associated with what are called browser cookies or b

21  cookies and a browser cookie, which you can see here, was a

22  unique string of data that a website sends to an internet

23  user's browser.  And the browser then sends back each time it

24  goes back to that website, and that browser cookie stays the

25  same even if the computer switches wifi connections.

1      So, for example, if a person goes from their house and

2  takes their computer and then reconnects at a coffee shop and

3  they go back to the same website, it would send the same

4  browser cookie.  So this was another piece of information.

5      They also found -- I'm sorry.  These browser cookies are

6  unique.  That's what he testified to.

7      Now, the -- they also found what is called a user agent

8  string which is not unique; but is a piece of evidence that can

9  help to, as he called it, build a fingerprint around a set of

10  information.

11      And a user agent string is data that the browser provides

12  to the web server that describes the software running on the

13  computer.  And here they thought it was unusual and notable

14  because it had the word "sputnik" in it.  And he testified that

15  was not something they commonly saw in user agent strings and

16  it stood out to him.

17      So they identified eventually more than 30 customer

18  accounts accessed using these various data points.  And they

19  also identified an e-mail address associated with a newly

20  created LinkedIn account that was associated with those

21  intrusions, and that was chinabig01@gmail.com.

22      And that is how LinkedIn accounts were identified.  They

23  were identified by a user's e-mail address, but this e-mail

24  address represented a LinkedIn account that was associated with

25  these intrusions.

1        He testified that the unauthorized access involved access

2    to their internal wiki which is a system that contained

3    information for employees to use in conducting their jobs, and

4    that they also access the server where the user credential

5    database, the passwords -- the passwords and the user names

6    were stored.

7        Now, you also heard from Nick Berry, the employee whose

8    credentials were used; and he told you he had been a Site

9    Reliability Engineer at LinkedIn; that he had access to

10   LinkedIn systems as part of his employment with LinkedIn, and

11   he would access them from his home computer via the VPN.

12       He told you he also hosted a personal website on the

13   computer he had at his house.  Now, as a Site Reliability

14   Engineer he had access to sensitive LinkedIn information and

15   databases.  He told you he was not in Russia; that that was not

16   him using those credentials to access the LinkedIn systems.

17       You heard from Bryant Ling an FBI Special Agent and a

18   forensic expert.  He examined Nick Berry's computer.  And he

19   found that someone had visited Nick Berry's personal website on

20   that computer after viewing Nick Berry's LinkedIn profile which

21   had a link to his website.  And that someone had eventually

22   installed malicious software known as Madnez.  And he showed

23   you what it looked like when it ran.  And they installed it on

24   Nick Berry's computer, and he found that someone gained secure

25   shell access to the computer after multiple attempts and that

1   this all happened just before the LinkedIn logs showed that

2   access using Nick Berry's account to the LinkedIn VPN system

3   from Russia.

4       And so that's here on our timeline in that March time

5   period, March of 2012.

6       Now, you also heard from Cory Louie of Dropbox.  He was a

7   former Secret Service Agent who in 2012 became the head of

8   trust and security at Dropbox.  He told you Dropbox was a Cloud

9   storage service.  That suffered its own intrusion in 2012.

10      Similarly to LinkedIn, Dropbox set up a war room to

11  respond.  And he showed you a summary of the Dropbox logs

12  showing access to employee accounts at Dropbox from Russian IP

13  addresses.

14      He told you that Dropbox had something similar to the

15  browser cookie.  It was another almost unique string of data

16  that would show common access from the same computer over

17  different IP addresses.  And that in particular they discovered

18  that a compromise had happened through a service called Dropbox

19  For Teams and someone had accessed the account of an employee

20  called Tom Wiegand and used his account to invite an outside

21  account into the Dropbox corporate system on Dropbox For Teams,

22  and the name of that outside account was chinabig01@gmail.com.

23  It was a Dropbox account identified by the same e-mail address

24  that Bruno Connelly had identified at LinkedIn.

25      He testified that you -- that they also saw access by this

 1    unauthorized visitor to the wiki, the Dropbox wiki, which

 2    similarly had information about the infrastructure of their

 3    computer systems.

 4        Tom Wiegand testified that he had been a Technical Support

 5    Engineer at Dropbox at the time he told you that he had used

 6    the same password on his LinkedIn account and on his Dropbox

 7    account.  But that he had never traveled to Russia; that he

 8    never invited chinabig01@gmail.com to be part of the Dropbox

 9    corporate teams and that he never had actually heard of

10    chinabig01@gmail.com.

11        Now, moving onto Formspring, you heard from Ade Olonoh who

12    had started Formspring and ran all of the infrastructure.  He

13    testified that Formspring was another type of social network

14    that specialized in questions and answers.  He told you that

15    employees used systems to access their corporate servers

16    including something called SSH, secure shell.  And that

17    Formspring learned in July of 2012 that someone had posted

18    Formspring data on a public forum.

19        Just like LinkedIn and Dropbox, Mr. Olonoh testified that

20    Formspring moved on to reviewing their logs to find out what

21    happened.  And that they found an IP address accessing their

22    corporate system through the account of an employee named John

23    Sanders; and that IP address traced back to Russia but John

24    Sanders was located in San Francisco.

25        And you saw those logs, and they showed someone accessing

1    things like database administration tools, running searches in

2    the Formspring wiki, which also had information about the

3    company and the infrastructure.  You could see access through

4    that secure shell method.  And you saw log entries that showed

5    Madnez had been installed on the Formspring servers, the same

6    malware that Bryant Ling had shown you from Nick Berry's

7    computer.  And he testified that was not something that the

8    company used or would have installed on its computers.

9         You saw log entries that showed someone taking out data

10   from the Formspring servers, from the table where the passwords

11   and user names were stored.

12        And you heard from John Sanders who was a Formspring

13   employee, a Systems Engineer, that he had access to Formspring

14   servers through secure shell; but he wasn't the one who

15   installed or ran Madnez and that he was involved in the

16   investigation of how his account had been compromised in order

17   to do that.

18        He told you that he used a password manager software that

19   created a database of all his passwords, and he kept that in

20   his Dropbox account.  And according to Dropbox, his Dropbox

21   account had seen activity from Russian IP addresses.

22             THE COURT:  Ms. Kane, your time is up but how much

23   more do you have?

24             MS. KANE:  About 30 seconds, Your Honor.

25             THE COURT:  Take your time.  Please finish up.

**PROCEEDINGS**

1          **MS. KANE:**  Thank you.  So that is the brief summary of

2    what you have seen from our timeline.  We have LinkedIn,

3    Dropbox and Formspring.

4          We are now going to move on with our case.  You will hear

5    from one more witness representing LinkedIn.  Then you will

6    hear from other witnesses including law enforcement agents, and

7    finally you will hear from Special Agent Miller who has been

8    here previously at the table with us and is now sitting in the

9    back of the courtroom.

10         Thank you.

11         **THE COURT:**  Thank you, Ms. Kane.  Who would like to

12   summarize for the Defense?

13         **MR. GASNER:**  Your Honor -- thank you, Your Honor, I

14   will do so.

15         Good morning, Everybody.  As you remember, I'm Adam

16   Gasner.  And along with Valery Nechay, we both represent

17   Mr. Nikulin, who is now sitting over in the corner here,

18   previously at Counsel table.

19         I'm going to grab this lectern right here.

20         **THE COURT:**  Again, while we are pausing, raise your

21   hand if at any time you are having trouble hearing me or any of

22   the lawyers or witnesses.

23                      (Pause in proceedings.)

24         **MR. GASNER:**  And I will endeavor to give a succinct

25   summary of what we have heard three and a half months ago.

1          I think it's important that everyone acknowledge that what

2     the witnesses we have heard say was that there was -- there had

3     been an intrusion into three companies.  You have heard from

4     those witnesses:  From LinkedIn, Bruno Connelly, Nick Berry;

5     from Dropbox, Cory Louie and Tom Wiegand and from Formspring.

6          And each of those witnesses came in here and testified

7     fairly clearly that their company had been intruded upon.

8     That's what you have heard from each one.

9          Now, there has been no evidence that Mr. Nikulin was the

10    person responsible.  We will look through this.  Bruno Connelly

11    from LinkedIn, he testified that many users can have the same

12    IP address.  Multiple IP addresses from the Russian Federation

13    accessed Nick Berry's LinkedIn profile, and there are methods

14    to conceal an IP address.

15         This is a theme you will hear from the other witnesses.

16    They look at their systems logs, Bruce Connelly testified; and

17    they see the information that their systems log captured with

18    regard to the IP address.  They see what they received.

19         Turning to Ade Olonoh from Formspring, he explained that

20    an intrusion occurred at Formspring but made no connection to

21    Mr. Nikulin.  He said Mr. Nikulin was not identified as the

22    person responsible for the intrusion.

23         He went on as an expert in computer science to explain to

24    you that a proxy server can be used to mask the IP address from

25    the originator.  And the IP address that goes to the systems

1   log at the companies like Formspring may not be the IP address

2   sent from the original router or computer.

3       Now, he went on to say that he doesn't have the capability

4   looking at his systems logs to do a reverse lookup or some sort

5   of check to see whether a proxy server was used or to see

6   whether another IP address was actually responsible.

7       So when you look through these witnesses that testified

8   three months ago, they testified substantially similarly in

9   each instance.

10      John Sanders, no knowledge of the identity or the

11  individuals who committed this intrusion.

12      Nick Berry, he confirmed an intrusion happened through his

13  home Mac computer but he had no connection to Mr. Nikulin.

14      Cory Louie, former Secret Service Agent who worked as a

15  security consultant with Dropbox, very high-level person with a

16  lot of background, he affirmed the different and multiple IP

17  addresses from the Russian Federation accessed Dropbox when he

18  reviewed the breach; different and multiple IP addresses from

19  the Russian Federation.

20      So Tom Wiegand from Dropbox, an intrusion occurred.  No

21  connection to Mr. Nikulin.

22      So let's look at the one non-company witness that we were

23  presented with.  Witness Bryant Ling, he explained that in

24  order to have a sense of certainty, a fingerprint, an idea that

25  you are sure that a person, a specific person, is responsible

1    for an intrusion, there is a triangle.  There is three pieces

2    of information that you would want to have.

3        You want to have an e-mail or a social media account

4    associated with that person.  One piece of the puzzle.  You

5    want to have an ISP associated with that person, with a router

6    or computer.  And then you want to have a computer or a piece

7    of hardware so you can look at that computer's systems log to

8    see whether they are the ones transmitting that ISP.

9        You are going to have those three pieces of information,

10   he testified, to be certain that you can capture a person

11   associated with an intrusion.

12       We are going to hear evidence continuing on, including

13   Ganesh Krishnan from LinkedIn, whose testimony we will hear as

14   we proceed in this trial.

15       So I want you to look back at the summary of the evidence

16   and recognize that Bruno Connelly, Nick Berry, Cory Louie, Tom

17   Wiegand, Ade Olonoh and John Sanders did testify that there was

18   an intrusion.  Thank you.

19           **THE COURT:**  Thank you, Mr. Gasner.  Okay.  At this

20   time the Government may call its next witness.

21           **MS. KANE:**  Thank you, Your Honor.  The United States

22   calls Ganesh Krishnan.

23           **THE COURT:**  Spell that for us, please.

24                   (Pause in proceedings.)

25           **THE COURT:**  Are you the witness?  Come stand up here.

```
 1   Take the oath to tell the truth and then welcome.
```
 2   <u>**GANESH KRISHNAN**</u>,
```
 3   called as a witness for the Government, having been duly sworn,
 4   testified as follows:
```
 5           **THE CLERK:**  Please be seated.
 6           **THE COURT:**  All right.  Now please remove your mask so
```
 7   the jury can see your face.  That will be fine.  Maybe a little
 8   bit lower so we can see your chin.  There we go.  Great.  And
 9   lean forward so that you speak into the microphone or adjust it
10   so -- because it moves all around and tell us how to spell your
11   name.
```
12           **THE WITNESS:**  Ganesh, G-A-N-E-S-H; Krishnan,
```
13   K-R-I-S-H-N-A-N.
```
14           **THE COURT:**  Can everyone hear?  Great.  If you have
```
15   trouble, I want you to raise your hand and speak up.  Okay.
16   First question.
```
17   <u>**DIRECT EXAMINATION**</u>
18   **BY MS. WAWRZYNIAK:**
19   **Q.**   Hello, Mr. Krishnan.  What field do you work in?
20   **A.**   Information security.
21   **Q.**   How long have you worked in that field?
22   **A.**   Over 20 years.
23   **Q.**   And has your experience primarily been in Silicon Valley?
24   **A.**   Yes.
25   **Q.**   What did you study in school?

KRISHNAN - DIRECT / WAWRZYNIAK

1    **A.**    Masters in computer science.

2    **Q.**    What year did you complete your studies?

3    **A.**    1997.

4    **Q.**    At some point in your career, did you work at LinkedIn?

5    **A.**    Yes.

6    **Q.**    What years did you work at LinkedIn?

7    **A.**    2010 through 2016.

8    **Q.**    And what was your role at LinkedIn when you worked there?

9    **A.**    I was a heading up Information Security.

10   **Q.**    As the head of Information Security, what were your

11   responsibilities?

12   **A.**    Managing the security of the LinkedIn systems and the

13   infrastructure, employees and so on.

14   **Q.**    Were you involved in the incident response for a LinkedIn

15   data breach that occurred in 2012?

16   **A.**    Yes.

17   **Q.**    Describe how you first became aware of that incident.

18   **A.**    So my manager -- actually, I was in India helping set up

19   the LinkedIn technology center in India when the breach -- when

20   the notification of the breach first happened.  My manager

21   called me, and then I flew over to the -- to the states; and I

22   was leading the technical response from that point on.

23   **Q.**    Do you remember what time of year this was that you flew

24   back from India to the United States to assist with the data

25   breach?

1    A.     Yeah, it was June of 2012.

2    Q.     And once you got to LinkedIn's offices, describe what was

3    happening.

4    A.     There was a war room set up.  So this was basically the

5    most important issue at LinkedIn at the time.

6           We had a number of people involved from various

7    departments, like Security, Engineering, PR, our Executives,

8    Legal Department and the team was basically investigating what

9    had happened and how to respond to the incident.

10   Q.     How would you describe the atmosphere at the time?

11   A.     It was all hands-on deck.

12   Q.     Do you recall what had been posted online?

13   A.     It was the password hashes for supposedly LinkedIn

14   members.

15   Q.     And when you say "password hashes," can you describe what

16   that means?

17   A.     Yeah.  So when systems -- when users log in, the end

18   systems have to store passwords for those users.  And the way

19   they generally do that is using this typography scheme called

20   one-way hashing.  That stores a one-way representation of the

21   user's password which can then be later checked when the user

22   logs in again.  So --

23   Q.     Did LinkedIn view the data that had been posted as

24   valuable?

25   A.     Yes.

**KRISHNAN - DIRECT / WAWRZYNIAK**

1   **Q.**   How did the incident response team go about figuring out

2   how the password hashes had been stolen?

3   **A.**   So when the password hashes were publicly posted, the

4   first step was to verify that they actually belonged to

5   LinkedIn, which was done as soon as possible.  And then we

6   moved on from there to figure out what was the extent of the

7   breach, whether the breach was still occurring in which case we

8   needed to stop the bleeding and then figure out what remedial

9   steps we needed to take in order to better protect ourselves.

10  **Q.**   As you went about figuring out how the data had been

11  stolen, was any anomalous activity detected?

12  **A.**   Yes.  During the course of the investigation, we

13  discovered that there was anomalous activity via the VPN logs,

14  which was a way to access LinkedIn's internal systems -- for

15  employees to access LinkedIn's systems.

16  **Q.**   And as part of incident response, did the company go

17  through the VPN system logs?

18  **A.**   Yes.

19  **Q.**   To help direct your testimony, I would like to pull up an

20  exhibit that was previously admitted.  This is Exhibit 33.  Are

21  you able to see that, Mr. Krishnan?

22  **A.**   Yes.

23  **Q.**   All right.  So I want to direct you -- do you recognize

24  this document?

25  **A.**   Yes, it's -- it looks like logs -- log entries.

1  **Q.**  All right.  So if we go down about two-thirds of the way

2  down this first page, do you see the series of entries -- kind

3  of about two-thirds of the way down -- where the location is

4  reflected as Russian Federation?

5  **A.**  Yes.

6  **Q.**  Is this the anomalous activity that you referenced just a

7  moment ago?

8  **A.**  Yes.

9  **Q.**  And I believe you testified that VPN was something that

10  LinkedIn employees could use to log into LinkedIn systems

11  remotely; is that right?

12  **A.**  Yes.

13  **Q.**  General question for you about VPN.  If a LinkedIn

14  employee at this time had started a connection from a wifi

15  network and then for some reason they got disconnected from the

16  wifi, would that generally cause the VPN session to disconnect?

17  **A.**  It may depend on the VPN system; but in general I believe

18  so, yeah.

19  **Q.**  So there is a couple of Russian IP addresses here.  Can

20  you explain what the incident response team did with those IP

21  addresses?

22  **A.**  So -- this is a -- this was a general, you know, I would

23  say, fairly standard incident response to where if you find

24  something anomalous, like this, let's say, you know, this

25  individual was -- normally if you can see logging in from the

1  United States and all of the sudden you see them logging in

2  from the Russian Federation, that stands out.  That individual

3  wasn't in Russia, and that activity wasn't expected.

4       You then take that anomalous IP address in this case, and

5  then you basically look for other systems where you can find

6  the same IP address across the board.

7       And then you see if you can find other unique traces of

8  events in the logs, and then you chain your investigation and

9  you carry on that investigation.  That's how standard incident

10 response happens in the security space, and that's what we did

11 in this case.

12 **Q.**  And what did you discover when you sort of pivoted from

13 these Russian IP addresses and looked for them other places in

14 LinkedIn system logs?

15 **A.**  So there was a lot of logs we looked at.  This was a

16 multi-month investigation.  So I don't have -- I don't remember

17 exactly all the things we found because it has been a while.

18      But we were able to track down the things like -- you

19 know, from the IP address to things like cookies and user

20 agents and also track down some activity on the linkedin.com

21 systems.

22      So the logs you are reviewing here are VPN logs which are

23 for employees to access LinkedIn, but we were able to chain and

24 find traces of this type of activity on the linkedin.com

25 systems which are -- you know, which is the linkedin.com

1    website which is open to the public as well.

2    **Q.**   I think to help illustrate what you are saying, let's move

3    to Exhibit 32, which was previously admitted.

4         All right.   So this is a very long -- a large spreadsheet,

5    and it is currently opened to the log in data with timestamps

6    tab.

7              **MS. WAWRZYNIAK:**   And, Ms. Yee, if you can scroll down

8    to row 8959.

9    **BY MS. WAWRZYNIAK:**

10   **Q.**   All right.   So, Mr. Krishnan, do you recognize this

11   spreadsheet that is in front of you?

12   **A.**   Yes.

13   **Q.**   And does this contain some of the data that LinkedIn was

14   able to trace through its system logs?

15   **A.**   Yes.

16   **Q.**   So you had mentioned a moment ago a cookie and a user

17   agent string, and I thought to make it more concrete we could

18   look at a specific row.   So I'm directing your attention to row

19   8959 column A says Russian Federation?

20   **A.**   Uh-huh, yes.

21   **Q.**   And could you tell us which column has the cookie that you

22   were talking about?

23   **A.**   Let me see.   I believe it's the column that says

24   browser_ID.

25   **Q.**   So that would be the number that ends in ddda7082?

KRISHNAN - DIRECT / WAWRZYNIAK

1   A.   Yes.

2   Q.   And can you explain how LinkedIn used browser cookies at

3   the time.

4   A.   Yeah.  So what this looks like is a -- so whenever you

5   visit the LinkedIn website, it tags the browser with a random

6   number essentially.  So every browser gets a different random

7   number.  This appears to be that random number for that browser

8   which appears to be coming from the Russian Federation.

9   Q.   If you see two entries -- if there are two rows in the

10  spreadsheet that have the same b cookie in them, how would you

11  interpret that?

12  A.   You would interpret it as being from the same browser.

13  Q.   In other words, it was the same machine?

14  A.   Yes.

15  Q.   Even if the IP address was different?

16  A.   Yes.

17  Q.   And staying on row 8959, if you look at the column that

18  says user agent at the top, it is column H --

19         MS. WAWRZYNIAK:  Ms. Yee, if we can scroll over so

20  column H is visible for 8959, please.

21  BY MS. WAWRZYNIAK:

22  Q.   The entry that starts with Mozilla and ends in sputnik

23  2.1.0.18, Mr. Krishnan, can you explain what that data is?

24  A.   That appears to be a user agent for this particular

25  browser from the Russian Federation.  That particular name

KRISHNAN - DIRECT / WAWRZYNIAK

1    "sputnik" does ring a bell.  I don't remember where all we

2    encountered that during the investigation, but that appears to

3    be the user agent string for the --

4    **Q.**    And when you say it "rings a bell," you mean in connection

5    with this specific incident --

6    **A.**    Yes.

7    **Q.**    -- incident response?

8    **A.**    Yes.  We saw it in multiple places, yes.

9    **Q.**    I want to switch over to the memo info tab of Exhibit 32,

10   please.

11         And, Mr. Krishnan, what is your understanding of the

12   LinkedIn user members -- I'm sorry -- the LinkedIn users that

13   are shown in this tab?  Can you explain how they came to be in

14   this tab?

15   **A.**    I'm not sure how exactly they came to be, but what this

16   seems like is a list of LinkedIn users and their e-mail

17   addresses and some detail.  I don't exactly know how this tab

18   was created.  I don't recall.

19   **Q.**    I think you testified previously that in this incident

20   response, LinkedIn did see that some LinkedIn members were

21   accessed from?

22   **A.**    Yes.  Okay.  I see.  So this might be the list of LinkedIn

23   members that were accessed by the same kind of signature, user

24   agent IP address, Russian Federation.  So that's probably what

25   this list is, okay.

1   Q.   At the time, back in 2012, did LinkedIn users -- were they

2   able to connect with other LinkedIn users?

3   A.   Yes.

4   Q.   And is the number of connections what is reflected in

5   column B, the connections column there?

6   A.   Yes.

7   Q.   At this time back in 2012 did LinkedIn prompt users to

8   connect with other LinkedIn users?

9   A.   Yes, as in "recommend," correct?

10  Q.   Right.

11  A.   Yes.

12  Q.   Could you explain what that was?

13  A.   Yeah.  So basically you could either voluntarily search up

14  a LinkedIn member and connect with them or LinkedIn would

15  recommend who you should connect with.  So there have always

16  been two modes of connecting.

17  Q.   And at this time during this incident response, did a

18  person need to have his or her own LinkedIn profile in order to

19  be able to view the full profiles of other LinkedIn members?

20  A.   I believe so, yes.

21  Q.   During your time at LinkedIn, were there times when the

22  website was set up so that a person could go on and type in a

23  LinkedIn member ID and look at a profile that way?

24  A.   I believe so, yes.

25  Q.   And what was a LinkedIn member ID?

KRISHNAN - DIRECT / WAWRZYNIAK

1    A.    It was just a unique number representing a LinkedIn

2    member.

3    Q.    So I'm going to move away from Exhibit 32.

4          What were the key takeaways from the investigation portion

5    of the incident response back in 2012?

6    A.    So from the investigation portion, you know, we started

7    with the employee computer, Nick Berry's computer, that was

8    compromised through the VPN logs.  It was clear that that was

9    the anomalous activity that was the compromise that started the

10   overall breach.

11         And from there on, whoever was responsible for the breach

12   moved onto other systems and then ultimately accessed LinkedIn

13   password data.  And then that's how that online password data

14   that was posted came to be.

15   Q.    About how long did it take you to figure all of that out

16   back in 2012?

17   A.    The investigation lasted at least a few months, and then

18   the remedial steps lasted a lot longer after that.

19   Q.    Did LinkedIn hire an outside consultant to work with the

20   team on incident response?

21   A.    Yes.

22   Q.    Do you remember the name of that consultant?

23   A.    ISec Partners.

24   Q.    And did LinkedIn have to pay the outside consultant for

25   its assistance on the incident response?

1    **A.**    Yes.

2    **Q.**    At any point were you or anyone on the incident response

3    team able to identify a particular person that you believe was

4    responsible for the data breach?

5    **A.**    No.

6    **Q.**    During your time at LinkedIn, was this the most

7    significant data breach that you worked on?

8    **A.**    Yes.

9         **MS. WAWRZYNIAK:**  No further questions from the

10   Government.

11        **THE COURT:**  Cross-examination.

12        **MR. GASNER:**  Yes, thank you, Your Honor.

13                    **CROSS-EXAMINATION**

14   **BY MR. GASNER:**

15   **Q.**    I felt like I was a shouting a few minutes ago.  Does

16   everybody hear me okay?  Okay.  Thank you.

17        Everybody, in the jury box?  Thank you.

18        Mr. Krishnan, at the time of the intrusion were you -- you

19   were just discussing you were the Senior Director of

20   Engineering at LinkedIn?

21   **A.**    Yes.

22   **Q.**    And isn't it true that in June of 2012 you noticed strange

23   log-in behavior by employee Nick Berry?

24   **A.**    Sorry.  Could you please repeat the question.

25   **Q.**    Yeah.  Back in -- I think it was approximately June of

1   2012, didn't you notice some strange log-in behavior by

2   employee Nick Berry?

3   **A.**   You mean, you are referring to as part of the

4   investigation; right?

5   **Q.**   Yes.

6   **A.**   We noticed, yes.

7   **Q.**   And you noticed this log-in behavior as part of your

8   investigation by reviewing systems logs for LinkedIn servers;

9   correct?

10   **A.**   Yes.

11   **Q.**   The systems logs capture activity on the LinkedIn server;

12   right?

13   **A.**   Yes.

14   **Q.**   And, for example, they capture IP addresses for which a

15   log-in originates; right?

16   **A.**   Yes.

17   **Q.**   And if you could bear with me for an example, would be

18   like if you got a telephone call and you look at your caller

19   ID, that's like a -- that phone number that you see on your

20   phone is sort of like an IP address that you would see on the

21   computer; correct?

22   **A.**   Yes.   IP address is a unique number assigned to every

23   computer.

24   **Q.**   Right.   Sort of like a telephone number is a unique number

25   assigned to a cell phone; right?

1    **A.**    Yes.

2    **Q.**    And the LinkedIn database when that records that IP

3    address, there is no way to independently verify the accuracy

4    of the information that it is receiving; correct?

5    **A.**    Could you repeat the -- I don't follow the question

6    exactly.

7    **Q.**    Sure.  When the systems log for LinkedIn records an IP

8    address, it is merely being -- it is merely recording the

9    information that its being sent; correct?

10   **A.**    Yes.

11   **Q.**    Similarly, you know, to a cell phone.  Sir, have you ever

12   received a spam phone call?

13   **A.**    I didn't.

14   **Q.**    And when you get a phone number on your caller ID, you

15   understand that is not necessarily the phone number from which

16   the telephone call originated; right?

17   **A.**    Yes, possibly, yes.  That's a possibility.

18   **Q.**    In other words -- the last question on that point -- the

19   telephone number that you receive on your caller ID could be

20   the number that is masking the true phone number from which the

21   phone call originated; right?

22   **A.**    Yes.

23   **Q.**    Now, in the context of IP addresses, are you familiar with

24   the term "proxy server"?

25   **A.**    Yes.

1   **Q.**   And isn't it true, sir, that a proxy server is one that

2   covers up or masks the origin of the true IP address?

3   **A.**   Yes.  A proxy server is a way to route your traffic

4   through some other server.  So yes.

5   **Q.**   So, in other words, if a proxy server is used, the

6   LinkedIn systems log would record the number of the proxy

7   server, not the number from which they -- the connection

8   originated; right?

9   **A.**   That's correct.

10  **Q.**   And when you look at the LinkedIn systems logs, you cannot

11  tell whether a proxy server was used, can you?

12  **A.**   You cannot tell from the logs that we looked at, yeah.

13  **Q.**   Pardon me just for restating that.  You cannot tell;

14  correct?

15  **A.**   Yeah.  You cannot tell if a proxy server was used or not.

16  While we looked at the anomalous activity in this case, there

17  was no indication that it was a proxy server; but you can never

18  be a hundred percent sure, yeah.

19  **Q.**   Well, you can't tell from looking at the systems logs, can

20  you?

21  **A.**   Yeah, you can't tell by just looking at the logs, yes.

22  **Q.**   So with regard to the IP addresses, the anomalous IP

23  addresses that LinkedIn did receive, you were able to determine

24  the general country of origin of those anomalous

25  communications; right?

**A.**   So our goal was to look at anomalous activity for the user in question, and the IPs that we just looked at previously were absolutely anomalous.  So our goal was to find how this happened and then figure out how we could stop it.

So we weren't trying to tie it back to a particular country or anything like that.  So we were looking at anomalous activity compared to the normal activity of that user, and this was certainly anomalous.

**Q.**   Yes.  And in the course of your investigation, you were able to determine the general country of origin for those communications, weren't you?

**A.**   Yes, yes.

**Q.**   And that country of origin for those anomalous communications was the Russian Federation; correct?

**A.**   Yes.

**Q.**   At least that's based on the IP addresses that the LinkedIn systems logs recorded; correct?

**A.**   Yes.

**Q.**   So if a proxy server was used, you cannot be certain where the actual origin of the intrusion was; correct?

**A.**   Yes, not from the -- from that log, yeah.

**Q.**   Right.  And even within Russia, the systems log recorded IP addresses that presented from generally the Russian Federation; correct?

**A.**   Yes.

**KRISHNAN - CROSS / GASNER**

1   Q.   A country that spans about 11 time zones; isn't that

2   right?

3   A.   Yes.

4   Q.   So from your internal investigation, based on the

5   information you reviewed at LinkedIn Corporation when you were

6   an employee there, you don't know whose computer or who used

7   the IP addresses that the system logs recorded, do you?

8   A.   So we weren't trying to find who the individual was.   We

9   were trying to stop the breach.   What we did was we took the

10  anomalous IP addresses and then joined that with other data

11  that we just looked at, like the cookie data and the user agent

12  data --

13  Q.   Uh-huh.

14  A.   -- to give us confidence that that's how the breach was

15  happening.

16  Q.   Understood.

17  A.   Okay.

18  Q.   So your goal was to contain the breach and, perhaps, begin

19  some remediation, not investigate the source of the breach;

20  right?

21  A.   That's correct.

22  Q.   So moving on to the Virtual Private Networks, you saw VPN

23  logins to the LinkedIn databases from Nick Berry's account;

24  right?

25  A.   Yes.

**KRISHNAN - CROSS / GASNER**

1  Q.   And certainly you would expect to see VPN logins from Nick

2  Berry's account to originate from Santa Clara County; right?

3  A.   Yes.

4  Q.   The IP addresses -- the anomalous IP addresses that you

5  received in the LinkedIn systems logs, they were not all the

6  same IP address, were they?

7  A.   They were not -- I don't recall exactly if every one of

8  them was the same or not.  We were looking for a general

9  anomaly in terms of location so --

10  Q.   But you don't recall all the IP addresses being the same,

11  do you?

12  A.   I don't recall.

13  Q.   You do recall that there were several or numerous IP

14  addresses that were considered anomalous; right?

15  A.   I don't recall how many there were.

16                    (Pause in proceedings.)

17  BY MR. GASNER:

18  Q.   So ultimately you located approximately 36 LinkedIn

19  members who you determined -- whose accounts may have been

20  compromised; right?

21  A.   Yeah, that's the list that we just -- that spreadsheet,

22  yeah.  I don't remember the exact number but yes.

23  Q.   And LinkedIn Corporation is a social or a professional

24  networking platform, isn't it?

25  A.   Yes.

1    Q.    So individuals -- individual business people have

2    profiles; right?

3    A.    Yes.

4    Q.    And so initially your finding 36 members whose profiles

5    may have been compromised, right, approximately?

6    A.    Yeah, possibly.

7    Q.    I'm distinguishing that from the intrusion into the

8    LinkedIn databases.  That's why I'm making that -- just so you

9    understand, the difference between the compromise of the

10   account into the intrusion into the database.

11   A.    Yeah.

12   Q.    Does that make sense to you?

13   A.    Yeah.

14   Q.    So when you are looking at the compromises, you don't know

15   if the profile had actually be accessed, do you?

16   A.    We looked at a bunch of logs.  I don't recall exactly what

17   log revealed what, but we -- chances are we looked at accesses

18   as well; right.  That's how we determined --

19   Q.    Access and attempted access; correct?

20   A.    Attempted, yeah.  So if there was a log on the

21   linkedin.com system or access from the anomalous IPs or other

22   things that we had, then it would have shown up in our --

23   Q.    Understand.  And, by the way, an attempt to compromise a

24   profile, right, of a LinkedIn member doesn't mean that the

25   person that attempted to compromise the profile is the same

1   person that caused the breach, is it?

2   **A.**   Again, we weren't looking for a particular person.  So it

3   is possible that they had multiple individuals, but I can't

4   tell.

5   **Q.**   But to be clear, it is the LinkedIn databases that

6   contained the hashed password information; right?

7   **A.**   Yes.

8   **Q.**   Not the profiles?  Just being clear.

9   **A.**   That's correct.

10   **Q.**   So as you were saying, you weren't looking for a

11   particular person.  You don't know whether the compromises were

12   the result of one person's activities or multiple people's

13   activities; correct?

14   **A.**   No.  That's correct.  No.

15         **THE COURT:**  I couldn't understand.  You have to speak

16   more clearly.  What was your answer?

17         **THE WITNESS:**  That's right.  I don't know if it was

18   one person or multiple people.

19         **THE COURT:**  All right.  Thank you.

20   **BY MR. GASNER:**

21   **Q.**   And, by the way, when you reviewed those compromises, you

22   determined some of them had a user agent string of sputnik;

23   correct?

24   **A.**   Yes.

25   **Q.**   And you recall a few minutes ago saying you remember that

1   user agent string because of the word sputnik; correct?

2   A.   Uh-huh, yes.

3   Q.   So, by the way, user agent string, that's not a unique

4   identifier, is it?

5   A.   It is not -- it is not a unique identifier.  It is a

6   unique identifier for a browser, but that tied with other

7   information can yield interesting data when you are

8   investigating an incident like this.

9   Q.   Understood.  But what I mean is that with the particular

10  user agent string, you can't ID a specific computer or device

11  using the UAS alone, can you?

12  A.   No.

13  Q.   It does narrow down the possibilities.  Is that fair to

14  say?

15  A.   Yes.

16  Q.   Using the car analogy -- just trying to help the jury

17  understand -- that's like saying, the user agent string might

18  be similar to saying someone was driving a Honda four-door,

19  right, as opposed to the specific license plate or VIN number?

20  A.   Yes.

21  Q.   So it describes a general piece of hardware that is

22  running specific software; correct?

23  A.   Yes.

24  Q.   That's like saying user agent string might identify, you

25  know, a Dell computer running Windows as opposed to an Apple

KRISHNAN - CROSS / GASNER

1   running an IOS; correct?

2   **A.**   Uh-huh, yes.

3   **Q.**   Are you familiar with something called a Mac address,

4   M-A-C?

5   **A.**   Yes.

6   **Q.**   That's a number that specifically identifies a particular

7   device, isn't it?

8   **A.**   Yes, it identifies a network interface card inside a

9   computer, yeah.

10   **Q.**   So the Mac address of an iPad would be different than the

11   Mac address of a Dell computer; right?

12   **A.**   Yes.

13   **Q.**   In fact, between two different iPads, the Mac address

14   would specifically ID one particular device; correct?

15   **A.**   Yes.

16   **Q.**   Okay.  Now, you are familiar with the contents of

17   information that are present in user agent strings, aren't you?

18   **A.**   Could you please repeat.  What specifically do you mean by

19   "contents," as in what is in the user agent string?

20   **Q.**   Yes.

21   **A.**   Yeah.

22   **Q.**   So are you familiar that a user agent string can contain

23   something like a language pack code?

24   **A.**   I believe so, yes.

25   **Q.**   And that would be -- a language pack code could tell you

1  what language was being used on that browser or on that

2  computer; correct?

3  A.   Yes.

4  Q.   You don't recall whether the user agent strings in the

5  anomalous intrusions had a language pack code, do you?

6  A.   No, I don't recall.

7  Q.   So you don't recall whether the user agent strings in this

8  case -- regarding specifically the anomalous IP communications

9  had a language pack code in Russian, do you?

10  A.   No.

11  Q.   So I want to move over to log retention periods.  Are you

12  familiar with that term?

13  A.   Yes.

14  Q.   That's the period in which your database retains systems

15  logs information generally; correct?

16  A.   Yes.

17  Q.   When you were reviewing the systems logs in this

18  intrusion, you determined that some of them didn't maintain

19  systems logs long enough to cover this breach; right?

20  A.   I don't exactly recall but I believe so, yeah.

21  Q.   There were systems logs in place to log information

22  regarding this breach, but some of those had already been

23  erased before the investigation began; correct?

24  A.   I believe so, yeah.

25  Q.   So when you were doing your analysis into this breach, can

 1    you recall whether you discovered any malware on the

 2    compromised LinkedIn systems?

 3    **A.**   I don't recall.

 4    **Q.**   Okay.  So there was -- to your information and to your

 5    investigation, no evidence of any botnets, for example, present

 6    on the LinkedIn servers?

 7    **A.**   I don't believe so.

 8    **Q.**   You don't believe so; correct?

 9    **A.**   Yeah.

10                        (Pause in proceedings.)

11    **BY MR. GASNER:**

12    **Q.**   By the way, you are familiar with the term "malware,"

13    aren't you?

14    **A.**   Yes.

15    **Q.**   And that's information or a piece of code that is placed

16    onto a server without the knowledge of the person that has

17    proper authority over that server; correct?

18    **A.**   Yes.

19    **Q.**   When malware is placed on servers, the person that is

20    affected -- the server that is affected, might not immediately

21    know that there is malware on the server; correct?

22    **A.**   Yes.

23    **Q.**   And they might not know that there is malware, you know,

24    on their profile, for example; correct?

25    **A.**   Yes.  Profile, although is a -- yeah, you could have

1   placed a malware that could have shown up on your profile, yes,

2   perhaps.

3   **Q.**   And sometimes malware is placed not on a corporate

4   database but on a personal computer; correct?

5   **A.**   Yes.

6   **Q.**   And sometimes that malware remains dormant for a some

7   time; correct?

8   **A.**   Yes.

9   **Q.**   Until a certain action occurs; correct?

10  **A.**   Yes.

11  **Q.**   But as to your recollection, you don't -- based on your

12  investigation, you don't recollect any malware or any botnets

13  placed on the LinkedIn servers, do you?

14  **A.**   No.

15          **MR. GASNER:**  Thank you very much, sir.  Be well.

16          **THE WITNESS:**  Thank you.

17          **THE COURT:**  Thank you.  Redirect, please.

18          **MS. WAWRZYNIAK:**  Yes, Your Honor.

19                      <u>**REDIRECT EXAMINATION**</u>

20  **BY MS. WAWRZYNIAK:**

21  **Q.**   Mr. Krishnan, I want to start with the topic of proxy

22  servers which Mr. Gasner was just asking you about.

23          If -- was there anything on the LinkedIn systems, any

24  controls at the time, that would have prevented an employee

25  from using a proxy server and then going into VPN at the time

1   in LinkedIn?

2   **A.**   No, I don't believe so.

3   **Q.**   Would you expect -- can you explain just what -- sort of

4   conceptually what using a proxy server means?

5   **A.**   Yeah.  So say if I wanted to talk to another server, I

6   could route my browser or my traffic through an intermediary,

7   which is a proxy, which is called a proxy server.

8        So the server that I'm trying to talk to would see the

9   proxy server instead of my machine.  That's what a proxy server

10  is.  It is used in many contexts, but that is the general

11  meaning of a proxy server.

12  **Q.**   So focusing on VPN now, so if you have a machine and it

13  connects to your proxy server, that's one connection.  And then

14  the proxy server would theoretically connect to the VPN.  So

15  that would be a second connection; is that right?

16  **A.**   That's right.

17  **Q.**   So would you expect a user that is connected through a

18  proxy server for that VPN connection to be more or less stable

19  than a person who is just connected directly through their own

20  wifi at home?

21  **A.**   Could you repeat the question.  Less stable as in --

22  **Q.**   Yeah.  Do you think it would be the same level of

23  stability, more or less stable if a person is connecting to VPN

24  through a proxy server versus just connecting through their

25  home wifi network?

1   **A.**    It is hard to tell.  I mean, it all depends on the

2   situation and their setup; right.

3   **Q.**    But the proxy server itself has to have a stable

4   connection to maintain --

5   **A.**    Yes.

6   **Q.**    -- its connection with the VPN; right?

7   **A.**    Yes.

8   **Q.**    So I did ask you this question on your direct about, you

9   know, if a connection is lost, that general -- if an internet

10  connection is lost, it would generally disrupt the VPN

11  connection?

12  **A.**    Yes.

13  **Q.**    Right?  So would you agree that theoretically the proxy

14  server connection, if that connection was disrupted for any

15  reason, that could disrupt the VPN connection?

16  **A.**    Yeah, likely, yeah.

17  **Q.**    You said a few times on your cross-examination that there

18  wasn't any way to tell from the logs themselves whether a proxy

19  server was used.  Are there other ways to investigate whether a

20  proxy server is used in general?

21  **A.**    Based on the information you have in the logs, yeah, in

22  generally -- I don't recall exactly in this specific case what

23  we had and what we didn't.  But in general, yeah, if you had

24  information in the logs -- like, again, depending on the type

25  of access like user agent and other things -- then you could

1    tell whether it was -- it was a different user using a proxy

2    server.

3         So, for instance, what you could do is if there were

4    multiple different cookies, the numbers that we saw earlier --

5    coming in from the same IP address, then you could -- then you

6    could conclude that that is likely a proxy server because there

7    are many, many different of those cookies from the same IP

8    address, which would mean that there are users behind it.

9         So that would be one way to tell.  It would all depend on

10   the system in question and what logs you had in place.

11   **Q.**   In the scenario where there are multiple IP addresses but

12   one or two cookies, what would you conclude from that based on

13   your expertise?

14   **A.**   That is probably the same set of browsers, right, the

15   small number because that's the worse case which is it's a

16   smaller number of individuals behind more large number of IPs.

17   **Q.**   Mr. Gasner asked you about language codes that can be

18   embedded in user agent strings.

19        If I showed you the sputnik user agent string that we

20   looked at before, do you think you would recognize where the

21   language information might be encoded?

22   **A.**   I can see.  I can try but I don't know exactly where that

23   is so --

24             **MS. WAWRZYNIAK:**  Ms. Yee, can we bring back up Exhibit

25   32.

1        I think we need to make it bigger, please, and scroll

2   down.  We can go back to 8959, please.

3        I think you can keep scrolling down, and then we will just

4   scroll over to the user agent column.

5            THE COURT:  You are losing our attention.  We need to

6   be able to find these things quickly.

7            MS. WAWRZYNIAK:  All right.  So 8959, let's scroll to

8   the right, Helen, please.  All right.  Stop that's good.

9   BY MS. WAWRZYNIAK:

10  Q.   All right.  Mr. Krishnan, looking at the user agent string

11  there in row 8959, do you see anywhere encoded in there the

12  language?

13  A.   I don't know where it is exactly at.  I can't -- it is not

14  obvious from this but -- I may be mistaken because I don't know

15  exactly where it is supposed to be.

16       Oh, there is the RU.  Maybe that's the -- I don't know.

17  I'm just guessing at this point.

18  Q.   You are calling out the -- after Windows NT6.1:RU?

19  A.   Yeah.

20  Q.   Your testimony is that you are not sure?

21  A.   Yeah, I'm not sure exactly where the language pack is in

22  this.

23  Q.   Okay.

24                   (Pause in proceedings.)

25  \\\

1    BY MS. WAWRZYNIAK:

2    **Q.**   Just to clarify, was the LinkedIn browser cookie at the

3    time, was that totally unique?

4    **A.**   Yes, unique for a browser, yeah.

5    **Q.**   So if the same LinkedIn browser cookie showed up as

6    accessing a LinkedIn member's profile and also somewhere else

7    in the logs, what would you conclude from that?

8    **A.**   It is most likely the same browser, same machine.

9              **MS. WAWRZYNIAK:**  Nothing further.

10             **THE COURT:**  Anything more, Mr. Gasner?

11             **MR. GASNER:**  Let me confer with co-Counsel,

12   Your Honor.

13                      (Pause in proceedings.)

14             **MR. GASNER:**  Nothing further, sir.  Be well.

15             **THE COURT:**  May this witness be excused?

16             **MS. WAWRZYNIAK:**  Yes, Your Honor.

17             **THE COURT:**  Mr. Gasner?

18             **MR. GASNER:**  Yes, Your Honor.

19             **THE COURT:**  Okay.  Mr. Krishnan, thank you.  You are

20   free to go.  You can put your mask back on and have a good day.

21             **THE WITNESS:**  Thank you.

22             **THE COURT:**  All right.  It is 12:15.  I want to give

23   the jury a short break.  I apologize because starting tomorrow

24   we will have a lunch prepared for you in your other courtroom,

25   but we don't have that today.  I don't -- when we were on the

**PROCEEDINGS**

 1  1:00 o'clock schedule, you got your own lunch; but we are going

 2  to go to 2:00 normally.  We might break a little early today.

 3      But since we may be pushing onto 2:00, this is a good time

 4  for us to take at least a 15 to 20-minute break, and then we

 5  will resume.

 6      I cannot give you a lunch break today.  I'm sorry.  I hope

 7  maybe you got a snack with you.  But starting tomorrow, I will

 8  do a better job.  So please remember my admonition.  No talking

 9  about the case.  We will see you back here in 15 to 20 minutes.

10      (Proceedings were heard outside the presence of the jury:)

11      **THE COURT:**  All right.  Thank you.  Be seated.  We

12  will take our break too unless the lawyers have any issues for

13  me.

14      **MR. GASNER:**  Nothing from the Defense but 12:40,

15  Your Honor, 12:38?

16      **THE COURT:**  Yeah, something like that.  Do you -- who

17  is your next witness?

18      **MS. KANE:**  Well, Your Honor, we did have something to

19  raise, and that is the pending Motion in Limine Number 6.

20      **THE COURT:**  That the one about the interview in the

21  State Department?

22      **MS. KANE:**  Yes, Your Honor.

23      **THE COURT:**  Not the State Department.

24      **MS. KANE:**  Yes.  Not the State Department but the

25  interview.

1      **THE COURT:**  The Embassy.  Yes, I'm prepared to make a

2   ruling on that, but I want to -- let me hear from the Defense.

3      I cannot understand even why you want this in.  The

4   testimony basically says that your client was in a conspiracy.

5   So why would you even want this testimony in?

6      **MS. NECHAY:**  Well, Your Honor, we think that the

7   interview itself and the information that is revealed in the

8   interview reveals that the co-conspirator here -- a couple of

9   them -- Kislitsin and Belan -- were working with the FSB.

10      So given that that is relevant to the Defense that we are

11   exploring, we feel the need to ask questions about that and see

12   what law enforcement -- to what extent they have knowledge

13   about that relationship between the cyber community and the

14   Russian intelligence.

15      **THE COURT:**  So what?  So what if the Russian

16   government was behind it?  What difference does that make?

17      **MS. NECHAY:**  Well, it is not just the hypothetical in

18   general.  It's that these are co-conspirators -- indicted

19   co-conspirators in this case.  And not just that they are

20   indicted co-conspirators in this case, but they have multiple

21   other indictments against them where, in fact, the Department

22   of Justice is, in fact, alleging that these same individuals in

23   those cases conspired with the FSB.

24      **THE COURT:**  All right.  What does the -- what is the

25   Government's position?

1      **MS. KANE:**  Excuse me, Your Honor.

2          I think the Court's initial reaction that this, first off,

3    is hearsay.  It is inadmissible.  There is no theory that has

4    been put forward as to why this hearsay would be admissible.

5          Second of all, it is clearly confusing as can be seen from

6    the explanation here.  It doesn't have anything to do with the

7    facts of this case.  And it is going to be extraordinarily

8    confusing to the jury.

9          **THE COURT:**  Okay.  That's not a juror there, is it?

10      **MS. WAWRZYNIAK:**  No, it is just us, Your Honor, AUSA

11   Wawrzyniak and our paralegal.

12      **THE COURT:**  All right.  Sorry.

13      **MS. KANE:**  It's not cross-examination because the only

14   testimony the United States intends to elicit from the witness

15   in question is the identification of Mr. Kislitsin on a video.

16      **THE COURT:**  Say that again.

17      **MS. KANE:**  The only testimony that the United States

18   tends to elicit from the witness in question is for him to

19   identify Mr. Kislitsin on a video in which he appears with the

20   Defendant.

21      **MS. NECHAY:**  And, Your Honor --

22      **THE COURT:**  Wait.  Is that the same interview that you

23   are going to use, part of the same interview?

24      **MS. KANE:**  No, Your Honor.  We are not using -- we are

25   not intending to introduce any part of the interview, and

**PROCEEDINGS**

1    that's why --

2           THE COURT:  Well, what are you talking about then?

3    You are going to produce -- what is going to be the

4    identification testimony?

5           MS. KANE:  The identification is simply that this

6    agent has met Mr. Kislitsin, recognizes him and therefore can

7    identify him on the eyed very.  He does not intend to testify

8    to any of the statements that Mr. Kislitsin made.  They are

9    hearsay.  They are not admissible.

10          THE COURT:  Okay.  I see your point.  What were you

11   being to say, Ms. Nechay?

12          MS. NECHAY:  Yes, thank you, Your Honor.  I was going

13   to say that this agent is relying on identification -- well, he

14   identified this witness because he met with him in 2014.

15          So the basis for the identification he is going to be

16   making in court, this witness, is based in part on his

17   knowledge of the witness identifying him during the 2014

18   meeting.

19          So as I have laid out in my papers, the Government intends

20   on crippling our ability to thoroughly cross-examine this

21   Government witness on the issue of how he identifies from the

22   video these individuals; how does he know who they are.  In

23   part because the response calls for an acknowledgment that he

24   met with Kislitsin in 2014 at the Embassy.

25          THE COURT:  What do you say about that point?

PROCEEDINGS

1        **MS. KANE:**  The fact that he met him is going to be

2   part of his direct testimony.  And absolutely the Defense can

3   challenge his identification, his ability to recognize the

4   physical features of the witness.  But the hearsay statements

5   from that witness are not part of the cross-examination.  They

6   have nothing to do with his identification.

7        **THE COURT:**  Does he base the identification on

8   something else other than the interview?

9        **MS. KANE:**  Well, I mean, he met him one time

10  face-to-face.  And he will testify that the -- that

11  Mr. Kislitsin presented identification to enter the building in

12  which the interview took place.

13       **THE COURT:**  Well, so it was that same occasion?

14       **MS. KANE:**  Yes.

15       **THE COURT:**  All right.  Is it submitted?

16       **MS. NECHAY:**  There is just one more thing, Your Honor.

17  I think one of the -- one of the Defense perspective's here is

18  that this information is also being used for non-hearsay

19  purposes.

20      So when I wished to ask some of these agents about whether

21  they had in the course of their investigation learned that one

22  of the co-conspirators was working with the FSB, my purpose in

23  asking that information is twofold.

24      Number one, I want to see what -- I want to explore what

25  the agent did with that information?  Did they attempt to

1    independently verify that information?  Did they -- what

2    investigative steps did they take?

3        So I think that is equally as important as us being able

4    to cross-examine on the issues of whether in this particular

5    case the other co-conspirators worked with the Russian

6    government in some way to implicate our client.

7                MS. KANE:  Your Honor, again, that's exactly the

8    point.  This agent isn't testifying about an investigation of

9    this Defendant or anyone else.  He is simply testifying that he

10   has met Mr. Kislitsin and can recognize him on a video.

11               THE COURT:  All right.  This is a tentative ruling.

12   It is conceivable I will change my mind as I -- as the rest of

13   the trial goes, but right now I'm excluding this evidence.  It

14   is hearsay.  And the idea that it is for -- admissible for

15   effect on the listener in order to put the investigation itself

16   on trial is excludable under Rule 403 as not being very useful,

17   not being very probative.  A lot of confusion.  Take up time.

18   And it's just hearsay.  It's hearsay, hearsay, hearsay, all day

19   long.

20       I might change my mind depending on if the Government

21   opens the door.  So I'm going to have to listen carefully to

22   how the Government itself uses the interview.

23       I should also say that the identification is a special

24   category.  That is not the same as substantive statements.  So

25   his ability to identify the person in question is -- even

1   though it may have arisen out of the same scenario is not the

2   same as accepting the truth of substantive statements made by

3   that subject during the interview.

4        So that's my tentative ruling.  All right.  We are going

5   to now take our break.  Who is your next witness?

6             MS. KANE:  Your Honor, the Court's ruling may affect

7   who our next witness is.

8                       (Pause in proceedings.)

9             MS. KANE:  Special Agent Mlaker will then be our next

10  witness.

11            THE COURT:  How long will that go?

12            MS. KANE:  The direct, I anticipate five minutes.

13            THE COURT:  All right.  After that, who is your next

14  witness?

15            MS. KANE:  And then it will be Special Agent Richard

16  LaTulip from the Secret Service.

17            THE COURT:  All right.  How long will that go?

18            MS. KANE:  Ten minutes probably, Your Honor.

19            THE COURT:  All right.  Well, we may get to another

20  witness after that.

21       By the way, was the witness we just had the guy who wanted

22  to -- had his protective order and so forth?

23            MS. KANE:  That was, Your Honor, yes.

24            THE COURT:  So we are done with that?

25            MS. KANE:  That is moot.  Thank you.

1          **THE COURT:**  Good.  Okay.  We will take 15 minutes from

2     right now.  Thank you.

3          **MS. KANE:**  Thank you, Your Honor.

4                    (Recess taken at 12:27 p.m.)

5                    (Proceedings resumed at 12:54 p.m.)

6          (Proceedings were heard in the presence of the jury:)

7          **THE COURT:**  All right.  Everyone is in position.

8     Welcome back.  Please be seated.

9          And not quite yet, Ms. Kane.  I want to explain something

10    to the jury.

11         We have one empty seat in the jury box, and we have a

12    couple of seats over there on the right-hand side.  And not

13    right now but certainly starting in the morning after we

14    sanitize it all overnight, I want to move as many of you in the

15    left -- my left side over there.  That way the juror -- the

16    lawyers will have less -- will have to look less left and right

17    and can kind of slightly more concentrate their gaze to see all

18    of the jury.

19         So, now, I do have this question for you because that's a

20    more comfortable seat in the jury box -- although didn't we get

21    cushions?  I thought we did have cushions.  We do have cushions

22    for you out there.

23         But if there is somebody who has a back problem or

24    really -- it is uncomfortable for you to sit in these hard-back

25    pews -- Mr. Thaute, you are raising your hand.

1      **JUROR THAUTE:**  I have a severe back problem.

2      **THE COURT:**  All right.  So we will -- note that.

3  Anyone else have a -- who is that raising their hand?

4      **JUROR CAMPOS:**  Jacques Campos.

5      **THE COURT:**  I want you to make a note of this, Tracy.

6  I want you to talk to Tracy about it.  Unfortunately, we only

7  have one.  Maybe flipping a coin.  I'm not sure.

8      **JUROR CAMPOS:**  I will just deal with it.

9      **THE COURT:**  You are relinquishing, but is there anyone

10  else?

11      **JUROR ZHEN:**  I'm willing to trade.

12      **THE COURT:**  You see, isn't that just great.  Isn't

13  that just the way our country should work?

14      So what we will do is we will rearrange it overnight, but

15  for now I want you to sit right where you are.  Is there anyone

16  else who has a disability or issue with your back such that you

17  would prefer to sit in one of these soft seats?

18                      (No response.)

19      **THE COURT:**  Softer seats.  Thank you.  I didn't --

20  yes?

21      **JUROR WOODROW:**  Is it okay to stand?

22      **THE COURT:**  Yeah.  You have got my permission any time

23  you want to stand up.  Just be mindful of others; you might

24  block their view.  Yes, you can stretch their back.  Yes, very

25  good thing to do.  You have got my okay to do that any time you

**PROCEEDINGS**

 1   want.

 2        Okay.  But for today we are going to sit where we are

 3   because we don't have that much more time, and we will deal

 4   with the reorganization tomorrow.

 5        Okay.  Are we already now to resume with the trial.  I

 6   think so.  Ms. Kane, your next witness.

 7            **MS. KANE:**  Thank you, Your Honor.  The United States

 8   calls Special Agent Anton Mlaker.

 9            **THE COURT:**  Stand by the witness box.  Stand 6 feet

10   from the juror and raise your right hand.

11                        **ANTON MLAKER**,

12   called as a witness for the Government, having been duly sworn,

13   testified as follows:

14            **THE CLERK:**  Please be seated.

15            **THE COURT:**  Excellent.  Have a seat.  Once you get

16   settled in, take off your mask so the jury can see and hear you

17   well.  That's great.  And then adjust the microphone so it

18   catches your voice and tell us your name.

19            **THE WITNESS:**  My name is Anton Mlaker.

20            **THE COURT:**  You can move it up and down so that it

21   will catch your voice better.  Say it again.

22            **THE WITNESS:**  Anton Mlaker.

23            **THE COURT:**  Everybody can hear?  They all say yes.

24            **THE CLERK:**  Can you spell your last name, please.

25            **THE WITNESS:**  Yes, Ma'am.  M-L-A-K-E-R.

 1              THE COURT:  Great.  Go ahead.

 2              MS. KANE:  Thank you.

 3                    DIRECT EXAMINATION

 4   BY MS. KANE:

 5   Q.   Where do you work?

 6   A.   I work for the FBI.

 7   Q.   And what is your title with the FBI?

 8   A.   I am a Special Agent.

 9   Q.   How long have you been a Special Agent with the FBI?

10   A.   For approximately 14 years.

11   Q.   What is your current assignment with the FBI?

12   A.   I'm currently assigned to the Las Vegas field office for

13   the Cyber Crime Unit.

14   Q.   And how long have you been in that assignment?

15   A.   I have been in this assignment for -- since about the

16   beginning with only a two-year period in between where I did

17   another crime.

18   Q.   Okay.  And have you received special training as an FBI

19   agent?

20   A.   I have.  I received some training from Quantico in the

21   beginning and since then multiple trainings on an annual basis

22   for cyber crime related investigations.

23   Q.   I would like to direct your attention to the Spring of

24   2014.

25        In that time, did you meet with a person named Nikita

**MLAKER - DIRECT / KANE**

1   Kislitsin?

2   **A.**   I did.

3   **Q.**   And that's K-I-S-L-I-T-S-I-N.

4       Where did you meet him?

5   **A.**   I met him in Moscow.

6   **Q.**   And how did you know that the person you met was Nikita

7   Kislitsin?

8   **A.**   First, Mr. Kislitsin had identified himself and stated

9   that he was Nikita Kislitsin.  And, second, the building where

10  we met required that he provide an identification before

11  entering.

12  **Q.**   And can you generally describe his physical appearance?

13  **A.**   He was a little taller than average.  Slender build.

14  Light-colored hair.  Appeared to be maybe in his late 20s.

15  **Q.**   All right.  Do you see before you a folder marked Exhibit

16  74?

17  **A.**   I do.

18  **Q.**   Okay.  And inside that folder is a computer disk.  Do you

19  recognize that disk?

20  **A.**   I do.

21  **Q.**   And what is on that disk?

22  **A.**   This disk contains a video.

23  **Q.**   How do you recognize that disk and know what is on there?

24  **A.**   I see my initials that I prescribed on there.

25  **Q.**   And have you previously viewed the contents of that disk?

1    **A.**    I have.

2    **Q.**    Did you recognize any of the people in the video that is

3    on that disk?

4    **A.**    I did.  I recognized one person.

5    **Q.**    And who was that?

6    **A.**    Nikita Kislitsin.

7             **MS. KANE:**  At this time I move for the admission of

8    Exhibit 74.

9             **THE COURT:**  Any objection?

10            **MR. GASNER:**  No objection.

11            **MS. KANE:**  In addition, there is a translation of

12   Exhibit 74, which is Exhibit 75; and I have a stipulation to

13   read regarding that.

14            **THE COURT:**  Okay.  But was there any objection to 74?

15            **MR. GASNER:**  Your Honor, I submitted that to the

16   Court, no.

17            **THE COURT:**  All right.  Is this the video that we have

18   talked about before?

19            **MS. KANE:**  It is one of them, yes, Your Honor.

20            **THE COURT:**  All right.  Received in evidence.

21       (Trial Exhibit 74 received in evidence.)

22            **MS. KANE:**  As to Exhibit 75 -- well, let me read our

23   stipulation.

24       Government Exhibit 74 is a video clip recovered from the

25   image of a computer owned by Oleksandr -- that's

 1   O-L-E-K-S-A-N-D-R; Ieremenko, I-E-R-E-M-E-N-K-O.  In the video

 2   clip people speak in the Russian language.

 3       The Government has created an English language transcript

 4   for the video, Government Exhibit 75.  The transcript provides

 5   an accurate translation from the Russian language to the

 6   English language.

 7       And I move for admission of Exhibit 75.

 8       **THE COURT:**  Well, usually the stipulations don't come

 9   into evidence except as read to the jury.  They don't come in

10   as a separate document.  We can talk about that later, but what

11   I need to say to the jury is -- first, Mr. Gasner, is that

12   correctly stated as your stipulation?

13       **MR. GASNER:**  Yes, Your Honor.  Based on the Court's

14   previous ruling, we are submitting this evidence before the

15   Court to the Court's discretion on admissibility.

16       **THE COURT:**  All right.  Well, then the -- the jury

17   will remember that I have told them several times that not one

18   word a lawyer ever says is evidence.  But when there is a

19   stipulation like this, it is evidence.  So what you just heard

20   is evidence that you may consider in this case.

21       All right.  So 75 is received in evidence in its verbal

22   form.  Whether or not it goes in as a separate document, we

23   will have to talk about that later.

24       **MS. KANE:**  Your Honor, I apologize.  I think, perhaps,

25   I wasn't clear.  Exhibit 75 is the English translation of the

1    Russian audio on this --

2              THE COURT:  I see, yes.

3              MS. KANE:  -- video.

4              THE COURT:  All right.  So 75 is received in evidence.

5    It is the actual transcript -- it is the transcript, so to

6    speak.

7              MS. KANE:  Yes.

8              THE COURT:  All right.  And, yes, you are correct.

9    That's received.  75 is received in evidence.

10        (Trial Exhibit 75 received in evidence.)

11             MS. KANE:  Thank you, Your Honor.  And now I would

12   like to play this video, and it will play with the transcript

13   at the bottom.

14                  (Video was played but not reported.)

15   BY MS. KANE:

16   Q.   Special Agent Mlaker, did you recognize Nikita Kislitsin

17   in that video?

18   A.   I did.

19   Q.   And could you describe what he was wearing in the video?

20   A.   He was the gentleman that was wearing the black and yellow

21   checkered flannel hoodie.

22             THE COURT:  I think it would help if you replayed it

23   quickly and to that point, so that he could point it out to the

24   jury who he says is that guy.

25             MS. KANE:  Thank you, Your Honor.  That's just what I

 1    was going to do.

 2              THE COURT:  All right.  Thank you.

 3              MS. KANE:  This time we will play it and if you can

 4    just stop us and tell us when you recognize him.

 5                   (Video was played but not reported.)

 6              THE WITNESS:  Stop there.

 7              THE COURT:  Well, it didn't stop.

 8    BY MS. KANE:

 9    Q.   It was the person in the yellow and dark checked shirt

10    with the hood.  Is that who you are describing?

11    A.   Correct.

12              THE COURT:  Well, I missed it.  I'm sorry to be so

13    dumb, but do it again so that I can see it.  I didn't --

14                   (Video was played but not reported.)

15              THE COURT:  Is that it?  The guy right there in the

16    middle with the yellow and black?

17              THE WITNESS:  Yes, Your Honor.

18              THE COURT:  That's the guy right there in the middle?

19              THE WITNESS:  Yes, Your Honor.

20              THE COURT:  Okay.  All right.  I see what you were

21    saying.  I thought it was the guy on the left.  No.  It is the

22    guy in the middle there.  Okay.  I stand corrected.  Thank you.

23    BY MS. KANE:

24    Q.   We have the video stopped now.  And the person that you

25    are seeing there in the middle in the yellow and black.  That's

1  who you have identified as Nikita Kislitsin?

2  **A.**   That's correct.

3  **Q.**   Do you recognize anyone else in that video?

4  **A.**   I do not.

5  **Q.**   Have you seen Mr. Kislitsin in person since meeting him in

6  2014?

7  **A.**   No.

8          **MS. KANE:**   Thank you.   No further questions.

9          **THE COURT:**   Cross-examination.

10                        <u>**CROSS-EXAMINATION**</u>

11         **MS. NECHAY:**   One moment, Your Honor.

12                  (Pause in proceedings.)

13  **BY MS. NECHAY:**

14  **Q.**   Good afternoon.

15  **A.**   Good afternoon.

16  **Q.**   In the video that we just saw right now, there appear to

17  be a group of individuals discussing an internet cafe; correct?

18  **A.**   I would have to see the translation at the bottom again to

19  really answer the question as to what they were discussing.

20         **MS. NECHAY:**   May we kindly replay this video.

21                  (Video was played but not reported.)

22  **BY MS. NECHAY:**

23  **Q.**   I will just go ahead and ask you once more.   Does there

24  appear to be some discussion of an internet cafe?

25  **A.**   There was mention of an internet cafe, yes.

1    **Q.**   And there was some discussion about coffee or tea being

2    provided.  Did you see those words come --

3    **A.**   I did.

4    **Q.**   -- across the screen?

5    **A.**   I did.

6    **Q.**   There didn't appear to be any discussion on your screen of

7    a conspiracy to commit intrusions on software companies.  That

8    did not appear on the screen, any discussion about that?

9    **A.**   I think that would be very difficult to say whether or not

10   what was discussed was or was not part of a conspiracy of some

11   sort.

12   **Q.**   Sure.

13   **A.**   I don't know if this had any part to do with the

14   conspiracy or not.

15   **Q.**   Okay.  On its face it did not appear to you that there was

16   some nefarious discussion going on?

17   **A.**   I think if you were to answer the question with this

18   independently, I do not see any discussion that would lead me

19   in that direction.

20            **MS. NECHAY:**  Thank you.  One moment, please.

21                    (Pause in proceedings.)

22   **BY MS. NECHAY:**

23   **Q.**   As well, you did see Mr. Nikulin in that video; is that

24   correct?

25   **A.**   Is that the gentleman there on the left in the glasses?

1    Q.    Yes, it is.

2    A.    If you would like me to identify him in the video, I would

3    probably have to watch that again.

4         MS. NECHAY:   Okay.  Can we go ahead and play that one

5    more time.  And I will go ahead and ask you to stop when we see

6    him.

7              (Video was played but not reported.)

8         MS. NECHAY:   Can we please stop right there.

9    BY MS. NECHAY:

10   Q.    I will just go ahead and bring your attention to the white

11   chalkboard in the back with the scarf.  Did that appear to be

12   Mr. Nikulin in the video?

13   A.    Is there a way you can bring that up on the screen so I

14   can see what you are referring to?

15        MS. NECHAY:   Yes, if we can just pull it up one more

16   time.

17             (Video was played but not reported.)

18   BY MS. NECHAY:

19   Q.    Right there.  I think it was just a moment ago but did you

20   have an opportunity to -- right, there -- did you have an

21   opportunity to identify whether or not that is Mr. Nikulin?

22   A.    I do not have as much familiarity with Mr. Nikulin.  I

23   could say that it could be him, but I don't know that I could

24   say that it is him.

25   Q.    Okay.  That's fine.

```
 1              MS. NECHAY:  No further questions from the Defense.

 2              THE COURT:  Thank you.  Redirect?

 3              MS. KANE:  No further questions, Your Honor.

 4              THE COURT:  May this witness be excused and

 5     discharged?

 6              MS. KANE:  Yes, Your Honor.

 7              THE COURT:  You are excused and discharged from the

 8     subpoena.  Thank you.

 9              THE WITNESS:  Thank you, Your Honor.

10              THE COURT:  Have a good day.  You can put your mask

11     back on as you leave.  Next witness.

12              MS. KANE:  Thank you, Your Honor.  The United States

13     calls Special Agent Richard LaTulip.

14              THE COURT:  Welcome.  Please come forward.  Stand

15     approximately 6 feet away from that first juror and raise your

16     hand and take an oath to tell the truth.

17                          RICHARD LATULIP,

18     called as a witness for the Government, having been duly sworn,

19     testified as follows:

20              THE CLERK:  Please be seated.

21              THE COURT:  You will have to remove your mask so we

22     can all see and hear you better.  Thank you.  And then you lean

23     forward and speak into this microphone and give us your correct

24     name.  Please, your name.

25              THE WITNESS:  Oh, my name.  I'm sorry.  Apologize.
```

1    Richard K. Latulip.  Last name is spelled L-A-T-U-L-I-P.

2                      **DIRECT EXAMINATION**

3    **BY MS. WAWRZYNIAK:**

4    **Q.**   Good afternoon --

5            **THE COURT:**  Counsel.

6    **BY MS. WAWRZYNIAK:**

7    **Q.**   -- Special Agent LaTulip.

8    **A.**   Good afternoon.

9    **Q.**   Where do you work?

10   **A.**   I work for the United States Secret Service.

11   **Q.**   What is your title?

12   **A.**   Special Agent.

13   **Q.**   How long have you been a Special Agent with the Secret

14   Service?

15   **A.**   Approximately 24 years and 6 months.

16   **Q.**   What are your general responsibilities as a Special Agent?

17   **A.**   So I worked criminal investigations specifically focusing

18   on cyber criminal investigations.

19   **Q.**   Where are you currently assigned?

20   **A.**   Currently I'm assigned in San Diego, California.

21   **Q.**   Do you have any special training in the field of computer

22   forensics?

23   **A.**   Yes.

24   **Q.**   Could you please explain your training.

25   **A.**   Yes.  In 2004 I was sent to the academy to learn computer

**LATULIP - DIRECT / WAWRZYNIAK**

1  digital forensics.

2  **Q.**   And have you done computer forensics since that time?

3  **A.**   Yes.

4  **Q.**   I want to direct your attention to November of 2012.

5  Where were you stationed at that time?

6  **A.**   So during that time I was assigned to the Tallin resident

7  office.  That is located in Tallin, Astonia.

8  **Q.**   Could you spell for the record Tallin.

9  **A.**   Yes.  T-A-L-L-I-N.

10  **Q.**   And while you were stationed there, what were your general

11  responsibilities?

12  **A.**   So I was the point of contact for the United States Secret

13  Service, and I was responsible for liaison for the Paris field

14  office which was the overall office for Eastern Europe which

15  included the Baltics and Ukraine.

16  **Q.**   And did there come a time in November of 2012 when you

17  assisted with the cyber crime investigation in the Ukraine?

18  **A.**   Yes.

19  **Q.**   Please tell the jury what you did with respect to that

20  investigation.

21  **A.**   So during that time being assigned to the Tallin resident

22  office and one of the specialists in the area as it related to

23  computer forensics, I was asked to fly down to Kyiv, Ukraine,

24  and liaison with our counterparts in Ukraine for the execution

25  of search warrants.

1        This was something that was ongoing at the time and was

2    being worked out of our offices in the United States.  They had

3    worked with our Office of International Affairs in preparing a

4    Mutual Legal Assistance Treaty.  They provided the probable

5    cause in the United States.  Submitted that in the courts in

6    the Eastern District of New Jersey.  These things -- these

7    documents were approved and sent over to their counterparts in

8    the Ministry of Foreign Affairs in Ukraine.

9        They then passed these documents onto the proper points of

10   contact in the Ukranian law enforcement, and I was responsible

11   at the time to liaison with them and assist in the execution of

12   the MLAT in Kyiv, Ukraine.

13   Q.  And you used the term "MLAT" there.  Can you just explain

14   how you are using that term.  What does MLAT mean?

15   A.  So MLAT stand for the Mutual Legal Assistance Treaty.

16   This is a treaty that countries agree on in terms of like laws.

17       For example, if there is a law regarding network

18   intrusions in Ukraine, the United States has a comparable law

19   as well.  We use this Treaty in order to work together and

20   collaborate on casework.

21       So when a suspect in the United States has ties to or

22   resides in a foreign country, we will use the Office of

23   International Affairs to prepare this Mutual Assistance Legal

24   Treaty.  The Treaty encompasses anything from search warrants

25   to subpoenas.  And the host country will act upon that Mutual

1    Legal Assistance in accordance with their laws and policies and

2    execute if they deem it appropriate.

3    Q.   So with respect to this investigation, there was a request

4    to the Ukraine to do search warrants in the Ukraine; is that

5    right?

6    A.   Yes.

7    Q.   Was one of the residents that was searched the residence

8    of Oleksandr Ieremenko?

9    A.   Yes.

10   Q.   And what city was his residence in?

11   A.   Kyiv, Ukraine.

12   Q.   Were computers and other electronic media seized during

13   the search of the Ieremenko residence?

14   A.   Yes.

15   Q.   Did the United States Secret Service and others acting at

16   the Secret Service's direction create images of some of the

17   seized computers and other electronic media?

18   A.   Yes.

19   Q.   In particular was an image of a Sony Vaio laptop computer

20   made?

21   A.   Yes.

22   Q.   And what does an image mean in this context?

23   A.   So "image" in terms of forensics is basically taking a

24   bit-for-bit image of whatever the target device is; in this

25   particular case the Sony laptop.

1          What we would typically do -- and we did in these

2     circumstances -- is we would use a forensic write-blocking

3     device.  Write-blocking indicates that that target device would

4     be prevented of any changes or alterations to the data or media

5     that is contained within that hard drive.

6          Once it has successfully been connected a hash or an image

7     will be mathematically computed.  We usually refer to this as

8     MD5, Message Digest 5.  It is a very complicated mathematical

9     equation.

10          Once the data is analyzed and computed and an MD5 number

11     is created, it will go forward with taking an image of that

12     device.  Once the entire image of the device has been -- has

13     been obtained, it will then create a secondary MD5 -- or

14     Message Digest 5 -- algorithm, and it will compare the two.

15          If both are matching or identical, it will give or provide

16     a success that the image has been created bit-for-bit.

17     **Q.**   So for clarity, how do you know that the image that is

18     created matches the original computer?

19     **A.**   Well, the program -- Encase is the company that created

20     this program.  So the computation, it just basically grabs

21     everything that is contained on the hard disk drive.  It puts

22     it through this Message Digest System.  It calculates that and

23     produces a number.

24          Once that number has been created, it will then go forward

25     with imaging bit-for-bit every -- every spot on that hard disk

**LATULIP - CROSS / NECHAY**

1  drive.  Once it is completed, it will take a secondary

2  calculation of all of that data; and it will then compare with

3  the first pre-imaging computation and post.

4       So if those two numbers are exact, then you have a

5  bit-for-bit image of whatever was contained on that hard disk

6  drive.

7  **Q.**   So if MD5 hashes match for the image and the original,

8  then you have -- you know you have a bit-for-bit?

9  **A.**   Yes.

10  **Q.**   Was this process followed with respect to the Sunny Vaio

11  -- sorry -- the Sony Vaio that was seized from the Ieremenko

12  apartment?

13  **A.**   Yes.

14  **Q.**   And was an image created that was subsequently given the

15  Secret Service identifier Item 4A?

16  **A.**   Yes.  We labeled it 4A.  It was created and we maintained

17  it.  We also shared that with the FBI.

18  **Q.**   So the Secret Service gave a copy of 4A to the FBI; is

19  that correct?

20  **A.**   Yes.

21           **MS. WAWRZYNIAK:**  No further questions.

22           **THE COURT:**  All right.  Cross-examination.

23                      **CROSS-EXAMINATION**

24           **MS. NECHAY:**  Thank you, Your Honor.

25  \\\

LATULIP - CROSS / NECHAY

1  BY MS. NECHAY:

2  Q.    Good afternoon, Special Agent Latulip.

3  A.    Good afternoon.

4  Q.    Your work on this case stemmed from a cyber crime

5  investigation out of New Jersey; is that correct?

6  A.    Yes.

7  Q.    And the -- that investigation actually predated your

8  involvement?

9  A.    Yes.

10  Q.    So the investigation began before November of 2012?

11  A.    Yes.

12  Q.    You had to rely on information that your colleagues in the

13  FBI and the United States Attorney's Office provided to you to

14  get yourself familiar with the investigation when you started

15  working in 2012?

16  A.    That's not accurate.  We weren't necessarily collaborating

17  at that time with the FBI.  Albeit, the FBI and Secret Service

18  do have at times cases against, you know, typically the same

19  target; but this case was not in collaboration with the FBI.

20       So I was relying on information that was provided to me by

21  my counterparts with the United States Secret Service, those

22  case agents that were working that out of New Jersey.

23  Q.    Thank you for clarifying.  So you did have to rely on your

24  colleagues to inform you about the status of the case when you

25  started?

**LATULIP - CROSS / NECHAY**

1    **A.**    Yes.

2    **Q.**    Okay.  Similarly, you also had to rely often information

3    provided to you by Ukranian officials in the course of your

4    work together during the MLAT?

5    **A.**    We were -- again, that type of information that you are

6    speaking of -- because I was not the case agent -- I was

7    liaison officer -- my responsibility was once the MLAT was

8    approved by the Ukrainian officials and they had decided to

9    move forward and execute and honor the Mutual Legal Assistance

10   Treaty, my responsibility was to represent the United States

11   Secret Service's interest in Kyiv, Ukraine.

12       So a lot of that stuff predated my involvement.  And I

13   can't necessarily speak to what exactly had occurred previous

14   to my involvement.

15   **Q.**    In the course of the MLAT agreement, however, you do --

16   you do have to rely on the cooperation of the Ukranian

17   government to allow you, for example, to come onto their

18   premises and create images of computers?

19   **A.**    Yes, absolutely.

20   **Q.**    So in that way, you are relying on their information and

21   assistance?

22   **A.**    I guess I don't necessarily understand what you mean by

23   "relying on."  We worked together.  We collaborate together.

24   The MLAT clearly defined what the United States Government was

25   asking of the Ukranian government.  The Ukranian government

1   responded in a positive manner stating that, yes, they would

2   execute the Mutual Assistance Legal Treaty.  Yes, they had

3   confirmed the people in which we were looking at actually did

4   reside in Ukraine.

5        And then once all of their work had been done, they

6   confirmed which date they were going to execute the search

7   warrants; and then we were invited to participate as observers

8   and, if required, provide expertise in terms of computer

9   forensics or anything of that nature.

10  Q.   Okay.  So the MLAT agreement actually does allow for

11  governments to execute search and seizures on behalf of the

12  United States?

13  A.   Yes.

14  Q.   Okay.  And in certain cases the MLAT agreement also allows

15  for governments to execute arrests of individuals?

16  A.   Yes.

17  Q.   Do you know all of the Ukranian law enforcement and

18  intelligence agencies that were working on this investigation?

19  A.   Are you asking me if I know all of -- everybody that was

20  working on this case?

21  Q.   Correct.

22  A.   I mean, I can't attest to -- that I know everybody.  That

23  would be nearly impossible.

24  Q.   Okay.  In other words, you were allowed to participate in

25  some of the Ukranian's investigation, like you said, as an

1    observer?

2    **A.**    Yes.

3    **Q.**    And you were aware that there was a total of 9 search

4    warrants that were executed as part of this MLAT cooperation

5    with the Ukranian government?

6    **A.**    Yes.

7    **Q.**    But in one of those instances you were only allowed access

8    an hour after the execution of the search?

9           **MS. WAWRZYNIAK:**  Objection.  Relevance.

10          **MS. NECHAY:**  Your Honor, it is foundational as to the

11   course of the investigation and the cooperation of the Ukranian

12   government as it relates to --

13          **THE COURT:**  Is any of that evidence going to be put

14   into evidence here?

15          **MS. WAWRZYNIAK:**  No, Your Honor.  The Government is

16   focused only on the image of the Sony Vaio that was the subject

17   of Special Agent LaTulip's direct testimony.

18          **THE COURT:**  What then is the relevance of this?

19          **MS. NECHAY:**  It is relevant to Mr. Nikulin's defense.

20   It is probative of the MLAT, the cooperation by these foreign

21   governments that were relying on that Special Agent LaTulip

22   just said they were able to control the scope of the

23   investigation to some degree.  And I would like to -- I would

24   like to ask questions about that.

25          **THE COURT:**  I think it is too far afield because of

1    the subpoena that you are talking about.   None of that is going

2    to be offered into evidence.   You can inquire about the one

3    that -- the subpoena that this particular computer was seized

4    under.   That's fine.   But I don't think it's worthwhile to get

5    into any of the other subpoenas.   So the objection is

6    sustained.

7    **BY MS. NECHAY:**

8    **Q.**   Did you ever recommend the arrest of any of the

9    individuals that were subject to the investigation?

10   **A.**   No.

11   **Q.**   And, as far as you know, those individuals were never

12   arrested?

13   **A.**   Could you be more specific about when you say "those

14   individuals."

15   **Q.**   The individuals that you were investigating as part of

16   this cyber criminal investigation arising in 2012.

17          **MS. WAWRZYNIAK:**   Objection.   I think his testimony was

18   that he was not investigating.   He was participating as the

19   liaison agent at the time out of Astonia.

20          **THE COURT:**   Well, I have a preliminary question first.

21   Your question refers to "this investigation" which is

22   ambiguous.   Do you mean the investigation out of New Jersey --

23   which for all I know has nothing to do with our case -- or do

24   you mean this case, the one involving Mr. Nikulin?

25          **MS. NECHAY:**   The case arising out of New Jersey that

**LATULIP - CROSS / NECHAY**

1   involved the computer.

2       **THE COURT:**  What does that got to do with this case?

3   Did this computer that you are interested in come out of the

4   New Jersey investigation, the one that you are -- that you had

5   him testify to?

6       **MS. WAWRZYNIAK:**  It did, Your Honor.  It came out of

7   the New Jersey investigation.  But I think we can ask Special

8   Agent Latulip if that investigation at that time was at all

9   related to Mr. Nikulin's investigation.  I don't believe that

10  it was.  These are two separate investigations by two separate

11  agencies.

12      **THE COURT:**  Is that true?

13      **THE WITNESS:**  Yes.  At that time we were not looking

14  at the activities of Nikulin.

15      **THE COURT:**  Well, all right.  Now, what again was your

16  question?  Let me have it clearly in mind before I rule on it.

17      **MS. NECHAY:**  Simply just that no arrests came to

18  fruition as a result of his investigation or his search and

19  seizure of these materials.

20      **THE COURT:**  Do you know the answer to that question?

21      **THE WITNESS:**  I do.

22      **THE COURT:**  All right.  Go ahead and give us the

23  answer.

24      **THE WITNESS:**  Yes, we have arrested people.

25  \\\

1   BY MS. NECHAY:

2   Q.    And were one of those people Oleg Ieremenko?

3   A.    No.  We have not arrested him.

4   Q.    And to your knowledge he is still living in Russia and

5   continues to hack?

6            MS. WAWRZYNIAK:  Objection.  The question misstates

7   the testimony.

8            THE COURT:  What?

9            MS. WAWRZYNIAK:  The testimony was that Mr. Ieremenko

10  lived in Kyiv, Ukraine, not Russia.

11           MS. NECHAY:  My apologies.  I misspoke.

12           THE COURT:  How would he know if he is continuing to

13  hack?  Do you know anything about that?

14           THE WITNESS:  I do.

15           THE COURT:  All right.  Go ahead.  Tell us what you

16  know.

17                        (Laughter)

18           THE WITNESS:  Yes, he is continuing to hack.

19  BY MS. NECHAY:

20  Q.    And he still remains at large living in Ukraine?

21  A.    We are not actually positive he is in Ukraine or in

22  Russia.  So -- I know that he moved between both locations.

23                   (Pause in proceedings.)

24  BY MS. NECHAY:

25  Q.    May I ask why you did not recommend the arrest of

1    Ieremenko to the Ukranian government?

2    **A.**   So at the time we executed a search warrant and that was

3    our request.  So what also was occurring at the same time is he

4    is a Ukranian citizen.  And by our agreement, between the

5    United States Government and Ukraine is that they will not

6    extradite nor will they arrest a Ukranian citizen.  So there

7    was no way possible for us to use the Mutual Legal Assistance

8    process to go and ask the Ukrainians to arrest a Ukranian

9    citizen.

10   **Q.**   But you could have technically recommended the arrest, and

11   the Ukranian officials could have made their own decision; but

12   that was not a recommendation made in this case?

13   **A.**   In order for us to make that type of recommendation, we

14   would have to surrender our case to the Ukranian officials and

15   allow in whole for them to prosecute on behalf of the United

16   States Government.  And we were not in a position to ask the

17   Ukranian government to prosecute on our behalf and surrender

18   our rights to investigate that case.

19   **Q.**   Do you believe all of the information that you have

20   received from the Ukranian government in connection with this

21   case or any others?

22          **MS. WAWRZYNIAK:**  Objection.  This is calling for an

23   opinion that is not warranted based on the direct.

24          **THE COURT:**  Well, it is also -- sustained.  But it is

25   further sustained on the ground that it is compound to ask do

```
 1   you believe all, which would include thousands of pieces of
 2   information.  And asking the witness to comment on the truth
 3   and voracity of every one of those, that's too much.  So
 4   sustained on that ground as well.
 5                    (Pause in proceedings.)
 6            MS. NECHAY:  Thank you, Special Agent LaTulip.  Be
 7   well.
 8            THE COURT:  Redirect.
 9                    REDIRECT EXAMINATION
10   BY MS. WAWRZYNIAK:
11   Q.   One question for you, Special Agent Latulip.  To your
12   knowledge, has Mr. Ieremenko been indicted in the United
13   States?
14   A.   Yes.
15            MS. WAWRZYNIAK:  No further questions from the
16   Government.
17            THE COURT:  Can you spell that guy's name, please.
18            MS. WAWRZYNIAK:  Yes.  It is capital
19   I-E-R-E-M-E-N-K-O.
20            THE COURT:  Is that correct?  That's the way you spell
21   it.
22            THE WITNESS:  Yes.
23            THE COURT:  The jury is going to want to know.  Where
24   has he been indicted in the USA?
25            THE WITNESS:  In the district of New Jersey.
```

1           THE COURT:  Okay.  Anymore questions?

2   BY MS. WAWRZYNIAK:

3   Q.   And just to clarify, the Secret Service's investigation

4   was a separate investigation from what your understanding is of

5   the investigation that led to the charges against Mr. Nikulin?

6   A.   Yes.

7           MS. WAWRZYNIAK:  Thank you.  Nothing further.

8           THE COURT:  Okay.  May the witness be excused?

9           MS. NECHAY:  No further questions from Defense.

10          MS. WAWRZYNIAK:  Yes, Your Honor.

11          THE COURT:  Go ahead.  You are free to go.  Put on

12  your mask and have a good day.

13          THE WITNESS:  Thank you.

14          THE COURT:  Let's go to the next witness.

15          MS. WAWRZYNIAK:  Before we do that, Your Honor, I want

16  to read into the record one stipulation.

17          THE COURT:  All right.  Remember what I said about

18  stipulations.  Once both sides agree to it, that is evidence.

19  But let's read it slowly.  And then I will ask Mr. Gasner if he

20  so stipulates.

21          MS. WAWRZYNIAK:  All right.  So for the record, I'm

22  holding up what has been labeled Trial Exhibit 66.

23      The stipulation is as follows (reading):  "Government

24  Exhibit 66 is an exact copy of the forensic image made on or

25  about November 16th, 2012, of a Sony Vaio computer owned by

```
 1   Oleg Ieremenko.

 2         THE COURT:  That Exhibit Number was what?

 3         MS. WAWRZYNIAK:  Exhibit 66.

 4         THE COURT:  Like 66, Route 66?

 5         MS. WAWRZYNIAK:  Yes, Your Honor.

 6         THE COURT:  So stipulated, Mr. Gasner?

 7         MR. GASNER:  Yes, Your Honor.

 8         THE COURT:  All right.  That stipulation is evidence.

 9   Are you moving in 66?

10         MS. WAWRZYNIAK:  We are not moving in 66 at this time,

11   Your Honor.

12         THE COURT:  Okay.  All right.  But the stipulation is

13   evidence in the case.  Next witness.

14         MS. WAWRZYNIAK:  The Government calls Andre Romanenko.

15         THE COURT:  Please come over here and stand 6 feet

16   away from the juror and raise your right hand to take an oath

17   to tell the truth.

18                         ANDRE ROMANENKO,

19   called as a witness for the Government, having been duly sworn,

20   testified as follows:

21         THE CLERK:  Please be seated.

22         THE COURT:  Welcome again.  What you need to do is

23   first take off your mask so we can see and hear you better.

24   And then speak into the microphone and it will move all around

25   and catch your voice.  And start off by giving us your name
```

1   again.

2           THE WITNESS:  My name is Andre Romanenko.

3           THE COURT:  You need to get closer to the microphone.

4   Too far away.  Say it again.

5           THE WITNESS:  Andre Romanenko.

6           THE COURT:  Okay.  Move the microphone closer to your

7   voice.  It will move.

8       Counsel, first question.

9                        **DIRECT EXAMINATION**

10  BY MS. KANE:

11  Q.   Good afternoon.

12  A.   Good afternoon.

13  Q.   Could you please tell us how you are currently employed?

14  A.   Yes.  I am an attorney at law.  I have my immigration

15  practice in San Francisco.  And I'm also a licensed court

16  certified interpreter in the State of California.

17  Q.   And what language do you interpret?

18  A.   I interpret from Russian into English, from English into

19  Russian.

20  Q.   And how long have you been a court certified interpreter?

21  A.   Since 2019.

22  Q.   When did you first begin speaking Russian?

23  A.   When I was born.

24  Q.   Where were you born?

25  A.   I was born in Minsk Belarus.

1    Q.   Was that the language that you spoke at home?

2    A.   This was the language that I spoke at home.  This is the

3    language that I continue to speak at home.

4    Q.   And tell us about anything in your education relevant to

5    your knowledge of the Russian language.

6    A.   I received my formal education in high school for 11 years

7    in the Russian language in Belarus.  The focus of the education

8    was on translating, doing technical translations.

9         After graduating from high school, I went to Minsk

10   Linguistic University for four years where I studied general

11   linguistics.  The education was in the Russian language.  I

12   majored in languages which included Russian, Belarus and Polish

13   and Japanese.

14   Q.   And did you specifically study anything with regard to

15   translating or interpreting from Russian to English?

16   A.   Yes, we had an extensive number of courses specifically

17   designated to train us as interpreters and translators.  I

18   attended the Interpreter's Department where I received courses

19   in technical translation, ethics of translating, linguistics.

20   Q.   Thank you.

21        MS. KANE:  Your Honor, the United States offers this

22   witness as an expert in the translation and interpretation from

23   Russian into English and English into Russian.

24        MS. NECHAY:  No objection.

25        THE COURT:  All right.  So please stick to his

1    expertise and everything will be fine.

2            **MS. KANE:**  Thank you.

3    **BY MS. KANE:**

4    **Q.**    Now, I would like to show you what has been marked for

5    identification as Exhibit 73.

6            Do you recognize Exhibit 73?

7    **A.**    Yes, I do.

8    **Q.**    And what is it?

9    **A.**    This is a word-for-word transcription and translation of

10   the conversation from the video that I was showed on Friday.

11   **Q.**    Okay.  And in your opinion was Exhibit 73 an accurate --

12   well, I'm sorry, what was the language in the video?

13   **A.**    The language was Russian.

14   **Q.**    Okay.  And what you are looking at there, is that in

15   English?

16   **A.**    Yes.

17   **Q.**    And in your opinion based on your expertise, is that

18   translation an accurate one?

19   **A.**    It is my opinion that this is an accurate translation.

20           **MS. KANE:**  And now I would like to -- can we show just

21   to the witness and not to the jury -- Exhibit 72?

22                         (Pause in proceedings.)

23           **THE COURT:**  Well, the poor judge should see it too,

24   shouldn't he?

25           **MS. KANE:**  I'm sorry, Your Honor.  I meant not to show

```
 1    it to the jury.  Yes.
 2            THE COURT:  But it is not coming through up here.  So
 3    maybe it is not on the screen yet.
 4            THE CLERK:  I think I might have been able to do it.
 5            MS. KANE:  Are we able to do that?
 6            THE CLERK:  I think so.
 7            MS. KANE:  This is the first time we have tried to.
 8            THE COURT:  That's fine.  Let's work out the bugs.  So
 9    have you got it set up on your -- Tracy, for some reason I'm
10    not -- I see a picture of a video that I have seen before.  So
11    this is the video I guess; right?
12            MS. KANE:  Yes, Your Honor.
13            THE COURT:  All right.  So haven't I already ruled
14    that this is in evidence except not the -- not the audio, just
15    the video?
16            MS. KANE:  That's correct, Your Honor.  And we are --
17    to the extent that something may happen such that this audio
18    could come in, we are just establishing that we have an
19    accurate translation.
20            THE COURT:  For now I understand.  That's fine.  But
21    the audio does not yet come into evidence.
22            MS. KANE:  Yes.
23            THE COURT:  The video can, though.
24            MS. KANE:  Exactly.
25    \\\
```

 1  BY MS. KANE:

 2  Q.   The video that you are seeing there, is that the video for

 3  which Exhibit 73 is in your opinion an accurate translation?

 4  A.   Yes, it is.

 5       MS. KANE:   Thank you.

 6  BY MS. KANE:

 7  Q.   Now, I would like to show you two exhibits, 143B and 143C.

 8       THE COURT:   Did you say B and C?

 9       MS. KANE:   Yes, Your Honor, B as in bravo.

10       THE COURT:   And C as in --

11       MS. KANE:   Charlie.

12       THE COURT:   -- as in Charlie?   Okay.   Go ahead.   What

13  is your question?

14  BY MS. KANE:

15  Q.   Do you recognize these exhibits?

16  A.   Yes, I do.

17  Q.   Okay.   And what is Exhibit 143B?

18  A.   Exhibit 143B is -- contains images, screenshots from the

19  Vkontakte, V-K-O-N-T-A-K-T-E, social network in Russia,

20  multiple screenshots of messages in the Russian language.

21  Q.   And you mentioned Vkontakte.   Is that -- the spelling that

22  you gave is the English spelling of that word; is that correct?

23  A.   Yes, it is.

24  Q.   Okay.   And what is Exhibit 143C?

25  A.   Exhibit 143C contains the identical screenshots but

1  translated into the English language?

2  **Q.**   And the -- have you reviewed those exhibits before?

3  **A.**   Yes, I have.

4  **Q.**   And based on your expertise, is the translation at Exhibit

5  143C an accurate English translation of the Russian contained

6  in Exhibit 143B?

7  **A.**   Yes, it is.

8       **MS. KANE:**  Thank you.

9  **BY MS. KANE:**

10 **Q.**   Now, I would like to show you --

11       (Pause in proceedings.)

12       **MS. KANE:**  I'm sorry, Your Honor, just a moment.

13       (Pause in proceedings.)

14 **BY MS. KANE:**

15 **Q.**   Two exhibits.  All right.  So what is Exhibit 89 that is

16 now in front of you?

17 **A.**   Exhibit 89 is a transcription and translation of a

18 telephonic conversation that I believe is recorded on this CD.

19 **Q.**   And have you previously listened to that telephonic

20 conversation which is at Exhibit 89A?

21 **A.**   Yes, I have.

22 **Q.**   And based on your expertise, is the translation in English

23 at Exhibit 89 an accurate translation of the Russian -- I'm

24 sorry -- the telephonic conversation was in Russian; is that

25 right?

ROMANENKO - DIRECT / KANE

1   A.   Yes.

2   Q.   So is Exhibit 89 an accurate translation of that Russian

3   conversation?

4   A.   Yes, it is.

5          MS. KANE:   Thank you.   Can we show on the screen for

6   the witness and the Court Exhibit 76A?

7                    (Pause in proceedings.)

8   BY MS. KANE:

9   Q.   Do you recognize Exhibit 76A?

10  A.   It is really hard to see -- to read it, the resolution is

11  very poor.

12         MS. KANE:   We are going to blow up just the part --

13  no, no, no, just this part.

14                    (Pause in proceedings.)

15  BY MS. KANE:

16  Q.   All right.   Do you see a name on this exhibit in blue?

17  A.   Yes, I do.

18  Q.   And what is that name in English?   I'm sorry.   Can you

19  translate it into English?

20  A.   Translating it word-for-word would be Yevgeniy Lomovich.

21  Q.   And is that name in the original exhibit written in

22  Russian?

23  A.   Yes, it is.

24  Q.   Does the word Lomovich have any particular meaning in

25  Russian other than being a name?

1    A.   The word itself looks like a nickname, not like a regular

2    Russian last name.   If I were to translate this or find an

3    equivalent, I would translate this as hackenburg (phonetic) or

4    breakovich (phonetic).   It has the root of break or breaking.

5    The word "Lom" itself is a crowbar in English.

6    Q.   You mentioned the word -- the name Yevgeniy?

7    A.   Yes.

8    Q.   And the English name Yevgeniy -- sorry, the Russian name

9    Yevgeniy can be written in English in a number of ways.   And

10   sometimes it is written with a Y and sometimes with an E; is

11   that right?

12   A.   Yes.   There are many variations of this name in English.

13   Q.   And what are some of the nicknames of Yevgeniy in the

14   Russian language?

15   A.   Zhenya, Zhenyok.

16          COURT REPORTER:   Could you spell that, please?

17          THE WITNESS:   Z-H-E-N-Y-A.   Z-H-E-N-Y-O-K.

18   BY MS. KANE:

19   Q.   What about something -- again, I apologize for my

20   Russian -- something like Zhenyiska (phonetic)?

21   A.   That is also a variation, a diminutive of Zhenya.

22   Q.   The name Anya in Russian, is Anya considered a diminutive

23   of the word Anna?

24   A.   Yes.

25   Q.   And in Russian sirnames, are the sirnames gender; that is,

1    they are masculine or feminine?

2    **A.**   Yes, the ending indicates the gender.

3    **Q.**   And how is that ending indicated?

4    **A.**   With the ending.

5    **Q.**   What letter?  For example, for the name Nikulin, what

6    would be the feminine of Nikulin?

7    **A.**   There would be an ending of A, Nikulina.

8    **Q.**   What about the name Kislitsin?

9    **A.**   The feminine would be Kislitsina.

10   **Q.**   And are you familiar with -- I'm sorry -- continuing with

11   the gender -- the use of gender in Russian, when streets --

12   what is the word for street in Russian?

13   **A.**   Ulitsa.

14   **Q.**   And is that masculine or feminine?

15   **A.**   Spelling would be U-L-I-T-S-A.  And that would be

16   feminine.

17   **Q.**   So when a street is named in Russian, does it get a

18   feminine version of its name?

19   **A.**   Yes, it does.

20          **MS. KANE:**  No further questions.  Thank you.

21          **THE COURT:**  Cross-examination?

22          **MS. NECHAY:**  Your Honor, I do have cross-examination

23   although it might be quite lengthy.

24          So since it is 10 until 2:00 o'clock right now, I propose

25   resuming the cross-examination tomorrow so we don't keep this

 1  good jury waiting.

 2           **THE COURT:**  All right.  We will do that.  You need to

 3  be back here at 8:30 in the morning, and we will resume with

 4  your testimony then.  So you may -- can you be here then?

 5           **THE WITNESS:**  Yes, Your Honor.

 6           **THE COURT:**  Thank you.  Please put on your mask and

 7  exit.  We will see you in the morning.

 8       I want to let the jury go, but I need to let the witness

 9  go first.

10       Now, for the jury, a few of you we will rearrange tomorrow

11  and -- including Zhen.  You are still willing to give up your

12  seat, so these two with the bad backs can have these two seats?

13       And I'm also going to move as many as I can -- still

14  maintaining separation -- to this side of the room so that

15  we -- we won't be as spread quite out.  But I think by my count

16  I will still have to have at least one over here on my left but

17  they will be along the aisle.

18       So tomorrow Tracy will have all that worked out.  And a

19  few of you will be getting new seats tomorrow.

20       I want to say something about the jury.  You are great.

21  Here we are in this time of pandemic, and you are serving your

22  country by serving on this jury.  It's a tremendous thing.

23  Thank you for that.

24       So follow Tracy out now.  She will -- remember the

25  admonition.  No talking about the case, and we will see you

**PROCEEDINGS**

 1   back here -- you know, if you are closer to 8:30 than 8:45,

 2   there is a chance we can begin early.  I believe there is a

 3   good chance we can begin earlier.  So if you are here by 8:30,

 4   that would be great, but 8:45 at the latest.  Thank you.

 5        (Proceedings were heard outside the presence of the jury:)

 6        **THE COURT:**  Okay.  Everyone else be seated.  I have

 7   a -- maybe I should wait until Tracy to get back.  I have a

 8   Zoom question that I don't know the answer to.

 9        When I glance up at my Zoom screen, I'm the only one on

10   the screen.  Now, the witness is never on there.  I don't know

11   why.  Occasionally I can see one of the Defense lawyers, but is

12   there someone in charge of -- supervising the Zoom part so the

13   public is able to see --

14        **MS. KANE:**  Your Honor, I believe it is Ms. Geiger is

15   the controller, the master of the Zoom.  Here she is.

16        **THE COURT:**  Okay.  Tracy, I raised this question.

17   Oddly the witness is never on my Zoom.  Occasionally a lawyer

18   is, but I'm always on it but -- I really -- I'm the least

19   important.

20        Tracy, who is the one who is supposed to make sure that

21   the cameras are on and the audience is seeing something

22   worthwhile?  Is that you or somebody else?

23        **THE CLERK:**  I think it's me.

24        **THE COURT:**  Okay.  Just be mindful that the witness is

25   not showing up.

```
 1              THE CLERK:  Well, he was showing up on mine.  So he is
 2    not showing up on anybody else's?
 3              THE COURT:  I don't know.  Certainly not on mine.  So
 4    let's pay attention to that before we resume tomorrow.
 5              MS. KANE:  I'm sorry, Your Honor.  I might suggest
 6    there is a gallery view option on Zoom.
 7              THE CLERK:  Okay.
 8              MS. KANE:  If you can make that choice, it looks like
 9    a bunch of -- like six square box in the very top right.
10              THE COURT:  I'm afraid to touch a thing.
11              MS. KANE:  If you switch to the gallery view, it
12    should show you all of the people who are actually
13    participating in the Zoom.
14              THE COURT:  Okay.  Who is Helen?  I have a box called
15    Helen.
16              MS. KANE:  That's our paralegal.
17              THE COURT:  All right.  And who is SF09 evidence?
18              THE CLERK:  That is the Court that everything goes
19    through.
20              THE COURT:  I see.  Okay.  Do the lawyers have any
21    business for the Judge before we break?
22              MR. GASNER:  Thank you, Your Honor, yes.  For the
23    Defense, just two pieces of business.  Mostly procedural.
24         One, it appears that Mr. Nikulin's -- speaking of Zoom --
25    his internet connection is spotty, and he has been not able to
```

**PROCEEDINGS**

1    observe the Zoom although, of course, he has been in the

2    courtroom; and he has been able to hear and see otherwise.

3        But it appears that his internet connection is -- has been

4    dropping, if that's the correct word.  So he has not been

5    online, so to speak, for part of the afternoon.  If we can just

6    see if about addressing that --

7            THE COURT:  Tracy, can you help fix that or can you

8    help get IT in here to fix that?

9            THE CLERK:  He is coming up right now.

10            THE COURT:  All right.  Somebody is going to look at

11    that.  I would say for the record, he is in a very good

12    position to observe real-time without the benefit of Zoom so --

13            MR. GASNER:  Understood.

14            THE COURT:  I don't think that has been as much of a

15    problem.

16            MR. GASNER:  I'm not objecting to the process.  Just

17    pointing it out.

18            THE COURT:  Thank you.

19            MR. GASNER:  And then the other piece is just with

20    regard to scheduling, from my understanding we are in line to

21    get close to concluding evidence tomorrow depending on how one

22    witness, Mr. -- Agent Miller's testimony may be lengthy.  I

23    don't know that.  I'm not in control of that.

24        I wanted to talk to the Court about the schedule for the

25    week briefly just so that the lawyers could prepare.  If we

**PROCEEDINGS**

1   conclude evidence tomorrow, Your Honor, before 2:00 o'clock, if

2   that were to occur, the Defense proposition is that we have an

3   instruction conference and that we move towards closing on

4   Wednesday.  I know I'm being optimistic.  I'm just bringing it

5   to your attention.

6       **THE COURT:**  How about, are you -- you don't have to

7   commit yet.  But are you putting on any witnesses?

8       **MR. GASNER:**  Your Honor, at this point -- I told the

9   U.S. Attorney's Office this -- it is unlikely.  We have not

10  made a formal decision.

11      **THE COURT:**  All right.  Is it probable that you will

12  rest tomorrow?

13      **MS. KANE:**  Your Honor, we do anticipate that Special

14  Agent Miller's direct testimony will be a few hours.  Whether

15  we complete that or not tomorrow, I think depends on the length

16  of time spent with the translator on cross and also

17  cross-examination of Mr. Miller -- Agent Miller.  Special Agent

18  Miller is our last witness.

19      **THE COURT:**  And he will be up next?

20      **MS. KANE:**  He is next, yes.

21      **THE COURT:**  All right.  I'm going to try to get out to

22  you tonight or certainly in the morning the draft of the

23  instructions so we -- and if we can have that conversation

24  tomorrow, we will.

25      Now, I have to also say I have my criminal calendar at

1    2:00 o'clock tomorrow.

2              **MR. GASNER:**  I see.

3              **THE COURT:**  So that might make it a problem but -- I'm

4    not sure what you mean if we were to -- are you saying that you

5    want to be able to kick the can down the road as to whether or

6    not you are going to call any Defense witnesses?

7              **MR. GASNER:**  No, Your Honor.  Thank you very much.

8    I'm just looking at the length of the remaining witnesses and

9    was suggesting that if we concluded early tomorrow, that we

10   break for the day to either work on instructions and/or closing

11   and that the -- there is no -- in no event would the Court

12   require the parties to commence closing arguments tomorrow.

13             **THE COURT:**  Oh, all right.  I give -- now, I

14   understand.  That's very reasonable.  We would -- put the

15   closings off until Wednesday, but we would try to get the

16   instructions settled; and then you can have the rest of the day

17   off to go prepare your closing.

18             **MR. GASNER:**  Thank you.

19             **THE COURT:**  Now I see what you are getting at.  Of

20   course.  That's very reasonable.

21             **MR. GASNER:**  Thank you.

22             **THE COURT:**  Okay.  What else do you have for me?

23             **MS. KANE:**  Nothing further from the Government,

24   Your Honor.

25             **THE COURT:**  All right.  Then now, you should know

PROCEEDINGS

1   there were quite a lot of exhibits that were referenced by the

2   Government and you offered none of them into evidence.  I could

3   show you my list, but it starts with 66, 73, 72, 143B, 143C,

4   89, 89A, and 76A.  None of those have been moved into evidence.

5          **MS. KANE:**  Yes, Your Honor.  We anticipate moving most

6   of those into evidence with Special Agent Miller.

7          **THE COURT:**  All right.  It's up to you.  Okay.  My

8   friends, see you in the morning.  Thank you.

9              (Proceedings adjourned at 2:01 p.m.)

10                      ---oOo---

11

12              <u>CERTIFICATE OF REPORTER</u>

13         We certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15

16   DATE:   Monday, July 6, 2020

17

18

19

20   _____

21              Marla F. Knox, RPR, CRR
                 U.S. Court Reporter

22

23

24

25