**Volume 5**

**Pages 369 - 538**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>          Plaintiff, )<br>)<br>  VS. )<br>)<br>YEVGENIY ALEKSANDROVICH )<br>NIKULIN, )<br>)<br>          Defendant. )<br>_____ ) | **NO. CR 16-00440 WHA** |

San Francisco, California
Tuesday, July 7, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

> DAVID L. ANDERSON
> United States Attorney
> 450 Golden Gate Avenue
> San Francisco, California  94102
> **BY: KATHERINE L. WAWRZNIAK**
> **MICHELLE J. KANE**
> **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:

> LAW OFFICE OF ADAM G. GASNER
> 345 Franklin Street
> San Francisco, California  94102
> **BY: ADAM GASNER**
> **VALERY NECHAY**
> **ATTORNEYS AT LAW**

Interpreters:      Maria Entchevitch and Marina Brodskaya

Reported By:  Marla F. Knox, RPR, CRR, RMR
            United States Official Court Reporter

<u>**I N D E X**</u>

Tuesday, July 7, 2020 - Volume 5

<u>**GOVERNMENT'S WITNESSES**</u>                                  <u>**PAGE**</u>  **VOL.**

<u>**ROMANENKO, ANDRE (RECALLED)**</u>
(PREVIOUSLY SWORN)                                      397    5
Cross-Examination by Ms. Nechay                         397    5
Redirect Examination by Ms. Kane                        408    5

<u>**MILLER, JEFFREY**</u>
(SWORN)                                                 410    5
Direct Examination by Ms. Kane                          411    5

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | **VOL.** |
|---|---|---|---|
| 3A  | | 477 | 5 |
| 3B  | | 477 | 5 |
| 3E  | | 477 | 5 |
| 5   | | 417 | 5 |
| 6   | | 489 | 5 |
| 14  | | 473 | 5 |
| 17  | | 527 | 5 |
| 17A | | 527 | 5 |
| 19A | | 488 | 5 |
| 26B | | 421 | 5 |
| 35  | | 473 | 5 |
| 38  | | 469 | 5 |
| 41  | | 473 | 5 |
| 44  | | 483 | 5 |
| 44A | | 483 | 5 |

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 45 | | 483 | 5 |
| 47 | | 473 | 5 |
| 48 | | 517 | 5 |
| 52 | | 473 | 5 |
| 54 | | 473 | 5 |
| 62B | | 473 | 5 |
| 62A | | 493 | 5 |
| 85 | | 451 | 5 |
| 85A | | 451 | 5 |
| 86 | | 461 | 5 |
| 88 | | 504 | 5 |
| 88A | | 504 | 5 |
| 89 | | 378 | 5 |
| 89A | | 378 | 5 |
| 89 | | 505 | 5 |
| 89A | | 505 | 5 |
| 90 | | 504 | 5 |
| 90A | | 504 | 5 |
| 113 | | 485 | 5 |
| 117 | | 473 | 5 |
| 118 | | 501 | 5 |

**I N D E X**

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 119 | | 501 | 5 |
| 125 | | 473 | 5 |
| 135 | | 504 | 5 |
| 135A | | 504 | 5 |
| 136 | | 504 | 5 |
| 136A | | 504 | 5 |

PROCEEDINGS

1   <u>**Tuesday - July 7, 2020**</u>                                   <u>**8:27 a.m.**</u>

2                          <u>**P R O C E E D I N G S**</u>

3                              **---000---**

4       (Proceedings were heard outside the presence of the jury:)

5          **THE COURT:**  Let's come to order.

6       For the record, this is USA versus Nikulin.  Counsel, are

7   all present.  The Defendant is present.  The jury is not

8   present.  Interpreters are present.

9       So we will get started.  I got an e-mail from Mr. Gasner.

10  You said you had something to raise, so why don't we just turn

11  immediately to you.

12      By the way, am I coming through?  It doesn't sound like

13  you can hear me.

14         **MR. GASNER:**  I am -- I can hear you.  I'm not sure

15  whether it is through the microphone, Your Honor.

16         **THE COURT:**  You know, Tracy, my microphone is not on.

17  One, two, three, hello?  Is that better?

18      Marla, did you get all my initial remarks?

19         **COURT REPORTER:**  I did.

20         **THE COURT:**  Okay.  Great.  Mr. Gasner.

21         **MR. GASNER:**  Good morning, Your Honor.

22         **THE COURT:**  Good morning.

23         **MR. GASNER:**  Yes, there were two issues, maybe three.

24  I just wanted to flag them with the Court.  One was with regard

25  to the translator's testimony.  We are beginning with him again

**PROCEEDINGS**

1  today on cross.  And I will let Ms. Nechay address the

2  substance but I want to flag the issue for the Court.

3      There were a number of it looks like exhibits that were

4  used with this witness, but it appears the U.S. Attorney's

5  Office is deferring admitting those until after the witness is

6  no longer testifying.  And we want to discuss the admissibility

7  of those because I think -- otherwise, this witness will be

8  subject to recall because we might want to use those exhibits

9  during the course of the cross-examination.  It affects the

10 scope of the cross-examination.

11      So I think the Court noted yesterday that these exhibits

12 were being talked about but weren't admitted.

13      So we think for the purpose of cross, we would like to

14 know from the Government whether or not they are going to be

15 admitted under a party admission or otherwise so that we can go

16 ahead and use those more freely during the cross-examination of

17 this witness.

18          THE COURT:  Which exhibit numbers are you speaking of?

19          MS. NECHAY:  Your Honor, specifically I'm speaking of

20 Exhibit 89.

21          THE COURT:  89.

22          MS. NECHAY:  Really, that's the main exhibit.

23          THE COURT:  Is it 89 or 89A?

24          MS. NECHAY:  89.

25          THE COURT:  Let's -- I think that's a reasonable

**PROCEEDINGS**

1  request.  Does the Government intend to try to offer that?

2        **MS. KANE:**  Yes, Your Honor.  We do intend to offer

3  that into evidence.

4        **THE COURT:**  Well, the -- but what -- they ought to be

5  allowed to use that -- are you going to oppose its admission?

6        **MS. NECHAY:**  I don't believe I have grounds to oppose

7  it, Your Honor; but it does put us in a little bit of a bind

8  because essentially we would be then -- the Defense would be

9  introducing some prejudicial statements about Mr. Nikulin's --

10  the fact that he is in jail because the word that is discussed

11  that is at issue here is -- as you recall, Your Honor -- is

12  "hack" and whether it means to break or to hack.

13        And in the context of the exhibit and the translation that

14  is provided, it was a phone call that Mr. Nikulin made while he

15  was in custody.  And he -- there is a statement that the

16  Government is claiming is "I want to hack the prison.  The

17  rules here are stupid."

18        And so, of course, the discussion inherently about what

19  this word means calls into question the background of

20  Mr. Nikulin's confinement.

21        **THE COURT:**  Could someone hand to me the Exhibit 89?

22        **MS. KANE:**  Yes, Your Honor.

23        **THE COURT:**  So I can focus on this exact paragraph.  I

24  forgot my gloves but --

25        **MS. KANE:**  Your Honor, if I can just address the

**PROCEEDINGS**

1    Government's intention for this exhibit was to offer it into

2    evidence while Special Agent Miller is testifying because he

3    can lay the foundation that it is, in fact, the Defendant's

4    voice on the recording.

5        So we do intend to offer it into evidence, and we don't

6    object to the Defense cross-examining the translator regarding

7    this exhibit.

8        **THE COURT:**  Who are the people speaking here?  Who is

9    Zhenya and who is Anya?

10       **MS. KANE:**  Zhenya is the Defendant and Anya is a woman

11   he speaks to regularly.

12       And, Your Honor, the Defense has not objected to the

13   admissibility of the call.  They simply objected to the

14   translation of a particular word is my understanding.

15                    (Pause in proceedings.)

16       **THE COURT:**  Well, let's make sure -- I understand --

17   from the Defense point of view on Number 89, are you objecting

18   to its admission?

19       **MS. NECHAY:**  No, Your Honor.

20       **THE COURT:**  All right.  So what is the problem?

21       **MS. NECHAY:**  I would like to thoroughly cross-examine

22   the translator on the meaning of the word that here is

23   referenced as "hack."

24       **THE COURT:**  Well, fine.

25       **MS. NECHAY:**  Certainly.

**PROCEEDINGS**

1              **THE COURT:**  I don't have a problem with that, of

2    course.

3              **MS. NECHAY:**  I just wanted to flag --

4              **THE COURT:**  They can do that.

5              **MS. KANE:**  Your Honor, that is what we anticipated and

6    is one of the reasons we called this translator to testify.

7         Perhaps, to solve the logistical problem, at the beginning

8    of the translator's time on the stand, the Government could

9    offer Exhibit 89 into evidence because -- with the agreement of

10   the Defense, and then they can cross-examine him on it.

11             **THE COURT:**  Or I could just say to the jury when

12   everyone is here that between last night and today, the

13   Government has offered 89.  I have admitted it into evidence

14   and that -- that will be one of the things that the Defense

15   cross-examines on.  Is that -- does that set it up for you?

16             **MS. NECHAY:**  That does, Your Honor.

17             **THE COURT:**  All right.  Then that's what I will do.

18             **MS. KANE:**  Just to clarify 89, is a translation of the

19   call and the call is at 89A.

20             **THE COURT:**  Is what?

21             **MS. KANE:**  The actual audio of the call in Russian is

22   at Exhibit 89A.

23             **THE COURT:**  All right.

24             **MS. KANE:**  So they should both come in together.

25             **THE COURT:**  Do you agree with that?  It seems like

PROCEEDINGS

1  that is right.

2          **MS. NECHAY:**  Yes, Your Honor, I do.

3          **THE COURT:**  Okay.  Done.

4      (Trial Exhibits 89 and 89A received in evidence.)

5          **MS. KANE:**  Thank you, Your Honor.

6          **MR. GASNER:**  Thank you very much, Your Honor.

7      And then the second issue that the Defense wants to raise

8  with the Court is I have three FBI Most Wanted posters related

9  to alleged co-conspirators in this case.  I believe they are

10 self-authenticating documents.  I have showed those to the

11 Government just yesterday as I found them yesterday.

12     And I would like to use them during cross-examination.

13 May I show to the Court what I'm referring to?

14         **THE COURT:**  Sure.

15                     (Pause in proceedings.)

16         **THE COURT:**  I want to go back to 89 for a minute.

17 Where was he being held in November 19th, 2018?

18         **MS. KANE:**  Your Honor, I believe he was at Santa Rita

19 at that time.

20         **THE COURT:**  Okay.  All right.

21     Okay.  So now I'm looking at FBI -- wanted by the FBI,

22 Alexsey Belan.  I have heard that name.  Dmitry Alexandrovich

23 Dokuchaev.  Nice looking guy.  Looks like he could work in

24 Silicon Valley.  And Evgeniy Mikhailovich Bogachev, a smiling

25 face.

**PROCEEDINGS**

1       Any problem with this?

2           **MS. KANE:**  Your Honor, I think we can put the

3   self-authentication issue aside.  That's the least of the

4   problems with these.

5       These are hearsay, and they are totally irrelevant to the

6   trial that we are conducting.

7           **THE COURT:**  Well, what -- I have heard that name

8   Belan.

9           **MS. KANE:**  So the wanted posters that the Defense is

10  trying to admit address a -- an indictment released in 2017

11  after the Defendant was already indicted and in custody and

12  describes a conspiracy that began in 2014 after all of the

13  criminal conduct that is alleged in this case.

14      So there is no relevance to the facts that are at issue

15  here for those two; that is the Belan and the Dokuchaev wanted

16  posters.

17          **THE COURT:**  Belan.

18          **MS. KANE:**  Belan or Belan, yes.

19          **THE COURT:**  Well, Belan says -- you are incorrect

20  about the dates.  It says between January of 2012 and April of

21  2013 Belan is alleged to have intruded the computer networks of

22  three major U.S. based e-commerce companies in Nevada and

23  California.

24      He is alleged to have stolen their data -- user databases,

25  et cetera, et cetera.

1          **MS. KANE:**  Yes, Your Honor, I'm sorry.  I was getting

2     to that.  I was addressing the overlap between the Belan and

3     the Dokuchaev posters which allege a conspiracy between the two

4     of them that began in 2014, and I believe that's what the

5     Defense intends to ask about.  And that is the part that is

6     entirely irrelevant to this case.  It has no overlap whatsoever

7     with the criminal conduct.

8          In addition, the Belan poster describes an earlier

9     indictment against Belan that does not name Dokuchaev, and that

10     is what the Court has just described.

11          **THE COURT:**  The one about January 2012?

12          **MS. KANE:**  That's the one I'm talking about.  That is

13     also irrelevant to this case.  It doesn't address any of the

14     conduct -- the companies that are at issue here.  There is no

15     allegation regarding Belan hacking Evernote in this case.

16          So there is no -- there is no overlap, again, between the

17     statements in that wanted poster and the allegations in this

18     case.

19          Moreover, those statements are totally hearsay; and there

20     is no hearsay exception that allows the admission of a wanted

21     poster.

22          **THE COURT:**  Well, that's a -- it's a statement by the

23     FBI, and the witness who is going to be on the stand is an FBI

24     agent.  What is he going to do, say that the FBI's own wanted

25     poster is incorrect?

1          **MS. KANE:**  Well, that's not the issue, Your Honor.  If

2     they wish to cross-examine Special Agent Miller regarding his

3     personal knowledge of a case, we can address the admissibility

4     or not of those statements.

5          **THE COURT:**  Isn't he coming in here as some kind of an

6     expert?

7          **MS. KANE:**  He will be testifying in part as an expert

8     regarding the market for stolen credentials.

9          **THE COURT:**  Well, I will have to see where -- I have a

10     feeling the Government is going to overreach with Agent Miller

11     and try to convict the Defendant based on opinions -- not

12     facts, but opinions that are proffered by Miller based on his,

13     quote, expertise.

14        I don't know.  I have got to wait and listen to it.  But

15     if he purports to be an expert, then this kind of thing is

16     perfectly usable except for 403.  403 -- but it is not a

17     hearsay problem.  It is a 403 problem.

18        So you have to be very careful how he proceeds if he

19     purports to be an expert.  Experts get cross-examined on things

20     like this all the time.

21        Now, I don't know if it's true or not that he is

22     completely -- he is charged with something totally different.

23     Do you have the indictments handy that would show that Belan

24     was charged by -- in our District with something immaterial to

25     our case?

**PROCEEDINGS**

1    **MS. KANE:**  Well, Your Honor, I could get copies of the

2    indictments.  But that's not what the Defense is seeking to

3    admit.  And that's part of the issue here.  They are seeking to

4    admit just these wanted posters that have a summary of the

5    charges.

6        **THE COURT:**  Yes, but if he is going to testify as an

7    expert, maybe this kind of hearsay is permissible.  I don't

8    know.  I have to listen to his testimony and see how it

9    unfolds.

10       But, for example, I have a feeling that he is going to try

11   to say, your witness, that the Defendant is the guy who has

12   that same first name.  And is that personal knowledge or is

13   that an opinion?

14       **MS. KANE:**  Well, Your Honor, I'm sorry.  I'm not sure

15   exactly what you are referring to.

16       **THE COURT:**  So far there is no evidence in the case

17   that shows that this Defendant did it.  There is evidence in

18   the case that somebody in Russia did it, and there is evidence

19   that he was at a meeting where they talked about an internet

20   cafe; but there is no evidence that this Defendant is the one

21   that broke in, is there?

22       Maybe -- I'm not -- I'm not saying -- I should say it is

23   hard for me to see the evidence.  Possibly it is hidden there

24   in all the Morse code.  So I feel like I got to wait and hear

25   your closing argument on that.  But my thought is that you are

PROCEEDINGS

1   saving Agent Miller to be the overarching expert to put it all

2   together for the jury.  And within reason, that's okay, I guess

3   if he is really an expert.

4      But if he is an expert and not a percipient witness, then

5   experts get cross-examined with things like treatises all the

6   time.  Treatise this.  Treatise that.  Wanted poster here.

7   Wanted poster there.  I feel like that may be okay.

8      However, I will warn the Defense on this.  Under Rule 403,

9   I don't think you should be getting into sideshows about some

10  other indictment that has very little to do with our case.

11         **MR. GASNER:**  Thank you very much.

12         **THE COURT:**  I just don't -- honestly, I don't see how

13  this helps you unless you are trying to confuse the jury.

14         **MR. GASNER:**  No, Your Honor.  The issue -- one of the

15  issues is that, for example, Alexsey Belan is listed on their

16  chart in this case as other relevant people.  We believe that

17  will there are other Russian hackers that are responsible for

18  this hack including any of the other relevant people on that

19  chart.

20      Alexsey Belan, for example, has been communicated with,

21  and there is evidence that may be -- maybe we can, maybe we

22  can't get out -- with Mr. Dokuchaev who is an FSB agent; okay.

23         **THE COURT:**  He is what?

24         **MR. GASNER:**  He works for Russian Intelligence

25  according to our information; okay.

1        **THE COURT:**  Yeah.

2        **MR. GASNER:**  And the connection with him and Belan and

3    then their purported connection -- the Government's purported

4    connection Mr. Belan to Mr. Nikulin makes me believe that I

5    have a right to inquire with regard to the relationship of

6    these other relevant people, their relationship to Russian

7    Intelligence and their capability and ability to purport --

8    excuse me -- to commit these hacks.  There are other people,

9    not necessarily co-conspirators that are certainly responsible.

10       And then if you look at the other -- so, first, I

11   addressed Belan and his relevance.  Then I addressed Dokuchaev

12   and his relevance.

13       Turning to Evgeniy Bogachev, this guy is probably the

14   number one Russian hacker in the world.  It is widely known.

15   He has got the same first name as the person that the

16   Government has been claiming is Mr. Nikulin.

17       They are calling -- the name is at issue.  Yevgeniy

18   Evgeniy.  We heard this from the translator today -- I mean

19   yesterday -- excuse me -- that Evgeniy is a diminutive of

20   Yevgeniy, also a nickname of Zhenya.  We heard all of this

21   yesterday.

22       And these are relevant other people that the Defense

23   believes very likely are the actual culprits in this case.

24   Just because they got this guy out of Russia and they think

25   that they want to point the finger at him, that's fine.  But

1    I believe the Defense has a right to inquire with regard to

2    names that are relevant in this case, with regard to

3    individuals that are listed in this case, and with regard to

4    their connection to Russian Intelligence because it is the

5    Defense --

6         THE COURT:  What good does it do you to show that

7    there are other people in Russia -- which everybody knows is

8    full of hackers -- Lithuania, Astonia, it is like hack city

9    over there.  There are plenty of people over who know how to

10   hack.

11        MR. GASNER:  That's true.

12        THE COURT:  What good does it do you if the Government

13   catches one guy who could do it and maybe did do it?  So your

14   point is maybe someone else could have done it.  That doesn't

15   prove much.  Everybody in the world knows it is full of hackers

16   over there.

17        MR. GASNER:  I understand that maybe it is common

18   knowledge; and if the Court wants to take judicial notice of

19   that and we can alert the jury to that fact.  But unfortunately

20   I'm dealt with the cards that I'm dealt with.  And I have to

21   deal with the rules of evidence, and I have to get in evidence

22   so that I can properly argue it over an objection.

23        And the reality here is that I believe the Russian

24   Intelligence and the Russian government is complicit in the

25   hacks of United States companies.  I believe our right to

1   explore that fact -- because I believe that the Russian

2   government is providing misinformation to the United States

3   under Mutual Legal Assistance Treaties because they have an

4   interest in keeping the United States government from

5   understanding the truth with regard to these hacks.  The

6   Russian Intelligence, Russian government has an interest in

7   that.

8        And so, therefore, when we have named suspects that have

9   admitted to be working with the FSB, when we have hackers with

10  the same first name or same nickname that this translator says

11  is the name that the Government thinks is responsible and when

12  we have Mr. Belan, who is listed as an other relevant person in

13  this case, I think the jury has the right to know that and the

14  Defense has the right to explore that under cross-examination

15  in support of our defense.

16       **THE COURT:**  Okay.  I'm not going to make a final

17  ruling yet.  I'm going to wait a minute.  But I do think there

18  is -- I see one narrow legitimate line of cross and maybe

19  others, but it is true -- I have heard in this case before that

20  this first name is common in Russia, Yevgeniy.  How do you say

21  it?

22       **MS. KANE:**  Your Honor, I believe that was the

23  statement of Counsel; but, yes, I think --

24       **THE COURT:**  All right.  But let's say that it is

25  admitted.  I think it was admitted by someone here; that that

1    was a common name in Russia.  And even more so, if it is not --

2    let's say it is not common, it is even more powerful.  So the

3    FBI agent is on the stand and Mr. Gasner says:  Okay,

4    Mr. Agent, is it true or not that Yevgeniy is a common name in

5    Russia?

6         So he finally says:  I don't know.  I don't know.

7         Then he says:  Well, isn't it true that you have heard of

8    Mr. Dokuchaev in Russia and his first name is Yevgeniy?

9         And he has to admit:  Yes, I have heard of that guy.

10         And he is like the world's premier hacker?

11         Well, he is a hacker.  I don't know if he is premier, but

12    he is a hacker, okay.

13         But his first name is Yevgeniy.  And he is a hacker and he

14    is in Russia; right?

15         Yes.  And, in fact, the FBI has all-points bulletin out to

16    try to get him?

17         Yes, yes, yes.

18         And so why isn't it perfectly permissible for the

19    cross-examination to show that that Yevgeniy might be somebody

20    else?

21         **MS. KANE:**  Your Honor, I think there are two things I

22    need to address to make sure the Court is very clear on what is

23    going on and what is before the Court.

24         With regard to Mr. Bogachev, the wanted poster in front of

25    the Court right now does not allege that Mr. Bogachev is a

 1    hacker.   It does allege a violation of Title 18, Section 1030.

 2         But the actual statements in that wanted poster is that

 3    Mr. Bogachev was the administrator in a conspiracy that

 4    involved sending spam and malicious software to harvest

 5    credentials and steal money from people's bank accounts.   It

 6    couldn't be more different than what the Defendant is alleged

 7    to have done.

 8         So with this -- for this poster and the other two, the

 9    Court is exactly right.   That Rule 403 shows that this is

10    unduly prejudicial.   It is going to confuse the jury.   It is

11    going to inject issues that shouldn't be issues in this trial.

12    This is simply pointing to one other person on this earth who

13    may or may not have committed -- violated the same statute that

14    the Defendant violated in a totally different way and saying

15    couldn't it have been him?

16         And that is not something that Defendants are generally

17    permitted to do; to just list a roster.   You know, a bank

18    robber can't come in and say:   This guy robbed a bank once.

19    Couldn't it have been him?   What about this guy?

20         That is not how evidence works.

21         **MR. GASNER:**  Oh, yes it can.

22         **THE COURT:**  He has got the same first name and he is a

23    hacker, that's a lot better than just "some other guy robbed a

24    bank once."

25         **MS. KANE:**  Again, I want to be clear there is no

PROCEEDINGS

1   allegation in that document -- that doesn't say "hacker."

2       THE COURT:  It doesn't use the word "hacker," but it

3   comes pretty close.  The software was used to capture bank

4   account numbers, passwords, personal ID numbers, other

5   information necessary to log on to online banking accounts

6   while Bogachev knowingly acted in a role as administrator.

7   Others involved in the scheme conspired to distribute spam and

8   phishing e-mails.

9       You know, I think that the jury could reasonably conclude

10  that somebody capable of doing that kind of stuff is capable of

11  doing what is alleged against our Defendant.

12      MS. KANE:  Although it says:  Others distributed the

13  spam and the malicious links and then Bogachev was an

14  administrator.  And this is why this is so confusing to

15  introduce into this trial.

16      THE COURT:  Well, you have got an expert guy.  He can

17  explain all that.

18      MS. KANE:  That's the second issue I wanted to

19  address, Your Honor, which is that Special Agent Miller's

20  expert testimony is very limited in this case.

21      We will stop during his testimony.  We will set aside the

22  portion of his testimony that is expert testimony.  And the

23  testimony he will give as an expert is regarding the market for

24  stolen credentials and the ways in which individuals interact

25  in that market; the way that they sell and buy stolen

1    credentials.  And he will testify as to that market.  And then

2    that will be the end of his expert testimony.

3         And we will again set that -- set off the end of that, and

4    we will then proceed with his testimony as a percipient witness

5    in this case.

6         **THE COURT:**  Okay.  Well, maybe you got it -- maybe

7    that will work and maybe it won't; but sometimes I know the

8    Government will -- will confuse those two things and what you

9    call percipient is really expert.

10        By the way, on Bogachev at the top in big red letters it

11   says:  Conspiracy to participate in racketeering activity, bank

12   fraud, conspiracy to violate the Computer Fraud and Abuse Act,

13   conspiracy to violate the Identity Theft and Assumption

14   Deterrence Act, aggravated identity theft, conspiracy computer

15   fraud, wire fraud, money laundering, con -- I mean, a fair

16   number of these things are exactly what is alleged in our case.

17        **MS. KANE:**  They are the same statutes, Your Honor.  To

18   the extent that we have facts from that poster, the facts are

19   very different.

20        But --

21        **THE COURT:**  All right.  Maybe they are different but I

22   don't know.  I'm not going to rule in or out anything yet.  I

23   think it is useful for me to be up to speed.  So I'm not saying

24   you can do it yet, Mr. Gasner; but I'm not ruling it out yet.

25        And if I was you, I would proceed with your best stuff

1   first so that I can see that you are not wasting time.  And

2   maybe then I will let you go even farther and deeper into it,

3   but I don't know the answer yet.

4       I will also say that the idea that somehow because the

5   government in Russia is trying to hack into the USA -- and we

6   all know that they did -- is so farfetched that it has anything

7   to do with this case.

8       I don't know.  That one I'm not sold on.  But the name,

9   the confusingly similar name and the fact that the FBI itself

10  is hot to get this guy, yeah -- and there is an issue in this

11  case of who done it.  So that -- it is not to me so farfetched

12  to say how do we know we got the right guy.  Maybe this other

13  guy is the right one?

14      And you got an FBI -- he is a skilled witness.  He will

15  probably be able to blow Mr. Gasner out of the water and

16  explain it all to the jury beautifully, and so there won't be

17  any problem.

18      So I'm not sure where this is going to wind up.  I want to

19  hold onto these.  Can I or are these your only copy?

20          **MR. GASNER:**  Those are for you, Your Honor.

21          **THE COURT:**  Yes.  Anything else?

22          **MR. GASNER:**  Pardon me.  Thank you.  A couple of

23  things.  One, I do believe that the expert disclosure for Agent

24  Miller is broader than the recitation by the Government just

25  now.  And so I guess we will have to listen to that carefully.

1        And I'm also concerned that when the testimony turns to

2   lay testimony that there is going to be the -- the elicitation

3   of hearsay and other types of evidence through his testimony

4   that an expert would typically do.  And I'm going to be

5   objecting to that.

6        **THE COURT:**  If you are doing it on a percipient basis,

7   no hearsay.  That's why I think you are going to have to do

8   most of this by expert.

9        So be aware of that.  If this is hearsay, then you have a

10  problem if he is trying to put out hearsay to the jury as a

11  percipient fact witness.  We got to get going here.

12       **MR. GASNER:**  Nothing further from the Defense.

13       **MS. KANE:**  Your Honor, on that note, when Special

14  Agent Miller does testify, we have proposed jointly the model

15  jury instruction 4.14 regarding opinion evidence by an expert.

16  And I don't know if the Court wants to give that instruction at

17  the time of the testimony.

18       **THE COURT:**  Well, I -- I can -- I had in mind -- I

19  don't know what that one says, but I usually let the jury know

20  that opinions are opinions and facts are facts.  And so you --

21  by the way, you don't have to -- under the Federal Rules, you

22  don't have to tender somebody as an expert.  If you -- if there

23  is a dispute over it, then the main thing is you have to -- if

24  you qualify him as an expert, then you can ask questions within

25  that realm.  But I don't like it whenever you want me to

**PROCEEDINGS**

1   certify to the jury that he is an expert.  So don't ask me to

2   do that.

3           **MS. KANE:**  Yes, Your Honor.

4           **THE COURT:**  That is just a gimmick to make it sound

5   like he is God, and he is just another ordinary witness.  So

6   I'm not going to -- I will just -- I won't -- please just --

7   but what you could do is say:  I'm now coming to his expert

8   portion or I'm now on his fact portion.  That part I would --

9   or just call it opinion.  Don't call it expert.  Just call it

10  opinion.  It is not expert.  It is opinion.  Okay.  But I will

11  allow it because of his special expertise, training or

12  experience.  Okay.  What is next?  We got to get going here.

13  Are we ready?

14          **MR. GASNER:**  Yes, Your Honor.

15          **MS. KANE:**  Yes, Your Honor.

16          **THE COURT:**  We made a mistake yesterday.  I have been

17  properly reprimanded.  I did not, what is the word, wipe

18  down -- we did not wipe down the witness stand between

19  witnesses.  And we -- I see we have got at least two witnesses

20  today; right?

21          **MS. KANE:**  Yes, Your Honor.

22          **THE COURT:**  Tracy, how are we supposed to do it?  I

23  asked that there be a -- what do they call them -- a porter

24  here.  In between the two witnesses can you do your thing with

25  the porter job?

1          **PORTER:**  Yes, Your Honor.

2          **THE COURT:**  Excellent.  Great.  Let's bring in our

3    jury.

4          **MS. KANE:**  Your Honor, may I ask what the schedule

5    will be today with breaks?  Will it be similar to yesterday?

6          **THE COURT:**  Well, similar, but I usually -- go ahead,

7    Tracy, bring them in.

8        What I usually do is look for golden opportunities.  So

9    depending on how long the first witness goes, I could call a

10   break right after that and then the porter can clean up and

11   take care of two things at once.

12       On the other hand, let's say he is only on the stand for

13   five minutes, then I can't just send the jury out after five

14   minutes.  I have got to go to the next witness with clean up in

15   between.

16       I am going to try to have a lunch break today for at least

17   30 minutes, and we will have at least one break by

18   10:00 o'clock, 10:30 somewhere in there.

19          **MS. KANE:**  Thank you.

20          **THE COURT:**  Just bear with me.  It is hard to predict

21   what the schedule will be.

22               (Recess taken at 9:00 a.m.)

23          (Proceedings resumed at 9:02 a.m.)

24    (Proceedings were heard in the presence of the jury:)

25          **THE COURT:**  Members of the Jury, I think you have

```
 1   probably -- we have rearranged a few of you so that it will be
 2   more comfortable for you and also better for the lawyers if all
 3   of you will be on that side of the room now.
 4        Tracy, is everyone here?
 5            THE CLERK:  I believe so.
 6            THE COURT:  Let's just do a head count.  Do we have 12
 7   or not?
 8            THE CLERK:  Yes, we have 12.
 9            THE COURT:  All right.  Good.  Thank you.  All right.
10   Please be seated and welcome back.
11        Welcome back.  Now, if you-all, Members of the Jury, need
12   to stand up, be my guest.  That's okay.  And -- or if you need
13   a break at any time, we will accommodate that.  Raise your hand
14   or if you feel like that you want to move to a different spot,
15   we will try to accommodate that too.
16        So -- but right now we think we have a good arrangement,
17   and we want to give it a try.  So great.
18        Now, you will remember -- oh, I have some more news for
19   you.  There is a good chance but I won't say a certainty or
20   not.  It just may be a probability, better likely than not,
21   that we will get the case to you for decision by Wednesday and
22   that you would then have Wednesday, Thursday and Friday and
23   next week, if you need it, to deliberate.
24        And at this time I want to -- whenever you are in the next
25   break, you might consider whether starting tomorrow, which is
```

**PROCEEDINGS**

 1  Wednesday, you would stay later than 2:00 o'clock in order to

 2  deliberate.  That's up to you.  You don't have to.  You can

 3  decide:  No, I want to go home at 2:00 o'clock and we will

 4  deliberate Thursday and Friday.  That's okay.  But I let the

 5  jury decide their own schedule for the afternoons.

 6       And you have my permission to -- don't talk about the

 7  merits of the case.  Just say:  Do you want to stay later on

 8  Wednesday and Thursday and Friday.  Or you could decide that

 9  day by day.  But sometimes you need advance planning to make

10  the arrangements to be able to do that.  But, please, do not

11  discuss the merits of the case in deciding whether or not you

12  would want to stay later.

13       So that's what the lawyers are telling me.  Now, it could

14  be wrong.  It could be that we are going to go into next week.

15  I have to warn you.  You still need to be prepared to be here

16  next week, but I believe that there is a good chance that the

17  case will go to you for decision on Wednesday; and you could

18  have Wednesday, Thursday and Friday to deliberate plus next

19  week.

20       Okay.  You will remember when we broke yesterday, that

21  Mr. Romanenko, the interpreter; right, Ms. Kane?

22            **MS. KANE:**  Yes, Your Honor.

23            **THE COURT:**  He was on the stand.  Is he here now?  And

24  he was about to be cross-examined but because of the hour, we

25  decided to put it over.  So bring him on in.

1       So we are going to finish up with Mr. Romanenko.  And then

2    we will go to a long witness, a witness who will be on the

3    stand for several hours.  So that might even take the rest of

4    the day.

5       Mr. Romanenko, you know the drill now.  Please have a seat

6    in the witness stand.

7       Before you begin, the lawyers have asked me to say that

8    Exhibits 89 and 89A have been offered by the Government in

9    evidence and have now been received into evidence.  And so

10   those two exhibits might come up in the cross-examination in a

11   few minutes.  But 89 and 89A, which were mentioned yesterday,

12   are now in evidence.

13      So that part is done.  And were there any other

14   preliminaries that I was supposed to go into?

15           **MS. NECHAY:**  No, Your Honor.

16           **THE COURT:**  All right.  So, Ms. Nechay, I don't know

17   if you know her or not but there she is.  Valery Nechay.  She

18   is going to cross-examine you now on behalf of the Defendant.

19      Ms. Nechay, the floor is yours.  Please go ahead.

20                     **ANDRE ROMANENKO**,

21   called as a witness for the Government, having been previously

22   duly sworn, testified further as follows:

23                   **CROSS-EXAMINATION**

24   BY MS. NECHAY:

25   **Q.**   Thank you very much.  Good morning.  Thank you for coming

1   back to supplement your testimony.

2        As a reminder to the jurors, I will just briefly begin by

3   refreshing the recollection as to your testimony.

4        On direct examination you stated that Zhenya is a nickname

5   for Yevgeniy.

6   A.   Yes.

7   Q.   First of all, let's discuss the name Yevgeniy.  This is a

8   first name rather than a last name in the Russian language?

9   A.   Correct.

10  Q.   And it is a common -- Yevgeniy is a common name in Russia?

11  A.   Yes.

12  Q.   Yesterday I believe you stated there are many permutations

13  for the spelling of Yevgeniy; is that correct?

14  A.   Yes.

15  Q.   It may be spelled perhaps, Yevgeniy, with a Y like

16  Y-E-V-G-E-N-I-Y?

17  A.   Yes, in English.

18  Q.   Uh-huh.  Or in English it can be spelled Evgeniy beginning

19  with an E, E-V-G-E-N-I-Y?

20  A.   Yes.

21  Q.   So essentially it could be spelled in multiple different

22  ways, perhaps, I didn't even mention?

23  A.   Correct.

24  Q.   And these spelling variations of the name Yevgeniy

25  primarily exist when the name is translated into the English

1    language; meaning -- let me clarify.  Meaning, are there

2    permutations of the spelling in Russian for the name Yevgeniy?

3    A.   Not for the name Yevgeniy.

4    Q.   Okay.  So it is just when it is just -- the permutations

5    of the spelling are primarily when the name is translated into

6    English?

7    A.   Translated into English.

8    Q.   The first name Yevgeniy may sound unique here in America;

9    but as you were just saying, it is very common in Russia.  It

10   is ubiquitous?

11   A.   Correct.

12   Q.   And it is not just common in Russia.  It is common in

13   other former Soviet territories as well?

14   A.   Yes.

15   Q.   Including Ukraine?

16   A.   Yes.

17   Q.   What other Russian speaking territories is the name

18   Yevgeniy popular in?

19   A.   Any of the post-Soviet Republics, Belarus, Kazakhstan,

20   Moldova, Lithuania.

21   Q.   What other names are uncommon here but popular in Russia,

22   for example?

23   A.   There are lots of them:  Andre, Anton, Alexander.

24   Q.   Can you think -- perhaps, can we make an analogy, is that

25   as common as the names Adam, William or Jeffrey here in the

**ROMANENKO - CROSS / NECHAY**

1    United States?

2    **A.**    The names that I have just mentioned?

3    **Q.**    Yes, I apologize.  And the name Yevgeniy, is that

4    similarly as popular as, for example, Adam, William or Jeffrey?

5    **A.**    Yes.

6    **Q.**    However, the name Yevgeniy is not only used as a first

7    name but can be used as a middle name as well?

8    **A.**    There would be a variation of the name.  It would be

9    Yevgenivich (phonetic).

10   **Q.**    And you are speaking of the patronymic system in Russian

11   speaking countries whereby the persons familial name, according

12   to their father, will be used in the middle -- as a middle

13   name?

14   **A.**    The father's first name would be used as the middle name

15   of the child.

16   **Q.**    Okay.  And the shortened version of Yevgeniy irrespective

17   of its English spelling is Zhenya?

18   **A.**    Yes.

19   **Q.**    The shortened name Zhenya in Russian does not denote some

20   signifier for one specific person?

21   **A.**    Correct.

22   **Q.**    So whether a random person named Yevgeniy is of Russian

23   Ukranian or Belarusian descent, that Yevgeniy's name would

24   always be shortened Zhenya?

25   **A.**    That would be one variation.

1   Q.   Essentially Yevgeniy and Zhenya are used interchangeably?

2   A.   Yes.

3   Q.   And the name Anna -- or in Russian Anya -- was also

4   brought up yesterday.  Do you recall?

5   A.   Yes.

6   Q.   And is Anna or Anya also a very common name in Russia?

7   A.   Yes.

8   Q.   In fact, it is probably one of the most common names in

9   Russia?

10  A.   One of them, yes.

11  Q.   Yesterday when you were discussing the names, you

12  described them as nicknames or Zhenya as a nickname.  What is

13  your operating definition of nickname?

14  A.   I'm sorry.  I did not discuss Zhenya as a nickname.  I

15  said that it is a diminutive of Yevgeniy.

16  Q.   Okay.  And that's, again, because it is -- Zhenya is not

17  an identifier for one specific person the way that a nickname

18  would suggest that it has -- is a nickname for one specific

19  person?

20  A.   Yes.

21  Q.   In a different context you use the term nickname, well, in

22  the context of a linguistic structure of the name Lomovich.  Do

23  you remember?

24  A.   Yes.

25  Q.   And you testified about Lomovich, the middle portion, you

1   discussed was a crowbar in Russian?

2   **A.**   The root of the word translates into English as a crowbar.

3   **Q.**   Okay.  However, many names -- many words in Russian also

4   have a double meaning?

5   **A.**   Yes.

6   **Q.**   For example, I was introduced by the Judge to you as

7   Valery Nechay.  But if my name in Russian was pronounced Nechai

8   (phonetic), can you tell me what does the second portion of

9   that mean in Russian?

10  **A.**   You mean your last name?

11  **Q.**   Yes.  For example, just Nechai (phonetic), what would that

12  "chai" mean in Russian?

13  **A.**   It would mean hot tea.

14  **Q.**   So it is not unfeasible that Lomovich is some Russian

15  person's actual last name?

16  **A.**   Correct.

17  **Q.**   Let's discuss the Russian language a little bit in

18  general.  Russian is complicated as a language in general.

19  Would you agree?

20  **A.**   Yes.

21  **Q.**   And you agreed previously that there are many words that

22  could have multiple meanings.  For example, when there is a

23  prefix, it can change the particular meaning of a word?

24  **A.**   Yes.

25  **Q.**   And the prefix is before the root?

1   A.   Correct.

2   Q.   Let me use an example.  What is a word for run in Russian?

3   A.   Bezhat, B-E-Z-H-A-T.

4   Q.   So, for example, bezhat, if you say -- if you change the

5   prefix and you say pre-bezhat, what does that mean?

6   A.   To run up, to stop running.

7   Q.   And if you change the prefix from the word bezhat to

8   izbezhat, how does that change the meaning?

9   A.   To run away, to run from.

10  Q.   If I change the prefix of the word bezhat to tsybezhat,

11  how does that change the meaning of the word?

12  A.   To run into something.

13  Q.   And if I use the prefix pobezhat, how does that change the

14  meaning of the word bezhat?

15  A.   To run up to or to run close to something.

16  Q.   So as we have just demonstrated, depending on the prefix,

17  the word can have multiple meanings?

18  A.   Yes.

19  Q.   And sometimes those meanings are completely different?

20  A.   Sometimes.

21  Q.   The meaning can vary further depending on the context that

22  it is used in?

23  A.   Absolutely.

24  Q.   As well as the slang and dialect?

25  A.   Yes.

1   Q.   When you were asked to translate the materials you

2   reviewed in this case, you were familiar with the accusations

3   by the Prosecution?

4   A.   Yes.

5   Q.   So that is the context within which you reviewed the

6   documents to check for their accuracy and interpret them?

7   A.   Along with the text as the context.

8   Q.   Specifically you were asked about -- you were asked about

9   differences between Russian words that could either mean "hack"

10  or "break"?

11  A.   Yes.

12  Q.   And at that time you did know the context of what you

13  were -- what you were reviewing?

14  A.   Yes.

15  Q.   Specifically, you were asked to review a call -- a --

16  excuse me -- an audio as well as the transcript for that call?

17  A.   Yes.

18  Q.   Do you recall when you reviewed that transcript when the

19  word you believed was used "hack," what was that word?

20  A.   The word in Russian was vzlomat, V-Z-L-O-M-A-T.

21  Q.   And this is also similar to another word, slomat?

22  A.   Correct.

23  Q.   And what does slomat mean?

24  A.   Slomat means to break something into pieces.

25  Q.   Do you recall that in the transcript when the word you

1  believe vzlomat was used that the transcript indicated that

2  there was laughing?

3           THE COURT:  I don't understand the question.  Please

4  rephrase it somehow.  It is just not clear.

5           MS. NECHAY:  Sure.

6  BY MS. NECHAY:

7  Q.   Do you recall the transcript indicating that the speaker

8  was laughing while they were using that word?

9  A.   This word was used in several places.  In one of them the

10 speaker was laughing.

11 Q.   Are you certain that it was only in one place that there

12 was an indication there was laughing?

13 A.   The other transcript was a transcript of a writing, so

14 there was no laughing over there.

15          THE COURT:  It is unclear -- can I ask you to clarify?

16 Are we talking about a recording, audio recording, or are we

17 talking about a transcript and, thirdly, a translation into

18 English?

19          So there are three different things.  And I want to make

20 sure the jury is following your cross-examination.  So keep

21 those distinctions in mind, please.

22          MS. NECHAY:  Thank you, Your Honor.  I was -- just to

23 clarify to, Your Honor, I was speaking of Exhibit Number 89 of

24 the English transcript.

25          THE COURT:  All right.  So that has not yet been clear

1    to the jury but okay.  So you are talking about 89?

2           MS. NECHAY:  Yes, Exhibit 89.

3           THE COURT:  All right.  So please continue.

4           MS. NECHAY:  Thank you.

5           THE COURT:  Here is what is confusing to me:  You were

6    talking about laughter but when you have -- wouldn't you have

7    to be hearing the audio in order to know that there was

8    laughter as opposed to a transcript which is just words?

9           MS. NECHAY:  Well, Your Honor, in the particular

10   transcript provided by the Government, they did indicate in

11   brackets that there was laughing.  If Your Honor needs a

12   reference, it is on page 3 of Exhibit 89.

13          THE COURT:  I see one reference now.  Okay.  All

14   right.  I see your point.  Okay.

15          MS. KANE:  If I could just clarify, Your Honor, the

16   jury has not seen the transcript nor heard the recording here.

17          THE COURT:  Correct.  They haven't seen it yet but 89

18   is in evidence.  And they will eventually see it if they wish.

19   Okay.  Go ahead.

20   BY MS. NECHAY:

21   Q.   At the time that you reviewed this transcript, you had

22   never met Mr. Nikulin?

23   A.   No.

24   Q.   So you had no way to tell whether he has a strange sense

25   of humor and was making a joke here?

ROMANENKO - CROSS / NECHAY

1   **A.**   Correct.

2   **Q.**   And you also hadn't received all of his other -- other

3   transcripts of his jail calls in the past?

4   **A.**   Correct.

5   **Q.**   So you had no ability to use in context the totality of

6   how his communication style is when you were in interpreting

7   this transcript and the audio?

8   **A.**   I was verifying the accuracy of the translation.  And when

9   listening to the conversation -- to the recording in Russian

10  and reviewing the translation in English, the translation in

11  the context of that conversation seemed accurate to me.

12  **Q.**   But, again, you stated that when you are interpreting,

13  meanings could change depending on the context?

14  **A.**   Yes.

15  **Q.**   And you did not have any ability to have the benefit of

16  knowing this individual to know what his subjective intention

17  was in making these statements?

18  **A.**   I did not know his subjective intentions.  I translated

19  the document and verified the accuracy based on the context

20  presented to me.

21          **MS. NECHAY:**  Thank you very much.

22          **THE COURT:**  Is that it?

23          **MS. NECHAY:**  No further questions, Your Honor.

24          **THE COURT:**  Okay.  All right.  Any redirect?

25  \\\

ROMANENKO - REDIRECT / KANE

1          MS. KANE:  Thank you, Your Honor.

2                    REDIRECT EXAMINATION

3    BY MS. KANE:

4    Q.   Ms. Nechay asked you some questions about the context for

5    your translation.

6          Based on your expertise as a translator, did you review

7    the translations consistent with that expertise and render your

8    opinion in the normal course that you do in translating?

9    A.   Yes.

10   Q.   And is the type of information that you had in order to

11   render an opinion on this translation similar to the types of

12   information you typically have when you are translating?

13   A.   Yes.

14   Q.   Can you ever know the subjective intent of someone for

15   whom you are translating?

16   A.   If the person tells that to me, then I know it.

17   Otherwise, I judge by the context.

18   Q.   And if I told you that that call was made in the context

19   of a Defendant accused of something totally different, like,

20   assault or bank robbery, would that change your opinion as to

21   the translation?

22   A.   No.

23          MS. KANE:  Thank you, Your Honor.  No further

24   questions.

25          THE COURT:  Well, let's just -- I know you didn't

```
 1   intend to leave any such impression, but let's not confuse

 2   anybody here.   There is no suggestion ever that the Defendant

 3   has robbed a bank, is there?

 4          MS. KANE:   No, absolutely not, Your Honor.   I was

 5   simply responding to the Defense question regarding the context

 6   of this case.   I apologize if I left any such impression.

 7          THE COURT:   All right.   The jury should be aware that

 8   there is no suggestion ever that the Defendant has robbed a

 9   bank, and that was just for hypothetical illustrative purposes.

10   So that's fine.

11      Okay.   Anymore recross?

12          MS. NECHAY:   No.   Thank you, Your Honor.

13          THE COURT:   May this witness be excused and

14   discharged?

15          MS. KANE:   Yes.   Thank you.

16          MS. NECHAY:   Yes.

17          THE COURT:   Thank you, sir.   You can put your mask

18   back on and have a good day.   We are going to go to the next

19   witness, but could our day porter come forward and wipe down

20   the witness bench, please.

21      And while we are doing that, you may bring in your next

22   witness.

23          MS. KANE:   Thank you, Your Honor.   The United States

24   calls Special Agent Jeffrey Miller.

25          THE COURT:   Excellent.   Please bring him forward too.
```

ROMANENKO - REDIRECT / KANE

```
 1                        (Pause in proceedings.)
 2          THE COURT:  Members of the Jury, I will just have to
 3   explain, I didn't remember that we were supposed to do this
 4   between witnesses.  So we didn't do it yesterday.  That was my
 5   fault.  And -- but I have been reminded, and we are going to do
 6   it the right way for the safety of the witnesses.
 7       The witness may come forward and stand about there and
 8   raise your right hand.
 9                        JEFFREY MILLER,
10   called as a witness for the Government, having been duly sworn,
11   testified as follows:
12          THE COURT:  Welcome, sir.  You know the drill.  Please
13   remove your mask and speak into the microphone and give us your
14   name so that we can.
15          THE WITNESS:  Jeffrey S. Miller.
16          THE COURT:  I think you need to be a little closer to
17   the microphone in order to make sure that everybody hears.  Say
18   it again.
19          THE WITNESS:  Jeffrey S. Miller.
20          THE COURT:  Everybody hear okay?  Raise your hand if
21   you feel you have a problem hearing.
22                        (No response.)
23          THE COURT:  All right.  Everything is cool.  Counsel,
24   please go ahead.
25          MS. KANE:  Thank you, Your Honor.
```

1                        <u>**DIRECT EXAMINATION**</u>

2   **BY MS. KANE:**

3   **Q.**   Good morning.

4   **A.**   Good morning.

5   **Q.**   Could you please tell us where you work.

6   **A.**   I work for the Federal Bureau of Investigation.

7   **Q.**   How long have you worked for the FBI?

8   **A.**   A little over ten years.

9   **Q.**   And where are you currently assigned to work for the FBI?

10  **A.**   The Indianapolis field office.

11  **Q.**   How long have you been assigned there?

12  **A.**   About two months.

13  **Q.**   And where were you assigned before Indianapolis?

14  **A.**   The San Francisco field office.

15  **Q.**   And how long were you there?

16  **A.**   Just shy of ten years.

17  **Q.**   Before you began your work as an FBI agent, did you

18  receive training?

19  **A.**   I did.

20  **Q.**   And can you tell us about some of that training?

21  **A.**   It was a six-month training at the FBI Academy where we

22  were taught law, defensive tactics, investigative techniques,

23  things of that nature.

24  **Q.**   And are you assigned to a particular FBI squad in

25  Indianapolis?

**MILLER - DIRECT / KANE**

1   **A.**   Yes, I am.

2   **Q.**   And what does that squad do?

3   **A.**   Cyber Crime.

4   **Q.**   When you were in San Francisco, were you assigned to a

5   particular squad?

6   **A.**   Yes, I was.

7   **Q.**   And what did that squad do?

8   **A.**   Also Cyber Crime.

9   **Q.**   And can you describe what types of crimes you mean when

10  you say "cyber crime"?

11  **A.**   Sure.  We would typically investigate data breaches --

12  large scale, small scale, distribute dialects, so overwhelming

13  a server with data to take it off-line, things of that nature.

14  **Q.**   Before you joined the FBI, did you have any work

15  experience that is relevant to your work on the cyber crimes?

16  **A.**   Yes, I did.

17  **Q.**   Can you describe that, please?

18  **A.**   Sure.  I was a prototype manufacturing engineer at Delphi

19  Electronics & Safety.  And my day-to-day functions involved

20  software development, network administration, database

21  administration.

22  **Q.**   And did you work with particular types of software?

23  **A.**   Yes, I did.

24  **Q.**   What was that?

25  **A.**   Oracle databases, SQL databases, programming languages.

**MILLER - DIRECT / KANE**

1   **Q.**   And did you go to university?

2   **A.**   I did.

3   **Q.**   Where did you go?

4   **A.**   Purdue University.

5   **Q.**   That's in Indiana, where you are now?

6   **A.**   Yes, Ma'am.

7   **Q.**   And what did you study?

8   **A.**   Computer technology.

9   **Q.**   Now, how many computer intrusion cases would you say that

10  you have worked on in your time with the FBI?

11  **A.**   As a sole investigator, somewhere between 25 and 35.

12  **Q.**   And did those cases involve theft of user credentials?

13  **A.**   Yes, they did.

14  **Q.**   And what about the disposal or trafficking of those

15  credentials?

16  **A.**   Yes.

17  **Q.**   In addition to your training as an FBI agent at the

18  initial course in Quantico, have you received any other

19  training relevant to your cyber investigation?

20  **A.**   Yes.  I have received ongoing training in various fields;

21  but in particular I have received training -- there was a Linux

22  for law enforcement class, log analysis using Splunk.  It is a

23  software platform.

24  **Q.**   Could you spell that, please?

25  **A.**   S-P-L-U-N-K.  I have taken industry standard SANS courses,

**MILLER - DIRECT / KANE**

1   introduction to cyber security, security essentials, Macintosh

2   forensics.

3   **Q.**   And do you have any particular training in forensic

4   extraction techniques?

5   **A.**   Yes.  I have certification with the FBI as a Dext

6   Examiner.

7   **Q.**   What does that mean?  Can you spell that?

8   **A.**   Sure.  D-E-X-T.

9   **Q.**   And what does that mean?

10  **A.**   It authorizes me to make images of Windows machines and

11  conduct an examination of the resulting image to search for

12  various items.

13  **Q.**   Okay.  And I think I used the term "digital extraction."

14  And I apologize.  Maybe you could tell the jury how you

15  understood that term.

16  **A.**   As far as?

17  **Q.**   What is digital extraction?

18  **A.**   Yes.  Digital extraction is taking and removing or finding

19  evidence on an image and taking it off that machine.

20  **Q.**   Thank you.

21       Now, I would like to take you back to 2012.  Were you

22  involved in the investigation of a computer intrusion incident

23  at LinkedIn?

24  **A.**   I was.

25  **Q.**   And how did you get involved with that?

1   **A.**   I believe it was June 6th of 2012, LinkedIn called my

2   supervisor and advised him of a situation a data breach.  Based

3   on my case load and background, I was assigned the

4   investigation.

5   **Q.**   And what did you do to begin your investigation?

6   **A.**   I immediately wanted to interview employees of LinkedIn

7   and obtain log files.

8   **Q.**   And did LinkedIn provide you information about what they

9   had reported?

10  **A.**   They did.

11  **Q.**   And what types of information did they give you?

12  **A.**   They provided me SSH logs, secure shell; VPN logs.

13  **Q.**   And what was it that they reported to you initial -- or to

14  the FBI initially that caused you to start investigating?

15  **A.**   They had identified a posting on a website

16  insidepro.com -- it is a Russian forum -- that had a link to

17  approximately 6.5 password hashes.

18  **Q.**   And why was LinkedIn in particular reporting this to the

19  FBI?

20  **A.**   It supposedly belonged to LinkedIn.  It was LinkedIn data.

21  **Q.**   And you said that was on a website called inside.pro?

22  **A.**   I believe it is InsidePro.

23  **Q.**   Oh, I'm sorry, insidepro.com?

24  **A.**   Correct.

25  **Q.**   Thank you.  Were you able to visit that website?

**MILLER - DIRECT / KANE**

```
1   A.    Yes, I was.

2   Q.    And did you see the posting that LinkedIn had referred to?

3   A.    I did.

4   Q.    Were you able to -- you referred to a link in the posting.

5   Were you able to follow the link?

6   A.    Yes.

7   Q.    Were you able to see what was posted?

8   A.    Yes, I was.

9         MS. KANE:   I would like to show what has been marked

10  as Exhibit 5.

11  BY MS. KANE:

12  Q.    Are you able to see that on your screen?

13  A.    I am not.

14        MS. KANE:   Okay.

15             (Pause in proceedings.)

16        MS. KANE:   I have a set of exhibits here.   And,

17  perhaps, you can step down and put them close to you.

18        THE WITNESS:   It is on the screen now.

19        THE COURT:   All right.   5 is not yet in evidence.   Am

20  I correct?

21        MS. KANE:   That's correct, Your Honor.   It should not

22  be on the jury screen.

23             (Pause in proceedings.)

24  BY MS. KANE:

25  Q.    Do you have Exhibit 5?
```

1   **A.**   I can pull it up.  It was on the screen a second ago.

2   **Q.**   Okay.  We also have a hard copy for you.

3                        (Pause in proceedings.)

4          **MS. KANE:**  You can keep it in the folder actually

5   because we will just put those aside when we are done with

6   them.

7                        (Pause in proceedings.)

8   **BY MS. KANE:**

9   **Q.**   Do you recognize Exhibit 5?

10  **A.**   I do.

11  **Q.**   What is it?

12  **A.**   This is the posting of the LinkedIn password hashes on

13  InsidePro.

14  **Q.**   And does this look like what you saw back in 2012?

15  **A.**   Yes, it does.

16         **MS. KANE:**  Your Honor, the United States moves to

17  admit Exhibit 5.

18         **MR. GASNER:**  Submitted, Your Honor.

19         **THE COURT:**  Received in evidence.

20      (Trial Exhibit 5 received in evidence.)

21         **MS. KANE:**  Can we show Exhibit 5?

22  **BY MS. KANE:**

23  **Q.**   Is this what you were referring to when you said that

24  there was a link?

25  **A.**   Yes, Ma'am.

MILLER - DIRECT / KANE

1    **Q.**   Thank you.

2         **MS. KANE:**  We can put that down now.

3    **BY MS. KANE:**

4    **Q.**   We will come back to that posting, but I would like to

5    talk about what you mentioned regarding information from

6    LinkedIn.

7         You said that they provided you logs and other data?

8    **A.**   That's correct.

9    **Q.**   So I would like to show what has been admitted as Exhibit

10   33.

11        **MS. KANE:**  We can put that up.

12                    (Pause in proceedings.)

13   **BY MS. KANE:**

14   **Q.**   Do you recognize Exhibit 33?

15   **A.**   I do.

16   **Q.**   What is it?

17   **A.**   These are VPN logs for the user Nick Berry.

18   **Q.**   And is this something you received from LinkedIn in 2012?

19   **A.**   Yes, it is.

20   **Q.**   And you reviewed this in the course of your investigation?

21   **A.**   I absolutely did.

22   **Q.**   Did you identify significant investigative leads from this

23   document?

24   **A.**   I did.

25   **Q.**   And what were those?

1   A.   They were logins to the VPN from Russian IP addresses.

2   Q.   And why were those significant?

3   A.   Because Mr. Berry lived here in the Bay Area.

4        MS. KANE:   And if we can just blow up this section

5   here.

6   BY MS. KANE:

7   Q.   Are those the IP addresses that you identified as

8   significant that are identified there as Russian Federation?

9   A.   Yes, they are.

10  Q.   That is an IP address that ends in .170 and one that ends

11  in .239?

12  A.   Correct.

13  Q.   And those -- I'm sorry.   Let me move on.

14       I would like to show you Exhibit 26, which should be in

15  one of the bags.   I apologize.   It is in a box.

16                    (Pause in proceedings.)

17  BY MS. KANE:

18  Q.   Do you recognize Exhibit 26?

19  A.   Yes, I do.

20  Q.   And what is it?

21  A.   It is a hard drive provided by LinkedIn.

22  Q.   Okay.   And did LinkedIn provide this to you around the

23  beginning of your investigation?

24  A.   Yes, they did.

25  Q.   And what did it contain?

 1   **A.**   I believe it contained SSH and VPN logs.

 2   **Q.**   So those are the logs you mentioned before?

 3   **A.**   Yes.

 4   **Q.**   Okay.  So now -- you can put that aside -- and I would

 5   like to show you -- I would like you to pull out from the

 6   folder -- actually, I have it here.  This is Exhibit 26B.

 7   **A.**   Thank you.

 8   **Q.**   Do you recognize Exhibit 26B?

 9   **A.**   I do.

10   **Q.**   And what is that?

11   **A.**   This is an excerpt of those VPN logs.

12   **Q.**   All right.  So did you create this from the contents of

13   the drive we were just looking at?

14   **A.**   I did.

15   **Q.**   And does it accurately reflect your summary of a relevant

16   portion of those VPN logs?

17   **A.**   Yes, it does.

18   **Q.**   Are those logs voluminous and difficult for humans to

19   review?

20   **A.**   Extremely.

21   **Q.**   All right.

22        **MS. KANE:**  The United States moves to admit Exhibit

23   26B.

24        **MR. GASNER:**  Submitted, Your Honor.

25        **THE COURT:**  Received in evidence.

1              (Trial Exhibit 26B received in evidence.)

2              MS. KANE:  So let's show Exhibit 26B, please.

3                      (Pause in the proceedings.)

4              MS. KANE:  It doesn't seem to be on the screen.

5                      (Pause in proceedings.)

6              MS. KANE:  Do we need to do something to put it on the

7    screen?

8              THE CLERK:  I think she is doing that now.

9                      (Pause in proceedings.)

10             MS. KANE:  We were disconnected from the Zoom for a

11   moment.  All right.

12   BY MS. KANE:

13   Q.   So what does Exhibit 26B show?

14   A.   It shows a connection from those two Russian IP addresses.

15   Q.   All right.  So does this have more information than the

16   other log that we had been looking at?

17   A.   Yes, it does.

18   Q.   Okay.  And if you could just explain to us what you --

19   what you found significant about this -- I'm sorry -- about

20   this exhibit.  We have here the username column.  And what does

21   that show?

22   A.   Nberry.

23   Q.   And the IP address column, what does that show?

24   A.   178.14.107.170 and 17.140.105.239.

25   Q.   Okay.  And the dates are March 3rd and March 5th of 2012;

1  is that right?

2  **A.**   That's correct.

3  **Q.**   So do these connections that you are showing here, are

4  those the same connections we were just looking at on the other

5  VPN log that you received from LinkedIn?

6  **A.**   Yes, they are.

7  **Q.**   And this summary shows additional information that is not

8  on the other summary because it wasn't included in that one; is

9  that right?

10  **A.**   That's correct.

11  **Q.**   Okay.  And it includes a duration for these connections;

12  is that right?

13  **A.**   Yes.

14  **Q.**   And we see a duration of 39 minutes for the first

15  connection; 20 minutes for the second connection; and 2 days, 7

16  hours and 18 minutes for the third connection; is that right?

17  **A.**   That's correct.

18  **Q.**   All right.  And that third connection is from the IP

19  address ending in .239; is that correct?

20  **A.**   Yes.

21  **Q.**   Okay.  And, again, that's the same connection that we were

22  just looking at on Exhibit 33?

23  **A.**   Yes.

24  **Q.**   Now, the date and time on this spreadsheet -- what is the

25  time zone for these?

1    **A.**   UTC.

2    **Q.**   Okay.  And the other summary was converted to Pacific

3    time, I believe, was the prior testimony?

4    **A.**   I believe that's correct, yes.

5    **Q.**   Okay.  This also includes a column that says bytes,

6    B-Y-T-E-S, xmt and bytes rcv.  What are -- what did those show?

7    **A.**   Yes.  The bytes xmt is the total amount sent during the

8    connection, and the bytes received is the amount received by

9    the end user.

10   **Q.**   And the bytes refer to the data; is that right?

11   **A.**   Yes, the amount of data being sent.

12   **Q.**   And what is the amount of data that was sent or received

13   in the third connection from the 239 IP address?

14   **A.**   It is in bytes so 312,310,611.

15   **Q.**   Okay.  Now, I would like to switch to a timeline and this

16   was previously shown with the witness, Special Agent Bryant

17   Ling.

18          **MS. KANE:**  So if we can put that timeline up, the

19   first slide.

20          **THE WITNESS:**  Can I add something about the duration?

21          **THE COURT:**  Yes.  Go ahead.

22          **THE WITNESS:**  The duration is important on the last IP

23   address as it is connected for over two days, which would

24   indicate you would need a very stable connection.  If your

25   internet connection drops, most likely the VPN would cancel out

 1  and that session would disconnect.  So it is an anomalous long

 2  connection.

 3          THE COURT:  Okay.  Thank you.

 4  BY MS. KANE:

 5  Q.   All right.  So if we could begin the slide, so this is

 6  what was shown when we ended with Special Agent Ling.  And now

 7  you have just testified regarding this connection that lasted

 8  over two days from the .239 IP address.  So I would like to add

 9  this to this timeline.

10          MS. KANE:  Go ahead.

11  BY MS. KANE:

12  Q.   So that comes in right there.  Now, let's go back to 26B.

13          THE COURT:  I don't get your point.  What are you

14  suggesting?

15  BY MS. KANE:

16  Q.   So this connection through the Nick Berry VPN log -- or

17  VPN credentials occurs just after the successful access to Nick

18  Berry's computer, as Special Agent Ling testified; is that

19  correct?

20  A.   That's correct.

21          THE COURT:  Okay.  It was on the -- the Nick Berry

22  timeline but it just evaporated.

23          MS. KANE:  I'm sorry, Your Honor.

24          THE COURT:  The box, the new box on the timeline

25  disappeared.

1            **MS. KANE:**  Oh, can you put that back for a moment?

2    Thank you.

3        So we have Nick Berry's testimony, as it was.  And that is

4    in the blue boxes.  And Special Agent Miller just testified to

5    this new fact that we have added, and that's in the red box.

6            **THE COURT:**  All right.  Well, is this showing to the

7    jury?  Can you all see this?

8        All right.  They say yes.

9        I want the jury to understand that this timeline here is

10   not evidence.  You are not purporting to say this is evidence.

11   This is just your argument piece that helps keep things

12   organized for, but this is not itself evidence.

13           **MS. KANE:**  That's correct, Your Honor.  Just as with

14   Special Agent Ling, we are using this to help everyone

15   understand the testimony.

16           **THE COURT:**  All right.  Okay.

17           **MS. WAWRZYNIAK:**  Your Honor, there is a question back

18   here.

19           **JUROR WOODROW:**  The view of the attorneys is blocking

20   off the edge of our --

21           **THE COURT:**  For me too.  That is an excellent point.

22   Counsel, what is happening here is the picture of me and the

23   attorneys is also on -- sharing the screen.  Is there a way to

24   do the timeline without doing the Zoom?

25           **MR. GASNER:**  Your Honor, whoever has control of the

 1  Zoom can move that -- can move that minimized screen over to

 2  the left so that it is visible.

 3          **THE COURT:**  That's an excellent suggestion.  Can you

 4  do that?

 5          **MS. KANE:**  I think it is actually the feed from the

 6  CRD's feed that we need to do that on.

 7          **THE CLERK:**  Okay.  Hang on.  Sorry.

 8                      (Pause in proceedings.)

 9          **THE COURT:**  Tracy, do you know how to do that?

10          **THE CLERK:**  I'm trying, Judge.  Hang on.

11          **THE COURT:**  Okay.

12          **MS. KANE:**  If you see --

13          **THE COURT:**  I'm going to have one of my jurors to come

14  up here and take over.

15                          (Laughter)

16          **MS. KANE:**  If you see on the very top where it says

17  Adam Gasner, there is four little icons.  If you click on the

18  one that is just sort of a line right there, give that a try.

19  Click on that.

20                      (Pause in proceedings.)

21          **MS. KANE:**  That should minimize the images if you just

22  take your cursor to where the video is.  Take your mouse --

23          **THE COURT:**  I'm sorry.  Did somebody say something?  I

24  thought I heard a suggestion back there.  Okay.

25          **MS. KANE:**  As you said, Your Honor, this is --

1          **THE COURT:**  Ms. Zhen, I thought you had an idea how to

2    fix this.

3          **JUROR ZHEN:**  The Counsel Woman has it right.  You

4    bring the mouse over to where the video is.  You can drag it to

5    the -- right out of the way or you can click on the minimize --

6          **THE CLERK:**  The mouse isn't working.

7          **THE COURT:**  Click on the minimize.  Click on the minus

8    sign and see if that will get rid of the pictures of the

9    lawyers.

10          **MS. KANE:**  I think the CRD is having trouble

11    controlling her mouse.

12          **THE CLERK:**  Yeah, I am.

13          **THE COURT:**  So the mouse is going -- scurrying around

14    without -- well, okay.  Here is what we are going to do.  You

15    raise an excellent point, and we are going to keep going for

16    now and fix it before long.

17          **THE CLERK:**  Yes.

18          **THE COURT:**  We will fix it but we can't fix it right

19    on the fly.  So let's move along.  And whenever we take our

20    break, we will get it fixed.

21          **MS. KANE:**  Let's go back to 26B.  If we can go to the

22    second tab click on the second tab, please.

23    **BY MS. KANE:**

24    **Q.**   Special Agent Miller, what does this second tab of 26B

25    show?

**MILLER - DIRECT / KANE**

1   **A.**   It also shows VPN connections for the Nick Berry user.

2   **Q.**   Okay.  And were these from IP addresses that traced back

3   to Russia?

4   **A.**   No, they are not.

5   **Q.**   Okay.  Why did you select these to pull out of the VPN

6   logs for your summary?

7   **A.**   These were IPs that Mr. Berry confirmed that he had used.

8   **Q.**   And did -- so -- these were from the same logs as the

9   other connections on the other tab?

10  **A.**   That's correct.

11  **Q.**   And if we can look here in the duration and the bytes

12  columns?

13          **MS. KANE:**  Can you blow up this part here

14  (indicating).

15  **BY MS. KANE:**

16  **Q.**   Okay.  Well, let's just read what is in the duration

17  column.  The first connection from a non-Russian IP address we

18  have listed here is 2 hours and 42 minutes; is that correct?

19  **A.**   That's correct.

20  **Q.**   And the second one is 19 minutes; is that correct?

21  **A.**   That's correct.

22  **Q.**   And what are the bytes received for these connections?

23  **A.**   Unfortunately, I can't see them because of the Zoom.

24  **Q.**   Do you have a paper copy there?

25  **A.**   I do.  The bytes received for the first connection were

1   2270076 and the second connection were 2198603.

2   Q.   And so going back to the first page, the first tab, the --

3   just using basic math, what is the largest amount of bytes

4   received of all the connections we just looked at?

5   A.   For the 239 IP address for the two-day.

6   Q.   That was for the two-day connection; is that right?

7   A.   That's correct.

8   Q.   And is it fair to say that that is much larger than the

9   other amounts?

10  A.   Yes, it is.

11  Q.   In reviewing these logs, did you see any other connections

12  that had similar length and amount of bytes received?

13  A.   I did not.

14  Q.   Okay.  Thank you.  Did you investigate Nick Berry in the

15  course of the investigation of the LinkedIn intrusion?

16  A.   Yes, I did.

17  Q.   What did you do?

18  A.   I requested records for social media accounts of his to

19  establish an IP history trail.

20  Q.   All right.  Did you interview him?

21  A.   Yes, I did.

22  Q.   Did you review a copy of his computer?

23  A.   Yes, I did.

24  Q.   And in that box there is something marked Exhibit 7, if

25  you want to just take a look at that.

```
 1                        (Pause in proceedings.)

 2    BY MS. KANE:

 3    Q.    Do you recognize Exhibit 7?

 4    A.    Yes, I do.

 5    Q.    What is it?

 6    A.    This is an image of Mr. Berry's iMac.

 7    Q.    And that is the image that Special Agent Ling testified

 8    about previously; is that right?

 9    A.    That's correct.

10    Q.    And did you review that -- that image during your

11    investigation of the LinkedIn intrusion?

12    A.    I did.

13    Q.    Now I would like to show you what has already been

14    admitted as Exhibit 32.

15          And while we are pulling that up, while you were reviewing

16    that image and otherwise investigating Mr. Berry, did you see

17    any IP overlap that led you to believe that he was responsible

18    for the Russian IP logins?

19    A.    Absolutely not.

20    Q.    So here is Exhibit 32.  Did you review this during your

21    investigation?

22    A.    Yes, I did.

23    Q.    And what is it?

24    A.    This particular tab is login data for various LinkedIn

25    members.
```

1   **Q.**   And if we could look at the member info tab, please.   We

2   have showed this before.   And what does this show?

3   **A.**   This shows a list of compromised LinkedIn member accounts

4   that LinkedIn identified -- excuse me -- using the Russian IP

5   addresses and other pivot points that they discovered during

6   their investigation.

7   **Q.**   Okay.   And when you say "other pivot points," what were

8   those?

9   **A.**   In particular the user agent string and the browser

10  cookie.

11  **Q.**   All right.   Now, let's go back to the login data with

12  timestamps tab.

13       And this tab shows the login data including the IP

14  addresses for those member IDs we were just looking at; is that

15  right?

16  **A.**   That's correct.

17  **Q.**   And now I would like to show -- to make it easier for the

18  jury to see, we have taken just a snapshot of only the entries

19  with IP -- that the IP address that ends in .239.

20       So this is that same exhibit but just showing those

21  particular entries.   And this now has a much fewer number of

22  entries.   We have 8 there and what does this show?

23  **A.**   This shows the login information using that 239 IP that

24  has the same browser cookie and user agent string.

25  **Q.**   So that looks like there are two different browser IDs.

1   That is the browser cookie; correct?

2   **A.**   Correct.

3   **Q.**   One of them starts eeb and one of them starts 8aa?

4   **A.**   That's correct.

5   **Q.**   Were those the two that LinkedIn had identified for you in

6   their investigation?

7   **A.**   Yes.

8   **Q.**   And the user agent string column reflects a series of data

9   and all of these have the word "sputnik" in them; is that

10  right?

11  **A.**   Yes, they do.

12  **Q.**   Now, there is a member ID column and what does that show?

13  **A.**   That is the member ID for the LinkedIn member.

14  **Q.**   And you should have up there a printout of just the member

15  ID tab that we were just looking at on that spreadsheet.   It

16  should be in your Exhibit 32.

17       Again, just to make this easier, we have printed out a

18  copy so we don't have to flip back and forth.

19                       (Pause in proceedings.)

20  **BY MS. KANE:**

21  **Q.**   So if you will look at that member info tab --

22            **MS. KANE:**   Let's keep that up there, please.

23  **BY MS. KANE:**

24  **Q.**   All right.   So the member ID on the first line there, what

25  does that show?

1    A.    19028755.

2    Q.    All right.  And which -- which -- what is the name of the

3    member as reflected in the LinkedIn records that you have in

4    front of you?

5    A.    Dima Kolobov.

6    Q.    What about the second member ID?

7    A.    30431121.

8    Q.    And what is the name of that member?

9    A.    I'm having a hard time finding it on the list.  Here it

10   is.  It is Jaak Parik from Skype.

11   Q.    Okay.  And what about the next member ID listed there?

12   A.    That is the same?

13   Q.    And the next unique one.

14   A.    3711982.

15   Q.    Okay.  And what is the member information for that?

16   A.    Ivaylo Kushev from Xtreme Studio.

17   Q.    And the next one?

18   A.    53584827.

19   Q.    All right.  And what is the member information for that?

20   A.    Sandra Konings (phonetic) from Interactive 3D.

21   Q.    And the next one?

22   A.    21068177.

23   Q.    And what is the member information for that?

24   A.    That's Mark Konetchy from Facebook.

25   Q.    So these records here are showing that that .239 IP

1   address connected -- logged into all those different member

2   accounts at LinkedIn?

3   **A.**   That's correct.

4   **Q.**   And the dates that we are looking at here begin

5   February 9th and continue through until April 1st of 2012; is

6   that right?

7   **A.**   That's right.

8          **MS. KANE:**   Now if we can look at another slide.

9   **BY MS. KANE:**

10  **Q.**   We have another snapshot that shows just the logins from

11  the .170 IP address.

12         **MS. KANE:**   If you can make that bigger.   I'm sorry,

13  our ability to blow up is for some reason not working, to make

14  these bigger, so that's why I'm reading the information.

15  **BY MS. KANE:**

16  **Q.**   So this shows a login from the .170 IP address.   And do

17  you recognize the browser ID?

18  **A.**   Yes, it is the same as the previous two -- one of the two.

19  **Q.**   Okay.   And the user agent string contains the word

20  "sputnik;" is that right?

21  **A.**   Yes, it does.

22  **Q.**   And this is on March 3rd of 2012; correct?

23  **A.**   Yes, it is.

24  **Q.**   And do you see a member ID there?

25  **A.**   I do.

1  Q.   And what is the member information for that?

2  A.   The number is 35374254.  And that member is Andrew Hawken

3  from Web 24.

4  Q.   So all of the logins that you found in this -- in the

5  spreadsheet from which these are drawn were from the .170 IP

6  address and the .239 address had one of those two browser

7  cookies except the one that had no browser cookie; is that

8  right?

9  A.   That's correct.

10 Q.   Now, I would like to show what has been admitted as

11 Exhibit 32A.  Do you recognize 32A?

12 A.   Yes, I do.

13 Q.   Is this something you received from LinkedIn?

14 A.   Yes, it is.

15 Q.   Did you receive this before or after or at the same time

16 as 32?

17 A.   I believe this was some time after.

18 Q.   Okay.  So does it reflect different information than 32?

19 A.   Some, yes.

20 Q.   Okay.

21      MS. KANE:  And if we can look at the IP history tab --

22 I'm sorry -- the login with timestamps tab, if you could go to

23 the top.

24 BY MS. KANE:

25 Q.   And what does this show?

1   **A.**   Same as the previous spreadsheets, the logins for those

2   member accounts.

3   **Q.**   Okay.  And does this show logins associated with the same

4   two cookies that we saw before?

5   **A.**   Yes, those cookies are contained in this spreadsheet.

6   **Q.**   Now, looking at the user agent string column, are you

7   familiar with the term language pack code?

8   **A.**   Yes, I am.

9   **Q.**   Is that something that appears in the user agent string?

10  **A.**   Yes, it did.

11  **Q.**   Does it always?

12  **A.**   Not always.

13  **Q.**   Okay.  Now, let's look at the member info tab.

14       There is a last line there with a member ID that ends in

15  4412.  Do you see that?

16  **A.**   Yes, Ma'am.

17  **Q.**   Was that something that was significant in your

18  investigation?

19  **A.**   Yes, it was.

20  **Q.**   And why is that?

21  **A.**   Because this member created this account using those

22  similar cookies, user agent string and IP addresses.

23  **Q.**   And what date was it created?

24  **A.**   I believe August 3rd, 2012.

25  **Q.**   Looking in the column that says connections, how many

1  connections --

2        **THE COURT:**  Can I -- can I just -- I know the jury is

3  dying for me to interrupt, would you -- I'm going to ask

4  myself.  And if the Defense wants to object, okay.

5        In simple, two sentences, over the last ten minutes or so,

6  what is it that you think is the significance of what you are

7  telling us about cookies and every code and -- user names, what

8  are we getting at?

9        **THE WITNESS:**  Yes, Your Honor.  So the cookies that

10  are contained on these spreadsheets outline the same MO as the

11  attacker who breached the LinkedIn systems coming back in and

12  compromising more LinkedIn accounts and creating this last line

13  here, an account with this name and e-mail address.

14        **THE COURT:**  All right.  We are going to break at this

15  point so that you can have a chance to fix the timeline thing.

16        The jury will get 15 to 20 minutes in the other room.  Let

17  me ask Tracy a question.  What are we going to do for the lunch

18  today?  Do we have that all set up?

19        **THE CLERK:**  We do.

20        **THE COURT:**  All right.  So we will -- this is not

21  lunch yet.  But we will have a lunch later today for you in the

22  other room, but for now you will just take a break.  Please

23  remember the admonition.  No talking about the case.  Thank

24  you.

25        (Proceedings were heard outside the presence of the jury:)

1        **THE COURT:** All right.  Everyone be seated.  The

2    witness can step down.  Take a break as well.  I'm going to

3    take my break unless the lawyers need me for something

4    anything.

5        **MS. KANE:**  No, Your Honor.

6        **MR. GASNER:**  No, Your Honor.

7        **THE COURT:**  I want you to fix this thing.  I believe

8    this is exceedingly hard to follow, and I want you to know my

9    eyesight is just average for a 75-year-old guy.  I can't read

10    these tiny numbers on these screens, so maybe some of the other

11    jurors are having the same trouble.  But this is a -- this is

12    gobbledygook.  And you need to think of a way to make it come

13    alive if you want the jury to try to grasp -- I think they are

14    trying hard.

15        So just my suggestion.  All right.  We will -- we will

16    take about a 15 to 20-minute break ourselves.

17                    (Recess taken at 10:10 a.m.)

18              (Proceedings resumed at 10:28 a.m.)

19        **THE COURT:**  Let's bring in the jury.

20        The lawyers should be aware, I think, that -- we on the

21    Zoom -- at least as it is coming to me -- I can see your elbow.

22    I can see maybe your ear, but your cameras are not picking you

23    up when you are talking.  Anyway, so be aware that you are --

24    we are doing this for the benefit of the public, and I want

25    the -- to try our best so that we can see you while you are

PROCEEDINGS

 1  speaking.  So just be a little bit more mindful of where the

 2  camera is, and that's all I'm asking.

 3       Second thing is, did you get the -- get it fixed so that

 4  we can show that --

 5            MS. KANE:  Your Honor, we are going to go old-school

 6  and use the ELMO just to blow these up.  We are almost done

 7  with these spreadsheets.  It will be just a minute or two, and

 8  then we will be moving on.  We will go over what I think the

 9  jury couldn't see just very quickly.

10            THE COURT:  No.  I'm talking about the timeline.  They

11  never got to see your red box on the timeline.

12            MS. KANE:  Yes.  And I think that -- the CRD, I think,

13  has figured out how to hide the -- the Zoom faces so that

14  people will be able to see all the way over there.

15            THE COURT:  Well, if you want to go back to it, you

16  can.  If you don't, that's up to you.  All right.  Here comes

17  our jury.

18       (Proceedings were heard in the presence of the jury:)

19            THE COURT:  Welcome back.  Be seated.  Is our witness

20  ready?

21            THE WITNESS:  Yes, sir.

22            THE COURT:  Okay.  Ms. Kane, are you ready?

23            MS. KANE:  Yes, I am.  Thank you.

24            THE COURT:  Everybody in the jury, jury room, we all

25  ready?  It looks like it.  Okay.  Let's go.  Proceed.

1          <u>**DIRECT EXAMINATION**</u>   **(resumed)**

2   **BY MS. KANE:**

3   **Q.**   When we broke, we were discussing Exhibit 32A and the

4   member information that LinkedIn had provided to you.

5          **MS. KANE:**   So I would like to use the ELMO for a

6   moment, please.

7   **BY MS. KANE:**

8   **Q.**   And what we are showing here is the member information tab

9   from Exhibit 32A, and I think I was directing your attention to

10   the last line of Exhibit 32A.

11          So in the columns at the top are member ID connections,

12   first name, last name and company.

13          So on this last line here, we have a member ID and then

14   what is the first name and last name?

15   **A.**   Jammiro Quatro.

16   **Q.**   And the number of connections?

17   **A.**   Zero.

18   **Q.**   The company?

19   **A.**   None listed.

20   **Q.**   All right.   Continuing across to that last entry, there is

21   a column that says job title.   What does it say for this entry?

22   **A.**   Job title.

23   **Q.**   Okay.   Registration date?

24   **A.**   August 3rd of 2012.

25   **Q.**   All right.   E-mail address?

1    **A.**    Chinabig01@gmail.com.

2    **Q.**    Okay.  Vanity name?

3    **A.**    None.

4    **Q.**    And location?

5    **A.**    Russian Federation.

6    **Q.**    Thank you.  And why was that significant in your

7    investigation?

8    **A.**    It was significant for several reasons.  The first being

9    that account was linked by the malicious logins from Russian

10   IPs, the user agent strings and the cookies, which would

11   indicate it was done by the same individual as well as having

12   zero connections for a job search website.  You would expect to

13   have some connections with others.

14   **Q.**    So was there something different about this entry than the

15   other ones on that member information tab?

16   **A.**    Yes.

17   **Q.**    What was that?

18   **A.**    It was the connection between the intrusion and breach and

19   the creation of that account.

20   **Q.**    Okay.  So were the other entries on that tab ones that you

21   identified as victims?

22   **A.**    That's correct.

23   **Q.**    And what about the chinabig01 account?

24   **A.**    We believe that was the attacker.

25   **Q.**    Now, I want to go back just very briefly so we can blow up

1    for the jury Exhibit 26B, which was the summary that you

2    created from the VPN logs.

3           And you were talking about this.  And I want to make sure

4    the jury can see what it was that you were talking about.  So

5    we will continue with the ELMO for a moment.

6           So this is showing, as I scroll through here, only

7    connections from the -- I'm sorry.  I said the VPN logs.  I

8    apologize.  Which logs are these?

9    A.    These are the member logs.

10   Q.    So these are logins to member accounts?

11   A.    Correct.

12   Q.    These are showing only logins from the IP address that

13   ends in .239.  And you had identified that as one that had

14   connected through Nick Berry's account from the Russian

15   Federation?

16   A.    Yes, I did.

17   Q.    And how many different member accounts did this IP address

18   log into in addition to accessing Nick Berry's VPN account?

19   A.    I believe two.

20   Q.    Different member --

21   A.    Excuse me.

22   Q.    -- accounts?

23   A.    Several different member accounts, yes.

24   Q.    So more than two?

25   A.    More than two.  Only two on the screen at the time.

**MILLER - DIRECT / KANE**

1   **Q.**   I apologize.  The total looks like many more than two;

2   right?

3   **A.**   Yes.

4   **Q.**   Okay.  Thank you.  And those were all the names that you

5   had read before?

6   **A.**   That's correct.

7   **Q.**   So the member IDs that we are looking at here in this

8   member column, does each represent a unique LinkedIn member?

9   **A.**   Yes, the ones we previously read.

10  **Q.**   The ones that you read.  And the same for this

11  spreadsheet.  This is the login to a member account from the

12  .170 address that had also compromised Nick Berry's VPN

13  credentials; right?

14  **A.**   Yes.

15  **Q.**   And this shows it logging into a member account as well?

16  **A.**   It does.

17  **Q.**   And the date on that member account login is March 3rd,

18  2012.  And the dates we saw for the other IP address start in

19  February 2012?

20  **A.**   They do.

21  **Q.**   And they continue through into April of 2012?

22  **A.**   Yes.

23  **Q.**   And we see the browser ID and those are two different

24  browser IDs.  Those are the two LinkedIn identified for you; is

25  that right?

MILLER - DIRECT / KANE

1    A.    Yes, they are.

2    Q.    We see the user agent string which is similar in each of

3    these entries; right?

4    A.    Yes.

5    Q.    And each one contains the word "sputnik"?

6    A.    Yes.

7    Q.    Those are for the .239 login.  And the same is true for

8    the .170 login; right?

9    A.    Yes.

10   Q.    And there is the browser ID which is the same as one of

11   them on the other page?

12   A.    It is.

13   Q.    Now, if we could show the last thing on these spreadsheets

14   with Exhibit 32A, if we can look at the login tab, at the

15   bottom there it shows the user agent string.  Do you see that?

16   A.    It is not on my screen.

17          MS. KANE:  Okay.

18                     (Pause in proceedings.)

19          THE COURT:  Possibly -- we have the ELMO.  Did we

20   switch between the ELMO and the computer?

21          MS. KANE:  I think we are switched back now.

22          THE CLERK:  We are.

23          THE COURT:  All right.

24                     (Pause in proceedings.)

25          THE COURT:  Okay.  The spreadsheet just came on the

**MILLER - DIRECT / KANE**

```
 1   screen.
 2              MS. KANE:  Great.
 3              THE COURT:  This is 32A.
 4              MS. KANE:  Yes.  This is 32A which we were looking at
 5   before.
 6              THE COURT:  It should be in the jury box; right?
 7              MS. KANE:  Yes.  It is admitted.
 8   BY MS. KANE:
 9   Q.   In the user agent column there, we were previously
10   discussing the language pack code.  And you said that the
11   language pack code does not always appear in the user agent
12   string?
13   A.   That's right.
14   Q.   And do you see the language pack code in any of these user
15   agent strings?
16   A.   I see it in several towards the bottom.  It is after the
17   windows NT6.1.  The "ru" would indicate the Russian language
18   pack.
19   Q.   And those appear -- that designation appears in that last
20   set, which is the user agent string that ends in sputnik
21   2.1.0.18 --
22   A.   That's correct.
23   Q.   -- is that right?  Thank you.
24   A.   You are welcome.
25              MS. KANE:  Okay.  We can put that down.
```

1    BY MS. KANE:

2    Q.   All right.  I would like to move on from the spreadsheets.

3         So the Russian IP addresses that we were just looking at,

4    did you conduct further investigation regarding those IP

5    addresses?

6    A.   I did.

7    Q.   And the two IP addresses that we identified that we were

8    looking at ended in .239 and .170; correct?

9    A.   Yes.

10   Q.   Now, are you able to use U.S. legal process to obtain

11   information about those IP addresses?

12   A.   Unfortunately, I'm not.

13   Q.   And why not?

14   A.   Because those IP addresses resolve to a foreign country.

15   Q.   So if they had resolved to the United States, what would

16   you have been able to do?

17   A.   I could have obtained a subpoena for subscriber records.

18   Q.   So were you able to obtain any subscriber records for

19   those two IP addresses?

20   A.   Using U.S. legal process, no.

21   Q.   So what did you do?

22   A.   I obtained an MLAT, a Mutual Legal Assistance Treaty,

23   request for subscriber information for those IP addresses.

24   Q.   Okay.  And what is an MLAT, MLAT or Mutual Legal

25   Assistance Treaty request?

1   **A.**   As previous agents have testified, it's a treaty that the

2   United States has with various countries that allows us to use

3   probable cause here in the United States that is vetted for a

4   similar crime in the foreign country, and the foreign country

5   would then provide the results that we are seeking.

6   **Q.**   And what types of investigation can you conduct through

7   MLAT requests?

8   **A.**   You can request subscriber records.   You can request

9   contents of accounts or you can request the search of devices.

10  It depends country to country.

11  **Q.**   So what did you request in your Mutual Legal Assistance

12  Treaty request?

13  **A.**   I requested subscriber information for, I believe, five IP

14  addresses that resolved to Russia including the .170 and the

15  .239 IPs.

16  **Q.**   And you said there were five IP addresses.   What was --

17  what led you to ask about the other three?

18  **A.**   So the others were identified in the log files as also

19  being anomalous but not as anomalous as the 170 or 239.

20  **Q.**   Were those the only five Russian IP addresses that were

21  identified in the LinkedIn logs?

22  **A.**   No, they were not.

23  **Q.**   Okay.   So why did you request those five and not all of

24  them?

25  **A.**   As I previously stated, we have to request a foreign

1  country's assistance.  And so if you request, say, a hundred IP

2  addresses, it is a much higher burden for them to go through

3  the process of producing those records.  So you want to limit

4  it to the important items only.

5  **Q.**   And when you make a request to a U.S. company through a

6  subpoena, how long does it usually take to get records back?

7  **A.**   On average, two to three weeks.

8  **Q.**   And for a Mutual Legal Assistance Treaty request, how long

9  does it usually take?

10 **A.**   On the shortest end, I have seen 8 to 9 months.  On the

11 longest end, 5 years.

12 **Q.**   If a country to which you make a Mutual Assistance Legal

13 Treaty request doesn't provide the information, what could you

14 do?

15 **A.**   We can -- I can work with the Department of Justice and

16 our international -- Office of International Affairs to request

17 again of the foreign government; but we can't compel them to

18 provide us the records.

19 **Q.**   Can you compel a U.S. provider to provide you records?

20 **A.**   Yes, we can.

21 **Q.**   So I would like to show you what has been marked and

22 should be in your box as Exhibit 79.

23     And while you are there, why don't you grab, 79, 80, 85

24 and 85A.

25                    (Pause in proceedings.)

1   **A.**   79 and what are the other numbers?

2   **Q.**   80, 85 and 85A.  Great.

3        So do you recognize 79?

4   **A.**   Yes, I do.

5   **Q.**   And what is it?

6   **A.**   This is an MLAT return from the Russian Federation.

7   **Q.**   And is that a response to the one -- to the request that

8   you made?

9   **A.**   Yes, it is.

10  **Q.**   And did this response provide the information you had

11  requested?

12  **A.**   No, it did not.

13  **Q.**   What -- generally, what did it include?

14  **A.**   It included public information about the IP addresses I

15  had requested and the companies that owned those IP addresses.

16  **Q.**   Was that information that you could already obtain on your

17  own?

18  **A.**   Yes, it was.

19  **Q.**   So what did you do in response?

20  **A.**   We followed up through the Department of Justice, our

21  Office of International Affairs and asked again for the Russian

22  government to produce the records.

23  **Q.**   And I would like to show you Exhibit 80.  Okay.  Do you

24  recognize that?

25  **A.**   I do.

1    Q.    And what is it?

2    A.    This is the follow-up response from the Russian

3    Federation.

4    Q.    Okay.  And what is the date on that response?

5    A.    It looks like the date is October 30th of 2013.

6    Q.    Okay.  Did that response provide the subscriber

7    information you had requested?

8    A.    Yes, it did.

9    Q.    All right.  Now, did you consider your request to be

10   completely fulfilled when you had received that response?

11   A.    I did; however, one of the pages was blurry.

12   Q.    Okay.  So what did you do?

13   A.    Again, I followed up with the Department of Justice and

14   reached out to the Office of International Affairs.  Reached

15   out to the Russian government and asked for a resend of that

16   page.

17   Q.    I would like to show you Exhibit 85.  Do you recognize

18   Exhibit 85?

19   A.    Yes, I do.

20   Q.    Okay.  What is that?

21   A.    This is the -- the follow-up with the clearer page --

22   Q.    Okay.

23   A.    -- that we requested.

24   Q.    And 85A, do you recognize that?

25   A.    Yes, I do.

1   **Q.**   And what is that?

2   **A.**   This is the English translation of the MLAT return from

3   the Russian Federation.

4   **Q.**   Okay.

5          **MS. KANE:**   And at this time I would like to read a

6   stipulation. (Reading:)

7       "Government Exhibit 85 is a response by the Russian

8   government to a Mutual Legal Assistance Treaty request by the

9   United States in the Russian language.

10      Government Exhibit 85A is an accurate translation of the

11  document from the Russian language to the English language."

12          **THE COURT:**   So stipulated?

13          **MR. GASNER:**   So stipulated, Your Honor.

14          **THE COURT:**   All right.   That is evidence in the case,

15  what you have just heard, even though it was spoken by the

16  attorneys.   If it is a stipulation, it counts as evidence.

17  Okay.   Very well.   Next.

18          **MS. KANE:**   The United States offers Exhibits 85 and

19  85A into evidence?

20          **THE COURT:**   Any objection?

21          **MR. GASNER:**   Submitted, Your Honor.

22          **THE COURT:**   Received in evidence, both.

23      (Trial Exhibits 85 and 85A received in evidence.)

24  **BY MS. KANE:**

25  **Q.**   So you testified that Exhibit 85, the Russian response in

**MILLER - DIRECT / KANE**

1    Exhibit 85A, the English translation, provided the subscriber

2    records that you had requested?

3    **A.**   Yes, it did.

4    **Q.**   And let's show Exhibit 85A.

5         **JUROR SERPA:**  Your Honor, the jury can't see the

6    witness in the back because the monitors are off.

7         **THE COURT:**  Okay.  We need Tracy.  Are the monitors

8    off completely?

9         **JUROR SERPA:**  Yeah.

10        **THE COURT:**  Isn't that odd.  I wonder how that

11   happened.

12        **THE WITNESS:**  Ours are working.

13                  (Pause in proceedings.)

14        **THE COURT:**  Did that do any good?

15        **JUROR SERPA:**  No.  There is a red light.  Is there

16   like a power button?  Maybe someone switched the -- flicked the

17   switch on the floor.

18        **THE COURT:**  Do one of the lawyers think they can help?

19                  (Pause in proceedings.)

20        **THE COURT:**  Well, does it look like the power is off?

21        **JUROR SERPA:**  Yes, it looks like the power is off.

22        **THE COURT:**  Is there a standard power button

23   someplace?

24        **MS. KANE:**  Your Honor, I tried re-setting both of the

25   power strips over there; and it didn't fix the problem.  I

1   think the power might be further down the line.

2          THE COURT:  But not the power strip but the -- is

3   there a power button on the --

4          JUROR SERPA:  It looks like it but it's not letting

5   me.

6          MR. GASNER:  Your Honor, it looks like there is power

7   coming to the machine.  There are lights on but it looks like

8   the actual screen is not -- it looks like it is -- the power

9   button on the screen is not turned on somehow.

10         MS. KANE:  I think we have got it.  There should be a

11  remote behind there.

12                    (Pause in proceedings.)

13         THE COURT:  Just for my feeble edification, what did

14  you do?

15                         (Laughter)

16         MS. KANE:  I pressed power.

17         THE COURT:  On what?

18         MS. KANE:  There was a remote behind the monitor.

19         THE COURT:  What was it doing off?  What was the unit

20  doing off to begin with?

21         JUROR WOODROW:  Maybe it timed out.

22         MS. KANE:  It must have been some sort of time issue.

23         THE COURT:  Okay.

24         MS. KANE:  I will hold onto this so if it goes out

25  again, we will quickly resume.

1        **THE COURT:**  All right.  Thank you for spotting it and

2   thank you for fixing it.  All right.  Let's go back to where we

3   were so that we can catch the jury up on your evidence.

4        **MS. KANE:**  All right.

5   **BY MS. KANE:**

6   **Q.**   We were looking at the response that the FBI received to

7   its Mutual Legal Assistance Treaty request to the Russian

8   government?

9   **A.**   That's correct.

10  **Q.**   And the response that you received was from the Russian

11  government, but what was the Russian government actually

12  sending you?

13  **A.**   Subscriber information.

14  **Q.**   And the subscriber information, what is the source of that

15  subscriber information?

16  **A.**   From the actual provider in Russia.

17       **MR. GASNER:**  Objection.  Lack of foundation.  Hearsay.

18       **THE COURT:**  All right.  It's true, that is all hearsay

19  unless he is an expert.  How would he know that unless he has

20  special knowledge, training and so forth?

21       **MS. KANE:**  Well, let's look at the document then.

22       **THE COURT:**  Same problem.  It is hearsay.  I'm going

23  to let him answer.  But based on our prior conversations, you

24  should be aware this is testimony that requires specialized

25  training and expertise under the rules.

**MILLER - DIRECT / KANE**

1    So I will allow him because he has the training, but that

2  opens the door to some other things that we have already

3  discussed.  So that's my ruling.  Please go ahead.

4  **BY MS. KANE:**

5  **Q.**   So you received a document within the response, and I'm

6  showing you one of the pages in the response.

7          **MS. KANE:**  And if we can blow up that very top section

8  there.

9                  (Pause in proceedings.)

10         **MS. KANE:**  I'm going to use the ELMO again.

11         **THE COURT:**  All right.

12         **MS. KANE:**  Do you have Exhibit 85 and 85A?

13         **THE COURT:**  Do we need Stefan?  He just came in.

14  Tracy, do we need Stefan?  Here is Stefan right here.  I think

15  we fixed it.

16  **BY MS. KANE:**

17  **Q.**   All right.  So we have the top of the -- this is the

18  translated version of the document.  And at the top there, what

19  does it say?

20  **A.**   Recipient.

21  **Q.**   It says National Cable Networks; is that right?

22  **A.**   Yes, it does.

23  **Q.**   And you had made your request based on the publicly

24  available information for those IP addresses; is that right?

25  **A.**   Yes.

**Q.**   And what did the publicly available information say about the provider for that IP address?

**A.**   That it was National Cable Networks.

**Q.**   Okay.

      **MS. KANE:**  If you can go back out.

           (Pause in proceedings.)

      **MR. GASNER:**  Your Honor, while they are doing this, may we have a brief sidebar?

      **THE COURT:**  Well, under the rules I'm supposed to take you into the jury room, I guess, to do a -- I take one lawyer from each side into the back here so that -- because it is impossible for us to -- we are not supposed to get close.  So is it important enough to warrant that?

      **MR. GASNER:**  Your Honor, I would just like to address an issue, yes.

      **THE COURT:**  All right.  I want the jury to stay put. No talking among yourselves.  I will go into the jury room with one lawyer from each side and we will hear the sidebar.

    (The following proceedings were heard at the sidebar:)

      **MR. GASNER:**  Your Honor, I'm hesitant to even do this because I don't want to highlight this information necessarily, but I have received expert disclosures from the Government regarding this witness' expertise, and it has nothing to do with his expertise on Mutual Legal Assistance Treaties.  It has nothing to do with his expertise with regard to how these

1    records are produced.

2         The very narrow scope of his expertise seemed to be just

3    the -- just with regards to how databases are bought and sold

4    and something else with regard to investigating how these

5    databases are extracted from computers, for example.

6         But the scope of his expertise was limited in their

7    disclosure and had nothing to do with this area of inquiry.

8         I believe this is hearsay, double hearsay; and it is

9    patently inadmissible.  And it is frustrating that they are

10   being able to get into it right now.

11        MS. KANE:  Your Honor, these are business records,

12   foreign business records, that are admissible as an exception

13   to the hearsay rule.

14        THE COURT:  There is no testimony that supports that.

15   How could anybody tell us what is admissible -- I mean, what is

16   of public record in the Soviet Union?

17        MS. KANE:  Your Honor, I will go back and lay that

18   foundation we do have because the exhibit came in without it.

19   I didn't go through that, and I will go back through and I will

20   lay the foundation for the business records.  We do not intend

21   for this to be part of his expert testimony.

22        THE COURT:  You may not intend it, but it does require

23   expert testimony to get this in.

24        MS. KANE:  He simply -- just as we would if he

25   subpoenaed business records from a United States company and

1    then we would put them in through the agent.  This is the same

2    testimony, just foreign business records.  That's all we are

3    intending to do.  We are just trying to get the business

4    records up on the screen.  He is not opining about this.

5            THE COURT:  All right.  I'm going to let you ask these

6    questions because in my opinion I believe he has the expertise

7    to interpret the materials and to get them in.

8        There is a separate question of whether or not there was a

9    proper disclosure that you would be using him in this way.  I

10   don't -- without interrupting the trial and so forth -- this is

11   going to have to be a Rule 29 consideration.

12       I'm going to let you do it.  But I believe that Mr. Gasner

13   may have a valid point that this is all expert testimony.  I'm

14   going to just give you a couple of examples.  You have had him

15   exonerate that guy -- I forgot his name now -- the guy at

16   LinkedIn.

17           MR. GASNER:  Nick Berry.

18           THE COURT:  Yeah, Berry.  He gave an opinion that he

19   is innocent.

20           MS. KANE:  Your Honor, he did not say he was innocent.

21   He said there was no IP connection to Nick Berry -- he didn't

22   find any IP records that connected to Nick Berry.

23           THE COURT:  You said:  Did you find any evidence

24   linking him to the intrusion?  And he said:  Absolutely not.

25       So I mean that to me is he is innocent.

1    So this guy is up there using his expertise to interpret

2    the materials.  And if he had been properly qualified, probably

3    I would have allowed all of that insofar -- but I don't know

4    that he was properly disclosed.  But I'm -- Mr. Gasner, I'm

5    going to let you make that under Rule 29 later but not now.

6        I'm going to let the Government put on its case, but I

7    have one last thing to say.  I think this does open the door to

8    a lot of the kind of thing that Mr. Gasner wants to ask about

9    the scope of the investigation.

10       When it becomes his turn, subject to Rule 403 -- I'm not

11   saying everything you want to do.  I'm saying some of the stuff

12   you want to do I'm going to allow on cross-examination.  That's

13   the best we can do.

14       Continue on.  Objection noted.  Overruled for the reasons

15   stated.  Let's go back on the record.

16       **MR. GASNER:**  Thank you, Your Honor.  And, again, I

17   don't want to highlight it so I ask for a continuing objection

18   on this area.

19       **THE COURT:**  Fine.  That's even better.

20       (Proceedings were heard in the presence of the jury:)

21       **THE COURT:**  Please continue, Ms. Kane.

22       **MS. KANE:**  Thank you, Your Honor.

23   BY MS. KANE:

24   Q.  When we broke, we were looking at the English translation

25   of Exhibit 85 which is in -- the English translation is Exhibit

1   85A.

2       And what we have done here is blow up a portion related to

3   the IP address that ends in .239.  And this was the document

4   which at the top said National Cable Networks.  And what does

5   this show as the subscriber information for that IP address?

6   **A.**   The name of that subscriber was Yevgeniy Alexandrovich

7   Nikulin residing in Moscow on Kantemirovskaya Street.

8   **Q.**   Thank you.  Now, if we can look at the second part

9   there -- and this is continuing on the same page -- can you

10  read the subscriber information for the IP address ending in

11  .170?

12  **A.**   The name on the account was Inga Viktorovna Tonkikh from

13  Moscow on Sevanskaya Street.

14  **Q.**   Did you also -- in this, Exhibit 85 and 85A -- receive

15  records for the other three IP addresses that you requested

16  information for?

17  **A.**   I did.

18  **Q.**   And what was the subscriber information for those?  If you

19  could just summarize from Exhibit 85A.

20  **A.**   I believe one came back to a company Istresd (phonetic).

21  One came back to Yandex, which is a Russian search provider

22  similar to Google here.  It was an indexing machine, so one

23  that they use to comb the internet.  And the third came back to

24  a different individual.

25          **THE COURT:**  Again, the interpreters I know think that

**MILLER - DIRECT / KANE**

```
 1   your voice trails off at the very end and it does a little.

 2   The jury may have the same issue, so please keep your voice up

 3   at the end of the sentences.

 4          THE WITNESS:  My apologies, Your Honor.

 5          THE COURT:  Not a problem.  Let's go ahead.

 6   BY MS. KANE:

 7   Q.   Thank you.  And if you could grab Exhibit 86 from the box

 8   there, it's right here.  I apologize.  Do you recognize Exhibit

 9   86?

10   A.   Yes, I do.

11   Q.   And what is that?

12   A.   This is the certificate of authenticity for the business

13   records from the MLAT return.

14   Q.   So did that accompany Exhibit 85 when you received it?

15   A.   Yes, it did.

16                    (Pause in proceedings.)

17          MS. KANE:  Your Honor, the United States offers

18   Exhibit 86 into evidence.

19          THE COURT:  Any objection?

20          MR. GASNER:  Submitted, Your Honor.

21          THE COURT:  Received in evidence.

22        (Trial Exhibit 86 received in evidence.)

23          THE COURT:  Are you going to put that on the screen?

24          MS. KANE:  Yes.  We can show Exhibit 86.

25   BY MS. KANE:
```

MILLER - DIRECT / KANE

1  Q.   So is this the type of -- this is the -- a certificate of

2  authenticity of business records that accompanied your -- the

3  response that you received to your Mutual Legal Assistance

4  Treaty request; is that right?

5  A.   Yes, it is.

6  Q.   And the response you received contained subscriber records

7  for IP addresses?

8  A.   Yes.

9  Q.   And the certificate states a couple of things about those

10 records.  Can you read those?

11 A.   Sure.  The first line says:  Were made at or near the time

12 of occurrence of the matters set forth therein by from

13 information transmitted a person with knowledge of those

14 matters.

15     2.  Were kept in the course of regularly conducted

16 business activity.

17     3.  Were made by the said business activity as a regular

18 practice?

19     And 4.  If not original records, are duplicates of

20 original records.

21 Q.   So you mentioned -- we saw some of the names --

22         MS. KANE:  We can put that down.

23 BY MS. KANE:

24 Q.   We saw some of the names that were included in the

25 subscriber records that you received.  Were those the first

1   times you had seen those names in the course of your

2   investigation?

3   **A.**   Yes, it was.

4   **Q.**   Did you ask -- sorry, what did you do with that

5   information?

6   **A.**   I put it in the case file and noted it and tried to follow

7   up on as much of the information contained within as possible.

8   **Q.**   All right.   I would like to go back to the initial posting

9   of the LinkedIn data that we discussed earlier.   And that was

10  Exhibit 5.

11      Do you recall that there was a username and an e-mail

12  address associated with that posting?

13  **A.**   Yes, I do.

14  **Q.**   And did you investigate that information?

15  **A.**   Yes.

16  **Q.**   Okay.   So did you identify a person associated with that

17  username and e-mail address?

18  **A.**   Yes, the username was dwdm and the e-mail address was

19  dwdm@rambler.ru.   And I identified that individual as Alexsey

20  Sipkin.

21  **Q.**   And did you investigate an Alexsey Sipkin?

22  **A.**   Yes.

23  **Q.**   Okay.   And what did you learn about Alexsey Sipkin?

24  **A.**   That he was a Russian National who lived in St. Petersburg

25  who worked for the company Alcatel-Lucent as an optical

**MILLER - DIRECT / KANE**

1   engineer.

2   **Q.**   And did you obtain any information in your investigation

3   of Alexsey Sipkin?

4   **A.**   Yes.   I subpoenaed as many records as I could find for

5   U.S. companies as well as reaching out to Alcatel-Lucent.

6   **Q.**   And what did you receive as evidence, if anything?

7   **A.**   I received subscriber information for online accounts with

8   IP histories as well as an image of his Alcatel-Lucent work

9   computer.

10  **Q.**   And I would like you to look at Exhibit 97 in the box

11  there.   Do you recognize that?

12  **A.**   Yes, I do.

13  **Q.**   What is it?

14  **A.**   That is the hard drive from Alcatel-Lucent.

15  **Q.**   And what did it contain?

16  **A.**   An image of Mr. Sipkin's work computer.

17  **Q.**   When you made the request under the Mutual Legal

18  Assistance Treaty to Russia, had you already identified

19  Mr. Sipkin in your investigation?

20  **A.**   Yes, I did.   We identified him pretty early on.

21  **Q.**   So I would like to look back at Exhibit 85A.

22          **MS. KANE:**   If we can show that.

23  **BY MS. KANE:**

24  **Q.**   This is the first page of 85A.   And there is a sentence in

25  there that contains Alexsey Sipkin's name.   Can you read that

1  sentence?

2  **A.**   Yes.  It says:  The Office of the Prosecutor General of

3  the Russian Federation would like to express our respect to the

4  U.S. Department of Justice and pursuant to the Treaty between

5  the United States of America and the Russian Federation on

6  Mutual Legal Assistance in criminal matters of June 17, 1999,

7  and based on your request, hereby forwards to you copies of

8  documents obtained in pursuance of the request of the U.S.

9  Department of Justice to provide legal assistance on the

10  criminal case instituted against A. Sipkin based on the fact of

11  illegal access to computer information.

12  **Q.**   And was Alexsey Sipkin listed as a subscriber of any of

13  the IP addresses in that Mutual Legal Assistance Treaty

14  response?

15  **A.**   No, he was not.

16  **Q.**   And do you know why his name appears there in that

17  request?

18  **A.**   Yes, I do.

19  **Q.**   Why is that?

20  **A.**   The title of the request was "The Investigation of Alexsey

21  Sipkin" when I made the request.

22  **Q.**   Just to clarify, so when you made the request to the --

23  through the Mutual Legal Assistance Treaty, you had identified

24  Alexsey Sipkin; but you had not come across the name of

25  Yevgeniy Alexandrovich Nikulin yet?

MILLER - DIRECT / KANE

1    **A.**    That's correct.

2    **Q.**    All right.  I would like to turn to a new topic.

3         **MS. KANE:**  You can put that down.

4         **THE COURT:**  Can I ask a clarifying question because I

5    thought I saw that name, the Defendant's name, in one of the

6    documents a few minutes ago.  And now you are suggesting that

7    he had not yet seen it.  I'm not quite sure what -- do you

8    understand what I'm getting at?

9         **THE WITNESS:**  Yes, Your Honor.

10        **THE COURT:**  In two sentences or less, explain my

11   confusion.

12        **THE WITNESS:**  When I made the request to the Russian

13   Federation, I gave the name Alexsey Sipkin along with the IP

14   addresses used in the intrusion.  I received the results from

15   the Russian Federation that included the Defendant's name.

16        **THE COURT:**  All right.  I got it now.  Okay.  Thanks.

17   Go ahead.

18        **MS. KANE:**  Thank you.

19   **BY MS. KANE:**

20   **Q.**    Were you involved -- well, Exhibits 32, 32A and 33, the

21   spreadsheets that we looked at from LinkedIn, those were

22   important to your investigation; is that right?

23   **A.**    Yes, they were.

24   **Q.**    Okay.  Those included information about members of

25   LinkedIn that had potentially had their accounts compromised;

1    is that right?

2    A.    Yes.

3    Q.    And did you contact anyone on that list?

4    A.    Yes, I did.

5    Q.    What did you do?

6    A.    I attempted to contact the U.S. based companies on the

7    list initially and reach out to them to notify that their

8    employees had been targeted and were potentially compromised or

9    if not already, may be in the future.

10   Q.    And did those company include Dropbox?

11   A.    Yes, it did.

12   Q.    All right.  And what happened when you contacted Dropbox?

13   A.    Dropbox was very appreciative of the information.  They

14   indicated at the time they had not seen anything but would let

15   me know if they did.

16   Q.    Did you hear anything else from them?

17   A.    I did.  Within about two weeks they called me back

18   urgently to tell me the information I provided was accurate and

19   that they noticed some activity on their platform.

20   Q.    And what did you do in response?

21   A.    I interviewed members of Dropbox.

22   Q.    And did that include Cory Louie?

23   A.    Yes, it did.

24   Q.    Did they provide you any data?

25   A.    At that time we provided legal process for subscriber

1   records for some of the activity, and they gave us some

2   identifiers up front.

3   **Q.**   And then I would like to show you what has been admitted

4   as Exhibit 142.

5                     (Pause in proceedings.)

6   **BY MS. KANE:**

7   **Q.**   Is Exhibit 142 the type of data that you received from

8   Dropbox at that time?

9   **A.**   At that time, no, not in this format at least.

10  **Q.**   I'm sorry.  When I said -- I said the type of data.

11  **A.**   Yes, this is the type of data.

12  **Q.**   Thank you.  And approximately when was it that you

13  received this from Dropbox, this type of data?

14  **A.**   I want to say probably July of 2012.

15  **Q.**   Okay.  And so that included -- the data you received at

16  the time included IP addresses, user agent strings, and what

17  else?

18  **A.**   IP user agent strings, subscriber records for an account

19  and, I believe, just a number of accounts that might have been

20  Dropbox accounts that have been compromised.

21  **Q.**   Okay.  So now I would like you to take a look at Exhibits

22  38 and 146.  Do you recognize those?

23  **A.**   Yes, I do.

24  **Q.**   All right.  What are they?

25  **A.**   These are subscriber records from Dropbox for the account

MILLER - DIRECT / KANE

1   associated with the e-mail chinabig01@gmail.com.

2   **Q.**   And what is 146?

3   **A.**   The certificate of business records from Dropbox for those

4   records.

5             **MS. KANE:**  Your Honor, the United States offers

6   Exhibit 38 into evidence.

7             **MR. GASNER:**  Submitted.

8             **THE COURT:**  I'm sorry?

9             **MR. GASNER:**  Submitted.

10            **THE COURT:**  38?

11            **MS. KANE:**  Yes, Your Honor.

12            **THE COURT:**  All right.  Received in evidence.

13        (Trial Exhibit 38 received in evidence.)

14            **MS. KANE:**  Let's show Exhibit 38.

15  **BY MS. KANE:**

16  **Q.**   And what is this that we are looking at here?

17  **A.**   This is the subscriber information for that account.

18  **Q.**   And what -- and the account you requested was

19  chinabig01@gmail.com.  But these records are from Dropbox;

20  right?

21  **A.**   That's correct.  Upon my initial meeting with Dropbox,

22  they informed us that they had identified this account as being

23  associated with the activity they identified.

24            **MR. GASNER:**  Objection.  Hearsay.  Lack of foundation.

25            **THE COURT:**  Why is that not hearsay?

1              **MS. KANE:**  Your Honor, we can move on.  We don't -- we

2    can --

3              **THE COURT:**  The answer is stricken because it is

4    hearsay.

5    **BY MS. KANE:**

6    **Q.**   You made a request to Dropbox for subscriber records

7    associated with the e-mail account chinabig01@gmail.com; is

8    that right?

9    **A.**   Yes, I did.

10   **Q.**   And this is what you received back?

11   **A.**   Yes, it is.

12   **Q.**   What is the name on the account?

13   **A.**   Jammis Gurus.

14   **Q.**   So I would like to zoom in here.  What is the rest of this

15   document that we are looking at?

16   **A.**   This is IP history for the account which would include

17   account logins from -- whether it is the website or the Dropbox

18   client you could install on your computer with the IP address,

19   date and time, the location and user agent string.

20   **Q.**   And this is all part of the same business records you

21   received from Dropbox; is that right?

22   **A.**   Yes.

23   **Q.**   And were there any -- anything significant in here for

24   your investigation?

25   **A.**   Yes, there was.

MILLER - DIRECT / KANE

1   Q.   What was that?

2   A.   There were logins, one, from the Russian Federation; and,

3   two, the user agent string was almost identical, if not

4   identical, to the one used to compromise LinkedIn.

5   Q.   Now, was there a user agent string for every login in

6   here?

7   A.   No, there was not.

8   Q.   Did you investigate this Dropbox account further?  Did you

9   request any other records?

10  A.   I did.  I obtained a search warrant for the contents of

11  the account.

12  Q.   And what, if anything, was in the account?

13  A.   There was a text file in the account.  I believe it was

14  named zzzczz or some variation, but it had no data in the file.

15  Q.   So this is the second -- so you had identified that an

16  account was created at LinkedIn with the chinabig01@gmail.com

17  e-mail address and then identified an account at Dropbox with

18  the same e-mail address at this point?

19  A.   Yes.

20  Q.   Did you -- sorry, when it says "gmail.com," what company

21  is that associated with?

22  A.   That is associated with Google.

23  Q.   So did you request any information from Google regarding

24  that account?

25  A.   I did.

MILLER - DIRECT / KANE

1   Q.   What did you do?

2   A.   I served a subpoena for subscriber records for that

3   account.

4   Q.   And did you -- you did that once.  Did you do it ever

5   again?

6   A.   I did it -- excuse me.  I did it very -- a lot of times,

7   numerous search warrants, numerous subpoenas.

8   Q.   All right.  So in the boxes there, we have two sets of

9   documents.  And those are -- one set contains Exhibits 125, 14,

10  35, 41, 47, 52, 54, 62B and 117.  And there should be another

11  set that includes exhibits 2, 15, 34, 42, 46, 53, 55, 63, and

12  116A?

13  A.   Yes.

14  Q.   And what are those?

15  A.   These are the certificates of authenticity for each time I

16  requested records from Google, whether it was a search warrant

17  or subpoena.

18  Q.   So that was the second list that I read you there starting

19  with Exhibit 2; is that right?

20  A.   That's correct.

21  Q.   Okay.  And when you say "certificate of authenticity,"

22  that is authenticating those records as business records of

23  Google?

24  A.   Yes.

25  Q.   That is similar to the one that you mentioned for Dropbox

 1   that we just saw?

 2   **A.**   That's correct.

 3   **Q.**   And similar to the one you received with your Russian MLAT

 4   request response; is that right?

 5   **A.**   Yes.

 6   **Q.**   Then the other set contains what?

 7   **A.**   This other set contains the subscriber records; so the

 8   name, date of account, registration and the login history or IP

 9   history for the account.

10   **Q.**   Okay.  And those are all for the account

11   chinabig01@gmail.com; is that right?

12   **A.**   Yes, they are.

13   **Q.**   All right.

14          **MS. KANE:**  So the United States moves to admit Exhibit

15   125, 14, 35, 41, 47, 52, 54, 62B, and 117?

16          **THE COURT:**  Any objection?

17          **MR. GASNER:**  No objection.

18          **THE COURT:**  All right.  All of those are received in

19   evidence.

20          (Trial Exhibits 125, 14, 35, 41, 47, 52, 54, 62B and

21          117 received in evidence.)

22   **BY MS. KANE:**

23   **Q.**   All right.  We will return to the content of those

24   exhibits.  But with regard to that account, in addition to

25   those subscriber records, did you obtain content of the

 1    account?

 2    **A.**    Yes, I did --

 3    **Q.**    And when --

 4    **A.**    -- on several occasions.

 5    **Q.**    And when I say "content," what do you understand that to

 6    mean?

 7    **A.**    That is the information in the account.  So for this

 8    instance it is a Gmail, Google, account.  It would be the

 9    e-mail contents, search history; things you have typed in

10    google.com, web activity, that kind of information.

11    **Q.**    So that included e-mail messages, for example?

12    **A.**    Yes, e-mail content.

13    **Q.**    If you could grab, please, Exhibits 3A and continuing and

14    also Exhibit 1.  So what is Exhibit 1?

15    **A.**    It is the results of the search warrant for the

16    chinabig01@gmail.com account.

17    **Q.**    And so that's something you received from Google?

18    **A.**    Yes, I received this data from Google.

19    **Q.**    And Exhibit 2 from the previous group of exhibits you

20    looked at --

21            **THE COURT:**  Wait a minute.  I don't understand that

22    part.  Are you saying Exhibit 1 was a search warrant return?

23            **THE WITNESS:**  Yes, Your Honor.

24            **THE COURT:**  But usually that is executed by a law

25    enforcement officer.

1          **MS. KANE:**  Your Honor, I think what he means is

2    response, the response from the company.  Not the return that

3    is filed with the Court.

4          **THE COURT:**  You mean a subpoena of some sort or are

5    you talking about a search warrant?

6          **MS. KANE:**  Special Agent Miller is testifying that he

7    executed a search warrant with Google for account contents and

8    received account contents from Google.  And that response is

9    what is on that exhibit.

10         **THE COURT:**  So Google is the one who responded to the

11   search warrant, like it was a subpoena or something?

12         **MS. KANE:**  I will let Special Agent Miller do the

13   testimony.

14         **THE COURT:**  Is that right?

15         **THE WITNESS:**  I obtained a search warrant for the

16   content, Your Honor; and they provided me the data in the

17   account.

18         **THE COURT:**  Okay.

19   **BY MS. KANE:**

20   **Q.**   When you say "they," who is they?

21   **A.**   "They" being Google.

22   **Q.**   All right.  So you obtained a search warrant for the

23   account that you served on the company, Google?

24   **A.**   Yes, I served it on Google.

25   **Q.**   Is that typically what you do for e-mail account search

1   warrants?

2   **A.**   Yes, it would be the same with a Hotmail which is

3   Microsoft or Yahoo! account.

4   **Q.**   All right.  So Exhibit 1 -- and then if you can look at

5   Exhibit 2 from the previous group that we were looking at --

6   and just remind us of what Exhibit 2 is.

7   **A.**   Record -- Exhibit 2 is the certificate of authenticity

8   verifying that the records are accurate from Google.

9   **Q.**   And when you say "accurate," it is verifying that they are

10  business records; is that right?

11  **A.**   Yes, that is correct.

12  **Q.**   Thank you.  And that is something -- did you receive that

13  with Exhibit 1?

14  **A.**   Yes, I did.

15  **Q.**   Okay.

16      **MS. KANE:**  The United States moves for admission of

17  Exhibit 1.

18      **MR. GASNER:**  No objection, Your Honor.

19      **MS. KANE:**  I'm sorry.  Strike that.  Please -- we

20  don't need to admit Exhibit 1.  I'm just going to admit the

21  individual e-mail messages.

22      **THE COURT:**  Well, what are you moving to admit?

23      **MS. KANE:**  The next thing that I talk about.

24      **THE COURT:**  All right.

25      **MS. KANE:**  Yes.  Thank you.

1    BY MS. KANE:

2    **Q.**   So you have Exhibits 3A, B and E there in a folder.

3    **A.**   Yes.

4    **Q.**   Do you recognize those?

5    **A.**   These are e-mails from within the chinabig01@gmail.com

6    account.

7    **Q.**   All right.  And you received those with -- in Exhibit 1 in

8    the response you got from Google; is that right?

9    **A.**   Yes, I did.

10           **MS. KANE:**  I will move to admit Exhibits 3A, B and E.

11           **MR. GASNER:**  No objection.

12           **THE COURT:**  3A, B and C, all admitted.

13           **MS. KANE:**  It is E, Your Honor.  A, B and E.

14           **THE COURT:**  All right, alpha, beta, echo.  All right.

15   All in evidence now.

16        (Trial Exhibits 3A, 3B and 3E received in evidence.)

17           **MS. KANE:**  All right.

18           **THE COURT:**  But not Number 1.

19           **MS. KANE:**  Not Number 1.  Thank you.

20           **THE COURT:**  Not Number 1.  Usually the lawyers like

21   number 1 to be the zinger, you know, the best document in the

22   case.

23                        (Laughter)

24           **THE COURT:**  But the Government doesn't want Number 1

25   in evidence.  All right.  Just a little thing to keep your

 1   interest up.  Okay.  Keep going.

 2   **BY MS. KANE:**

 3   **Q.**   All right.  So if we could show Exhibit 3A, please.

 4          **MS. KANE:**  If we can just blow up the header

 5   information.

 6          **THE COURT:**  Now, these are part -- are these the

 7   e-mails from within -- is that what we are showing now?

 8          **THE WITNESS:**  Yes, Your Honor.

 9          **THE COURT:**  Okay.

10                    (Pause in proceedings.)

11          **THE COURT:**  All right.  I wish you would settle on

12   what you are going to put on the screen.

13   **BY MS. KANE:**

14   **Q.**   So this is an e-mail message that you found in the

15   chinabig01@gmail.com account; right?

16   **A.**   Yes.

17   **Q.**   And what is the date on the e-mail?

18   **A.**   January 2nd of 2012.

19   **Q.**   All right.  And who is it addressed to?

20   **A.**   Chinabig01.

21   **Q.**   If we can show Exhibit 3B.

22          **THE COURT:**  But that was in Russian or something.

23   What did the actual e-mail say?

24          **MS. KANE:**  Your Honor, we just needed to look at the

25   top to see that chinabig01 part.

1              THE COURT:  Okay.

2              MS. KANE:  Thank you.

3     BY MS. KANE:

4     Q.   So Exhibit 3B has already been admitted into evidence.

5     This was, again, an e-mail message you found in the chinabig01

6     account; is that right?

7     A.   Yes.

8     Q.   And who is this addressed to?

9     A.   Jammis.

10    Q.   And what is the date on this e-mail message?

11    A.   April 10th, 2012.

12             MS. KANE:  We can show Exhibit 3B -- I'm sorry.  3C.

13             THE COURT:  You moved into evidence A, B and E; not C.

14             MS. KANE:  3C is already in evidence.

15             THE COURT:  Okay.  Yes, it is.  You are right.

16    BY MS. KANE:

17    Q.   And this is another e-mail message you found in the

18    chinabig01@gmail.com account?

19    A.   Yes.

20    Q.   And who is this addressed to?

21    A.   It is addressed to Jammis again.

22    Q.   And what is the date on this?

23    A.   May 24th, 2012.

24             MS. KANE:  Let's show Exhibit 3D which is also already

25    in evidence.

1   BY MS. KANE:

2   Q.   This is another message that you found in the account?

3   A.   Yes.

4   Q.   Okay.  And what is the date on this one?

5   A.   June 13th, 2012.

6   Q.   And then Exhibit 3E, this is another message you found in

7   the account?

8   A.   Yes, it is.

9   Q.   And what is the date on this one?

10  A.   August 3rd, 2012.

11  Q.   And to whom is this addressed?

12  A.   Jammiro Quatro.

13  Q.   And this is an e-mail from LinkedIn; is that right?

14  A.   Yes, it is.

15  Q.   There was previous testimony that these were automatically

16  generated, the messages like this one from LinkedIn.  Were most

17  of the messages that you found in the account contents ones

18  that appear to be automatically generated?

19  A.   Yes, they were.

20  Q.   So after you reviewed -- and sorry -- we saw that they

21  were addressed to a number of different names; is that right?

22  A.   Yes.

23  Q.   So we saw a Jammis, a Jammiro and a Chinabig01?

24  A.   That's correct.

25  Q.   So at that point in your investigation when you reviewed

1    these e-mail messages, did you know who the true owner of this

2    account was based on the content?

3    **A.**   I did not yet.

4    **Q.**   Did you gain any other leads from reviewing the contents

5    of this account?

6    **A.**   I did.

7    **Q.**   And how did you identify those?

8    **A.**   I identified other companies that sent these automated

9    messages to the account that were within the United States that

10   I could easily follow up on.

11   **Q.**   And what is the one of the companies that you followed up

12   on?

13   **A.**   Afraid.org.

14   **Q.**   What is Afraid.org?

15   **A.**   Afraid.org provides a service to its users that allows you

16   to remotely connect to your computer at home from using a URL,

17   a distinct name, even if your IP address at home changes.

18   **Q.**   And what did you do with regard to the Afraid.org lead?

19   **A.**   I obtained subscriber information for the account.

20   **Q.**   And when you say "the account," what did you request?

21   **A.**   The account with the e-mail address chinabig01@gmail.com.

22   **Q.**   And did you receive a response?

23   **A.**   I did.

24   **Q.**   If you want to look in that box, we have identified

25   Exhibits 43, 44, 44A, and 45.  Do you recognize those?

MILLER - DIRECT / KANE

1    **A.**   Yes, I do.

2    **Q.**   What are they?

3    **A.**   This is information provided from Afraid.org.

4    **Q.**   Okay.  So Exhibit 44 -- sorry -- Exhibit 43 is what?

5    **A.**   The declaration of custodian of records.

6    **Q.**   All right.  And that certifies that these are business

7    records of Afraid.org?

8    **A.**   Yes, it does.

9    **Q.**   And what is Exhibit 44?

10   **A.**   44 is a CD containing the original results.

11   **Q.**   That's what you received from Afraid.org?

12   **A.**   Yes.

13   **Q.**   What about 44A?

14   **A.**   44A is a printout of some of the records I received from

15   Afraid.org.

16   **Q.**   So those are -- those were contained on the disk at 44?

17   **A.**   Yes.

18   **Q.**   All right.  And what about 45?

19   **A.**   45 is the subscriber records for the account Afraid.org

20   account associated with the e-mail address

21   chinabig01@gmail.com.

22          **MS. KANE:**  United States moves for the admission of

23   Exhibits 44, 44A and 45.

24          **MR. GASNER:**  Submitted, Your Honor.

25          **THE COURT:**  All received.

1              (Trial Exhibits 44, 44A and 45 received in evidence.)

2              **MS. KANE:**  So if we can show Exhibit 45, please.

3                      (Pause in proceedings.)

4    **BY MS. KANE:**

5    **Q.**   So what are we looking at here?

6    **A.**   This is the subscriber information for the

7    chinabig01@gmail.com account for Afraid.org.

8    **Q.**   And what is the name on this account?

9    **A.**   Zopaqwe1 Zopaqwe1.

10   **Q.**   And that is spelled Z-O-P-A-Q-W-E-1; is that right?

11   **A.**   That's correct.

12   **Q.**   Now continuing down, we are going to blow up another

13   portion there.  It lists a password.  What is the password?

14   **A.**   It is the same as the name on the account Zopaqwe1,

15   Z-O-P-A-Q-W-E-1.

16   **Q.**   It also lists a -- it says:  Found one active domain.

17   What is the active domain?

18   **A.**   Zopaqwe1.com, Z-O-P-A-Q-W-E-1.com.

19   **Q.**   All right.  There is a user agent listed -- I'm sorry --

20   agent it says.  And that includes the word "sputnik;" is that

21   right?

22   **A.**   Yes, it does.

23   **Q.**   So we looked at the domain that was -- we are pronouncing

24   it Zopaqwel, but I don't know.  It is not really a word.

25   Zopaqwel.com, did you investigate that domain?

1   **A.**   I did.  I looked to see if that domain had ever been

2   registered and it had not; meaning, there is no website located

3   at zopaqwel1.com.

4   **Q.**   Did you identify any other accounts with other services

5   registered with the e-mail account chinabig01@gmail.com?

6   **A.**   I did.

7   **Q.**   And what was that?

8   **A.**   One account was registered at vimeo.com.

9   **Q.**   What is Vimeo?

10  **A.**   Vimeo is a video service website similar to YouTube.

11  **Q.**   So I would like you to look at Exhibits 113 and 138.

12          **MR. GASNER:**  Ms. Kane, what was the second number?

13          **MS. KANE:**  138.

14  **BY MS. KANE:**

15  **Q.**   And what are those?

16  **A.**   113 is a subscriber information for the Vimeo, the Vimeo

17  account associated with the e-mail address at

18  chinabig01@gmail.com.

19      Excuse me.  And 138 is the certification of custodian of

20  records certifying the business records.

21  **Q.**   Thank you.

22          **MS. KANE:**  The United States moves for the admission

23  of Exhibit 113.

24          **MR. GASNER:**  Submitted, Your Honor.

25          **THE COURT:**  Received in evidence.

 1            (Trial Exhibit 113 received in evidence.)

 2            **MS. KANE:**  If we can show 113.

 3    **BY MS. KANE:**

 4    **Q.**   So what is this that we are looking at?

 5    **A.**   This is an e-mail from Vimeo containing the subscriber

 6    information.  It has the e-mail address that I requested

 7    chinabig01@gmail.com, with the username uarebeenhacked.

 8            (Pause in proceedings.)

 9    **BY MS. KANE:**

10    **Q.**   Did you also receive login records from Vimeo with your

11    subscriber information?

12    **A.**   I did.

13    **Q.**   And did those login records contain IP addresses?

14    **A.**   They did.

15    **Q.**   So at this point you had identified accounts controlled by

16    the same e-mail address, chinabig01@gmail.com, at LinkedIn,

17    Dropbox, Afraid and Vimeo?

18    **A.**   And Formspring as well.

19    **Q.**   Thank you.  All right.  Let's move on to Formspring.

20            Your Honor, I'm starting a new section here, and I don't

21    know what the lunch plan is?

22            **THE COURT:**  I appreciate the heads-up.  The lunch will

23    be ready for the jury in 12 or so minutes.  I don't want to

24    send them in there until it is there.  We will take it right up

25    until noon, and then we will break then.

1              MS. KANE:  I'm happy to do that.  All right.

2              THE COURT:  Thank you.

3    BY MS. KANE:

4    Q.   Did you talk to Formspring in the course of your

5    investigation?

6    A.   I did.

7    Q.   And how did that come about?

8    A.   I believe I saw a posting on the same website as the

9    LinkedIn data, insidepro.com, posting data for sale.

10   Q.   Who did you -- did you speak to someone at Formspring?

11   A.   I did.

12   Q.   Who was that?

13   A.   Ade Olonoh.

14   Q.   And did Formspring provide you any information, any data,

15   in your investigation?

16   A.   They provided me log files.

17   Q.   Okay.  So I would like you to look at what has been marked

18   as Exhibit 18.

19              THE WITNESS:  1-8?

20              MS. KANE:  Yes -- I believe Exhibit 18 was already

21   admitted.

22              THE COURT:  It is.  18 is in evidence.

23              MS. KANE:  That's correct.  Thank you.

24   BY MS. KANE:

25   Q.   Exhibit 18, please.  If you can look at that, Exhibit 18

1   was admitted with Mr. Olonoh as the records that had been

2   provided.  What is Exhibit 19?

3   **A.**   19 is a summary of IP overlap for the Formspring logs.

4   **Q.**   Okay.  Is that a summary that you prepared?

5   **A.**   Yes, it is.

6   **Q.**   And what was the source of the records in there?

7   **A.**   The Formspring logs for Mr. Olonoh.

8   **Q.**   Do you have an Exhibit 19A as well?

9   **A.**   I believe the CD is 19A.

10  **Q.**   So what you just testified about was the summary was 19A;

11  is that right?

12  **A.**   Yes.

13  **Q.**   And what was previously shown during Mr. Olonoh's

14  testimony as Exhibit 19, do you recall the Formspring logs?

15  **A.**   Yes, I do.

16  **Q.**   And so is Exhibit 19A a summary prepared from Exhibit 19?

17  **A.**   Yes, it is.

18  **Q.**   Thank you.  And Exhibit 19 was a summary of Exhibit 18,

19  the original logs from Formspring; is that right?

20  **A.**   Yes.

21  **Q.**   Thank you.  And those logs were voluminous, would you say?

22  **A.**   Yes, they were.

23  **Q.**   Okay.

24          **MS. KANE:**  So we will move to admit Exhibit 19A.

25          **MR. GASNER:**  Submitted.

 1              **THE COURT:**  Received.

 2         (Trial Exhibit 19A received in evidence.)

 3              **MS. KANE:**  Let's bring up 19A.

 4    **BY MS. KANE:**

 5    **Q.**   Can you describe how you created this summary?

 6    **A.**   Can we scroll over so I could see all the columns, please.

 7    So this summary contains in one format the -- snippets from the

 8    various log formats so it is easy to read.

 9    **Q.**   And these are the Formspring logs?

10    **A.**   That's correct.

11    **Q.**   Okay.  And then you said it was a summary of the IP

12    overlap.  So what does that mean?

13    **A.**   Could we scroll all the way to the left, please.

14    **Q.**   Let's look at lines 1 through 7.  Can we -- can you see

15    lines 1 through 7?

16    **A.**   Yes.

17                        (Pause in proceedings.)

18    **BY MS. KANE:**

19    **Q.**   I'm sorry.  We are looking at 19.  We are going to bring

20    up 19A.

21                        (Pause in proceedings.)

22    **BY MS. KANE:**

23    **Q.**   19A is the one you described as the overlap?

24    **A.**   That's correct.  That was the summary on the previous

25    screen.

**MILLER - DIRECT / KANE**

1   Q.   We will come back to 19A.   You mentioned something about

2   Formspring data being posted.   Do you recall where it was

3   posted?

4   A.   Yes, inside the Russian forum insidepro.com just like

5   billing data.

6   Q.   And I would like to show you what has been marked as

7   Exhibit 6.   Do you have Exhibit 6?

8                         (Pause in proceedings.)

9              THE WITNESS:   66?

10             MS. KANE:   6.

11                        (Pause in proceedings.)

12  BY MS. KANE:

13  Q.   Do you recognize Exhibit 6?

14  A.   Yes, I do.   This is the posting on insidepro.com of the

15  Formspring data.

16  Q.   All right.   Is this something you viewed at the time?

17  A.   It was.

18  Q.   Okay.   It looks like what you saw at the time?

19  A.   Yes, it does.

20  Q.   Okay.

21             MS. KANE:   The United States moves for admission of

22  Exhibit 6.

23             MR. GASNER:   Submitted, Your Honor.

24             THE COURT:   Received in evidence.

25        (Trial Exhibit 6 received in evidence.)

 1           MS. KANE:  All right.  We can show Exhibit 6.

 2   BY MS. KANE:

 3   Q.   So that blown up part there, what are we looking at?

 4   A.   This is the posting by an individual using the nickname

 5   Slavuti4.  It says:  Help me PLZ, please, with sha256 hashes

 6   and a link.

 7           THE COURT:  Can I ask a question?  Where do you --

 8   where did this come from again?

 9           THE WITNESS:  The Russian forum insidepro.com.

10           THE COURT:  The what?  Say it again.

11           THE WITNESS:  A forum, a website.

12           THE COURT:  Okay.

13   BY MS. KANE:

14   Q.   What is a forum?

15   A.   A forum is a type of a website where users can post

16   questions and comments and assist each other for communication.

17           THE COURT:  I got it.  Okay.

18   BY MS. KANE:

19   Q.   And was this something that you captured at the time

20   during your investigation?

21   A.   Yes, it was.

22   Q.   So this is a like a screenshot of what you saw; is that

23   right?

24   A.   That's exactly what this is.

25   Q.   Okay.  So what did you do in response to this information?

MILLER - DIRECT / KANE

1   **A.**   I tried to validate the validity of this information

2   contained in the link.

3   **Q.**   And what happened?

4   **A.**   Formspring confirmed it was their data.

5   **Q.**   Now, I want to go back to the chinabig01@gmail.com

6   account.

7        We saw earlier a few of the e-mail messages that you had

8   obtained -- that you had found in the search warrant results

9   that you received from Google.   You mentioned other types of

10  account contents.   Did you obtain any other types of account

11  contents for that account?

12  **A.**   Yes, I did.   I obtained the search history for the

13  account.

14  **Q.**   And how did you obtain that?

15  **A.**   Through the same search warrant.

16  **Q.**   I would like you to look at Exhibits 62 and 62A.   And in

17  addition, Exhibit 63 is in the bundle that you looked at before

18  that you identified as Google certifications.

19       Do you recognize Exhibit 62?

20  **A.**   Yes, I do.

21  **Q.**   What is that?

22  **A.**   This is the data obtained from Google in response to the

23  search warrant.   It has the search history.

24  **Q.**   Okay.   And what is Exhibit 63?

25  **A.**   63 is the certificate of authenticity for the business

 1   records for that search warrant from Google.

 2   **Q.**   And then there is an Exhibit 62A.  What is that?

 3   **A.**   62A contains the search history for that account, the

 4   chinabig01@gmail.com.

 5   **Q.**   Okay.  And when you reviewed the search history in the

 6   results, what languages were the searches in?

 7   **A.**   English and Russian.

 8   **Q.**   Okay.  So 62A you said is search history from the account.

 9   What language is that set of search history in?

10   **A.**   English.

11   **Q.**   So is that something that you pulled out of the response

12   from Google, just the English responses or the English

13   searches?

14   **A.**   Yes.

15   **Q.**   And explain what search history means in the context of a

16   Google account.

17   **A.**   Sure.  When you register a Google account, you can set a

18   setting to maintain your search history.  So any time you

19   search anything on the Google toolbar or website, it will

20   catalog that and save it to your account for references later

21   on that computer or, say, a different device.

22   **Q.**   So Exhibit 62A is a summary that you made from the

23   response at Exhibit 62; is that right?

24   **A.**   Yes.

25            **MS. KANE:**   The United States moves for the admission

MILLER - DIRECT / KANE

 1   of 62A.

 2           MR. GASNER:  Submitted.

 3           THE COURT:  In.  Received.

 4      (Trial Exhibit 62A received in evidence.)

 5           MS. KANE:  Let's show 62A.  We are going to -- blowing

 6   up the first few entries there.

 7   BY MS. KANE:

 8   Q.   There is an entry -- there are a number of entries for

 9   February 18th, 2012.  And it says "searched for."  And then it

10   has a different phrase on each one.  So what does this mean --

11   what are we looking at here?

12   A.   These are the words that were typed into the Google search

13   engine for this account the chinabig01@gmail.com.

14   Q.   Okay.  And can you read the words for the February 18th

15   entries?

16   A.   Yes.

17        Searched for svn ssh key.

18        Searched for Oracle export.

19        Searched for Oracle export utility.

20        Visited a website from oracle.ru.

21        Searched for EMS export Oracle.

22        Searched for EMS data export for Oracle.

23   Q.   Okay.  Now, I would like to go back to our timeline that

24   we were looking at that was begun with Special Agent Ling.

25                   (Pause in proceedings.)

1          **THE COURT:**  Okay.  It is on my screen.  Oops, there --

2     there.  It is right there.

3          **MS. KANE:**  All right.

4     BY MS. KANE:

5     **Q.**  So this is what we were looking at before.  And I would

6     like to sort of move -- we have now filled up this page on the

7     timeline, so we are going to start a new section.  And what we

8     will do is we will move and just include the last few entries

9     from the previous timeline that we were looking at.

10         So those blue entries are the ones that Special Agent Ling

11    testified to, and the red is what you already discussed this

12    morning that we have put up.  That was that last box.

13         So now, let's add what we just looked at.  So we have

14    February 18th, 2012, search for Oracle export from

15    chinabig01@gmail.com; and we also have the information you

16    previously testified about for the ISP records for the .239 IP

17    address; is that right?

18    **A.**  That's correct.

19         **THE COURT:**  Will this be a good time to break?  It is

20    lunchtime for the jury.  All right.  You can take a minute more

21    to kind of --

22         **MS. KANE:**  I have two or three more questions on this

23    timeline; just to add things.

24         **THE COURT:**  Finish that up and then we will take a

25    break.

1        **MS. KANE:**  Okay.  Great.  All right.

2     So let's -- well, you know what, why don't we break now.

3  I don't want to make them wait.

4        **THE COURT:**  Thank you.  All right.  We are going to

5  take a break.  Please remember the admonition.  This will be a

6  30-minute break.  And I think the food is waiting for you in

7  the other room.  Yes, Ma'am?

8        **JUROR WOODROW:**  We just want to know if we go into

9  deliberation, can we come earlier than 8:45 a.m. if needed?

10       **THE COURT:**  I need to check with the Clerk's Office to

11  make sure.  Normally I would say absolutely, yes.  And I would

12  be here very early, well before the sunrise to let you in.

13       However, because of COVID-19, I have to comply with the

14  ground rules that our Clerk's Office has come up with for

15  safety.  And I will inquire.  Is this a question all of you

16  have?

17     I will find out the answer.  Okay.  Good question.  All

18  right.  Please go enjoy your lunch and don't talk about the

19  case yet.  It will be your duty to do so in due course.

20       (Proceedings were heard outside the presence of the jury:)

21       **THE COURT:**  Everyone can be seated.  The witness can

22  stay.  He is the case agent so.

23     Anything for -- the lawyers want to raise with me?

24       **MR. GASNER:**  Nothing from the Defense at this point.

25       **MS. KANE:**  No, Your Honor.  Thank you.

 1          **THE COURT:**  All right.  I do have one question.  And I

 2     don't need an answer now, but I do need it in due course.

 3          That certification from Russia had some blanks.  You

 4     didn't show the jury the blanks.  It was above -- you had the

 5     part that showed the business record thing.  But above that, I

 6     could see it had an "I" and then it was a Russian name.  And

 7     then "I am" the blank of the blank, and they didn't fill in the

 8     blanks on your certification.

 9          So I -- I'm asking is that a defect in some manner?  And

10     the other question is how this ever gets in under Rule 803?

11     Because it does say all the conditions are shown by the

12     testimony of the custodian or another qualified witness or by

13     certification that complies with 902.11 or 12 or with a statute

14     permitting the certification.

15          Now, are you relying on 902.11 or 902.12 or a statute?

16          **MS. KANE:**  Well, Your Honor, they are admissible as

17     foreign business records.

18          **THE COURT:**  Where?  Foreign -- okay.  Is there a

19     different one that you are relying on?

20          **MS. KANE:**  Sorry.  Give me a moment, please.

21          **THE COURT:**  It could be under the MLAT itself.

22          **MS. KANE:**  Well, Your Honor, there are statutes that

23     also interact with the rules of evidence.  The exhibit is

24     already admitted so I --

25          **THE COURT:**  I understand but I -- I admitted it; but

 1   then after I saw it on the screen and saw those blanks, I began

 2   to wonder about it.  And I'm going to give you time to answer

 3   this in detail.  Just put it on the list of things that need to

 4   be answered.

 5          **MS. KANE:**  Your Honor, I was referring to 902.3,

 6   foreign documents attested by officials.

 7          **THE COURT:**  Okay.  902.3.

 8          **MS. KANE:**  But we can discuss further --

 9          **THE COURT:**  It says it must be certified by somebody

10   that -- certifies a genuineness of the signature and official

11   position of the signer or attester.  But those were left blank

12   in yours.  It is just a name.  They could have been taxicab

13   driver.  I don't know.

14      So I raise the question.  I'm not making any ruling, but

15   it went by me pretty fast so -- and when I saw the blanks, I

16   said:  I wonder if that's a problem.

17      Okay.  We will take a break at this time.  Enjoy your

18   lunch.  I have a -- I know -- I feel -- I don't want to be

19   critical of your team there.  It takes forever to bring stuff

20   up on the screen.  In the meanwhile we are wasting 30 seconds,

21   45 seconds each time.  Isn't there a quicker way to bring it up

22   on the screen?

23          **MS. KANE:**  Your Honor, the Zoom is what is making it

24   very slow.

25          **THE COURT:**  Is it?  Okay.  All right.  Thank you.

```
 1                    (Recess taken at 12:08 p.m.)

 2                  (Proceedings resumed at 12:42 p.m.)

 3          (Proceedings were heard in the presence of the jury:)

 4          THE COURT:  Be seated.  We need to wait for the

 5   interpreters.

 6                    (Recess taken at 12:43 p.m.)

 7                  (Proceedings resumed at 12:50 p.m.)

 8          THE COURT:  Interpreters, please tell me when you are

 9   ready.

10                    (Pause in proceedings.)

11          INTERPRETER:  We are ready, Your Honor.

12          THE COURT:  Ready?

13          INTERPRETER:  Yes.

14          THE COURT:  Okay.  All right.  Ms. Kane, please

15   continue.

16          MS. KANE:  Thank you, Your Honor.

17   BY MS. KANE:

18   Q.  When we broke for lunch, we had been looking at Exhibit

19   62A; and you testified that that was search history that you

20   had obtained from Google for the chinabig01@gmail.com account.

21       And we looked at page 1 and you read some entries from

22   February 18th.  I would now like to turn to page 3 -- sorry,

23   February 18th, 2012 that was.

24       Now, let's look at page 3.  Okay.  So there is an entry

25   there for June 6th, 2012, and it continues down through entries
```

MILLER - DIRECT / KANE

1  for June 7th, 2012.

2      Can you tell us -- some of them say "searched for" and

3  some of them say "visited."  Can you describe those for us?

4  **A.**    Sure.  One says:  Searched for dwdm

5  site:http:\\forum.insidepro.com.

6  **Q.**    And that's June 6th.  And there is another entry for

7  search 6th with a similar website?

8  **A.**    Yes.  It says:  Visited

9  http:\\forum.insidepro.com/search.php?search_author=dwdm.

10 **Q.**    And then there is an entry for June 7th.  Can you tell us

11 what that is?

12 **A.**    It says:  Searched for LinkedIn hash.

13 **Q.**    And the next entry for June 7th, 2012?  You don't have to

14 read all the slashes, but if you can tell us what it says.

15 **A.**    Sure.  This one visited a slash.org story for LinkedIn in

16 password hashes leaked online.

17 **Q.**    There is another entry for June 7th.  What website is

18 that?

19 **A.**    Thenextweb .com.

20 **Q.**    It says visited.  And then at the end there, the website

21 name, what does it say?

22 **A.**    "Bad day for LinkedIn.  6-5 million hashed passwords

23 reportedly leaked.  Change yours now."

24 **Q.**    And then on June 7th, continuing down, there are two more

25 entries that say:  Searched for dwm.  And one says:  Dwm

1   InsidePro; is that right?

2   **A.**   Yes, dwdm.

3   **Q.**   I'm sorry, dwdm.  Thank you.  Okay.  I would like to turn

4   briefly back to our timeline.

5        So as you will recall -- we had moved on in our timeline,

6   and we are now on the second page.  So there is still the blue

7   that represented what Special Agent Ling had testified to with

8   my colleague.

9        And you had added a couple items.  And now we will add

10  from the search history what you just talked about.

11       And you previously testified today that on -- on or about

12  June 6th, 2012, LinkedIn reported the password hashes being

13  posted to the FBI; is that right?

14  **A.**   That's correct.

15  **Q.**   Now, let's turn to Exhibits 118 and 119.  Do you have

16  those?  Do you recognize those exhibits?

17  **A.**   Yes, I do.

18  **Q.**   And what are they?

19  **A.**   Exhibit 118 is Russian search history.  So search history

20  in the Russian language from the chinabig01@gmail.com account.

21  **Q.**   And what is Exhibit 119?

22  **A.**   119 is the English translation of those Russian search

23  terms.

24  **Q.**   All right.

25       **MS. KANE:**  Now, I would like to read a stipulation.

MILLER - DIRECT / KANE

```
 1   It says (reading):  "Government Exhibit 118 is an excerpt of
 2   Russian language search history.  Government Exhibit 119 is an
 3   accurate translation of the search history from the Russian
 4   language to the English language."
 5           THE COURT:  So stipulated.
 6           MR. GASNER:  Yes, Your Honor.
 7           THE COURT:  All right.  That is evidence in the case.
 8   Go ahead.
 9           MS. KANE:  And the United States would move to admit
10   Exhibits 118 and 119.
11           THE COURT:  Any objection?
12           MR. GASNER:  No, Judge.
13           THE COURT:  Received.
14       (Trial Exhibits 118 and 119 received in evidence.)
15           MS. KANE:  All right.  If we could please show Exhibit
16   119.
17   BY MS. KANE:
18   Q.   And on page 1 there are some entries for June 7th.  If we
19   can highlight those, can you tell us what the entries for
20   June 7th, 2012, are?
21   A.   Searched for collision at MD5.
22       Visited search of MD5 collisions as easy to nibble
23   sunflower seeds.
24       Searched for collision at MD5 example.
25       And visited MD5 collisions.  Does anyone know a real
```

MILLER - DIRECT / KANE

1    example with a string?

2    **Q.**   And then there are some entries from November 9th.  Can

3    you tell us what those are?

4    **A.**   Yes.  Searched for 3 Kantemirovskaya Street, apt. 2 on

5    both entries.

6    **Q.**   Thank you.

7        When you received these search responses, did you

8    recognize anything in the November 9th entries?

9    **A.**   Yes, I did.

10   **Q.**   And what is that?

11   **A.**   I noticed that the street name Kantemirovskaya matched the

12   street name for the subscriber of the 239 IP from the Russian

13   MLAT return.

14           **MS. KANE:**  Let's move on.  We can take that down.

15   **BY MS. KANE:**

16   **Q.**   During the course of your investigation, did you obtain

17   any audio recordings of the Defendant?

18   **A.**   Yes, I did.

19   **Q.**   I would like you to look at Exhibits 88, 88A, 89, 89A, 90,

20   90A, 135, 135A, 136, and 136A?

21   **A.**   I don't believe I have 90.

22   **Q.**   Do you recognize these?

23   **A.**   One moment.

24                       (Pause in proceedings.)

25           **THE WITNESS:**  Yes, I do.

MILLER - DIRECT / KANE

 1   BY MS. KANE:

 2   Q.   And are these the recordings you just referred to?

 3   A.   Yes, they are.

 4   Q.   And also the translations of those recordings?

 5   A.   That's correct.

 6   Q.   Do those recordings contain the Defendant speaking?

 7   A.   Yes, they did.

 8   Q.   How do you know that it was the Defendant speaking?

 9   A.   I have heard the Defendant speak in association with these

10   court proceedings before.

11   Q.   So you were able to recognize his voice on the audio

12   recordings?

13   A.   Yes, I was.

14        MS. KANE:   Your Honor, at this time I would like to

15   read another stipulation.

16        THE COURT:   Please go ahead.

17        MS. KANE:   (Reading) "Government Exhibits 88A, 89A,

18   90A, 135A, and 136A are CDs containing true and accurate

19   excerpts of recording of calls between the Defendant and

20   various individuals."

21        MR. GASNER:   So stipulated.

22        THE COURT:   All right.   That stipulation counts as

23   evidence in the case.

24        MS. KANE:   Your Honor, at this time the Government

25   moves for admission of Exhibits 88A, 90, 90A, 135, 135A, 136,

1    and 136A including a -- pursuant to that stipulation, a second

2    stipulation that reads:  "The Government has created English

3    language transcripts for Government Exhibits 88A, 90A, 135A,

4    and 136A translating each of the excerpts of the recordings of

5    calls.  These transcripts are Government Exhibits 88, 90, 135,

6    and 136.  The transcripts provide an accurate translation from

7    the Russian language to the English language."

8        So we move for the admission of those calls and those

9    translations.

10       THE COURT:  All right.  I think first I need to --

11   give me -- it was very confusing.  You jumped around.  I need

12   the numbers again.

13       MS. KANE:  I'm sorry, Your Honor.  I just want to

14   break this up because there is a -- well, the calls -- the

15   first group of calls we will do is call -- Exhibit 88, 90, 135,

16   and 136.

17       THE COURT:  Received in evidence.

18       (Trial Exhibits 88, 90, 135 and 136 received in

19        evidence.)

20       MS. KANE:  And we move for the admission of the

21   translation of those calls which are Exhibits 88A, 90A, 135A

22   and 136A pursuant to the stipulation that they are accurate

23   translations.

24       THE COURT:  Received.

25       (Trial Exhibits 88A, 90A, 135A and 136A received in

MILLER - DIRECT / KANE

1          evidence.)

2               MS. KANE:  We also move for the admission of the call

3     89 and its translation 89A.  And that is pursuant to the

4     stipulation that it is the Defendant's call and the

5     translator's testimony today that that is an accurate

6     translation.

7               THE COURT:  Received.

8          (Trial Exhibits 89 and 89A received in evidence.)

9               MS. KANE:  Thank you, Your Honor.

10              THE COURT:  Now, just to make sure my note -- did you

11    also move for 90, 135 and 136?

12              MS. KANE:  Yes, Your Honor.

13              THE COURT:  All right.  All of that as well as the

14    little As.  Okay, got it.  All in evidence.  Thank you.

15              MS. KANE:  So we will play Exhibit 88, and we will

16    show the translation on the screen while it is playing.

17              THE COURT:  Very well.  Do that.

18                        (Pause in proceedings.)

19              MS. KANE:  We can proceed, if there is no objection,

20    just going through the transcript at this point given that the

21    original --

22              THE COURT:  What is the key point you are trying to

23    publish to the jury?

24              MS. KANE:  Well, the original is in Russian.  So

25    playing it --

1          **THE COURT:**  Well, I'm going to let you just read the

2    translation.  You read it.  You say:  Zhenya, you can write

3    here if you want to.  I can tell you the address.

4          Sasha:  I got it, Zhenya.

5          Just read it out loud and the jury can follow along on the

6    screen anyway.  That way it will get published without any

7    further ado and loss of time.

8          **MS. KANE:**  Thank you, Your Honor.

9          **THE COURT:**  But put it up on the screen so they can

10   follow along with --

11   **BY MS. KANE:**

12   **Q.**   All right.  So the call says (reading):  "Zhenya:  You can

13   write it here if you want.  I can tell you the address.

14         Sasha:  I got it, Zhenya.

15         Zhenya:  If you want to.

16         Sasha:  What do you want to tell?  The address?

17         Zhenya:  Yes, if you want to.

18         Sasha:  Wait a minute, Zhenya.  I will write it down.

19         Female speaker 1:  We won't be able to write it down.  Let

20   him send us a letter.

21         Sasha:  Zhenya, can you send us a letter?

22         Female speaker 1:  Let him send us a letter as he did in

23   Czech Republic, and we will have the return address.  Perhaps,

24   we won't be able to write it down.

25         Sasha:  I will try to ask the attorney one more time.

1        Zhenya:  I can send a letter to Kantemirovskaya Street.

2        Sasha:  Send a letter to Kantemirovskaya Street, of

3   course.  We will have the address."

4        So in this recording, who is Zhenya?

5   **A.**   The Defendant.

6             **MS. KANE:**  So let's move to Exhibit 89.

7             **THE COURT:**  I think it would help the jury to know the

8   date of that conversation so that it just doesn't float in

9   space.

10            **MS. KANE:**  Thank you, Your Honor.

11            **THE COURT:**  So please tell the jury -- let the

12  witness.  What was the date of that conversation?

13            **MS. KANE:**  The date of that conversation was

14  November 8th, 2018.

15            **THE COURT:**  Is that right?

16            **THE WITNESS:**  Yes, that's correct.

17            **THE COURT:**  All right.

18            **MS. KANE:**  This is the Exhibit 89.  The date of this

19  conversation is November 19th, 2018.

20       Can you blow it up?

21       It says (reading):  "Anya, haven't they told you anything?

22       Zhenya:  I should have got food as well.  Neither food nor

23  books and magazines arrived.  I asked to bring me computer

24  magazines.

25       Anya:  Do you even know what the time is when you call

MILLER - DIRECT / KANE

1  somebody?

2      Zhenya:  I do.  The time is okay now.  The attorneys work

3  24/7.

4      Anya:  Zhenya, who said the attorneys work 24/7?  If you

5  want everybody to work like that, it doesn't mean everybody

6  wants it.

7      Zhenya:  I hack websites 24/7.  I hacked.

8      Anya:  You hack websites?

9      Zhenya:  I hack websites (laughing).  You know what?  Can

10  you find Artemiy Nevahno on Russian social network?

11      Anya:  I know.

12      Zhenya:  Come again.

13      Anya:  I know.

14      Zhenya:  Come again.

15      Anya:  I said I know.  I know him.  We are friends on

16  Bkohtakte.

17      Zhenya:  You are?

18      Anya:  Yes."

19      It continues (reading):  "Zhenya:  Let him register an

20  American number.  I want to call him to talk.  Okay?

21      Anya:  Okay.

22      Zhenya:  I want to hack the prison here (laughing).

23      Anya:  Do you want to hack the prison?

24      Zhenya:  I want to hack the prison.  The rules here are

25  stupid.

1        Anya:  Okay.

2        Zhenya:  Can you ask to send me some magazines.  Not just

3    about cars.  About computers, about --

4        Anya:  Zhenya, call them in the evening and tell them

5    yourself."

6            **THE COURT:**  All right.  Just a second, there is a

7    reference there that you heard to the jury -- that the jury

8    heard to prison; and I need to give you an admonition that you

9    are in no way -- no way -- to draw any inference of guilt about

10   anything from that reference to prison.

11       We are here to determine whether or not the Defendant is

12   guilty of the specific crimes that are charged.  And whether in

13   the past he was ever in some prison is not evidence of any

14   guilt whatsoever.

15       So please keep that in mind during your deliberations.  Go

16   ahead.

17           **MS. KANE:**  Thank you, Your Honor.

18   **BY MS. KANE:**

19   **Q.**   In the recording for which this is the translation, who is

20   Zhenya?

21   **A.**   Again, that's the Defendant.

22   **Q.**   And we saw a reference to a Russian social network in that

23   translation.  Are you familiar with that Russian social

24   network?

25   **A.**   I am.

MILLER - DIRECT / KANE

1   **Q.**   And what is it called --

2   **A.**   The short version is vk.com, and it is very similar to

3   Facebook but the Russian equivalent.

4   **Q.**   Do you know who the Defendant was speaking with in Exhibit

5   89 --

6   **A.**   Yes.

7   **Q.**   -- that I just read, the person identified as Anya?

8   **A.**   Yes.

9   **Q.**   And who is it?

10  **A.**   Anya Shvedova.

11  **Q.**   How do you know that?

12  **A.**   Based on contact lists with these proceedings.

13  **Q.**   All right.  Now I would like to move to Exhibit 90.

14               (Pause in the proceedings.)

15          **THE COURT:**  Okay.  What is the question?

16          **MS. KANE:**  I'm waiting for it to come up, Your Honor.

17          **THE COURT:**  All right.

18                 (Pause in proceedings.)

19          **MS. KANE:**  This is another translation of a recorded

20  call from November 29th, 2018.

21      It says (reading):  "Zhenya:  I would like to have more

22  magazines.

23      Male speaker 2:  Okay, Zhenya.  We will tell the attorneys

24  to give you more magazines.

25      Zhenya:  Computer ones.  I mean about technology.  I don't

**MILLER - DIRECT / KANE**

1   know how to put it right, hi-tech.

2        Zhenya:  As to the books, I would like science fiction and

3   high-tech magazines.

4        Male speaker 2:  High-tech, okay, Zhenya.

5        Zhenya:  I don't know, about computers.  About what

6   happens in the modern world.

7        Male speaker 2:  Okay, Zhenya.  I will call him today."

8        And again in this call, who is Zhenya?

9   **A.**   The Defendant.

10  **Q.**   And male speaker 2 addresses the Defendant as Zhenya and

11  Zhenya responds; is that right?

12  **A.**   That's correct.

13  **Q.**   All right.  Let's do Exhibit 135.  This is a recording

14  from September 30th, 2019.

15       It says (reading):  "Male speaker 1:  Hello.

16  Male speaker 2:  Hello.

17  Male speaker 1:  Hello.  Good day.

18  Male speaker 2:  Good day.

19  Male speaker 1:  Is this a book store?

20  Male speaker 2:  Yes, yes.

21  Male speaker 1:  I would like to know if you have a

22  Russian magazines in your store, if you have any interesting

23  magazines, I don't know, about women, about computers, about

24  what's going on in the world around."

25       That's all we need to read for that one.  And let's do

1    Exhibit 136 -- I'm sorry.  In the call that we just read, who

2    was male speaker 1?

3    **A.**   The Defendant.

4    **Q.**   And how do you know that?

5    **A.**   I have heard his voice before in these proceedings.

6    **Q.**   And that was the person that was asking for magazines?

7    **A.**   Yes, the high-tech magazines, computer magazines.

8    **Q.**   Exhibit 136.  This is a call from October 13, 2019.

9    (Reading):

10        "Male speaker 1:  Hello.

11        Male speaker 2:  Hello.

12        Male speaker 1:  Hi.

13        Male speaker 2:  Hi.

14        Male speaker 1:  This is Zhenek Evgeniy.

15        Male speaker 1:  You know where to go?

16        Male speaker 2:  Where?

17        Male speaker 1:  Now, vashakniga.com.

18        Male speaker 2:  Vashakniga.com.

19        Male speaker 1:  Do they have any interesting magazines?

20        Male speaker 2:  What kind of magazines are you interested

21    in?  Medicine, arts, Jewish world --

22        Male speaker 1:  How about girls, bikes, something

23    interesting, computers.

24        Male speaker 2:  They have hobbies and recreation,

25    programming and computers.

**MILLER - DIRECT / KANE**

1       Male speaker 1:  What's there?

2       Male speaker 2:  Databases, hardware, various sections,

3  operating systems, application suites, applications, networks,

4  communication.

5       Male speaker 1:  I am talking about some interesting

6  magazines (chuckles).

7       Male speaker 2:  They are shown by topics here so you

8  select, networks and communications.

9       Male speaker 1:  Are there any with girls?  What's going

10  on in the world, new cell phones.

11       Male speaker 2:  Now.

12       Male speaker 1:  What's new in high-tech in general.

13       Male speaker 2:  Uh-huh, just a second.  How do you search

14  here?  I can't figure it out.

15       How do you select them by topics?

16       Male speaker 1:  I don't have internet here.  I do have a

17  communicator but I can't go online.  Even though it must open a

18  browser.

19       Male speaker 2:  Uh-huh.

20       Male speaker 1:  But there is no connection.

21       Male speaker 2:  But you can ask them, like high-tech.

22       Male speaker 1:  I can ask the guards but I don't want to

23  ask them.

24       Male speaker 2:  I understand.  I don't know.  This is a

25  stupid website.  I select -- I can only select children's book,

**MILLER - DIRECT / KANE**

1   family, Jewish world by category.

2       Male speaker 1:  But are there any magazines?

3       Male speaker 2:  Books, audiobooks.

4       Male speaker 1:  I don't have here player.  I would listen

5   to the radio, audiobooks."

6       There is some designations there U/A which means

7   unintelligible.

8       "Male speaker 2:  Unintelligible."

9       **THE COURT:**  No.  You left out:  "Male speaker 1:  Like

10  around the world, behind the wheel, various magazines."

11      **MS. KANE:**  That was the next line I was going to read.

12  I was just reading the one above it, male speaker 2 had an

13  unintelligible response.

14      And then male speaker 1 responds (reading):  "Like around

15  the world, behind the wheel, various magazines.

16      Male speaker 2:  Products.  It's done so badly.  I will

17  not check.

18      Male speaker 1:  I asked the attorney to bring something.

19  She did not send anything.

20      Male speaker 2:  Now, wait a second.  There are magazines.

21      Male speaker 1:  Well --

22      Male speaker 2:  I think it's High Tech Pro.

23      Male speaker 1:  What's there?

24      Male speaker 2:  It's about multimedia and stuff, about

25  new things.

1          Male speaker 1:  High Tech Pro, okay.

2          Male speaker 2:  Now, I will have a look.

3          Male speaker 1:  I will ask the attorney to order.  Have

4    you seen the new iPhone?

5          Male speaker 2:  Yes, it looks like a bucket.

6          Male speaker 1:  Yes, I think so too with three --

7          Male speaker 2:  With square.

8          Male speaker 1:  What do they -- three --

9          Male speaker 2:  One is wide angle.  The second one is

10   super wide angle, and the third one is to take pictures in the

11   darkness."

12         THE COURT:  Is that all on that exhibit or is there

13   more?

14         MS. KANE:  That is the end.

15         THE COURT:  I need to give another admonition to the

16   jury.  There were references there to guards.  And, again, I

17   tell you any information that the Defendant was ever in custody

18   or in prison is irrelevant to your decision.  It is not

19   evidence of guilt.

20         The fact that he wants to see magazines with girls or

21   high-tech, I don't see the relevance of that, Ms. Kane.  I

22   don't know why you are even putting this before the jury.

23         So I -- we are going to have a conversation about that.

24   Maybe you could just tell them:  Why is it relevant?  What is

25   the relevance of what we just saw other than to put before the

 1   jury the thing about the guards?

 2          MS. KANE:  Your Honor, I'm happy to discuss the legal

 3   relevance of the evidence.  Do we want to do that now or should

 4   I continue with Special Agent Miller's testimony and perhaps --

 5          THE COURT:  Go ahead and continue, but I want to tell

 6   this jury the fact that he was ever in custody or ever in

 7   prison or had guards is not relevant, and you cannot consider

 8   that in determining whether he is guilty.

 9      You got to go with the real evidence in the case, if there

10   is any, before -- you can't rely on something like that.  Go

11   ahead.

12          MS. KANE:  Thank you, Your Honor.  We can take this

13   down.

14   BY MS. KANE:

15   Q.   Let's move on to your investigation.  Before we broke, we

16   looked at records you obtained from a company called

17   Afraid.org.  And the name on the account that we saw was

18   Zopaqwel or Z-O-P-A-Q-W-E-1, and that was for an account in the

19   name -- in the e-mail address of chinabig01@gmail.com.

20      Did you use that Zopaqwel name as a lead in your

21   investigation?

22   A.   Yes, I did.

23   Q.   And did you identify any other accounts associated with

24   that name?

25   A.   Yes, I did.

**MILLER - DIRECT / KANE**

1   **Q.**   And what account was that?

2   **A.**   Sure.  Because the name was fairly unique, I conducted a

3   Google search and found a kongregate.com profile with the same

4   username.

5   **Q.**   What is Kongregate?  And that's spelled with a K,

6   K-O-N-G-R-E-G-A-T-E; is that correct?

7   **A.**   That's correct.  It is an online gaming website.

8   **Q.**   How did you identify an account with Kongregate?

9   **A.**   Again, I had the unique Zopaqwel username and a quick

10  Google search displayed the results.

11  **Q.**   Okay.  Did you request subscriber records from Kongregate?

12  **A.**   I did.

13  **Q.**   I would like you to look at Exhibits 48 and 137.  Do you

14  recognize those exhibits?

15  **A.**   Yes, I do.

16  **Q.**   What are they?

17  **A.**   137 is the certificate of authenticity confirming these

18  are business records for Kongregate, and Exhibit 48 is the

19  subscriber data I received from Kongregate for that account.

20          **MS. KANE:**  We would like to move to admit Exhibit 48.

21          **MR. GASNER:**  Submitted.

22          **THE COURT:**  Received in evidence.

23       (Trial Exhibit 48 received in evidence.)

24          **MS. KANE:**  Can we show exhibit 48.

25  \\\

```
 1   BY MS. KANE:
 2   Q.   All right.  So we are looking at a spreadsheet here.  What
 3   is this?
 4   A.   These are the -- I believe these are the payment records
 5   associated with that Kongregate account for Zopaqwel1.
 6   Q.   And there are dates in the created date/time column.  Can
 7   you give us the date range of these records?
 8   A.   Yes.  They span July 11th, 2012, through August 21st,
 9   2012.
10   Q.   And have you ever seen the Kongregate website?
11   A.   Yes, I have.
12   Q.   And what would someone pay for on the Kongregate website?
13   A.   To play video games.
14   Q.   In the credit card number column -- that is column X --
15   there is a string of numbers with some asterisks in the middle.
16   And what are -- what does that represent?
17   A.   That represents a masked credit card number.
18   Q.   So what do you mean by masked?
19   A.   For security reasons some companies don't maintain the
20   entire number.  They block out a section in the middle or at
21   the front.
22   Q.   And what are the last four digits of the credit card
23   number there?
24   A.   0405.
25           MS. KANE:  Now, let's look at the other spreadsheet in
```

 1   this exhibit.

 2                    (Pause in the proceedings.)

 3            **MS. KANE:**  We will come back to Exhibit 48.

 4   BY MS. KANE:

 5   **Q.**   I would like you to look at Exhibit 142A, please.  Do you

 6   recognize that?

 7   **A.**   Yes, I do.

 8   **Q.**   What is it?

 9   **A.**   This is a summary of IP overlap.

10   **Q.**   And what do you mean by IP overlap?

11   **A.**   So in these types of investigations I try to build a

12   history of IP addresses for various accounts and relate them to

13   the intrusions.  And in this case this is IP history for

14   Dropbox as well as a Skype account.

15   **Q.**   Okay.  And is that a summary that you created?

16   **A.**   Yes, it is.

17   **Q.**   Does it also -- well, you know, let's come back to that

18   because -- we will have to come back to those Kongregate

19   records.

20        Let's go to Exhibit 19A, which we will pull up on the

21   screen here.  We previously discussed this.

22        So before the break you were testifying about Exhibit 19A,

23   and you testified that this was a summary that you created from

24   Formspring records.  Do you remember that?

25   **A.**   Yes.

1   Q.   And can you describe how you created it?

2   A.   Yes.  I would take the records from the various logs and

3   combine them into one.

4   Q.   So which logs did you use to create this one?

5   A.   I believe there is a column to the right that would say.

6   Q.   Can we scroll across?

7                     (Pause in proceedings.)

8          MS. KANE:  All the way across, the other way.

9                     (Pause in proceedings.)

10  BY MS. KANE:

11  Q.   There is an account column there?

12  A.   Yes.

13  Q.   And what does that show?

14  A.   This shows the various log files or records that contain

15  that IP address involved in the Formspring intrusion.

16  Q.   All right.  So you previously testified about Formspring

17  logs, LinkedIn logs, and Dropbox logs.  Are those what you used

18  to create the summary?

19  A.   That's correct.

20  Q.   So let's go back to the first column and look at

21  exhibits -- look at lines 1 through 7.

22       And exhibits -- in lines 1 through 7 show entries from

23  June 4, 2012, through June 13th, 2012; is that right?

24  A.   That's correct.

25  Q.   Okay.  And they all have the same IP address ending in .0;

MILLER - DIRECT / KANE

1    is that right?

2    **A.**    Yes.

3    **Q.**    Now looking over the account tab, which shows the source

4    you used, the first one is the Formspring log; is that right?

5    **A.**    Yes.

6    **Q.**    And that shows an entry on the Formspring log from that IP

7    address?

8    **A.**    That's correct.

9    **Q.**    The second two show LinkedIn consumer account login; is

10   that right?

11   **A.**    Yes.

12   **Q.**    And that shows in the IP address column the same IP

13   address, and then what is the action column reflect?

14   **A.**    That is the browser cookie for the LinkedIn login.

15   **Q.**    Was that one of the two browser cookies that you linked to

16   the compromises?

17   **A.**    Yes, it is.

18   **Q.**    Then lines 5 and 6 say Dropbox employee tony@dropbox .com

19   for the account.  Is that the source of the information?

20   **A.**    Yes, it is.

21   **Q.**    So it was the Dropbox logs we looked at previously; right?

22   **A.**    That's correct.

23   **Q.**    And then the action, what does that say?

24   **A.**    Access activity.

25   **Q.**    And that's from the same IP address; is that right?

1    **A.**    Yes.

2    **Q.**    And then line 7 says formspringsecure.organize.  What does

3    that refer to?

4    **A.**    A Formspring log.

5    **Q.**    That is the source of the information in line 7?

6    **A.**    Yes.

7    **Q.**    And that shows on June 13th, 2012, from the same IP

8    address an action.  And what is that action?

9    **A.**    Webmin -- and a number -- successful login as jsanders

10   from 178.177.28.0.

11   **Q.**    Okay.  Let's go down to line 2307.  And this shows an

12   entry from June 14th, 2012; is that right?

13   **A.**    Yes, it is.

14   **Q.**    And, again, if we can show the source columns for the

15   entries there on June 14th, what is the source of that

16   information?

17   **A.**    A Formspring log.

18   **Q.**    Okay.  And it looks like the next two come from LinkedIn

19   consumer account login records.  Is that the LinkedIn

20   spreadsheets we were looking at earlier today?

21   **A.**    Yes, it is.

22   **Q.**    And let's look at the action in the beginning.

23        All right.  So we are looking at this LinkedIn consumer

24   account login as the source.  And then on June 15th, what does

25   it show in the action?

1  **A.**   The same browser cookie ending in 7082.

2  **Q.**   And also on June 16th; is that right?

3  **A.**   That's correct.

4  **Q.**   Okay.  And then we show entry on the source column for

5  Dropbox employee tony@dropbox.com and here for June 16th in

6  that line it says "access activity" in the action column.

7       So did that information come from the Dropbox logs?

8  **A.**   Yes, it did.

9  **Q.**   And the next two show on June 16th and 17th something from

10  a LinkedIn consumer account login for a different member ID

11  than we have previously been looking at.  Is that also from the

12  LinkedIn spreadsheets we looked at earlier?

13  **A.**   Yes, it is.

14  **Q.**   And what does that show in the action column?

15  **A.**   The same browser cookie ending in 7082.

16  **Q.**   And going back to the entry at 2307 for June 14th, 2012,

17  in the action column, what does it say there?

18  **A.**   Get/jsanders/test/madnez.php.  And there is some more.

19  **Q.**   And that comes from the Formspring logs; right?

20  **A.**   That's correct.

21       **MS. KANE:**  Your Honor, if I may have just a moment

22  here.

23                    (Pause in proceedings.)

24  BY MS. KANE:

25  **Q.**   All right.  I want to go back to Formspring.

 1           We discussed the posting of Formspring data earlier today.

 2           And you said that you had seen a website, a forum, where

 3     the data had been posted and that was what began your

 4     investigation of Formspring; is that right?

 5     A.   That's correct.

 6     Q.   Did you ever find any evidence of that data being sold?

 7     A.   Yes, I did.

 8     Q.   And when -- when was that?

 9     A.   The sale of the data in particular was about September of

10     2012.

11     Q.   And how did that come up in your investigation?

12     A.   I saw references to it in a related investigation.

13     Q.   Okay.  Did you review e-mail records for an individual

14     using the e-mail address fyo -- F-Y-O -- fyofyofyo@hotmail.com?

15     A.   Yes, I do.

16     Q.   And I would like you to look at Exhibits 20 and 147.

17     A.   I have 147.  You said 20.

18              THE COURT:  I think she said 21 and 147.

19              MS. KANE:  20 and 147.

20              THE WITNESS:  I have 147.

21              MS. KANE:  Okay.

22                      (Pause in proceedings.)

23     BY MS. KANE:

24     Q.   What is Exhibit 147?

25     A.   147 is the declaration of authentication of business

**MILLER - DIRECT / KANE**

1  records, so the certification from Microsoft for a search

2  warrant.

3  **BY MS. KANE:**

4  **Q.**   All right.  We will come back to this.

5                      (Pause in proceedings.)

6  **BY MS. KANE:**

7  **Q.**   Let's turn then to after the Formspring intrusion.

8  Continuing into 2013, did you become aware of a potential

9  computer intrusion at a company called Automattic?  And that's

10  spelled A-U-T-O-M-A-T-T-I-C.

11  **A.**   Yes, I did.

12  **Q.**   And what is Automattic?

13  **A.**   Automattic is the parent company of Wordpress, and

14  Wordpress is software that allows you to customize website

15  content and display web pages.

16  **Q.**   And when did you have occasion to become aware of a

17  potential intrusion there?

18  **A.**   In about November of 2013.

19  **Q.**   And what did you do?

20  **A.**   I interviewed Barry Abrahamson.

21  **Q.**   Who is Barry Abrahamson?

22  **A.**   He was an employee at Automattic.

23  **Q.**   And did you obtain any records from Automattic?

24  **A.**   Yes, I did.

25  **Q.**   I would like you to look at Exhibits 16 and 153 and also

MILLER - DIRECT / KANE

```
 1   17 and 17A.
 2                   (Pause in proceedings.)
 3   BY MS. KANE:
 4   Q.   Do you recognize these?
 5   A.   Yes, I do.
 6   Q.   What are they?
 7   A.   Exhibit 16 are log files provided by Automattic.  Exhibit
 8   153 is the certificate of authenticity of those records from
 9   Automattic.
10   Q.   And that's referring to the business records?
11   A.   The business records, that's correct.
12   Q.   Okay.
13   A.   And Exhibit 17 is Automattic IP summary.
14            THE COURT:  7 what?
15            THE WITNESS:  17.
16            THE COURT:  17?
17            THE WITNESS:  Yes, Your Honor.
18            THE COURT:  And that was what?  The summary that you
19   did or --
20            THE WITNESS:  The summary that I created, yes.
21   BY MS. KANE:
22   Q.   And is that a summary that you created based on the
23   records provided by Automattic?
24   A.   Yes, it is.
25   Q.   And are the records that were provided by Automattic
```

 1  voluminous?

 2  **A.**   Yes, they were.

 3  **Q.**   So those are computer logs of potential intrusions?

 4  **A.**   Yes.

 5  **Q.**   All right.  And what is 17A?

 6  **A.**   17A takes those IP addresses from the log files and

 7  compares them against other IP addresses for accounts in the

 8  case or other victims.

 9  **Q.**   So 17 is the summary of the Automattic logs and 17A

10  combines -- is a summary of those logs and a summary of other

11  logs in the case; is that right?

12  **A.**   Yes, just like the logs we just saw.

13       **MS. KANE:**  United States moves to admit Exhibits 17

14  and 17A.

15       **MR. GASNER:**  Submitted.

16       **THE COURT:**  Received in evidence.

17     (Trial Exhibits 17 and 17A received in evidence.)

18       **MS. KANE:**  Let's show Exhibit 17A.

19  **BY MS. KANE:**

20  **Q.**   So we are going to look at 17A here.  Let's look at the

21  tab that ends in .156.  So you just testified that this was a

22  summary you created of the records from Automattic and other

23  records we have looked at previously today; is that right?

24  **A.**   That's correct.

25  **Q.**   So let's look at lines 30 through 41.

1            **THE COURT:**  I have got an error code on my screen.  Is

2    there an error code on the jury's?  Okay.  Good.  It doesn't

3    matter for me then.  Please continue.

4    **BY MS. KANE:**

5    **Q.**   So if we could go to the top so we can see the column

6    names, please.

7            So on the left we have date and then we have IP address

8    and then we have account and then we have usage count.

9            In the account column can you explain what that shows,

10   just generally?

11   **A.**   Sure.  That would be the log file or location where I

12   found that IP address.

13   **Q.**   So then if we can -- if we are looking at lines 30 through

14   41, for line 30, it says Automattic log file.  And it has an IP

15   address that ends in .156.  In all of the entries on this page

16   have the same IP address; right?

17   **A.**   That's correct.

18   **Q.**   And then looking at line 31, it says Automattic dzver.

19   What is dzver?

20   **A.**   That is a username for an Automattic employee.

21   **Q.**   And that came from the Automattic records that they

22   provided you?

23   **A.**   Yes, it did.

24   **Q.**   And what does that entry reflect?

25   **A.**   That reflects logins to that account and in the usage

 1   column at 6, there were six logins to that dzver account using

 2   that .156 IP on that day.

 3   **Q.**   And you are looking at line 33?

 4   **A.**   Yes.  Sorry.

 5   **Q.**   July 18th, 2013?

 6   **A.**   Yes.

 7   **Q.**   On line 32, it has a similar entry but it says jrtashjian,

 8   J-R-T-A-S-H-J-I-A-N.  Do you recognize that?

 9   **A.**   Yes, I do.

10   **Q.**   And what is that name?

11   **A.**   That is another Automattic employee user ID or username.

12   **Q.**   And that comes from the Automattic records?

13   **A.**   Yes, it does.

14   **Q.**   Is that also true for the entry on July 18, 2013, where it

15   says George Stephanis, S-T-E-P-H-A-N-I-S?

16   **A.**   Yes.

17   **Q.**   Now, continuing there is an entry that says vimeo

18   chinabig01@gmail.com.  What does that reflect?

19   **A.**   That reflects the IP addresses contained in the previously

20   talked about Vimeo records for the chinabig01@gmail.com

21   account, and you will see there are 16 logins from that IP

22   address from that Vimeo account on that day.

23   **Q.**   And the next line, line 36, shows Google

24   chinabig01@gmail.com.  What does that mean?

25   **A.**   That would be logins to the Google account for

1   chinabig01@gmail.com, which would be four for that day.

2   **Q.**   And then continuing, there are additional entries

3   reflecting the user names you previously discussed for

4   Automattic employees also on July 18th and July 19th of 2013;

5   is that right?

6   **A.**   That's correct.

7   **Q.**   Now, we can look at the tab that says .68.

8        And this has the same columns as the previous tab;

9   correct?

10  **A.**   Yes.

11  **Q.**   Let's look at lines 37 to 44.  On line 37, we see an entry

12  for July 29th, 2013, from an IP address that ends in .68.  And

13  all of the entries on this page have that same IP address;

14  right?

15  **A.**   That's correct.

16  **Q.**   That says Automattic log file.  What does that reflect?

17  **A.**   That IP address was found in an Automattic log file that

18  was provided to me.

19  **Q.**   And then continuing to line 38 on July 29th, 2013, it says

20  Automattic pyhhak -- P-Y-H-H-A-K -- personal-SSH log.  What

21  does that reflect?

22  **A.**   That reflects a login into that username pyhhak, who was

23  also an Automattic employee, their account.

24  **Q.**   And there is an identical entry again on July 29th.  And

25  then the next line is line 40.  There is an entry that says

1  Google chinabig01@gmail.com.  What does that show?

2  **A.**   That shows a login from the Google account for

3  chinabig01@gmail.com from that IP address on that day.

4  **Q.**   The same day as the login to the Automattic employee's --

5  **A.**   That's correct.

6  **Q.**   Let's move to the next tab, 54.

7        **THE COURT:**  We are going to have to break in about 30

8  or 40 seconds.  It is almost 2:00 o'clock.

9        **MS. KANE:**  All right, Your Honor, would you like me to

10  ask a couple more questions?

11        **THE COURT:**  If you can finish the subject in two more

12  questions, sure.

13  **BY MS. KANE:**

14  **Q.**   Well, here, we have the same column; is that right.

15  **A.**   Yes.

16  **Q.**   If we look at line 28, there is an entry for July 13th,

17  2013, from an IP address that ends in .54.  And it says

18  Google-chinabig01@gmail.com; is that right?

19  **A.**   That's correct.

20  **Q.**   And that comes from the Google logs that you discussed

21  earlier?

22  **A.**   Yes, it does.

23  **Q.**   And then continuing July 14th, 2013, there are a number of

24  entries for Automattic log files.  What does that show?

25  **A.**   That shows that IP being used and captured in an

1  Automattic log file.

2  **Q.**   So that's the same IP address logging into the Google

3  chinabig01@gmail.com account according to the Google records

4  and then logging into the Automattic system according to the

5  Automattic records?

6  **A.**   That's correct.

7          **MS. KANE:**  There is one more tab, Your Honor.  Would

8  you like me to continue or should we stop?

9          **THE COURT:**  No.  It is 2:00 o'clock.  It is time for

10  the jury to be let go.  We will pick it up there in the

11  morning.

12      I want to let the jury know a couple of things.  Miss --

13  just a minute -- don't tell me -- Ms. Woodrow, you asked about

14  what time the jury could come when you begin deliberating.  And

15  it's slightly complicated, but I will give you the short

16  version.  It is 7:00 a.m.

17      I need to work with the lawyers to make sure and see how

18  early everyone can get here; but tentatively I'm going to say

19  7:00 a.m., but everyone -- all jurors have to be present

20  whenever you begin deliberating.  You can't start deliberating

21  with 6 or 7 of you here.  It has to be everybody.  But we are

22  not there yet.

23      I had thought we might be close to finishing the evidence

24  today.  I don't think so.  How much more do you have with this

25  witness?

1          **MS. KANE:**  Your Honor, I have a couple more topics to

2     cover with him.

3          **THE COURT:**  Is it more than an hour?

4          **MS. KANE:**  Maybe a little more.

5          **THE COURT:**  How much cross-examination do you think?

6          **MR. GASNER:**  Your Honor, I'm not positive but I would

7     say somewhere between 60 and 120 minutes.

8          **THE COURT:**  Did you say 60 to 120?  You mean like one

9     to two hours; right?

10         **MR. GASNER:**  Yes, sir.

11         **THE COURT:**  Well, there is a chance then we will have

12    the closing arguments tomorrow and the case would go to you.

13    I'm not going to let the lawyers talk me into further delays on

14    the closing arguments.  So we will start with those as soon as

15    we can.  And -- so the case might go to you tomorrow for

16    decision.  But if not, I'm pretty sure it will go on Thursday.

17         All right.  Now, remember the admonition.  No talking

18    about the case with anybody.  It will be your duty to talk

19    about it when you begin to deliberate but not yet.

20         Hold your horses.  I will see you back here tomorrow as

21    early as say 8:30, please.  Thank you.

22         (Proceedings were heard outside the presence of the jury:)

23         **THE COURT:**  Have a seat.  I have a 2:00 o'clock

24    criminal calendar that I'm already late for.

25         But I want to ask you the question, Ms. Kane, on that last

1  jail call, I don't see any probative value for you in that --

2  and I did see some prejudice for you laying that before the

3  jury on the last jail call where he is asking for girl

4  magazines and computer magazines.

5      There is a little bit of talk about the new iPhone and how

6  the guards won't let him do this; the guards won't let him do

7  that.  Why did you possibly want that in evidence other than to

8  prejudice the Defendant?

9      **MS. KANE:**  Your Honor, there was a consistent theme

10  throughout the calls -- that was demonstrated across several

11  calls of the Defendant's interest in high-tech topics and

12  computers, and that was the relevance of that call.

13      **THE COURT:**  All right.  So --

14      **MS. KANE:**  We provided --

15      **THE COURT:**  That would then point the finger at guilt

16  at about a billion people on earth who happen to be interested

17  in high-tech and computers -- and for that matter -- girls.

18  And to me if that's evidence of guilt, then God help us in this

19  country.  That's terrible.

20      That -- and the one that you had where he said "I hacked

21  24/7," okay.  That was good evidence.  I'm not saying that he

22  was guilty, but that's a propensity to hack.  That's fine.  No

23  problem there.  But the last one I feel is so far -- so lacking

24  in any probative value and so obviously prejudicial that you

25  should not have used it.  That's my opinion.

1      I'm not -- I'm leaving it in evidence.  I think it is

2   going to backfire on you.  This jury is going to say what kind

3   of case does the Government have if that's what they have to

4   resort to.  So you may wind up losing this case because of

5   stunts like that.

6      That's my opinion.

7           MS. KANE:  Your Honor, we did provide these

8   translations and recording to the Defense and notified them of

9   the clips that we intended to use, and there was no objection

10   to the validity of the translation or the clips.

11           MS. NECHAY:  Your Honor, I would just like to briefly

12   respond to that.  We did challenge the relevance to the

13   Government, but it is not our decision how they proceed with

14   their case but that issue was raised.

15           THE COURT:  Okay.  We got to have a charging

16   conference tomorrow.  We are going to start -- you are not

17   going to talk me into putting these closings off until

18   Thursday.  So be ready to do your closings tomorrow on both

19   sides.  We may not finish them.  We may have to stop

20   mid-stream, but we have a fighting chance to get a verdict this

21   week; and I'm not giving that up if there is any substantial

22   time left on the clock tomorrow.

23           MS. KANE:  Your Honor, we --

24           THE COURT:  Wait.  Are you going to argue with me on

25   this?  You wanted to be able to do your closings on Wednesday

1   and I gave you that.

2           MR. GASNER:  You did, Your Honor.

3           THE COURT:  I'm not giving you Thursday.

4           MR. GASNER:  I'm not arguing that.  I'm arguing to

5   readdress that issue tomorrow afternoon because what I do not

6   want to occur -- I will be prepared to go tomorrow, I promise.

7   What I do not want to see is where the Government goes first.

8   I go second.  We run out of time.  And then we move to Thursday

9   anyway for rebuttal.

10      I would prefer to see what the timing looks like when we

11  get there.  And I just want to address that concern.  But I

12  otherwise will be ready to go.  Thank you, Your Honor.

13          THE COURT:  Well, I will let you address that point if

14  that scenario unfolds.  Let me ask you a different question.

15  How much do you-all think you need for closing argument here,

16  counting rebuttal?

17          MS. WAWRZYNIAK:  I would estimate, Your Honor, two

18  hours for the Government if the -- for further argument, plus

19  rebuttal.

20          MR. GASNER:  I have been known to underestimate,

21  Your Honor, on this question; but I don't think I will go over

22  an hour.  I don't intend on -- given the amount of witnesses we

23  have had in this case, which actually has not been that many, I

24  don't suspect I will go more than an hour.  Probably less.

25          THE COURT:  Okay.  I'm probably going to let the

**PROCEEDINGS**

1   Government have a total of two hours because -- because I must

2   say, I think the evidence has come in a haphazard, hard to

3   follow way; and maybe you can make some sense out of it in the

4   closing argument.

5        I see -- I don't see much evidence -- I see that there was

6   intrusions.  I don't see a lot of evidence that this particular

7   Defendant is the one that did it, though, maybe the scales will

8   fall from my eyes when I hear your brilliant summation.

9        I don't know.  So I'm -- I think you need the time.  I'm

10  going to give you two hours, but that includes your rebuttal

11  time.  So don't -- you know, you need to save some time for

12  your rebuttal.

13       Okay.  I will see you at 8:30 in the morning unless you --

14  if you send me an e-mail that you need me sooner, I guess I

15  could try to be here sooner.  But you said 8:00 o'clock this

16  morning.  I was here at 8:00 o'clock but nobody was here.

17            **MR. GASNER:**  No, Your Honor.  We were here.

18            **THE COURT:**  We came down here.  No one was here.

19            **MR. GASNER:**  I was sitting outside.

20            **THE COURT:**  Okay.  Well --

21            **MR. GASNER:**  Outside of the courtroom.

22            **THE COURT:**  Next time I'm telling my law clerks to use

23  their X-ray vision and to look through the wall to see if they

24  were there.

25            **MARSHAL:**  I saw them here.

1          **MR. GASNER:**  We got a witness, and we were chatting

2   with your friendly porter as well about his cleaning.

3          **THE COURT:**  All right.  All right.  All right.

4          **MR. GASNER:**  Your Honor, can we just get a timing on

5   when we should expect to do this charging conference?

6          **THE COURT:**  8:30 in the morning.

7          **MR. GASNER:**  First thing?

8          **THE COURT:**  Yeah.

9          **MS. KANE:**  We did submit joint instructions.

10         **THE COURT:**  What I submitted to you is very close to

11  what you submitted to me with some of my normal add-ons.

12         **MS. KANE:**  I was just going to say there was nothing

13  that came up with the Government in the course of trial -- we

14  don't have any additional instructions to add.

15         **THE COURT:**  I want to -- yes, I think that's correct.

16  However, do we need a 404(b) instruction, for example?  Think

17  about that.  All right.

18         **MR. GASNER:**  All right.

19         **THE COURT:**  See you tomorrow.

20         **MS. KANE:**  Thank you, Your Honor.

21              (Proceedings adjourned at 2:07 p.m.)

22                      ---oOo---

23

24

25

**CERTIFICATE OF REPORTER**

    I certify that the foregoing is a true and correct transcript, to the best of my ability, of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above-entitled matter.

    I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.


DATE:   Tuesday, July 7, 2020




_Marla Knox_
_____

Marla F. Knox, RPR, CRR, RMR
United States Court Reporter