**Volume 6**

**Pages 539 - 699**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
  VS.                              )          **NO. CR 16-00440 WHA**
                                   )
YEVGENIY ALEKSANDROVICH            )
NIKULIN,                           )
                                   )
            Defendant.             )
_____   )

San Francisco, California
Wednesday, July 8, 2020

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES:</u>**

For Plaintiff:
                    DAVID L. ANDERSON
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            **BY:  KATHERINE L. WAWRZNIAK**
                  **MICHELLE J. KANE**
                  **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                    LAW OFFICE OF ADAM GASNER
                    345 Franklin Street
                    San Francisco, California  94102
            **BY:  ADAM GASNER**
                  **VALERY NECHAY**
                  **ATTORNEYS AT LAW**

Interpreters:       Maria Entchevitch and Marina Brodskaya

Reported By:  Marla F. Knox, RPR, CRR, RMR
              United States Official Court Reporter

## I N D E X

Wednesday, July 8, 2020 - Volume 6

<u>**GOVERNMENT'S WITNESSES**</u>       <u>**PAGE**</u>  <u>**VOL.**</u>

<u>**MILLER, JEFFREY (RECALLED)**</u>
(PREVIOUSLY SWORN)                555   6
Direct Examination resumed by Ms. Kane   555   6
Cross-Examination by Mr. Gasner       679   6

## E X H I B I T S

<u>**TRIAL EXHIBITS**</u>      <u>**IDEN**</u>  <u>**EVID**</u>  <u>**VOL.**</u>

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 19B | | 674 | 6 |
| 21A | | 622 | 6 |
| 21B | | 622 | 6 |
| 21C | | 622 | 6 |
| 21D | | 622 | 6 |
| 21E | | 622 | 6 |
| 21F | | 640 | 6 |
| 22A | | 622 | 6 |
| 22B | | 622 | 6 |
| 25 | | 637 | 6 |
| 25A | | 637 | 6 |
| 32C | | 674 | 6 |
| 66D | | 643 | 6 |
| 66A | | 645 | 6 |
| 68 | | 668 | 6 |
| 70 | | 668 | 6 |
| 71A | | 644 | 6 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 72 | | 646 | 6 |
| 76A | | 660 | 6 |
| 76B | | 660 | 6 |
| 113A | | 557 | 6 |
| 120 | | 621 | 6 |
| 120A | | 621 | 6 |
| 124A | | 674 | 6 |
| 124B | | 674 | 6 |
| 128 | | 623 | 6 |
| 142A | | 590 | 6 |
| 143I | | 594 | 6 |
| 143E | | 596 | 6 |
| 143F | | 596 | 6 |
| 143J | | 607 | 6 |
| 143K | | 607 | 6 |
| 143D | | 617 | 6 |
| 148 | | 609 | 6 |
| 149 | | 611 | 6 |
| 150 | | 611 | 6 |
| 152B | | 630 | 6 |
| 152C | | 630 | 6 |

PROCEEDINGS

1   <u>**Wednesday - July 8, 2020**</u>                          <u>**8:33 a.m.**</u>

2                   <u>**P R O C E E D I N G S**</u>

3                      **---000---**

4        (Proceedings were heard outside the presence of the jury:)

5        **THE COURT:**  The Defendant is here.  All Counsel are

6    present, and it's the -- it's about 8:32 a.m.  The jury is, of

7    course, not present right now.  And we need to go over these

8    jury instructions as well as the special verdict form.

9        Before I forget it, though, it occurred to me last night

10   about the closing arguments; that one scenario we cannot have

11   that would be unfair would be for the Government to reserve for

12   rebuttal even more time than the Defense takes in its closing

13   so you can't do that.  You have to front load your argument,

14   not backload it.

15       So what I'm going to do is -- you still have the two hours

16   subject to one limitation on rebuttal.  You cannot take more

17   time than the Defense took in total for its argument.

18       So if the Defense takes 15 minutes, you get a 15-minute

19   rebuttal even if you have more time left on the clock.  If the

20   Defense takes an hour, then you get up to an hour depending on

21   how much time you saved from your two hours.

22       So, in other words, it is sandbagging to take more time

23   than the Defense takes.

24       **MS. KANE:**  Yes, Your Honor.

25       **THE COURT:**  All right.  That's the only thing I got on

1    that topic.

2         Another topic that I have is I want to make sure that the

3    lawyers are good with what is in evidence and not in evidence.

4         Now, I keep pretty good notes.  The Clerk's notes are the

5    official ones, but some time today I want you to take my sheet

6    of paper and make sure that we all are in agreement as to what

7    is in and not in.

8         There have been many exhibits referenced; but if it

9    doesn't say "in" by it, that means it is not in.  A lot of them

10   were never moved in by the Government.  So be aware of that.

11        Okay.  Now, let's turn to the instructions.  You ready?

12        **MS. KANE:**  Yes, Your Honor.

13        **THE COURT:**  Okay.  Let's -- let me -- let me ask on

14   the -- I think I can -- I can do this.  Since I think you are

15   all pretty much in agreement with these instructions, I'm going

16   to ask first for the -- do you have any modifications or

17   objections through the first nine paragraphs -- numbered

18   paragraphs?  Those are the preliminary instructions that go up

19   to about page 6 and a half.  Anything by the Government?

20        **MS. KANE:**  No, Your Honor.

21        **THE COURT:**  The Defense?

22        **MR. GASNER:**  No, Your Honor, not through the first

23   nine.

24        **THE COURT:**  All right.  So now we go to number 10 and

25   let's say 10 all the way through -- we will say all the way

**PROCEEDINGS**

1    through the bottom of paragraph 15, any -- anything by the

2    Government?

3              **MS. KANE:**  No, Your Honor.

4              **THE COURT:**  How about the Defense?

5              **MR. GASNER:**  No, Your Honor.

6              **THE COURT:**  Okay.  Now starting with Number 16, 16 all

7    the way -- well, first let me just do it maybe an easier way.

8         The Government should give me the first place at which you

9    want to make a modification or make an objection, and then I

10   will do the same thing for the Defense.

11             **MS. KANE:**  Your Honor, it appeared that these

12   instructions were consistent with what we had submitted, so we

13   have no modifications.

14             **THE COURT:**  There was one that I might have taken out,

15   and that was the one that concerned statements by the

16   Defendant -- right, did I take that out -- because at the time

17   I didn't think there would be any, but now we have those

18   jailhouse calls.  I'm willing to put that back in if anybody

19   wants that.

20             **MR. GASNER:**  Thank you.  Yes, Your Honor.

21             **THE COURT:**  All right.  So my law clerk will put

22   that -- that stipulation back in, more or less, where I took it

23   out.

24        Okay.  How about the Defense, do you have any other

25   objections or modifications?

1          **MR. GASNER:**  No, Your Honor, I do not.  I agree with

2    the Government; that these are consistent with our joint

3    proposal.

4          However, I believe the Court was going to address the

5    issue of inserting a 404(b) instruction.

6          **THE COURT:**  Well, yes.  And there was 404(b) evidence.

7    You know, you don't have to have one in there.  It is up to you

8    to ask for it.  If you want one, then I will put one in; but I

9    have not drafted it.  Maybe you could give me a draft or just

10   outline for me what you think it should say.  Possibly I could

11   draft it.

12         **MR. GASNER:**  Thank you, Your Honor.  At an appropriate

13   break we will submit something to the Court on that.

14         **THE COURT:**  All right.  It would go something like

15   this:  You heard evidence about a company called Automattic and

16   an intrusion into Automattic.  The Defendant is not charged

17   with any intrusion into Automattic, and this evidence was

18   admitted for the limited purpose of showing -- and then fill in

19   the blank, what the reason for it is -- I'm not sure what the

20   code word is but for me it is modus operandi -- and the

21   Government's contention is that this shows modus operandi by

22   the Defendant.

23         And then I suppose you would want to put in:  The Defense

24   says that -- it denies that this was even the Defendant.  I

25   don't know what you put in or -- and then it is offered for the

1   limited purpose, fill in the blank.

2       That's what I think -- I wish you-all would agree on it

3   but that -- if the Defense wants it, you are entitled to get a

4   404(b) instruction.

5       **MS. KANE:**  Your Honor, I would just note that we did

6   submit with our joint proposed instructions the Ninth Circuit

7   model instruction which was stipulated Instruction Number 19 in

8   our joint instructions.  That is at page 25.

9       **THE COURT:**  Did that address 404(b)?

10      **MS. KANE:**  Yes, Your Honor.

11      **THE COURT:**  Read it out loud please so I can have it

12  in mind.

13      **MS. KANE:**  (Reading:) You have heard testimony that

14  the Defendant intentionally accessed Automattic computers

15  without authorization.  This evidence of other acts was

16  admitted only for limited purposes.  You may consider this

17  evidence only for the purpose of deciding whether the

18  Defendant -- and then it goes through the list of the different

19  potential types of admissibility under 404(b).  I can read all

20  of them.

21      **THE COURT:**  Do they all apply in our case?  I thought

22  they don't all apply.

23      **MS. KANE:**  I think that's right, Your Honor.  That's

24  what I'm saying in our initial joint proposed instruction we

25  just used the model.  We can probably narrow it to --

1    **THE COURT:**  All right.  Well, you-all try to narrow it

2    for me.  Now the way that you said "Automattic" the jury is not

3    going to remember.  I would say that you heard evidence about

4    an intrusion in a company called Automattic.  But if you say

5    "Automattic," they are going to think you are using the word

6    automatic in its generic.  So you clarify that piece of it.

7    **MS. KANE:**  I see what you mean, Your Honor.  Thank

8    you.

9    **MR. GASNER:**  Thank you.  Your Honor -- and also I

10   don't think this is necessarily going to be in dispute -- but

11   now that I listen to that instruction, my request is likely

12   going to be that it says something along the lines of "You have

13   heard evidence that the Government alleges that Mr. Nikulin has

14   committed an intrusion into a company called Automattic"

15   because, of course, we do dispute that intrusion.  I don't

16   think it's a -- I don't think it is an enormous difference, but

17   it makes a --

18   **THE COURT:**  Write it up the way you want it and give

19   it to the Defense -- I mean, the other side.  See if you can't

20   agree, but I definitely don't want you to be admitting

21   something that you don't -- you are not required to admit any

22   bad act in order to get a 404(b) instruction.

23   **MR. GASNER:**  Thank you, Your Honor.  That was my

24   point.  I appreciate it.

25   **THE COURT:**  Yes.  Okay.  All right.  Now let's go to

1  the special verdict.  Let me just ask generically:  Does the

2  Government have any problem whatsoever with this form?

3        **MS. KANE:**  No, Your Honor.  Again, this appears

4  consistent with the joint proposed special verdict form that

5  the parties had submitted.

6        **THE COURT:**  That's what we tried to do.

7        **MS. KANE:**  Exactly.

8        **THE COURT:**  All right.  How about the Defense?

9        **MR. GASNER:**  Your Honor, the Defense submits on it.  I

10  don't have any proposed alterations or changes.

11        **THE COURT:**  I just couldn't hear the last part.

12        **MR. GASNER:**  I don't have any proposed alterations or

13  changes.

14        **THE COURT:**  Got it.  Thank you.  I do have just not a

15  practical question but in reading it, I saw that you had

16  sometimes put in the $5,000 in value in one way.

17        For example, in number 1, do you also find beyond a

18  reasonable doubt that the value of the information obtained

19  exceeded 5,000.  But then when you get to number 2, you say:

20  Do you also find beyond a reasonable doubt that the offense

21  caused loss of one or more persons during any one-year period

22  aggregating at least $5,000 in value.

23        Now, that -- there are a lot of similarities there, but

24  there is also some differences.  And I assume that the statutes

25  read that way.

PROCEEDINGS

1          **MS. KANE:**  Yes, Your Honor.  The first count charges a

2     violation of Section 1030(a)(2).  And so the reference in

3     verdict form paragraph 1(b) is to a portion of (a)(2).

4          Whereas, Count 2 charges a violation of 1030(a)(5).

5          And so it has a different element although they just both

6     happen to use $5,000 as the threshold.  It is a threshold of a

7     different type.  One is the value of the information, and one

8     is the loss to the victim.

9          **THE COURT:**  All right.  I got it.  It's one of those

10     distinctions that probably doesn't have a difference, but it

11     could be confusing to the jury.

12          All right.  That's all I got on -- now, let me ask you a

13     different question.  When we started the trial, I asked whether

14     the Defendant wanted to have the indictment shown to the jury.

15     And I think you said no; right?

16          **MR. GASNER:**  That's correct.

17          **THE COURT:**  And that's fine.  That's fine.  But here

18     we are.  Will the -- how is the jury going to know the specific

19     counts and what is alleged in each specific count?

20          Now, maybe you all -- the answer is that the lawyers are

21     going to explain that in the closing argument and that the

22     Defense is happy with that, that's okay.  That's done from time

23     to time.

24          But that would be the only way I could see in this -- see,

25     for example, like paragraph 17, we say:  The Defendant is

PROCEEDINGS

 1   charged in Count 5 with -- and then we go into what the statute

 2   requires.  But we do not say:  Okay, this is the Dropbox or

 3   this is so-and-so.

 4        So how will the jury know that Count 5 pertains to company

 5   X and intrusion Y of company X?  Now, again, I say to you it's

 6   okay with me if you let -- if we trust the U.S. Attorney to lay

 7   it all out clearly or you lay it all out clearly; but is this

 8   your stipulated instructions are -- don't inform the jury of

 9   that and they don't have the indictment.

10        So it's a -- you know, it is not a major point; but it is

11   something that you might worry about at night later on.  So

12   what is your view on that subject?

13        MR. GASNER:  Your Honor, my view on that subject is

14   the lawyers will handle it during closing.  And that the

15   Defense still would prefer the jury not to have the indictment

16   in hand in the deliberation room.

17        THE COURT:  Well, I'm sorry.  All right.  So you are

18   saying you still don't want them to have the indictment, and

19   you will handle it in the closing?

20        MR. GASNER:  I think that's appropriate, Your Honor.

21        THE COURT:  Fine.  That's fine as long as we -- it's

22   clear.  Is that okay with the Government?

23        MS. KANE:  I'm going to let Ms. Wawrzyniak address the

24   Court.

25        THE COURT:  Ms. Wawrzyniak.

PROCEEDINGS

1          **MS. WAWRZYNIAK:**  Your Honor, I see the point that you

2     are making; and my initial reaction is that it might be better

3     to put the dates and the names of the victim companies --

4     incorporate that into the special verdict form.

5          I don't know if Mr. Gasner has a reaction to that, but

6     that way there is no need for the jury to be trying to

7     reference something else when they are looking at the verdict

8     form.

9          I have done it that way in other cases and could take a

10    pass at putting the dates and --

11         **THE COURT:**  Well, I think that's not a bad idea.

12    Mr. Gasner, what about this on the verdict form?  It would read

13    exactly the same way except at the end after the word -- Count

14    1 of the indictment, you would have a parentheses that said --

15         **MS. WAWRZYNIAK:**  On or about such-and-such.

16         **THE COURT:**  What was the name of the company again?

17         **MS. WAWRZYNIAK:**  So Count 1 is LinkedIn.

18         **THE COURT:**  Say (LinkedIn intrusion February X 2012.)

19         **MS. WAWRZYNIAK:**  I think it is on or about March 3rd

20    and 4th, 2012, is what is alleged in the indictment.  I would

21    take the language exactly from the indictment.

22         **THE COURT:**  All right.  I think that's a good idea.

23    Mr. Gasner.

24         **MR. GASNER:**  I have no objection to that.  I concur.

25         **THE COURT:**  All right.  So, Ms. Wawrzyniak, would you

PROCEEDINGS

```
 1    do it by hand -- in hand?

 2            MS. WAWRZYNIAK:  Okay.

 3            THE COURT:  And then show it to Mr. Gasner on all of

 4    the counts.  Now, on the subparts, I don't think you need it.

 5    It is just --

 6            MS. WAWRZYNIAK:  I would agree, yeah.

 7            THE COURT:  It is just the numbered ones.  And then

 8    you give it to us in handwritten form so we can see where the

 9    changes are.  And then my most excellent law clerk will type it

10    in.

11            MS. WAWRZYNIAK:  I will do so, Your Honor.

12            THE COURT:  Thank you.  Okay.  Good.  Now, that solves

13    that problem.

14        Are we ready to see if the jury is present and resume?

15            MS. KANE:  Yes, Your Honor.

16            MR. GASNER:  Yes, Your Honor.

17            THE COURT:  Okay.  Karen, the jury knows that they --

18    we want them to come a little early.  So there is a good chance

19    they are all here.  If they are all here, bring them all in.

20    If they are not, then we will, of course, wait until they are

21    all present.

22            THE CLERK:  Okay.  I will endeavor to go find out.

23            THE COURT:  And we will just wait right here.

24                    (Recess taken at 8:49 a.m.)

25                   (Proceedings resumed at 8:52 a.m.)
```

1      **THE COURT:**  While we are waiting, by any chance, have

2  you streamlined what you have left to do so that we can -- I

3  can tell the jury -- we can give them an idea of how much time

4  we are going to have?

5      **MS. KANE:**  Well, Your Honor, we still are finishing

6  with Mr. Miller's testimony this morning.  I think, as we said

7  yesterday, it's another hour.

8      **THE COURT:**  He is your last witness?

9      **MS. KANE:**  Yes.

10      **THE COURT:**  How much time is it?  Still an hour or

11  more?

12      **MS. KANE:**  Yes, Your Honor.

13      **THE COURT:**  Mr. Gasner, how about yours -- your

14  estimate?

15      **MR. GASNER:**  I think probably 60 minutes or less.

16      **THE COURT:**  All right.  So that's progress.  You said

17  yesterday one to two hours.  So now we are in minutes.

18      **MR. GASNER:**  I also said yesterday that I'm notorious

19  at underestimating, Your Honor, so that's my bias.

20                    (Laughter)

21      **THE COURT:**  All right.  Well --

22      **MR. GASNER:**  I do have a technical question.  At some

23  appropriate point I want to test the ELMO.  I brought this to

24  your Courtroom Deputy Clerk this morning.  I'm having some

25  connectivity issues during the course of the trial, and I know

**PROCEEDINGS**

1    that we are presenting a lot of evidence through the Zoom

2    program; but that's caused some issues, I think, as we have

3    seen in this trial.

4         So in order to get around this, I may be presenting some

5    documents on the ELMO during my cross and/or my closing because

6    I fear the technology will get in the way of the advocacy.

7              **THE COURT:**  That's a good point, and we will address

8    that.  Are we here?  Let's see.  All the jurors are waiting to

9    come in.  So let's rise for our jury.

10        (Proceedings were heard in the presence of the jury:)

11             **THE COURT:**  Great.  Welcome back.  Have a seat.  Thank

12   you for being not only on time but a little early, I think,

13   this morning.  So we are going to start a little early.  We

14   have about ten minutes extra today, maybe or end ten minutes

15   early.

16        Ms. Kane, we need the witness back.

17             **MS. KANE:**  Yes, Your Honor.  We will continue with the

18   examination of Special Agent Jeffrey Miller.

19             **THE COURT:**  Okay.  Agent Miller, come forward.  Have a

20   seat.

21        You comfortable?

22             **THE WITNESS:**  Yes, thank you.

23             **THE COURT:**  Be sure to speak into the microphone and

24   keep your voice up throughout the answer.

25             **JUROR SERPA:**  The screens are off.

1          THE COURT:  Our monitors are off, Karen, but --

2   Ms. Kane, who solved that problem yesterday --

3                    (Pause in proceedings.)

4          THE COURT:  Did it come on?

5          THE CLERK:  Hold on.  Anything on?

6          THE COURT:  What should they be seeing?

7          JUROR WOODROW:  Yes, we have it.  Thank you.

8          THE COURT:  Okay.  It is up and running.  Go ahead,

9   Ms. Kane.

10         MS. KANE:  Thank you, Your Honor.

11                       JEFFREY MILLER,

12  called as a witness for the Government, having been previously

13  duly sworn, testified further as follows:

14                  DIRECT EXAMINATION  (resumed)

15  BY MS. KANE:

16  Q.   Special Agent Miller, when we finished yesterday, you were

17  discussing your investigation of an intrusion at a company

18  called Automattic.

19       Before we finish with that, I want to go back to an

20  earlier discussion we had about records that you obtained from

21  a company called Vimeo.

22       Now, you testified yesterday that you found an account at

23  Vimeo under the username chinabig01@gmail.com; is that right?

24  A.   That's correct.

25  Q.   And you testified yesterday that Vimeo provided the FBI

1   subscriber records and IP login records for that account.

2   A.    That's correct.

3   Q.    And yesterday we looked at Exhibit 113, which was the

4   Vimeo subscriber records that showed the username and other

5   data for the account.  Do you recall that?

6   A.    Yes, I do.

7   Q.    All right.  Now what I would like -- I would like you to

8   look at Exhibit 113A.  And now yesterday when you testified

9   about Exhibit 113, you also described receiving those records

10  as business records of Vimeo with a certification.  And that

11  was at Exhibit 138; is that right?

12  A.    Yes.

13  Q.    And are the records at Exhibit 113A also part of the

14  records you received from Vimeo with that business record

15  certification?

16  A.    Yes, it is.

17  Q.    And can you describe what the records are in 113A?

18  A.    Sure.  The records include date and time and IP address,

19  the user ID and the URL or link to the video that was viewed.

20  Q.    And to which account do these records relate?

21  A.    To the Vimeo account associated with the e-mail address

22  chinabig01@gmail.com.

23        MS. KANE:  So the United States moves for the

24  admission of Exhibit 113A.

25        MR. GASNER:  Submitted.

1           **THE COURT:**  Received in evidence.

2       (Trial Exhibit 113A received in evidence.)

3           **MS. KANE:**  If we can please show 113A and we can make

4    that bigger for the jury.

5    **BY MS. KANE:**

6    **Q.**  And so can you now tell the jury -- now that they can see

7    the records --

8           **MS. KANE:**  If we can just blow up two lines or so of

9    that.

10   **BY MS. KANE:**

11   **Q.**  Tell them what they are looking at.

12   **A.**  So these records captured the date and time, IP address of

13   the account associated with the e-mail address

14   chinabig01@gmail.com and the different videos on Vimeo that the

15   account viewed in the URI tab.

16   **Q.**  And these records cover a period in 2013; is that right?

17   **A.**  That's correct.

18   **Q.**  Thank you.  Now, I would like to turn back to Automattic.

19       Remind the jury what Automattic is, please.

20   **A.**  Automattic is the parent company of Wordpress which is

21   software that allows individuals to post content and create

22   websites.

23   **Q.**  And yesterday you testified about some records you

24   obtained from Automattic.  How did you obtain those records?

25   **A.**  Automattic provided them to me.

1   Q.    And was Automattic a United States company?

2   A.    Yes, they were.

3   Q.    You testified that you interviewed someone at Automattic

4   during the course of your investigation.  Who was that?

5   A.    Barry Abrahamson.

6   Q.    And who is Barry Abrahamson?

7   A.    His title was System wrangler, but he did IT security for

8   Automattic.

9   Q.    And you testified yesterday that Automattic produced

10  business records at Exhibit 16 along with a business records

11  certification from the company at Exhibit 153.  Do you recall

12  that?

13  A.    Yes, I do.

14  Q.    Okay.  And then you also testified that Exhibit 17A was a

15  summary that you created in part including those Automattic

16  business records; is that right?

17  A.    That's correct.

18  Q.    And, now, remind the jury of what those business records

19  contained from Automattic.

20  A.    They included log files from Automattic as well as logs

21  associated with employees and employee logins.

22  Q.    And did those records include IP address login records?

23  A.    Yes, they did.

24  Q.    Now you testified that 17A also included records from

25  other accounts that you had obtained subscriber records for in

**MILLER - DIRECT / KANE**

1    this investigation; is that right?

2    **A.**    Yes.

3    **Q.**    And what were some of those accounts?

4    **A.**    Chinabig01@gmail.com and the Vimeo account associated with

5    the e-mail address chinabig01@gmail.com.

6    **Q.**    Now, I would like to look at those Gmail records for a

7    moment.

8              **MS. KANE:**   Can we show Exhibit 125 which was

9    previously admitted.

10                          (Pause in proceedings.)

11   BY MS. KANE:

12   **Q.**    Okay.  We have that up on the screen.  So can you describe

13   to us what we are looking at here, please?

14   **A.**    This is the information from Google for the subscriber

15   associated with the e-mail address chinabig01@gmail.com

16   including the IP history, so the logins to the account and the

17   associated IPs and dates and times.

18   **Q.**    And what type of information is included with this

19   subscriber information?

20   **A.**    The name on the account; so the name provided by the user,

21   their e-mail address, if the account is active, the various

22   Google services that they use, the date the account was

23   created, the IP that the created was using, and a country code

24   or language code.

25   **Q.**    Then it also shows on the bottom below what you just read,

**MILLER - DIRECT / KANE**

1    what are we seeing there?

2    **A.**   That's the IP login history that I previously described.

3    **Q.**   And you mentioned, the name is something that the

4    subscriber provides.  Are you familiar with how these types of

5    Google accounts are created?

6    **A.**   Yes, I am.

7    **Q.**   So the subscriber, you testified, provides the name.  What

8    about some of the other data that we are looking at there;

9    where does that come from?

10   **A.**   The other data is captured by Google systems themselves as

11   the user interacts with their account.

12        **MS. KANE:**  Now, if we could blow up the bottom portion

13   of this.

14   **BY MS. KANE:**

15   **Q.**   What is this?

16   **A.**   This is a secondary account or an account that is linked

17   to the previous account.

18   **Q.**   So what data do we see there?

19   **A.**   We see the name, chinabig02 chinabig02, the e-mail address

20   chinabig02@gmail.com, status, the services the account use, the

21   secondary e-mail, chinabig01@gmail.com, creation date, IP

22   address used to create the account as well as the date and a

23   language code.

24   **Q.**   All right.

25        **MS. KANE:**  So we can take that down.

MILLER - DIRECT / KANE

1   BY MS. KANE:

2   Q.   You testified yesterday regarding several other versions

3   of Google subscriber records for the chinabig01@gmail.com

4   account; is that right?

5   A.   Yes, I did.

6   Q.   And why are there so many versions of those subscriber

7   records?

8   A.   Those subscriber records indicate each time I obtain legal

9   process to get records from Google.

10  Q.   And so do you have different information in those various

11  sets of subscriber information?

12  A.   Yes.

13  Q.   Okay.

14       MS. KANE:   So let's show Exhibit 41, which was

15  admitted yesterday.

16  BY MS. KANE:

17  Q.   What are we looking at here?

18  A.   It is more Google subscriber information for the

19  chinabig01@gmail.com account.

20  Q.   And so how would you compare the subscriber information

21  part at the top with the previous version we looked at?

22  A.   It is very, very similar.

23  Q.   And now the IP address history is different; is that

24  right?

25  A.   That's correct.

1    Q.   And what is different about it?

2    A.   The dates and times of the logins as well as some of the

3    IP addresses.

4    Q.   So what were the -- what was the date range of what we

5    were just looking at?

6    A.   I would have to see the screen again.

7    Q.   Okay.  Well, what is the date range that we are looking at

8    here?

9    A.   This is September 20th, 2012, through October 6th, 2012.

10   Q.   Okay.

11        MS. KANE:  If we can go back to Exhibit 125, quickly.

12   BY MS. KANE:

13   Q.   You can see the date range there.  What is that?

14   A.   Yes.  It's July 26th, 2012, through August 16th, 2012.

15   Q.   So each time you requested subscriber records from Google,

16   did you get a different set of date ranges in the IP addresses?

17   A.   Yes, it was a refreshed date range.

18   Q.   Okay.  So does Google, in your experience, keep the IP

19   address login information?

20   A.   Yes, they do.

21   Q.   And how long do they keep it for?

22   A.   It can depend but on average approximately 180 days.

23   Q.   Okay.  So each time you would request this information,

24   you would get a different window into the IP address history.

25   Is that a fair description?

1    A.    Yes.

2              MS. KANE:   So I would like to show one more exhibit

3    from this set which is Exhibit 47 which was admitted yesterday.

4    BY MS. KANE:

5    Q.    And what is it that we are seeing here?

6    A.    Again, this is more subscriber information for the

7    chinabig01@gmail.com account.

8    Q.    All right.   And, now, how does the subscriber information

9    here compare?

10   A.    It is very similar.

11   Q.    What is the user -- the name on the account?

12   A.    Alex Corti.

13   Q.    And in your experience can users change that name -- you

14   testified that that's information that is provided by the user.

15         In your experience can users change the name on an account

16   like this?

17   A.    Yes, they can change the name whenever they like.

18   Q.    And -- but this has the same creation date -- it is the

19   same account as what you were looking at before; is that right?

20   A.    That's correct.

21             MS. KANE:   Then let's look at the IP history.

22   BY MS. KANE:

23   Q.    So this has a different date range.   What is this date

24   range?

25   A.    This date range is December 31st, 2012, through March 3rd,

1    2013.

2    **Q.**    So what we have seen here is an example of three different

3    date ranges of IP addresses that you got from Google records;

4    is that right?

5    **A.**    That's correct.

6    **Q.**    Are those the types of records that you use to create the

7    overlap summary that we were looking at yesterday for Exhibit

8    17A?

9    **A.**    Yes, it was.

10   **Q.**    Now, let's go back to Exhibit 17A.  And let's go to the

11   tab that says gravatar, the last tab.  And can you describe for

12   the jury what they are seeing here in this summary?

13   **A.**    This is a summary of the different IPs captured from the

14   various accounts.  So you will have the date and time in UTC,

15   the IP address that was used, the action taken on the account,

16   and the account where the logs -- the records came from.

17   **Q.**    And so at line 2, we see on July 12th, 2013, a login to

18   the Google account chinabig01@gmail.com from an IP address that

19   ends in .27.  Is that from the Google records you were

20   describing?

21   **A.**    Yes, it was.

22   **Q.**    And then on line 3 we see a reference on the same date and

23   the same IP address.  The action describes something with the

24   word madnez in it and then the account refers to Automattic and

25   it has the word furchin -- F-U-R-C-H-I-N --

1    dev.luv.gravatar .com.   What does that refer to?

2    **A.**   That refers to the Automattic employee with the username

3    furchin.

4    **Q.**   And did the Automattic records indicate who that employee

5    was?

6    **A.**   Yes, they did.

7    **Q.**   Who was it?

8    **A.**   I believe it was Michael Byrc.

9    **Q.**   How do you spell Byrc?

10   **A.**   B-Y-R-C, I believe.

11   **Q.**   Now, as we go down to line 17, there is a reference to

12   July 19th, 2013, from the same IP address.  It says viewed

13   video in the action column, and then the account says Vimeo

14   chinabig01@gmail.com.

15       Does that come from the Vimeo records that we were just

16   looking at?

17   **A.**   Yes, it does.

18           **MS. KANE:**  Now, if we can go back to the first tab,

19   please.

20           **THE COURT:**  Tell me when you are about to leave the

21   subject of Automattic so that I can give a cautionary

22   instruction, but I will wait until the end that -- of this

23   segment.

24           **MS. KANE:**  Thank you, Your Honor.

25       Let's go to the next tab and let's scroll down.

1  BY MS. KANE:

2  Q.   So there are references here --

3        MS. KANE:  Back down.

4  BY MS. KANE:

5  Q.   To on -- let's see.

6        MS. KANE:  Let's stop there.

7  BY MS. KANE:

8  Q.   On line 31 it refers to something on the date July 8,

9  2013, from the IP address ending in .156.  And it refers to

10  Automattic and then it says "dzver."  What is that?

11  A.   That is the username for an Automattic employee.

12  Q.   And do you know which Automattic employee it is?

13  A.   I would have to see the list from Automattic.

14  Q.   We will turn to that later then.  What about the -- what

15  about the line 34, it says on July 18th from the same .156 IP

16  address, and there is an entry that says Automattic George

17  Stephanis.  And what does that refer to?

18  A.   Another Automattic employee username.

19  Q.   What does that show in that line?

20  A.   It shows logins from the employee accounts from that IP

21  address on that date.

22  Q.   What about lines 35 and 36?

23  A.   Those show logins from that IP address from the Vimeo

24  account associated with chinabig01@gmail.com as well as the

25  Google account for chinabig01@gmail.com.

1   Q.   Okay.

2          MS. KANE:   Let's go to the next tab.   Let's scroll

3   down.

4   BY MS. KANE:

5   Q.   All right.   Let's look at line 38 that shows a July 29th,

6   2013, entry from an IP address ending in .68.   And then it

7   refers to Automattic and then it has P-Y-H-H-A-K.   What does

8   that refer to?

9   A.   That is also another Automattic employee user ID or name.

10  Q.   Do you know the name of that Automattic employee?

11  A.   It is on the list.   I don't know it off the top of my

12  head.

13  Q.   Okay.   We will get back to that then.   Now, I would like

14  to switch to Exhibit 119, which we looked at yesterday.

15         MS. KANE:   And, Your Honor, this still relates to

16  Automattic.   So although I'm changing exhibits, I'm still on

17  the same topic.

18  BY MS. KANE:

19  Q.   And can you remind the jury of what Exhibit 119 is?

20  A.   This is the English translation of search history for the

21  chinabig01@gmail.com account.

22  Q.   Now, I would like to look at page --

23         MS. KANE:   Let's keep going down here -- sorry -- to

24  the next page.   Let's go to page 3.   Can we blow up --

25                    (Pause in proceedings.)

1    BY MS. KANE:

2    Q.   Let's switch to Exhibit 62A.   And can you remind the jury

3    of what Exhibit 62A is?

4    A.   This is search history for the chinabig01@gmail.com

5    account.

6    Q.   Okay.   And let's look at page 11.   All right.   What are we

7    looking at here in the search history?

8    A.   These are searches for an individual or various

9    individuals and information about them and their e-mail

10   addresses.

11   Q.   Okay.   So the first entry is for August 3rd, 2013.   It

12   says:   Visited pyry, P-Y-R-Y, hakulinen, H-A-K-U-L-I-N-E-N,

13   gravatar profile.

14       Does that have any significance in your investigation?

15   A.   Yes.   That was one of the Automattic employees that was

16   referenced previously.

17   Q.   Okay.   And do you recall then what the username was that

18   we saw in the Automattic logs that we were looking at?

19   A.   I believe it was pyhhak.

20   Q.   All right.   So here -- in the chinabig01@gmail.com search

21   history, there is a search for the name of the employee that

22   was in the Automattic logs with the access in -- in the exhibit

23   17A that we were looking at?

24   A.   That's correct.

25   Q.   Now, down lower we see a reference on August 3rd.   It

 1   says:  Searched for apokalyptik -- that's spelled

 2   A-P-O-K-A-L-Y-P-T-I-K -- Demitrious, D-E-M-I-T-R-I-O-U-S. and

 3   was that significant in your investigation?

 4   **A.**   Yes.  That was the username of another Automattic employee

 5   that I discovered in the log files as well as the individual's

 6   first name.

 7   **Q.**   And those log files that we were looking at, those are the

 8   log files that we were looking at in Exhibit 17A; is that

 9   right?

10   **A.**   Yes.

11   **Q.**   So there was access to that employee's account from the

12   same IP address that was accessing the chinabig01@gmail.com

13   account and other accounts you had summarized?

14   **A.**   That's correct.

15            **MS. KANE:**  Let's go to the next page.

16   **BY MS. KANE:**

17   **Q.**   And what are we seeing here?

18   **A.**   Similar searches for information about the user

19   apokalyptik and the individual's true name.

20            **MR. GASNER:**  I'm sorry.  I didn't hear the last part.

21   Your voice fell off.

22            **THE WITNESS:**  Sorry.  The individual's last name

23   Demitrious Kelly.

24   **BY MS. KANE:**

25   **Q.**   Was Demitrious Kelly the name of the employee from the

1   Automattic records?

2   **A.**    Yes, it was.

3   **Q.**    And there is a reference for August 3, jzelazny,

4   J-Z-E-L-A-Z-N-Y.  And what was that?

5   **A.**    Again, another Automattic employee username.

6           **MS. KANE:**  If we can look at page 9.

7   **BY MS. KANE:**

8   **Q.**    There is an entry there for July 17th.  Can you show us --

9   can you tell us what that is, the second one or both -- I'm

10  sorry -- both of them.

11  **A.**    One is for searching for GTX 780 on the website

12  forum.insidepro.com and then visiting a link on

13  forum.insidepro.com.

14  **Q.**    And the words "insidepro.com" came up previously in your

15  testimony.  What is that?

16  **A.**    That is where the LinkedIn hashes as well as the

17  Formspring password hashes were posted.

18  **Q.**    I want to look at one more entry on this page.  This shows

19  on July 18th, 2013, a search for ashish, A-S-H-I-S-H, shukla,

20  S-H-U-K-L-A, Automattic.  And was that something that had come

21  up in your investigation?

22  **A.**    Yes, it was.

23  **Q.**    And what is the significance of that?

24  **A.**    That's another employee at Automattic who we discovered

25  unauthorized access.

1  Q.  And then again on July 18th there is a similar entry that

2  says:  Searched for Ashish Shukla, Systems Wrangler.

3      And you mentioned Systems Wrangler before today.  What is

4  the significance of Systems Wrangler for Automattic?

5  A.  That was the title given to individuals in their

6  information security team.

7          MS. KANE:  Thank you.  We can put that down.

8          THE COURT:  Are we done with the Automattic part?

9          MS. KANE:  Yes, Your Honor.

10         THE COURT:  Okay.  I just need to give you a

11  cautionary instruction.  You have heard now a lot of testimony

12  about a company called Automattic -- spelled with two Ts.  It

13  is spelled a little strangely -- and alleged intrusion into

14  that company.

15      Now, in our indictment the Defendant is not -- N-O-T --

16  not, not charged with any conduct relating to Automattic or any

17  intrusion into Automattic.

18      So you might say:  Well, why then are we even hearing this

19  evidence?  I'm allowing this evidence in for a limited purpose

20  that I will explain to you when I give you the final charge.

21  It is for a very limited purpose that you may consider this

22  evidence only.

23      And with that, I'm just going to leave it at that for the

24  moment.  And I need to flag for you this caveat, and I have.

25      So now we can continue.

1          MS. KANE:  Thank you, Your Honor.

2   BY MS. KANE:

3   Q.   Now, what we were just looking at in Exhibits 119 and 62A

4   were what you described as search history from the

5   chinabig01@gmail.com account.

6        And you previously had testified regarding e-mail messages

7   that you had also obtained from the same account yesterday; is

8   that right?

9   A.   Yes.

10  Q.   And you testified that you had reviewed the contents of

11  the account, and most of the e-mail messages appeared to be the

12  types of automated system messages that we looked at in

13  Exhibits 3A, B, C, D, et cetera; is that correct?

14  A.   That's correct.

15  Q.   Okay.  Now, when you were reviewing the contents of the

16  account, did you see any messages that were personal to the

17  owner of the account, like, from the -- you know, from mom or

18  something?

19  A.   I did not.

20  Q.   Was there any correspondence, any e-mail messages to or

21  from the account that gave you any personal details about the

22  owner of the account?

23  A.   There was one -- a few e-mails that were sent that

24  contained photographs.

25  Q.   Okay.  Do you want to describe those?

1   **A.**   Yes.   They were photographs of an individual holding up a

2   large fish.

3   **Q.**   Did you investigate those photographs?

4   **A.**   Yes, I did.

5   **Q.**   What did you do?

6   **A.**   So when photographs are taken, sometimes information is

7   contained within the photo called metadata; just information

8   about the device that was taken, the photo was taken on.   I

9   discovered within those photos a serial number and a make and

10  model of the camera.

11  **Q.**   And what did you do with that information?

12  **A.**   I believe it was a Canon photo or Canon camera.   So I

13  reached out to Canon to see if there was information about that

14  serial number or if it had ever been registered.

15  **Q.**   Were you able to obtain any information that furthered

16  your investigation?

17  **A.**   Unfortunately, the camera was never registered.

18         **THE COURT:**   May I -- we switched gears; right?   We are

19  not on Automattic anymore?

20         **MS. KANE:**   That's correct, Your Honor.

21         **THE COURT:**   What are we on?   I missed it.   I think the

22  jury might have missed it.   In half a sentence, what account

23  are we talking about?

24         **THE WITNESS:**   Yes, Your Honor, we are talking about

25  the chinabig01@gmail.com account and the communications

 1   contained therein.

 2            **THE COURT:**   Okay.  I got it now.  Thank you.  Go

 3   ahead.

 4   **BY MS. KANE:**

 5   **Q.**   So finishing up with that account, you mentioned a couple

 6   of pictures.  Was there anything written that was personal from

 7   the person that had -- you know, that held the account that

 8   helped you identify the person?

 9   **A.**   There was not.

10   **Q.**   Now, I would like to go back to Exhibit 85A that we looked

11   at yesterday.  You testified that this was -- this is the

12   translation of the response that you received from Russia in

13   your request for subscriber records; is that right?

14   **A.**   That's correct.

15   **Q.**   Okay.  And you testified that you received -- you

16   requested subscriber records for five IP addresses?

17   **A.**   Yes.

18   **Q.**   And remind the jury of how you selected those five IP

19   addresses.

20   **A.**   Yes.  Two of the IP addresses were selected because they

21   were used to access Mr. Berry's VPN account and to connect to

22   the LinkedIn networks, and the other three were found in the

23   log files.

24   **Q.**   And we looked yesterday at the records for the .239 and

25   .170 IP addresses.  Do you recall that?

MILLER - DIRECT / KANE

1    **A.**    Yes, I do.

2    **Q.**    And let's show those.

3                        (Pause in proceedings.)

4    **BY MS. KANE:**

5    **Q.**    And when you requested these records, did you provide a

6    date and time for which you wanted the subscriber records?

7    **A.**    I did.

8    **Q.**    All right.  And for the .239 address, what was the date

9    that you requested?

10   **A.**    March 3rd, 2012.

11   **Q.**    Okay.  And why did you request that date?

12   **A.**    That was the date of the connection on the VPN log for

13   Nick Berry's account.

14   **Q.**    Okay.  And that was what we looked at in Exhibit 33; is

15   that right?

16   **A.**    That's correct.

17   **Q.**    And also Exhibit 26B; is that right?

18   **A.**    Yes.

19   **Q.**    And you showed the duration of that connection in those

20   logs.  Do you recall that?

21   **A.**    Yes, I do.

22   **Q.**    Do you remember approximately what the duration was?

23   **A.**    For the 239 IP I believe it was 2 days, 7 hours and some

24   change.

25   **Q.**    And did you make a similar request for date and time for

MILLER - DIRECT / KANE

1    the other IP addresses that you requested?

2    **A.**   Yes, I did.

3    **Q.**   So just -- without going through each date and time, was

4    that a date and time that you had gotten from the LinkedIn

5    records?

6    **A.**   That's correct.

7            **MS. KANE:**  Now, let's blow up the top here.

8    **BY MS. KANE:**

9    **Q.**   So at the top of this response for those two IP addresses,

10   what -- is there a company name up there?

11   **A.**   National Cable Networks.

12   **Q.**   All right.  Now, we are looking at page 17 of Exhibit 85A.

13        What are we looking at here?

14   **A.**   This is the subscriber information for one of the IP

15   addresses.

16   **Q.**   And is there a company name indicated here?

17   **A.**   Yes, there is.

18   **Q.**   What is it?

19   **A.**   Yota.

20   **Q.**   Okay.  So this is a different company than the other two

21   IP addresses?

22   **A.**   Yes.

23   **Q.**   This is the subscriber information.  And what is the name

24   on this account?

25   **A.**   Sergey Petrovich Novikov.

**MILLER - DIRECT / KANE**

1    Q.   You testified yesterday regarding an individual named

2    Alexsey Sipkin.   Do you recall that?

3    A.   Yes, I do.

4    Q.   And you testified that you had identified Alexsey Sipkin

5    as the identity of the username dwdm; is that right?

6    A.   That's correct.

7    Q.   And where did that dwdm come from?

8    A.   That was the individual who posted the LinkedIn password

9    hashes on the insidepro.com forum.

10   Q.   So did any of the --

11             MS. KANE:   You can take that down.

12   BY MS. KANE:

13   Q.   Did any of the ISP records -- for the five IP addresses

14   that you requested in your MLAT request -- include the

15   subscriber Alexsey Sipkin?

16   A.   No, they did not.

17   Q.   How did you identify Alexsey Sipkin as the identity -- the

18   true identity of dwdm?

19   A.   We identified the e-mail address dwdm@rambler.ru as being

20   associated with that posting on InsidePro and found social

21   media accounts for that individual where he indicated his

22   employer was Alcatel-Lucent.

23   Q.   And so what did you do with that information?

24   A.   I reached out to Alcatel-Lucent to confirm.

25   Q.   Did you also look for any -- sorry, you mentioned

1    rambler.ru.  Did you determine what that referred to?

2    **A.**    That is a Russian e-mail provider.

3    **Q.**    So were you able to obtain subscriber records through the

4    subpoenas that you described yesterday that you had been using?

5    **A.**    No, I was not.

6    **Q.**    Did you identify any accounts for which you could obtain

7    subscriber records with the subpoena?

8    **A.**    Yes, I did.

9    **Q.**    And were those U.S. accounts?

10   **A.**    Yes, they were.

11   **Q.**    Did you actually obtain records for accounts that you had

12   identified for Alexsey Sipkin?

13   **A.**    Yes, I did.

14   **Q.**    Did those subscriber records include IP address history?

15   **A.**    Yes, they did.

16   **Q.**    And did any of the IP addresses in the IP address history

17   for those accounts, overlap with the IP addresses provided to

18   you by LinkedIn in their VPN or other logs?

19   **A.**    No, they did not.

20   **Q.**    You testified yesterday that you obtained a copy of a

21   computer belonging to Alexsey Sipkin; is that right?

22   **A.**    That's correct.

23   **Q.**    And I believe you testified that you reviewed the contents

24   of that computer?

25   **A.**    I did.

**MILLER - DIRECT / KANE**

1  **Q.**   And when you reviewed the contents of that computer, did

2  you see any connection to chinabig01?

3  **A.**   I did not.

4  **Q.**   Did you see any connection to LinkedIn?

5  **A.**   I did not.

6  **Q.**   Now you mentioned also the username Slavuti4 -- that's

7  S-L-A-V-U-T-I-4 -- as the user ID of the person who posted the

8  Formspring hashes to insidepro.com; is that right?

9  **A.**   That's correct.

10 **Q.**   And did you investigate that username?

11 **A.**   I did.

12 **Q.**   Did you see any reference to Slavuti4 on Alexsey Sipkin's

13 computer that you examined?

14 **A.**   I did not.

15 **Q.**   Did you find any accounts for which you could obtain

16 subscriber records with a subpoena for Slavuti4?

17 **A.**   I believe I did.

18 **Q.**   Did you obtain any IP address history in those records?

19 **A.**   Yes.

20 **Q.**   And did you find any overlap with the IP address -- and

21 there was one IP address associated with the Formspring

22 intrusion; is that right?

23 **A.**   Yes, there was.

24 **Q.**   Any overlap with that one IP address in the records you

25 found for Slavuti4?

1    **A.**    No.

2    **Q.**    So were you able to identify the true identity of the

3    person using the username Slavuti4?

4    **A.**    I was not.

5    **Q.**    All right.  I would like to move now back to records we

6    discussed yesterday from a company called Kongregate.  That's

7    Kongregate with a K; right?

8    **A.**    Yes.

9    **Q.**    And remind the jury what Kongregate is.

10   **A.**    It's an online gaming website.

11   **Q.**    And how did you -- sorry -- you had obtained records that

12   were admitted yesterday at Exhibit 48 from Kongregate.

13        And how did you obtain those records?

14   **A.**    Through a subpoena.

15   **Q.**    Okay.  And you testified yesterday that you subpoenaed an

16   account with the username Zopaqwel 1 -- that's Z-O-P-A-Q-W-E --

17   and then the number 1; correct?

18   **A.**    Yes.

19   **Q.**    And remind the jury how you identified Zopaqwel 1 as

20   something significant.

21   **A.**    That was the username I discovered in the Afraid.org

22   account associated with the e-mail address

23   chinabig01@gmail.com.  And I took that username -- because it

24   seemed relatively distinct -- and searched Google and found the

25   Kongregate account.

1   Q.   So let's show Exhibit 48.

2        MS. KANE:   Let's go to the second spreadsheet.   All

3   right.

4   BY MS. KANE:

5   Q.   So do you recognize what is on the screen here?

6   A.   Yes, I do.

7   Q.   And tell the jury what this is.

8   A.   This is the subscriber or account information for the --

9   for that Kongregate account.

10  Q.   Okay.  And so on line 2 it identifies username Zopaqwel 1.

11  That was the information that you had previously -- that you

12  identified as the username; is that right?

13  A.   Yes.

14  Q.   And then what is the e-mail address for the account?

15  A.   R-0-0-T-A-L-K-A@mail.ru.

16  Q.   And how would you pronounce that username?

17  A.   R00talka.

18  Q.   Now, this also shows some other information.  Can you read

19  the -- there is some payment account information.  What do you

20  see there?

21  A.   Yes.  It's for a credit card type, Visa.  The expiration

22  date in 2015 and the last four digits are 0405.

23  Q.   What we are looking at here, if you want to check -- it

24  says last four digits but --

25  A.   I believe Excel truncates a leading zero.

MILLER - DIRECT / KANE

```
1   Q.   Okay.  So what we see on the screen here, though, is what?

2   A.   405.

3   Q.   Okay.  And it says total purchases?

4   A.   Seventeen.

5   Q.   Okay.  It also identifies a country.  What is that?

6   A.   The Russian Federation.

7   Q.   Okay.  And it has a last login entry?

8   A.   June 6th, 2013.

9   Q.   Let's go back to the other set of records for Exhibit 48

10  that we were looking at yesterday.

11       And remind the jury of what these records are.

12  A.   These are credit card payments associated with the

13  account.

14  Q.   Okay.  And --

15            THE COURT:  Which account do you --

16            THE WITNESS:  For the Kongregate account, sir.

17            THE COURT:  All right.

18  BY MS. KANE:

19  Q.   And let's look over at -- there is a column headed AL.

20            MS. KANE:  If we can show that.

21       And, perhaps, Your Honor, if I may, I was going to see if

22  we could again hide the sidebar on the screen as we did

23  yesterday so that the jury can see the full screen.

24            THE COURT:  Go ahead.

25            THE CLERK:  I'm not sure what Tracy did yesterday.
```

```
 1              THE COURT:  Hit the minimize button.

 2              MS. KANE:  If you go to where you see the picture of

 3      the Judge there, and just above that there is sort of some

 4      boxes.  If you click the far left one there, yep.  You got it.

 5      Right there.  Yep.

 6              THE COURT:  No, no, the pictures of the --

 7              MS. KANE:  That's good.

 8              THE COURT:  You got it.  Did it work on the screen,

 9      though, for the jury?  It did.  Okay.

10              MS. KANE:  Thank you very much.

11      BY MS. KANE:

12      Q.   All right.  So there is a column headed AL and a column

13      headed AM.  One says billing first name and one says billing

14      last name.  What are the names -- the different unique names

15      that we see there?

16      A.   We have Jammis Tom; Yalov Makalov; GH; FGHFG, and John

17      Pattison.

18      Q.   And now if we could look over to column X on this

19      spreadsheet, and yesterday we looked at --

20              MS. KANE:  A little too far.

21      BY MS. KANE:

22      Q.   Yesterday we looked at column X in these credit card

23      gateway records, and I believe you testified that that

24      reflected a masked credit card number; is that right?

25      A.   That's correct.
```

MILLER - DIRECT / KANE

1   Q.    Okay.  So previously today you said the last four digits

2   of the credit card number on the account were 0405.  And that's

3   what we see here; is that right?

4   A.    Yes.

5   Q.    And it's the same credit card number for each of these

6   transactions; right?

7   A.    Yes, it is.

8   Q.    But we saw different names in the columns we were just

9   looking at?

10  A.    Yes.

11  Q.    So what, if anything, does that tell you for your

12  investigation about those names?

13  A.    They are fictitious.

14  Q.    Now, did you try to investigate this credit card number?

15        MR. GASNER:  Your Honor, I move to strike the previous

16  answer.  Lack of foundation.  Lack of -- calls for an

17  opinion -- expert opinion, and I think it is irrelevant.

18        THE COURT:  I don't know about the relevance part, but

19  I don't think you have established that he is qualified to give

20  that opinion that the names would be fictitious.

21        So I am -- I'm going to strike that answer subject to you

22  being able to demonstrate that that -- that he is qualified to

23  give that opinion, and it is just an opinion.  It is not --

24  so -- what in his experience, training or education would allow

25  him to draw that conclusion.  Sustained for now.

1          MS. KANE:  Thank you, Your Honor, that's all right.

2    We can just move on.

3          THE COURT:  Okay.  Then the jury will disregard that

4    answer about fictitious.

5    BY MS. KANE:

6    Q.   Now, I think I was asking if you had investigated this

7    credit card number that you found on the Kongregate results?

8    A.   Yes, I did.

9    Q.   And were you able to determine anything about the owner of

10   that credit card?

11   A.   I was not.

12   Q.   Why not?

13   A.   It belonged to a Russian bank.

14   Q.   So were you able to subpoena the bank records for that

15   credit card?

16   A.   I was not.

17   Q.   Okay.  Are you able to subpoena bank records for U.S.

18   banks?

19   A.   Yes, I am.

20   Q.   Now, we also have in these credit card gateway records --

21          MS. KANE:  If we can go back to the beginning.

22   BY MS. KANE:

23   Q.   I just want to look at the date range here.  What is the

24   date range for these records?

25   A.   The date range is July 11th, 2012, through August 21st,

```
 1   2012.

 2             MS. KANE:   Now, let's go across.

 3   BY MS. KANE:

 4   Q.   Now there is a column headed BF.   And what does that show?

 5   A.   An IP address.

 6   Q.   Okay.   And this was part of what was provided by

 7   Kongregate; correct?

 8   A.   Correct.

 9   Q.   Did you find any connection between these IP addresses and

10   anything -- any of the IP addresses you had identified

11   previously in your investigation?

12   A.   No.

13   Q.   Did you find any connection between IP addresses in the

14   Kongregate records and IP addresses you identified during your

15   investigation?

16   A.   Yes, I did.

17   Q.   Okay.   And what were those?

18   A.   There was overlap between the Kongregate IP addresses and

19   IP addresses provided by Dropbox.

20   Q.   Okay.   So where did you find those Kongregate IP

21   addresses?

22   A.   I would have to see more of the records.

23   Q.   Okay.   Was that in the other spreadsheet?

24   A.   I believe it was.

25             MS. KANE:   Okay.   Let's go back to the other
```

MILLER - DIRECT / KANE

1    spreadsheet.

2    **BY MS. KANE:**

3    **Q.**   And this continues to be from the Kongregate business

4    records provided to you by Kongregate; right?

5    **A.**   Yes.

6    **Q.**   All right.  Let's go to the CC purchases tab.  And what do

7    we see here?

8    **A.**   More details about the credit card purchases.

9    **Q.**   Okay.  Now in column P here, we see something called IP

10   and what does that reflect?

11   **A.**   The IP used during the transaction.

12   **Q.**   Okay.  If we can keep going to the beginning -- I'm

13   sorry -- there is a country name captured in the Kongregate

14   records too.  What does that say?

15   **A.**   I believe that said Russian Federation.

16   **Q.**   And what is the date range on these transactions?

17   **A.**   July 11th, 2012, through August 21st, 2012.

18   **Q.**   So is this different credit card -- sorry -- a different

19   set of data for the credit card transactions we were looking

20   at?

21   **A.**   Yes.

22   **Q.**   All right.  And did you find any overlap between those IP

23   addresses that we were looking at and any other IP addresses

24   you identified in your investigation?

25   **A.**   Yes, I did.

1   **Q.**   Okay.  Now, I would like you to look at what has been

2   marked as Exhibit 142A.  Do you recognize 142A?

3   **A.**   Yes, this is a summary I created.

4   **Q.**   And what did you use to create that summary?

5   **A.**   Dropbox IPs and IPs associated with the Skype username.

6   **Q.**   Is there an Exhibit 142 as well?

7   **A.**   142B is Dropbox IP overlap.

8   **Q.**   Okay.

9        **MS. KANE:**  Can we put Exhibit 142A up just so the

10  witness can see it, please.

11       **THE WITNESS:**  I believe they are in the wrong folders.

12  It says 142A.

13       **MS. KANE:**  Oh, I see.  Okay.  I think that was the

14  confusion.

15       Can we put it just so the witness can see, please -- or

16  sorry, so it is not being shown to the jury.

17       **THE CLERK:**  Judge, do you see it on your screen?

18       **THE WITNESS:**  No, I do not.

19       **THE CLERK:**  You don't see it on yours?

20       **THE WITNESS:**  Now I do.  Thank you.

21       **MS. KANE:**  It is showing over here too?

22       **THE COURT:**  Is it showing in the jury box?

23       **JUROR SERPA:**  No.

24       **MS. KANE:**  Excellent.

25  \\\

MILLER - DIRECT / KANE

1    BY MS. KANE:

2    **Q.**   This is Exhibit 142A; correct?

3    **A.**   Yes.

4    **Q.**   Can you describe for us -- I'm just going to scroll

5    through here so you can look -- what records you used to create

6    142A?

7    **A.**   I used the records provided by Dropbox, the Kongregate

8    records, and I believe I saw a chinabig01@gmail.com in there.

9    **Q.**   So is this a summary that you created from otherwise

10   voluminous records?

11   **A.**   Yes.

12          **MS. KANE:**  Your Honor, we move to admit Exhibit 142A.

13          **THE COURT:**  Any objection?

14          **MR. GASNER:**  Submitted, Your Honor.

15          **THE COURT:**  Just I want to make sure I understand what

16   142A is.  You prepared it; correct?

17          **THE WITNESS:**  Yes, Your Honor.

18          **THE COURT:**  And you prepared it from records from

19   Dropbox, but -- I understand that part -- but anyone else?

20          **THE WITNESS:**  So as with the other companies --

21          **THE COURT:**  What?

22          **THE WITNESS:**  As with the other companies, I used the

23   logs the company provided and compared that against all the

24   other records I had for accounts in the investigation.

25          **THE COURT:**  Just in one sentence, what were you trying

1    to do?  What were you trying to find out?

2         **THE WITNESS:**  Yes.  I was trying to compare the IPs

3    for the intrusions to IPs of accounts that we had identified to

4    try to identify the individual.

5         **THE COURT:**  And does an IP address, in your opinion,

6    trace to a specific individual or does it trace to a particular

7    server or does it trace to a particular provider in Russia for

8    example?  What does it trace to?

9         **THE WITNESS:**  So each IP is a different provider or

10   could be a different provider.  Each IP goes back to a specific

11   device connected to the internet.  But if the IP is used in a

12   short amount of time between different accounts, it is most

13   likely controlled by the same person.

14        **THE COURT:**  That's an opinion now.

15        **THE WITNESS:**  Yes, Your Honor.

16        **THE COURT:**  All right.  All right.  142A is going to

17   be received in evidence.  Thank you.

18        (Trial Exhibit 142A received in evidence.)

19   **BY MS. KANE:**

20   **Q.**   Okay.  So I want to direct your attention to lines 101

21   through 105.  Can you tell us what that is showing?

22   **A.**   Line 101 indicates access activity for a Dropbox employee

23   on July 5th, 2012 using an IP ending in .49.

24        **JUROR SERPA:**  Are we supposed to see it?

25        **MS. KANE:**  Yes.

1          THE COURT:  Please let the jury see it.  It is in

2    evidence.

3          THE CLERK:  It just takes a minute.

4          THE COURT:  Sorry.  I should have said so.  Thank you.

5    Thank you.

6                    (Pause in proceedings.)

7    BY MS. KANE:

8    Q.   Thank you.  You can continue.

9    A.   So there is an entry for access activity for the Dropbox

10   employee tony@dropbox on July 5th, 2012, from an IP address

11   ending in .49.

12        And then on July 11th, 2012, there are purchases -- three

13   purchases from the same IP address ending in .49 for the

14   Kongregate account associated with the username Zopaqwel1 and

15   the e-mail address r00talka@mail.ru.

16   Q.   So those are the Kongregate records we were just looking

17   at; correct?

18   A.   Yes, they are.

19   Q.   Now, let's go up.  If you see at lines 36 through 39, can

20   you describe what we see there?

21   A.   Line 36 is an entry on May 26th, 2012, with an IP ending

22   in .176 for the Dropbox account associated with

23   chinabig01@gmail.com.  And then also later on May 26th, 2012,

24   the same IP address accesses the Dropbox employee account

25   tomw@dropbox.com.

MILLER - DIRECT / KANE

```
 1            And then shortly after that on the same day, the same IP
 2   address accesses the Dropbox account associated with the e-mail
 3   address chinabig01@gmail.com.
 4            MS. KANE:  Thank you.  All right.  We can put that
 5   down.
 6   BY MS. KANE:
 7   Q.   All right.  So you had obtained records from Kongregate
 8   and those were associated with an e-mail address
 9   r00talka@mail.ru?
10   A.   Yes.
11   Q.   And I believe you testified about that e-mail address.
12   Were you able to obtain any subscriber records?
13   A.   No, I was not.
14   Q.   Now, did you find any other leads for that username?
15   A.   Yes, I did.
16   Q.   What did you find?
17   A.   I used the root of that username r00talka and found a
18   Google account using the same username.
19   Q.   And did you obtain records for that Google account?
20   A.   Yes, I did.
21   Q.   I would like you to look at Exhibit 143.  Do you recognize
22   Exhibit 143?
23   A.   Yes, I do.
24   Q.   And what is it?
25   A.   This is the content of the e-mail address
```

1    r00talk@gmail.com from Google.

2    **Q.**   And how did you obtain that?

3    **A.**   With a search warrant.

4    **Q.**   So did you obtain those records from Google?

5    **A.**   Yes, I did.

6    **Q.**   And what was the request that you made to Google -- what

7    was the account name?

8    **A.**   R00talka -- R-0-0-T-A-L-K-A -- @gmail.com.

9    **Q.**   And can you look at Exhibit 143A?

10   **A.**   Yes.

11   **Q.**   What is that?

12   **A.**   This is the certificate of authenticity of business

13   records for that data from Google.

14           **MS. KANE:**  All right.  So the U -- sorry --

15   **BY MS. KANE:**

16   **Q.**   Now I would like you to look at Exhibit 143I.  And what is

17   that?

18   **A.**   This is the subscriber information for that

19   r00talka@gmail.com account.

20   **Q.**   And is that something you obtained along with the records

21   from Google?

22   **A.**   Yes.

23   **Q.**   And that was also obtained with the certificate of

24   authenticity you just described; is that right?

25   **A.**   That's correct.

1          **MS. KANE:**  We move to admit Exhibit 143I.

2          **MR. GASNER:**  Submitted.

3          **THE COURT:**  Received.

4       (Trial Exhibit 143I received in evidence.)

5          **MS. KANE:**  Let's show 143I.

6    BY MS. KANE:

7    Q.   So can you tell us what we are looking at here?

8    A.   This is the subscriber information for the Google account

9    r00talka@gmail.com.

10   Q.   All right.  And what is the name on this account?

11   A.   First name r00talka, last name r00talka, R-0-0-T-A-L-K-A,

12   for both.

13   Q.   And there is an entry for last logins.  What does that

14   show?

15   A.   It shows dates in 2012, August 15th, June 17th, 2012, and

16   August 15th, 2011.

17   Q.   Now in the Google records we looked at previously, there

18   was IP login history you testified.  Did you get IP login

19   history with these subscriber records?

20   A.   I did not.

21   Q.   Okay.  And we saw the last login dates -- and you had

22   testified that Google doesn't keep the login records forever;

23   is that right?

24   A.   That's correct.

25   Q.   And I think you testified it was somewhere around 180

1   days?

2   **A.**   That being on the high end, yes.

3   **Q.**   So for the last login dates here, by the time you had

4   identified and requested records for this account, were you

5   within 180 days of the last login?

6   **A.**   I was not.

7   **Q.**   Okay.  Now, in addition to these subscriber records for

8   the account, did you obtain any content of the account, like,

9   we looked at before e-mail messages or search history, for

10  example?

11  **A.**   Yes, I obtained both the e-mail content and the e-mail

12  messages as well as search history for this account.

13  **Q.**   So I would like you to look at Exhibits 143E and F.  Do

14  you recognize those?

15  **A.**   Yes, I do.

16  **Q.**   What are they?

17  **A.**   E are the Russian searches conducted in the account and F

18  is the English translation of those searches.

19          **MS. KANE:**   I would like to move for admission of the

20  search history and I have a stipulation to read.

21      (Reading:)  "Government Exhibit 143E is excerpts of

22  Russian language search history.  Government Exhibit 143F is an

23  accurate translation of the search history from the Russian

24  language to the English language."

25          **THE COURT:**   So stipulated.

1          MR. GASNER:  So stipulated.

2          THE COURT:  All right.  Those are received in evidence

3    143E and 143F.

4        (Trial Exhibits 143E and 143F received in evidence.)

5          MS. KANE:  Let's show 143F.

6    BY MS. KANE:

7    Q.   Can you tell us what we are looking at here?

8    A.   Yes.  On June 18th, 2012, the account searched for

9    LinkedIn hack.

10        On July 27th, 2011, the account searched for mysql count

11   Fields.

12        July 26th, 2011, the account searched for change mac

13   address wifi windows 7.

14        And on June 6th, 2011, it searched for an address,

15   ochakovskaya.

16   Q.   Now, I would like to return to the timeline that we were

17   looking at yesterday.

18          THE COURT:  Can I ask you a question about the

19   relevance for a minute?  Now, the answer is not evidence but

20   I'm trying to help us understand why we are going into this.

21        Why do we care about this r00 account at Google and what

22   they were searching for?  Why is that relevant?  What is your

23   theory so at least the jury can have the benefit of your theory

24   of relevance.

25          MS. KANE:  Well, Your Honor, Special Agent Miller is

1    testifying about the steps that he was taking in his

2    investigation to identify the people responsible.

3            THE COURT:  Yeah, I get that.

4            MS. KANE:  Or person responsible for the LinkedIn,

5    Dropbox, Formspring intrusions.

6            THE COURT:  Yes.  But maybe this is just a dry hole

7    and we are wasting our time.  I don't know.  Is there going to

8    be evidence that the Defendant's name pops up on this account?

9            MS. KANE:  Well, Your Honor -- I'm hesitant to offer

10   too much of my own words.  I would like to let Special Agent

11   Miller --

12           THE COURT:  All right.

13           MS. KANE:  -- give the testimony.

14           THE COURT:  So we don't know yet whether this is a dry

15   hole, and we are just getting thoroughly immersed in a dry hole

16   or whether or not it is going to lead to a blazing headline.

17       We don't know yet.  But I must say I'm at a loss of why we

18   are taking up so much time.  You said yesterday you had a

19   little bit more than an hour, and we have gone an hour and 20

20   minutes.

21       So we are running out of -- we are taking up the jury's --

22   we are imposing on the jury.  So let's try to pick up the pace

23   somehow.

24   BY MS. KANE:

25   Q.   All right.  So I think this is where we were yesterday

1   with our timeline.  And yesterday you also testified about the

2   search history for chinabig01@gmail.com, and there was a search

3   for the LinkedIn hash on June 7th, 2012.  So we will add that

4   to our timeline and now we just saw on June 18th, 2012, a

5   search for LinkedIn hack in the r00talka@gmail account.  So we

6   will add that as well.

7                       (Pause in the proceedings.)

8   BY MS. KANE:

9   Q.   All right.  Now, let's go back to Exhibit 143F, and let's

10  go to page 2.

11       All right.  Can you tell us what we are looking at here?

12  A.   The account searched on February 21st, 2011, for dentistry

13  24 hours Moscow and then searched again on February 21st, 2011,

14  for dentistry Kantemirovskaya.

15  Q.   And was there something significant -- had that come up in

16  your investigation before?

17  A.   The name Kantemirovskaya, yes.

18  Q.   How did that come up?

19  A.   The subscriber records for the 239 IP that was used to

20  connect to Mr. Barry's VPN credentials came back to the

21  Defendant who lived on Kantemirovskaya Street in Moscow.

22  Q.   We also saw a search yesterday from the

23  chinabig01@gmail.com account for an address on Kantemirovskaya

24  Street; is that right?

25  A.   That's correct.

1          **MR. GASNER:**  Pardon me, Your Honor, may I interpose an

2     objection, please.

3          I don't believe that there is -- I think there is lack of

4     foundation with regard to residence of Mr. Nikulin at that

5     address.

6          **THE COURT:**  I just -- repeat your last point.

7          **MR. GASNER:**  I believe that the testimony of Agent

8     Miller that there is evidence that Mr. Nikulin lived at that

9     address lacks foundation.

10          **THE COURT:**  Sustained.  That will be stricken.  He has

11     no personal knowledge of that.  And so the jury will disregard.

12     If you want to go into expert testimony and show his opinion

13     concerning the address of the Defendant and what it is based

14     on, this one thing.  But this witness has no personal

15     knowledge, zero, of where the Defendant lived in Moscow.

16          Sustained.

17     BY MS. KANE:

18     Q.   So we previously looked at Exhibit 85A, the translation of

19     the Mutual Legal Assistance Treaty request; and you testified

20     that that, for the 239 IP address, included subscriber records.

21     And those subscriber records had an address and the Defendant's

22     name; is that right?

23     A.   That's correct.

24     Q.   And the address listed with the Defendant's name what

25     street was that?

**MILLER - DIRECT / KANE**

1   **A.**   Kantemirovskaya.

2   **Q.**   Thank you.

3         **THE COURT:**  Okay.  That piece -- that all is -- has

4   been admitted.  That's legitimate for you to use that

5   information.  I'm not saying that it is gospel, but that is at

6   least in evidence.

7         **MS. KANE:**  Thank you, Your Honor.

8   **BY MS. KANE:**

9   **Q.**   Now, let's go back to page 1 of 143F.  There is a

10  reference to Wordpress there.  Can you read that?

11  **A.**   Searched for Wordpress vulnerabilities on April 15th,

12  2011.

13  **Q.**   And had the term "Wordpress" come up in your

14  investigation?

15  **A.**   Yes, it had.

16  **Q.**   And how did that come up?

17  **A.**   The victim Automattic was the parent company of Wordpress.

18        **THE COURT:**  These are searches by what number or IP

19  address?  I think I have lost track of that.  These were --

20  this is records back from Google telling us searches by what

21  account?

22        **THE WITNESS:**  The r00talka@gmail.com account,

23  Your Honor.

24        **THE COURT:**  Now, I remember.  Okay.  Please go ahead.

25  \\\

1    **BY MS. KANE:**

2    **Q.**    There is one more entry here in the search history for

3    July 27th of 2011.  It says searched for mysql count fields or

4    my sql.  Had my sql or sql come up in the investigation?

5    **A.**    Yes, it had.

6    **Q.**    How is that?

7    **A.**    It is a database.

8    **Q.**    And how did that relate to the investigation?

9    **A.**    I believe it was a database used by one of the victims.

10   **Q.**    Thank you.

11           **MS. KANE:**  Your Honor, I'm going to move to another

12   exhibit.  I don't know if you wanted to take a morning break.

13           **THE COURT:**  Well, we have gone an hour and 25 minutes.

14   That's about what you said you needed.  Are you nearly end --

15           **MS. KANE:**  I have a couple more things to cover.

16           **THE COURT:**  Just a couple?

17           **MS. KANE:**  I apologize.  Like Mr. Gasner, I think I

18   was underestimating.

19           **THE COURT:**  All right.  We will take a break at this

20   time, 15 to 20 minutes.  Please don't talk about the case.

21   Thank you all.

22        (Proceedings were heard outside the presence of the jury:)

23           **THE COURT:**  Everyone, be seated.

24        Now, that the jury is out, educate me.  What does -- do

25   you have any evidence that directly connects this r00talka

**PROCEEDINGS**

1    account with the Defendant?

2              MS. KANE:  We do, Your Honor.

3              THE COURT:  What is that going to be?

4              MS. KANE:  That is coming up next.

5              THE COURT:  That is going to be like a blockbuster.

6    The room will shake whenever that finally comes out.

7         Is it really solid or is it just inference?

8              MS. KANE:  Well, Your Honor -- I think we are still on

9    the record here.  I mean, I don't want to be arguing.

10             THE COURT:  But there is no jury here.

11             MS. KANE:  Okay.

12             THE COURT:  Is his name going to appear in some

13   record?

14             MS. KANE:  Well, his face is going to appear,

15   Your Honor.

16             THE COURT:  What?

17             MS. KANE:  His face is going to appear.

18             THE COURT:  All right.  Do you have any e-mails -- any

19   of these accounts between him and this person Anya, who was his

20   girlfriend apparently?  Is there anything like that there?

21             MS. KANE:  There is a connection there, yes,

22   Your Honor.

23             THE COURT:  Are we going to hear about that?

24             MS. KANE:  Yes, Your Honor.

25             THE COURT:  You need to -- you told this jury

**PROCEEDINGS**

1  yesterday a little over an hour and their patience is wonderful

2  but we -- we are putting our ability to get this case to a

3  verdict at risk this week.  So please try to streamline --

4        **MS. KANE:**  Well, Your Honor -- I'm sorry.  I didn't

5  mean to interrupt, Your Honor.

6        **THE COURT:**  Yeah.

7        **MS. KANE:**  It seemed that, perhaps, I was going

8  through things too quickly yesterday and that maybe I wasn't

9  drawing out enough for -- because I knew you had a number of

10 questions.  And that's why I was trying to be more clear about

11 all the foundation and relevance.

12       **THE COURT:**  Sometimes it is better if you go straight

13 to the picture.  You know, here is the picture of the Defendant

14 on this very account instead of all this mumbo-jumbo that is so

15 hard to follow.  I don't know.  We will take our 15 minutes

16 now.  Thank you.

17       **MS. KANE:**  Thank you, Your Honor.

18                (Recess taken at 10:16 a.m.)

19              (Proceedings resumed at 10:32 a.m.)

20      (Proceedings were heard in the presence of the jury:)

21       **THE COURT:**  Welcome back.  Have a seat.  Let's make

22 sure everyone is settled in and all the jurors are ready to go.

23 Excellent.  Please proceed, Ms. Kane.

24       **MS. KANE:**  Thank you, Your Honor.

25 \\\

**PROCEEDINGS**

1    BY MS. KANE:

2    Q.   When we left off, we were discussing the contents of the

3    account r00talka@gmail.com.   And you testified that you had

4    obtained those contents from Google; is that right?

5    A.   Yes.

6    Q.   Now, in addition to what we previously discussed from the

7    account, did you find any correspondence in the account?

8    A.   Yes, I did.

9    Q.   And did you find anything in the correspondence that

10   helped you identify the owner of the account?

11   A.   Yes, I did.

12   Q.   And what was that?

13   A.   They were automated e-mails from the social media company

14   VK.com.

15   Q.   All right.   Are you familiar with the social media company

16   VK?

17   A.   Yes, I am.

18   Q.   And how are you familiar with it?

19   A.   I have had a VK account for several years.

20   Q.   How long would you say you have had that account?

21   A.   Seven years or so.

22   Q.   And when you get an account with VK -- and that is also

23   known as VKontakte; is that right?

24   A.   I believe so, yes.

25   Q.   It is a Russian word translated into English; right?

**PROCEEDINGS**

1   A.   Yes.

2   Q.   And when you get an account with VK, do you sign up with

3   an e-mail address as we have seen with some of these other

4   accounts?

5   A.   Yes.

6   Q.   And does the service then send messages to the e-mail

7   account associated with the VK account?

8   A.   It does.

9   Q.   And did it do that when you originally signed up for your

10  account?

11  A.   It did.

12  Q.   Is there a display name that the user can enter for their

13  account?

14  A.   Yes.

15  Q.   Is that similar to the accounts we were looking at earlier

16  today for which you obtained subscriber records?

17  A.   Yes.

18  Q.   Can the user change that display name?

19  A.   Yes, they can.

20  Q.   And you -- you said that you have an account.  And does

21  your -- in your account can you see that there are messages

22  automatically generated by the system that are sent to your

23  account?

24  A.   Yes.

25  Q.   And what types of messages do you -- can you receive in

PROCEEDINGS

1    your account that way?

2    **A.**    Normal notifications, interactions on the platform, if

3    someone mentions you or sends you a notification.

4    **Q.**    And then what kind of message does it generate?

5    **A.**    It sends you a link to if it was a post, the post or if it

6    was a login, it would notify you of a login.

7    **Q.**    And does it send it to the e-mail account that is

8    associated with the VK profile?

9    **A.**    Yes.

10   **Q.**    All right.  And describe what a VK profile looks like?

11   **A.**    It looks very similar to a Facebook profile, a user

12   profile photo, a name, information about the person, maybe

13   where they went to school, where they live, friends, those

14   things.

15   **Q.**    I would like you to look at Exhibits 143J and K.  Do you

16   recognize these?

17   **A.**    I do.

18   **Q.**    And what are they?

19   **A.**    These are automated messages from VK.com that I discovered

20   in the r00talka@gmail.com account.

21         **MS. KANE:**  Your Honor, the United States moves for the

22   admission of 143J and K.

23        I need to make one thing clear for the record about these.

24   Yesterday when Mr. Romanenko, the Russian speaker, was

25   testifying, he testified to the accuracy of the translation.

1        At the time these documents were labeled Exhibits 143B and

2   C.  We have discussed with the Defense that for procedural

3   reasons, we are relabeling them 143J and K.  But the testimony

4   yesterday regarding the accuracy of the translation at Exhibit

5   143C from Russian into English applies to the content now of

6   Exhibit 143K.  The Russian is 143J.

7        With that, we move for admission of these exhibits, 143J

8   and K.

9            MR. GASNER:  Submitted, Your Honor.

10           THE COURT:  All right.  143J and K will be received in

11  evidence.  I will note that according to my notes, 143B and C

12  were never moved into evidence.

13       (Trial Exhibits 143J and 143K received in evidence.)

14           MS. KANE:  Yes, Your Honor, that's correct.  The

15  translator testified yesterday to the accuracy of those

16  translations, but we have now raised them and moved them into

17  evidence with Special Agent Miller.

18           THE COURT:  All right.  So we have one more wrinkle to

19  absorb, but we have done it.  So move on.

20           MS. KANE:  Thank you, Your Honor.  Now I would like to

21  use the ELMO to show this exhibit.

22           THE CLERK:  Give me a second.

23                   (Pause in proceedings.)

24  BY MS. KANE:

25  Q.   So, Special Agent Miller, can you tell us what we are

**PROCEEDINGS**

1    looking at here?

2    **A.**    This is -- this is the English translation of an automated

3    e-mail from VK .com to the r00talka@gmail.com account.

4    **Q.**    All right.  And what is the subject?

5    **A.**    Anna Shvedova left a comment to a post on your wall.

6    **Q.**    And the date?

7    **A.**    December 21, 2011.

8    **Q.**    And it is addressed to a name.  What is that name?

9    **A.**    Top Man.

10   **Q.**    Okay.  And then it has content here so I would like to

11   zoom in here.  It says Top Man next to a photo.  Do you

12   recognize that photo?

13   **A.**    Yes, I do.

14   **Q.**    Do you recognize the person in the photo?

15   **A.**    Yes, I do.

16   **Q.**    Who is that?

17   **A.**    That's the Defendant.

18   **Q.**    And this is showing a notification.  And how would you

19   describe this?  What is it a notification of?

20   **A.**    A post that Ms. Shvedova made on Top Man's wall.

21   **Q.**    So there is a photo there.  I will zoom in on that photo

22   and then it says next to it Anna Shvedova.  Had that name come

23   up before in your investigation?

24   **A.**    Yes, it had.

25   **Q.**    How did that come up?

**PROCEEDINGS**

1   **A.**   The name was listed as a contact with regards to these

2   proceedings provided by the Defendant.

3   **Q.**   So I would like to show Exhibit 14 -- I would like you to

4   look at Exhibit 148.  Do you recognize that?

5   **A.**   Yes, I do.

6   **Q.**   And what is it?

7   **A.**   A contact list.

8   **Q.**   Okay.  I have a --

9        **MS. KANE:**   I would like to move for admission of

10  Exhibit 148, and I have a stipulation to read.

11        **THE COURT:**   Read the stipulation first.

12        **MS. KANE:**   (Reading:)  "Government Exhibit 148 is a

13  true and correct copy of a contact list containing information

14  provided by Defendant."

15        **THE COURT:**   So stipulated?

16        **MR. GASNER:**   Yes, Your Honor, no objection.

17        **THE COURT:**   All right.  148 received in evidence.

18     (Trial Exhibit 148 received in evidence.)

19        **MS. KANE:**   If we can switch to the computer for a

20  moment and we will show 148.

21  **BY MS. KANE:**

22  **Q.**   Can you tell us what you see at the bottom there?

23        **MS. WAWRZYNIAK:**   We can't see it out here.

24        **THE COURT:**   Okay.  We need to turn -- can you see it

25  over there?

PROCEEDINGS

```
 1                JUROR SERPA:  No.

 2            THE COURT:  Sorry.  Let's --

 3            THE CLERK:  Sorry.  It's my fault.

 4            MS. KANE:  We are all learning.

 5            THE COURT:  Is it on now?

 6            MS. WAWRZYNIAK:  Yes.

 7            THE COURT:  Good.  Thank you.

 8   BY MS. KANE:

 9   Q.   So what do we see here?

10   A.   Contact listed as Anna Shvedova from Moscow, Russian

11   Federation with a phone number and a date creation.

12   Q.   Okay.  I would like to -- while we are on this -- also

13   look at the first entry on that contact list.  Can you tell us

14   what we are seeing here?

15   A.   Contact name of Mikhail Nikulin.  Address MSK MSK, Russian

16   Federation.

17   Q.   And --

18            MS. KANE:  We can put that down.

19   BY MS. KANE:

20   Q.   Do you have Exhibits 149 and 150 there?

21   A.   Yes, I do.

22   Q.   And what are they?

23   A.   Exhibit 149 is a message from --

24   Q.   It is an e-mail message?

25   A.   Yes, it is.
```

**PROCEEDINGS**

1  **Q.**   And what is 150?

2  **A.**   Another e-mail message.

3          **MS. KANE:**   I have stipulations to read regarding 149

4  and 150.

5          **THE COURT:**   Please do.

6          **MS. KANE:**   (Reading:)   "Government Exhibit 149 is a

7  true and correct copy of an e-mail message sent by Defendant in

8  the Russian language.   Government Exhibit 150 is an accurate

9  English translation of Government Exhibit 149."

10     And we move for admission of 149 and 150.

11          **THE COURT:**   That's both -- is that stipulation

12  correct.

13          **MR. GASNER:**   Yes, sir.

14          **THE COURT:**   Both exhibits received.

15     (Trial Exhibits 149 and 150 received in evidence.)

16  **BY MS. KANE:**

17  **Q.**   Can you tell us what we see here?

18  **A.**   Yes.   It is a message from the Defendant to a Mikhail

19  Nikulin with an e-mail address dated January 14th, 2019; and it

20  says:   "Hi, its Zhenya, why aren't you writing?   What is

21  interesting in Moscow?   How are our parents?"

22  **Q.**   Thank you.   Now I would like to switchback to the ELMO,

23  please.

24          **MS. KANE:**   Can we switchback to the ELMO?

25          **THE CLERK:**   You are.

```
 1              MS. KANE:  It is not up here.  If everyone up here can

 2    see it, then we are good.  Okay.  Thank you.

 3    BY MS. KANE:

 4    Q.   So now this is page 2 of 143K.  And what do we see here?

 5    A.   It's a message or an e-mail from Anna Shvedova.

 6    Q.   Well, the e-mail -- is the e-mail from Anna Shvedova?

 7    A.   Let me correct myself.  It is an automated message from VK

 8    regarding a message Anna Shvedova left.

 9    Q.   It is again addressed to Top Man; is that right?

10    A.   That's correct.

11    Q.   Okay.  And then the notification again shows a photo next

12    to the words Top Man.  And what does that show?

13    A.   The photo is of the Defendant.

14    Q.   Okay.  And then there is also a photo of -- I will zoom in

15    on the photos -- here.  It is next to the words Anna Shvedova;

16    correct?

17    A.   Correct.

18    Q.   And again at page 3 here, what do we see?

19    A.   Another notification through the VK .com website, a

20    message from Shvedova.

21    Q.   Okay.  And what is the date on this one?

22    A.   January 12th, 2012.

23    Q.   What does the message say?

24    A.   You are my sweetheart.

25    Q.   There is another message here.  And what is the date on
```

**PROCEEDINGS**

1  this one?

2  **A.**   January 27th, 2012.

3  **Q.**   And what is the subject?

4  **A.**   Anna Shvedova sent you a gift.

5  **Q.**   Is this another one of the automated messages that you

6  were describing?

7  **A.**   Yes, it is.

8  **Q.**   All right.  This one has a name on it.  What is that name?

9  **A.**   Evgeniy Kantemirovskaya.

10  **Q.**   Did the word Kantemirovskaya seem significant related to

11  anything in your investigation?

12  **A.**   Yes.

13  **Q.**   And what was that?

14  **A.**   I had seen it in the MLAT return from the Russian

15  Federation for the IP address ending in .239 as well as in

16  Google search histories.

17  **Q.**   And yesterday when we were listening to the recording of

18  the Defendant, was there also a mention in Exhibit 88?

19  **A.**   Yes, I believe there was.

20  **Q.**   And that was a reference to Kantemirovskaya Street; is

21  that right?

22  **A.**   I believe so.

23  **Q.**   All right.  Now, let's look at the next page.  This is

24  dated February 7th, 2012?

25  **A.**   Yes.

1   **Q.**   And what is the subject?

2   **A.**   Anna Shvedova replied to your comment.

3   **Q.**   And there is a picture here next to the name Anna

4   Shvedova.  And then below it is another picture next to the

5   name Evgeniy Kantemirovskaya.  And do you recognize the person

6   in the picture next to that name?

7   **A.**   Yes, I do.

8   **Q.**   And who is that?

9   **A.**   That is the Defendant.

10  **Q.**   And in this message there is also a reply again from the

11  same photo and name that we saw before; is that right?

12  **A.**   Yes.

13  **Q.**   Turning to the next page, is this another one of the

14  notifications from this r00talka account?

15  **A.**   Yes, it is.

16  **Q.**   And this is dated March 6th, 2012?

17  **A.**   Yes.

18  **Q.**   And what does this show here?

19  **A.**   Accepted friend requests.  One from an individual Mikhail

20  Nikulin.

21  **Q.**   And that was a name that was on the e-mail message that we

22  just saw; is that right?

23  **A.**   A variation, yes.  I think this one has a K.

24  **Q.**   And on the next page now, we are into March 28th, 2012.

25  What does this show?

**PROCEEDINGS**

1  **A.**   Another subject is Anna Shvedova replied to your comment.

2  **Q.**   And there is a photograph and the name Anna Shvedova.

3  This is a different photograph than we saw before.  Based on

4  your use of VK, can people change the photograph that appears

5  for their account?

6  **A.**   Yes.

7  **Q.**   And there is a reply again from Evgeniy Kantemirovskaya.

8  There is a photo there.  Do you recognize that photo?

9  **A.**   Yes, I do.

10      **THE COURT:**  Wait a minute.  Just a second.  I want you

11  to answer.  But you move it around so much we can't see it.

12  Get it to the place you want so the jury can see for themselves

13  how clear it is.  All right.

14      **MS. KANE:**  There we go.

15      **THE COURT:**  Is that it?  Okay.  Now answer the

16  question.

17      **THE WITNESS:**  If you zoom out a little bit, it will be

18  less blurry, please.

19      **THE COURT:**  I couldn't hear your answer.  What?

20      **THE WITNESS:**  I requested the picture be zoomed out.

21  It is too blurry.

22      **THE COURT:**  Zoom it out.

23      **THE WITNESS:**  Thank you.  The individual in the middle

24  is the Defendant of those three people.

25  \\\

PROCEEDINGS

**BY MS. KANE:**

**Q.**   And that's next to the name Evgeniy Kantemirovskaya again; is that right?

**A.**   Yes.

**Q.**   All right.  I would like to look at the next message. Again, looking at the header, what does this show?

**A.**   Subject Sofi Denisova left you a personal message.

**Q.**   What is the date on this?

**A.**   April 15th, 2012.

**Q.**   And can you read the first sentence of this -- sorry -- the first two sentences of this message?

**A.**   I now live on Kantemirovskaya.  Moved just recently, smiley face, smiley face, smiley face.  We are now neighbors again.  I work as a stylist but it's rather only a hobby.  My soul need something else.

**Q.**   You can stop there.  Thank you.  And now the last page, what does the header here show?

**A.**   Mikhail Nikulin left you a personal message.

**Q.**   And what is the date?

**A.**   That is May 20th, 2012.

**Q.**   And what does this show?

**A.**   A message from Mikhail Nikulin with a link.

**Q.**   And is this another one of the automatic notifications?

**A.**   Yes.

**Q.**   Thank you.  All right.  I would like you to look at

**PROCEEDINGS**

1    Exhibit 143G and 143H.  Do you recognize those?

2    **A.**    Yes, I do.

3    **Q.**    What are those?

4    **A.**    143H is an e-mail received by the r00talka@gmail.com

5    account that is in Russian, and 143G is the English translation

6    of that e-mail.

7    **Q.**    And do you have 143D in front of you as well?

8    **A.**    Yes, I do.

9    **Q.**    And what is that?

10   **A.**    This is an e-mail sent to the r00talka@gmail.com account

11   and it states:  Hi, china china.

12   **Q.**    Okay.

13         **MS. KANE:**  We move to admit -- I'm sorry, are those

14   e-mail messages in English?

15         **THE WITNESS:**  143D, yes.

16         **MS. KANE:**  We move to admit 143D.

17         **THE COURT:**  Received.

18       (Trial Exhibit 143D received in evidence.)

19         **MS. KANE:**  Can we show 143D?

20         **JUROR SERPA:**  You might need to turn off the ELMO.

21         **THE CLERK:**  I got it.

22         **JUROR SERPA:**  Thank you.

23         **MS. KANE:**  Blow up the header and the first paragraph.

24   BY MS. KANE:

25   **Q.**   So this is -- what is this that we are looking at?

PROCEEDINGS

1   A.   It is an e-mail sent to r00talka@gmail.com from a website

2   beanstalkapp .com.

3   Q.   And what is the date?

4   A.   April 9th, 2012.

5   Q.   And it is addressed to someone.  Who is it addressed to?

6   A.   China china.

7   Q.   Let's look at the next page.

8        MS. KANE:  Same thing.  Can we blow up the header on

9   the first paragraph -- sorry, just the header.

10  BY MS. KANE:

11  Q.   So what is this?

12  A.   An e-mail sent from payonline.ru to the r00talka@gmail.com

13  account.

14  Q.   And what is this?

15  A.   Payment information.

16  Q.   So we see r00talka@gmail.com.  And then below it there is

17  a series of asterisks and the number 0405.  And did you

18  recognize that as having come up in your investigation?

19  A.   Yes, I did.

20  Q.   And how had that come up before?

21  A.   Those were the same last four digits of the credit card

22  used on the Kongregate account associated with Zopaqwel1.

23  Q.   And that was -- that Kongregate account was under the

24  e-mail address r00talka@mail.ru; is that right?

25  A.   That's correct.

**PROCEEDINGS**

1    Q.    This is August 11, 2012.  Is this a similar message to the

2    previous one?

3    A.    Yes, it is.

4    Q.    And is the payment information you identified previously

5    the same here?

6    A.    It appears so, yes, minus the date at the bottom,

7    I believe.

8    Q.    All right.  Let's go to the last page.  And what is this

9    page?

10   A.    This is an e-mail from accessrx .com to the

11   r00talka@gmail.com account.

12   Q.    And this also is addressed to a name.  What is the name?

13   A.    China.

14   Q.    I would like to move to a new topic and go back to the

15   Formspring data that we discussed before.

16         During your investigation, did you ever see evidence of

17   that data being sold?

18   A.    Yes, I did.

19   Q.    And how did that come up?

20   A.    I saw references in a related investigation in e-mails.

21   Q.    And whose e-mail records were those?

22   A.    They were Nikita Kislitsin.

23   Q.    And when did that come up?

24   A.    The actual sale transaction?

25   Q.    When did it come to your attention?

**PROCEEDINGS**

1    **A.**    2013.

2    **Q.**    I would like you to look at Exhibits 20 and 147.  I think

3    they should be next to you.

4    **A.**    Yes.

5    **Q.**    And do you recognize those?

6    **A.**    Yes, I do.

7    **Q.**    And what are they?

8    **A.**    This is a disk containing the search warrant return for

9    the e-mail address fyofyofyo@hotmail.com for Microsoft.

10   **Q.**    And when you say "return," you mean a response that you

11   received from Microsoft?

12   **A.**    Yes, that's correct.

13   **Q.**    And what is Exhibit 147?

14   **A.**    It is the declaration of authentication of business

15   records certifying that disk as business records.

16   **Q.**    So you received these records in the course of your

17   investigation.  How did you obtain these records?

18   **A.**    A search warrant.

19   **Q.**    Okay.  So you served a search warrant on Microsoft for the

20   records; correct?

21   **A.**    For the content of that account, yes.

22   **Q.**    So Exhibit 20 is what you received back; is that right?

23   **A.**    That's correct.

24   **Q.**    And what is the connection of this fyofyofyo account to

25   Nikita Kislitsin?

**PROCEEDINGS**

1    **A.**    It is an account that he uses.

2    **Q.**    Can you look at Exhibits 120 and 120A.  Do you recognize

3    those?

4    **A.**    Yes, I do.

5    **Q.**    Okay.  What are they?

6    **A.**    These are e-mails contained in the fyofyofyo@hotmail.com

7    account.

8    **Q.**    And what language are they in?

9    **A.**    120A is in Russian.  120 is the translation in English.

10    **Q.**    All right.

11         **MS. KANE:**  I would like to read a stipulation

12    regarding these exhibits.

13         **THE COURT:**  Please.

14         **MS. KANE:**  (Reading:)  "Government Exhibit 120A is an

15    e-mail chain in the Russian language.  Government Exhibit 120

16    is an accurate translation of the e-mail chain from the Russian

17    language to the English language."

18         **MR. GASNER:**  So stipulated.

19         **THE COURT:**  Thank you.

20         **MS. KANE:**  We move to admit Exhibits 120 and 120A.

21         **MR. GASNER:**  No objection.

22         **THE COURT:**  Received.

23         (Trial Exhibits 120 and 120A received in evidence.)

24    BY MS. KANE:

25    **Q.**    And do you have there Exhibits 21A through E, 22A and 22B?

1    **A.**    Yes, I do.

2    **Q.**    What are those?

3    **A.**    Exhibit 21A is an e-mail from the fyofyofyo@hotmail.com

4    account.   What other numbers?

5    **Q.**    22A and 22B.

6    **A.**    It's another e-mail from that same account.

7           **MS. KANE:**  All right.  I have a stipulation to read

8    regarding these exhibits.

9        (Reading:)  "Government Exhibits 21A through E are e-mails

10   written in a mixture of English and French.  Government

11   Exhibits 22A and 22B provide an accurate translation of the

12   French language portions to the English language and also

13   include the English text."

14       We move to admit 21A through 21E, 22A and 22B.

15          **MR. GASNER:**  So stipulated and no objection.

16          **THE COURT:**  All received.

17       (Trial Exhibits 21A, 21B, 21C, 21D, 21E, 22A and 22B

18        received in evidence.)

19   **BY MS. KANE:**

20   **Q.**    I would like you to look at Government Exhibit 128.

21          **MS. KANE:**   I have a stipulation to read regarding 128.

22   (Reading:)  "Government Exhibit 128 is an e-mail attachment

23   that consists of Formspring user data in the form of username,

24   e-mail address, encrypted password, location, IP address, and

25   country code."

1          We move to admit Exhibit 128.

2               **MR. GASNER:**  No objection.

3               **THE COURT:**  Received.  And is that stipulation -- you

4     so stipulate?

5               **MR. GASNER:**  Yes, Your Honor.

6               **THE COURT:**  All right.  Thank you.

7          (Trial Exhibit 128 received in evidence.)

8     **BY MS. KANE:**

9     **Q.**   Now, I would like to step back from the exhibits for a

10    minute and ask you some questions.

11         In addition to the previous training and experience you

12    discussed yesterday, do you have any additional experience

13    regarding the market for stolen credentials or user data?

14    **A.**   Yes, I do.

15    **Q.**   What is that training and experience?

16    **A.**   I received training in various lingo or terms used in the

17    market as well as communication platforms.

18    **Q.**   All right.  And do you have experience in investigations

19    regarding the sale of stolen credentials?

20    **A.**   Yes, I do.

21    **Q.**   And do you have experience investigating the marketplaces

22    for stolen credentials?

23    **A.**   Yes, I do.

24    **Q.**   And can you describe those marketplaces?

25    **A.**   The marketplaces are typically websites that offer the

1   sale of stolen information, whether it be credit cards, user

2   credentials, passwords, things of that nature.

3   **Q.**   And are those websites that are easily available on the

4   internet to anyone?

5   **A.**   Some yes.  Some no.

6   **Q.**   And how would you describe them?

7   **A.**   Some are dark market or dark web sites.

8   **Q.**   What does that mean?

9   **A.**   It requires software to view them.

10  **Q.**   Do you have experience with the communications between

11  individuals involved in the sale of stolen data?

12  **A.**   Yes.

13  **Q.**   And in your experience and training investigating stolen

14  credentials, are you familiar with terms used by participants

15  in the marketplace for that data?

16  **A.**   Yes, I am.

17  **Q.**   Do participants in those types of transactions use

18  specialized language or jargon?

19  **A.**   Yes.

20  **Q.**   Do participants in those markets have specialized roles?

21  **A.**   Yes, they do.

22  **Q.**   Are you familiar with those roles?

23  **A.**   Yes.

24  **Q.**   Can you describe the different roles?

25  **A.**   Yes.  There are various roles including hackers, the

1    individuals who break into websites and steal data.  There are

2    the data brokers who help facilitate the sale of the stolen

3    data.  You have the buyers or the individuals who are actually

4    buying the stolen data, and then you also have bruters who are

5    individuals who try to crack or decrypt the stolen passwords.

6    Q.    When the data is sold, are there particular people

7    involved in the sale transactions?

8    A.    Yes.  It is typically referred to as a cash-out process.

9    So it is a way to monetize whatever stolen information.

10   Q.    And can you tell the jury what you mean by "cash-out" and

11   "monetize"?

12   A.    Sure.  So you could obtain stolen credit cards.  And an

13   individual in the cash-out service could provide ways for you

14   to get money out of the bank accounts associated with those

15   stolen credit cards.

16   Q.    And who buys the data?

17   A.    Other nefarious individuals who are trying to conduct

18   other schemes.

19   Q.    And what typically is the use for this type of stolen

20   data?

21   A.    There are a lot of uses.  Some include sending spam

22   advertisements to e-mail addresses to try to drive sales to

23   various pills.  People use the stolen data to access bank

24   accounts of victims, e-mail addresses, those kinds of things.

25   Q.    You mentioned the term "bruter."  Can you just give a

1  little bit more of a description of what that means?

2  **A.**   Yes.  So in this instance, say the LinkedIn data -- you

3  have a member ID, e-mail address and password hash, which is an

4  encrypted or obfuscated version of the password, these

5  individuals try to reverse that and figure out what the actual

6  clear text password is.

7  **Q.**   Are you familiar with the term "dump" --

8  **A.**   Yes.

9  **Q.**   -- in the context of the market for credentials?

10  **A.**   Yes, I am.

11  **Q.**   And what does that mean?

12  **A.**   That is usually the stolen data itself.

13  **Q.**   What types of credentials tend to fetch the highest

14  prices?

15  **A.**   Credentials for services that are widely used by

16  individuals, so a large user base, as well as credentials that

17  had been publicly notified that there had been a breach.

18  **Q.**   And once it does become public, what happens to the price

19  of the credentials?

20  **A.**   The price usual diminishes because the companies will then

21  force either password resets or remediate the issue, so the

22  attackers may not have as good access to the data or might not

23  be as valuable.

24  **Q.**   And in the marketplace for stolen data, is data sold only

25  once?

1   **A.**    No.   These individuals will sell the data as many times as

2   they can to generate as much profit as possible.

3   **Q.**    What happens to the price as they sell it multiple times?

4   **A.**    It typically diminishes.

5   **Q.**    So in this case there was evidence that credentials were

6   stolen from LinkedIn, Dropbox and Formspring.   And how would

7   you compare the value of, let's say, the Formspring data on the

8   one hand and then the LinkedIn and Dropbox data on the other

9   hand?

10  **A.**    So Formspring at the time was a smaller social network,

11  I believe, with somewhere around 30 million users.   LinkedIn

12  was much larger and it had valuable information about

13  individuals that could be used for targeting; so their name,

14  e-mail address, where they work, associates.   So the LinkedIn

15  data was much more valuable.

16  **Q.**    And if a dump, as you described it, has more records in

17  it, would that be more valuable than a dump with a smaller

18  number of records?

19  **A.**    Potentially, yes.

20  **Q.**    All right.   Now, I would like to show you what we

21  previously looked at.   And that's Exhibit 120A -- I'm sorry --

22  120.   And you testified that this was an e-mail chain.   In

23  looking at this, at the dates, the dates -- the earliest dates

24  are at the bottom of the e-mail chain; is that right?

25  **A.**    Yes.

1   **Q.**   So let's start and highlight the bottom messages.   So what

2   does this say?

3   **A.**   This is a message from no name e-mail address

4   moy.yawik@gmail.com on June 25th, 2012.   And it says:   "Hi, are

5   you going to contact my guy and his partner?"

6   **Q.**   And how does the date of this message relate to the

7   Formspring intrusion that you previously discussed?

8   **A.**   It is in the same timeframe.

9   **Q.**   Now the e-mail chain continues on July 2nd and July 3rd.

10   Can you read the July 2nd at 19:14 e-mail?

11   **A.**   Yes.   It says:   Mag, for some reason I can't reach him.

12   He is not online.   How often does he usually go online?

13   **Q.**   And then the next one?

14   **A.**   It's done.   I got in touch with him.

15   **Q.**   Now, you testified previously that fyofyofyo@hotmail.com

16   is the account from which you obtained these e-mail messages;

17   correct?

18   **A.**   That's correct.

19   **Q.**   Through a search warrant to Hotmail?

20   **A.**   To Microsoft.

21   **Q.**   Yes, to Microsoft.   Now, so remind the jury who is

22   fyofyofyo.

23   **A.**   Nikita Kislitsin.

24   **Q.**   All right.   And this is a conversation with someone using

25   the e-mail account moy.yawik@gmail.com -- M-O-Y.Y-A-W-I-K.   Who

PROCEEDINGS

1    is that?

2    **A.**   Alexsey Belan.

3    **Q.**   And how did you determine who -- that those people were

4    controlling those accounts?

5    **A.**   It was based on information contained in the accounts.

6    **Q.**   And what types of information did you see in the accounts?

7    **A.**   Billing statements and references to other accounts and

8    names.

9             **MR. GASNER:**  Your Honor, at this point I would like to

10   object to that information and move to strike.  Lack of

11   foundation.  Lack of personal knowledge.

12            **THE COURT:**  Well, the witness has been giving opinion

13   testimony as someone with specialized training.  Opinion

14   testimony can come into evidence, but it is only as good as

15   what it is based on and it is not necessarily fact.  It is just

16   opinion.

17        And it is always up to you, the jury, to decide how much

18   weight to give to any evidence.  But when we are talking about

19   opinion evidence, you should keep in mind that it is an opinion

20   and is only as good as the underlying facts or record that

21   supports the opinion.

22        So I give you that caveat.  I'm going to let the testimony

23   stand for now.  All right.  Go ahead.

24            **MS. KANE:**  Thank you, Your Honor.

25   \\\

1    BY MS. KANE:

2    Q.   I would like to go and have you look at Exhibit 152B and

3    C.  And tell us if you recognize 152B and C?

4    A.   152B is an e-mail from the e-mail account moy_yawik@vk.ru.

5    and 152C is copy of a passport.

6    Q.   And are these documents part of what you described as

7    helping you to identify the owner of the moy.yawik account?

8    A.   Yes, they are.

9              MS. KANE:  Move to admit Exhibits 152B and C.

10             MR. GASNER:  Submitted.

11             THE COURT:  Received in evidence.

12        (Trial Exhibits 152B and 152C received in evidence.)

13   BY MS. KANE:

14   Q.   So what is 152C?

15   A.   A Russian passport.

16   Q.   Do you recognize the person in that photograph?

17   A.   I do.

18   Q.   Who is it?

19   A.   Alexsey Belan.

20   Q.   So that is something that you found in the moy.yawik

21   account; correct?

22   A.   Yes.

23   Q.   And looking at 152B, what is this?

24   A.   This appears to be a billing statement in the name of

25   Alexsey Belan.

1   **Q.**   All right.  Is this something that you found in the

2   moy.yawik account?

3   **A.**   Yes, it is.

4   **Q.**   All right.  So let's go back to what we were looking at

5   previously, which was Exhibit 120.  So there is a July 12,

6   2012, entry highlighted here from fyofyofyo@hotmail.com.  And

7   you testified that that is Nikita Kislitsin.

8        Can you, using your knowledge of the jargon employed in

9   the transaction of stolen data, describe what this conversation

10  means?

11  **A.**   Yes.  Mr. Kislitsin is reaching out to Mr. Belan, and he

12  is concerned because the whole dump or data had been posted

13  publicly making it less valuable.

14  **Q.**   All right.  Well, he says:  He burned the whole dump

15  having posted a portion of the hashes into the public domain.

16  How do you interpret that?

17  **A.**   That some of the stolen data was posted publicly.

18  **Q.**   All right.  And he says a portion of the hashes.  What

19  does "a portion of the hashes" refer to?

20  **A.**   The password hashes.

21  **Q.**   We are highlighting 2 entries from July 13, 2012.  This is

22  a continuation of the same conversation; correct?

23  **A.**   Yes.

24  **Q.**   And there is the moy.yawik account, which you testified is

25  Alexsey Belan, saying "I can vouch for him."  And asking:

1    "What is the database if it's not a secret?"

2        And the response on July 13th from Nikita Kislitsin is

3    "Formspring;" right?

4    A.    That's correct.

5    Q.    Now, we are showing a continuation of the conversation on

6    July 13th, 2012.  So there is an entry at the bottom from

7    moy.yawik.  And what does that entry reflect?

8    A.    It says:  "Okay.  I will wait for him so we can have a

9    tack.  On the leak, did you break it yourself or did you buy it

10   from someone?  Maybe you should check out that angle."

11   Q.    And that's Alexsey Belan as you testified; right?

12   A.    Yes.

13   Q.    And then the top entry, the last entry on this chain, also

14   on July 13, 2012, is from Nikita Kislitsin.  Can you tell us

15   what is happening in that response?

16   A.    Yes.  Kislitsin states:  "No.  It was his bruter who

17   posted it with a link to insidepro.com."

18   Q.    And remind us, what was the significance of insidepro.com

19   with regards to Formspring?

20   A.    That's where the data was posted.

21   Q.    All right.  All right.  And that was the password hashes

22   that were stolen from Formspring; right?

23   A.    That's correct.

24   Q.    Now, let's turn to Exhibit 21A.  Is and what is -- we are

25   going to look at 22A.  I apologize.  So 22A, what is that?

1   A.   What is on the screen?

2   Q.   No.  Just in general, can you describe what 22A is.  It is

3   on the screen.

4   A.   An e-mail thread.

5   Q.   And who is this between?

6   A.   Nikita Kislitsin and someone using the e-mail address

7   ibob750@gmail.com.

8   Q.   There is an entry on the last page, page 9, for July 17,

9   2012.  And what does that say?

10  A.   "Rais, I have got a good website, Formspring .com.  It's a

11  very popular and big website.  It has 30 million users.  Let me

12  know if you are interested in it."

13  Q.   All right.  So this says Dor Fyo.  And who is that?

14  A.   Nikita Kislitsin.

15  Q.   So that was the username on the account that we were just

16  looking at, the fyofyofyo account; right?

17  A.   That's correct.

18  Q.   And these e-mails are from the same search warrant

19  response?

20  A.   Yes, I believe so.

21  Q.   All right.  So now we highlighted another section.  And

22  just datewise, how does this compare to the conversation that

23  we were looking at between Alexsey Belan and Nikita Kislitsin?

24  A.   It is in the same timeframe.

25  Q.   And this happens after --

1    **A.**    That's correct.

2    **Q.**    -- that conversation; right?

3         So the July 17th conversation here, can you describe what

4    is happening in this conversation?

5    **A.**    Yes.  Mr. Kislitsin is saying the best price is 10,000

6    Euros.  There are 30 million users with e-mail, username,

7    messages and so on.

8         And ibo ibo responds:  Thanks for your offer but them

9    database were sold how many times because for them already then

10   I already bought my customers aren't happy.

11        And it continues.

12   **Q.**    How do you interpret that given what you discussed

13   previously about databases being sold multiple times?

14   **A.**    That the -- ibo ibo is asking how many times it has been

15   sold because he wants to get the most out of the data.

16   **Q.**    And this describes data of 30 million users.  And is that

17   significant with regard to Formspring?

18   **A.**    Yes, it is.

19   **Q.**    And how is that?

20   **A.**    That's about how many users they had.

21   **Q.**    And here is a response on July 18th from Nikita Kislitsin

22   to ibo ibo.  And what is he saying here?

23   **A.**    It is a fresh database.  It wasn't sold to anybody yet.

24   Also, I sell DB, database, only in one hands and he gives

25   statistics breaking down the accounts by country.

**PROCEEDINGS**

1    **Q.**   So this -- and this -- this conversation continues.   And

2    it is, again, in reverse date order, so we are going from the

3    end to the beginning of the document but from the beginning to

4    the end of the conversation; is that right?

5    **A.**   That's correct.

6    **Q.**   Okay.   So here we have a continuation of the conversation

7    again starting July 26th.   And what is -- what is your summary

8    of this conversation?

9    **A.**   Ibo ibo is asking for the type of information in the

10   database because he needs a specific type of data, and then he

11   asks for samples.   And Mr. Kislitsin confirms that he is

12   talking about Formspring.

13   **Q.**   All right.   Now, we are highlighting an additional

14   portion.   This is continuing on July 31st, 2012.   And what is

15   happening here?

16   **A.**   Kislitsin provides ibo ibo an attachment entitled

17   fr1k.csv.   He says:   "Rais, sorry for late answer.   I was on

18   the conference in Las Vegas.   Example of data is attached."

19   **Q.**   Okay.   You testified about Exhibit 128, which was

20   admitted, and there was a stipulation that Exhibit 128 was

21   Formspring data.   Is Exhibit 128 what was attached here to this

22   e-mail?

23   **A.**   Yes, it is.

24   **Q.**   Okay.   And this is a continuation into August, August 9th

25   of 2012.   What is happening here?

1   **A.**    Ibo ibo is providing an offer to Nikita Kislitsin of 5,000

2   Euros; trying to haggle.  And Mr. Kislitsin comes back and

3   says:  "Rais, let's do 5,500 Euro.  It is really a cheap price

4   for such a big database.  When do you plan to send money?  Next

5   week?"

6   **Q.**    All right.  Okay.  So here is August 11th, 2012, there is

7   a statement from Nikita Kislitsin.  And what is he saying here?

8   **A.**    We will try to do such database I think if possible.

9   Rais, send money to a new name.  Name:  Oleg Tolstikh.  City:

10  Moscow.

11  **Q.**    And now we are looking at August 14th, 2012, and there is

12  a statement from ibo ibo who says:  "As per the money it should

13  be this week?"

14  **A.**    Yes.

15  **Q.**    And then on August 16th, what is happening in that

16  conversation there?

17  **A.**    Kislitsin tells Rais he is still waiting for the money

18  that he promised to send and he asked for it tomorrow.

19  **Q.**    Okay.  And what is this?

20  **A.**    Ibo ibo reaches back out to Kislitsin and says:  "I give

21  money Monday.  Sorry for the delay.  Nikita.  Sad face."

22  **Q.**    All right.  This is the first page.  So this is the end of

23  the conversation.  Can you tell us what you see here?

24  **A.**    Yes.  Kislitsin reaches out to ibo ibo says:  "So what

25  about money?  It is Wednesday already."

**PROCEEDINGS**

1          He responds -- Kislitsin says again:  "Rais, wait, money

2     today."

3     **Q.**   Okay.  Now, there was a discussion of a sale price of

4     5,500 Euros in there; is that right?

5     **A.**   Yes.

6     **Q.**   And do you recall approximately how much that was in U.S.

7     dollars at the time?

8     **A.**   At the time it was somewhere between 7,100 and 7,200, U.S.

9     dollars.

10    **Q.**   Now, I would like you to look at Exhibits 25 and 140.  And

11    do you recognize those?

12    **A.**   25 is a CD containing Western Union records.  25A is a

13    printout of the records.  And 140 is the certificate of

14    authenticity of business records from Western Union for those

15    records.

16    **Q.**   Are these records that you obtained during your

17    investigation?

18    **A.**   Yes, they are.

19    **Q.**   You said 25A was a printout.  So is that a printout of

20    Exhibit 25, the CD?

21    **A.**   Yes.

22              **MS. KANE:**  We will move to admit Exhibits 25 and 25A.

23              **MR. GASNER:**  Submitted.

24              **THE COURT:**  Received.

25         (Trial Exhibits 25 and 25A received in evidence.)

PROCEEDINGS

1      **MS. KANE:**  Let's show 25A.

2  **BY MS. KANE:**

3  **Q.**  All right.  So tell us what we are looking at here.

4  **A.**  These are two Western Union transactions from a sender,

5  Mehmet Sozen, on September 19th, 2012, and a transaction on

6  September 13, 2012.  One for $910.62.  The other for $6,219.72.

7  **Q.**  So approximately how much total is that?

8  **A.**  $7,100.

9  **Q.**  All right.  And it says on the left hand column amount

10  U.S.; is that right?

11  **A.**  That's correct.

12  **Q.**  Who is Mehmet Sozen?

13  **A.**  That was the individual ibo ibo, Rais.

14  **Q.**  Now looking at the bottom here, what do we see?

15  **A.**  There is a row --

16      **MR. GASNER:**  Pardon me.  I don't mean to interrupt,

17  Agent Miller.  I object to -- again, to the evidence with

18  regard to who ibo ibo is as lack of foundation.  Lack of

19  personal knowledge.

20      **THE COURT:**  Again, this is an opinion by the witness.

21  What he bases it on is not may be too clear, but it is only as

22  good as what he bases it on.  And the jury needs to take that

23  into account and in evaluating it.  He is giving opinion

24  testimony.

25      And so if Counsel wants to try to explain what the witness

1   based that testimony on, that would be okay.

2          MR. GASNER:  And, Your Honor, just to follow up on

3   that -- without it being a speaking objection -- it seems like

4   it is outside the scope of his expertise.

5          THE COURT:  Well, that's a separate point we have

6   discussed, and I -- you are talking about the designation.

7   Well, possibly that's true.  But I'm allowing that in light of

8   the foundation -- expert foundation that I have heard so far.

9          MR. GASNER:  Thank you.

10  BY MS. KANE:

11  Q.   So I would like to call your attention, Special Agent

12  Miller, to Exhibits 21F and 22B.  Do you have those?

13  A.   21F, yes.  And 22B, yes.

14  Q.   And 22B was admitted.

15         MS. KANE:  Can we see -- sorry --

16  BY MS. KANE:

17  Q.   Tell us what 21F is.

18  A.   21F is an e-mail between fyofyofyo@hotmail.com and

19  ibob749@gmail to the same e-mail addresses we were discussing.

20  Q.   Okay.  And so did that come from the same search

21  warrant -- the same account that you were just testifying

22  about, the records obtained from Microsoft?

23  A.   Yes.

24         MS. KANE:  So move to admit 21F.

25         THE COURT:  Received.

PROCEEDINGS

1           (Trial Exhibit 21F received in evidence.)

2    BY MS. KANE:

3    Q.   So can you tell us what we see here in 21F.

4    A.   Yes.  It is an e-mail from ibo ibo to Mr. Kislitsin where

5    he says:  Code Sozen Mehmet.  And gives payment numbers.

6    Q.   So Sozen Mehmet from ibo ibo.  And is this part of the

7    foundation for your conclusion that ibo ibo that we were just

8    discussing was Mehmet Sozen?

9    A.   Yes, it is.

10   Q.   We will look at 21F.

11           THE COURT:  I thought that was 21F.

12           MS. KANE:  I'm sorry.  I apologize.  22B.  Thank you.

13   BY MS. KANE:

14   Q.   What is this?

15   A.   It's an e-mail from ibo ibo to fyofyofyo.  It says:

16   "Nikita, you live?  Smiley face."

17   Q.   You can stop there.  Is this part of the -- what you used

18   in your -- as your basis for determining that Nikita Kislitsin

19   was Dor Fyo or fyofyofyo?

20   A.   Yes.

21   Q.   And we have April 24th, 2012.  Again, what is that there?

22   A.   Ibo ibo is sending an e-mail to fyofyofyo, and he

23   addresses it to Nikita.

24   Q.   All right.  We can move on from here.

25           Now, other than the InsidePro posting that you -- that you

**PROCEEDINGS**

1  described that began your investigation of LinkedIn's

2  intrusion --

3                        (Pause in proceedings.)

4  **BY MS. KANE:**

5  **Q.**    -- are you aware of any other public posting of the

6  LinkedIn user data?

7  **A.**    Yes, I am.

8  **Q.**    And can you describe that?

9  **A.**    There was a posting, I believe, in May of 2016, on a dark

10 web forum containing a link to LinkedIn data.

11 **Q.**    Did you investigate who posted it?

12 **A.**    Yes, I did.

13 **Q.**    Are you aware of any evidence that it was posted by the

14 Defendant?

15 **A.**    No, I am not.

16 **Q.**    Were you able to determine who posted it?

17 **A.**    No, I was not.

18 **Q.**    Are you familiar with an individual named Oleksandr

19 Ieremenko?

20 **A.**    Yes, I am.

21 **Q.**    And did his name come up during this investigation?

22 **A.**    Yes, it did.

23 **Q.**    And did you obtain evidence related to Oleksandr Ieremenko

24 during your investigation?

25 **A.**    Yes, I did.

**PROCEEDINGS**

1  **Q.**   And what was that evidence?

2  **A.**   It was a copy of an image of a hard drive from the U.S.

3  Secret Service.

4  **Q.**   We have Exhibit 66, which has been previously identified.

5  Do you recognize Exhibit 66?

6  **A.**   Yes, I do.

7  **Q.**   What is that?

8  **A.**   This is the hard drive.

9  **Q.**   So did you examine the contents of that hard drive?

10 **A.**   I did.

11 **Q.**   And how did you do that?

12 **A.**   I used forensic tools to extract data from the drive.

13 **Q.**   What types of forensic tools did you use?

14 **A.**   I used the Forensic Tool Kit Imager to load the image and

15 to browse through the directories as well as Magnet Forensics

16 Internet Evidence Finder.

17 **Q.**   I will have you look at Exhibits 66 -- I'm sorry -- did

18 you find anything relevant to the Defendant on your search of

19 Ieremenko's computer?

20 **A.**   Yes, I did.

21 **Q.**   Okay.  So I would like you to look at Exhibit 66D.  Do you

22 recognize that?

23 **A.**   Yes, I do.

24 **Q.**   What is it?

25 **A.**   It is a photograph of the Defendant in a black Bentley.

**PROCEEDINGS**

1    **Q.**   All right.

2             **MS. KANE:**  We move to admit Exhibit 66D.

3             **THE COURT:**  Any objection?

4             **MR. GASNER:**  Submitted.

5             **THE COURT:**  Received.

6        (Trial Exhibit 66D received in evidence.)

7    **BY MS. KANE:**

8    **Q.**   All right.  So do you recognize the person in this photo?

9    **A.**   Yes, I do.

10   **Q.**   And who is it?

11   **A.**   The Defendant.

12   **Q.**   You mentioned it was a black Bentley.  I know it is a

13   little blurry, but what are we seeing here?

14   **A.**   That is the Bentley logo.

15            **MR. GASNER:**  Objection.  Relevance.  Move to strike.

16            **THE COURT:**  Overruled.  It will stay in.

17   **BY MS. KANE:**

18   **Q.**   Now, could you please look at Exhibit 71A.  And what is

19   that?

20   **A.**   It is a photo of the Defendant and another individual.

21   **Q.**   All right.  And did you obtain that photo from -- through

22   your examination of the Ieremenko computer at Exhibit 66?

23   **A.**   Yes, I did.

24            **MS. KANE:**  We move to admit 71A.

25            **MR. GASNER:**  Submitted.

```
 1              THE COURT:  In.  Received in.
 2         (Trial Exhibit 71A received in evidence.)
 3              THE COURT:  By the way, 66D, that other photo, what
 4    was the source of that?
 5              MS. KANE:  Special Agent Miller.
 6              THE WITNESS:  That was also on the computer,
 7    Your Honor.
 8              THE COURT:  Which computer?
 9              THE WITNESS:  Mr. Ieremenko's.
10              THE COURT:  Thank you.  Go ahead.  Next.
11         I would like for you to finish at about noon, which is
12    five minutes away.  Can you do that?
13              MS. KANE:  Not quite, Your Honor.  I'm sorry.
14              THE COURT:  Continue on.
15    BY MS. KANE:
16    Q.   Do you recognize anyone in this photo?
17    A.   Yes, I do.
18    Q.   And who do you recognize?
19    A.   The Defendant on the left-hand side.
20    Q.   Okay.  And describe what he is wearing in the photo?
21    A.   It appears to be black pants, a V-cut sweater and a white
22    dress shirt with polka dots.
23    Q.   Okay.  And can we show exhibit -- sorry, can you look at
24    Exhibit 66A.  Do you recognize that?
25    A.   Yes, I do.
```

**PROCEEDINGS**

1  Q.   Is that another photo that you obtained through your

2  search or your examination of Ieremenko's computer?

3  A.   Yes, it is.

4           MS. KANE:   Move to admit 66A.

5           MR. GASNER:   Submitted.

6           THE COURT:   Received.   Received.

7        (Trial Exhibit 66A received in evidence.)

8           MS. KANE:   Let's show 66A.

9  BY MS. KANE:

10 Q.   Do you recognize the person in this photo?

11 A.   Yes, I do.

12 Q.   Who is that?

13 A.   Anna Shvedova.

14 Q.   And that is the same person we saw in the photographs that

15 we were looking at in the VK notifications earlier today; is

16 that right?

17 A.   That's correct.

18 Q.   Now, let's look at Exhibit 66E.  I'm sorry, if you can

19 look at it, please.  Do you recognize it?

20 A.   66B?

21 Q.   E as in echo.

22 A.   I only have through D.

23 Q.   Okay.  We will come back to that.

24           MS. KANE:   I would like to move on to Exhibits 72, 73,

25 74 and 75.   74 and 75 have previously been admitted.

**PROCEEDINGS**

1        I will read a stipulation regarding 72 and 73.

2        (Reading:) "Government Exhibits 72 -- Government Exhibit

3    72 is a video clip recovered from the image of a computer owned

4    by Oleksandr Ieremenko.  In the video clip people speak in the

5    Russian language.  The Government has created English language

6    transcript for the video.

7        Government Exhibit 73 -- an English transcript for the

8    video, Government Exhibit 73.  The transcript provides an

9    accurate translation from the Russian language to the English

10   language."

11            **THE COURT:**  So stipulated.

12            **MR. GASNER:**  So stipulated.

13        **MS. KANE:**  And at this point I'm just going to move to

14   admit Exhibit 72, which is consistent with what we have

15   discussed before.

16            **THE COURT:**  Received.

17        (Trial Exhibit 72 received in evidence.)

18        **MS. KANE:**  And we are going to play Exhibit 72 but not

19   show the transcript.

20                **(Video was played but not reported.)**

21        **JUROR SERPA:**  It is not playing on our screen.

22        **MS. KANE:**  It is not playing on the jury screens.

23        **THE CLERK:**  It should be because it is showing up.

24        **THE COURT:**  Is there anything on the screen?

25        **THE WITNESS:**  Frozen.

PROCEEDINGS

1          THE COURT:  Does it show a building?

2          JUROR SERPA:  Yes.

3          THE COURT:  Well, it is frozen for everybody.

4          MS. KANE:  It is playing on the Zoom feed.

5          JUROR WOODROW:  There it goes.

6              (Video was played but not reported.)

7          THE COURT:  Okay.

8          MS. KANE:  Okay.  So I think what the jury is seeing

9     just skipped over a significant portion so we should probably

10    restart it.

11         THE COURT:  All right.  Go back and redo it.  There is

12    something goofy about the Zoom feed feeding into our system

13    here that has caused delays like that, and I -- I am sorry.  We

14    didn't realize that was going to happen.  Something we have to

15    fix for the future.  All right.

16             (Video was played but not reported.)

17         THE COURT:  Is that it?

18         MS. KANE:  Yes, Your Honor.

19         THE COURT:  All right.  So is that the end of that

20    exhibit?

21         MS. KANE:  Yes.

22         THE COURT:  Okay.  Do you have any follow-up on

23    that -- any follow-up questions on that video?  Otherwise, we

24    are going to take our break.

25         JUROR SERPA:  It is playing again.

PROCEEDINGS

```
1              MS. KANE:  I think that's the delay issue.  We could
2    just turn off the jury's screen, perhaps.
3              THE COURT:  Why don't we -- has the jury now seen
4    everything on the video?
5              MS. KANE:  Yes, Your Honor.
6              THE COURT:  My apologies for the confusion, but you
7    have seen everything -- wait a minute.  They didn't --
8              JUROR SERPA:  We never saw that.
9              THE COURT:  We never saw that guy, so we haven't seen
10   the whole video.
11                  (Video was played but not reported.)
12             THE COURT:  Are we now done?  We finished that.  Do
13   you have any follow-up questions on this video?
14             MS. KANE:  I have probably two or three questions.
15             THE COURT:  Ask those questions and then we will take
16   our break.
17   BY MS. KANE:
18   Q.   All right.  Special Agent Miller, do you recognize anyone
19   in that video?
20   A.   Yes, I do.
21   Q.   Who do you recognize?
22   A.   Oleksandr Ieremenko.
23   Q.   And how do you know that it is Oleksandr Ieremenko?
24   A.   Based on a passport photo I found on his computer.
25   Q.   We will come back to that, but which one of the people in
```

PROCEEDINGS

1   the video was Oleksandr Ieremenko?

2   **A.**   The one holding the camera, not driving.

3   **Q.**   Okay.  And do you know who the person driving was?

4   **A.**   I do not know his name.

5   **Q.**   Have you seen him anywhere else?

6   **A.**   Yes, I have.

7   **Q.**   Where?

8   **A.**   In photos with the Defendant that we previously looked at.

9   **Q.**   Okay.  That was the photo that we looked at earlier today

10  showing the Defendant near a pool table; is that right?

11  **A.**   That's correct.

12        **MR. GASNER:**   Pardon me.  Objection.  Vague.  When you

13  say "he," who are you referring to, the driver or the

14  passenger?

15        **THE WITNESS:**   I apologize.  Mr. Ieremenko is the

16  passenger.  The unknown individual is the driver.

17        **MR. GASNER:**   Okay.

18  **BY MS. KANE:**

19  **Q.**   And the driver is the person that we saw also in another

20  photograph earlier today?

21  **A.**   That's correct.

22  **Q.**   And the final question is:  There is a black car in the

23  video in front of the car that is -- that the person filming

24  the video is driving; is that right?

25  **A.**   Yes.

**PROCEEDINGS**

1    **Q.**   And do you recognize what type of car that is?

2    **A.**   It's a black Bentley.

3         **MS. KANE:**   Thank you.   And we are done with that

4    exhibit, Your Honor.

5         **THE COURT:**   We are going to take a break.   That was,

6    perhaps, the most dismal weather and video; and we should all

7    be glad to live in such a wonderful place that we do.   Having

8    seen that, I'm grateful for my -- how my life turned out.

9                            (Laughter)

10        **THE COURT:**   You all have a 30-minute lunch.   It is

11   waiting for you in the other room.   Karen will take you in

12   there, and we will see you back in just a few minutes.   Thank

13   you.

14       (Proceedings were heard outside the presence of the jury:)

15        **THE COURT:**   Okay.   Be seated.   We have got to finish

16   this.   This is so slow.   You told the jury an hour and 20

17   minutes.   Here we are past noon and you are still going.   So

18   how much more do you have?

19        **MS. KANE:**   We are going to play the other video, and

20   then we have some additional evidence from the same hard drive;

21   and then I have just very briefly some summary spreadsheets to

22   discuss at the end.   That's it.

23        **THE COURT:**   You already showed that other video once,

24   the inside the hotel video.

25        **MS. KANE:**   That's correct, Your Honor.   But, if you

1    recall, the agent who testified with that video was not able to

2    identify the Defendant in the individual.  So we do need to

3    have Mr. Miller -- Special Agent Miller testify regarding that

4    video.

5            **THE COURT:**  All right.  Well, you should be ready with

6    your cross to go as soon as the Government is finished.

7            **MR. GASNER:**  Thank you, Your Honor.  Just two points,

8    if I may, the subject of the fancy cars, this Bentley -- which

9    is being described as a Bentley by multiple people including

10   incorporated in the question -- was a subject of the Defense in

11   limine motion that the Court granted to prevent the Government

12   from unnecessarily getting into issues of lavish lifestyles

13   including expensive cars and watches, et cetera.

14       The Court granted that motion with the caveat that if the

15   video was going to come in, there might be a glimpse of a black

16   car; but it wasn't going to come in for the type of car it was

17   or how fancy it was or anything like that; but we weren't going

18   to preclude the Government from showing that video because it

19   had other relevant information.

20       But the import of the -- what I just watched was questions

21   regarding a Bentley, answers regarding a Bentley, questions

22   about a car, pictures of somebody sitting on a car and Anna

23   sitting on another fancy car.

24       It seems to me that it either violated the spirit or the

25   law of the in limine, but it is frustrating because the Court

 1   ruled on that issue.

 2          THE COURT:  Well, thank you for reminding me.  I have

 3   no memory of what you just said.  I'm sure it is true.  Is that

 4   true?

 5          MS. KANE:  Your Honor, the Government did not elicit

 6   any questions regarding the value of the car, the source of the

 7   car.  It was simply connecting the Defendant -- the photo of

 8   the Defendant in a black car to the black car in the video.

 9   And identifying a car by its brand is the only way --

10          THE COURT:  That's what I thought you were doing, and

11   I thought that was okay; but don't -- are you planning to make

12   any kind of argument about lavish life -- look at all the money

13   he got.  My God, he got 60 to $7,100 out of this deal.  And you

14   couldn't even buy a tire for a Bentley with that.  I hope you

15   are not planning to argue lavish lifestyle.

16          MS. KANE:  Your Honor, we are not.  We do recognize

17   the Court's ruling on the motion in limine, and we simply were

18   using that as a method of identification of the vehicle.

19          THE COURT:  I think that was a permissible use.  So I

20   overrule the objection.

21          MR. GASNER:  Thank you.  And then the other piece of

22   the -- just looking at the day, I want to readdress the issue

23   of closings given what is going on here today timing-wise.

24      I mentioned to the Court that my concern here was that the

25   Government would be allowed to open.  That I would be allowed

1    to -- open their closing.  I would be allowed to close.  And

2    then the Government is going to have a rebuttal argument.

3         And my sincere concern is I would like that all to come in

4    in one day, rather than having the Government not only close

5    through Agent Miller but close again through their own

6    testimony -- probably one of these two U.S. attorneys -- and

7    then I go, and then another U.S. attorney gets up.

8         I feel like it is ganging up on me in regards to the

9    timing because we have had -- we have had effectively four

10   months of trial here with a long break.  And all this evidence

11   and all this closing is coming in through Agent Miller.

12        And then we are going to hear from one U.S. attorney.

13   Then I'm going to go.  And then maybe tomorrow we will hear

14   from another one.  It just doesn't seem right.

15             THE COURT:  Well, we are not going to get to any

16   closing argument today.

17             MR. GASNER:  Fair enough.  That's --

18             THE COURT:  You are going to take up how much more

19   time?

20             MR. GASNER:  That makes sense.  We are not even at

21   cross yet.  So if that's the case, then --

22             THE COURT:  We are not going to have any closing

23   today.

24             MR. GASNER:  Submitted then.  No problem.

25             THE COURT:  But we will have closings tomorrow.

**PROCEEDINGS**

```
1              MR. GASNER:  Of course.

2              THE COURT:  All right.  Have a good lunch.  Thank you.

3              MS. KANE:  Thank you, Your Honor.

4                      (Recess taken at 12:10 p.m.)

5                  (Proceedings resumed at 12:40 p.m.)

6          (Proceedings were heard in the presence of the jury:)

7              THE COURT:  Okay.  Everyone, find their seats and

8      welcome back.  Be seated.

9          Just to let you know, the guy in the back of the courtroom

10     taking a picture is part of the court staff and because this is

11     the first jury trial that has resume since the pandemic, we are

12     taking a picture for the record so that we can -- all the

13     Judges can discuss if there is a way to improve the system

14     going forward.  That's the reason for the pictures.  Okay.

15     Thanks.  That's good.

16         Karen, my picture didn't come up again.  I'm giving up on

17     the Zoom.

18             JUROR SERPA:  The TVs are off.

19             THE CLERK:  Hang on.  That's me.

20             MS. KANE:  No.  It's the remote.

21             THE COURT:  Let me ask a question.  Can all of you

22     come, let's say, tomorrow at 8:00 o'clock?  Would you be able

23     to make it at 8:00 o'clock and make up for lost time?

24             JUROR SERPA:  Yes.

25             THE COURT:  Is there anyone who could not?
```

 1                      (No response.)

 2           **THE COURT:**  We are going to try to start at

 3     8:00 o'clock to make up for the delays that we have had.  It is

 4     nobody's fault.  I'm not blaming anybody.  I'm just saying we

 5     are learning as we go, and we have had a few delays.

 6           We are going to start at 8:00 o'clock tomorrow.  We will

 7     try to finish today at 2:00 as you probably expected.

 8           All right.  Ms. Kane, let's move on.

 9           **MS. KANE:**  Thank you, Your Honor.

10     **BY MS. KANE:**

11     **Q.**   When we finished, we had just played a video that you

12     testified about.  And remind the jury of where -- where that

13     video came from.

14     **A.**   The video came from Mr. Ieremenko's computer.

15     **Q.**   And when you examined Mr. Ieremenko's computer, were you

16     able to find any dates associated with that video?

17     **A.**   Yes, I was.

18     **Q.**   And can you describe that?

19     **A.**   It was March of 2012.  I don't recall the exact date.

20     **Q.**   Okay.  And did you find any other videos on the computer?

21     **A.**   Yes, I did.

22           **MS. KANE:**  Okay.  So Exhibit 74 has previously been

23     admitted along with its translation, and we will play Exhibit

24     74 now; and we will show the translation on the screen.

25                  (Pause in proceedings.)

1          MS. KANE:  I think that the evidence computer is not

2    as a panelist on the Zoom.

3          THE CLERK:  It should be.  Let me go over here and

4    double-check.

5                    (Pause in proceedings.)

6          THE CLERK:  Is that working?

7          MS. KANE:  It looks like it.  It is scrolling around

8    but --

9          THE CLERK:  Okay.

10                   (Pause in proceedings.)

11         THE COURT:  Is there an alternative way to go?

12   Ms. Kane, can you just read it out loud?

13         MS. KANE:  Well, we do need to show the video,

14   Your Honor.

15         THE COURT:  Which video is it?

16         MS. KANE:  It is the video that was previously played

17   in a conference room.

18         THE COURT:  Yeah.  Where they are talking about the

19   internet cafe?

20         MS. KANE:  I don't think the translation has been

21   shown to the jury yet.  Just the video.

22         THE COURT:  I thought there was testimony to that

23   effect.

24         MS. KANE:  Maybe you did show it to the jury.  Okay.

25   Well, we do need to play the video, though.

MILLER - DIRECT / KANE

```
 1           THE COURT:  We have already seen it.  I thought --
 2    maybe I'm wrong.  Let me ask the Defense.  Didn't we see and
 3    hear everything?
 4           MS. NECHAY:  I do believe that we saw the video.  I
 5    don't believe the audio was played.
 6           THE COURT:  All right.
 7           MS. NECHAY:  Is that correct, Ms. Kane?
 8           THE COURT:  I stand corrected.  Okay.
 9           MS. KANE:  And there is further testimony we discussed
10    before the break regarding the video, short testimony to come
11    in so.
12           THE COURT:  Well, what do we need to do in order to --
13    we can't keep the jury waiting like this.  It is either going
14    to work or we have to go to another subject.
15           JUROR SERPA:  It is working now.
16           THE COURT:  All right.
17                        (Pause in proceedings.)
18           THE COURT:  It is not coming to life.
19           MS. KANE:  It is the delay as it processing over Zoom,
20    Your Honor.  There we go.
21                  (Video was played but not reported.)
22    BY MS. KANE:
23    Q.   Special Agent Miller, tell us if you recognize anyone in
24    the video?
25    A.   Yep, I do.
```

**MILLER - DIRECT / KANE**

1   **Q.**   Who do you recognize?

2   **A.**   The Defendant.

3   **Q.**   What is he wearing in the video?

4   **A.**   A black scarf and a white sweater.

5   **Q.**   Did you recognize anyone else in the video?

6   **A.**   Yes, I did.

7   **Q.**   Who did you recognize?

8   **A.**   Nikita Kislitsin.

9   **Q.**   And there was a person in the video that we just saw next

10  to the Defendant wearing a striped sweater and a printed shirt

11  under it.  Did you see that person anywhere else in your

12  investigation?

13  **A.**   Is it the person, right, in front of him there?

14  **Q.**   Yes -- yes, sir.

15  **A.**   Yes.

16  **Q.**   And where did you see that person previously?

17  **A.**   Photos with the Defendant playing what appeared to be

18  pool.

19  **Q.**   And so that's what you previously testified about before

20  we broke; is that right?

21  **A.**   Yes.

22  **Q.**   That was the same person that was in the car we saw

23  driving in the previous video?

24  **A.**   Yes.

25  **Q.**   And in reviewing -- so this video came from

**MILLER - DIRECT / KANE**

1    Mr. Ieremenko's drive as well; is that right?

2    **A.**   Yes.

3    **Q.**   And were you able to determine -- associate any date with

4    the file on the drive?

5    **A.**   Yes.

6    **Q.**   What was the date?

7    **A.**   It was in March of 2012.

8    **Q.**   All right.  And was the date the same date as the previous

9    video that we saw?

10    **A.**   Yes, I believe it was.

11    **Q.**   Okay.  I would like to move on to other evidence.

12    Did you find any correspondence on Mr. Ieremenko's

13    computer?

14    **A.**   Yes, I did.

15    **Q.**   What type of correspondence did you find?

16    **A.**   I found Skype chats.

17    **Q.**   What is Skype?

18    **A.**   Skype is a peer-to-peer messaging platform that allows you

19    to message and talk with friends.

20    **Q.**   Okay.  So what does "peer-to-peer" mean?

21    **A.**   It just means the communications go from one machine to

22    the other.

23    **Q.**   So when you say "one machine to the other," whose machines

24    are you talking about?

25    **A.**   The chat participants.

1    **Q.**    Okay.  So if someone is using Skype, they can send

2    messages to another person on Skype; is that right?

3    **A.**    Yes, over the internet.

4    **Q.**    And do the messages go through a central place or in 2012

5    did the messages go through a central place where they were

6    kept?

7    **A.**    In 2012 they did not.

8    **Q.**    Okay.  So is that what you meant by peer-to-peer?

9    **A.**    Yes.

10   **Q.**    So you said you found Skype chats on the Ieremenko

11   computer.  I would like you to look at Exhibits 76A and B.  Do

12   you recognize those?

13   **A.**    Yes, I do.

14   **Q.**    What are those?

15   **A.**    These are those Skype chats.

16   **Q.**    All right.  And these are Skype chats that you found on

17   the Ieremenko computer that you were just describing; is that

18   right?

19   **A.**    Yes.

20         **MS. KANE:**  The United States moves for admission of

21   Exhibits 76A and B.

22         **MR. GASNER:**  No objection.

23         **THE COURT:**  Received.

24      (Trial Exhibits 76A and 76B received in evidence.)

25   \\\

1    BY MS. KANE:

2    Q.   So I would like to show you Exhibit 76B.  And we will use

3    the ELMO for this.  All right.  So tell us what 76B shows?

4    A.   This is an English translation of a Skype chat between two

5    individuals.

6    Q.   Okay.  And what is the date on the chat?

7    A.   October 4th, 2012.

8    Q.   And who are the participants in the chat?

9    A.   Evgeniy Lomovich and Sergey Shalyapin.

10   Q.   And when you reviewed Mr. Ieremenko's computer, was there

11   additional information about Evgeniy Lomovich and Sergey

12   Shalyapin?

13   A.   Yes.  There was references to the Skype user names that

14   they had utilized.

15   Q.   All right.  And what were the Skype user names that they

16   used?

17   A.   Yevgeniy Lomovich it was dex -- D-E-X -- 007.  And for

18   Sergey Shalyapin vaiobro, V-A-I-O-B-R-O.

19   Q.   And the first entry is a message from Evgeniy Lomovich,

20   dex.007 as you testified; and it looks like a number, an e-mail

21   address and then a string of numbers and letters.  What is

22   that?

23   A.   That is a user ID, e-mail address and a hash of a

24   password.

25   Q.   When you say a user ID and a password, what are they for?

MILLER - DIRECT / KANE

1    **A.**    LinkedIn.

2    **Q.**    How do you know that?

3    **A.**    I confirmed them with LinkedIn.

4    **Q.**    Did you view the LinkedIn data?

5    **A.**    Yes, I did.

6    **Q.**    And then the second entry from Sergey Shalyapin, back

7    to -- that is Sergey Shalyapin vaiobro back to dex.007, what is

8    that?

9    **A.**    It is a list of member IDs separated by a comma.

10   **Q.**    And those are LinkedIn in member IDs?

11   **A.**    That's correct.

12   **Q.**    And then there is another entry from Yevgeniy Lomovich

13   dex.007 that has more numbers, e-mail addresses and strings of

14   code.  And what are those?

15   **A.**    More LinkedIn member IDs, e-mail addresses and password

16   hashes.

17   **Q.**    And how do you know that?

18   **A.**    I verified them with LinkedIn.

19          **MR. GASNER:**  Your Honor, based on that, I would object

20   as to hearsay.

21          **THE WITNESS:**  I saw the data.

22          **THE COURT:**  Well, how did you -- you saw what data?

23          **THE WITNESS:**  I went to LinkedIn and met with

24   representatives, and we confirmed each one of these lines was

25   LinkedIn member data.

1      **THE COURT:**  All right.  It would be hearsay; but since

2   he is testifying about someone with specialized learning and so

3   forth, it's opinion, not fact.  It is opinion.  And he is

4   telling us the basis of his opinion.  And I'm going to allow it

5   based on that theory as opposed to him being a percipient

6   witness.

7      **MR. GASNER:**  Thank you, Your Honor.  I do object

8   because it is outside the scope of his expertise.  I will ask

9   for a continuing objection on that basis.

10      **THE COURT:**  That is outside the scope of the

11   designated.  But he has given us enough testimony for him to be

12   qualified to give that answer.  So objection overruled without

13   prejudice to your other point about the accuracy of the

14   designation.

15      **MR. GASNER:**  Thank you.

16   **BY MS. KANE:**

17   **Q.**   For the data that we are looking at there in this entry

18   sent by Evgeniy Lomovich dex.007, there is a timestamp on it.

19   It says 16:52.  Is that a timestamp?

20   **A.**   Yes.

21   **Q.**   Those numbers, e-mail addresses and password hashes, as

22   you testified, did you see those exact things in the LinkedIn

23   data that you looked at?

24   **A.**   Yes, I did.

25   **Q.**   All right.  I'm turning to page 2 of Exhibit 76B.  And

MILLER - DIRECT / KANE

1   there is a discussion here continuing between Sergey Shalyapin

2   vaiobro and Evgeniy Lomovich dex.007.  And I will zoom in so

3   you can see it.  What does this show?

4   A.   It shows a conversation where Shalyapin says:  Don't be

5   upset about Anya.  It will all be good.  And it continues on

6   saying:  Thanks a lot for the accounts, smiley face.  And goes

7   on to say -- talk about the relationship.

8   Q.   And what is the response from dex.007?

9   A.   You share.  I don't think it's likely we make peace.  She

10  just left and that's it.  Doesn't want to be with me.  Doesn't

11  see the future.

12  Q.   Okay.  You said you share.  Maybe I need to zoom in more.

13  A.   I'm sorry.  "Your share."

14          THE COURT:  We can't see who is speaking on this.

15  There -- there we go.

16  BY MS. KANE:

17  Q.   So that's Evgeniy Lomovich also with the account name

18  dex.007; is that right?

19  A.   Yes.

20  Q.   All right.  I'm on page 6 of Exhibit 76B.  And there is a

21  date here.  What is the date?

22  A.   October 18th, 2012.

23  Q.   Okay.  And what does this conversation show?

24  A.   Lomovich says:  Fucking crap.

25          Shalyapin:  Yep.  When you have an opportunity, please

1   check out this prick, with a link to a LinkedIn user.  I

2   couldn't find him in that long list.  Apparently the e-mail

3   didn't have %@savvis%.  And then it continues.

4   Q.   And then there is a response from Evgeniy Lomovich

5   dex.007.  And what is the response?

6   A.   A LinkedIn member ID, e-mail address and password hash as

7   well as a phrase rocky19, the word pass, an e-mail address.

8   And it says his -- another e-mail.

9   Q.   And do you know what that member ID, e-mail address and

10  password hash represent?

11  A.   LinkedIn member data.

12  Q.   Did you verify that by looking at the actual LinkedIn

13  data?

14  A.   Yes, I did.

15  Q.   All right.  I want to turn to page 7 of Exhibit 76B.

16       And this is also on October 18th, 2012; is that right?

17  A.   Yes.

18  Q.   Okay.  What do we see here?

19  A.   Lomovich dex.007 says:  By the way, do you have new

20  shells; for example, C99 madshell but which would work in safe

21  mode.  Good.  So that it could be viewed in the directory.

22  Q.   All right.  I'm turning to page 8 of Exhibit 76B.  What is

23  the date on this chat?

24  A.   October 18, 2012.

25  Q.   Okay.  So there is some -- a message by Sergey Shalypin

1  vaiobro at the top and there is a long paragraph.  Can you read

2  the last line of that paragraph?

3  **A.**   I will have to write happy birthday, with a lot of emojis.

4  **Q.**   Okay.  And then there is a response from Evgeniy Lomovich

5  dex.007.  And what is the response?

6  **A.**   Cool.  Thanks.

7  **Q.**   And if you could continue with the conversation.

8  **A.**   Yes.  Mr. Shalyapin says:  Am I the first one?  Smiley

9  face.

10      Lomovich:  Sad face, bummer, yes.

11      Shalyapin:  Why bummer?  Smiley face.

12      Lomovich:  Bummer, bummer.

13      Shalyapin:  Give yourself a present tomorrow.  Cheer up,

14  smiley face.

15      Lomovich:  Smiley face, hehe.  What do you think I should

16  give myself?

17      Shalyapin:  Buy a watch, smiley face.

18      Lomovich:  For how much?

19      Shalyapin:  Up to 10K.

20      Lomovich:  Why not 25K?  25-year-old equal 25K.

21  **Q.**   All right.  So this chat, you testified, took place,

22  according to the records you found, on October 18th, 2012?

23  **A.**   Yes.

24  **Q.**   Do you know when the Defendant's birthday is?

25  **A.**   Yes, I do.

MILLER - DIRECT / KANE

1   **Q.**   How do you know that?

2   **A.**   Based on these court proceedings.  I have seen his date of

3   birth.

4   **Q.**   Have you any other basis for knowing his birthday?

5   **A.**   I have seen it on documents.

6   **Q.**   All right.  Have you ever heard the Defendant make any

7   representations about his birthday?

8   **A.**   Yes, I have.

9   **Q.**   And what were those?

10  **A.**   He stated his birthday was October 19th, 1987.

11  **Q.**   Okay.  So that would be the day after October 18th, which

12  is when these chats took place?

13  **A.**   That's correct.

14  **Q.**   And how old would the Defendant have been in 2012 when

15  these chats took place?

16  **A.**   25.

17  **Q.**   Thank you.  All right.  I would like you to look at

18  Exhibits 68 and 70.  Are those additional pieces of

19  correspondence from the Ieremenko drive?

20  **A.**   Yes, they are.

21  **Q.**   And did you find those on the Ieremenko drive?

22  **A.**   Yes, I did.

23          **MS. KANE:**  Move for admission of Exhibit 68 and 70.

24          **MR. GASNER:**  Submitted.

25          **THE COURT:**  Received in evidence.

1          (Trial Exhibits 68 and 70 received in evidence.)

2          **MS. KANE:**  We will show Exhibit 70.  Let's go to

3   page 5.

4   **BY MS. KANE:**

5   **Q.**  So these chats look different than the other chats that we

6   were looking at?

7          **JUROR SERPA:**  Are we supposed to see it?

8          **THE COURT:**  Karen, they are not seeing it yet.

9          **THE CLERK:**  I have it on the correct -- it takes a

10  minute.

11         **THE COURT:**  Ms. Kane, take a look at the screen over

12  there and see what is happening.

13         **MS. WAWRZYNIAK:**  It is black over here, Your Honor.

14         **THE COURT:**  What?

15         **MS. WAWRZYNIAK:**  The screen is black.  We are not

16  seeing the exhibit.

17         **THE CLERK:**  Let me turn it off again.

18         **THE COURT:**  Is it off altogether again?

19         **MS. KANE:**  No.

20         **THE CLERK:**  I just turned it off.  Let me turn the A/V

21  on again.

22                   (Pause in proceedings.)

23         **THE COURT:**  Is it back on, Karen?

24         **THE CLERK:**  Yeah, it is.  I can see -- are the

25  monitors back on?

1           THE COURT:  Is the screen back, lit up again?

2           MS. KANE:  Yes, the screens are lit up; but it's not

3   showing what she is sharing on her screen.

4           THE COURT:  Ms. Kane, you need to punch the right

5   buttons.

6           THE WITNESS:  There we go.

7           MS. KANE:  We got it.

8   BY MS. KANE:

9   Q.    Let's go to page 5 while we are doing that.

10          Special Agent Miller, you testified these are also Skype

11  chats that you found on Mr. Ieremenko's computer; is that

12  right?

13  A.    That's correct.

14  Q.    Are these between the same two Skype IDs that we were

15  previously looking at?

16  A.    Yes, it is.

17  Q.    Now, these look different.  Why do they look different?

18  A.    These were found in deleted space on the computer;

19  meaning, they had been deleted at some point.

20  Q.    So did you -- I'm sorry -- so these were found on

21  Ieremenko's computer but stored in a different way than the

22  other chats we looked at?

23  A.    That's correct.

24  Q.    Now, on page 5, this first entry here, this is dated

25  November 10th, 2012.  It says:  Author dex.007.  Display name

1    Yevgeniy Lomovich.  That is the same name and display name that

2    we were looking at before; right?

3    **A.**   Yes.

4    **Q.**   Okay.  And then in the message that he is sending, we see

5    a reference to Afraid.org; is that correct?

6    **A.**   That's correct.

7    **Q.**   Let's go to page 8, and here we have another message.  And

8    this is also from dex.007 Yevgeniy Lomovich.  And this is being

9    sent to vaiobro Sergey Shalyapin; right?

10   **A.**   That's correct.

11   **Q.**   All these messages here, like the messages we just looked

12   at, are going back and forth between the two; is that right?

13   **A.**   Yes.

14   **Q.**   There is a line that starts with 23:  On November 10th,

15   2012 -- and it shows dex.007 sending the message login and

16   passcode is Zopaqwe1; is that right?

17   **A.**   That's correct.

18   **Q.**   And did that word or Z-O-P-A-Q-W-E-1 come up in your

19   investigation previously?

20   **A.**   Yes, it did.  It came up in the Kongregate records as well

21   as the Afraid.org records for the e-mail account associated

22   with chinabig01@gmail.com.

23   **Q.**   Now we are looking at page 4 of Exhibit 70, and there is a

24   reference here on the line that says 1582.  And it is the

25   message sent on November 10th, 2012, from dex.007 Yevgeniy

1   Lomovich.  It says:  Will give you a few sqls in a sec.

2       And did sql, had that come up in your investigation?

3   A.   Yes, it had.

4   Q.   How did that come up?

5   A.   That is the database language used to query databases.

6   Q.   And then there is a message here.  The line starts 12559.

7   It is sent on November 10th, 2012, and it says 2:13 a.m. is the

8   time.  It is from dex.007 Yevgeniy Lomovich to vaiobro Sergey

9   Shalyapin.  It says:  Time to go to sleep.  It's 6.

10      Now, the message sent time up here says UTC; is that

11  correct?

12  A.   Yes.

13  Q.   So do you know what the difference was between UTC and

14  Moscow time in 2012?

15  A.   I believe there is a four-hour offset.

16  Q.   And so if it were approximately 2:12 or 2:13 a.m. UTC,

17  what time would it have been in Moscow?

18  A.   Just after 6:00 a.m.

19  Q.   So now if we can just look at page 1 of this document, we

20  were just looking at conversations that took place in November

21  of 2012 and at the beginning here the message sent dates are

22  September of 2012.

23      Now, the messages we looked at in the previous exhibit

24  were all from October 2012; is that right?

25  A.   Yes.

1  Q.   So if we were to put them all together in one timeline,

2  the messages we just looked at would be sort of in the middle;

3  is that right?

4  A.   Yes.

5  Q.   All right.  Now, in Mr. Ieremenko's computer, was there

6  any other data associated with the Skype conversations that

7  helped you in your investigation?

8  A.   Yes, there was.

9  Q.   And what was that?

10 A.   There were records of the IP addresses used by the

11 individuals in these chats when the chats were made.

12 Q.   So specifically the chats that we were just looking at

13 between dex.007 Yevgeniy Lomovich and vaiobro Sergey Shalyapin,

14 there were IP address information there?

15 A.   Yes.

16 Q.   Is that right?  Okay.

17      And was that IP address information useful in your

18 investigation?

19 A.   Yes, it was.

20 Q.   I would like you to look at Exhibits 32C, 19B, 124A and

21 142B?

22      **THE COURT:**  While he is getting those, repeat the

23 numbers.

24      **MS. KANE:**  32C, 19B, 124A and 142B.

25      **THE WITNESS:**  I think I have them all.

MILLER - DIRECT / KANE

1    BY MS. KANE:

2    Q.   Do you recognize them?

3    A.   Yes, I do.

4    Q.   Okay.  And are these summaries that you prepared in this

5    investigation?

6    A.   Yes, they are.

7    Q.   Okay.  And are they summaries of the data we previously

8    looked at and that has been admitted here today?

9    A.   Yes.

10   Q.   Plus -- sorry -- plus the Skype IP address data that you

11   just described?

12   A.   Yes.

13   Q.   And that was -- so describe -- the Skype IP address data

14   was for -- was captured on Mr. Ieremenko's computer.  That's

15   what you testified; right?

16   A.   Yes.

17   Q.   And whose IP addresses was it capturing?

18   A.   It captured Mr. Ieremenko's as well as the individuals he

19   was talking with.

20   Q.   Okay.  So it captured the one -- the IP address being sent

21   from dex.007?

22   A.   Yes.

23   Q.   And is that the information that you put in these

24   summaries?

25   A.   Yes, it is.

1          MS. KANE:  We move for admission of Exhibits 32C, 19B,

2   124A and 142B.

3          THE COURT:  Any objection?

4          MR. GASNER:  No, Your Honor.

5          THE COURT:  All received.

6      (Trial Exhibits 32C, 19B, 124A and 124B received in

7       evidence.)

8          MS. KANE:  So let's show Exhibit 124A.

9   BY MS. KANE:

10  Q.   So can you just briefly describe this summary for us?

11  A.   This is a summary of the IP addresses used to access the

12  chinabig01@gmail.com account overlapped with the dex.007 Skype

13  account.

14  Q.   Okay.  And that's the Dropbox account for

15  chinabig01@gmail.com --

16  A.   That's correct.

17  Q.   -- is that right?

18  A.   I'm sorry.

19  Q.   Okay.  So if we can look at lines 58 and -- through 60.

20  So line 58 is dated September 13th, 2012.  And it has an entry

21  from an IP address ending in .61.  It says:  IP assigned to

22  dex.007 during Skype chat with vaiobro.  And then dex.007 Skype

23  data from Ieremenko.  And if it continues over -- it says

24  computer; is that right?

25  A.   Yes.

1    **Q.**   So that's the Skype data you were just describing?

2    **A.**   That's correct.

3    **Q.**   All right.  And then the next entry is from the same IP

4    address.  It says:  Login.  And then it says Google

5    chinabig01@gmail.com.  Is that the information you were

6    describing also?

7    **A.**   Yes, that's the --

8    **Q.**   So in addition to the Dropbox account, it also has the

9    Google account on it?

10   **A.**   Yes.

11   **Q.**   Okay.  And so the date on that is September 21st, 2012; is

12   that right?

13   **A.**   For the Google login it is September 20th.

14   **Q.**   I'm sorry.  You are right.  Then looking at line 60,

15   September 21st, what does that show?

16   **A.**   A login with the 61 IP that was assigned to dex.007 during

17   Skype chat with vaiobro.

18   **Q.**   Now I want to give you a copy -- I'm sorry -- let's look

19   at Exhibit 32C.  And is Exhibit 32C a similar summary that

20   includes the Skype data and other IP data that you found from

21   the various logs in this investigation?

22   **A.**   Yes, it does.

23   **Q.**   So now I would like you to look at line 13354 and 13355.

24   And what do those show?

25   **A.**   Line 13354 shows a date timestamp of August 7th, 2012, at

```
 1   5:32:48 from IP address 178.177.12.157 with information about a
 2   login to a LinkedIn member account.
 3   Q.   All right.  And then the next line?
 4   A.   Another entry for August 7th, 2012, shortly after, at
 5   20:31:14 from the same IP address ending in .157.  And that was
 6   an IP assigned to dex.007 during a Skype chat with vaiobro.
 7   Q.   Can we look at Exhibit 142B, please.  If we can show lines
 8   2 and 3.  I think you can see them as they are.
 9        MS. KANE:  I'm sorry.  Madam CRD, can we minimize the
10   screen on the side there so the jury can see the full screen?
11        THE CLERK:  I thought I did that --
12        MS. KANE:  Can the jury see the full screen?  I think
13   we are fine.
14        THE CLERK:  Okay.
15        MS. KANE:  Thank you.
16   BY MS. KANE:
17   Q.   So we are looking at 142B, lines 2 and 3.  What do we see
18   there?
19   A.   Entries on May 23rd, 2012, 17:23:26 from the IP address
20   188.32.14.109 and that was an IP assigned to dex.007 during a
21   Skype chat with vaiobro.
22        Row 3 has an entry on May 24th, 2012, the next day, at
23   2:34:00, the IP address -- same IP address -- ending in .109.
24   And that is access activity for a Dropbox employee.
25   Q.   Okay.  And so the information about the Dropbox employee
```

MILLER - DIRECT / KANE

1   account access, that comes from the information that Dropbox

2   had provided to you; is that right?

3   **A.**   That's correct.

4   **Q.**   Now, let's look at Exhibit 19B.

5        We will look at line 2316.

6   **A.**   That is dated June 16th, 2012 at 18:17:39 from the IP

7   address 178.177.2870.

8        And that's an IP assigned to dex.007 during a Skype chat

9   with vaiobro.

10  **Q.**   And then what is the next line?

11  **A.**   June 17th, 2012, at 18:55:57 from the same IP ending in .0

12  with a LinkedIn browser cookie.

13  **Q.**   Is that one of the browser cookies that had been

14  identified previously in the investigation as associated by

15  LinkedIn with the intrusion?

16  **A.**   Yes, it was.

17  **Q.**   And going across, if we can see the last column on the --

18  line 2317.  So what does that say there?

19  **A.**   LinkedIn consumer account login member 15779395.

20  **Q.**   So that was one of the LinkedIn consumer accounts that was

21  included in the spreadsheets we looked at at the beginning that

22  were associated with the IP addresses and browser cookies and

23  user agent strings; is that right?

24  **A.**   Yes.

25  **Q.**   And then continuing down -- if we can scroll down here --

 1          MS. KANE:  Go back across.

 2    BY MS. KANE:

 3    Q.    Let's look at 2318.  What does that show?

 4    A.    June 17th, 2012, 22:02:30 from the IP address

 5    178.177.28.0.

 6          And it says SSHD, a number, accepted password for jsanders

 7    from 178.177.28.0 port.

 8    Q.    So in this exhibit we are combining the summaries for

 9    Formspring with the other data that you had found; is that

10    right?

11    A.    Yes.

12    Q.    Okay.  So this shows the same IP address logging into the

13    Formspring account for John Sanders, a LinkedIn consumer

14    account, and then a -- assigned to the dex.007 ID during a

15    Skype chat with vaiobro; is that right?

16    A.    Yes.

17    Q.    And that is what we looked at in the previous summaries

18    was a similar IP overlap between the dex.007 identity and the

19    information you obtained for the other intrusions and the other

20    accounts associated with chinabig01; is that right?

21    A.    Yes.

22          MS. KANE:  Your Honor, I think I'm done.  If I may

23    just have a moment to consult with my co-Counsel, please.

24                    (Pause in proceedings.)

25          MS. KANE:  Thank you, Your Honor.  No further

MILLER - CROSS / GASNER

1    questions.

2              THE COURT:  All right.  Thank you.  Cross-examination.

3                   <u>CROSS-EXAMINATION</u>

4              MR. GASNER:  Thank you, Your Honor.

5    BY MR. GASNER:

6    Q.   Good afternoon, Agent Miller.

7    A.   Good afternoon.

8    Q.   So, Agent Miller, what I would like to do is start with

9    the testimony that you gave regarding the VK social network and

10   the r00talka Gmail account.  Do you recall that?

11   A.   Yes, I do.

12   Q.   So preliminarily, the VK social network you indicated was

13   a social platform similar to the United States version of

14   Facebook; right?

15   A.   Yes.

16   Q.   And that is a platform that people can sign up for, and

17   then they can post pictures; talk with each other; post videos,

18   things like this; right?

19   A.   Yes.

20   Q.   And they can have friends join that group or they can

21   decline friends joining that group; right?

22   A.   I believe so, yes.

23   Q.   Now, with regard to the e-mail account r00talka@gmail.com,

24   you looked at a series of e-mails associated with that account;

25   correct?

1    **A.**    Yes, I did.

2    **Q.**    And you saw a series of those e-mails shown today, in

3    fact; right?  Do you remember that earlier?

4    **A.**    Yes, I do.

5    **Q.**    The pictures on the r00talka@gmail.com account were

6    forwarded automatically from the VK social network; correct?

7    **A.**    The e-mails were generated from the VK social network.

8    **Q.**    They were sent to the r00talka Gmail account; correct?

9    **A.**    Yes.

10   **Q.**    Right.  In other words, the VK social network sent them

11   automatically to the r00talka@gmail account; correct?

12   **A.**    Yes.

13   **Q.**    So the person that was the subscriber of the

14   r00talka@gmail account would be receiving those e-mails from VK

15   automatically; right?

16   **A.**    If that was the e-mail associated with the account, yes,

17   that was the case.

18   **Q.**    Okay.  So when you were looking at the substance of the

19   r00talka account, the conversation between the person

20   purporting to be -- excuse me.  When you were looking at the

21   exhibits related to the r00talka account, those were e-mails

22   that were basically -- they were basically substance that came

23   from the VK social network; right?

24   **A.**    Some of them yes.  Some of them no.

25   **Q.**    Okay.  The pictures of Anya, for example, and the -- and

1  of purporting to be Mr. Nikulin, those came from the VK social

2  network; right?

3  A.    Yes.

4  Q.    Okay.  And the substance of the use of that e-mail didn't

5  otherwise have photographs on it; right, the e-mail account

6  itself, not the e-mails received from the VK social network?

7  A.    That's correct.

8  Q.    Okay.  So the -- the identifiers of Mr. Nikulin and Anya

9  on -- weren't on separate e-mails that were assigned to

10  r00talka@gmail.com separate from any information that came from

11  the VK social network; right?

12  A.    That's correct.

13  Q.    Okay.  So speaking of, Anya, your investigation revealed

14  that Anya is a social friend of Mr. Nikulin; right?

15  A.    That would be fair to say, yes.

16  Q.    And one of the ways you -- that that has come out in this

17  case is yesterday there was references to communications

18  between two of them in recorded phone calls; right?

19  A.    Yes.

20  Q.    And in those reported phone calls yesterday, there was

21  reference to Mr. Nikulin purportedly saying that he was in

22  prison; right?

23  A.    I believe that was part of the transcript, yes.

24  Q.    Right.  And then there was part of the transcript where he

25  talked about having guards; right?

**MILLER - CROSS / GASNER**

1   A.   Yes.

2   Q.   And that was in 2018; correct?

3   A.   That's correct.

4   Q.   You know Mr. Nikulin was not in prison in 2018, don't you?

5   A.   I'm sorry.  Could you clarify, please?

6   Q.   You know that Mr. Nikulin was not in prison in 2018, don't

7   you?

8   A.   Can you define prison?  He was in custody.

9   Q.   That's not what I said.  You know what a prison is, don't

10   you?

11   A.   Yes, I do.

12   Q.   You are an FBI agent, aren't you?

13   A.   Yes, I am.

14   Q.   And so you are familiar with the Bureau of Prisons, aren't

15   you?

16   A.   Yes, I am.

17   Q.   And you know how to distinguish that from a local jail,

18   don't you?

19   A.   Yes.

20   Q.   You know what the word "jail" is, don't you?

21   A.   Yes, I do.

22   Q.   Okay.  So yesterday you know that Mr. Nikulin was not in

23   prison in 2018, don't you?

24   A.   Mr. Nikulin was in prison, I believe, it was -- it may

25   have been late 2018, maybe 2019.

**MILLER - CROSS / GASNER**

1  Q.   You know those phone calls didn't originate from a prison,

2  don't you?

3  A.   That's correct.

4  Q.   Okay.  You weren't asked that yesterday, were you?

5  A.   No.

6  Q.   Okay.  Moreover, you know that Mr. Nikulin was in jail in

7  a pretrial detention on this case in 2018, don't you?

8  A.   Yes, I do.

9  Q.   You weren't asked that yesterday, were you?

10 A.   No, I was not.

11 Q.   Okay.  So to your knowledge he wasn't in prison when those

12 phone calls were made; right?

13 A.   That's correct.

14 Q.   Okay.  And you know in 2018 the charges he was facing were

15 the charges that he was facing in this courtroom right here?

16 A.   Yes.

17 Q.   Nothing else; right?

18 A.   That's correct.

19 Q.   Okay.  So I want to turn to your background and

20 experience, Agent Miller.

21      You started investigating cyber crime in 2010; correct?

22 A.   Yes, I did.

23 Q.   All right.  And you have been working on this case since

24 2012; right?

25 A.   Yes, I have.

**MILLER - CROSS / GASNER**

1   **Q.**   All right.  It's a long time for a case, isn't it?

2   **A.**   Yes, it is.

3   **Q.**   It is probably one of your oldest cases, isn't it?

4   **A.**   Yes.

5   **Q.**   So you have invested a lot of time into this matter,

6   haven't you?

7   **A.**   As have many other agents, yes.

8   **Q.**   Okay.  We can break that into two.  My question was:  Have

9   you invested a lot of time into this case?

10  **A.**   Yes, I have.

11  **Q.**   All right.  But what you want to offer is that you also

12  know that other agents have too; right?

13  **A.**   Yes.

14  **Q.**   Because you are invested in this case, aren't you?

15  **A.**   Of course.

16  **Q.**   All right.  And part of your investigation -- well, let me

17  move to this.

18  **A.**   To be clear, I'm invested in all the investigations that I

19  handle.

20  **Q.**   Yeah, I understand.  But in this case you have sat through

21  the whole trial, haven't you?

22  **A.**   Yes, I have.

23  **Q.**   You have worked closely with the prosecutors in this case?

24  **A.**   Yes.

25  **Q.**   Worked closely with them for years, haven't you?

**MILLER - CROSS / GASNER**

1    **A.**    One of them yes.

2    **Q.**    I mean, you believe Mr. Nikulin is guilty, don't you?

3    **A.**    I believe that the evidence suggests that, yes.

4    **Q.**    Okay.  But --

5            **MS. KANE:**  Objection, Your Honor.

6            **MR. GASNER:**  Goes to bias, Your Honor.

7            **THE COURT:**  If the Defense wants to ask that question,

8    that opens the door, perhaps, to other things; but that's a --

9    it's okay for the Defense to try to show bias.  But the other

10   side can possibly exploit that now -- Mr. Gasner, so be

11   careful -- on redirect.  All right.  So do you want him to

12   answer that question?

13   **BY MR. GASNER:**

14   **Q.**    You are biased against Mr. Nikulin, aren't you?

15   **A.**    That is incorrect.

16   **Q.**    You are not an independent witness, are you?

17   **A.**    I'm the case agent.

18   **Q.**    Okay.  So the effort that you have put in over these last

19   eight years is to build a case in order to prosecute

20   Mr. Nikulin; right?

21   **A.**    That's incorrect.  I have been building a case to find out

22   who is responsible for these breaches, whether that's

23   Mr. Nikulin or not.  That was not the focus of the

24   investigation.  To figure out who it was.

25   **Q.**    Okay.

1   **A.**   It was to figure out who it was.   Whether it was Nikulin

2   or not, that was irrelevant.

3   **Q.**   The facts that you have put together in this case in your

4   mind point to Mr. Nikulin; right?

5   **A.**   I believe the facts in this case, yes, point to

6   Mr. Nikulin.

7   **Q.**   I mean, Mr. Nikulin never confessed to you, did he?

8   **A.**   No, he did not.

9   **Q.**   You don't have a video or something like this of him

10  committing these intrusions, do you?

11  **A.**   Those very rarely, if ever, exist.   So no.

12  **Q.**   You do have a video that shows Mr. Nikulin; right?

13  **A.**   I do.

14  **Q.**   In a hotel in Moscow; correct?

15  **A.**   Yes.

16  **Q.**   And in that video the conversation that is being had is

17  about an internet cafe, isn't it?

18  **A.**   It is referencing an internet cafe.

19  **Q.**   Well, there were details about it; right?

20  **A.**   There are few details, yes.

21  **Q.**   Well, that's what is captured on the video, isn't it?

22  **A.**   That small section they reference an internet cafe, yes.

23  **Q.**   Referencing creating an internet cafe in this town; right?

24  **A.**   That's not true.

25  **Q.**   Referencing they could have tea in the internet cafe;

**MILLER - CROSS / GASNER**

1  right?

2  **A.**    They are referencing tea, yes.   These are not businessmen

3  in this video.

4  **Q.**    These are not businessmen in this video?

5  **A.**    They are not.

6  **Q.**    They are -- you know all their business interests then?

7  **A.**    I do not.   But based on the content of that video -- I

8  haven't been in many business meetings where someone gives the

9  bird to others laughing and joking.   And I know the -- some of

10  the other individuals in that video.

11  **Q.**    So you have -- this is not in a residence, is it?

12  **A.**    No.   You said it was a hotel.

13  **Q.**    It looks like a conference room in a hotel, doesn't it?

14  **A.**    Yes.

15  **Q.**    And there is water glasses on the table?

16  **A.**    Sure.

17  **Q.**    Whiteboards?

18  **A.**    Yes.

19  **Q.**    People sitting around with notepads?

20  **A.**    A meeting.

21  **Q.**    By the way, you don't purport to know everybody that is in

22  that video, do you?

23  **A.**    No, I do not.

24  **Q.**    You don't know what business interests the other people in

25  that video may or may not have, do you?

**MILLER - CROSS / GASNER**

1  A.   No.  But I do know that individuals in that room have been

2  charged with crimes similar to this.

3  Q.   Absolutely.  They -- people like Mr. Belan; right?

4  A.   I did not see Mr. Belan in that video, no.

5  Q.   People like Mr. Ieremenko?

6  A.   I don't believe he was in pictured in that video.

7  Q.   People like Nikita Kislitsin?

8  A.   He was in the video, yes.

9  Q.   And it is your view that Mr. Kislitsin is involved in

10  cyber crime; right?

11  A.   I believe the evidence suggests that.  We have e-mails

12  showing he was trafficking data, yes.

13  Q.   Okay.  So during the course of your investigation, you are

14  not just investigating Mr. Nikulin; correct?

15  A.   Absolutely not.

16  Q.   In fact, you are casting for a wide net trying to figure

17  out what happened.  Isn't that true?

18  A.   You have to follow all leads, yes.

19  Q.   And part of your investigation involved other individuals

20  besides Mr. Nikulin; right?

21  A.   Yes.

22  Q.   And you are aware of other large scale federal

23  investigations that are going on by your Bureau in the United

24  States, don't you?

25  A.   I have no personal knowledge.  I'm not involved in those

 1   investigations.

 2   **Q.**   You -- you are aware, for example, of the investigation

 3   out of New Jersey that we have talked about in this case?

 4   **A.**   Can you clarify?

 5           **MS. KANE:**  Objection.  Vague.

 6           **THE COURT:**  Overruled.  Do you understand the

 7   question?

 8           **THE WITNESS:**  Can you clarify the question, please?

 9   **BY MR. GASNER:**

10   **Q.**   Sure.  The indictment out of New Jersey associated with

11   the United States Secret Service investigating the hacks

12   into -- into -- what are they called -- press releases so that

13   people can trade in advance of those press releases.

14   **A.**   I have heard of that, yes.

15   **Q.**   So a part of your job is to know about other

16   investigations in the cyber hacking to see whether there was

17   any cross connection with your cases; right?

18   **A.**   That's very general.  We follow the leads in our

19   individual cases and where they go.  And if they happen to

20   cross other investigations, then we would follow up on those

21   leads.

22   **Q.**   Right.  So if there was a -- if there are suspects in

23   other cases that may be related to your investigation, you

24   would follow up on that lead; right?

25   **A.**   If there was ties to my case, yes.

1  Q.   And so you are familiar with -- well, first of all, you

2  are in the cyber crime unit, aren't you, sir?

3  A.   Yes, I am.

4  Q.   And part of your duties is to be -- when you are doing

5  investigation is to be aware of the types of suspects that

6  might be committing the crimes that you are investigating;

7  right?

8  A.   Again, that's very vague.  I would follow the leads in the

9  case.  And if they pointed me to a different investigation,

10 then, yes, I would look up more details about that

11 investigation.

12 Q.   And in particular, you are investigating Russian Nationals

13 that are involved in cyber crime; correct?

14 A.   I have investigated several Russian Nationals, yes.

15 Q.   Are you familiar with Yevgeniy Bogachev?

16 A.   I recognize the name.

17 Q.   Don't you --

18      MS. KANE:  Objection.  Relevance.

19      THE COURT:  Overruled.

20 BY MR. GASNER:

21 Q.   How have you heard the name?

22 A.   The wanted poster you showed.

23 Q.   Okay.  Well --

24      MR. GASNER:  Your Honor, what I'm going to propose to

25 do based on the witness' answers show him the poster so I can

 1    see if this is what he is referring to.

 2            THE COURT:  Go ahead.

 3            MS. KANE:  Objection.  Relevance and 403.

 4            THE COURT:  Well, you -- you can only show it to the

 5    witness at this point.

 6            MR. GASNER:  That's fine.

 7            THE COURT:  Not to the jury.  So it only goes to the

 8    witness and me.

 9            MR. GASNER:  Thank you, Your Honor.

10            THE COURT:  And to Counsel.  It is not in evidence.

11            MR. GASNER:  I'm putting it up on the ELMO.  If we can

12    kindly regulate it to the Court and to the witness.

13            THE CLERK:  They can't see anything; right?  Just

14    confirming.

15            THE COURT:  Can you see anything over there?

16            JUROR SERPA:  No.

17            THE COURT:  The answer is it is okay.  Can the witness

18    see it?

19            THE WITNESS:  Yes, I can.

20            THE COURT:  Go ahead.  What's the -- let the witness

21    study it so that -- it is supposed to refresh his memory in

22    some way.

23                        (Pause in proceedings.)

24            MR. GASNER:  Feel free to take your time and look up

25    whenever you have reviewed it.

**MILLER - CROSS / GASNER**

```
 1                    (Pause in proceedings.)
 2             THE WITNESS:  Okay.
 3   BY MR. GASNER:
 4   Q.   So as a preliminary question --
 5             THE COURT:  Keep your voice up.
 6             MR. GASNER:  Yes, Your Honor.
 7   BY MR. GASNER:
 8   Q.   As a preliminary question, the person on this FBI wanted
 9   poster is Yevgeniy Mikhailovich Bogachev.  First name is
10   E-V-G-E-N-I-Y; middle name M-I-K-H-A-I-L-O-V-I-C-H; last name
11   B-O-G-A-C-H-E-V.  Do you see that?
12   A.   I do.
13   Q.   Are you aware in course of your investigation into Russian
14   cyber criminals that Mr. Bogachev is wanted by the FBI?
15   A.   Based on this photo, yes.
16   Q.   And does what you are looking at look to be a Wanted by
17   the FBI poster that you are familiar with?
18   A.   It does.
19   Q.   You have seen many posters similar, haven't you?
20   A.   I have seen some, yes.
21   Q.   Okay.  And do you recognize the individual in that
22   photograph from your investigations?
23   A.   I do not.
24   Q.   And are you aware -- have you -- were you aware that
25   Mr. Bogachev was wanted by the FBI?
```

MILLER - CROSS / GASNER

```
 1   A.    Yes.

 2   Q.    And you were aware that he is wanted by the FBI for

 3   charges such as aggravated identity theft; correct?

 4   A.    Based on this poster, yes, that's what it says.

 5             THE COURT:  Wait.  Wait.  He is asking -- are you

 6   saying that this poster is the only way you knew that?

 7             THE WITNESS:  Yes, I knew the name and I knew that he

 8   was wanted; but I didn't know the specific charges.

 9             THE COURT:  All right.  Next question.

10             MR. GASNER:  Thank you.

11   BY MR. GASNER:

12   Q.    Are you aware that -- then are you aware that the United

13   States has a $3 million bounty on this man?

14   A.    I believe that is also on the bottom of this poster, yes.

15   Q.    I understand that.  I'm asking from your independent

16   knowledge.

17   A.    I have seen this poster.

18   Q.    Okay.

19             MS. KANE:  Objection.

20             INTERPRETER:  The interpreters cannot hear the

21   question.

22             THE COURT:  What did the interpret say?

23             INTERPRETER:  The interpreter cannot hear the

24   question.

25             THE COURT:  She wants you, I think, to move you back
```

MILLER - CROSS / GASNER

 1    to your microphone.

 2              THE CLERK:  Can you test that one?

 3              MR. GASNER:  Testing.  Testing.  My apologies.  Yes.

 4              THE COURT:  Go ahead.  I'm overruling the objection.

 5    This -- the witness testified to the scope of his examination.

 6    He exonerated some people.  He said he went down many different

 7    leads.  And so now Counsel is asking did he go down this lead.

 8    So it is fairly within the scope of what happened on the

 9    direct.  All these objections are overruled.  Go ahead.

10              MR. GASNER:  Thank you, Your Honor.

11    BY MR. GASNER:

12    Q.   So are you saying, Agent Miller, that you are not aware

13    that Mr. Bogachev -- was he apprehended by the FBI -- in a hack

14    that caused in excess of $100 million through his malware or

15    botnet called GameOver Zeus?  Are you not familiar with that?

16    A.   Can you say it slower, please.

17    Q.   Sure.

18              THE COURT:  I want you to go to your microphone over

19    there because we are having trouble hearing you with the system

20    we have to live with here.

21              MR. GASNER:  I understand, Your Honor.  I apologize

22    and the mask is complicating things as well.

23              THE COURT:  Ask the question again.

24    BY MR. GASNER:

25    Q.   Agent Miller, are you not aware that Yevgeniy Bogachev was

1   apprehended by the FBI in a hack that caused in excess of a

2   $100 million dollars in his malware or botnet called GameOver

3   Zeus?  Are you not aware of that?

4   **A.**   I don't believe he was ever apprehended; hence the poster.

5   **Q.**   Were you aware that he was investigated for GameOver Zeus?

6   **A.**   Based on this, yes.

7   **Q.**   Now, in the course of your investigation and into this

8   case and others, are you familiar with the word "botnet"?

9   **A.**   I am.

10  **Q.**   And is that a virus or a malware that can be placed on an

11  individual's computer?

12  **A.**   The botnet itself is not, no.

13  **Q.**   What is the botnet?

14  **A.**   The botnet is a collection of compromised computers.

15  **Q.**   Aha.  So once a piece of malware is put on a series of

16  computers or infects a series of computers, that is a called a

17  botnet?

18  **A.**   It depends on the malware and the communication methods of

19  the malware.

20  **Q.**   Uh-huh.  And but malware is -- excuse me.  Malwares can

21  sit dormant on a computer for some period of time; correct?

22  **A.**   It can.

23  **Q.**   And then be triggered by a certain action; right?

24  **A.**   Possibly, yes.

25  **Q.**   What else do -- what else, if that's just possible?

MILLER - CROSS / GASNER

1    A.    You will have to be more specific.

2    Q.    What other kind of malware are you familiar with?

3    A.    There is key-loggers, malware that steals credentials.

4    Q.    And in order to do that, sometimes they act immediately

5    upon infection and sometimes they lie dormant?

6    A.    Yes, like I previously said.

7    Q.    So with regard to the name Evgeniy Bogachev -- you have

8    been sitting through this trial and heard the linguist or the

9    translator testify, didn't you?

10   A.    I did.

11   Q.    And you are aware that the name Evgeniy is a -- another

12   version of Zhenya?

13   A.    Based on the translator, yes.

14   Q.    And you know that the word Evgeniy is the same in Evgeniy

15   Bogachev in the Most Wanted poster -- FBI -- excuse me -- the

16   Wanted by the FBI poster is the same spelling as Evgeniy

17   Lomovich that you were referring to earlier?

18   A.    The first name, yes.

19   Q.    Yes.  And you have also -- know that there is another

20   spelling of that first name of Yevgeniy with a Y?

21   A.    Yes.

22   Q.    And that there is -- similar names, same different

23   spellings but the same name?

24   A.    Yes.

25   Q.    From the -- from your understanding and from your review

1   of the FBI poster, are you aware that Evgeniy Bogachev's

2   signature in his GameOver Zeus code or browser ID was the name

3   Slavik?

4   **A.**   Based on this poster, yes.  Slavik but there were several

5   others that were mentioned as well.  It is not just Slavik.

6            **MR. GASNER:**  Excuse me one moment.

7                       (Pause in proceedings.)

8            **THE COURT:**  It is almost time to stop.  If this is a

9   good breaking point, great.  If you got a few more questions,

10  we will let you finish.

11           **MR. GASNER:**  I think that's appropriate, Your Honor.

12  I was just clarifying something.  We might as well break.

13           **THE COURT:**  Have you finished this line of questions?

14           **MR. GASNER:**  We have finished partially on this line

15  of questions, but there are some follow-up.

16           **THE COURT:**  All right.  We will wait until the morning

17  to resume at this point.

18      The jury will remember the admonition.  Don't talk about

19  this case.  And, remember, please be here by 8:00 a.m.

20      I am still hoping that we can get the case to you

21  tomorrow.  However, I don't know that.  We took a lot more time

22  today than I expected and so we are off course; but maybe we

23  can make up an hour of it tomorrow if you are here on time.

24  Have a good evening and see you back here then.

25           (Proceedings were heard outside the presence of the jury:)

PROCEEDINGS

```
 1              THE COURT:  Everyone, be seated.  So tomorrow, my
 2    marshals, I want the Defendant to be here at 7:30 a.m.
 3              MARSHAL:  Yes, Your Honor.
 4              THE COURT:  The lawyers here at 7:30 a.m. and then we
 5    will start at 8:00 a.m. with the jury or even earlier if they
 6    are ready.  So that will be our schedule tomorrow.  How much
 7    longer do you think you have on cross?
 8              MR. GASNER:  If we start it by -- on cross by
 9    8:00 a.m., Your Honor, I suspect that I will be done by -- with
10    cross by 9:00, 9:30.
11              THE COURT:  All right.  The direct was very long, so
12    that's reasonable.  I'm not -- but on the other hand, we have
13    to be mindful whether or not we are going to lose one of the
14    jurors because of her vacation if we don't get this case to the
15    jury in time for them to fairly deliberate this week.  So it's
16    okay with me if we go into next week, but be mindful that
17    that's the tradeoff.
18              MR. GASNER:  All right.  I will, Your Honor, and I
19    will try to be direct and crisp with my line of questioning.
20              THE COURT:  All right.  In light of how much time the
21    Government spent, I think you ought to give back some of that
22    two hours.  Think about it.
23         I'm not ordering that yet.  You ought to say an hour and a
24    half ought to be enough, something like that, in order for us
25    to try to get this case to the jury.  I'm not going to order
```

1  that yet, but you should think about that in order to make up

2  for lost time because what you did was just lay before the jury

3  your closing argument.  So maybe you don't need as much time

4  for closing argument.

5      I have -- I'm going to give to Karen my list of exhibits.

6  And, again, if it says "in," that means I let it in evidence.

7  If there is no "in" beside it, then that means it was not

8  admitted into evidence although Karen's list will be the

9  official.  I do keep good notes.  I don't want us to have

10  glitches so you need to -- you need to address that today.

11      And then the last thing is supposedly IT was going to be

12  here at 2:00 o'clock, but they are not here.  But you lawyers

13  hang around.

14      Jolie, can you find out why they are not here and because

15  we have got to fix these -- I want you to explain every glitch

16  with the electronics because when you do your closing

17  arguments, I want you to have the benefit of the best we can do

18  or if it is going to be fouled up, then at least you can work

19  around it.  All right.  Anything you want me to address before

20  we break for the day?

21          MR. GASNER:  No.  Thank you very much, Your Honor.

22          MS. KANE:  No, Your Honor.

23          THE COURT:  All right.  Good luck to both sides.  See

24  you tomorrow.

25              (Proceedings adjourned at 2:01 p.m.)

1

2                    **CERTIFICATE OF REPORTER**

3          I certify that the foregoing is a true and correct

4    transcript, to the best of my ability, of the official

5    electronic sound recording provided to me by the U.S. District

6    Court, Northern District of California, of the proceedings

7    taken on the date and time previously stated in the

8    above-entitled matter.

9          I further certify that I am neither counsel for, related

10   to, nor employed by any of the parties to the action in which

11   this proceeding was taken; and, further, that I am not

12   financially nor otherwise interested in the outcome of the

13   action.

14

15   DATE:   Wednesday, July 8, 2020

16

17

18
                    _____
19
                        Marla F. Knox, RPR, CRR, RMR
20                       United States Court Reporter

21

22

23

24

25