**Volume 7**

**Pages 700 - 893**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | **NO. CR 16-00440 WHA** |
| ) | |
| YEVGENIY ALEKSANDROVICH ) | |
| NIKULIN, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

San Francisco, California
Thursday, July 9, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

                    DAVID L. ANDERSON
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
          BY:  **KATHERINE L. WAWRZNIAK**
                    **MICHELLE J. KANE**
                    **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:

                    LAW OFFICE OF ADAM GASNER
                    345 Franklin Street
                    San Francisco, California  94102
          BY:  **ADAM GASNER**
                    **VALERY NECHAY**
                    **ATTORNEYS AT LAW**

Interpreters:      Maria Entchevitch and Marina Brodskaya

Reported By:  Marla F. Knox, RPR, CRR, RMR
               United States Official Court Reporter

## **I N D E X**

Thursday, July 9, 2020 - Volume 7

|                                              | **PAGE** | **VOL.** |
|----------------------------------------------|----------|----------|
| Jury Instructions                            | 871      | 7        |

| **GOVERNMENT'S WITNESSES**                   | **PAGE** | **VOL.** |
|----------------------------------------------|----------|----------|
| **MILLER, JEFFREY (RECALLED)**               |          |          |
| (PREVIOUSLY SWORN)                           | 719      | 7        |
| Cross-Examination (resumed) by Mr. Gasner    | 719      | 7        |
| Redirect Examination by Ms. Kane             | 849      | 7        |
| Recross-Examination by Mr. Gasner            | 866      | 7        |

## **E X H I B I T S**

| **DEFENDANT'S EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|--------------------------|----------|----------|----------|
| 1                        |          | 727      | 7        |
| 2                        |          | 780      | 7        |
| 3A                       |          | 796      | 7        |
| 3B                       |          | 796      | 7        |
| 3C                       |          | 796      | 7        |

1    <u>**Thursday - July 9, 2020**</u>                              <u>**7:32 a.m.**</u>

2                      **P R O C E E D I N G S**

3                            **---oOo---**

4        **THE COURT:**  The lawyers are here.  The Defendant is

5    here.  The jury is not.  We are here at 7:30 to try to make up

6    for some lost time, but the computers have crashed.  And so

7    we -- in part and they are trying to fix it, but maybe we can

8    do this piece of business, which is I want to make sure that

9    you had an opportunity to vet the exhibits in evidence and not

10   in evidence to see if we have any issues there.  Are there any

11   issues that we need to address?

12       **MS. WAWRZYNIAK:**  No, Your Honor.  We went through the

13   exhibits yesterday with Ms. Hom, and I think we were fine with

14   them.

15       **THE COURT:**  All right.  Is that true?

16       **MR. GASNER:**  That is true.  There does not appear to

17   be any issues.  I think everything was admitted that we

18   expected to be admitted.  I defer to the Government.  They were

19   pretty careful in that regard.

20       **THE COURT:**  Excellent.  Thank you for that good work.

21     Is there any other issue I can help you with before we try

22   to see if the computers are working?

23       **MS. WAWRZYNIAK:**  Just on the issue of the exhibits,

24   Ms. Geiger, do you have the full set now?  Did you get the box?

25       **THE CLERK:**  I did.

1          MS. WAWRZYNIAK:  Because they are in the box.  Okay.

2     Good.

3          THE COURT:  All right.

4          MS. KANE:  Your Honor, there was one issue that we

5     wanted to raise with the Court this morning.

6          THE COURT:  Please go ahead.

7          MS. KANE:  So yesterday during the Defense questioning

8     of Special Agent Miller, there were a number of questions about

9     the meeting that is on the video that we showed in Court.  And

10    those questions were characterizing what type of meeting that

11    was.

12       Previously the Court had excluded the -- the audio from

13    the earlier video in which the same people who attend the

14    meeting describe exactly what kind of meeting it is going to

15    be.

16       And given the questioning yesterday, the Defense has

17    opened the door now to that audio because the jury has been

18    left with a misimpression about that meeting.

19         THE COURT:  Well, no, I don't think so because the --

20    the video in the hotel room, they never talk about anything but

21    the cafe, the internet cafe.  And there were a lot of other

22    people in that room then that were -- that were in the car.  It

23    is not correct what you just said.  It is not the same people

24    in the car.  It is some of the same people but not all of the

25    same people.

```
1         And so the fact that they went there for the purpose maybe
2    of talking about hacking, which I don't remember that being in
3    the audio anyway, what actually happened is on tape.  We know
4    what happened.  So I disagree with your analysis.  It is not
5    opened yet.  So that motion is denied.  All right.  Are we --
6    how are we doing, Tracy?
7              THE CLERK:  We are still working on it, Judge.
8              THE COURT:  Well, the one with the witness doesn't
9    work at all.
10             THE CLERK:  We are connecting right now.
11             THE COURT:  Okay.  Which is the other one that doesn't
12   work?
13             THE CLERK:  We are connecting the Defendant's computer
14   up and the witness.
15             THE COURT:  All right.
16             THE CLERK:  And then we will do yours.
17             THE COURT:  Okay.  Can I ask a -- there goes the
18   person I was going to ask.
19                        (Pause in proceedings.)
20             THE COURT:  No witness?
21             MS. KANE:  No, we don't have our witness yet.
22             THE COURT:  That's okay.  Can I ask -- I have a couple
23   of other things.  First, I want to apologize to your legal
24   assistant.  What is her name?
25             MS. KANE:  Our legal assistant?
```

1              THE COURT:  Yeah.

2              MS. KANE:  You mean Ms. Yee?

3              THE COURT:  Yeah.  Here, listen, you have been doing a

4    great job; and I came to realize that the fault was not in your

5    punching the right button on time.  The fault was in me and the

6    court for having set up a defective system.  We did not realize

7    it going into the trial.

8         We thought that everything was cool, and it had been

9    tested out, and I thought they did a brilliant job and -- but

10   it turns out that the interplay between Zoom and the court

11   evidence system, there is an unexpected fault, which is that

12   the data goes up into the cloud and it comes out to various

13   computers at different rates.

14        So when it was tested out, apparently it was sent to the

15   freeway of all freeways for the data and -- where they did not

16   have a problem in our IT department.  But for the poor lambs of

17   the computers that the rest of us have here in the courtroom,

18   there was a delay.

19        So some people out there in the real world experience

20   delays.  Other people got it quicker.  And it was an unforeseen

21   innocent error on our part, but it was not your fault.

22        And I, at one point, implied that you were not doing it

23   fast enough; and I was wrong to make that suggestion.  You were

24   doing your job perfectly well.  I am recommending you for a

25   promotion in the U.S. Attorney's Office and for putting up with

1   my criticism.  All right.  So thank you for that.

2           **MS. KANE:**  Thank you, Your Honor.  I will say that on

3   behalf of Ms. Yee.

4           **THE COURT:**  We are all learning as we go here.  For

5   our next trial I'm recommending we get rid of Zoom and have an

6   overflow for the public, and we will see if my recommendation

7   holds any water.  Okay.

8       I have one last -- I want to change the subject

9   altogether.  I'm sure there will be a Rule 29 motion; is that

10  right?  There going to be a Rule 29 motion?

11          **MR. GASNER:**  There will be.

12          **THE COURT:**  I'm going to reserve until after it goes

13  to the jury and we get a verdict on that.

14          **MR. GASNER:**  Pardon me, Your Honor?  I didn't

15  understand that second part.

16          **THE COURT:**  I won't grant you an acquittal before the

17  verdict.  I will reserve on ruling on it until after we get a

18  verdict.

19          **MR. GASNER:**  Of course.

20          **THE COURT:**  That's what is normally done.

21  Nevertheless, I can't order you -- anyone to do this.  Argue

22  the case anyway you want.  But it would be useful to the Judge

23  in thinking about Rule 29 to see the specific connections that

24  the Government has made between this Defendant and the hacks.

25      So late yesterday we began to see, I think for the first

time, anything that connected the Defendant to this case and
there were several items.  So good for you.  I mean, you got
some evidence there.

     But then I got to thinking last night, well, some of that
may be connected to LinkedIn.  Some of it may be connected to
Formspring -- Spring Forum or whatever it was called -- and I
couldn't quite in my own mind as I was going to sleep last
night reconstruct it as to -- you had those things from the
face -- VK, for example.  You had various pictures.

     And so, anyway, my point is that I feel it would be very
useful in ruling on Rule 29 for the Government in your closing
argument to do what I think you are probably going to do
anyway, but I hope you do -- and that is to address the
question what specifically ties this Defendant to these
specific counts.  That's all I'm -- I can't order you to do --
I'm not ordering you to do it because it is up to you, but that
would be useful to me.  Otherwise, I'm going to have to have a
lot of briefing on this later.

          **MS. WAWRZYNIAK:**  We understand, Your Honor.  I wanted
to just tell you that I'm going to do the opening closing.  I
prepared a slide deck, and I definitely am laying out the type
of evidence that you are talking about.

          **THE COURT:**  All right.  That's wonderful to hear.

     What was my other point I was going to make kind of along
those lines?  It will come to me later.

1           Mr. Gasner, you look like you are about to say something.

2           **MR. GASNER:**  I think I'm -- I think I always look that

3     way, Your Honor.

4           **THE COURT:**  You what?

5           **MR. GASNER:**  What I -- actually, what I want to say is

6     something -- just a very small scheduling issue that is

7     probably irrelevant or can be deferred until later.

8           I don't know where we are going to be at the end of the

9     day today.  But if the case is submitted to the jury by the end

10    of today, I have got a relatively important matter -- not as

11    important as this -- over in the State courthouse at

12    9:00 o'clock a.m. and I presume the jury will be deliberating

13    at that time.  And I was wondering if I could have leave of

14    court to attend to that matter between 9:00 and 9:30 tomorrow

15    morning.  It is for a case that has been ongoing for some time.

16          **THE COURT:**  My advice to you is not to do that.  To be

17    here.  But if you are not here and -- then Ms. Nechay has to

18    have the final word and be able to make a decision on any note

19    that comes from the jury.  She cannot call you.  She cannot

20    track -- she has got to be able to say yes, no or here is what

21    I -- because it is -- time is too precious so --

22          **MR. GASNER:**  I understand.

23          **THE COURT:**  My advice would be not to do that.

24    Probably there will be notes from the jury, and you will be

25    over there out-of-pocket and Ms. Nechay will be, you know,

1    thinking I'm being mean to her; but she is going to have

2    absolute authority to say yes, no, or here is my point.

3            MR. GASNER:  Well, I -- I haven't made a decision.  I

4    do have complete faith in Ms. Nechay in that regard.  I do

5    understand the value of being here, and I'm often sitting in

6    the courtroom for days for deliberation for that purpose.

7            THE COURT:  Me too.  I did the same thing.  All right.

8            MR. GASNER:  Understood.  Thank you, Your Honor.

9            THE COURT:  Do we have a witness yet?

10           MS. WAWRZYNIAK:  We do, Your Honor.

11           THE COURT:  Is the system working yet?

12           INTERPRETER:  We are having a hard time hearing.

13           THE COURT:  You can't hear me?  Thank you for letting

14   me know.  Tracy, is our -- is our computer working yet?

15           THE CLERK:  Yes, it is, Your Honor.  I just need to

16   log you in.

17           THE COURT:  All right.

18           MR. GASNER:  And, Your Honor, the Defense does have

19   one more issue before the witness.

20           THE COURT:  You have one more what?

21           MR. GASNER:  Just one more issue to raise before the

22   witness begins his testimony.

23           THE COURT:  Yes.  What?

24           MR. GASNER:  It has to do with the admissibility of

25   this FBI poster that we were showing yesterday.  I would like

1    to clarify whether the Court is going to allow me to admit that

2    before we are in the presence of the jury.

3              THE COURT:  Well, why is it admissible?

4              MR. GASNER:  Because it is a -- a true and accurate

5    representation of a government statement.  I believe it's a

6    true and accurate FBI poster that hasn't been disputed.  It is

7    a statement of the United States Government --

8              THE COURT:  No, I'm not going to.

9              MR. GASNER:  -- Department of Justice.

10             THE COURT:  Look, I allowed you to use it to refresh

11   his memory.  But so far you don't have a record good enough to

12   let this come into evidence.  So the answer to that is so far,

13   no.

14             MR. GASNER:  Okay.

15             THE COURT:  Looks like.  Is the system now working?

16             THE CLERK:  Yes, Your Honor, I believe it is.

17             THE COURT:  So are we now ready to bring the jury in

18   and proceed?

19             MS. KANE:  Yes, Your Honor.

20             THE COURT:  Tracy, go get our jury.

21        And now let me ask, Mr. Gasner, give me a rough idea of

22   how much more cross do you have?

23             MS. KANE:  I'm sorry.  Our witness has just entered

24   the courtroom.

25             THE COURT:  That's okay.  Come on forward.  How much

```
 1    is it?  An hour, two hours?
 2            MR. GASNER:  I think somewhere between there.  It is
 3    kind of hard -- it depends on the answers I get.
 4            THE COURT:  Okay.  That's fair.  All right.  Please
 5    welcome back, Agent.  Have a seat.
 6            THE WITNESS:  Thank you, Your Honor.
 7            MR. GASNER:  An hour or two depending on the answers.
 8                    (Pause in proceedings.)
 9            THE CLERK:  Your Honor, we are missing four jurors.
10            THE COURT:  The best laid plans.  It is now 7:50 and
11    four jurors are not yet here so we have got to wait.
12        Have we tested out the new fix to make sure it is going to
13    work?
14            MS. WAWRZYNIAK:  Your Honor, I had the opportunity
15    yesterday to test my PowerPoint over the Zoom with the
16    courtroom staff.
17            THE COURT:  Uh-huh, but I thought we were somehow --
18    so we are still using Zoom?
19            MS. WAWRZYNIAK:  I believe so, yes.
20            THE COURT:  But what then was the fix?
21            MS. WAWRZYNIAK:  I don't know if there actually was a
22    fix.  All I can say is that it was working, and what was
23    displayed on the laptop was displaying on Zoom pretty much
24    contemporaneously.
25            THE COURT:  Well, they told me they had a good fix
```

1    and -- so I think so.  It will be interesting to see if it

2    works.

3        While we have this dead time, I want to ask a question of

4    my interpreters and you don't have to answer this now -- it is

5    a contingent question.  I anticipate the possibility that the

6    jury would want to start tomorrow if we are continuing with

7    evidence or argument; that they might want to start an hour

8    early like at 7:30 in order to possibly be able to deliberate

9    and get a verdict tomorrow, if they ask for that.

10       So but that means that you would have to be here early

11   like you were today which I very much appreciate.  But I know

12   it's an imposition on you to ask you to do that.  So I want you

13   to think about whether or not you are willing to accommodate us

14   if they made that request.  Don't say yes or no now.  Just

15   think about it and we can talk later if that contingency

16   arises.

17       Mr. Gasner, are you going to be using exhibits with your

18   cross-examination?

19       **MR. GASNER:**  Your Honor, to the extent that I do need

20   an exhibit or need to refresh this witness' recollection, my

21   intention is to go old school and use the ELMO rather than the

22   technology.  I hope that works.

23       **THE COURT:**  All right.  We will see what happens.

24   Good for you.  Yeah, I'm an old-school guy too.

25       **MR. GASNER:**  Well, I would say it is going to be a

1    hybrid, Your Honor.  Rather than printing everything out, I

2    have it on this iPad here -- this iPad, but I just tested it

3    out with the ELMO.

4        So instead of printing out a lot of papers, I think I can

5    put the iPad on the ELMO and show documents as though they were

6    hard copies.  Maybe I'm saving a few trees that way.  We will

7    see.

8            THE COURT:  Have you tried that to see if the glare

9    works?

10           MR. GASNER:  I have tried it yes, Your Honor.

11           THE COURT:  One of the old school things I still like

12   are easels with paper.  We don't have one in this courtroom,

13   but I have one in my chambers that I used when I was a trial

14   lawyer and the -- they are so useful to -- so my law clerks

15   draw cartoons for me to explain complicated things and I keep

16   those.

17       I have hundreds of pages of those that explain timelines

18   or how some patent works or -- and, you know, that goes back to

19   probably, what do you think 1900?  Anyway.

20           MR. GASNER:  Absolutely.

21           THE COURT:  A long time.  A long time.  Easels and

22   when I was a -- trying cases in back in the day, every lawyer

23   had an easel and every courtroom had one too; but you would

24   usually need more than one.  So they were nifty things to have,

25   and I still use mine from then.  It is old school.

```
1            Another one that we don't have in this courtroom that we
2    don't have, but I have in my other courtroom is a wooden
3    pointer stick which is about 3 feet long.  Ready?
4            THE CLERK:  Still missing two.
5            THE COURT:  The pointer stick is also useful to point
6    to things like on your timeline there as opposed to those red
7    dot things that -- anyway --
8            MR. GASNER:  I was -- I was taught by a mentor of mine
9    that if I ever pulled out one of those red dot things, he would
10   swat it out of my hand.
11                           (Laughter)
12           THE COURT:  Who was that?
13           MR. GASNER:  Hugh Levine.
14           THE COURT:  Oh, yeah.  Well, good for Hugh Levine.
15   Plus, everybody else in the room is worried about their eyes
16   will be put out by the red dot inadvertently hitting them.
17       I was told yesterday that -- that the whole point of this
18   plastic sheet in front of me was that I would not have to wear
19   a mask.  I didn't realize that until yesterday.  But since I
20   have already done it, I'm going to stick -- and you-all are
21   doing it and the jury is doing it.  I'm going to stick with
22   wearing my mask anyway so --
23           MR. GASNER:  Your Honor, while we are talking about
24   it, I have to concede that I wish I had a picture of you up
25   there with the black bandana the first time we wore masks.
```

1          **THE COURT:**  I still have that.  Would you like me to

2    wear that?

3          **MR. GASNER:**  As they say, it was pretty cool.  I have

4    a red one.  I have a black one.  I have a blue one.  Yeah, I do

5    a lot of back country hiking.  I have a lot of bandanas.

6    Bandanas are very useful things.  Keep the mosquitoes off.

7    Keep the sun off your neck.  Sometimes you can use it as a hat.

8    I know how to make a hat of it.  Claim a camp with them.  All

9    kinds of good uses for a bandana.

10        There is one thing you don't do with a bandana.  You don't

11   blow your nose on a bandana, never.

12                         (Laughter)

13         **THE COURT:**  Those bandana.  Bandanas are precious.

14   You don't blow your nose on a bandana.  Tracy, let's go see if

15   they are here yet.

16         **THE CLERK:**  Okay.

17         **THE COURT:**  Have any of you been paying attention to

18   how many participants we have on the Zoom?

19         **MR. GASNER:**  Just briefly, Your Honor.  It's varied

20   between 30 and 50.

21         **THE COURT:**  Yeah, that's what I'm thinking.  Right now

22   it is 20.

23         **MR. GASNER:**  It is a little early for some people.

24         **THE COURT:**  A little early for those people who would

25   usually be interested in this, but I have seen it up to 53 or

```
 1    55.  I think that was the highest I saw, but it seems like it's

 2    running around 40 on average; but that counts the ones we have

 3    here in the courtroom.  So really in terms of on the outside

 4    world, I guess it is more like 30.  That's still a lot.

 5         If we had 30 people on the outside filling up this

 6    courtroom, it would -- it would -- you know, it would be three

 7    or four pews back there filled with viewers.  And we have no

 8    way to know who they are.  They could be people in this

 9    building just out of interest.  It could be the press.  It

10    could be the public.

11         One thing I'm going to ask the jury to do -- and I will

12    ask all of you to do -- if within the next two weeks anybody

13    gets sick, you need to let us know because then we will have to

14    let everyone else know so that they can take precautions.

15         I hope that doesn't happen, of course; but we need to be

16    prepared for that contingency to protect everyone else.  So let

17    us know if that happens.

18              THE CLERK:  Still missing two.

19              THE COURT:  Okay.  Well, I'm sorry that our plan

20    didn't work out.

21                   (Recess taken at 8:00 a.m.)

22                (Proceedings resumed at 8:17 a.m.)

23              THE COURT:  One of the jurors has had a flat tire and

24    will be 20 minutes late.  What that means, I don't know.  Was

25    it 20 minutes from when we got the report?  Is the tire fixed?
```

1   It is very vague.  Jolie, go to the jury -- see how much more

2   information you can get from the administrator.

3          **LAW CLERK:**  Yes, I'm asking now.

4          **THE COURT:**  I don't know.  Do you lawyers want -- we

5   are missing one.

6          **MR. GASNER:**  Does the Court have that juror's cell

7   phone number?  Perhaps an inquiry can be made directly to the

8   juror.

9          **THE COURT:**  Tracy, do we?  Do we have the cell phone

10  number of that juror?

11         **THE CLERK:**  I believe I do, Your Honor.

12                   (Pause in the proceedings.)

13         **THE CLERK:**  He said he is now getting off the big

14  bridge.  He will be at the Civic Center parking lot in nine

15  minutes.

16         **THE COURT:**  Did you hear that?  He will be at the

17  parking lot, Civic Center, in nine minutes.  My guess is that

18  means 20 minutes from now we can start.

19      Tracy, the other jurors will be anxious over this so can

20  you go down and inform them?

21      And unless the lawyers need me, I'm going to take a

22  10-minute break.  Is that all right?

23         **MS. KANE:**  Yes, Your Honor.

24         **MR. GASNER:**  Yes, Your Honor.

25                   (Recess taken at 8:20 a.m.)

1          (Proceedings resumed at 8:40 a.m.)

2          **THE COURT:**  Thank you.  Welcome back.  Be seated.

3   Thank you for those of you who got here so early I profoundly

4   thank you and I'm sorry it didn't work out today.  We are

5   starting late, not early but that sometimes happens.

6          One other thing, the -- you know we have experienced

7   glitches with the software and being able to show you things

8   like videos and documents; and I don't want you to think in

9   anyway that was the fault of the lawyers or their paralegals.

10         In fact, it was my fault because of the system that we put

11  in place.  I didn't vet it enough to make sure that it was

12  going to work right in all circumstances.  It worked right in

13  some circumstances.  But, anyway, the lawyers are innocent on

14  that.  Don't hold anything against them in terms of the delays

15  in the case.

16         Okay.  Now, you will remember Agent Miller was on the

17  stand.  He finished his direct testimony and now Mr. Gasner had

18  begun his cross-examination and will now continue his

19  cross-examination.

20         If you are going to be using the ELMO, let's make sure --

21  are those screens on now?  Everything is cool with that?

22  Great.

23         Okay.  Mr. Gasner, the floor is yours.

24         **MR. GASNER:**  Thank you very much, Your Honor.

25  \\\

1                    **JEFFREY MILLER**,

2   called as a witness for the Government, having been previously

3   duly sworn, testified further as follows:

4                **CROSS-EXAMINATION (resumed)**

5          MR. GASNER:  Preliminarily just with regard to the

6   technology, I'm wedded over here to this podium because of the

7   microphone.  But can everybody in the back, the jurors, hear

8   me?  Okay.  And I beg your pardon for turning my back to

9   you-all.  I'm used to seeing everybody in the box, so I'm sorry

10  about that.  I know we are all trying.

11  **BY MR. GASNER:**

12  **Q.**   Good morning again, Agent Miller.

13  **A.**   Good morning.

14  **Q.**   Agent Miller, you have been employed as a Special Agent

15  with the FBI assigned to the investigation of cyber crimes

16  since about May of 2010; right?

17  **A.**   That's correct.

18  **Q.**   And your training for your job included a 21-week FBI

19  training where you received instruction on various aspects of

20  federal investigations; right?

21  **A.**   That's correct.

22  **Q.**   And since graduating from that FBI academy, you have been

23  assigned to the San Francisco field office investigating

24  high-technology and cyber crime offenses; right?

25  **A.**   Yes.

1   Q.   And those investigations include computer-related

2   offenses, computer intrusions, trafficking in unauthorized

3   access devices, identity theft, wire fraud, internet extorsion

4   and other matters like this; correct?

5   A.   That is correct.

6   Q.   And in this case you are aware that you have been proving

7   testimony as an expert as well; correct?

8   A.   Partially, yes.

9   Q.   Yes.  And that's an expert into aspects of cyber crime;

10  right?

11  A.   Yes.

12  Q.   So when we adjourned yesterday, we had briefly been

13  discussing a Russian cyber criminal named Yevgeniy Bogachev;

14  right?

15  A.   We were.

16  Q.   And was it your intention to say yesterday that that was

17  the first time that you were aware that Mr. Bogachev was on the

18  Most Wanted List by the FBI?

19  A.   No.  It was the first time I have seen the details on that

20  poster.

21  Q.   Okay.  And prior to seeing the FBI Most Wanted poster for

22  Yevgeniy Bogachev, had you ever actually seen that poster

23  before?

24  A.   I may have seen it before, yes.

25  Q.   And in particular in the last several days, had you

1  reviewed that poster with the United States Attorney's Office?

2  A.    No.

3  Q.    Had they showed it to you?

4  A.    No.

5  Q.    Okay.  Now, just to be clear, I said his name was Yevgeniy

6  Bogachev.  He is also known as Evgeniy Bogachev; correct?

7  A.    Based on the translator, yes, I believe that's correct.

8  Q.    And based on the translator, you are aware that both the

9  names Yevgeniy and Evgeniy have a diminutive form of Zhenya;

10  correct?

11  A.    Yes.

12  Q.    Since yesterday, have you had the opportunity to look into

13  the crimes of Mr. Evgeniy or Yevgeniy Bogachev?

14  A.    No, I have not.

15  Q.    So based on your review of the FBI poster -- and by the

16  way, you are familiar with the way those posters look generally

17  in your experience; correct?

18  A.    Yes.

19  Q.    You have seen them for other alleged criminals; right?

20  A.    Yes.

21  Q.    And that poster that we looked at to you appeared to be a

22  true and accurate FBI Most Wanted poster based on your training

23  and experience; right?

24  A.    It did, but I would want to see it from the FBI website to

25  confirm that that was the same one but, yes.

**MILLER - CROSS / GASNER**

1  Q.   Sure.  And at no time are you saying prior to right now

2  have you confirmed that on the FBI website?

3  A.   Like I previously mentioned, I may have seen it in passing

4  but I have not reviewed it.

5  Q.   Right.  However, you have access to the FBI website

6  wherein you can look for it yourself; right?

7  A.   If I was so inclined, yes.

8  Q.   Yes.  And in this instance -- in this case you spent a lot

9  of time investigating a person named Yevgeniy or Zhenya, last

10  name unknown; right?

11  A.   For part of it, yes.

12  Q.   What I mean by that is for a portion of your

13  investigation, you had a suspect that you thought was culpable

14  for the intrusions in this matter but you only had a first

15  name?

16  A.   Yes.

17  Q.   And to be clear, as I think my prior question intimated,

18  that first name was Yevgeniy; correct?

19  A.   Yes.

20  Q.   Also written as Evgeniy in your investigation; right?

21  A.   In some places, yes.

22  Q.   And just to be crystal clear, also written as Zhenya in

23  your reports; right?

24  A.   Yes.

25  Q.   Are you aware from your review of the FBI Most Wanted

1  poster that Evgeniy Bogachev has the largest FBI reward for

2  information leading to his arrest of any other cyber criminal

3  currently being investigated?

4  A.   I haven't seen the most recent Wanted posters, so I

5  couldn't say for sure; but I know it is a large amount.

6  Q.   Okay.  And based on your recollection from, perhaps,

7  seeing this before, are you aware or not aware that that reward

8  for Mr. Evgeniy Bogachev is $3 million?

9  A.   Based on the poster you showed me yesterday, yes.

10 Q.   Yes.  And you don't have any reason to disbelieve the

11 facts on the poster, do you?

12 A.   No.

13 Q.   And if you wished to, you could -- at a break or

14 yesterday -- have looked on the FBI website and confirmed that

15 the information that you were seeing yesterday was accurate;

16 right?

17          MS. KANE:  Objection, Your Honor.

18          THE COURT:  What is the objection?

19          MS. KANE:  What is the relevance?

20          THE COURT:  Overruled.  It is relevant enough.  Go

21 ahead.  Please answer.

22          THE WITNESS:  Could you please repeat the question.

23 BY MR. GASNER:

24 Q.   Sure.  You were capable since you saw -- if you wished, if

25 you had wanted to, if you were interested in doing so, you

1   could have looked at the FBI website since yesterday and

2   confirmed that the information on the poster we were reviewing

3   yesterday was accurate; right?

4   **A.**   I could have.

5   **Q.**   Okay.  But you chose not to?

6   **A.**   That's correct.

7   **Q.**   Okay.  Although from your review of the poster, it appears

8   to be a true and accurate representation of the FBI poster for

9   Yevgeniy Bogachev; right?

10  **A.**   Yes.

11  **Q.**   So are you aware from that review yesterday that Evgeniy

12  Bogachev malicious software, GameOver Zeus and Cryptolocker,

13  involved espionage components?

14  **A.**   I didn't see that on the screen yesterday, no.

15  **Q.**   If I showed it to you again, could that refresh your

16  recollection?

17  **A.**   Sure.

18          **MR. GASNER:**  Thank you.  May I approach, Your Honor?

19          **THE COURT:**  Please do.

20      No.  You can't show -- you can -- do you have an extra

21  copy he can have?

22          **MR. GASNER:**  Yes, Your Honor, although I was going to

23  publish it just to the witness and to you.

24          **THE COURT:**  All right.  Well, I have a copy.  So if

25  you wanted to just show it to the witness, that's okay.  But

```
 1   you can also show it to -- on the ELMO.
 2            MR. GASNER:  Okay.
 3            THE COURT:  That's just -- it is not supposed to come
 4   through to the jury.
 5            MR. GASNER:  No.
 6            MS. WAWRZYNIAK:  The problem, Your Honor, is this is
 7   visible to all the jurors.  It is showing there.
 8            MR. GASNER:  Not my intention.
 9            THE COURT:  Turn that around, please.
10            MS. WAWRZYNIAK:  I turned it off, Your Honor.
11            MR. GASNER:  Thank you, Ms. Wawrzyniak.
12   BY MR. GASNER:
13   Q.   So, Agent Miller, I have placed this --
14            THE COURT:  Keep your voice up.
15            MR. GASNER:  Pardon me.
16   BY MR. GASNER:
17   Q.   I have placed this poster on the ELMO.  I know you may or
18   may not be able to see all of it.  Can you see a portion of it?
19   A.   Yes, from the middle to the top.
20   Q.   Okay.  If you could kindly review what -- to refresh your
21   memory to review what is listed on that.  And if you wish to
22   look further down, please indicate so.
23            THE COURT:  What is your question -- what is the
24   specific thing you want him to confirm?
25            MR. GASNER:  I would like him to confirm that the
```

1  malware used by Evgeniy Bogachev involved an espionage

2  component.

3          THE WITNESS:  I don't see that on the screen here.

4          MS. KANE:  Objection, Your Honor.  This is not

5  refreshing his recollection.

6          THE COURT:  Well, he says --

7                  (Pause in proceedings.)

8          MR. GASNER:  Thank you, Your Honor.

9  BY MR. GASNER:

10  Q.   By the way, Agent Miller, I didn't mean to interrupt.  You

11  were reviewing --

12  A.   Yes, I do not see any references to espionage.

13  Q.   Thank you.

14          MR. GASNER:  Your Honor, based on this witness'

15  testimony that this reflects a true and accurate representation

16  of the FBI poster, I would like to publish it to the jury and

17  move it into evidence.

18          THE COURT:  All right.  Yes.

19          MS. KANE:  Objection -- we object to the admission of

20  this, Your Honor, on relevance, hearsay and 403 grounds.

21          THE COURT:  All right.  I'm going to allow this to be

22  published to the jury so it will help them follow the

23  testimony.

24      I'm letting it come to the jury with a caveat, which is

25  that ordinarily this would be hearsay, but it is an FBI

1    government document; and it -- it at least shows what the FBI

2    thought might be true at the time of the poster.  And because

3    that has some possible relevance to the scope of the

4    investigation, which this witness testified to at length on

5    direct, I'm going to allow this line of questions and let the

6    jury follow it better by letting this document come into

7    evidence.

8         So what is the Exhibit number?

9         MR. GASNER:  So, Your Honor, we would ask that that be

10   marked as Defense Exhibit 1.

11        THE COURT:  All right.  Defense 1 received in

12   evidence.

13        (Defense Exhibit 1 received in evidence.)

14        MR. GASNER:  Thank you.  And may it be published to

15   the jury, Your Honor.

16        THE COURT:  Yes, you may.

17        MR. GASNER:  Thank you, Your Honor.  Madam Clerk, if

18   we can kindly publish that.

19        JUROR WOODROW:  The screen just turned off.

20        THE COURT:  What did it go off again?  Wonder why they

21   go off so often.  Do they just time out?

22        MS. KANE:  I think so, Your Honor.

23        THE COURT:  Thank you for fixing that, Ms. Kane.

24        MR. GASNER:  Is it published everybody?  I believe it

25   is cut off.  I'm going to give you an opportunity to look at

1   it, and then I'm going to push it up a little bit so that the

2   complete document -- excuse me -- so the complete document is

3   legible.

4                        (Pause in proceedings.)

5            MR. GASNER:  Thank you.  I assume that is appropriate

6   time.  I will continue to move on.

7            THE COURT:  Please.  Next question.

8            MR. GASNER:  Thank you.

9   BY MR. GASNER:

10  Q.   So, Agent Miller, with regard -- part of your

11  investigations into cyber crime involves investigations into

12  alleged criminals and cyber criminals working out of the

13  Russian Federation; correct?

14  A.   I have no direct experience investigating the Russian

15  Federation or the government of.

16  Q.   I'm sorry.  I missed the last part.

17  A.   I have no direct involvement in investigating the Russian

18  government.  I never have.

19  Q.   No.  I'm -- okay.  I hear your answer.  But what I would

20  like to ask you is that in your investigation into cyber

21  criminals, you have investigated cyber criminals that are based

22  out of the Russian Federation; correct?

23  A.   Yes, I have.

24  Q.   And in your investigation into this case, you -- prior to

25  today, are you claiming that you were unaware of a cyber

1   criminal named -- who has the same first name as this

2   Defendant?

3   **A.**   Could you please clarify your question.

4   **Q.**   Sure.  During the course of your last eight years

5   investigating this case looking for a person -- a Russian

6   person whom had, to you, first name of Yevgeniy during the

7   course of that investigation, are you claiming to be unaware

8   during that investigation of an FBI criminal who had the same

9   first name that you were looking for who is charged or

10  investigated for, rather wanted for, crimes that are similar?

11  **A.**   That's very vague.  What I will say is during my

12  investigation, yes, there was the name Yevgeniy.  And I

13  followed the evidence and -- and let it lead where it led.

14  Followed every thread.  At no point during my eight-year

15  investigation did I find any ties to Mr. Bogachev.

16  **Q.**   Understood.  But during the course of your

17  investigation -- I'm asking whether or not prior to today's

18  conversation and yesterday's conversation, when you were

19  looking for a cyber criminal at the time of your investigation,

20  where you knew that person was Yevgeniy, last name unknown, did

21  you follow up and investigate a known criminal wanted by the

22  FBI for the same types of crimes whose first name was Yevgeniy?

23  **A.**   Like I had previously mentioned, I followed the evidence;

24  and it did not direct me towards Mr. Bogachev.  There was no

25  reason to think that that was the Yevgeniy, no IP addresses no

**MILLER - CROSS / GASNER**

1    monikers, no e-mail addresses.

2    **Q.**   Just a -- just the first name?

3    **A.**   Just the first name.  And as the translator said, it is

4    very common.  So you can't pivot on just a first name of

5    Yevgeniy.

6    **Q.**   And the location and nationality of the person?

7    **A.**   I don't believe that Mr. Bogachev is from Moscow, which is

8    where all the evidence suggested the LinkedIn attacker was.

9    **Q.**   I understand that.  So thank you for pointing that out.

10       So the IP addresses attached to the LinkedIn intrusions

11   said Russian Federation; did they not?

12   **A.**   Yes, they did.

13   **Q.**   They did not say Moscow; correct?

14   **A.**   That's taking it -- you have to take the evidence in its

15   entirety.  And so, yes, in the log files the GO location comes

16   back to the Russian Federation.  But with the MLAT return that

17   I received from the Russian government, it specifically said

18   Moscow for the IP that was used for the two-day connection with

19   Mr. Berry's credentials.

20   **Q.**   Completely understood.

21   **A.**   Yes.

22   **Q.**   But my question was:  You received log files from LinkedIn

23   --

24   **A.**   Yes.

25   **Q.**   -- that said the GO location was the Russian Federation;

**MILLER - CROSS / GASNER**

1    correct?

2    **A.**    Yes.

3    **Q.**    So Mr. Bogachev shared the same first name?

4    **A.**    Yes.

5    **Q.**    He is Russian?

6    **A.**    There are a lot of Russians named Yevgeniy, yes.

7    **Q.**    He is Russian, though; right?

8    **A.**    There are a lot of people in the United States named

9    Jeffrey.   That's not a connection.

10   **Q.**    Sounds like my argument.   The point is that he is from the

11   Russian Federation; correct?

12   **A.**    Which individual?   When you say "he" --

13   **Q.**    Bogachev.

14   **A.**    According to this poster, yes.

15   **Q.**    And he is charged with similar crimes that you investigate

16   as an expert for the last eight years; correct?

17   **A.**    There are a lot of individuals who hack companies, but you

18   have to follow the evidence.   So you just can't say: Yes, he

19   is Russian and he has the same first name.

20   **Q.**    So he is Russian.   He has the same first name.   He is

21   charged with the same crimes, and he is wanted by the FBI.   And

22   you did not follow up on that?

23   **A.**    I'm sorry.   This says he is the administrator.   He is not

24   the hacker.   Nowhere here does it say that he actually hacked

25   into these companies, like, the LinkedIn, Dropbox and

**MILLER - CROSS / GASNER**

1   Formspring bridges.  I testified to the different roles in the

2   marketplace.

3   **Q.**   Right.  They -- I understand what you are saying but what

4   I'm asking is for you to confirm that it is more than just the

5   first name here; correct?

6   **A.**   Based on this poster he is wanted for charges that are

7   similar.  However, the evidence, that is impartial.

8   **Q.**   I understand that.

9   **A.**   Yes.

10  **Q.**   But your answer to me was that it was just merely because

11  this fella that I was showing you had the same first name;

12  correct?

13  **A.**   Can you repeat that?

14  **Q.**   Your answer previously to me was that the reason you

15  didn't follow up on this is because this guy just happened to

16  have the same common first name.  And what I was trying to ask

17  you was whether there were other similarities that may have led

18  you to want to investigate.

19       **MS. KANE:**   Objection.  That mischaracterizes the

20  testimony.  Special Agent Miller didn't testify that he didn't

21  follow up on something.

22       **THE COURT:**   Okay.  Let me try to -- here is what

23  Counsel is trying to get at.  He is trying to show that there

24  are some similarities:  Russian, same first name, cyber crime.

25  Do you admit that those three things are similar?

1          THE WITNESS:  Yes, I do.

2          THE COURT:  Okay.  Next question.

3          MR. GASNER:  Thank you, Your Honor.

4    BY MR. GASNER:

5    Q.   Agent Miller, when you are investigating cyber crime

6    cases, do you continue to stay abreast of materials related to

7    that subject such as Department of Justice press releases and

8    related investigations?

9    A.   As far as all investigations or the ones I'm involved

10   with?

11   Q.   The types of crimes that you are involved with, the types

12   of crimes that you are in an expert and the types of crimes to

13   which you are assigned to investigate.

14   A.   I see news articles just like everyone else, yes.

15          THE COURT:  You need to keep your voice up too.

16          THE WITNESS:  Sorry.

17          THE COURT:  Because I didn't quite catch all of that.

18   Keep going, Counsel.

19          MR. GASNER:  Thank you.

20   BY MR. GASNER:

21   Q.   So as you just mentioned, you try to read news articles;

22   correct?

23   A.   Yes.

24   Q.   And you try to keep abreast of investigations related to

25   similar crimes that you are investigating that your colleagues

**MILLER - CROSS / GASNER**

1   work on; correct?

2   **A.**   I would say similar investigations or just technology in

3   general.

4   **Q.**   And you are -- you are a -- ever since school you have

5   been interested in technology; right?

6   **A.**   Yes.

7   **Q.**   And so you not only are interested in the cases in which

8   you investigate, but you are interested in what your colleagues

9   that do similar investigations, the matters that they

10  investigate too; correct?

11  **A.**   If I have time, yes.

12  **Q.**   Right.  So by the way, do you remember yesterday in

13  relation to your testimony regarding Evgeniy Lomovich that --

14  do you remember that testimony, by the way?

15  **A.**   Yes.

16  **Q.**   And that Evgeniy Lomovich, the spelling of that name was

17  E-V-G-E-N-I-Y -- excuse me -- E-V-G-E-N-I-Y?

18  **A.**   I believe that's correct, yes.

19  **Q.**   In other places in your summary, for example, did you also

20  spell that name Yevgeniy, Y-E-V-G-E-N-I-Y?

21  **A.**   I believe as a layman to the Russian language, I have used

22  that interchangeably.  Whether that is right or wrong, that's

23  how I have done it.

24  **Q.**   I understand.  But you acknowledge that you reviewed

25  materials wherein Evgeniy Lomovich became somebody you were

**MILLER - CROSS / GASNER**

1  interested in identifying; right?

2  **A.**   Yes.

3  **Q.**   And that when you wrote a summary, you actually took the

4  liberty of calling him or spelling his name Yevgeniy; correct?

5  **A.**   It was probably a typo.  But if that's what you say, I

6  would have to see my reports.

7  **Q.**   Yeah.  And as we have been talking about, those names are

8  interchangeable; right?

9  **A.**   Yes.

10  **Q.**   Now, speaking of you testifying as an expert, you have

11  been designated an expert on the market and use of stolen

12  online credentials here in this case; right?

13  **A.**   Yes.

14  **Q.**   And online forums function as a marketplace where one can

15  trade, buy, sell illegally obtained consumer and commercial

16  databases; right?

17  **A.**   Yes.

18  **Q.**   So with regard to the accessibility of these forums and

19  these marketplaces, you wouldn't just go on to Google and type

20  in "illegally obtained databases for sale;" right?

21  **A.**   There are various ways.  Some websites are open to the

22  public, some forums.  Some are closed.  Some are on the dark

23  web.  It depends on the forum.

24  **Q.**   Thank you for leading me just to my next series of

25  inquiry.

1          So you are familiar and have used in this case the term

2   "the dark web;" right?

3   **A.**   For better or for worse, yes.

4   **Q.**   What do you mean "for better or for worse"?

5   **A.**   It is a loose term used to describe sites that are

6   nefarious using different platforms.  It's not the best

7   nickname, but that's what it is.

8   **Q.**   Yes.  It is a broad category is what you are saying?

9   **A.**   Yes.

10  **Q.**   The most common way -- if we didn't call it the dark web

11  that -- not referencing the dark web, that one searches for

12  things, if you want to shop on Amazon or look up a news

13  article, typically you are going on a search engine like

14  Google; correct?

15  **A.**   Yes.

16  **Q.**   And that's not the dark web, is it?

17  **A.**   No, it's not.

18  **Q.**   Now, the dark web may be something like the TOR Network,

19  for example?

20  **A.**   That's correct.

21  **Q.**   T-O-R?

22  **A.**   Yes, The Onion Router.

23  **Q.**   The Onion Router, using the first letter of The Onion

24  Router to give the reference T-O-R; right?

25  **A.**   That's correct.

1   Q.   And that's a way to access areas on the web that would not

2   be, say, commonly available through, like, a Google search;

3   correct?

4   A.   Yes.

5   Q.   It is actually often a site for illicit activity; correct?

6   A.   Yes.

7   Q.   In your line of work it is where people might publish

8   requests related to stolen databases; right?

9   A.   They may.

10  Q.   But it is -- you are also familiar with the dark web

11  insofar as that it is also a marketplace for other criminality

12  like narcotics?

13  A.   It is a wide range, yes.

14  Q.   But it includes things like narcotics?

15  A.   Yes.

16  Q.   And with regard to accessing these sites in the United

17  States, is it unlawful to access the dark web in the United

18  States?

19  A.   Not to my knowledge.

20  Q.   Is it illegal to access the dark web in other countries,

21  for example, like Russia, if you know?

22  A.   I don't know the laws of other countries.

23  Q.   Okay.  So in these -- in the dark web and online forums,

24  that is a manner in -- that is a tool that people can use to

25  connect when they want to obtain -- well in your line of work,

**MILLER - CROSS / GASNER**

1  work related to stolen databases; correct?

2  **A.**   Yes.

3  **Q.**   On direct you testified how there can be different roles

4  in the market and -- excuse me -- there can be different roles

5  in a trafficking of stolen online credentials and databases;

6  right?

7  **A.**   Yes.

8  **Q.**   So roughly speaking, just broadly speaking, you broke that

9  down into intruders, brokers, buyers and bruters, if you will?

10 **A.**   I believe hackers, yes, and cash-out, I believe, was

11 another category I mentioned.

12 **Q.**   Hackers would be, for example, one category; right?

13 **A.**   Yes.

14 **Q.**   And then cash-out was one that you just indicated was

15 another in addition to what I just said?

16 **A.**   Yes.

17 **Q.**   Now, coder is another less nefarious word for hacker;

18 correct?

19 **A.**   Coder?

20 **Q.**   Coder.

21 **A.**   Not necessarily.

22 **Q.**   It is not less nefarious?

23 **A.**   Yes.

24 **Q.**   Pardon me.  I saw you were drinking, and I think I spoke

25 over you.  I apologize.

**MILLER - CROSS / GASNER**

1      So coder is a less nefarious or non-nefarious term; right?

2  **A.**   Yes, it can be.

3  **Q.**   It can be.  But it encompasses those that are hackers;

4  correct?

5  **A.**   I mean, that's -- again, that is a broad category.

6  **Q.**   Yeah.

7  **A.**   It could but it also could not.

8  **Q.**   Right.  But it is a coder, for example, would be the

9  individual that creates malicious or anomalous software that

10  can be used to hack; right?

11  **A.**   Yes.

12  **Q.**   Okay.  I'm just trying to narrow down the categories.

13  **A.**   Understood.

14  **Q.**   Some examples, I think you mentioned yesterday, of

15  malicious coding would include things like ransomware, spyware,

16  malware and the broader concept of botnets; right?

17  **A.**   I don't know if I mentioned all those terms but, yes.

18  **Q.**   You mentioned a number of them pretty quickly yesterday.

19  Do you recall that?

20  **A.**   I think I recall saying key-loggers, financial --

21  definitely financial data for malware.

22  **Q.**   And you distinguished that person or that category of

23  people from the brokers, buyers, bruters and cash-outs?

24  **A.**   Yes.

25  **Q.**   Okay.  But in the -- in your investigations, it is not

**MILLER - CROSS / GASNER**

1   necessary that different people play those roles, is it?

2   A.   No.

3   Q.   A coder could also be a broker; right?

4   A.   It could but that's not as likely.  The skill-sets are

5   different.

6   Q.   Skill-sets are different.

7        A coder could be a buyer; right?

8   A.   Again, the coders, it is a very specific skill-set that

9   requires a lot of experience and training.  So typically that

10  doesn't overlap as often with some of these other categories.

11  Q.   But, for example, if somebody bought a database, it would

12  be helpful if they knew what to do with it; right?

13  A.   Yes.

14  Q.   And then -- by the way, would you consider a bruter a type

15  of coder?

16  A.   Loosely.

17  Q.   Right.  And just for the jury's information -- we went

18  over it kind of briefly -- but we are using the term "bruter"

19  as a specific type of person that can use computers to sort of

20  brute-force unlocked hashed passwords; right?

21  A.   Yes.  They will try to reverse engineer.

22  Q.   And by "reverse engineer," what do you mean?

23  A.   To take the encrypted format -- just the random string of

24  characters -- and return the actual keys and letters and

25  numbers that you type for your password.

**MILLER - CROSS / GASNER**

1   Q.   And that requires them to use the computer; right?

2   A.   Yes.

3   Q.   And to use code in order to endeavor to do that; right?

4   A.   Yes.

5   Q.   So they are sort of a sub-category of coders, if you will?

6   A.   Or they purchase the code from someone else.

7   Q.   Right.  But you are aware that the most sophisticated

8   bruters are valuable because they utilize code that they have

9   written; right?

10  A.   Again, I couldn't speak to each individual if they wrote

11  the code or not.  But usually they will have code, and they may

12  modify it to their liking.

13  Q.   Maybe, perhaps, purchase code that has already been

14  written but modified for the specific task at hand?

15  A.   Again, maybe.

16  Q.   Yeah.  So those categories of people, they could all be

17  individuals or one person could wear multiple hats; right?

18  A.   That's potential, yes.

19  Q.   So it wouldn't be unknown for a single hacker to be

20  responsible for different elements of this process of

21  brokering, buying, brute-force unlocking and cashing out?

22  A.   All of those categories together, it would be rare.  These

23  individuals typically like to delegate duties so if someone

24  gets caught, you are not caught holding everything.

25  Q.   That makes sense.  Just like in business world, there are

1   companies that delegate different responsibilities; right?

2   A.   Yes.

3   Q.   And then there are solo practitioners or small businesses

4   where you have to wear a lot of hats; right?

5   A.   Yes.  But with something this technical, it is unlikely.

6   Q.   So just with regard to your training and experience and

7   your investigation in this case, are you aware that the Russian

8   Federation has a significant number of cyber criminal

9   organizations that operate out of that area?

10  A.   Could you clarify?

11  Q.   Sure.  In the area of cyber crime, which is what you spend

12  a lot of time on; right?

13  A.   Yes.

14  Q.   The Russian Federation has a large number of people that

15  operate in that space; correct?

16  A.   Yes, there is a large number of Russian hackers.

17  Q.   Yes.  And there is a large number of Russian hackers

18  continuing to this day doing that type of work; right?

19  A.   I'm sure there is.

20  Q.   You are investigating some now, I assume, aren't you?

21  A.   No, I am not.

22  Q.   Not currently?

23  A.   Not currently.

24          THE COURT:  May I say there is an ambiguity in that

25  line of questions.  I think you started off suggesting that the

1    hackers work for the government in Russia.  But then it went to

2    federation, which I -- and it may be that the witness is using

3    that as the generic country.  And if it makes any difference,

4    you should clarify that.

5              MR. GASNER:  Thank you, Your Honor.

6    BY MR. GASNER:

7    Q.   Are you aware that Russia has been determined the --

8    excuse me -- the country of Russia --

9              THE COURT:  The country or the government?

10             MR. GASNER:  The government.

11             THE COURT:  All right.  Say the government, not the

12   country.

13             MR. GASNER:  The government.  Yes, Your Honor.

14   BY MR. GASNER:

15   Q.   That the government of Russia has been a state sponsor of

16   cyber terrorism and other cyber criminality?

17   A.   My focus for the last eight years has been solely

18   non-state sponsored or government sponsored intrusions.  So I

19   have no firsthand knowledge of that, no.

20             THE COURT:  Wait, wait.  But you may not in your

21   professional capacity.  Have you ever -- are you -- do you have

22   any knowledge of what Counsel just said?

23             THE WITNESS:  Can you repeat the question?

24             MR. GASNER:  Sure.

25             THE COURT:  Yeah, please.

1  BY MR. GASNER:

2  **Q.**   That the government of Russia has been determined to be a

3  state sponsor of cyber terrorism and cyber criminality?

4  **A.**   As other countries have as well, yes.

5  **Q.**   Okay.  But related to Russia in particular, the answer to

6  my question is yes; correct?

7  **A.**   Yes.

8  **Q.**   Okay.  And based on your investigation and knowledge in

9  this area, it is not uncommon, is it, for governments like the

10  Russian government to coop cyber criminals and use them

11  basically as cyber mercenaries; correct?

12       **MS. KANE:**  Objection.

13       **THE COURT:**  What?

14       **MS. KANE:**  Relevance, 403.

15       **THE COURT:**  It has enough relevance that I will allow

16  it.  We haven't quite got to the 403 point yet.  And it is

17  within the scope of this witness' potential knowledge.  So the

18  objection is overruled.  Please answer the question.

19       **THE WITNESS:**  Can you please repeat that, sir.

20  BY MR. GASNER:

21  **Q.**   Sure.  I mean, you just stated that the Russian

22  government, as other governments --

23  **A.**   Correct.

24  **Q.**   -- are involved in cyber crime.  And are you aware that

25  Russia, like other governments, co-opt known cyber criminals

1   and have them and use them as cyber mercenaries?

2   **A.**    Again, I have no firsthand knowledge of that, so I

3   couldn't say for certain.

4   **Q.**    No.  But you are aware that the position of the Department

5   of Justice is that the Russian government is state sponsored --

6   has state sponsored cyber terrorist activities?

7   **A.**    Yes, like the other countries that we previously

8   mentioned.

9   **Q.**    I don't think you mentioned any other country.

10  **A.**    You just said other countries.  It is not just Russia.

11  **Q.**    No, it's not.  That's true.

12  **A.**    Yes.

13  **Q.**    China, for example?

14  **A.**    I'm sure, yes.  All countries.

15  **Q.**    Okay.  So cyber criminals in general that come into

16  possession of stolen data, they don't always sell it, do they?

17  They sometimes use it themselves; right?

18  **A.**    That's correct.

19  **Q.**    Sometimes these cyber criminals do use the stolen

20  information themselves to send spam, for example, on social

21  networks?

22  **A.**    Yes.

23  **Q.**    And that is a use that is different than just selling it

24  on the black-market for money; right?

25  **A.**    There -- I think we are splitting hairs.  If they use it

**MILLER - CROSS / GASNER**

1  for themselves, they are still probably generating profit from

2  it.  They are just keeping all of the proceeds versus selling

3  it.

4  Q.   Absolutely.  I'm not trying to have semantics here at all.

5  A.   That's okay.

6  Q.   I just want to note when a cyber criminal comes into

7  possession of something like an unlawful database or an

8  unlawful procured database of a company, sometimes they might

9  just sell that for a fixed sum and pocket the money; right?

10  A.   Yes.

11  Q.   But sometimes they actually use it themselves to send spam

12  to the users and then use that information for profit?

13  A.   That's one way, yes.

14  Q.   So -- and that's because when you spam somebody, based on

15  an unlawful procured database, you are intending to get that

16  further information from the target; right?

17  A.   It depends on the type of spam.

18  Q.   Okay.  Well, could you enlighten us as to the various

19  reasons why someone might spam rather than just selling a

20  database?

21  A.   They may want to send a malicious link in the spam.  They

22  may want to sell diet pills with the spam.  It just depends.

23  Q.   I missed the last part.

24  A.   Diet pills or some kind of pills with the spam, that is

25  pretty common.

**MILLER - CROSS / GASNER**

1   Q.   So what you are saying, though, is they are using that

2   spam or that e-mail still to further commercial gain?

3   A.   Yes.

4   Q.   And they do it in a variety of ways.  I think sometimes

5   they might have a, I guess, a real or a fake diet pill company

6   where they put that on the web, and they get money for that

7   object?

8   A.   That's a potential.

9   Q.   But sometimes they actually -- what I'm talking about is a

10  cyber criminal in possession of a stolen database -- sometimes

11  why they are spamming is because they want to get credentials

12  of the person that they are spamming; right?

13  A.   That's one option.

14  Q.   But credentials like, you know -- what I mean by

15  credentials is things like their e-mail address, social

16  security card number, passwords, things like this.

17  A.   That's one of the many options, yes.

18  Q.   And then they could use credentials to commit further

19  crimes; right?

20  A.   Yes.

21  Q.   For example, that's a form of identity theft; right?

22  A.   Yes.

23  Q.   And many times or sometimes -- you can categorize it as

24  you wish -- the person who received the spam may not even know

25  initially that they have been compromised; right?

1   A.   That's correct.

2   Q.   And without the target -- meaning, the actual person whose

3   credentials who have been compromised -- they might not even

4   know that those credentials are being used surreptitiously;

5   right?

6   A.   That's correct.

7   Q.   In fact, that is kind of the goal, isn't it?

8   A.   Yes, for the criminals.

9   Q.   And so one of the goals in getting stolen credentials from

10  people is so that you can have access to things like their

11  e-mail address; right?

12  A.   That's one way, yes.

13  Q.   And you can have access to their social media platforms;

14  correct?

15  A.   Potentially, yes.

16  Q.   And you can have access to information maybe even about

17  their computer, like their IP address; right?

18  A.   Maybe.

19  Q.   Sure.  But it is this type of information that a spammer

20  could be doing without the person even knowing; right?

21  A.   Yes.

22  Q.   So, by the way, do you remember yesterday -- and I know

23  you do -- the testimony regarding the r00talka account?

24  A.   Yes, I do.

25  Q.   And you remember the -- and I just want to clarify here

1  that the r00talka account was relevant because it had some

2  pictures of Mr. Nikulin on it, right, among other reasons?

3  **A.**   Among other reasons, yes.

4  **Q.**   But I -- and, again, forgive me if I didn't quite catch it

5  yesterday -- but the pictures on the r00talka account were

6  actually sent and created and resided on the VK social network

7  account; right?

8  **A.**   I believe the photos were actually links back to the VK

9  site.

10 **Q.**   So -- and, again, just to remind everyone, VK is like

11 Facebook; right?

12 **A.**   Yes, the Russian Facebook.

13 **Q.**   So somebody might -- and that's a social network; right?

14 **A.**   Yes.

15 **Q.**   And you reviewed, for example, Mr. Nikulin's VK social

16 media account; right?

17 **A.**   That one, yes.

18 **Q.**   Yes.   And that's the one that we were -- or the social

19 media posts that we were looking at on the r00talka account

20 were -- excuse me -- the information we were looking at on the

21 r00talka account actually originated on the VK social network;

22 right?

23 **A.**   Yes.

24 **Q.**   And then the VK social network would just send those

25 updates to the r00talka account automatically?

**MILLER - CROSS / GASNER**

1    A.    System notifications, yes.

2    Q.    System notifications.  So that wasn't -- that wasn't

3    something that had to be requested by the user of the r00talka

4    e-mail account?

5    A.    I believe it is in the account settings --

6    Q.    Yes.

7    A.    -- what type of notifications you would like to receive.

8    Q.    Right.  So those photographs we saw yesterday were --

9    looked like common social media posts where Mr. Nikulin and

10   miss girlfriend were communicating; right?

11   A.    Yes.

12   Q.    And the r00tlaka -- so that's the VK social network.  But

13   when you reviewed the r00talka e-mail account, you were able to

14   review search warrant returns with regard to the substance of

15   that e-mail account; correct?

16   A.    The content within the r00talka account, yes.

17   Q.    Yes.  I mean, that information resided within the United

18   States; correct?

19   A.    Yes, it did.

20   Q.    And so you were able to execute a warrant on that social

21   media platform and get them to provide you that information?

22   A.    I provided a warrant to Google for the r00talka account,

23   and that was the content within that account.

24   Q.    Right.  Just so we are clear -- I think there was a

25   question by the Court on this yesterday as well or maybe the

**MILLER - CROSS / GASNER**

1    day before -- you know, there is something called a subpoena;

2    right?

3    **A.**    Yes.

4    **Q.**    And people often or -- you serve subpoenas on companies or

5    people compelling them to give you documents; correct?

6    **A.**    In the United States, yes.

7    **Q.**    Yes.  I will clarify.  Within the United States using

8    United States law, you serve a subpoena, which is a court

9    order, for the person or the company you are serving it on to

10   provide you documents in their possession; correct?

11   **A.**    Yes.

12   **Q.**    And those documents can be information obviously, right,

13   like electronic information?

14   **A.**    Yes.

15   **Q.**    In your business it often is; right?

16   **A.**    Yes, it is.

17   **Q.**    All right.  To distinguish that from a search warrant,

18   which actually I think you indicated was the mechanism you were

19   using; right?

20   **A.**    Yes.

21   **Q.**    Normally a search warrant is something that you deliver in

22   a more traditional sense to, say, a business or a residence and

23   then you give them the warrant.  It allows you to go into that

24   business and residence and take what is listed on the search

25   warrant as available for you to search; right?

**MILLER - CROSS / GASNER**

1   **A.**    If that was -- if the search warrant was for a residence,

2   yes.

3   **Q.**    Or just a regular business entity, you know, a tire shop

4   or a CPA or something like that?

5   **A.**    Yes.

6   **Q.**    You would physically bring a search warrant to that place.

7   Show them that you have a court order to enter, and then you

8   could take their computer.  You could search their files,

9   things like this; right?

10  **A.**    Whatever is within the scope of the warrant, yes.

11  **Q.**    Right.  But there is a difference here when you are

12  dealing with technology companies like Google, rather than

13  serving them a subpoena to provide you specific documents, you

14  provided them with a search warrant that allows them to search

15  themselves for what you are asking; right?

16  **A.**    Yes.  A subpoena gets you basic subscriber information.

17  The search warrant gives you full content on the account that

18  was requested in the search warrant.

19  **Q.**    Okay.  I just wanted to clarify.  When you execute that

20  search warrant, you don't actually go to Google and start

21  rooting through their databases?

22  **A.**    No, I do not.

23  **Q.**    They voluntarily provide that information to you?

24  **A.**    They provide it pursuant to the court order.  They don't

25  voluntary provide information.

**MILLER - CROSS / GASNER**

1  Q.   Understood.  And sometimes they even push back on you,

2  don't they?

3  A.   Yes.

4  Q.   So the r00talka -- okay, so that's why I was asking.  The

5  r00talka e-mail is a e-mail that is owned or operated by the

6  Google corporation?

7  A.   Yes.

8  Q.   A U.S. company?

9  A.   Yes.

10 Q.   So you were able to get the substance of the r00talka

11 e-mail account through a search warrant; right?

12 A.   Yes.

13 Q.   And that r00talka e-mail didn't show Mr. Nikulin actively

14 communicating with his friend Anya or his mother or brother or

15 any other family members, did it?

16 A.   When you say "actively," you mean -- can you specify a

17 timeframe?

18 Q.   Yeah, in the timeframe in which your warrant was for.

19 What I mean is that there weren't e-mails back and forth to

20 family members where he was sending an e-mail; receiving an

21 e-mail; checking in about lunch; confirming a date?

22 A.   No.

23 Q.   Okay.  But you -- what you saw were large numbers of the

24 VK social media pushing notifications to the r00talka account?

25 A.   Yes.  There are a lot of times people have multiple e-mail

1  accounts.  Sometimes it is just for social media.  Sometimes it

2  is for personal communication with their mom.  That's normal.

3  Q.  Right.  So you don't know even if the r00talka account was

4  the only e-mail affiliated with the VK network, do you?

5  A.  During that timeframe the e-mails were sent, that was the

6  e-mail on the account.

7  Q.  But you don't know whether the VK network, which is a

8  Russian company; right?

9  A.  Correct.

10  Q.  Whether VK network was pushing notifications to other

11  e-mail accounts, do you?

12  A.  The VK system was pushing e-mail notifications to the

13  r00talka account during that timeframe.

14  Q.  Right.  But you don't know whether it was also pushing

15  notifications to other listed e-mail accounts, do you?

16  A.  I don't think it can send e-mails to two different

17  accounts -- notifications to two different accounts at once.

18  Q.  I mean, is that because you were able to access search

19  warrant information related to or -- is that because you were

20  able to access information from the VK social media platform?

21  A.  No.  When you register, you provide one e-mail address;

22  and that is then the e-mail address on record for that platform

23  and will send notifications.

24  Q.  You don't know whether you can add additional e-mail

25  accounts, do you?

 1    **A.**    I don't believe you can.

 2    **Q.**    You don't believe so or you know so?

 3    **A.**    I think you would have to change the e-mail on the

 4    account.

 5    **Q.**    So it is your testimony you cannot add additional e-mail

 6    accounts to the VK social network?

 7    **A.**    No.  I said I believe you can change it.

 8    **Q.**    I know you said you can change it.  You don't know if you

 9    can add multiple accounts?

10    **A.**    I don't know that nuance, no.

11    **Q.**    By the way, did you ever actually -- pardon me.

12                        (Pause in proceedings.)

13    **BY MR. GASNER:**

14    **Q.**    So you don't know, yourself, who had access to the VK

15    social media account, do you?

16    **A.**    Which account, sir?

17    **Q.**    Mr. Nikulin's.

18    **A.**    The r00talka?

19    **Q.**    No.  The VK social media account.

20    **A.**    Which VK social media account?

21    **Q.**    Mr. Nikulin's.

22    **A.**    Which account?  The r00talka?  That was the one I was

23    reviewing.

24    **Q.**    Not the e-mail account.  I'm talking about the actual VK

25    social media account.

1    **A.**   The one that was sending notifications?

2    **Q.**   Yes, the one that was sending the notifications.  That --

3    for example, you are aware that, for example, Facebook has been

4    hacked, right, by cyber criminals?

5    **A.**   I'm sure.

6    **Q.**   And social media platforms are an area in which hackers

7    target; correct?

8    **A.**   Can be.

9    **Q.**   Okay.  And but you don't know who was in control of the VK

10   social media platform, do you -- excuse me -- the social media

11   account for Mr. Nikulin?  You don't know whether Mr. Nikulin

12   was in control of that account, do you?

13   **A.**   His profile photo was on the account.

14   **Q.**   I understand that.

15   **A.**   No.

16   **Q.**   So and, by the way, the VK social media platform, were you

17   ever able to execute or issue any kind of search warrant or

18   subpoena pursuant to a Mutual Legal Assistance Treaty to the VK

19   social media platform?

20   **A.**   No, I did not.

21   **Q.**   Did not or have not?

22   **A.**   I did not and have not.

23   **Q.**   Okay.  So that means you never requested through Mutual

24   Legal Assistance Treaty any of the subscriber information

25   related to the VK social media account, did you?

**MILLER - CROSS / GASNER**

1   **A.**   No.   And there is a reason.

2   **Q.**   There is a reason that you didn't?

3   **A.**   I did not.

4   **Q.**   There is a reason you didn't ask for that?

5   **A.**   That's correct.

6   **Q.**   Okay.   Well, I guess that begs the question.

7   **A.**   So, I think as other Special Agents have testified, the

8   United States has the Mutual Legal Assistance Treaty with

9   various countries.   And several countries do not extradite

10  their own citizens.   And so if I request records for a certain

11  account, it may tip off the individual that owns that account;

12  and they would never leave that country.   So they would never

13  leave Russia, and we would never be able to apprehend the

14  individual.

15  **Q.**   So you are aware that the VK social network is a privately

16  owned company?

17  **A.**   Yes.

18  **Q.**   Do you know who owns the VK social media platform?

19  **A.**   I do not.

20  **Q.**   Do you know that -- their policy with respect to

21  notifications of their users in the event that their accounts

22  are compromised?

23  **A.**   I do not.

24  **Q.**   And you are -- your testimony is that you did not pursue

25  the subscriber information for the VK social media platform

**MILLER - CROSS / GASNER**

1  because you were concerned about tipping off a suspect?

2  **A.**   Potentially.

3  **Q.**   And, for example -- well, I will get to that in a minute,

4  I guess.

5     Do you know -- do you know if -- I think I know the answer

6  to this but -- do you know if there is a specific Russian

7  statute that precludes privately owned Russian companies from

8  cooperating with foreign entities in criminal investigations?

9  **A.**   I have no idea.

10  **Q.**   But the point remains that for a variety of reasons you

11  just enumerated, you never asked for that information?

12  **A.**   No, I did not.

13  **Q.**   All right.  So we just brought up the subject of MLAT,

14  Mutual Legal Assistance Treaty, which we talked about in this

15  trial.  I think in several different contexts.

16     I want to turn to that; okay?

17  **A.**   Okay.

18  **Q.**   So in order to pursue your investigation, you did have to

19  rely somewhat on the Russian government to cooperate with you;

20  correct?

21  **A.**   Yes, I did.

22  **Q.**   And you stated, I believe yesterday, that you didn't have

23  an independent way here in the United States of obtaining IP

24  addresses that originated in Russia through legal means here in

25  the U.S.; right?

1   **A.**    That's correct.

2   **Q.**    So the effort that you undertook was to issue those

3   requests through this treaty and then await a response;

4   correct?

5   **A.**    That's correct.

6   **Q.**    And during the course of your investigation, when you

7   initiated your MLAT request to the Russian government,

8   specifically related to the IP addresses that were anomalous in

9   the LinkedIn systems logs, you made this request under the

10  auspices of a criminal case against a Mr. Sipkin; correct?

11  **A.**    That was a name that we had identified at the time, and

12  that was early -- very early in the investigation, yes.

13  **Q.**    Sure.  Early -- that's exactly correct.  Early

14  investigation, Mr. Sipkin, S-I-P-K-I-N, was a person of

15  interest?

16  **A.**    Yes.

17  **Q.**    And so -- and that was specifically related to the IP

18  addresses that the systems logs in LinkedIn captured and were

19  considered anomalous; right?

20  **A.**    That's incorrect.  The name Mr. Sipkin came from the

21  posting of the LinkedIn data on the InsidePro forum.

22  **Q.**    I see.  So when you sent the request to the Russian

23  government regarding Mr. Sipkin, you were not asking for

24  information related to his post, were you?

25  **A.**    No, I was not.

1  Q.   You were asking information related to, I think it was,

2  five or six IP addresses for which you wanted to know the

3  subscriber information; correct?

4  A.   Yes, that's correct.

5  Q.   Okay.  And broadly speaking, the initial response from the

6  Russian government to your MLAT request naming Mr. Sipkin as

7  your target, you would say that the Russian government was

8  generally slow and unhelpful; correct?

9  A.   Slow, yes.  Unhelpful, the wrong information was provided.

10  It was just publicly available information.

11  Q.   Understood.  But I guess you said yesterday, I think it

12  was, that typically it takes a long time for the Russian

13  government to respond to an MLAT; right?

14  A.   I didn't specifically say the Russian government.  Each

15  country is different, but it can take eight, nine months on the

16  short end up to five years.  It just depends on the country.

17  Q.   That really contrasts with the efficiency in which the

18  United States companies will respond to you; right?

19  A.   Absolutely.

20  Q.   You -- when you -- when you issue a subpoena or a search

21  warrant on Google, they are very responsive, you would say?

22  A.   It depends.

23  Q.   Well --

24  A.   But yes.

25  Q.   You can e-mail someone at Google corporate, though, and

1  get an update on what is going on; and they will generally

2  respond?

3  **A.**   We have legal recourse, yes.

4  **Q.**   Yes.  By the way, by "legal recourse," you mean if they

5  don't respond, you can get an order to show cause and bring

6  them to court to show why they didn't; right?

7  **A.**   Yes.

8  **Q.**   Okay.  And, for example, if the Russian Federation or the

9  Russian government doesn't respond, you can't bring them to a

10 U.S. court and have them respond; right?

11 **A.**   No, I cannot.

12 **Q.**   You are kind of at their mercy in that regard; right?

13 **A.**   As with every country, yes.

14 **Q.**   Sure.  So when you sent your first MLAT request, they gave

15 you information that you would consider just publicly available

16 information?

17 **A.**   Yes.

18 **Q.**   You were clear on what you were requesting, though,

19 weren't you?

20 **A.**   I believe I was, yes.

21 **Q.**   And that information wasn't asking just for the name of

22 internet service providers, was it?

23 **A.**   No.

24 **Q.**   But that's what they sent back; right?

25 **A.**   Yes.

**MILLER - CROSS / GASNER**

1   Q.   You would say at best, that was just incompetence?

2   A.   Or a mistake.  I have had that happen with other

3   countries.

4   Q.   And at worse, it was misinformation; right?

5   A.   I have no reason to doubt the information returned to me

6   from an MLAT.  It is an official treaty.  So all information I

7   receive back is genuine.

8   Q.   You are not skeptical of information that you receive from

9   the Russian government, sir?

10  A.   Not in response to an MLAT, no.

11  Q.   The second time that you sent the MLAT, you requested

12  assistance -- I think is it -- from the Office Of International

13  Affairs?

14  A.   It was the same MLAT.  I believe we just requested the

15  Office Of International Affairs follow up on the request.

16  Q.   Okay.  And that's the liaison that you use in all MLAT

17  requests?

18  A.   I go through the Department of Justice, the U.S.

19  Attorney's Office and the Office Of International Affairs, yes.

20  Q.   Did you go through the Office Of International Affairs for

21  the first request?

22  A.   All requests go through the Office Of International

23  Affairs.

24  Q.   Right.  So when you just got back generalized information

25  that was not responsive to your original MLAT request, you

**MILLER - CROSS / GASNER**

1   followed up and sent the second one; right?

2   **A.**   We followed up and just inquired on the first one.   I

3   don't think we ever sent a second MLAT.   It was the same

4   document.

5   **Q.**   Same document?

6   **A.**   Yes.

7   **Q.**   Another request?

8   **A.**   A follow-up on the initial request, yes.

9   **Q.**   Telling them that the initial request wasn't responsive.

10  **A.**   Correct.

11  **Q.**   You wanted them to do it again?

12  **A.**   We wanted the information we originally asked for, yes.

13  **Q.**   Not the information they gave you?

14  **A.**   That's correct.

15  **Q.**   Okay.   So then they did that.   They responded the second

16  time the government; right?

17  **A.**   Yes, they did.

18  **Q.**   That wasn't good information, was it, the second response?

19  **A.**   It was good information.

20  **Q.**   You had to do it a third time, didn't you?

21  **A.**   A page was blurry.   Sometimes they are faxed.   So it is

22  not any fault of anyone's.   A page was blurry.

23  **Q.**   You couldn't read an important page on the document;

24  correct?

25  **A.**   That's correct.

1   Q.   It is not helpful if you get the information in an

2   illegible format; right?

3   A.   That's correct.

4   Q.   So you had to reengage with the Office Of International

5   Affairs the third time with the Russian government and again

6   request that they respond to the information that you are

7   requesting; right?

8   A.   Yes.

9   Q.   And so we are clear, in those three requests or three

10  efforts on one MLAT, you never mention Mr. Nikulin by name;

11  right?

12  A.   No, I did not.  I did not have his last name at that

13  point.

14  Q.   Right.  And you didn't mention any specific information

15  with regard to his person, like where he lived or anything;

16  right?

17  A.   No.

18  Q.   And you didn't mention that you were investigating

19  Mr. Nikulin in connection with any IP logs that were attributed

20  to a possible intrusion into LinkedIn; right?

21  A.   Correct.  At that point I had no names besides Mr. Sipkin.

22  Q.   So all the information the Russian government had when

23  they provided this information was regarding an investigation

24  that you were doing into Mr. Sipkin?

25  A.   That's correct.

1  **Q.**   Okay.  By the way, I could -- I would like to show you a

2  document that came up yesterday.

3  **A.**   Okay.

4  **Q.**   It is admitted, I believe, as Exhibit 86.  The Court

5  mentioned it, and there were some conversation about it.  It is

6  the certificate of authenticity of business records that was

7  received in response to your MLAT request with Mr. Sipkin as

8  the target.  Are you familiar with that document?

9  **A.**   Yes.

10  **Q.**   So, if I may, this is a -- this is in evidence.

11         **MR. GASNER:**  Your Honor, may we just publish it?

12         **THE COURT:**  What is the Exhibit number?

13         **MR. GASNER:**  Eighty-six, I believe.

14         **THE COURT:**  Is it just one page from 86 or the entire

15  document?

16         **MR. GASNER:**  No.  It is just -- well, I'm actually not

17  certain if 86 is the entire document or not.  I'm looking at

18  just the authenticity of business records.

19         **THE COURT:**  Show it to Counsel so Counsel can make

20  sure that it is -- is that from 86?

21         **MS. KANE:**  Yes, Your Honor.

22         **MR. GASNER:**  Yes.  And I will --

23         **THE COURT:**  Go ahead.

24         **MR. GASNER:**  I have previously shown that to Counsel

25  this morning in anticipation of this.

1   BY MR. GASNER:

2   Q.   So putting an 8-and-a-half-by-11 piece of paper on the

3   ELMO, I think it's in evidence so everybody should be able to

4   see it.

5        Do you recognize this document?

6   A.   Yes, this came with the MLAT return.

7   Q.   And I'm going to go back to the lectern so it is a little

8   easier.

9   A.   Thank you.

10        THE COURT:   You know, what is unclear is what this is

11   a certificate of authenticity to.   In other words, what was the

12   other information that this is certifying about?   Can we remind

13   the jury and myself what that information was?   I, frankly,

14   have forgotten.

15        MR. GASNER:   Yes, Your Honor.   So I believe this is in

16   relation to the MLAT return from the Russian government

17   authenticating the information that this agent received wherein

18   he was trying to identify the subscriber information for the IP

19   addresses that were listed or determined to be anomalous in the

20   systems logs from LinkedIn.

21        THE COURT:   And did any of those name the Defendant?

22        MR. GASNER:   Yes.   The third one named the Defendant

23   as being associated, I believe, with the IP address ending in

24   236.   Is that right, Mr. --

25        THE WITNESS:   I believe that IP was subscribed to by

**MILLER - CROSS / GASNER**

```
 1   the Defendant, yes.
 2              THE COURT:  Ending in what number, 236?
 3              THE WITNESS:  239.
 4              THE COURT:  Oh, 239, okay.  All right.  So now
 5   continue with your line of questions about the certificate.
 6   BY MR. GASNER:
 7   Q.   So when you -- this is a -- as a foundation, when you
 8   receive MLAT responses back from any country -- but in this
 9   instance the Russian government -- they come back to you in
10   Russian; correct?
11   A.   The language that we -- yes, it depends on the country
12   but, yes.
13   Q.   The language of origin of the country that you are
14   submitting it to?
15   A.   That's correct.
16   Q.   Then you have it translated?
17   A.   Yes.
18   Q.   And then you are able to interpret the information;
19   correct?
20   A.   Yes.
21   Q.   And an important document when you receive that
22   information back from any country, in this case Russia --
23   excuse me -- is something called a certificate of authenticity
24   of business records; right?
25   A.   That's part of it, yes.
```

Q.   That's where a custodian of records will sign or stamp or

otherwise authenticate that the documents that they are sending

back to you are documents that they kept in the normal course

of business; right?

A.   Yes.

Q.   And without that document, you can't be sure of the

reliability or the authentication or the authenticness of the

documents; right?

A.   Well, that's not wholly true.  The documents then are

embossed usually by the country that an official has verified

that the information contained therein is accurate before it is

provided back to the United States.

Q.   Absolutely.  And we have the same documents in the United

States, don't we?

A.   Yes.

Q.   You get them every time you use a subpoena or -- excuse

me -- a search warrant on any American company; right?

A.   Yes -- most times, yes.

Q.   It is a very common document to receive when you execute a

warrant or a subpoena?

A.   Yes.  The form here in the United States is more standard.

Some countries have their own forms that they provide.

Q.   So in this document or -- okay, let's talk about the

United States documents since you just brought it up.

     The certificate of authenticity usually provides the

**MILLER - CROSS / GASNER**

1   authenticator's full name; right?

2   A.   Yes.

3   Q.   It usually says who they are employed by?

4   A.   Typically, yes.

5   Q.   You need that information, right, to know whether they are

6   actually the custodian of record, don't you?

7   A.   Well, if I'm using, say, Google's law enforcement platform

8   and the documents come through their platform and it is signed

9   by a Google employee or an individual, I have no reason to

10  doubt Google's authenticity.

11  Q.   Sure.  It typically -- they typically state what position

12  they hold within the company; right?

13  A.   They can, yes.

14  Q.   And they affix their signature under penalty of perjury

15  indicating that they are providing documents that were kept in

16  the ordinary course of business; right?

17  A.   Yes.

18  Q.   Now, with regard to this document, this is -- you are

19  looking at Exhibit 86 -- this is the actual document that you

20  received back from the Russian Federation; right?

21  A.   Yes.

22  Q.   Even though it is in English -- it was not translated by

23  the U.S. Government -- this is the document that you actually

24  physically received from the Russian Federation; correct?

25  A.   I believe that's correct.

**MILLER - CROSS / GASNER**

1  Q.   Okay.   And this document has a person's name and two

2  initials; right?

3  A.   Yes.

4  Q.   It looks like Karpushkin E.S.?

5  A.   Yes.

6  Q.   Do you know what the E. or S. stands for?

7  A.   I do not.

8  Q.   Do you know if that is a first name or a last name?

9  A.   I do not.

10  Q.   Do you know whether Mr. Karpushkin speaks English?

11  A.   I do not.

12  Q.   Do you see that he wrote his name on an English document?

13  A.   Yes.

14  Q.   And do you see specifically that it says "I, the

15  undersigned, Karpushkin E. S., with the understanding that I am

16  subject to criminal penalty under the laws of Russia for an

17  intentionally false declaration, declare that I'm employed

18  by/associated with blank."  Do you see that?

19  A.   I do.

20  Q.   In the position of blank.  Do you see that?

21  A.   I do.

22  Q.   And by "blank," I mean there is an underline without the

23  information filled out.

24  A.   Yes.

25  Q.   And by reason of my position, I'm authorized and qualified

**MILLER - CROSS / GASNER**

1   to make this decision; right?

2   **A.**   Yes.

3   **Q.**   You don't know who this person is employed by, do you?

4   **A.**   I do not.

5   **Q.**   You don't know what their position is, do you?

6   **A.**   I do not.

7   **Q.**   Okay.  Later down in the document, there is a date of

8   excuse of the document and a date of signature?

9   **A.**   Yes.

10   **Q.**   And in the place of execution; correct?

11   **A.**   Yes.

12   **Q.**   And then a signature; right?

13   **A.**   Yes.

14   **Q.**   And then a couple of stamps; right?

15   **A.**   I believe those were embossed but, yes.

16   **Q.**   In the original they are embossed which means they cause

17   the letters therein to be raised?

18   **A.**   Correct.

19   **Q.**   So that --

20   **A.**   And that usually signifies it has been reviewed by an

21   official.

22   **Q.**   Sure.  There is no reviewing signature on this, is there?

23   **A.**   No but --

24   **Q.**   Okay.

25   **A.**   -- the stamp typically indicates that it is verified

**MILLER - CROSS / GASNER**

1    records that are being provided.

2    **Q.**   You don't know who put that stamp on there, do you?

3    **A.**   The Russian officials.

4    **Q.**   You don't know who did it?

5    **A.**   No.

6    **Q.**   You don't know their name; right?

7    **A.**   No.

8    **Q.**   You don't know whether it is Mr. Karpushkin or not?

9    **A.**   I never know for the MLAT returns, but they almost always

10   have some seal of authenticity.

11   **Q.**   This one has some sort of seal on it, doesn't it?

12   **A.**   Yes.

13   **Q.**   But the document is incomplete; right?

14   **A.**   It is missing those two lines, yes.

15   **Q.**   Right.  But, I mean, wouldn't you want to know who this

16   person was employed by and what their position is?

17   **A.**   Yes.

18   **Q.**   And we don't know that; right?

19   **A.**   No, I do not.

20   **Q.**   And this is the certificate of authenticity sent to you by

21   the Russian government that purports to authenticate the

22   document that you received that said Mr. Nikulin was a

23   subscriber of the IP address ending in .239; right?

24   **A.**   As I previously stated, I have never received MLAT results

25   that I did not believe were true and accurate.

1   Q.   I can see you don't want to answer that question, but I'm

2   going to repeat it.

3        This is a certificate of authenticity of the business

4   records that you received from the Russian government that

5   purports to connect Mr. Nikulin to the IP address ending in

6   .239; correct?

7   A.   It doesn't purport it.  It shows, yes.

8   Q.   The documents received say that; right?

9   A.   That's correct.

10  Q.   And this is the document that you received from that

11  government, from the Russian government, that certifies the

12  authenticity of that document; correct?

13  A.   Yes.

14  Q.   Okay.  I will move on.

15       So, by the way -- I know you said this before about your

16  belief in MLATs and the information that you receive therein --

17  but as a member of the American Intelligence Community, are you

18  testifying here today that you don't approach information that

19  you receive from the Russian government with any degree of

20  skepticism?

21  A.   I received the information from MLATs, and I trust that it

22  is accurate; and I use my investigative skills and techniques

23  and the facts in the investigation to attempt to validate the

24  information that is contained.

25  Q.   I understand that.  But are you stating that you, as --

**MILLER - CROSS / GASNER**

1   really as a member of the American Intelligence Community and

2   with the information that you have and the background and

3   education that you have received, that when you receive

4   information from the Russian government, are you saying you

5   don't have skepticism on that?

6   **A.**   I'm saying I trust that the information that they provide

7   is accurate.  And if I can prove otherwise through other means,

8   then that is a different story.

9   **Q.**   So did you make an attempt, an independent inquiry,

10  regarding the accuracy of the information the National Cable

11  Network provided to you with regards -- through the Russian

12  government with regards to the IP address and subscriber

13  information in this case?

14  **A.**   No.

15          MR. GASNER:  Excuse me, Your Honor.

16                  (Pause in proceedings.)

17  BY MR. GASNER:

18  **Q.**   Agent Miller, during the course of your investigation in

19  this case, one piece of information that you sought to sort out

20  was who the chinabig01 e-mail account belongs to; right?

21  **A.**   That's correct.

22  **Q.**   That Gmail account -- excuse me -- that chinabig01 e-mail

23  account was a Gmail account; correct?

24  **A.**   Yes, it was.

25  **Q.**   And just as a background, Gmail is short for Google mail;

MILLER - CROSS / GASNER

1   correct?

2   **A.**   I believe so, yes.

3   **Q.**   And in March of 2013, you obtained a court order to

4   require Google to disclose the subscriber information for

5   chinabig01, didn't you?

6   **A.**   I obtained court orders on numerous occasions.

7   **Q.**   Are you denying that you sought that subscriber

8   information through lawful process to Google in March of 2013?

9   **A.**   Not at all, but I would have to see the document to

10  confirm the date.   Like I said, I requested on numerous

11  occasions.

12  **Q.**   No.   I realize you did.   And I'm not denying that.

13          In particular I can show you a document.   If you saw your

14  own report, would it refresh your memory?

15  **A.**   Yes, it would.

16  **Q.**   Let me pull that up for you.

17                      (Pause in proceedings.)

18  **BY MR. GASNER:**

19  **Q.**   Agent Miller, I believe you sought that information in

20  March of 2013; but I believe the return was a little after

21  that, maybe in May of 2013.   But I'm going to show you the

22  court-ordered response from Google so you can refresh your

23  memory.   Okay?

24  **A.**   Thank you.

25          **THE COURT:**   This will just be for the witness to see.

1          MR. GASNER:  Yes, this is just to refresh his memory

2    for the approximate timeframe that he saw subscriber

3    information.

4          THE COURT:  Okay, go do that.  Tracy, make sure it is

5    only in the witness box.

6    BY MR. GASNER:

7    Q.   Agent Miller, only --

8          THE COURT:  Can you zoom down some?  It is very

9    oddball -- there.

10         MR. GASNER:  Is that better?

11         THE COURT:  That's better, yes.  Can you read that

12   okay?

13         THE WITNESS:  Yes, I can, Your Honor.

14   BY MR. GASNER:

15   Q.   Agent Miller, does that look like a return for your

16   inquiry into the subscriber information that -- documents dated

17   May 22, 2013?

18   A.   Yes, it does.

19   Q.   Does that refresh your memory that in approximately the

20   spring of 2013 you requested, among other times, the subscriber

21   information for chinabig01?

22   A.   Yes.

23         MR. GASNER:  Thank you.

24   BY MR. GASNER:

25   Q.   By the way, Agent Miller, you received, along with those

**MILLER - CROSS / GASNER**

1  documents from Google, a certificate of authenticity, don't

2  you?

3  **A.**   Yes, I do.

4  **Q.**   And do you recall whether Google, when they respond to

5  you, leaves out who they work for or who they are employed by?

6  **A.**   I believe it is a standard form Google provides.

7  **Q.**   And they include all that information; right?

8  **A.**   Typically, yes.

9  **Q.**   And they did in this case to your memory, right?

10  **A.**   I believe so based on the document.

11  **Q.**   All right.   So it is your memory now that in approximately

12  May of 2013 Google Corporation in the United States replied to

13  your search warrant request for subscriber information so that

14  you could see who is listed as the subscriber to

15  chinabig01@gmail.com; right?

16  **A.**   That's a court order, so I'm not sure if that was an

17  actual court order or a search warrant.   But, yes, I have done

18  both on the account.

19  **Q.**   Okay.   The effect is the same whether it is a court order

20  or whether it is a search warrant; correct?

21  **A.**   No.   Court order sometimes does not allow content.   It

22  just provides more metadata on the account that the subpoena

23  would not provide.

24  **Q.**   Metadata, things like pen registers, trap traces, you

25  could get that by way of a court order but you couldn't get the

**MILLER - CROSS / GASNER**

1    substance?

2    **A.**    That's correct.

3    **Q.**    Thank you for clarifying.  But in no way in this line of

4    questioning am I asking for any of the substance of the

5    e-mails.  I'm asking for the -- whether Google responded to

6    your request for the subscriber information.

7    **A.**    I believe so.  They typically provide the subscriber

8    information with all those requests.

9    **Q.**    And so -- just so I'm crystal clear, the subscriber

10   information is the name of the person associated with that

11   account according to Google; correct?

12   **A.**    That's the name the individual provided when registering

13   for the account and that's what Google captures, yes.

14   **Q.**    Yes.  Like -- and don't disclose anything personal here --

15   but, like, when you sign up for an e-mail account, you provide

16   them with your name so they know who you are and how to reach

17   you if necessary; right?

18   **A.**    Correct.

19   **Q.**    Okay.  So in about May of 2013 Google replied to your

20   request; right?

21   **A.**    Yes.

22   **Q.**    And you received a confidential and proprietary report

23   from Google that indicated the name -- the subscriber name on

24   the chinabig01 account; right?

25   **A.**    Yes, I believe so.

**MILLER - CROSS / GASNER**

1   Q.   Okay.  And if I show you a document that is the Google

2   confidential and proprietary report showing the Google

3   subscriber information for chinabig01, would you recognize it?

4   A.   I most likely would.

5        MR. GASNER:  Just for the witness, please.

6   BY MR. GASNER:

7   Q.   So, Agent Miller, I'm going to show you an

8   8-and-a-half-by-11 piece of paper, just for you.  Do you

9   recognize that piece of paper?

10  A.   Yes, I do.

11  Q.   Do you recognize the information within it?

12  A.   Yes, I do.

13  Q.   Is it a response from Google with regard to your request

14  to Google for subscriber information?

15  A.   Yes, but --

16  Q.   I didn't mean to interrupt.

17  A.   Sorry.

18  Q.   That's all right.  I paused and you appropriately started

19  to answer -- for chinabig01@gmail?

20  A.   Yes.

21  Q.   Does that look like a true and accurate representation of

22  the document that you received?

23  A.   Yes.

24       MR. GASNER:  Your Honor, I would like to mark that as

25  Exhibit 2 and publish to the jury and have it admitted.

**MILLER - CROSS / GASNER**

1            **THE COURT:**  Any objection?

2            **MS. KANE:**  Just to be clear, I believe this is already

3    admitted as a Government Exhibit.

4            **MR. GASNER:**  I don't know if it is individually

5    admitted; but if we want to use a larger, previously admitted

6    exhibit, it doesn't matter to me.

7            **THE COURT:**  I'm going to admit it in evidence.  But

8    for the benefit of the jury, what is the prior number so they

9    can look at it in the other context?

10            **MS. KANE:**  I will just need to check really quickly,

11    if I can see that Bates number offhand.

12            **MR. GASNER:**  Yes.  3437.

13            **THE COURT:**  Exhibit 2 is now received for the Defense.

14        (Defense Exhibit 2 received in evidence.)

15            **MR. GASNER:**  Your Honor, may I publish it to the jury?

16            **THE COURT:**  Yes, you may.

17   **BY MR. GASNER:**

18   **Q.**   I'm going to make sure it is legible to everybody.

19            **MS. KANE:**  Your Honor, that was Exhibit 14, I believe;

20    but I will have to confirm.

21            **THE COURT:**  Don't guess.  Don't guess.  Tell us when

22    you are certain.  Go ahead, Mr. Gasner.

23            **MR. GASNER:**  Thank you.

24   **BY MR. GASNER:**

25   **Q.**   Agent Miller, you can see along the top of this document

**MILLER - CROSS / GASNER**

1   Google confidential and proprietary; right?

2   **A.**   Yes.

3   **Q.**   And then under that it says "Google subscriber

4   information;" correct?

5   **A.**   Yes.

6   **Q.**   And who is the name of the person that is actually listed

7   as the subscriber of chinabig e-mail?

8   **A.**   The name provided is Alex Corti.

9   **Q.**   And so in September of 2013 Alex Corti is listed as a

10   subscriber, not Yevgeniy Nikulin; correct?

11   **A.**   Yes.

12   **Q.**   And you can see in that document various services that

13   that person has also subscribed to, Google services; right?

14   **A.**   Yes.

15   **Q.**   And you can also see a language code; right?

16   **A.**   Yes, I can.

17   **Q.**   Language code is DE; correct?

18   **A.**   DE.

19   **Q.**   That's not the Russian language code which would be RU;

20   correct?

21   **A.**   That's correct.

22   **Q.**   And you did an investigation into Alex Corti, didn't you?

23   **A.**   I tried to follow up on the name.

24   **Q.**   Okay.

25   **A.**   But with like a lot of the information with the chinabig

1    e-mails, the names were typically fictitious or appeared not to

2    be true names of individuals.

3    **Q.**    Now, this -- okay, so this subscriber, though, has a lot

4    of services that are listed Gmail, Google calendar, Google

5    code, Google developers console, like this; right?

6    **A.**    Those are Google identifiers for the services, yes.

7    **Q.**    And there is also, you know, web history listed?

8    **A.**    Yes.

9    **Q.**    It says YouTube; right?

10   **A.**    Yes.

11   **Q.**    Now, the subscriber information that you received also

12   included IP history; correct?

13   **A.**    I don't see the IP history below here.  It would typically

14   be right under the subscriber information if it had any.

15   **Q.**    Yes.  But do you have a memory of them providing -- that

16   is Google -- in a response to or request from you IP history

17   for the chinabig01 Gmail account?

18   **A.**    I received IP history from Google for chinabig01@gmail.com

19   on numerous occasions.

20   **Q.**    Okay.  Just like you received subscriber information on

21   numerous occasions; correct?

22   **A.**    Yes.

23   **Q.**    So if I showed you a report that you authored, would it

24   refresh your memory as to the subscriber -- excuse me -- as to

25   the IP history for the chinabig01 Google account for your

1   request?

2   **A.**   Yes, but I wouldn't know exactly which request unless it

3   is specifically stated.

4   **Q.**   Okay.  So later -- well, let me just pull it up for you.

5   **A.**   Not every request had IP history.

6   **Q.**   Not every request did you do an IP history.  Okay.

7        What about -- by the way, do you remember about how many

8   times you requested this?

9   **A.**   I do not off the top of my head.

10  **Q.**   Just rotating numerous times; right?

11  **A.**   Yes.

12  **Q.**   If you authored a report later in the fall of 2013 listing

13  subscriber information for the account chinabig01@gmail.com and

14  listing Alex Corti as the subscriber, if I showed you a report

15  that you authored, would it refresh your memory as to the IP

16  history?

17  **A.**   I believe that name was used on several times with the

18  results I received, and it was changed throughout the course of

19  the investigation.  So I still wouldn't be able to say

20  definitively that the information in that report is for this

21  specific instance.

22  **Q.**   For that specific return?

23  **A.**   Correct.

24        **THE COURT:**  For that specific what?

25        **MR. GASNER:**  Specific return.

**MILLER - CROSS / GASNER**

1    **THE COURT:**  Are you talking about the one dealing with

2    Mr. Alex Corti?

3            **MR. GASNER:**  Yes.

4    **BY MR. GASNER:**

5    **Q.**   Well, if I showed you a report you authored in September

6    of 2013 listing Alex Corti as a subscriber and including in

7    your report an IP history, would you be able to recognize that?

8    **A.**   Yes, I would.

9    **Q.**   Would it help refresh your memory?

10   **A.**   Sure.

11           **THE COURT:**  All right.  We are going to do this and

12   then take a break.  It is time for the jury to have a break,

13   but let's finish up this line of questions.

14                   (Pause in proceedings.)

15           **MR. GASNER:**  Madam Clerk, this is just for the

16   witness.

17           **THE CLERK:**  Hold on one moment.

18           **MR. GASNER:**  I will wait until you --

19           **THE CLERK:**  Okay.

20                   (Pause in proceedings.)

21   **BY MR. GASNER:**

22   **Q.**   I'm going to show you, Agent Miller, just the top portion

23   just so you can -- and this is your report.  So any information

24   you see therein, please let me know.

25   **A.**   Okay.

**MILLER - CROSS / GASNER**

1    Q.    Do you see -- what you are looking at is a -- what we

2    often call a 302 or Federal Bureau of Investigation report?

3    A.    Yes, it is.

4    Q.    This seems to have been authored in September of 2013?

5    A.    Yes.

6    Q.    And it lists the subscriber information for the

7    chinabig01@gmail account?

8    A.    Yes, it is cut off on the screen here.

9    Q.    Sure.  I'm going to push it up for you here.

10   A.    Thank you.

11   Q.    I'm pushing it up for you.  Can you see -- does that

12   refresh your memory as to who the subscriber was?

13   A.    Yes.

14   Q.    And also does this report, which you wrote, detail the IP

15   history?

16   A.    Yes, it does.

17   Q.    For that time period?

18   A.    Yes.

19   Q.    Okay.  And do you see any IP addresses related to the

20   chinabig e-mail account in this report --

21   A.    The screen just shut off.

22          THE COURT:  The screen just went away, Tracy.

23          MR. GASNER:  Oh, you know what, I think -- there we

24   go -- I'm going to take it off to make sure it is just for the

25   witness.

1    **THE COURT:**  It is on.

2       **THE WITNESS:**  It is back now.

3       **THE COURT:**  Okay.  Move it up a little higher so we

4    can see all those IP addresses.  All right.  Now, what is your

5    question about the IP addresses?

6    **BY MR. GASNER:**

7    **Q.**   My question is:  Do any of the IP addresses associated

8    with the chinabig01 e-mail account end in .239?

9    **A.**   No, not in this report.

10   **Q.**   Understood.  And to be clear, the .239 IP address is

11   relevant to you and to me because that's the one that the

12   Russian government said was associated with Mr. Nikulin;

13   correct?

14   **A.**   Yes.

15       **MR. GASNER:**  Your Honor, is this a good time for a

16   break?

17       **THE COURT:**  It would be.  Okay.  Thank you for being

18   so patient out there.  We will take a 15 to 20-minute break.

19   Please remember the admonition.

20      (Proceedings were heard outside the presence of the jury:)

21       **THE COURT:**  Be seated, everyone.

22      I'm going to ask the witness to step out of the room

23   because I have a question for the lawyers.  I know he is the

24   case agent, but he is also our witness right now.

25      (Special Agent Jeffrey Miller exits)

**PROCEEDINGS**

1    **THE COURT:**  Here is my question -- I raised this a

2    couple of days ago and that is to -- on this thing where the

3    blanks weren't filled in, in Russia on the certificate, I

4    thought the Government was relying on Rule 803 records --

5    number 6, records of regularly conducted activity.  And then it

6    has a standard things made at or about the time, et cetera.

7    And then the last one says:  All of these conditions are shown

8    by the testimony of the custodian or another qualified witness,

9    which we don't have, or by a certification that complies with

10   Rule 902.11 or 12 or with the statute permitting certification.

11       And then if you go look at 902.11 and 12, I wonder whether

12   or not those really apply here.  Number 12 only applies in

13   civil cases.  And Number 11 requires -- it says the original or

14   copy of a domestic record.  Now, but that -- so I'm not sure

15   that -- that -- that either of those applies.

16       But then I go back to number 803, which does say "or with

17   a statute permitting certification."

18       So that obviously raises does MLAT have its own

19   certification rules.

20       **MS. KANE:**  Your Honor --

21       **THE COURT:**  I asked this question the other day, but I

22   haven't gotten an answer.  Yes?

23       **MS. KANE:**  Yes, Your Honor.  It included --

24       **THE COURT:**  You need to speak into the mic.

25       **MS. KANE:**  We had included this issue in our trial

PROCEEDINGS

1    brief.

2          THE COURT:  All right.  I can't remember what you

3    said.  What did you say?

4          MS. KANE:  I understand.  I didn't quite remember

5    either.  There is a statute.  It is Title 18, United States

6    Code, Section 3505.

7          THE COURT:  And?

8          MS. KANE:  And that lays out that foreign business

9    records are admissible in criminal proceedings when they come

10   with a certification.

11         THE COURT:  Let me just look at the way it reads.

12   Eighteen --

13         MS. KANE:  There is a Seventh Circuit case, *U.S.*

14   *versus Strickland*, that discusses the purpose of 3505 which is

15   to streamline admission of foreign business records.

16         THE COURT:  Okay.  It says:  In a criminal proceeding

17   a foreign record of regularly conducted activity or a copy of

18   such record shall not be excluded as evidence by the hearsay

19   rule if a foreign certification attests that A, B, C -- and

20   those are the standard things -- D unless the source of

21   information or the method or circumstances of preparation

22   indicate lack of trustworthiness.  A foreign certification

23   under this section shall authenticate such record or duplicate.

24       So I guess the question is:  Is this a -- does this

25   qualify as a foreign certification if you have those blanks?

**PROCEEDINGS**

1          **MS. KANE:**  Your Honor, it is a signed under penalty of

2     perjury certification.  It meets the requirements.  The Defense

3     has been permitted to cross-examine the Special Agent about the

4     reliability of it.  So any -- any issues should go to the

5     weight that the jury would give to this document.

6          **THE COURT:**  Has our own circuit weighed in on this

7     issue?

8          **MS. KANE:**  I'm not aware of any Ninth Circuit

9     authority, Your Honor.

10         **THE COURT:**  What was the Seventh Circuit case?

11         **MS. KANE:**  It was a Seventh Circuit case.  It was

12    *United States versus Strickland* and the citation is --

13         **THE COURT:**  Law clerk, right this down.

14         **MS. KANE:**  I'm sorry, I lost it here -- 935 F.2nd 822,

15    and then the specific -- I'm sorry, I believe, there is also a

16    District of Columbia, District Court decision.  That is *United*

17    *States versus Al-Imam*.  And that is at 2019 Westlaw, WL 235

18    8365.

19         And it is the treaty itself, Your Honor, that governs

20    the --

21         **THE COURT:**  What does the treaty say on the

22    certificate point?

23         **MS. KANE:**  And the certificate meets the requirements

24    of the treaty, Your Honor.

25         **THE COURT:**  But where can we find the treaty?

1          **MS. KANE:**  The treaty itself is also available.  It is

2     on Lexis at 1999 UST Lexis 163.

3          **THE COURT:**  All right.  Thank you.  Does the -- I have

4     one other question on this.  3505 has this notice procedure in

5     subpart B where the Government was supposed to give written

6     notice of intention to use this document.  And then if the

7     other side doesn't object, it gets to come in.

8          **MS. KANE:**  And that was my next point, Your Honor.

9     Thank you.  We did provide that written notice for this

10    document and all of the other documents that we were intending

11    to enter with the authentication of custodian of records

12    declarations.

13         **THE COURT:**  When did you give that written notice?

14         **MS. KANE:**  I'm sorry?

15         **THE COURT:**  When did you give the written notice?

16         **MS. KANE:**  That was in advance of our original trial

17    date.  I will get you the date.  I don't have that at my

18    fingerprints, but we did provide that written notice.

19         **THE COURT:**  All right.  And did -- Mr. Gasner, did you

20    ever -- it says here you were supposed to file a motion if you

21    intended to object.  Did you ever do that?

22         **MR. GASNER:**  No written motion, Your Honor, or oral

23    prior to now.

24         **THE COURT:**  Well, for now, it is in evidence and the

25    blanks go to its trustworthiness and the weight to be given.

1    But I still want you to tell me where it is that you called out

2    this particular document that you were going to rely on such

3    that you complied with subpart B.

4            **MS. KANE:**  Your Honor, I can get you that information

5    momentarily.

6            **THE COURT:**  All right.  When I come back.

7            **MS. KANE:**  Thank you.

8            **THE COURT:**  Okay.  I'm going to take a break unless

9    the lawyers need me for something.

10           **MR. GASNER:**  No, Your Honor.  Just how long do we

11   have?

12           **THE COURT:**  Maybe 12 minutes, something like that.

13           **MR. GASNER:**  You bet.

14                    (Recess taken at 10:21 a.m.)

15                (Proceedings resumed at 10:37 a.m.)

16           **MR. GASNER:**  Your Honor, may we just bring up one

17   small issue outside the presence of the jury?

18           **THE COURT:**  Sure.  Go ahead.

19           **MR. GASNER:**  I have three photographs that came from

20   the subscriber data to the chinabig01 e-mail account.  I just

21   recognized that I don't have hard copies of those.  If I

22   show -- and I don't think this is disputed -- I have showed the

23   U.S Attorney's Office.  They brought it up yesterday.

24       It is the pictures of the man with the fish -- the

25   shirtless man with the fish that came from the chinabig01

1   search warrant of that account, that e-mail account.

2       If I show it to this witness and move it into evidence,

3   may I supplement three color photographs this afternoon to your

4   clerk so we can have hard copies in the file?

5           THE COURT:  Well, how -- that's fine with me.  Is

6   there any dispute over the authenticity of these photographs?

7           MR. GASNER:  No.

8           MS. KANE:  No, Your Honor.

9           THE COURT:  Well, the witness referred to a fish, I

10  think, right, earlier?

11          MR. GASNER:  Yes, it came up on direct; but I just

12  realized that I didn't have my color pictures with me.

13          THE COURT:  You can substitute those later unless

14  there is an objection raised on authenticity grounds.  Okay.

15  Here comes the jury.

16      (Proceedings were heard in the presence of the jury:)

17          THE COURT:  Great.  Welcome back.  Please have a seat.

18  Let's make sure everyone is there.  Everyone ready to go.

19  Pencils poised?  Perfect.

20      Mr. Gasner, you can continue please.

21          MR. GASNER:  Thank you, Your Honor.

22  BY MR. GASNER:

23  Q.   Agent Miller, when we left off before the break, we were

24  discussing subscriber information that you received from Google

25  Corporation in relation to the chinabig01 Gmail account; right?

**MILLER - CROSS / GASNER**

1   A.   Yes.

2   Q.   And I know you don't remember offhand but, suffice it to

3   say, that during the course of your investigation, you

4   requested subscriber information for the chinabig01@gmail

5   account from Google on numerous occasions?

6   A.   Yes, I did.

7   Q.   And you do recollect -- and it was referenced on direct --

8   that there were occasions when you didn't use just a court

9   order, but you used a search warrant so that you could get

10  content information, not just subscriber information; right?

11  A.   Yes.

12  Q.   And I can't recall which one of your requests yielded

13  content information.  But you referenced it yesterday in that

14  when you were pulling information from the Gmail account,

15  Google -- excuse me -- chinabig01, you actually got some

16  photographs; correct?

17  A.   Yes.

18  Q.   And those are photographs that were attached or received

19  or sent from -- or to the chinabig01@gmail.com account; right?

20  A.   I don't remember the exact direction but, yes.

21  Q.   But it is like when you send an e-mail, you can attach

22  pictures; right?

23  A.   Yes.

24  Q.   And then Google keeps a record of those pictures; right?

25  A.   Well, if it is attached to an e-mail, yes.

**MILLER - CROSS / GASNER**

1   Q.    Yeah.  And that's considered content; right?

2   A.    Yes, it is.

3   Q.    Meaning, that it is a slightly more detailed process to

4   get Google to release content; right?

5   A.    Yes, it is.

6   Q.    But, nonetheless, you were able to make that more detailed

7   request.  And Google did turn around and give you some content

8   including photographs that we mentioned yesterday; right?

9   A.    Yes.

10  Q.    So I want to show you a series of three photographs that

11  relate to your testimony yesterday but in particular you recall

12  testifying that you got photographs of a person; right?

13  A.    They were, I believe, two individuals but, yes.

14  Q.    And the central character in those photographs seem to be

15  a man; right?

16  A.    They were both men, yes.

17  Q.    In one picture there might be a woman; right?

18  A.    I don't believe there was a woman.

19  Q.    I will show you and maybe you can correct me if I'm

20  incorrect.

21  A.    Okay.

22  Q.    But what I would like to do is show you these three

23  pictures and just make sure that they truly and accurately

24  represent the photographs that you received from Google as

25  attachments to e-mails either to or from chinabig01@gmail.

1    Okay?

2    A.    Okay.

3              JUROR SERPA:   The TVs are off again.   Are we supposed

4    to see it?

5              THE COURT:   All right.   Here comes Ms. Kane.

6              MR. GASNER:   Thank you, Ms. Kane.

7              MS. KANE:   You are welcome.

8              MR. GASNER:   So, preliminarily, Madam Clerk, I'm just

9    going to show these to the witness just to make sure that they

10   are true and accurate to his recollection.   Okay?

11             THE CLERK:   Okay.

12   BY MR. GASNER:

13   Q.    Agent Miller, we were just referencing these photographs.

14   Does this picture that I'm showing you right now accurately and

15   fairly represent one of the three pictures that you received

16   that we were just talking about?

17   A.    Yes, it does.

18   Q.    And by the way, is there a man in the picture?

19   A.    Yes.

20   Q.    And as we were discussing, is there also a woman in the

21   picture?

22   A.    In the background, yes.

23   Q.    Yes, yes.   I'm going to show you a second photograph.   Ask

24   you the same question.   Showing you a second photograph, does

25   this fairly and accurately represent another of the photographs

**MILLER - CROSS / GASNER**

1   in this series that you received from your Google return?

2   **A.**   Yes, it does.

3   **Q.**   And then, lastly, may I show you the final in that series

4   photograph of a man that you received from your Google return?

5   **A.**   Yes.

6          **MR. GASNER:**   Your Honor, what I would like to do at

7   this point is mark those next in order, either cumulatively or

8   individually -- it doesn't matter to me -- and then publish --

9   ask for their admittance and publish them to the jury.

10          **THE COURT:**   We will mark them as 3, A, B and C and all

11   received in evidence.

12       (Defense Exhibit 3A, 3B and 3C received in evidence.)

13          **MR. GASNER:**   Thank you.   May we publish them?

14          **THE COURT:**   Please.   Go ahead.

15          **MR. GASNER:**   Thank you.

16                    (Pause in proceedings.)

17   BY MR. GASNER:

18   **Q.**   Agent Miller, showing you the first in a series of three

19   photographs that you received from Google Corporation as

20   attached to the chinabig01 e-mail account, do you remember that

21   photograph?

22   **A.**   Yes, I do.

23   **Q.**   Does it depict a man and a woman in the background in what

24   looks like a food market?

25   **A.**   It does.

**MILLER - CROSS / GASNER**

1   **Q.**   The man is shirtless?

2   **A.**   Yes.

3   **Q.**   Do you recognize the man?

4   **A.**   From this photo, I believe I know his name, yes.

5   **Q.**   Okay.  And is that person Mr. Nikulin?

6   **A.**   No, it is not.

7   **Q.**   Okay.

8          **THE COURT:**  We are all dying to know.  Can we ask who

9   it is or who he thinks it is?  Is that okay?  Go ahead.

10          **THE WITNESS:**  I believe the name is Ashot, A-S-H-O-T,

11   Asratyan.

12          **THE COURT:**  Spell that last name.

13          **THE WITNESS:**  A-S-R-A-T-Y-A-N, I believe.

14          **THE COURT:**  Okay.

15   **BY MR. GASNER:**

16   **Q.**   Okay.  And then the photos are fairly similar so I will go

17   through that more quickly.  Showing you what has been marked,

18   I believe, as 3B, do you see that photograph?

19   **A.**   Yes.

20   **Q.**   Color photograph of a man with a fish?

21   **A.**   Yes.

22   **Q.**   And with, what I believe is, a younger person standing

23   next to him?

24   **A.**   Yes.

25   **Q.**   That's the photograph that you referenced yesterday

1    indeed, isn't it?

2    **A.**    The fish, yes.

3    **Q.**    And are either of those people Mr. Nikulin?

4    **A.**    No.

5    **Q.**    And then showing you the last photograph, same thing.

6    Looks like a man in a market without his shirt on, and that

7    looks similar same person as in all three pictures; right?

8    **A.**    Yes.

9    **Q.**    So, by the way, with regard to this contents, you do

10   recall -- and I think you referenced that there were

11   occasions -- and I'm looking at an occasion in 2016 -- that you

12   did request user account web history from Google.  Do you

13   recall that?

14   **A.**    Yes.

15   **Q.**    And you recall initially Google not -- or Google

16   indicating to you that they would not produce those records

17   pursuant to the order; that they wanted a search warrant;

18   correct?

19   **A.**    I believe that's correct.

20   **Q.**    And in your numerous search warrant or otherwise getting

21   records produced through orders from Google, the subscriber

22   information for chinabig01@gmail did not come back as Yevgeniy

23   Nikulin; correct?

24   **A.**    It did not.

25   **Q.**    So I would like to talk to you, Agent Miller, about these

**MILLER - CROSS / GASNER**

1    IP addresses that you located as being anomalous starting with

2    LinkedIn in.  Are you familiar with those?

3    **A.**   Yes, I am.

4    **Q.**   Actually, why don't we turn -- we have talked about

5    LinkedIn quite a bit.

6        Why don't we turn -- as part of your investigation, you

7    received a list from a company called Dropbox of IP addresses

8    that were used in their unauthorized access.  Do you remember

9    that?

10   **A.**   Yes, I do.

11   **Q.**   Do you recollect getting a return from Dropbox listing the

12   ten IP addresses that they considered anomalous and were likely

13   as a result of a compromised account?

14   **A.**   I don't remember the exact number.  But, yes, I received

15   IPs from Dropbox.

16   **Q.**   And these IP addresses that you received from Dropbox,

17   your investigation led you to believe were used in the

18   unauthorized access to Dropbox in approximately May and early

19   June of 2012; right?

20   **A.**   Yes.

21   **Q.**   And when you reviewed those IP addresses that Dropbox and

22   yourself had determined were used in the unauthorized access

23   into their databases, none of those IP addresses ended in .239,

24   did they?

25   **A.**   I don't believe they did.

**MILLER - CROSS / GASNER**

1    Q.   Would referring to your report allow you to testify with

2    more certainty?

3    A.   Yes.

4          MR. GASNER:  So for the Government, I'm referring to

5    Bates number 1746.

6          MS. KANE:  Thank you.

7          MR. GASNER:  You are welcome.  Your Honor, I would

8    like to show Agent Miller -- and only Agent Miller -- a copy of

9    his 302 so he may refresh his recollection.

10         THE COURT:  Sure.  Go ahead.

11   BY MR. GASNER:

12   Q.   Agent Miller, what I'm showing you is a copy of your 302.

13   But if it helps you to look at a page before or after or up or

14   down on that document, please let me know.

15   A.   Will do.

16   Q.   Once you had a chance to refresh your recollection, if you

17   could just kindly indicate so.

18   A.   Yes.

19   Q.   Can you now testify with more certainty as to whether or

20   not the IP addresses that Dropbox provided to you regarding

21   what they believe were anomalous IP contacts, perhaps, related

22   to the intrusion into the databases, were any of those IP

23   addresses ending in .239?

24   A.   They were confirmed unauthorized accesses.  And, no, none

25   were the .239 IP address.

1   Q.   And you broke that into two parts because I asked a

2   compound question; right?

3   A.   That's correct.

4   Q.   So the first part was that they were confirmed

5   unauthorized access; correct?

6   A.   Yes.

7   Q.   But the second part is it didn't come from .239; right?

8   A.   No.

9          THE COURT:   Wait.   There is ambiguity in that answer

10  because you said "They didn't; right?"  He says "No."  Does

11  that mean:   No, it is not right or no it doesn't come with it?

12  Ask it without the "not."

13      Did any of those addresses include .239?

14          THE WITNESS:   No, they did not.

15          THE COURT:   Thank you.   Next question.

16          MR. GASNER:   Thank you, Your Honor.

17  BY MR. GASNER:

18  Q.   Now, as part of your lengthy investigation into this

19  matter, you did actually ask Google Corporation to provide you

20  something called a pen register and trap and trace data;

21  correct?

22  A.   Yes, on numerous occasions.

23  Q.   And I referenced those two words earlier.   Do you

24  remember?

25  A.   Yes.

1    Q.   But in particular I was looking at pen register and trap

2    and trace information from approximately November of 2013 to

3    January 2014.  Do you recollect that time period?

4    A.   I do.

5    Q.   And just so everyone is clear, isn't it true, A, that

6    something like a pen register and trap and trace do not require

7    the same type of search warrant because it doesn't include

8    content?

9    A.   That's correct.

10   Q.   So it is a little easier to get; isn't that right?

11   A.   A little.

12   Q.   And just so everyone is clear, a pen register is really

13   just a list of e-mails that were sent from a certain account;

14   right?

15   A.   As well as logins to the account, yes.

16   Q.   And then -- thank you for clarifying.  And then a trap and

17   trace is a list of e-mails received; correct?

18   A.   Yes.

19   Q.   And this is really a vestige of language that was related

20   to telephones; right?

21   A.   Initially, yes.

22   Q.   But it has been now carried over to be used in the

23   electronic communication context; right?

24   A.   Yes.

25   Q.   That pen register, which is a list of e-mails sent, and

1    the trap and trace -- excuse me -- strike that.

2        The response you got from Google, as you just mentioned,

3    included a list of IP addresses associated with that time

4    period; right?

5    A.   Yes, it would have.

6    Q.   And Google provided you a list -- particularly looking at

7    the period of November of 2013 to January 2014 -- a list of

8    about 200 different IP addresses associated with the sending

9    and receiving of e-mails from chinabig01@gmail.com; correct?

10   A.   I would have to see the list.

11   Q.   Understood.  If I showed you a copy of your FBI 302 report

12   in this regard -- in this matter, would that help refresh your

13   recollection?

14   A.   Yes, it would.

15   Q.   And, by the way, you have authored so many reports in this

16   case, haven't you?

17   A.   I have authored a lot, yes.

18   Q.   So, you know, you do have an independent memory of much of

19   what you testified to; correct?

20   A.   Yes.

21   Q.   But obviously referring to your own report helps refresh

22   your memory, doesn't it?

23   A.   Yes, it does.

24   Q.   Okay.

25        MR. GASNER:  Your Honor, just for Agent Miller's eyes

1    just to refresh his memory, may I show him --

2            **THE COURT:**  Sure.  Please go ahead, Tracy, just for

3    the witness and me.

4    **BY MR. GASNER:**

5    **Q.**   Agent Miller, I'm going to show you a copy of your report.

6    If you wish for me to scroll up or down or anything that helps

7    you authenticate it, please let me know.

8    **A.**   Thank you.  Please scroll up.

9    **Q.**   Scroll up so you can see --

10   **A.**   The IP history, please.

11   **Q.**   Oh, the IP history, I see.  So it is voluminous so I'm

12   going to show you the first page, and I will scroll for you --

13   I will go to the next page --

14   **A.**   Can you please scroll?

15   **Q.**   As you wish.

16   **A.**   Thank you.

17                       (Pause in proceedings.)

18   **BY MR. GASNER:**

19   **Q.**   And I think there is about five pages.  I'm happy to run

20   through them if you --

21   **A.**   That's fine.

22   **Q.**   Do you wish?

23   **A.**   No, that's okay.

24   **Q.**   Agent Miller, having just looked at your own report, does

25   that help refresh your memory as to the IP addresses associated

MILLER - CROSS / GASNER

1    with the chinabig01 account for that time period we were

2    discussing?

3    A.   Yes, it does.

4    Q.   And you remember that being a list of about 200 IP

5    addresses that were sent back to you on your return from

6    Google?

7    A.   Around there, yes.

8    Q.   And none of those IP addresses end in .239, do they?

9    A.   No, they don't.

10   Q.   So excuse me one moment.

11                  (Pause in proceedings.)

12   BY MR. GASNER:

13   Q.   By the way, just for clarity, when you received

14   information regarding the chinabig01 account, there were

15   actually a couple of accounts associated with chinabig;

16   correct?

17   A.   You mean associated through Google?

18   Q.   Yeah.

19   A.   Yes, there was one other.

20   Q.   So chinabig02 I think?

21   A.   Yes, that's correct.

22   Q.   And then there was also a variety of -- over the course of

23   your investigation -- subscriber information listed; right?

24   A.   Yes, there was.

25   Q.   And there were multiple IP addresses associated with each

1    account; right?

2    **A.**    Yes.

3    **Q.**    And there wasn't other information in that subscriber

4    content that you received on the return that named Mr. Nikulin;

5    correct?

6    **A.**    No.

7              **THE COURT:**  Say again.  You have got an ambiguity.

8              **MR. GASNER:**  Oh, correct.

9              **THE COURT:**  Say, "Was there any information in there

10   that named Mr. Nikulin."

11   **BY MR. GASNER:**

12   **Q.**    Was there any information in there that named Mr. Nikulin?

13   **A.**    No, there was not.

14   **Q.**    I would like to turn to -- not to data that you received

15   through subpoenas but, I would like to turn to -- and not with

16   regard to the actual e-mail account or the IP address, but I

17   would like to turn to hardware.  Okay?

18   **A.**    Okay.

19   **Q.**    As part of your investigation into this case, you

20   attempted to obtain hardware like computers, laptops or cell

21   phones that might yield evidence and leads; correct?

22   **A.**    Yes, I did.

23   **Q.**    And a physical device, like a computer or an iPad, a

24   tablet, or a smart phone can yield many different types of

25   information; can it not?

**MILLER - CROSS / GASNER**

1   A.   Yes, it can.

2   Q.   There can be copies of communications contained on a

3   hardware like e-mails, Skype chats, communications, that could

4   be useful; right?

5   A.   Yes.

6   Q.   There can be photographs; right?

7   A.   Potentially.

8   Q.   There could even be portions of stolen databases; right?

9   A.   Potentially.

10  Q.   And, in addition, if you have an actual device like a

11  computer, you can check for what the internal IP address is for

12  that computer, can't you?

13  A.   Yes, you can.

14  Q.   And you can actually check that computer's systems or

15  admin logs as well; correct?

16  A.   Yes, you can.

17  Q.   And those systems or admin logs -- I'm using those

18  interchangeably.  Do you understand what I mean?

19  A.   Yes, I do.

20  Q.   And those are logs that we have discussed in the context

21  of databases; right?

22  A.   Yes.

23  Q.   And database is just effectively a large computer, isn't

24  it?

25  A.   Yes, it is.

1   Q.   So even a small computer, like your home computer, has the

2   similar type of logs that we have discussed sort of ad nauseam

3   in this case; right?

4   A.   It has some logs, yes.

5   Q.   For example, you might be able to see a log that showed an

6   outgoing connection, correct, an outgoing IP connection?

7   A.   It depends on how the setup is of the computer.

8   Q.   Sure.  But certainly that would be a type of information

9   that in this type of case you would be looking for to see if it

10  was available?

11  A.   Yes.

12  Q.   You can also -- if you had a physical piece of hardware,

13  you could verify the user -- excuse me -- the user agent string

14  that was received by the connected computer like the LinkedIn

15  database; right?

16  A.   Are you saying you could see the user agent string on a

17  personal computer?

18  Q.   Well, what I'm saying is that -- I will clarify.  In this

19  circumstance, for example, you are familiar with what a user

20  agent string is; right?

21  A.   Yes, I am.

22  Q.   Piece of information that tells -- that is received by and

23  logged in a systems log of a receiving computer like a database

24  that says basically some pertinent information on the software

25  that the sending computer is running; correct?

**MILLER - CROSS / GASNER**

1    **A.**   It is typically captured in a web log, but it would be of

2    the browser that was connecting.

3    **Q.**   Yes.  And the browser is usually a piece of software that

4    somebody has attached in their own computer; right?

5    **A.**   Yes.

6    **Q.**   And as we talked about previously, a user agent string

7    isn't like a fingerprint or anything; right?

8    **A.**   No, it's not.

9    **Q.**   It is a broad piece of information that might narrow down

10   the type of software that a particular browser is using; right?

11   **A.**   Yes.

12   **Q.**   And I have used this example before, but just bear with

13   me.  It would be -- a user agent string is similar to saying

14   maybe you are looking for a Honda Accord, but it is not like

15   saying I'm looking for this license plate; correct?

16   **A.**   That's correct.

17   **Q.**   A license plate or -- you know what a VIN number is,

18   Agent?

19   **A.**   Yes, I do.

20   **Q.**   A Vehicle Identification Number?

21   **A.**   Yes.

22   **Q.**   And I'm just using this by way of analogy so that we can

23   understand away from the technical side of all of this.

24        A license plate identifies a particular vehicle that has

25   been registered; correct?

**MILLER - CROSS / GASNER**

1    **A.**    Yes, it does.

2    **Q.**    And a VIN number really describes with particularity a

3    particular automobile; right?

4    **A.**    Yes, it does.

5    **Q.**    And that in the computer context might be similar to what

6    I termed as a MAC, M-A-C, address?

7    **A.**    Potentially, yes.

8    **Q.**    MAC address is a unique identifier that is attached to an

9    individual piece of hardware; correct?

10   **A.**    Yes.

11   **Q.**    And I'm not -- just to be clear, not saying Mac in the

12   concept of Macintosh or Apple computers or anything like that.

13   It is a different term; right?

14   **A.**    Yes, it is.  It identifies a network device.

15   **Q.**    So if you had a piece of hardware that you believe was

16   associated with these breaches, that we have been discussing in

17   this case, you would be able to look at that piece of hardware

18   and see whether the browser that it was running compared to the

19   user agent string that you received or that the breached

20   company received; correct?

21   **A.**    You could, but it would depend on the browser and the time

22   you checked because it can change.

23   **Q.**    But there are logs that would potentially be able to tell

24   you what browser the computer was running for the pertinent

25   time period; right?

MILLER - CROSS / GASNER

1    **A.**   There could be, yes.

2    **Q.**   Well, that's just -- that is just information that you

3    would be looking for were you to have a piece of hardware

4    associated with this case; right?

5    **A.**   Potentially, yes.

6    **Q.**   And potentially if you had a piece of hardware associated

7    with Mr. Nikulin, you probably looked at those types of

8    information; right?

9    **A.**   Yes.

10   **Q.**   You would also be able to verify, for example, the

11   particular browser cookie that had been delivered from the --

12   from the website or the social media platform or the website

13   that was visited; correct?

14   **A.**   I wouldn't necessarily know how that browser cookie is

15   generated.  It is based on the company and the information that

16   they use to generate that cookie.

17   **Q.**   So you might need some specialized technical assistance if

18   you were going to look for that information; right?

19   **A.**   You would need information from the company, yes.

20   **Q.**   So, for example, if you went onto Facebook -- if you or I

21   or anyone logged onto Facebook, Facebook might with your

22   consent, hopefully, deposit a browser cookie onto your computer

23   so that when you ran a similar search, it would run more

24   efficiently; correct?

25   **A.**   Yes.

1   Q.   And in this case you have indicated that you have

2   looked -- that you located browser cookies associated with this

3   breach; correct?

4   A.   Yes.

5   Q.   So if you had a piece of hardware that was associated with

6   Mr. Nikulin, you would probably be able to look and see whether

7   or not that browser cookie existed on his computer; right?

8   A.   It may, yes.

9   Q.   I mean, it is a piece of software that is delivered to

10  someone's computer's browser specifically to help enhance their

11  future use of the website; correct?

12  A.   Yes.  But I believe it is just stored as plain text.

13  Q.   Okay.  So you would have to match that plain text;

14  correct?

15  A.   You would.

16  Q.   All right.  So, in fact, while we are talking about it,

17  you were able to obtain a computer image of Mr. Ieremenko's

18  computer; right?

19  A.   Yes, I was.

20  Q.   And just to be clear -- first of all, that image isn't the

21  actual physical computer; correct?

22  A.   No, it was not.

23  Q.   And as we heard Agent LaTulip testify to -- you were

24  present during his testimony; right?

25  A.   Yes, I was.

**MILLER - CROSS / GASNER**

1   Q.   And he testified as to how the computer was, quote,

2   imaged; right?

3   A.   Yes.

4   Q.   And that's a process by which you take a device like a

5   computer and you copy, if you will, that computer onto another

6   computer or hard drive so that you have all the information

7   contained there in; right?

8   A.   It is a generic explanation but, yes.

9   Q.   Why don't you give a slightly more specific one if I

10  misspoke.

11  A.   No.  It is just a byte-for-byte copy so you make sure you

12  have everything on the drive.  Yes.

13  Q.   Byte-for-byte?

14  A.   Yes.

15  Q.   That's the technical term?

16  A.   Yes, it is.

17  Q.   So the United States Secret Service was the one that

18  actually issued the Mutual Legal Assistance Treaty request to

19  the Ukraine; right?

20  A.   Yes.

21  Q.   And they are the ones that actually facilitated the

22  retrieval of that information; right?

23  A.   Yes.

24  Q.   You were not present for that, were you?

25  A.   No, I was not.

**MILLER - CROSS / GASNER**

1   Q.   And did not participate in the information that was

2   transmitted to the Ukraine regarding why they wanted

3   Ieremenko's computer; right?

4   A.   No, I was not.

5   Q.   But -- so if you were not physically present during the

6   seizure, do you have familiarity with how the seizure occurred?

7   A.   I don't know exactly how the execution went, no.

8   Q.   So isn't it accurate that some of the information that you

9   received off of Ieremenko's computer -- do you believe that

10  there was an accurate byte-for-byte image of that computer

11  provided?

12  A.   Yes.

13  Q.   And you don't believe that some of that information on

14  that computer wasn't transmitted?

15  A.   No.

16  Q.   Now, in the course of your investigation in this case, you

17  never obtained any piece of hardware associated with

18  Mr. Nikulin, did you?

19  A.   No, I did not.

20  Q.   And that means you didn't -- you didn't seize a computer

21  or an image of a computer; right?

22  A.   No.

23  Q.   Or even a cell phone?

24  A.   No.

25  Q.   Or a tablet?

**MILLER - CROSS / GASNER**

1    A.   No, sir.

2    Q.   A smart watch?

3    A.   No.

4    Q.   So no computer to verify the IP addresses used to see if

5    they matched any of the breaches?

6    A.   No.

7    Q.   No computer to verify if that computer matched -- if his

8    computer matched the user agent string?

9    A.   No.

10   Q.   Or matched the browser cookie, if possible?

11   A.   No.

12   Q.   Okay.  Well, did you request from the Russian

13   government -- similar to how agent LaTulip requested from the

14   Ukranian government -- access to Mr. Nikulin's computer?

15   A.   No, I did not.  And I previously explained why.

16   Q.   All right.  So I want to turn to some testimony you gave

17   regarding a different intrusion into a company called

18   Automattic.  Are you familiar with that?

19   A.   Yes, I am.

20   Q.   Mr. Nikulin was never charged with any crimes related to

21   the Automattic intrusion, was he?

22   A.   No, he was not.

23   Q.   And the Automattic intrusion isn't part of the evidence

24   against Mr. Nikulin in this case, is it?

25   A.   Some of the log files are relevant, yes.

**MILLER - CROSS / GASNER**

1   **Q.**   Relevant but he doesn't -- in the indictment, he is not

2   charged with any of that conduct related to the Automattic

3   intrusion; right?

4   **A.**   No, he is not.

5   **Q.**   There are multiple IP addresses associated with the

6   Automattic intrusion; correct?

7   **A.**   I believe so.  I would have to look at the logs but, yes.

8   **Q.**   Yeah.  And they don't match the IP addresses you used in

9   the Formspring, Dropbox or LinkedIn IP addresses, do they?

10  **A.**   I would have to look at the comparisons again.  The

11  entirety of the IP addresses used across all breaches and

12  across all accounts that were requested for subscriber

13  records --

14  **Q.**   Yeah.

15  **A.**   -- it is thousands so I don't have that memorized.

16  **Q.**   It is.  But you know that you are looking for very

17  specific IP addresses related to Mr. Nikulin.  For example, the

18  ones that end in .239?

19  **A.**   Yes, and others.

20  **Q.**   There is no "sputnik" listed in the browser in the user

21  agent string, is there?

22  **A.**   No.

23  **Q.**   This is regarding the Automattic case.

24          So -- and by the way, you interviewed a gentleman named

25  Barry Abrahamson in related to the Automattic intrusion; right?

1    **A.**   Yes, I did.

2    **Q.**   And you never heard Barry Abrahamson testify in this case,

3    did you?

4    **A.**   No, I did not.

5            **MR. GASNER:**  One moment.

6                        (Pause in proceedings.)

7    **BY MR. GASNER:**

8    **Q.**   So well then, Agent Miller, I want to ask you about

9    Alexsey Sipkin.  Okay?

10   **A.**   Okay.

11   **Q.**   Mr. Sipkin worked at a company called Alcatel-Lucent,

12   didn't he?

13   **A.**   Yes, he did.

14   **Q.**   And you investigated him way back in July of 2012

15   regarding the intrusion into the LinkedIn databases, didn't

16   you?

17   **A.**   Yes, I did.

18   **Q.**   And you asked his company, for example, as part of your

19   investigation to provide documents like his personnel file;

20   right?

21   **A.**   Yes, I did.

22   **Q.**   And, in fact, it was Alexsey Sipkin whose name was on your

23   original MLAT to Russia, right, regarding the IP address

24   subscriber information in this case?

25   **A.**   It was very early on in the investigation, but yes.

**MILLER - CROSS / GASNER**

1    **Q.**   And you suspected at that time early on in your

2    investigation based on what you knew that Alex Sipkin was

3    responsible for intrusions; correct?

4    **A.**    No.  At that time I knew Mr. Sipkin was responsible for

5    posting the data.  I had no connection to the actual intrusions

6    to Mr. Sipkin at that point.

7    **Q.**   Okay.  If you just give me one moment.

8                        (Pause in proceedings.)

9    **BY MR. GASNER:**

10   **Q.**   Can you articulate again what you just said about

11   Mr. Sipkin and why?

12   **A.**    In the beginning we identified DWDM, which was Mr. Sipkin,

13   as the poster of the LinkedIn data.  I identified IP addresses

14   associated with the breach at LinkedIn, but those two were not

15   mutually exclusive.  I didn't know if it was one in the same

16   person or not.

17   **Q.**   I see.  So was he also posting information with regard to

18   intrusions into eHarmony?

19   **A.**    I don't recall off the top of my head.

20   **Q.**   Okay.  I will return to that then.

21        May I -- because you don't recall, I'm going to show you

22   a -- oh, I see.  I'm going to show you an FBI report located at

23   YN001900 and ask you whether you have reviewed this report --

24   it was drafted by you -- and whether it refreshes your

25   recollection regarding that last question.  Okay?

MILLER - CROSS / GASNER

```
 1   A.    Okay.
 2              MR. GASNER:  Just showing it to the Government.
 3              MS. KANE:  Thank you.
 4              MR. GASNER:  Madam Clerk, this is just for the Agent,
 5   please.
 6   BY MR. GASNER:
 7   Q.    Agent Miller, this is a short report that I'm showing you.
 8   It is not a 302, as you can see.  It is a 1036.  Are you
 9   familiar with that form?
10   A.    Yes.
11   Q.    And this is regarding the MLAT return from the Russian
12   Federation regarding Mr. Sipkin, isn't it?
13   A.    Yes, it is.
14   Q.    If you would just look at the synopsis, please.
15   A.    Sure.
16   Q.    And when you are finished reviewing your report, would you
17   please kindly look up.
18                        (Pause in proceedings.)
19   BY MR. GASNER:
20   Q.    Isn't it true that you authored a report that said:
21   Synopsis, the Russian Federation response to the MLAT submitted
22   for the investigation of LinkedIn and eHarmony computer
23   intrusions by co-conspirators of Alexsey Sipkin.  Is that true?
24   A.    Yes, I authored that document.
25   Q.    Thank you.  So what you believe or what you were
```

**MILLER - CROSS / GASNER**

1  testifying to is that Mr. Sipkin was -- you don't believe

2  Mr. Sipkin was, for example, the coder, correct, in this

3  transaction of the database?

4  **A.**   When you say "coder," you mean --

5  **Q.**   Hacker.

6  **A.**   No.  All I knew at that time was he posted the data.  I

7  knew that was his role.

8  **Q.**   So you knew -- but you don't know what other roles he

9  might have had, do you?

10  **A.**   No.  This was very, very early on.

11  **Q.**   You don't know, for example, whether he could have been

12  the bruter; correct?

13  **A.**   Correct.

14  **Q.**   Because he was actually -- or he could have been

15  attempting to cash-out; correct?

16  **A.**   Correct.  However, since he posted the password hashes, it

17  was more likely that he was a bruter because I believe he is

18  asking for help.

19  **Q.**   Uh-huh.  Often when people hack into databases, they

20  receive hashed passwords; correct?

21  **A.**   If that was stored in the database, then yes.

22  **Q.**   And then the person that obtained those hashed passwords

23  might want help from someone called a bruter in order to unlock

24  those hashed passwords and see the plain text passwords; right?

25  **A.**   If they wanted to utilize the data for themselves, yes.

1    **Q.**   That appeared to be what Mr. Sipkin was looking to do;

2    correct?

3    **A.**   To use the data that he obtained, yes.

4    **Q.**   I mean, you just said he was looking for help; right?

5    **A.**   Yes, to crack the password hashes.

6    **Q.**   So I want to discuss another person.

7         Do you recall the name John List, L-I-S-T?

8    **A.**   I believe that was a name on one of the Google returns but

9    I'm not for sure.

10   **Q.**   You are correct, sir.

11        In September of 2012, you received evidence as a result of

12   a search warrant executed on Google that contained e-mails sent

13   to chinabig01@gmail; correct?

14   **A.**   Yes.

15   **Q.**   And this is, as we mentioned voluminously, part of your

16   ongoing investigation?

17   **A.**   Yes.

18   **Q.**   And did you find on March 3rd, 2012, chinabig01 received

19   an e-mail from support@web24com.?

20   **A.**   I believe he received an e-mail.  I don't know the exact

21   date.  But, yes, I know he received an e-mail from that

22   company.

23   **Q.**   Yes.  And the e-mail to chinabig01 from support@web24

24   stated that the chinabig01 e-mail account had been registered

25   with their help desk; right?

1   **A.**   If that's what it says, yes.

2   **Q.**   And to the extent that you feel I mischaracterize or you

3   want to refresh your memory, please let me know.

4   **A.**   Will do.

5   **Q.**   The registration was for a person named John List whose

6   address was listed in The People's Republic of China; right?

7   **A.**   I would have to see it but that sounds familiar, yes.

8   **Q.**   Would you like to see it to refresh your memory?

9   **A.**   Yes, please.

10          **MR. GASNER:**   Michelle, 1685.   Madam Clerk, just for

11  the Agent.

12          **THE CLERK:**   One moment, please.

13  **BY MR. GASNER:**

14  **Q.**   While we are doing that, the content of the return that

15  I'm going to be showing you is not just a pen register or a

16  trap and trace.   In this instance it would be a trap and trace

17  for what was received by chinabig01, but it actually includes

18  the contents; correct?

19  **A.**   So a search warrant?

20  **Q.**   Yes.

21  **A.**   Yes.

22  **Q.**   All right.   I'm just going to show you a 302 you authored

23  back in 2012.   This is page 3 of 10, halfway down the page.   If

24  you want me to go back or forth or need to see anything else on

25  your report, please let me know.   I can zoom in if you wish.

1              (Pause in proceedings.)

2         THE WITNESS:  Okay.

3    BY MR. GASNER:

4    Q.    Thank you.  Your memory is refreshed, sir?

5    A.    Yes.

6    Q.    So -- well, we will all just look at it.  So, Agent

7    Miller, isn't it accurate that on March 3rd, 2012, chinabig01

8    received anomalous activity e-mail from an accounts,

9    A-C-C-O-U-N-T-S, @web24.com.au.  And the e-mail was an invoice

10   for account 10172 made out to the following individual:

11   Mrs. John List, address, Glory S483/61, China?

12   A.    Yes, that's correct.

13   Q.    Next line:  China.  Copy:  People's Republic Of 54255.  Is

14   that accurate?

15   A.    Yes.

16   Q.    And isn't it true that just before that on March 3rd,

17   2012, at 3:08 a.m. chinabig01 received a confirmation e-mail

18   from support@web 24 .com.au that the following account had been

19   registered with their support desk:  Full name:  John List

20   (Mrs. John List).  E-mail:  Chinabig01@gmail.com.  And then

21   there is a password.  Is that accurate?

22   A.    Yes, it is.

23   Q.    Thank you.  And the date on that, again, March of 2012?

24   A.    Yes.

25         Based on my analysis of this account, there were numerous

**MILLER - CROSS / GASNER**

1    e-mails received with various names that seemed fictitious,

2    which would make sense because this account was created for

3    reconnaissance purposes.

4    **Q.**    That is an opinion, isn't it?

5    **A.**    Based on the facts, yes.

6    **Q.**    That is your opinion; right?

7    **A.**    That the account was used for reconnaissance?

8    **Q.**    Yeah.

9    **A.**    It was created after the intrusion, and it was used to

10   register for other services as well as reconnaissance for the

11   other victim companies, Dropbox and Formspring.

12           **MR. GASNER:**  So I object to lack of foundation.  Lack

13   of personal knowledge on the intent of whomever created it

14   unless this witness did.

15           **THE COURT:**  You -- but you asked the question.

16           **MR. GASNER:**  I asked the question, but he still has to

17   have personal knowledge.  And he didn't create it, so he can't

18   testify as to the mindset of anybody that did.

19           **THE COURT:**  Well, you asked the question so the answer

20   will stand.  The jury needs to understand the difference

21   between opinions and facts.

22       This investigator has investigated some things that he has

23   said he has no personal knowledge of, and he is drawing

24   inferences on.  And I believe you have the ability to know the

25   difference.  So it will stand in evidence, but you must keep in

```
 1   mind that an inference is only an inference.  It is only an

 2   opinion, and it might be wrong.  And you should evaluate what

 3   it is based on before you give any weight to such an inference

 4   or opinion.

 5        All right.  Please go ahead.

 6            MR. GASNER:  Thank you very much, Your Honor.

 7   BY MR. GASNER:

 8   Q.   During the course of your investigation, you did become

 9   interested -- particularly because of the LinkedIn intrusion --

10   with subscriber information related to an IP address ending in

11   .170; right?

12   A.   Can you advise of the first half of that IP, please?

13   Q.   170.

14   A.   The entire IP, yes.

15            MR. GASNER:  I might be able to look it up.  Hold on.

16                  (Pause in proceedings.).

17            THE COURT:  Next question, please.

18            MR. GASNER:  Yes, Your Honor.

19   BY MR. GASNER:

20   Q.   I will have to get back to that to give you the full

21   address.

22        I believe it is 178.140.107.170.

23   A.   Yes, I believe that's one of the two IPs that connected to

24   Mr. Berry's VPN.

25   Q.   Along with the .239 one; correct?
```

1    **A.**    That's correct.

2    **Q.**    And just because you asked, 178.140.105.239?

3    **A.**    Yes.

4    **Q.**    So you were interested in that, as you just said, because

5    it was associated with the anomalous connections to the

6    LinkedIn servers through Mr. Nick Berry's account; right?

7    **A.**    Yes.

8    **Q.**    And you received an MLAT return that indicated that on the

9    date and time in question of those IP connections; that the

10   .170 IP was associated with a person named Inga Tonkikh,

11   T-O-N-K-I-K-H?

12   **A.**    Yes.

13   **Q.**    And that person worked at the National Cable Network in

14   the Russian Federation; correct?

15   **A.**    I believe that was just a subscriber of that IP address.

16   I don't know where she worked.

17   **Q.**    Oh, I see.  It may not be relevant.  You don't remember

18   whether that was just subscriber information or whether the

19   person actually was employed there at NCN?

20   **A.**    I believe the information provided for all of the IPs was

21   the subscriber of those IPs as requested.

22   **Q.**    Okay.  May I show you --

23            **MS. KANE:**  That is in evidence.  That is Exhibit 85A.

24            **MR. GASNER:**  May we -- I will show it this way.

25       Your Honor, I would like to show what is in evidence as

MILLER - CROSS / GASNER

1   85A to the witness.

2               THE COURT:  Please.  Go ahead.

3               MR. GASNER:  And we can publish this to the jury.

4               THE COURT:  That should be coming through to the jury;

5   right?

6               MR. GASNER:  Yeah, it should.  It is in evidence.

7   BY MR. GASNER:

8   Q.   So just to be clear, because maybe I'm not, do you

9   recognize this document?

10  A.   Yes, I do.

11  Q.   And do you recognize -- and maybe it is just semantics

12  here that the connection on the date and time indicated in the

13  request from the dynamic IP address -- 178.140.107.170 -- was

14  established from the workstation of the network user of OAO

15  National Cable Networks?

16  A.   That's what it says, yes.

17  Q.   And it is your understanding that that workstation is that

18  person's private workstation, and they are not employed by that

19  company?

20  A.   That's correct.

21  Q.   I see.  And the full name of the person associated with

22  the 170 intrusion or IP address associated with the LinkedIn

23  intrusion is T-O-N-K-I-K-H, I-N-G-A, V-I-K-T-O-R-O-V-N-A?

24  A.   Yes.

25  Q.   And were you able to do further investigation into this

**MILLER - CROSS / GASNER**

1  person?

2  **A.**   I believe I found a social media profile for her, but I

3  don't believe it was a U.S. based.

4  **Q.**   Okay.  So you weren't able to execute any kind of warrant

5  or subpoena on their e-mails or otherwise?

6  **A.**   No.

7  **Q.**   The investigation stalled with regard to that person?

8  **A.**   Yes.

9  **Q.**   But they -- but the .170 is associated with the intrusion

10  into Nick Berry's computer; right?

11  **A.**   Yes, however, that IP address -- the connection times were

12  much smaller.  The 239 IP connected for 2 days and 7 hours.

13  And I believe the 170 IP connected for maybe 22 and 44 minutes.

14  **Q.**   Sure.

15  **A.**   Under an hour each I believe, so substantially less.

16  **Q.**   Substantially less.  But, nonetheless, not just a brief

17  misdial here; right?  There was -- actually, the connection was

18  maintained for longer than several seconds.

19  **A.**   Yes, but the total data transferred during those

20  connections was substantially smaller than the 239 IP.

21  **Q.**   You don't know what that person -- who that person is

22  or -- do you?

23  **A.**   According to the MLAT return, it is Ms. Inga.

24  **Q.**   You don't know anything about that person, though?

25  **A.**   No.

1    Q.    And you don't know who that person's associates are?

2    A.    No.

3    Q.    And you don't know what kind of information that person

4    shared about LinkedIn, do you?

5    A.    No.

6    Q.    But it does appear that that person compromised Nick

7    Berry's account, isn't it?

8    A.    Not necessarily.

9    Q.    Well, you said there is two connections that were more

10   than just several seconds; correct?

11   A.    Yes.

12   Q.    And so you don't know what that person was doing during

13   that connection, do you?

14   A.    No.  But the connection time and the data would suggest

15   that, if anything, it was small amounts of information was

16   taken compared to the 239 IP.

17   Q.    Sure.  But --

18   A.    I don't think the LinkedIn database file or the

19   information that was taken would have fit in that transfer

20   size.

21   Q.    Not during that connection; right?

22   A.    That's correct.  Well, those are the three connections to

23   Mr. Berry's VPN.

24   Q.    Got it.

25         But you don't know the contents of the information, do

1    you, that was transmitted in those two connections on the based

2    on .170?

3    **A.**   No, I do not.

4    **Q.**   You don't know what kind of information might have been

5    uploaded during that, do you?

6    **A.**   No.

7    **Q.**   So you don't know whether the .170 connection uploaded,

8    for example, malware, do you?

9    **A.**   I do not.

10   **Q.**   All right.  So -- and, by the way, just to be crystal

11   clear, you do know that Ms. Tonkikh was not authorized to

12   access Nick Berry's work computer, though; right?

13   **A.**   That's correct.

14   **Q.**   Okay.  Turning to a gentleman by the name of Alexsey

15   Belan, are you familiar with that name?

16   **A.**   I recognize the name, yes.

17   **Q.**   It exists on the poster behind me, doesn't it?

18   **A.**   Yes, it does.

19   **Q.**   And you believe he was involved in this case, don't you?

20   **A.**   No, I do not.

21   **Q.**   You don't think he had any involvement?

22   **A.**   Not with the LinkedIn, Dropbox or Formspring breaches, no.

23   **Q.**   So he wasn't indicted as a result of his actions?

24   **A.**   Not for these breaches, no.

25   **Q.**   And he is a Russian National?

```
 1   A.   Yes, he is.

 2   Q.   And you saw him on the video?

 3   A.   No, I did not.

 4   Q.   Did you see any pictures of him?

 5   A.   In the video or in general?

 6   Q.   Have you seen any pictures of him?

 7   A.   Yes, I have.

 8   Q.   Do you know -- going back to sort of how we started this

 9   examination -- whether Mr. Belan is listed as a Most Wanted

10   person by the FBI?

11   A.   Yes, I do.

12   Q.   And were you aware of that prior to today?

13   A.   Yes, I was.

14   Q.   Have you ever looked at his FBI Most Wanted poster?

15   A.   I helped initiate the first Wanted poster for Mr. Belan.

16        THE COURT:  Wait, wait.  Just a small point.  You say

17   Most Wanted.  Now the first one you used just said Wanted.  It

18   doesn't say Most Wanted.

19        MR. GASNER:  I probably misspoke.

20        THE COURT:  Maybe you misspoke.  Maybe he is just

21   wanted by the FBI.  So but -- you know, there are some people

22   like Al Capone, he was on the Most Wanted List so.

23                        (Laughter)

24        THE COURT:  But let's keep that distinction straight.

25        MR. GASNER:  Might depend on who you are asking.  It
```

1   might be Most Wanted by this Agent.

2   **BY MR. GASNER:**

3   Q.   Okay.  Well, that's helpful, Agent Miller.   If I showed

4   you a photograph of Mr. Belan, would you recognize him?

5   **A.**   Yes, I would.

6   Q.   If I showed you the Wanted By The FBI poster, would you

7   say that that was one that you have helped provide the

8   information for?

9   **A.**   The information -- so there is multiple cases that are

10  involved in that poster.   Mine were the earlier charges.   I had

11  no involvement in the 2017 indictment.

12  Q.   No.   You had -- you are aware that between January of 2012

13  and April of 2013, Belan is alleged to have intruded into the

14  computer networks of three major United States e-commerce

15  companies?

16  **A.**   Yes, I am.

17  Q.   So and to your knowledge, you know that Mr. Belan had

18  worked with the Russian Intelligence with regard to these

19  breaches?

20  **A.**   No, I did not.

21  Q.   Do you know that he has ever worked with Russian

22  Intelligence?

23  **A.**   I do not.   I have no firsthand knowledge of that, no.

24  Q.   Are you -- nonetheless, you would recognize him if you saw

25  him?

1  **A.**   I absolutely would.

2  **Q.**   All right.  I'm going to -- may I show you this Wanted By

3  The FBI poster to see if you would?

4  **A.**   Yes.

5          **MR. GASNER:**  Just for the witness, please.

6  **BY MR. GASNER:**

7  **Q.**   Agent Miller, are you -- what are you looking at?

8  **A.**   These are -- it is a Wanted By The FBI poster for Alexsey

9  Belan.

10 **Q.**   Does it look like a true and accurate representation of

11 the Wanted By The FBI poster that you are familiar with?

12 **A.**   Yes, it does.

13         **MR. GASNER:**  Your Honor, I would move to --

14         **MS. KANE:**  Objection.  Special Agent Miller testified

15 that there were -- there was a first poster.  I just want to

16 clarify with the question exactly what he is responding to.

17         **THE COURT:**  Fine.  I lost track of what you are trying

18 to do, Mr. Gasner.

19         **MR. GASNER:**  I'm -- well, I want to make sure that we

20 are talking about the same person, and I also want to ask him

21 some questions regarding his knowledge of Alexsey Belan, who is

22 a known person in this case.

23         **THE COURT:**  Didn't the Government put in some e-mails

24 and -- that dealt with Mr. Belan?  It seems like you did.

25         **MS. KANE:**  We did, Your Honor.  And my objection was

1   just to clarifying the -- that Special Agent Miller previously

2   testified about a first poster.

3           THE COURT:  Yeah.

4           MS. KANE:  I want to make sure that the question and

5   the answer are referring to the same thing, the same poster

6   here.  I just want to clarify.

7           THE COURT:  Okay.  But what are -- are you offering

8   this Wanted By The FBI poster?

9           MR. GASNER:  Yes.  I believe it is a true and accurate

10  representation of what it purports to be, and I have a question

11  about it.  If it is admitted, I'm able to ask that question.

12          MS. KANE:  We object to its admission into evidence on

13  relevance, hearsay and 403.

14          MR. GASNER:  I'm going to use it to impeach this

15  witness.

16          THE COURT:  Well, I'm going to let the pictures in.  I

17  let in the -- I don't know which part you are trying to use for

18  impeachment but --

19          MR. GASNER:  Line 2 under caution, Your Honor.

20          THE COURT:  Line 2 under caution, is that the -- is

21  that the one that he -- all of this -- I don't see anything

22  about 2017 here.

23          MR. GASNER:  Yes, Your Honor, under -- which one are

24  you looking at?

25          THE COURT:  No.  I'm looking at -- no wonder.  I'm

1    looking at the wrong one.  I'm looking at the Bogachev.

2         MR. GASNER:  Your Honor, tendering to the Court a copy

3    of what is before -- of what is before the witness although it

4    might be on your screen.

5         THE COURT:  I see.  Yes.  Are you saying that he

6    authored that paragraph?

7         MR. GASNER:  No.  I'm going to ask him regarding his

8    knowledge of this, though.

9         THE COURT:  That is not impeachment unless he authored

10   it.

11        MR. GASNER:  It certainly is.  People can be impeached

12   with almost all variety of information as long as it's

13   inconsistent with the witness' testimony.

14        THE COURT:  I don't think that's correct.  I don't

15   think that's correct.  But set up the supposed impeachment and

16   then let me -- and then I will rule on it after I hear if --

17   did he write -- did you write this paragraph?

18        THE WITNESS:  No, Your Honor.

19   BY MR. GASNER:

20   Q.   Let me ask you this, Agent Miller, is what you are looking

21   at, though, appear to be a true and accurate Wanted By The FBI

22   poster related to Alexsey Belan?

23   A.   Yes.

24   Q.   And that poster is put out by the Federal Bureau of

25   Investigations?

**MILLER - CROSS / GASNER**

1    **A.**    Yes.

2    **Q.**    Under the auspices of the Department of Justice?

3    **A.**    Yes.

4         **MR. GASNER:**  Your Honor, I think it is admissible and

5    has information therein that is inconsistent with this witness'

6    testimony.

7         **THE COURT:**  Possibly.  But it is not written by this

8    witness, so it is not proper impeachment.  So I'm not letting

9    you do that.

10        **MR. GASNER:**  Okay.  Well, nonetheless.

11        **THE COURT:**  It is just information inconsistent

12   generally with what the Government presented on this business

13   about the Russian Intelligence.  And so -- but it is not a

14   direct contradiction that this witness has made.  If we were to

15   allow that as impeachment, everything would come into evidence.

16   So, no, I don't think that's right.

17        **MR. GASNER:**  I think the argument that Your Honor just

18   made is the argument for its use in that regard.  But

19   understanding and respecting the Court's current ruling on

20   that, I do believe that it is admissible document and I can use

21   it for a broader argument.

22        **THE COURT:**  No.  Does it matter what he looks like?

23   That I would allow, the pictures into evidence so the jury can

24   see what this guy Belan looks like but -- if that's relevant in

25   the case.  But all of this other material about what he is

1    alleged to have done, I don't think that's -- I'm excluding it

2    also under Rule 403.  I think it is just too far afield.

3            **MR. GASNER:**  Understood, Your Honor.  I still have

4    some follow-up questions on it, but I know it is not in

5    evidence.

6            **THE COURT:**  All right.

7    **BY MR. GASNER:**

8    **Q.**    Agent Miller, so you have investigated Mr. Belan, haven't

9    you?

10   **A.**    Yes, I have.

11   **Q.**    And are you denying -- denying that Belan is alleged to

12   have conspired with Russian Intelligence Officers including

13   Dmitry Dokuchaev?

14   **A.**    What I'm saying is I was not involved in that

15   investigation, and I have no firsthand knowledge.

16   **Q.**    Okay.  But in the course of your investigation, have you

17   become aware that's the position of the United States

18   Government in this?

19   **A.**    Can you please specify which investigation, sir.

20   **Q.**    In the course of your -- preliminarily in the course of

21   your investigation into this case -- secondarily, in your

22   capacity as an expert in cyber crime for the Federal Bureau of

23   Investigations -- I would like to know whether or not you have

24   come into possession of information that would suggest that

25   Mr. Belan is alleged to have conspired with Russian

1   Intelligence Officers including Dmitry Dokuchaev?

2           THE COURT:  Now before you answer, he is not asking

3   about direct, personal, biblical knowledge.  That's the way you

4   have been answering.

5           THE WITNESS:  Yes.

6           THE COURT:  He is asking about information, hearsay or

7   otherwise, that you have come to your attention during the

8   course of anything as a professional within the FBI.  So it

9   could be hearsay.  It could be -- it is just the kind of stuff

10  that -- leads and so forth, other kind of information that

11  might have come to your attention even though it is not

12  directly -- directly involved in your investigation.  That's

13  what he is asking.

14      So what is the answer?

15          THE WITNESS:  I was aware of that based on that poster

16  and the indictment by the San Francisco field office, but that

17  was after my investigation of Mr. Belan previously and the

18  LinkedIn, Dropbox and Formspring breach.  It was well, well

19  after those occurrences.

20          THE COURT:  All right.  Next question.

21  BY MR. GASNER:

22  Q.  Just to clarify, your knowledge of that came well after

23  your investigation?

24          THE COURT:  No, don't use the word "knowledge"

25  because, see, that's biblical.  We don't want it to go there

1   because then if he didn't see it with his own eyes, that

2   doesn't count.  Just say "information."

3            MR. GASNER:  I see.

4   BY MR. GASNER:

5   Q.   The information that you received in this regard came to

6   you after the investigation into the intrusions into Dropbox,

7   Formspring and LinkedIn?

8   A.   Yes.

9   Q.   But you don't know -- well, strike that.  That's fine.

10                (Pause in proceedings.)

11  BY MR. GASNER:

12  Q.   So you became aware of that in 2017, is that what you

13  said?

14  A.   Yes, I believe so.  Yes.

15  Q.   And that -- the information that you received, was it or

16  was it not that Mr. Belan was an employee of the FSB?

17  A.   I don't know the exact wording.  I remember seeing

18  references to it on this Wanted poster.  Again, I was not

19  involved in that investigation, so I don't have the specific

20  details.

21  Q.   Okay.  Fair enough.  So you are not aware, are you, as to

22  whether or not -- to what extent and the details regarding his

23  cooperation with the Federal or FSB, otherwise known as Russian

24  Intelligence?

25  A.   I have no personal knowledge of that, no.

1   Q.   But you indeed are aware that that information is listed

2   as information in the poster; right?  That's how you got it.

3             MS. KANE:  Objection, Your Honor, this is now --

4             THE COURT:  Asked and answered.  We have been over

5   this 14 times.  Go to something new.

6             MR. GASNER:  I will not ask a 15th time, Your Honor.

7   I thank you for that.

8   BY MR. GASNER:

9   Q.   So turning to a gentleman by the name of Dokuchaev, do you

10  recognize that name?

11  A.   Yes.

12  Q.   That is D-O-K-U-C-H-A-E-V; right?

13  A.   Yes.

14  Q.   How do you know that name?

15  A.   It was with that indictment in 2017.

16  Q.   Okay.  And do you have knowledge or have you received

17  information with -- regarding Mr. Dokuchaev?

18  A.   Mr. Bogachev or Dokuchaev?

19            THE COURT:  I think he misspoke.

20            MR. GASNER:  Dokuchaev I said.

21            THE COURT:  Yes.

22            THE WITNESS:  As far as his involvement with?

23  BY MR. GASNER:

24  Q.   First of all, I'm asking do you -- you said you know who

25  he is; correct?

1   A.    Yes, I recognize the name.

2   Q.    But you recognize the name from some information beyond

3   just looking at a poster; right?

4   A.    I mean, I have seen his name referenced, yes.

5   Q.    Referenced in regards to?

6   A.    That investigation.

7   Q.    That investigation being?

8   A.    The 2017 investigation.

9   Q.    Into?

10  A.    The Yahoo! breach.

11  Q.    Okay.  And you are aware that his actual name, Dmitry

12  Dokuchaev, is an FSB Officer, aren't you?

13  A.    I don't have personal knowledge that he is an FSB Officer.

14  That is what is alleged on that poster.  And, again, I had no

15  personal knowledge of that investigation.

16  Q.    I understand that.  But you have received information

17  regarding this person; correct?

18  A.    Again, I have seen information on that poster, yes.

19  That's different than firsthand knowledge.

20  Q.    Yeah.

21  A.    Yes.

22  Q.    But the information that you received was that he was the

23  FSB Officer who directed, protected and paid the cyber hackers;

24  right?

25  A.    After -- alleged in 2017, which was numerous years after

1   the LinkedIn, Dropbox and Formspring breaches as well as the

2   other breaches I investigated Mr. Belan for.

3   Q.   Correct.  That's what I'm asking, I'm not asking you to

4   look back in time.  I'm asking whether you have the knowledge

5   that at least in the 2017 investigation into Yahoo! he was the

6   FSB Officer who directed, protected and paid the cyber hackers;

7   right?

8            MS. KANE:  Objection.  The Court excluded the document

9   and now it is being read.

10           MR. GASNER:  No, it is not.  I didn't read that

11  document.  That is a separate question.  That is incorrect, and

12  the witness didn't say yes.

13           THE COURT:  I think you are spending too much time on

14  this.  I will allow a couple more questions on it.  You are

15  trying to establish that the Government alleged that this

16  Dmitry guy, Dokuchaev, worked for the FSB and paid money to

17  hackers.  Is that what you are trying to establish?

18           MR. GASNER:  That's correct.

19           THE COURT:  Is that true; that's what the Government

20  itself alleged at some point?

21           THE WITNESS:  Yes, Your Honor, in 2017.

22           THE COURT:  Thank you.  Let's move to a new topic.

23           MR. GASNER:  Thank you, Your Honor.

24  BY MR. GASNER:

25  Q.   Agent Miller, you are familiar with Nikita Kislitsin, I'm

MILLER - CROSS / GASNER

1    certain; right?

2    A.    Yes, I am.

3    Q.    And he was identified by Secret Service Agent LaTulip in

4    prior testimony regarding the video from 2012; right?

5    A.    That's incorrect.  It was Special Agent Anton Mlaker from

6    the FBI.

7    Q.    Mlaker, sorry.  That is a typo on my part.  You understand

8    Kislitsin e-mail to be determined to be fyofyofyo@hotmail.com?

9    A.    Yes, sir.

10   Q.    And Kislitsin was determined to be responsible for, in

11   your view, the sale of the Formspring data?

12   A.    Yes.

13   Q.    And to your understanding, he is the one who communicated

14   with Mr. Belan; right?

15   A.    Yes, that's what the e-mail thread showed.

16   Q.    So your understanding is that these -- these parties in

17   your understanding may be part of the cash-out?

18   A.    Mr. Kislitsin, yes.

19                       (Pause in proceedings.)

20   BY MR. GASNER:

21   Q.    So in the conversations that you reviewed by

22   Mr. Kislitsin, do you remember him referencing a person named

23   Evgeniy or Yevgeniy or Zhenya?

24   A.    No, I do not.

25   Q.    And then with regard to a person named Oleg Tolstikh, do

**MILLER - CROSS / GASNER**

1    you know who that is?

2    **A.**    Yes, I do.  He was in the video in the conference room.

3    **Q.**    Have you -- it is your understanding he remains at large;

4    right?

5    **A.**    Yes, he does.

6    **Q.**    And so he has not been arrested in connection with any

7    criminal allegations against him in the United States; right?

8    **A.**    Not that I'm aware of.

9    **Q.**    To your knowledge, does he remain in Russia?

10   **A.**    I have no idea where he resides.

11   **Q.**    Did he -- in 2012 or shortly thereafter, did he -- to your

12   information, did he seek to legitimize his cyber crime

13   activities by becoming a founder of a Russian publicly listed

14   software company?

15   **A.**    I have no idea.

16   **Q.**    So you don't know a company that is called The Privy

17   Project?

18   **A.**    No.

19   **Q.**    So turning to the -- for example, the sale of the

20   Formspring data, you were able to follow some of the money with

21   regard to that sale; correct?

22   **A.**    Yes, I was.

23   **Q.**    And some of the money regarding that sale you followed

24   through some Western Union transactions?

25   **A.**    That's correct.

**MILLER - CROSS / GASNER**

1   Q.   And in any criminal investigation, part of your process is

2   to see who benefits from it, correct, monetarily?

3   A.   Yes, that's one aspect.

4   Q.   And if you can find money from -- going to or from any one

5   person, it may indicate that they were a part of criminal

6   activity; right?

7   A.   Yes.

8   Q.   You don't have any evidence that Mr. Nikulin ever got paid

9   or received anything for those data breaches, do you?

10   A.   No, I do not.  It was my understanding that Mr. Tolstikh

11   was the cash-out money man that would pass the money to the end

12   recipients.

13   Q.   Sure.  You don't know who the end recipients were, do you?

14   A.   The funds went, I believe, into a Russian account.  And

15   no.

16   Q.   And so you don't know who controlled that account?

17   A.   Well, I believe it was initially by Mr. Tolstikh.  And

18   where they went from there and who he paid, I do not know.

19   Q.   Okay.  So the money trail ran cold, so to speak?

20   A.   Yes.

21   Q.   But certainly didn't lead to Mr. Nikulin; right?

22   A.   But I have no nothing that would suggest that it did or it

23   did not.  It potentially could have.

24   Q.   Anything could have happened, right?

25   A.   Yes.

1   Q.   So the question is that you don't have any direct

2   information -- specific information that any money ever went to

3   Mr. Nikulin with regards to these breaches; right?

4   A.   No.

5            THE COURT:   Ambiguity again.

6            MR. GASNER:   Jumped on that again.

7   BY MR. GASNER:

8   Q.   Because you said "no," it creates an ambiguity.

9        Did to your knowledge Mr. Nikulin ever receive any

10  financial gain that you were able to track from these breaches?

11  A.   No.

12           MR. GASNER:   Agent Miller, it has been long days of

13  testimony from you.  I'm done.  Thank you.

14           THE WITNESS:   Thank you, sir.

15           THE COURT:   All right.  Thank you.  We are going to

16  take our break now for lunch.  Thirty minutes.  I heard that

17  you got two lunches each yesterday.  I just want you to know

18  how generous I am.

19                       (Laughter)

20           THE COURT:   And maybe I hope today you don't get zero

21  on account of that.  I'm going to let you go see what you have

22  got waiting for you.  Thank you.  Remember the admonition.

23       (Proceedings were heard outside the presence of the jury:)

24           THE COURT:   Have a seat, everybody.  So can you put up

25  on the screen the three fish pictures for a minute?  I want to

PROCEEDINGS

```
 1   see those.
 2            MR. GASNER:  Yes, Your Honor.
 3            THE COURT:  It is the one with the two guys that I am
 4   interested in.
 5            MR. GASNER:  Yes, I'm going to have to pull that up.
 6   One moment, please.  Just have to remind myself where it is
 7   located.
 8                       (Pause in proceedings.)
 9            THE COURT:  How long will the redirect be?
10            MS. KANE:  I would like to review my notes, but I
11   would anticipate maybe a half hour.
12            THE COURT:  Then I want you to do -- how long do you
13   need -- I want you to start at least your openings this
14   afternoon.
15            MS. WAWRZYNIAK:  Okay.
16            THE COURT:  Are you ready to do that?
17            MS. WAWRZYNIAK:  I am ready to do that, Your Honor.
18   I guess, like I said, it is about an hour and 15 minutes.
19            THE COURT:  It will have to go over to tomorrow but --
20   all right.
21            MR. GASNER:  Your Honor, publishing just to the Court.
22            THE COURT:  The one with the two guys.
23            MR. GASNER:  Oh, yeah, two guys and a fish.  Here I
24   can zoom it on it.
25            THE COURT:  I thought for a moment maybe that the
```

1  other guy was this guy Belan, but it doesn't look like the same

2  guy.  So --

3          **MR. GASNER:**  What kind of fish is that?

4          **THE COURT:**  What kind of fish is that?

5          **MR. GASNER:**  Yeah.

6          **THE COURT:**  Geez, I don't know.  What do you think it

7  is?

8          **MS. KANE:**  Looks like it has been dried or smoked or

9  something.

10          **MS. NECHAY:**  Barracuda.

11          **THE COURT:**  Maybe that's a Russian fish.  All right.

12  We are going to take our break now.

13          **MR. GASNER:**  12:30, Your Honor.

14          **THE COURT:**  Yeah, 12:30.  Thank you.

15          (Luncheon recess was taken at 11:58 a.m.)

16  **AFTERNOON SESSION**                                    **12:34 p.m.**

17      (Proceedings were heard in the presence of the jury:)

18          **THE COURT:**  Welcome back, ladies and gentlemen.  Be

19  seated.  Is the machine not on again?

20          **JUROR SERPA:**  Yes, it is off.  I think it turns off

21  every hour.

22          **THE COURT:**  Okay.  That's kind of like my brain.  My

23  brain times out too.

24                      (Laughter).  All right

25          **THE COURT:**  Now.  We are back to -- the Government

MILLER - REDIRECT / KANE

```
 1   gets to ask questions now on what is called redirect, but it

 2   won't be nearly as long as before.  So it will be a much

 3   shorter thing.  Please, go ahead.

 4          MS. KANE:  Thank you, Your Honor.

 5                    REDIRECT EXAMINATION

 6   BY MS. KANE:

 7   Q.   Good afternoon.

 8   A.   Good afternoon.

 9   Q.   I would like to start by showing you what has been

10   admitted as Government Exhibit 85.  So this is the --

11          MS. KANE:  It we switch to the ELMO, please.

12          THE CLERK:  Sure.

13   BY MS. KANE:

14   Q.   So do you recognize this?

15   A.   Yes, I do.

16   Q.   What is this?

17   A.   This is the Russian return from the MLAT.

18   Q.   Okay.  This is what you actually received through the MLAT

19   process you described?

20   A.   That's correct.

21   Q.   And what we looked at before was the translation?

22   A.   Yes.

23   Q.   Okay.  And this big blue stamp sealed here, that's part of

24   the response that you received?

25   A.   Yes, it is.
```

**MILLER - REDIRECT / KANE**

1  **Q.**   And there is a signature -- an original signature there?

2  **A.**   Yes.

3  **Q.**   And just paging through here, you can see there are

4  signatures and stamps throughout; is that right?

5  **A.**   That's correct.

6  **Q.**   And here is the page that refers to the .239 and .170 IP

7  addresses.  And you will see that in the original, this is on

8  letterhead it appears?

9  **A.**   Yes.

10  **Q.**   There is some handwriting and there is also a seal; is

11  that right?

12  **A.**   Yes, there is.

13  **Q.**   Now, I would like to turn to Exhibit 85.  This is the

14  translation of that document.

15      And you previously read the cover letter -- the first page

16  of 85A -- and you read that it includes a greeting and

17  describes what is being included.

18      And I just want to take a closer look here.  You can see

19  it's in the translation, of course, everything is typed.  So we

20  don't see the original signatures.  But it appears there is a

21  signature here and that has two initials; is that right?

22  **A.**   Yes, it does.

23  **Q.**   For the name.  And on this next page here, there is

24  another letter.  And can you just read what that says?  Are you

25  able to read that?

MILLER - REDIRECT / KANE

1    **A.**    Yes, I am.

2    **Q.**    Okay.

3    **A.**    (Reading:)  "Dear Sergey Mikhailovich:  We hereby forward

4    to you documents based on the request of the U.S. Department of

5    Justice to provide legal assistance regarding the case

6    instituted against A. Sipkin based on the facts of illegal

7    access to computer information, obtained in the territory of

8    Moscow in part concerning part VI para A.

9        Taking into consideration documents forwarded earlier, the

10   request of the U.S. law enforcement authorities has been fully

11   fulfilled."

12   **Q.**    All right.  And then it is signed.  There is a bracket

13   indicating there is a signature; right?

14   **A.**    Yes.

15   **Q.**    And then in the translation, the signature is typed?

16   **A.**    Yes.

17   **Q.**    What does it say?

18   **A.**    N.I. Shelepanov.

19   **Q.**    There is also letterhead here.  And what is the letterhead

20   on which it is printed?

21   **A.**    Head of the Directorate of Legal Assistance of the Main

22   Directorate of the International Legal Cooperation of Office of

23   the Prosecutor General of the Russian Federation.  3D class

24   state Counselor of Justice, S.M. Gribinyuchenko.

25   **Q.**    And there is another letter.  And this is also on

**MILLER - REDIRECT / KANE**

1  letterhead.  And, again, in the translation, it is just typed

2  like everything else.  What is the letterhead here?

3  **A.**  (Reading:)  "Attention:  Head of the Bureau of Special

4  Technical Projects of the Main Directorate of the Ministry of

5  Internal Affairs, BSTM GU MVD of Russia for the City of Moscow.

6  **Q.**  So it is being addressed to this person.  There is a name

7  there?

8  **A.**  Cornel of Justice V.V. Yurov.

9  **Q.**  And the letter -- if you just want to read it to yourself

10  and refresh your memory about it.

11                    (Pause in proceedings.)

12  **BY MS. KANE:**

13  **Q.**  Broadly speaking -- well, why don't you go ahead and read

14  it.

15  **A.**  (Reading:)  "Dear Vitaly Viktorovich, Department 5 of the

16  Control and Methodology Directorate of the Main Investigative

17  Directorate of the Main Directorate of the Ministry of Internal

18  Affairs KMU GSU GU MVD of Russia for the City of Moscow is

19  working to fulfill the request by the U.S. Department of

20  Justice to provide legal assistance in the criminal case

21  instituted against A. Sipkin based on the illegal access to

22  computer information.  In pursuance of the said request it is

23  necessary to receive details on the ownership of IP addresses:

24  77.88.25.23, 178.177.129.210; 95.131.179.30, 178.140.105.239;

25  178.140.107.170; during the period from November 1, 2011, until

1    July 1, 2012, with the mandatory completion of the certificate

2    of authenticity, para A of the request.

3         Based on the foregoing and pursuant to paragraph 4,

4    Article 21, Articles 38 and 457 of the Criminal Procedure Code

5    of the Russian Federation, please provide to us the information

6    requested above.

7         Enclosure:  Certificate of authenticity on one page.

8    Requested on five pages.  Total pages, six."

9    **Q.**    Again, it is signed by someone.  And this is the

10   translation.  We are seeing a typed signature.  And what is the

11   signature?

12   **A.**    S.N. Zdobnov.

13   **Q.**    Okay.  And it has that designation for that person's place

14   of employment.  What is that?

15   **A.**    Head of the Department 5 of the Control and Methodology

16   Directorate, Colonel of Justice.

17   **Q.**    And then down at the bottom it indicates it was prepared

18   by someone.  Do you see that?

19   **A.**    Yes.

20   **Q.**    What does it say?

21   **A.**    E.S. Karpushkin.

22   **Q.**    And do you recognize that name from earlier today?

23   **A.**    Yes, I do.

24   **Q.**    What was that?

25   **A.**    That was the name on the certificate of authenticity.

1   Q.   So based on looking at those letters and the signatures,

2   does it appear that it is common in Russia for signatures to

3   have initials for the first and second names?

4   A.   Yes.

5   Q.   Now, I want to turn to page 11 of Exhibit 85A.  And you

6   previously read this information when you were testifying.

7   This has the Defendant's name listed.  And when Mr. Gasner was

8   questioning you, he asked you a question about what it has on

9   the second set here for Inga Viktorovna Tonkikh.  He indicated

10  that there was something about it being established from the

11  workstation of a network user of OAO National Cable Networks

12  and suggested that might mean she was employed there.  Do you

13  recall that?

14  A.   Yes, I do.

15  Q.   Do you see looking at this document now that it has the

16  exact same information for the Defendant's name, the entry for

17  the .239 IP address as well?

18  A.   Yes, I do.

19  Q.   All right.  When you were talking earlier, you said

20  something to the effect that you were a layman to the Russian

21  language, I believe?

22  A.   That's correct.

23  Q.   So do you speak Russian?

24  A.   I do not.

25  Q.   Okay.  Can you read Russian?

**MILLER - REDIRECT / KANE**

1   **A.**   I cannot.

2   **Q.**   Based on your testimony here, there have been a number of

3   Russian documents that turned up in your investigation; is that

4   right?

5   **A.**   Yes.

6   **Q.**   And so did you have to have those translated?

7   **A.**   Yes, I did.

8   **Q.**   Did you use the same translator every time?

9   **A.**   I don't believe I did, no.

10  **Q.**   So how do you get documents translated when you come upon

11  something in one of your investigations?

12  **A.**   I put in a request to Language Services.  They identify a

13  translator for the specified language that has availability.

14  **Q.**   Okay.  And so you may get a one translator for a document

15  one time and a different translator for a document in the same

16  case another time; is that correct?

17  **A.**   That's correct.

18  **Q.**   And then do you ever have to do, like, a quick translation

19  when you don't have time to make a big request?

20  **A.**   Yes.

21  **Q.**   And when you do that, how do you get a quick translation?

22  **A.**   Just like anyone else, Google Translate.

23  **Q.**   Okay.  And you can do that to get a basic idea of what you

24  are looking at?

25  **A.**   It's for a gist of the --

MILLER - REDIRECT / KANE

1  **Q.**   Okay:

2  **A.**   -- the language.

3  **Q.**   And then in preparation for this trial, were additional

4  documents translated by services other than the FBI?

5  **A.**   Yes.

6  **Q.**   Okay.  So is it fair to say that all the different

7  Yevgeniys and Evgeniys we were looking at were not translated

8  by the same person?

9  **A.**   That's correct.

10 **Q.**   I would like to show you what has been admitted as Exhibit

11 76A.  And this is the original Russian of the Skype chats that

12 you looked at yesterday between dex.007 and vaiobro.

13      So in the Russian do you see the first blue name here and

14 you see that first word?

15 **A.**   Yes, I do.

16 **Q.**   And I know that you don't speak Russian or read Russian,

17 but can you recognize the shape of the first letters there?

18 **A.**   Yes, I can.

19 **Q.**   And that is something that you have seen in this

20 investigation a few times; is that right?

21 **A.**   Yes, I have.

22 **Q.**   Now I would like to go back to the original response to

23 the MLAT request we were looking at, and I would like to show

24 you the entry for that .239 IP address that was translated at

25 85A as the Defendant's name, Yevgeniy Alexandrovich Nikulin.

1    In English.  And do you recognize the same letters there in

2    Russian that we saw on the Skype chats previously?

3    **A.**    Yes, they are the same characters.

4    **Q.**    Okay.  Is that the characters here that begin with what

5    looks like an English E although it is in Cyrillic?  I don't

6    know what it is called.

7    **A.**    Yes.

8    **Q.**    And then I would like to bring up exhibit --

9            **MS. KANE:**  Can we bring this up just for the witness?

10   **BY MS. KANE:**

11   **Q.**    You testified yesterday that you had come upon the

12   Defendant's passport at some point, I believe?

13   **A.**    Yes.

14   **Q.**    Okay.  And that was in connection with these proceedings.

15   I just want to be clear, not in -- in your investigation?

16   **A.**    That's correct.

17   **Q.**    So I would like you to take a look at -- excuse me for a

18   minute.

19                        (Pause in proceedings.)

20            **MS. KANE:**  Exhibit 59.  Can we show this just to the

21   witness, please?

22            **THE WITNESS:**  I still see the ELMO screen.

23            **THE COURT:**  We have to switch it -- go back to the

24   electronic.

25            **MS. KANE:**  You know, I can use the copy that is here,

 1  Your Honor.  I can put that on the ELMO also if that's just for

 2  the witness.

 3          THE COURT:  Yeah, if that's easier for Tracy.

 4          THE WITNESS:  It is digitally on my screen now.

 5  BY MS. KANE:

 6  Q.  You can see what I'm showing here?

 7  A.  I see what is on the screen.  I see it in both, yes.

 8  Q.  All right.  Do you see what I have here?

 9  A.  No.

10          THE COURT:  We have to go into the witness --

11          THE WITNESS:  I see it but it is from Ms. Yee.  It is

12  not from the ELMO.

13          THE COURT:  So you are getting it off the computer?

14          THE WITNESS:  Yes.

15          MR. GASNER:  Why don't I just hand him a copy.  It

16  will make it go more quickly.  This is what has been identified

17  as Exhibit 59.  This is not in evidence.

18  BY MS. KANE:

19  Q.  Does that look like the copy of the Defendant's passport

20  that you have seen in connection with these proceedings?

21  A.  Yes, it is.

22  Q.  And do you recognize the same Russian characters that we

23  were just looking at on the Skype chats and on the MLAT

24  response on the Defendant's passport as well?

25  A.  Yes, I do.

**MILLER - REDIRECT / KANE**

1   **Q.**   And so all three of the names that we were looking at

2   begin with the same Russian letters, looks like an English E

3   and continues from there; is that right?

4   **A.**   Yes.

5   **Q.**   So it is the same -- appears to be the same name?

6   **A.**   Yes, it does.

7   **Q.**   Now, I would like to turn to a different topic.

8           **MS. KANE:**   We can take that off.

9   **BY MS. KANE:**

10  **Q.**   You discussed with Mr. Gasner an Evgeniy Bogachev, as you

11  will recall?

12  **A.**   Yes, I do.

13  **Q.**   Now, in investigating this case, you testified that you

14  had gotten subscriber records for many accounts.  You had

15  gotten search warrants.  So that gave you subscriber records

16  and IP addresses.  In any of those subscriber records or IP

17  addresses, did you find any connection to an Evgeniy Bogachev?

18  **A.**   No, I did not.

19  **Q.**   And in the MLAT response that we were looking at, was

20  Evgeniy Bogachev listed there?

21  **A.**   No, he was not.

22  **Q.**   Did his name appear in any document you received in the

23  evidence in this case?

24  **A.**   It did not.

25  **Q.**   While you were investigating this case regarding the

**MILLER - REDIRECT / KANE**

1    LinkedIn, Dropbox, Formspring and Automattic intrusions, did

2    you see any evidence regarding the use of a botnet in

3    connection with those intrusions?

4    **A.**   I did not.

5    **Q.**   And did you see any evidence of draining money from

6    victims' bank accounts?

7    **A.**   No, I did not.

8            **MR. GASNER:**  Your Honor, may I ask if Counsel ask

9    non-leading questions, please.

10           **THE COURT:**  These are narrowly directed questions but

11   they are on redirect.  And these are within the scope of your

12   cross-examination, so I will allow these narrowly directed

13   questions.

14           **MR. GASNER:**  Thank you.

15           **THE COURT:**  They are not leading, per se.  They are

16   just narrowly directed all right.  Go ahead.

17   **BY MS. KANE:**

18   **Q.**   Did you see any evidence of the Zeus Trojan?

19   **A.**   No, I did not.

20   **Q.**   Or something called GameOver Zeus?

21   **A.**   No.

22   **Q.**   I would like to show you -- this has been admitted as

23   Defense Exhibit Number 1 -- regarding Evgeniy Bogachev?

24           **MS. KANE:**  Can we show this on the ELMO, please?

25           **THE COURT:**  This is in evidence so everybody can see

1    it.

2    **BY MS. KANE:**

3    Q.    Do you see a date of birth listed on this poster?

4    A.    Yes, I do.

5    Q.    What is the date of birth listed there?

6    A.    October 28th, 1983.

7    Q.    Thank you.

8    A.    You are welcome.

9    Q.    We were looking a little while ago at a photo of an

10   individual with a fish and some other associated photos.  And

11   you found those photos, you testified, in the chinabig01@gmail

12   Google account contents; right?

13   A.    Yes, I did.

14   Q.    And you testified that you believed you knew the name of

15   that individual?

16   A.    Yes.

17   Q.    Or one of the people in the photos.

18         Did you investigate -- did you use that name as an

19   investigative lead?

20   A.    Yes, I did.

21   Q.    And in all the IP records and subscriber records you

22   obtained, did that name ever come up as one of the subscribers?

23   A.    No, it did not.

24   Q.    And in the LinkedIn, Dropbox and Formspring

25   investigations, those accounts that we were looking at, was

```
1    that one of the accounts?

2    A.    No, it was not.

3              MR. GASNER:  Pardon me.  Objection, vague.

4              THE COURT:  It is hard to hear you.

5              MR. GASNER:  I didn't understand that question.

6    Objection, vague.  A part of what accounts?

7              THE COURT:  Were you talking about the Gmail account?

8              MR. GASNER:  No.  I was asking about -- I will make it

9    more specific.  That's fine.

10             THE COURT:  Please.

11   BY MS. KANE:

12   Q.    The LinkedIn accounts that we looked at -- we looked at

13   two exhibits that had sets of LinkedIn accounts that had been

14   involved as compromised accounts or possibly the account

15   responsible, and that was the chinabig01 account; right?

16   A.    Yes.

17   Q.    And did you find any connection between that name and any

18   of those accounts other than that one photo?

19   A.    No, I did not.

20   Q.    We looked at the name Inga Tonkikh from the MLAT response.

21   And did that name come up as a subscriber in any of the records

22   that you received in your investigation?

23   A.    No, it did not.

24             MR. GASNER:  Objection --

25             MS. KANE:  Other than the MLAT response that I was
```

 1  talking about.

 2          MR. GASNER:  Objection.  That misstates the evidence.

 3  The name came up in the subscriber information from Russia.

 4          THE COURT:  Other than that.

 5          MS. KANE:  Yes.  Other than that.

 6          THE COURT:  Ask the question again.  Say "other than

 7  the subscriber information from Russia."

 8  BY MS. KANE:

 9  Q.   Other than the subscriber information on the MLAT response

10  from Russia that we just looked at, did that name come up on

11  any of the subscriber accounts or the IP addresses that you

12  were looking at in this investigation?

13  A.   No, it did not.

14  Q.   For the chinabig01@gmail account contents that you

15  received, the Defense Counsel was asking you about some of the

16  e-mails that had been received into that account that you saw.

17  And these were included in one of the reports you wrote.  You

18  didn't remember the specifics, so he showed you your report.

19      And you saw that one of the names to which e-mails were

20  addressed in that account was John List -- a Mrs. John List; is

21  that right?

22  A.   Yes.

23  Q.   Do you recall some of the other names, if there were any

24  other names, to which e-mails messages were addressed in that

25  account?

MILLER - REDIRECT / KANE

1    **A.**    There were quite a few.  I don't remember the exact names.

2    I would have to see my reports, but I think one might have been

3    ASDF or something alone those lines, china -- they were kind of

4    all over the place.

5    **Q.**    If I were to show you that same report, would that refresh

6    your recollection as to some of the names on that account?

7    **A.**    Yes, it would.

8                        (Pause in proceedings.)

9            **MS. KANE:**  I can either put it on the ELMO or hand

10   this to the witness.  This should be shown just the witness.

11           **THE COURT:**  Hand it to the witness.

12   **BY MS. KANE:**

13   **Q.**    Take a look and then put it to the side, please.

14                       (Pause in proceedings.)

15   **BY MS. KANE:**

16   **Q.**    Does that refresh your recollection?

17   **A.**    Yes, it does.

18   **Q.**    Do you remember some of the other names that you saw in

19   that account?

20   **A.**    Yes.  One was ASD.  One was Sasha.  One was China.  Many.

21   **Q.**    Okay.

22           **MS. KANE:**  I can take that back.

23   **BY MS. KANE:**

24   **Q.**    In reviewing the contents of that account, that included

25   search history; is that right?

**MILLER - REDIRECT / KANE**

1   A.   Yes.

2   Q.   And I'm sorry.  Let me go back to the e-mail messages for

3   a moment.  I apologize.

4        You were asked about something that said someone lived in

5   China in one of the e-mail messages received in the account.  I

6   think it indicated that Mrs. John List might have lived in

7   China; is that right?

8   A.   Yes, that was.

9   Q.   Did you see indications of other nationalities in that

10  e-mail account?

11  A.   Yes, I did.

12  Q.   And what was that?

13  A.   There were e-mails in English, German, I believe, Russian.

14  Q.   Okay.  Do you recall seeing in any in Chinese?

15  A.   I don't.

16  Q.   Now you reviewed the search history, and there were some

17  exhibits that we admitted yesterday that included the search

18  history on that account.

19       So that's the search history, you testified, that is saved

20  by Google for what people search for when they are Googling?

21  A.   That's correct.

22  Q.   And what languages were -- language or languages were the

23  search histories in?

24  A.   Russian and English.

25            **MS. KANE:**  Thank you, Your Honor.  I have no further

MILLER - RECROSS / GASNER

1   questions.

2           THE COURT:  May we now excuse the witness?

3           MR. GASNER:  Well, just one moment, please.

4                   (Pause in proceedings.)

5                   **RECROSS-EXAMINATION**

6   BY MR. GASNER:

7   Q.   Agent Miller, just a little bit of recross for just a

8   moment on your knowledge of the malware GameOver Zeus do you

9   remember being asked that question?

10  A.   I was asked if it was found anywhere or if I saw

11  references to it, yes.

12  Q.   Right.  But you are not -- you claim not to be familiar

13  with the GameOver Zeus malware, are you?

14  A.   Well, I don't know the specifics; but the malware that was

15  found was Madnez which was not -- and that was the only malware

16  that was found.

17          MR. GASNER:  Understood.  One moment.

18                  (Pause in proceedings.)

19          MR. GASNER:  Thank you.  Nothing further.

20          MS. KANE:  Your Honor, the United States rests.

21          THE COURT:  All right.  Thank you.  Agent, you may

22  step down.  Put your mask back on.

23      All right.  So at this time, Mr. Gasner, I will -- I will

24  allow you to deem that any Rule 29 motion has been made at this

25  point and will be addressed later.  But to save time for the

1    jury, it now goes to the Defense.  You are not obligated to put

2    on any defense, of course, but you have the option.  Do you

3    wish to present any evidence?

4            MR. GASNER:  Your Honor, thank you very much.

5        No.  The Defense rests.

6            THE COURT:  All right.  So after a lot of evidence, we

7    have reached in quick order two important milestones.  All of

8    the evidence that you are going to hear in the courtroom has

9    now been heard.  So we are now ready to do a couple of things.

10           Could I see those instructions, please?

11                        (Pause in proceedings.)

12           THE COURT:  Thank you.

13       We have the following left to do.  I need to educate you

14   on what the law is.  Most of us go to law school for three

15   years.  You get to go to law school for 45 minutes, but it is

16   important because we have refined what the law is that you need

17   to know for this case and so you will be up to speed on the

18   law.

19       In addition, we need to have the lawyers make their

20   closing arguments, so they can tie in the facts and evidence

21   that you have heard to what they -- how they think it applies

22   to the law in this case.  And then you get to go deliberate.

23       Now, we only have 50 minutes left today.  And what I have

24   been trying to do is balance in my mind how to give -- be as

25   fair as I can to the lawyers so that they don't have their

1   arguments interrupted and at the same time decide on how to do

2   the jury instructions.

3       So what I'm going to do -- I think I have got a good

4   solution.  I'm going to read about two-thirds of the jury

5   instructions to you now and then we are going to break for the

6   day.

7       And then when we come back tomorrow, we will have the

8   closing arguments.  And then after that, I will read the last

9   one-third of the instructions to you.

10      Let me just see.  Does Counsel have any heartburn over

11  that?

12          **MS. KANE:**  No, Your Honor.

13          **MR. GASNER:**  No, Your Honor, that's fine.

14          **THE COURT:**  Great.  So that's a pretty good way to go.

15      Now, let me talk about schedule before we get into reading

16  the instructions.

17      I think you should consider -- but you are not required

18  to -- consider staying past 2:00 o'clock tomorrow, but that's

19  up to you.  But you-all need to agree on it, what you are going

20  to do.  Have you talked about that?  Have you reached any

21  agreement on that?  You have?  You have reached a unanimous

22  agreement on whether to stay past 2:00 o'clock.  Tell me what

23  the answer is.

24          **JUROR SERPA:**  Yes.

25          **THE COURT:**  You want to stay past 2:00 tomorrow?

1    **JUROR SERPA:**  Yes.

2        **THE COURT:**  Okay.  So I am going to give time limits

3    to the lawyers on their closing arguments so when the curtain

4    comes down, it comes down.  So I -- and they are going to have

5    lots of time; but when the curtain comes down, it's over.

6        So I have a pretty good idea that the case will go to you

7    for decision -- about when it would go to you for decision.

8    But I also have another question is -- and that is do you want

9    to come in early tomorrow.  We failed utterly this morning,

10   didn't we?

11                        (Laughter)

12       **THE COURT:**  But in order -- if we do that, you-all

13   have to agree to be -- otherwise, it is just a waste of your

14   time to sit around here.  I don't mind wasting my time.  Don't

15   worry about me.  It is your time that I worry about.

16       So if you wanted to come in an hour earlier so that you

17   would be here at 7:45 and we would start no later than 8:00,

18   that would give us a fighting chance to have the case go to you

19   by noon.  But raise your hand if you -- if you promise me you

20   could be here by 7:45 and commit to do that.

21       (Jurors indicating)

22       **THE COURT:**  Help me out here.  Is that everybody?

23       **JUROR SERPA:**  Yes, Your Honor.

24       **THE COURT:**  All right.  That's everybody.  So we will

25   do that.  That's what we were going to do today, but we wound

PROCEEDINGS

1   up starting late, not early.  No flat tires.

2                          (Laughter)

3          **THE COURT:**  None of that.  You have got to be here.

4   So that means you probably got to get up earlier than you -- in

5   other words, try to be here at 7:30 instead of 7:45.

6          Okay.  So that's going to be our plan.  Now I know we

7   have -- no.  I'm not even going to go there yet.  We have --

8   what we are going to do now is turn to the jury instructions

9   where I tell you what is the final charge to the jury.  And I'm

10  going to read this and you will have a copy of this in the jury

11  room to look at if you need to.

12         But going all the way back to -- not quite the Stone

13  Age -- but going all the way back to Common Law, the way the

14  jury learned the law was through the Judge instructing the jury

15  on the law.  And that is what is about to happen now.

16         So this is a -- a time-honored procedure, but it is

17  required by law that I tell you -- I can't just give you a

18  copy.  I have to actually instruct you verbally on what the law

19  is.  This is divided into three parts.  It is like a sandwich.

20         There is the preliminary instructions about burdens of

21  proof and so forth.  Those are very important.

22         And then at the very end there are some concluding

23  instructions.

24         And then in the middle is the meat.  It is like a

25  sandwich.  The meat which tells you what each of the counts are

1    and what has got to be proven to prove those counts.

2        So we will see how far I can get on this.  I think I can

3    get at least two-thirds of the way through this, and then we

4    will break for the day.

5        You don't have to take notes.  It is up to you.  But

6    please listen carefully to the reading of the instructions.

7    Here I go.

8                    **JURY INSTRUCTIONS**

9        **THE COURT:**  Members of the jury, it is now my duty to

10   instruct you on the law that applies to this case.  A copy of

11   these instructions will be available in the jury room for you

12   to consult as necessary.

13       It is your duty to weigh and to evaluate all the evidence

14   received in the case and in that process to decide the facts.

15   It is also your duty to apply the law as I give it to you to

16   the facts as you find them, whether you agree with the law or

17   not.

18       You must decide the case solely on the evidence and the

19   law.  Do not allow personal likes or dislikes, sympathy,

20   prejudice, fear or public opinion to influence you.

21       You should not be influenced by any person's race, color,

22   religious beliefs, national ancestry, sexual orientation,

23   gender identity, gender, economic circumstances, or position in

24   life or in the community.

25       You will recall that you took an oath promising to do so

 1   at the beginning of the case.

 2       You must follow all of these instructions and not single

 3   out some and ignore others.  They are all important.  Please do

 4   not read into these instructions or into anything I may have

 5   said or done, any suggestion, as to what verdict you should

 6   return.  That matter is entirely up to you.

 7       The United States Government charges Defendant with nine

 8   counts.  Three counts of obtaining information from a protected

 9   computer in violation of Title 18, United States Code, Section

10   1030(a)(2)(C).

11       Two counts of intentional damage to a protected computer

12   in violation of Title 18, U.S. Code, Section 1030(a)(5)(A).

13       Two counts of aggravated identity theft in violation of

14   Title 18, U.S. Code, Section 1028A.

15       One count of conspiracy to traffic in unauthorized access

16   devices in violation of Title 18, United States Code, Section

17   371; and one count of trafficking in unauthorized access

18   devices in violation of Title 18, United States Code, Section

19   1029(a)(2).

20       The charges against the Defendant are contained in the

21   indictment.  The indictment simply describes the charges that

22   the Government brings against the Defendant.  The indictment is

23   not evidence and does not prove anything.

24       I'm going to repeat that sentence because it is very

25   important.  The indictment is not evidence and does not prove

anything.

A separate crime is charged against the Defendant in each count.  You must decide each count separately.  Your verdict on one count should not control your verdict on any other count.

You are here only to determine whether the Defendant is guilty or not guilty of the charges in the indictment.  The Defendant is not on trial for any conduct or offense not charged in the indictment.

The Defendant has pleaded not guilty to the charges against him and is presumed innocent unless and until the Government proves the Defendant guilty beyond a reasonable doubt.

The Defendant does not have to testify or present any evidence.  I'm going to repeat that sentence.  The Defendant does not have to testify or present any evidence.  The Defendant does not have to prove innocence.

The Government has the burden of proving every element of the charges beyond a reasonable doubt.

Let me explain what that means.  Proof beyond a reasonable doubt is proof that leaves you firmly convinced that Defendant is guilty.

It is not required, however, that the Government prove guilty beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation.  It may arise

from a careful and impartial consideration of all the evidence
or from a lack of evidence.

If, after careful and impartial consideration of all the
evidence, you are not convinced beyond a reasonable doubt that
the accused is guilty as charged, it is your duty to find him
not guilty.

On the other hand, if after a careful and impartial
consideration of all the evidence, you are convinced beyond a
reasonable doubt that the accused is guilty as charged, it is
your duty to find him guilty.

The indictment charges that certain offenses were
committed "on or about" or "approximately" on certain dates.

Although it is necessary for the Government to prove
beyond a reasonable doubt that each offense was committed on a
date reasonably near the respective date alleged in the
indictment, it is not necessary for the Government to prove
that the offense was committed precisely on the date alleged.

A Defendant in a criminal case has a constitutional right
not to testify.  In arriving in your verdict the law prohibits
you from considering in any manner that the Defendant did not
testify.

The evidence you are to consider in deciding what the
facts are consists of the sworn testimony of any witness, the
exhibits that are received in evidence and any facts to which
the parties agree.  And you know in this case we had a lot of

1    stipulations, so those were agreed-upon facts.

2        The following things are not evidence and you may not

3    consider them in deciding what the facts are:

4        First, questions, statements, objections and arguments by

5    the lawyers are not evidence.  The lawyers are not witnesses.

6    Although you must consider a lawyer's questions to understand

7    the answer of a witness, the lawyer's questions are not

8    evidence.

9        Similarly, what the lawyers have said in their opening

10   statements and their closing arguments and at other times is

11   intended to help you interpret the evidence but it is not

12   evidence.

13       If the facts, as you remember them, differ from the way

14   the lawyers state them, your memory of them controls.

15       Any testimony that I have excluded, stricken or instructed

16   you to disregard is not evidence.

17       In addition, some evidence was received only for a limited

18   purpose.  When I have instructed you to consider certain

19   evidence in a limited way, you must do so.

20       Anything you may have seen or heard when the court was not

21   in session is not evidence.

22       Now, evidence may be direct or circumstantial.  Direct

23   evidence is direct proof of a fact such as testimony by a

24   witness about what that witness personally saw or heard or did.

25       Circumstantial evidence is indirect evidence; that is,

1   proof of one or more facts from which you can find another

2   fact.

3        By way of example, if you wake up in the morning and see

4   that the sidewalk is wet, you may find from that, that it

5   rained during the night.  However, other evidence such as a

6   turned on garden hose may explain the presence of water on the

7   sidewalk.

8        Therefore, before you decide that a fact has been proven

9   by circumstantial evidence, you must consider all of the

10  evidence in light of reason, experience and common sense.

11       You are to consider both direct and circumstantial

12  evidence.  Either can be used to prove any fact.  The law makes

13  in distinction between the weight to be given to either direct

14  or circumstantial evidence.  It is for you to decide how much

15  weight to give any evidence.

16       I'm going to repeat that.  It is for you to decide how

17  much weight to give to any evidence.

18       You have heard testimony alleging that the Defendant is

19  alleged by the Prosecution to have intentionally accessed

20  computers at a company called Automattic without authorization

21  in July 2013.  This evidence of other acts was admitted only

22  for limited purposes.

23       You may consider this evidence only for the purpose of

24  deciding whether the Defendant acted with a method of operation

25  as evidenced by a unique pattern; namely, that Defendant used

1    stolen credentials to access employee accounts and then used

2    compromised employee accounts to conduct cyber attacks on other

3    employee accounts.  And you may use it for the purpose of

4    deciding whether the Defendant is the person who committed the

5    crimes charged in the indictment.

6         Of course, it is for you to determine whether you believe

7    this evidence.  And if you do believe it, whether you accept it

8    for the purposes offered.

9         You may give it such weight as you feel it deserves but

10   only for the limited purpose that I have described for you.

11        The Defendant is not on trial for committing these other

12   acts.  And I'm referring now to the Automattic scenario.  You

13   may not consider the evidence of these other acts as a

14   substitute for proof that the Defendant committed the crimes

15   charged.

16        You may not consider this evidence as proof that the

17   Defendant has a bad character or any propensity to commit

18   crimes.

19        Specifically, you may not use this evidence to conclude

20   that because the Defendant may have committed the other acts,

21   he must have also committed the acts charged in the indictment.

22        Remember, that the Defendant is on trial here only for the

23   nine counts charged in the indictment, and not for these other

24   acts involving Automattic.

25        Do not return a guilty verdict unless the Government

1   proves the crimes charged in the indictment beyond a reasonable

2   doubt.

3       In deciding the facts in this case -- sorry.  I'm going to

4   remove my mask.  It is interfering.

5       In deciding the facts in this case, you may have to decide

6   which testimony to believe and which testimony not to believe.

7       You may believe everything a witness says or part of it or

8   none ever it.

9       In considering the testimony of any witness, you may take

10  into account:  One, the witness' opportunity and ability to see

11  or hear or know the things testified to; the witness' memory,

12  the witness' manner while testifying, the witness' interest in

13  the outcome of the case, if any; the witness' bias or

14  prejudice, if any; whether other evidence contradicted the

15  witness' testimony; the reasonableness of the witness'

16  testimony in light of all the evidence; and any other factors

17  that bear on believability.

18      Sometimes a witness may say something that is not

19  consistent with something else he or she said.

20      Sometimes different witnesses will give different versions

21  of what happened.

22      People often forget things or make mistakes in what they

23  remember.

24      Also, two people may see the same event but remember it

25  differently.

1    You may consider these differences, but do not decide the

2    testimony is untrue just because it differs from other

3    testimony.

4    However, if you decide that a witness has deliberately

5    testified untruthfully about something important, you may

6    choose not to believe anything that witness said.

7    On the other hand, if you think the witness testified

8    truthfully about some things but -- I believe there is a

9    mistake here -- if you think the witness testified untruthfully

10   about some things but told the truth about others, you may

11   accept the part that you think is true and ignore the rest.

12   The weight of the evidence as to a fact does not

13   necessarily depend on the number of witnesses who testified

14   about it.

15   What is important is how believable the witnesses are and

16   how much weight you think their testimony deserves.

17   You have heard testimony that the Defendant made a

18   statement.  It is for you to decide:  One, whether the

19   Defendant made the statement.  And, two, if so, how much weight

20   to give it.  And in making those decisions you should consider

21   all of the evidence about the statement including the

22   circumstances under which the Defendant may have made it.

23   Now, we will turn to the specific counts charged in this

24   case.  A separate crime is charged in each count.  You must

25   decide each count separately.  The indictment charges nine

counts.  Your verdict must be unanimous as to each of the nine.

So let me explain that.  That is not very well written, is it?  Any verdict must be unanimous, and you must decide each count one at a time, separately, although you can do it in any order you want.

So as to each of the nine counts if you reach a verdict, that verdict must be unanimous as to that count.  So then you just go through all of the counts, and you have to be unanimous.  Unanimous means everybody agrees.  No dissents like the Supreme Court, no, this is -- you have to be unanimous.

All right.  The Defendant is charged in Counts One, Four and Seven of the indictment with unlawfully obtaining information from a protected computer in violation of Section 1030(a)(2)(C) of Title 18 of the United States Code.

In order for the Defendant to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt:

First, the Defendant intentionally accessed without authorization or exceeded authorized access to a computer; and, second, by accessing without authorization or exceeding authorized access to a computer, the Defendant obtained information from a computer that was used in or affecting interstate or foreign commerce or communication or located outside the United States but that computer was used in a manner that affected interstate or foreign commerce or

1    communication of the United States.

2        Is that really the way it reads?  That sounds goofy to me.

3    I'm going to read it again.  But the lawyers help me out here.

4    Did we leave a word out maybe?

5        By accessing without authorization or exceeding authorized

6    access to a computer, the Defendant obtained information from a

7    computer that was used in or affecting interstate or foreign

8    commerce or communication or located outside the United States

9    but that computer was used in a manner that affected interstate

10   or foreign commerce or communication of the United States.

11       Now, that's what the lawyers stipulated to and I'm going

12   to ask them to double-check that language before we resume

13   tomorrow.

14       If you find the Government has provided -- if you find the

15   Government has proved these two elements beyond a reasonable

16   doubt, then you must also determine whether the Government has

17   proved either of the following beyond a reasonable doubt:

18       A, that the offense was committed for the purpose of

19   commercial advantage or private financial gain or that the

20   value of the information obtained exceeded $5,000.

21       Now we go to Count Two.  And will the Defendant is charged

22   in Counts Two and Eight of the indictment with transmitting a

23   program, information, a code or a command to a computer

24   intending to cause damage in violation of Section 1030(a)(5) of

25   Title 18 of the United States Code.

In order for the Defendant to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt:

First, the Defendant knowingly caused the transmission of a program, information, a code or a command to a computer.

Second, as a result of the transmission the Defendant intentionally impaired without authorization the integrity, availability of data, a program, a system or information; and

Third, the computer was used in or affected interstate or foreign commerce or communication or was located outside the United States but was used in a manner that affects interstate or foreign commerce or communication of the United States.

If you find the Government has proved these three elements beyond a reasonable doubt, then you must also determine whether the Government has proved beyond a reasonable doubt that the offense caused loss to one or more persons during any one-year period aggregating at least $5,000 in value.

A corporation is considered a person for these purposes.

As used in Section 1030 of Title 18, the term "computer" means an electronic, magnetic, optical, electrochemical or other high speed data processing device performing logical, arithmetic or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device but such term does not include an automated typewriter or typesetter, a portable

hand-held calculator or any similar device.

The Defendant is charged in Counts Three and Nine of the indictment with aggravated identity theft in violation of Section 1028A of Title 18 of the U.S. Code.

In order for the Defendant to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt:

First, the Defendant knowingly possessed or used without legal authority a means of identification of another person.

Second, the Defendant knew that the means of identification belonged to a real person.

And, third, that the Defendant did so during and in relation to violations of Title 18, United States Code, Section 1030(a)(2)(c) and (c)(2)(B)(i) and (iii).

The term "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual including any name, social security number, date of birth, official state or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer ID number; unique electronic identification number, address or routing code or access device.

The term "access device" as used here means any card, plate, code, account number, electronic serial number, mobile identification number, personal identification number, or other

1   means of account access that can be used, alone or in

2   conjunction with another access device, to obtain money, goods,

3   services, or any other thing of value or that can be used to

4   initiate a transfer of funds other than a transfer originated

5   solely by paper instrument.

6       The Defendant is charged in Count Six -- let me pause here

7   just to interrupt this for a second -- I'm going to give you

8   also a special verdict form and it asks the questions -- I will

9   just read you the first one.

10      Has the Government proven beyond a reasonable doubt that

11  Defendant, Yevgeniy Nikulin, is guilty of computer intrusion in

12  violation of Title 18, United States Code, Section 10(a)(2) as

13  charged in Count One of the indictment.  That is, on or

14  approximately March 3rd, 2012, and continuing until about

15  March 4, 2012, in the Northern District of California and

16  elsewhere, the Defendant used the internet to access computers

17  belonging to LinkedIn Corporation and obtained information.

18      So the -- so that's the LinkedIn one.  And so each -- the

19  special verdict form is going to break it out by all nine

20  counts, by each company and each -- you know, like March 2012.

21  So you -- this will help guide you in understanding what the

22  indictment alleges more specifically.

23      So I know when I have been reading to you these counts,

24  you have been saying to yourself:  Well, where is LinkedIn?  I

25  haven't heard anything about that.  That is going to be in the

special verdict form.

All right.  Okay.  We are -- we are doing pretty good.  We are going to get to where I thought we would.  Bear with me now.  I'm going to go back to reading the instructions.

The Defendant is charged in Count Six of the indictment with trafficking -- trafficking in unauthorized access devices during a period of one year in violation of Section 1029(a)(2) of Title 18.

In order for the Defendant to be found guilty of that charge, the Government must prove each of the following elements beyond a reasonable doubt:

First, the Defendant knowingly trafficked in the unauthorized access devices at any time during a one-year period beginning on or about June 1, 2012, and ending on or about May 31, 2013.

Second, by trafficking in the unauthorized access devices during that period, the Defendant obtained anything of value worth $1,000 or more during that period.

Third, the Defendant acted with the intent to defraud.

And, fourth, the Defendant's conduct in some way affected commerce between one state and another state or between a state of the USA and a foreign country.

An "access device" means any card, plate code, account number, electronic serial number, mobile identification number, personal identification number, or other means of account

access that can be used, alone or in conjunction with another

access device, to obtain money, goods, services or any other

thing of value, or that can be used to initiate a transfer of

funds, other than a transfer originated solely by paper

instrument.

An "unauthorized access device" is any access device that

is lost, stolen, expired, revoked, concealed or obtained with

the intent to defraud.

To "traffic" in an access device means to transfer or

otherwise dispose of it to another, or to obtain control of it

with intent to transfer or to dispose of it.

An act is done knowingly if the Defendant is aware of the

act and does not act through ignorance, mistake or accident.

The Government is not required to prove that the Defendant

knew his acts or omissions were unlawful.  You may consider

evidence that the Defendant's words, acts or omissions along

with all other evidence in deciding whether the Defendant acted

knowingly.

The Defendant is charged in Count Five of the indictment

with conspiring to traffic in unauthorized access devices in

violation of Section 1029(a)(2) of Title 18.

In order for the Defendant to be found guilty of that

charge, the Government must prove each of the following

elements beyond a reasonable doubt:

First, beginning on a date unknown and ending on or about

1   May 31, 2013, there was an agreement between two or more

2   persons to commit the crime of trafficking in unauthorized

3   access devices.  I have just instructed you as to the elements

4   of that offense.

5        Second, the Defendant must be -- second, the Defendant

6   became a member of the conspiracy knowing of at least one of

7   its objects and intending to help accomplish it.

8        Third, one of the members of the conspiracy performed at

9   least one overt act after on or about June 13th, 2012, for the

10  purpose of carrying out the conspiracy.

11       A conspiracy is a kind of criminal partnership, an

12  agreement of two or more persons to commit one or more crimes.

13  The crime of conspiracy is the agreement to do something

14  unlawful.

15       I will repeat that.  The crime of conspiracy is the

16  agreement to do something unlawful.  It does not matter whether

17  the crime agreed upon was actually committed.

18       For a conspiracy to have existed it is not necessary that

19  the conspirators made a formal agreement or that they agreed on

20  every detail of the conspiracy.

21       It is not enough, however, that they have simply met,

22  discussed matters of common interest, acted in similar ways, or

23  perhaps, helped one another.  You must find that there was a

24  plan to commit at least one of the crimes alleged in the

25  indictment as an object of the conspiracy with all of you

1   agreeing as to the particular crime which the conspirators

2   agreed to commit.

3        One becomes a member of a conspiracy by willfully

4   participating in the unlawful plan with the intent to advance

5   or further some object or purpose of the conspiracy even though

6   the person does not have full knowledge of all of the details

7   of the conspiracy.

8        Furthermore, one who willfully joins an existing

9   conspiracy is as responsible for it as the originators.  On the

10  other hand, one who has no knowledge of a conspiracy but

11  happens to act in a way which furthers some object or purpose

12  of the conspiracy, does not become a co-conspirator.

13       Similarly, a person does not become a conspirator merely

14  by associating with one or more persons who are conspirators;

15  nor merely by knowing that a conspiracy exists.

16       An overt act does not itself have to be unlawful.  A

17  lawful act may be an element of a conspiracy if it was done for

18  the purpose of carrying out the conspiracy.

19       The Government has not required to prove that the

20  Defendant personally did one of the overt acts.  As long as

21  jurors agree, all agree, that the Government has proven each

22  element of a conspiracy, they need not unanimously agree on the

23  particular overt act that was committed in furtherance of the

24  agreed upon conspiracy.

25       Each member of the conspiracy is responsible for the

actions of the other conspirators performed during the course

in furtherance of the conspiracy.  If one member of a

conspiracy commits a crime in furtherance of a conspiracy, the

other members have also under the law committed that crime.

Therefore, you may find the Defendant guilty of

trafficking in unauthorized access devices during a period of

one year in violation of Section 1029(a)(2) as charged in Count

Six if the Government has proved each of the following elements

beyond a reasonable doubt:

First, a person named in Count Six committed the crime of

trafficking in unauthorized access devices during a period of

one year in violation of Section 1029(a)(2) as alleged in that

count.

Second, the person was a member of the conspiracy charged

in Count Six.

Third, the person committed the crime of trafficking in

unauthorized access devices during a period of one year in

violation of Section 1029(a)(2) of Title 18 in furtherance of

the conspiracy.

Fourth, the Defendant was a member of the same conspiracy

at the time the offense charged in Count Six was committed.

And, fifth, the offense fell within the scope of the

unlawful agreement and could reasonably have been foreseen to

be a necessary or natural consequence of the unlawful

agreement.

1      Now, we have reached the stopping point for today on the

2   instructions.  I want to try to summarize this in a -- in a

3   way -- what the -- what the jury must do is pay close attention

4   to the elements of proof for each count.

5      So if it says -- if these instructions say they have got

6   to prove A and B and C, it is not enough to prove A and B but

7   not C, each beyond a reasonable doubt.

8      If -- and let's say the Government has overwhelming proof

9   on A and overwhelming proof on B but falls short on C -- it is

10   not quite beyond a reasonable doubt -- can that strong proof on

11   A and B outweigh C?  No.

12      No.  It has to be beyond a reasonable doubt on all the

13   elements, all required elements.

14      And what you, the jury, has to do is like a laboratory

15   experiment.  You take a look at what the law requires, what are

16   the elements of proof that must be proven and then you lay

17   alongside that what the Government's evidence is and what all

18   the evidence in the case is and ask yourself that question.

19   Does this measure up to proof beyond a reasonable doubt?  Yes

20   or no.

21      And same thing on the other elements.  It is like a lab

22   experiment.  It is the -- is this proof beyond a reasonable

23   doubt on that element.  And then if the answer is yes, as to

24   all elements, then it is your duty to convict.

25      But if it is short on one of the elements of proof, and it

1    is not quite beyond a reasonable doubt, it is your duty to
2    acquit on that count.
3         So that's kind of what -- that is not just kind of.  That
4    is what you must do in the jury room is make that evaluation.
5         Okay.  We have reached a point where I have only about 3
6    minutes of reading left, and I'm going to hold that until after
7    we hear the closing arguments tomorrow.
8         The closing arguments will be several hours long so don't
9    think -- this will be chance for the lawyers -- and we have
10   excellent lawyers in this case.  This will be the chance for
11   the lawyers to make their case as to what they think they have
12   or have not proven or for the Defense to say what has or hasn't
13   been proven.
14        I want you to remember that not one word a lawyer ever
15   says in the courtroom is evidence.  And it's -- unless it is a
16   stipulated to.  It is what the witnesses say.  But
17   nevertheless, because these -- the lawyers always have the
18   opportunity to explain to you what they think has or has not
19   been proven.  It is very important to pay close attention so I
20   know you will.  I know you will.
21        And then after that, I'm going to give you the final 3
22   minutes of instructions.  And then the case will go to you for
23   decision.  And I suspect that will be -- if we start at
24   8:00 o'clock tomorrow, I'm hoping between 11:00 o'clock and
25   noon we will send the case to you for decision.  It will be

1    approximately, in that ballpark.

2         And then you get to stay as late as you want.  I will stay

3    here until midnight if you want.  It is up to you.  We will be

4    at your disposal as to how late we will stay.  But if you want

5    to go home at 2:00 o'clock, God bless you.  That's your

6    decision.  You are the jury, and you get to make that call.

7         If you don't reach a verdict by the end of tomorrow, of

8    course, you come back on Monday and we have all next week to

9    do -- to make a decision.  So we are -- we will be at your

10   disposal on that.

11        Okay.  Before we break for the day, is there any special

12   things that the lawyers want me to say to the jury before we

13   break?

14             **MS. KANE:**  No, Your Honor.

15             **THE COURT:**  All right.  Any -- let me just -- now, has

16   anyone thought of some reason why they can't be here by

17   7:30 tomorrow, 7:45 but let's try for 7:30.

18                       (No response.)

19             **THE COURT:**  Okay.  Then I'm going to wish you-all a

20   safe journey home.  See you here tomorrow.  Don't talk about

21   the case yet.  It will be your duty to do that tomorrow.

22        (Proceedings were heard outside the presence of the jury:)

23             **THE COURT:**  Okay.  Be seated.  All right.  So,

24   Mr. Gasner, we solved your problem about the broken up --

25   broken up arguments.

1          **MR. GASNER:**  That's right, one way or the other.

2          **THE COURT:**  One way or the other.  But we will stay as

3    late as they want.  So be flexible tomorrow.  Is there anymore

4    good I can do the lawyers at this point?

5          **MR. GASNER:**  No, Your Honor, nothing from the Defense.

6          **THE COURT:**  There is something goofy about that

7    instruction.  I want you to look at it again.  To me, it makes

8    no sense and it should be thrown out by the Supreme Court as

9    incomprehensible if that's the way the statute reads, but there

10   may be a word that we left out.  Would you look at that.

11         **MS. KANE:**  Your Honor, we will.  I will say that

12   Section 1030 in general is fairly incomprehensible, so I

13   wouldn't be surprised.

14         **THE COURT:**  Well, okay.  But look at it.  Look at it

15   again.  Let's try to straighten it out for the jury if need be.

16   Okay.  I'm tired and I have got some more hearings.  I'm going

17   to leave now.  So good luck to both sides.  All right.

18         **MR. GASNER:**  Thank you, Your Honor.

19         **MS. WAWRZYNIAK:**  Thank you, Your Honor.

20         **MS. NECHAY:**  Thank you, Your Honor.

21         **MS. KANE:**  Thank you, Your Honor.

22              (Proceedings adjourned at 1:52 p.m.)

23                      ---oOo---

24

25

1

2                          **CERTIFICATE OF REPORTER**

3          I certify that the foregoing is a true and correct

4     transcript, to the best of my ability, of the official

5     electronic sound recording provided to me by the U.S. District

6     Court, Northern District of California, of the proceedings

7     taken on the date and time previously stated in the

8     above-entitled matter.

9          I further certify that I am neither counsel for, related

10    to, nor employed by any of the parties to the action in which

11    this proceeding was taken; and, further, that I am not

12    financially nor otherwise interested in the outcome of the

13    action.

14

15    DATE:    Thursday, July 9, 2020

16

17

18

19    _____

20             Marla F. Knox, RPR, CRR, RMR
              United States Court Reporter

21

22

23

24

25