Pages 1 - 44
(Pages 45 - 75 sealed
and bound separately)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

UNITED STATES OF AMERICA,        )
                                 )
              Plaintiff,          )
   VS.                            )     No. CR 16-440-WHA-1
                                 )
YEVGENIY ALEKSANDROVICH           )
NIKULIN,                          )
                                 )
              Defendant.          )     San Francisco, California
_____)     Wednesday, February 19, 2020

### TRANSCRIPT OF UNSEALED PORTION OF PROCEEDINGS

**APPEARANCES:**

For Plaintiff:          DAVID L. ANDERSON
                        UNITED STATES ATTORNEY
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California  94102
                  BY:   **MICHELLE J. KANE**
                        **KATHERINE L. WAWRZYNIAK**
                        **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:          LAW OFFICE OF ADAM G. GASNER
                        345 Franklin Street
                        San Francisco, California  94102
                  BY:   **ADAM G. GASNER, ESQ.**

                        LAW OFFICE OF VALERY NECHAY
                        345 Franklin Street
                        San Francisco, California  94102
                  BY:   **VALERY NECHAY, ESQ.**

Also Present:           **MARIA ENTCHEVITCH**
                        **YANINA GOTSULSKY**
                        Russian-language Interpreters
                        **FBI SPECIAL AGENT JEFFREY MILLER**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

1   **Wednesday - February 10, 2020**                          **1:48 p.m.**

2                        **UNSEALED PROCEEDINGS**

3          **THE CLERK:**  Calling Criminal Action 16-440, United

4   States versus Yevgeniy Aleksandrovich Nikulin.

5       Counsel, please step forward and state your appearances

6   for the record.

7          **MS. KANE:**  Good afternoon, Your Honor.  Michelle Kane

8   and Katherine Wawrzyniak for the United States.

9          **MS. NECHAY:**  Good afternoon, Your Honor.  Valery

10  Nechay on behalf of Mr. Nikulin.

11         **MR. GASNER:**  Along with Adam Gasner on behalf of

12  Mr. Nikulin.  Good afternoon, Your Honor.

13         **THE COURT:**  Welcome.  And?

14         **THE INTERPRETER:**  Maria Entchevitch, Russian

15  interpreter.

16         **THE COURT:**  Have you been sworn in this case?

17         **THE INTERPRETER:**  Yes, I have, Your Honor.

18         **THE COURT:**  Excellent.  Welcome to you, too.  And

19  welcome to our defendant, Mr. Nikulin.

20      All right.  We're here for final pretrial conference.  Oh,

21  so many things.  Okay.  Let's go over the motions in limine

22  first.

23      The co-conspirator statements.  Where do we stand on that?

24         **MS. KANE:**  Well, Your Honor, the United States has

25  moved for the admission of co-conspirator statements contained

1   in some email correspondence.

2         **THE COURT:**  All right.

3         **MS. KANE:**  That's Motion in Limine No. 1.

4         **THE COURT:**  Yeah.  I remember it vaguely.

5         **MR. GASNER:**  Your Honor, may I confer with co-counsel

6   for a moment while you get sorted?

7         **THE COURT:**  Yeah.

8       (Off-the-Record discussion between counsel)

9         **MR. GASNER:**  Your Honor, may we make a

10  recommendation?

11      That filing appears to have -- was under seal.  And I

12  think it's probably appropriate, if we're going to argue it,

13  for the argument to proceed under seal.

14        **THE COURT:**  Are all these people with the government

15  here?

16        **MS. KANE:**  No, Your Honor.  There are some

17  non-government people.

18        **THE COURT:**  All right.  I'm not saying no to that

19  yet, but why should this be under seal?

20        **MS. KANE:**  Your Honor, the motion as filed by the

21  United States refers to a defendant in an under-seal

22  indictment.  That defendant is also an unindicted

23  co-conspirator in this indictment.

24        **THE COURT:**  Is it somebody under indictment here?

25  With me?

1          **MS. KANE:**  Yes, Your Honor.

2          **THE COURT:**  I have the case?

3          **MS. KANE:**  No.  That defendant has never appeared, so
4    I believe at that point that -- it was not initially assigned
5    to this Court, and I believe it's now with the executive
6    committee.

7          **THE COURT:**  When you say "this Court," you mean me.

8          **MS. KANE:**  Yes.

9          **THE COURT:**  All right.  Is there -- well, how many
10   people do we have?  Do we have people who are members of the
11   press or the public out there?  If so, raise your hand.

12         **THE MARSHAL:**  One here (Indicating).

13         **THE COURT:**  Okay.  One, all right.  All right.

14      (A hand is raised)

15         **THE COURT:**  Let's do this.  We'll come back to this,
16   because I don't want to inconvenience people, we'll come back
17   to the motions in limine on the co-conspirator statements.  See
18   if we can do some of this in the public.

19      How about No. 2, expert testimony of Tami Loehrs?

20         **MR. GASNER:**  Thank you, Your Honor.  I can address
21   that.  At this point, the defense is withdrawing Tami Loehrs
22   from that witness list.  We're using her for other purposes,
23   not for the purpose of testimony.

24         **THE COURT:**  So you're not using this witness at all?

25         **MR. GASNER:**  I'm not using her to testify at this

1    point.  We have -- we're using her for other purposes to

2    investigate the matter, but we're not proposing that she

3    testify at this point.

4              THE COURT:  Okay.  So nothing to do there, right?

5              MR. GASNER:  That's correct, Your Honor.  I mean, the

6    case is moving semi-quickly.  We have new disclosures, even as

7    of today, that we're going to review, and possibly implicate

8    expert testimony that I received just moments ago.

9         But as of this point we have no disclosures, expert

10   disclosures to turn over to the government.  And so I'm not

11   proposing in the absence of that, using her as a witness.

12   That's the defense's position, as we stand here right now.

13             THE COURT:  Okay.

14             MS. KANE:  And Your Honor, I would just note for the

15   Court that if the defense doesn't intend to call her, then

16   there's nothing further we need to do.  I respect that the

17   defense is hedging a bit, in noting that they do not at this

18   point intend to call her.

19        We've moved to exclude her based on the lack of an expert

20   disclosure.  We still don't know what any opinion would be, and

21   that's fine.  But to the extent they did decide to give a

22   disclosure, the government would still anticipate opposing her

23   testimony based on what we've seen from her testimony in many

24   other cases in which her testimony was excluded, found to be

25   misleading, confusing, in other Federal Court appearances.

1        **THE COURT:**  Why do I have to rule on any that now?  I

2    don't.  Okay.  So let's move on.

3        The next one is U.S. motion regarding opening statements.

4    What's the issue here?

5        **MS. KANE:**  Your Honor, given that it does not appear

6    that the defendant or any percipient witnesses will be

7    testifying for the defense, the United States filed this motion

8    to ensure that there's no mention of facts about the defendant

9    in opening statement that there is no basis to think would

10   actually come in, in the defense case, since there won't

11   actually be a witness to put them in.

12       **THE COURT:**  Well, maybe it'll come in on your case,

13   on cross-examination.  Right?  I don't know.  I don't know what

14   -- give me an example of the fact you want to keep out.

15       **MS. KANE:**  Well, if, at opening statement, one of the

16   defense attorneys wanted to describe the defendant's

17   upbringing.  Or his previous employment.  We don't anticipate

18   that any of that sort of evidence would come in on

19   cross-examination.

20       And we don't believe, based on the witness list, that

21   there is any reason that that would come in during the defense

22   case.

23       **THE COURT:**  Okay.  What do you say to that?

24       **MR. GASNER:**  I mean, really, Your Honor, I don't

25   suspect that I would endeavor to argue anything that I don't

1   anticipate being in evidence.  I think this is a prophylactic

2   motion by the government to -- endeavoring to circumscribe or

3   manipulate what is proffered in opening.

4        For example, it is the witness's -- excuse me -- it is the

5   defendant's sole right to decide whether he wishes to testify

6   or not.  That decision is not is going to be made until an

7   appropriate moment in trial, after the government's

8   case-in-chief has been concluded.  Much of what they are

9   indicating could be testimony or evidence that the defendant,

10  himself, or other witnesses, perhaps through cross-examination,

11  are able to proffer and testify to, and give evidence of.

12       So I think really, the effort to circumscribe my opening

13  or the defense's opening, you know, I understand the purpose of

14  the motion, but I don't think there is any particular ruling

15  the Court needs to make here.

16       If -- if the defense makes -- states facts in opening

17  which are not supported by the evidence, I think that happens

18  in a lot of trials.  And I believe what occurs typically is

19  that the party for which it happened against, whether it's the

20  defense or the People, or the government, what they do is they

21  comment on it in closing:  You were promised A in opening; it

22  didn't occur during the trial.  You take that in to the

23  credibility of what you are hearing.

24       But, what's the Court being asked to rule on right now?

25            **THE COURT:**  Okay.  What's your answer to that,

1    Ms. Kane?

2          **MS. KANE:**  Your Honor, as we noted in our motion,

3    counsel has an obligation not to describe facts in opening that

4    they do not reasonably believe would be introduced at trial.

5    And that's all we're seeking.

6          **THE COURT:**  Do you agree with that principle?

7          **MR. GASNER:**  I do agree with that principle.

8          **THE COURT:**  All right.  I'm going to rely on that

9    principle.  And the good faith of counsel.  I need to -- I

10   shouldn't -- I don't need to, but I will tell you what I say in

11   all trials.  And that is, I say to the jury at the outset and

12   at appropriate places among the way, something like this.  I

13   say:  Ladies and gentlemen, not one word that a lawyer says in

14   trial is evidence.  Zero.  Z-E-R-O.

15       Then I explain how great you lawyers are.  But that you're

16   not witnesses.  And that not a word that you say -- and I give

17   several examples.  I have found this to be exceedingly useful,

18   because I do believe that the single easiest way for a jury to

19   go wrong is to think that because you lawyers are in control,

20   that you wouldn't be saying it unless it was true.  And I

21   disabuse them of that idea.  I tell them it's not evidence,

22   unless the witness says it, under oath.

23       So I just bring that to your attention, because if the

24   government does comment at the end that you promised X and you

25   didn't deliver, they can put that together with the fact that

1   not a word you say is evidence, which, you know, is a standard

2   instruction.   I just make it more vivid.   So I would urge you

3   not to do that.

4        Now, it's also true the government has done this a few

5   times.

6        Here's another example of that.   You stand up and you say:

7   Well, Your Honor, they didn't give us -- They say this in the

8   presence of the jury:  The government didn't give us any memos

9   on that point.   Or:  They didn't give us that memo.

10        You can't say that in the pre- -- and I'll tell the jury,

11   that's not evidence.   You can't be testifying like that.   And

12   the government can't be making equivalent statements about what

13   the facts are.   Except in your opening statement, you can do

14   that, of course.

15        But once you're even questioning a witness, you can't say

16   something like:  Well, as, as the agent said yesterday, the

17   light was green.   And then -- well, no, you can't do that

18   because you're purporting to tell the jury -- testify about

19   what the -- it's just too many -- I've seen it too many times

20   to be abused.   They didn't quite stay it was green.   They said

21   it might have been green.   Or they said somebody told them it

22   was green.   They always try to fudge it, and fix it up.   So,

23   you can't do anything of that.

24        So I'm denying this motion.   But please, remember your

25   obligation to only say in the opening statement things that you

1   have a reasonable belief will actually come into evidence.

2           **MR. GASNER:**  A small point on that, if I may,

3   Your Honor?

4           **THE COURT:**  Sure.

5           **MR. GASNER:**  And I'm sure that the Court was

6   paraphrasing, but when the Court instructs the jury that the

7   statements of the lawyers are not -- is not evidence, I think

8   there's a qualifier that I'm fairly certain the Court gives,

9   which is:  The statements of the lawyers are not evidence;

10  they're only evidence insofar as the witness adopts --

11          **THE COURT:**  Yeah.

12          **MR. GASNER:**  -- or denies --

13          **THE COURT:**  Yeah.  If the witness were to say yes or

14  no, then that's true.  Of course, what the witness says is

15  evidence.

16      So if you were to say on a question, "Isn't it true the

17  light was green," and the witness says "Yes, that's true," then

18  of course that's evidence, because they're adopting what you

19  have just said.  Yeah, that works.

20      But if you were to say "Isn't it true the light was

21  green," and they say "I don't know," then the fact that you say

22  it's green isn't evidence of anything, other than the witness

23  doesn't know.

24          **MR. GASNER:**  (Nods head)

25          **THE COURT:**  All right.  So I'll give that

1    qualification.  If I forget to, you may point it out.  Because

2    you are right about that.

3         All right, next.  To exclude references to extradition,

4    confinement, mental competency and punishment.  All right.  It

5    says you don't have any objection to that.

6              MR. GASNER:  I think that's the state of the law,

7    Your Honor.  I do not intend to elicit those pieces of

8    information.

9              THE COURT:  All right.  That one's granted.

10        Next:  Presentation of unnoticed affirmative or legal

11   defense to jury where burden is on defense to proffer

12   foundation to court.

13        Give me an example of this, so I'll know what you're

14   talking about.

15             MS. WAWRZYNIAK:  Well, Your Honor, there haven't been

16   any notices of defenses.  For example, the defendant could have

17   noticed an intent under Rule 12 to raise mental defect as a

18   defense to the crimes.  That hasn't been presented.

19        So if this issue were to arise in trial after we had

20   rested our case, we would -- we're asking the Court to exclude

21   such a defense, because of the lack of proper notice.  And I

22   think for this one as well, defense is not contesting that

23   that's sort of the state of the law.

24             THE COURT:  My notes here say that you have no

25   objection.

1      **MS. NECHAY:**  We have no objection, Your Honor,

2  insofar as this portion discusses affirmative defenses.  Of

3  course, it should be obvious to the Court that our position is

4  we are entitled to argue that the government can't meet their

5  burden of proof.

6      But we agree that this pertains --

7      **THE COURT:**  Well, what affirmative defenses do you

8  agree that it would apply to?

9      **MS. NECHAY:**  Mental competence.  Perhaps an alibi

10 defense.

11     **MS. WAWRZYNIAK:**  Or entrapment.

12     **THE COURT:**  Entrapment?

13     **MS. NECHAY:**  Sure.

14     **THE COURT:**  All right.  Granted.

15     Next, the defense raises -- we'll skip over your first one

16 because it deals with co-conspirator.  Right?

17     Next we go to prior bad acts, bad character evidence,

18 prior criminal convictions, so forth.  What's your position on

19 that one, Ms. Kane?

20     **MS. KANE:**  Your Honor, the government provided notice

21 to the defendant regarding evidence that has to do with an

22 intrusion that's not charged in the indictment.  And that

23 intrusion involves the same M.O. as the intrusions that are

24 charged in the indictment.  The use of the same tactics, the

25 use of the same search terms.  The way that the defendant

targeted individual employees of the company.  It's a company

called "Automatic."  The government provided notice.  There are

logs from Automatic that contain evidence of the defendant's

actions.  We also have a witness from Automatic who will

testify, regarding those logs.

This is part of the same pattern as the three victims that

are charged in the indictment.  It's our position that it's

inextricably intertwined with that conduct.  It's part of a

continuing campaign.

THE COURT:  All right.  Time-wise, when did it occur

in the timetable?

MS. KANE:  It occurred -- so the intrusions that are

charged in the indictment occurred throughout 2012.  And this

one occurred in 2013.

THE COURT:  So it'd be afterwards.

MS. KANE:  It would be after, yes.  And as I said,

it's evidence of the continuing campaign by the defendant to

attack companies, compromise the credentials of their

employees, use those credentials to access user databases,

obtain user credentials.  And this is the same thing that he

did that's -- as it's alleged in the indictment.

So it's very similar, looking at the -- the test for -- to

the extent that it's not inextricably intertwined, which, we

believe it is, but to the extent that it's not, looking at the

test under 404(b), it's part of the same timeframe, continuing

1   conduct.   Very, very similar in terms of the conduct.

2      And therefore, it's appropriately admitted under either a

3   theory of inextricably-intertwined evidence or 404(b).

4       **THE COURT:**  All right.  What do you -- what does

5   Mr. Gasner say?

6       **MR. GASNER:**  Your Honor, we object.  I think that

7   there's a lot of issues with regard to the presentation of this

8   evidence.

9      Preliminarily, the disclosure that I received is now being

10   clarified that it's for modus operandi or M.O., for example.

11   It was a very general disclosure.  There was no specifics.  It

12   was difficult for the defense to ascertain the specific reason

13   that they were trying to introduce this evidence.

14      It's a prior-bad-act evidence which occurred subsequent to

15   the acts of in this case.  It's not a prior bad act.

16       **THE COURT:**  Yeah, it's a subsequent bad act.

17       **MR. GASNER:**  Correct.  And I also believe that it's a

18   non-charged act.  And I understand by its very nature, that's

19   what 404(b) evidence is.

20      But under Evidence Code 403, I think that the danger of

21   misleading the jury, the accumulation of time, outweighs any

22   probative value.  They've got three victims in this case for

23   which they're going to be seeking to introduce --

24       **THE COURT:**  Why isn't this the answer?  Don't make

25   any reference to it in the opening, save that to the end.  And

1    then after I hear all the other evidence, I'll be in a better

2    position to see how it fits in or doesn't.  And I'll also see

3    the extent to which to defense triggers any of the permitted

4    uses under 404(b).

5        It doesn't actually use the word "modus operandi" anymore,

6    but it does use the word "plan," "knowledge," "identity."  So

7    can you, can you adjust your presentation to say that at least

8    toward the very end of your direct case-in-chief?

9        **MS. KANE:**  Your Honor, of course, the government

10   would prefer to be able to plan and to talk about this evidence

11   in its opening.

12       That said, we also understand that if this is how the

13   Court would prefer to proceed, we can -- we can wait.

14       **THE COURT:**  Let's do that.  Let's do that.  That

15   way -- and I -- I can postpone ruling until I see how the case

16   comes in, and I will understand it twice as well at that point,

17   and then be able to make a more informed decision.

18       Okay.  So that one, I'm going to just -- I'm going to

19   postpone until the end of -- near at the end of your

20   case-in-chief.

21       All right, so neither side should make reference to that

22   in the opening statement.  If you're (Indicating) going to make

23   reference to it, then I'm going to let her make reference to

24   it.  So, all right.

25       Exclude government from making reference to Nikulin

1    finances and lifestyle under 403.  Do you plan to get into

2    that?

3           MS. WAWRZYNIAK:  Your Honor, as noted in our

4    opposition, there's only one piece of evidence on the exhibit

5    list that briefly shows a Bentley automobile.  The government

6    is not going to argue that that car is evidence of Nikulin's

7    wealth, or that it shows that he was obtaining a lot of wealth

8    through his hacking activities.  So we think that as a

9    practical matter, there's very little to exclude.

10          The point I tried to make in the papers, however, is that

11   should Mr. Nikulin take the stand and testify on his own

12   defense, for example, and make statements that are inconsistent

13   with photographs and lifestyle evidence that is -- that the

14   government has from his social media accounts, at that point we

15   think we would be able to use that evidence to impeach him or

16   cross-examine him.

17          And that approach of saying that lifestyle evidence could

18   become relevant depending on the defense presented by the

19   defendant is something that the Ninth Circuit sanctioned in the

20   *Kessi* case, K-E-S-S-I.

21          THE COURT:  All right.  So what is the one item you

22   say you want to use in your direct case-in-chief?

23          MS. NECHAY:  There's a video that we will lay

24   foundation for.  And in the video -- it's shot on someone's

25   cell phone.  And the person who's making the video is traveling

1  around Moscow in an automobile.  And they pull out --

2          THE COURT:  They're traveling around where?

3      MS. NECHAY:  They're in a sedan, driving around

4  Moscow.

5          THE COURT:  Oh, Moscow.  Okay.

6      MS. NECHAY:  Uh-huh.  And the person who's making the

7  video -- the car's pulling up in front of a hotel.  And the

8  person who's making the video is narrating and saying:  There's

9  going to be a meeting of hackers at this hotel.

10     And then a Bentley automobile sort of pulls in front of

11 the car in which the -- the filmmaker is situated.  And the

12 person making the video says:  Oh, look at that angry hacker.

13 Like, referring to whoever's driving the Bentley.

14     This video provides --

15         THE COURT:  Who's that?  Is that the defendant?

16     MS. NECHAY:  The government believes that it is the

17 defendant in that automobile.

18     But the purpose of admitting this video is to provide

19 context for a second video shot the same day, inside the hotel,

20 that shows the meeting that's referred to in first video.  And

21 in the second video, the defendant is clearly visible and

22 interacting with the other participants in the meeting.

23         THE COURT:  Okay.  What's the defense say?

24     MS. NECHAY:  Thank Your Honor.  I believe that the

25 reference to the Bentley is, in its nature, by its very nature,

1    prejudicial.  I don't see what purpose it really serves.

2        And there hasn't been an offer of proof as to any

3    credibility, that this reference that the person driving the

4    Bentley is a hacker was a valid statement.  I don't know who's

5    making that statement.  We don't know -- we just don't have

6    enough information.

7              THE COURT:  Well, is it a picture of the defendant in

8    the video?

9              MS. NECHAY:  I believe that's what the -- that's what

10   the government is contending.  But again, if there hasn't

11   really been a proffer that this is used for identification

12   purposes, there are other ways to establish the ID of the

13   defendant, without using prejudicial pictures of Bentleys.

14             THE COURT:  Was it the picture or the word "hacker"

15   that you don't like?

16             MS. NECHAY:  Both.  I believe the first is hearsay.

17   The reference to the statement of:  That's a hacker.

18       We don't know whether that was a joke, we don't know

19   whether it --

20             THE COURT:  Who was making the statement?

21             MS. NECHAY:  The person that was making the video.

22             THE COURT:  Who is that person, Ms. Kane?  Or

23   Ms. Wawrzyniak?

24             MS. WAWRZYNIAK:  His last name is Ieremenko.

25             THE COURT:  Is he going to testify?

1    **MS. WAWRZYNIAK:**  He is not.  This video came from his

2    computer.  The image was made pursuant to an MLAT with Ukraine.

3    So we are calling a Secret Service agent to authenticate the

4    image that contains the video.

5         (Reporter interruption)

6         **MS. KANE:**  I-E-R-E-M-E-N-K-O.

7         **THE COURT:**  Well, the word "hacker" is -- I don't get

8    it.  Why -- that's not under oath.  Why would you -- why is

9    that admissible?  Seems like that's just hearsay.

10        **MS. WAWRZYNIAK:**  I think we're not admitting it for

11   the truth.  You know, we're not actually going to argue that

12   it's the defendant in the Bentley.  Or that that Ieremenko is

13   calling Nikulin a hacker in that video.  We're trying to

14   provide context around the other video that clearly shows the

15   defendant in this meeting that occurred in the hotel.

16        **MS. NECHAY:**  Your Honor, if I may, I believe this is

17   just an attempt to circumvent the rules of evidence.  This is

18   inadmissible hearsay.  Additionally, it's prejudicial.

19   Whatever probative value it has is substantially outweighed by

20   that.

21        There is, again, other methods and means of identifying

22   Mr. Nikulin.

23        **THE COURT:**  Can we play it right now?  Do we have the

24   video here?

25        **MS. KANE:**  Your Honor, we don't have it queued up to

1    play right now.  It wasn't -- to give some background, this was

2    not a specific piece of evidence that the defendant referred to

3    in the motion in limine.

4        It's the -- the government is suggesting this is one

5    example that could theoretically fit into their argument, and

6    we wanted to ensure that the mere fact that the car is a

7    Bentley, which is known to be an expensive car, that is -- it's

8    not excluded for the fact that it shows a Bentley.  That's the

9    reason that we've raised this particular issue today.

10       If the Court would like, we can -- we should be able to

11   get the video --

12            **THE COURT:**  Here's what I want to do.

13            **MS. KANE:**  -- queued up for today.

14            **THE COURT:**  The reason you want to use it is to tie

15   it into the second video, right?  But how do we even know those

16   are the same day and the same place?

17            **MS. KANE:**  Your Honor, there will be testimony, as we

18   said, regarding the source of the video.

19            **THE COURT:**  Yeah, but that's from some agent.

20            **MS. KANE:**  There are both -- the technical details of

21   the files that indicate that they were taken on the same day.

22   There are also details between the two videos that are the same

23   that indicate that they were taken on the same day.  For

24   example, people are wearing exactly the same clothing.

25       Moreover, the video -- the first video showed the outside

1   of a hotel.  And then the second video is taken inside the

2   hotel.  So it all indicates that one is taken leading up to

3   their arrival at the hotel; the other is taken inside the

4   hotel.

5            THE COURT:  How long are these videos?

6            MS. KANE:  They're quite short, Your Honor.

7            MS. WAWRZYNIAK:  I would say less than 30 seconds

8   each, Your Honor.

9            THE COURT:  All right.  Before the trial starts, show

10  me these two videos.  And I'll see if 403 applies or not.

11           MS. NECHAY:  Your Honor, may I make an additional

12  record?

13           THE COURT:  Yeah.

14           MS. NECHAY:  I believe that if the meeting that the

15  government is citing here is a November, 2012 meeting, then

16  this meeting is proffered by their first motion in limine that

17  was submitted under seal, but I'll just say briefly that

18  meeting was regarding a potential internet business endeavor,

19  and was not in furtherance of any conspiracy.  There was no

20  evidence that there was any conspiracy discussed, in this case

21  (Indicating) or any other.

22       So, again, I would just say this is not only irrelevant,

23  but prejudicial.  And, causes the jury to speculate about

24  issues that are not relevant in this case.

25           THE COURT:  All right.  Well, we'll -- I know you

1   made that point also in the co-conspirator part.

2           **MS. NECHAY:**  (Nods head)

3           **MR. GASNER:**  (Nods head)

4           **THE COURT:**  So I have to -- I'm going to -- not going

5   to rule on that part yet.

6       Okay.  Before we go back to the co-conspirator, we have

7   now covered all the other motions in limine, right?

8           **MS. WAWRZYNIAK:**  Yes, Your Honor.

9           **MR. GASNER:**  Yes.

10          **THE COURT:**  Great.  Now, you've agreed on jury

11  instructions.

12          **MS. KANE:**  Yes, Your Honor.

13          **THE COURT:**  Quite amazing.  I thank you for that.

14          **MR. GASNER:**  Absolutely, Your Honor.  The proposed

15  jury instructions were filed jointly.

16      Obviously, we'll see how the evidence comes in, and there

17  may be some additional pinpoint instructions that apply to the

18  specific evidence.  We can take that up at a conference at

19  later time, I suppose.

20          **THE COURT:**  All right.  We'll -- do you understand

21  how we select the jury here?  I'll explain it to you.  But

22  somewhere I have a piece of paper that I hand out.

23      Have we given them that?

24      Have you seen how do I it?

25          **MS. WAWRZYNIAK:**  No, Your Honor.

1          **THE COURT:**  Okay.  So let me go through that.

2      I think we've asked for -- how many?  Fifty-something, 60?

3  And I will, first of all get rid of anybody who's hacking and

4  coughing or has the flu, just so they won't get everybody else

5  sick.  Which happens.

6      I've had -- early on in this job, somebody in the pool got

7  somebody sick, and three days later, somebody selected had to

8  be excused.

9      All right.  So then we start calling forward -- we'll get

10  one -- I think it's 32, is the number.  Yes.  And that will

11  eventually lead to 12 plus two.  Two alternates.  But we start

12  with 32.  And I will ask them about hardships and let anybody

13  who has a legitimate hardship be excused.  So then we fill

14  those in.

15      So out of the 30, that may get us up to, let's say, 40

16  have now been used.  So we finally get 32, and then I start

17  asking questions.  And I ask my own kind of standard set of

18  questions, and you've given me some.

19      And eventually I will let each side have -- usually it's

20  more like ten to 15 minutes, because I'll not -- you'll see

21  things that I don't see, and you can follow up.

22      So let's say another five or six get excused, based on

23  cause.  So then we fill those people in.  And eventually we're

24  going to get 32 who are passed for cause, or cause objections

25  are overruled.

1          So at that point, we still will have a few people left in

2     the back of the room.  But we will also have 32 that you have

3     now voir dired; you know who they are.  And, and -- but they --

4     the sequence of how they're seated is very important.

5          So number one is there (Indicating), closest to the court

6     reporter, all the way over to No. 7 on the front row

7     (Indicating).  And then No. 8 all the way over on the back row

8     to 14 (Indicating).  Then 15 is over there by the monitor.  And

9     then we go all the way across to 32, over on that side

10    (Indicating).

11         Now, the reason the number is important is that if we get

12    down -- we always are going to go with the -- we'll first pick

13    the normal jury.  The 12.  So when you're making your strikes,

14    your peremptory challenges, you get ten, and you get six

15    (Indicating).  And there's a strike sheet here that you will

16    pass back and forth.

17         Have you seen that before?  I'm sure you have.

18         **MR. GASNER:**  (Nods head)

19         **THE COURT:**  It's identical to what's been used for

20    years before I came here.

21         Now, if you pass -- you know, there was a Ninth Circuit

22    decision where you're using a different system, that if you

23    pass, you don't give up your challenge.  But that doesn't apply

24    in this.  If you pass, you're giving up that challenge.

25    Because the whole rationale of that decision was that you

1    haven't had a chance yet to voir dire the people in the back of

2    the room.  But before we get down to the 32, you have had that

3    chance.

4        If we have two consecutive passes by the government and

5    the defense, then everything is frozen, and the lowest 12 will

6    be selected as the jury.

7            MR. GASNER:  Your Honor, may I ask for clarification

8    on that last piece?

9            THE COURT:  Of course.  Please.

10           MR. GASNER:  Two consecutive passes:  Pass, pass?  Or

11   pass, pass, pass, pass?

12           THE COURT:  If you -- let's say you have two, and you

13   strike somebody, but the second one you pass on.  And then the

14   government passes.  That's fixed.  The jury is now -- we now

15   know it's the lowest 12.  And by "lowest 12," I mean by seat.

16   We go by seat number.

17           MR. GASNER:  Understood.

18           THE COURT:  So you could actually have this situation

19   where the person in the number-one seat was the last one called

20   forward.  And you might think:  Well, maybe, shouldn't they --

21   no.  They have occupied seat number one, so they have the

22   highest priority to sit on the jury.  So if -- if you get two

23   consecutive passes -- what I mean by that is you pass and they

24   pass, or vice-versa -- then that's the jury.

25       Now, that almost never happens.  It happens about one out

1    of ten times.  Usually you use up all your peremptories.  But

2    you don't have to.  It can be -- I've seen a few cases where we

3    don't use them all.

4         Then we -- because we got 32, we will, at a minimum, have

5    four left for the alternates.  And then you each get one strike

6    for the alternates.  And if we wind up with more than four,

7    because you don't use, you pass, then we go with the lowest two

8    seat numbers.  So we will then wind up with 14 people up there.

9         Okay?

10             MR. GASNER:  Yes, Your Honor.  Although I wonder why

11   you say we -- we would have a minimum of four left.  If we have

12   32, how do we get to a minimum of four left if we're picking

13   14?

14             THE COURT:  Well, let's see.  Maybe I didn't do the

15   math right.  Okay.  Twelve plus 16 is what?  Twenty-eight.

16             MR. GASNER:  Twenty-eight.

17             THE COURT:  And then we have 32, so that leaves four.

18   That's four.  Right?

19             MR. GASNER:  Yes.

20             THE COURT:  So I did do the math right.

21             MR. GASNER:  Sounds right.

22             THE COURT:  Okay.  Now, if you don't use all your

23   strikes on the first panel, then there'll be more than four.

24             MR. GASNER:  Uh-huh.

25             THE COURT:  Let's see.  Oh, can you both do this?

1    That would be very useful to the jury.  And that is to put up

2    over there (Indicating) a gigantic four-foot by eight-foot

3    board that has a timeline on it of key dates.  By that I mean

4    something that has a line across it that says:  Email No. 1.

5    Something very generic, that's not argumentative.  Can you do

6    that?

7        Don't put something like "Fraud begins here."  That's too

8    argumentative.  You can't say that.  It's got to be

9    something -- and here's why it's important.  As the witnesses

10   are testifying, even though you know the case cold, they don't.

11   The jury doesn't know the case cold.  And so they'll hear a

12   reference to a date or a meeting, and they -- the jury will not

13   remember that one thing came before the other.  And they won't

14   know the sequence, at least until the trial is about half over.

15   But they can glance up at this easy-to-read timeline and see

16   where the testimony fits in.

17       I find this to be a very simple thing, but it helps jury

18   comprehension.  Can you both agree?  But don't put anything --

19   and don't put in ten things.  Just put in six, seven or eight,

20   at the most.  Can you do that?

21           MR. GASNER:  I think we can agree on something,

22   Your Honor.

23           THE COURT:  All right.

24           MR. GASNER:  We'll meet and confer, and then agree to

25   do so.

1              **THE COURT:**  I appreciate it, thank you.

2              **THE COURT:**  All right.  Yes.

3          **MS. KANE:**  Your Honor, before we move away from the

4    jury issues, we just wanted to inquire as to whether the Court

5    would be interested in using a jury questionnaire, a written

6    questionnaire.

7              **THE COURT:**  I don't -- I generally think it takes

8    more time than it's worth.  But if you had a one-page,

9    one-and-a-half-page questionnaire, I would consider -- do you

10   have one that you want me to look at?

11         **MR. GASNER:**  We don't, Your Honor.  We wanted to

12   address it with the Court.  We think that a jury questionnaire

13   would be perhaps helpful.  At a minimum, perhaps giving the

14   Court a page of questions that we propose for a questionnaire.

15   And whether the Court wants to have the jury answer those in

16   advance for efficiency's sake, or whether the Court would

17   consider incorporating some of those key questions into the

18   Court's own voir dire, would be helpful.

19             **THE COURT:**  Well, I'll certainly do the latter.  And

20   I might do the former.  If you meet and confer and you came up

21   with something -- you've already given me voir dire questions.

22   Right?

23         **MR. GASNER:**  No.

24             **THE COURT:**  I thought you did.  I could have sworn I

25   saw a joint voir dire questions.

1        **MS. KANE:**  Your Honor, the United States did submit a

2    proposed voir dire questions.  But those were not -- that was

3    not a joint filing.

4        **THE COURT:**  All right.  Well, then, okay.  You can

5    still give me questions, independently.  But, all right.  You

6    two, if you -- I would consider that.  But I must say, I am not

7    a fan of questionnaires.  However, I have used them in other

8    case.  About three times in 20 years.  So, okay.

9        Exhibits.  I want to give you some flexibility here, but I

10   also -- I'll tell you what my standard approach is.  That the

11   witness on the stand should use the original paper copy with

12   the tag on it, so that there's no doubt what they're testifying

13   to.

14       Believe it or not, I've had cases where the lawyers

15   actually thought that Exhibit 17 was a different document,

16   altogether.  And it got to the final argument, and it came out

17   that the lawyer put something up on the screen that wasn't even

18   in evidence.  It was a civil case.

19       However, I don't want -- I don't want there to be any

20   confusion, so I want you to fish it out -- and that's the

21   document that goes into the jury room, and also on to the Court

22   of Appeals.  But I want you to use with the witness the actual

23   document that is going to go into the jury room.

24       Now, if that's going to cause you immense heartburn,

25   because you all are from big firms that do big-firm practice,

1    and you go:  Notebooks, notebooks, notebooks, okay, I'll do it

2    if you both agree.  But I promise you, if you're not very

3    careful, there'll be some errors in that.

4         So I'm going to be a little flexible.  But I prefer that

5    you just do it.  And then before each exam, you go to Theresa,

6    you fish out the documents you need.

7         All right?

8              **MS. KANE:**  Your Honor, we have no objection to that

9    practice.

10        And I just would note for the Court that there are some

11   exhibits on the government's exhibit list that are not amenable

12   to printing.  That might be, for example, a computer log that's

13   in spreadsheet format.

14             **THE COURT:**  Or video, yeah.  Or video.

15             **MS. KANE:**  Or video.  Exactly.  So we will work that

16   out, but I just wanted to raise that issue.

17             **THE COURT:**  Yes.  What you do with that, we'll say a

18   video, is you mark the CD individually as Government No. 71 and

19   then we know, we got a record that that's the video.  Then you

20   use that video.

21        All right.  However, I want you to also know that I know

22   as the trial goes along, you're going to want to show the jury

23   these documents.  So the witness will have the paper copy.  And

24   you, both sides, will have your technician there.

25        And so whenever the witness is looking at No. 17, and

1  it's -- let's say once it's in evidence, then you can -- your

2  technician can show Page -- Exhibit 17, whatever page you want.

3  And you can even highlight them, as far as I'm concerned.

4  That's okay.  So, you have to be able to educate the jury as we

5  go along.

6      Did you have a question?

7          **MS. NECHAY:**  I did, Your Honor.

8      I just wanted to make this request of the government, that

9  if they were going to be introducing an exhibit that -- for

10 example, a transcript or a snippet of a transcript, that that

11 correspond with the Bates number that we were given previously.

12 Or at least that we have notice --

13         **THE COURT:**  You -- definitely, yes.  I'm not going to

14 let you do that unless you show it to them in advance.  HIV one

15 case where your office was saying -- it was Chinese, it was a

16 translation issue, and that the word meant "murder" or

17 something like that.  Well, that was pretty bad.  Sounded like

18 they were trying to murder.  Turned out it actually meant

19 "Thursday."  Not "murder."

20     So you've got to give the other -- and, and by the way, I

21 had so much faith in your office that I said -- the defense was

22 saying:  No, it means "Thursday," no, it means "Thursday."  And

23 so, I said I can't believe the government would screw up like

24 that, but I said, I'd better be careful.  So I had an

25 evidentiary hearing.  And just before the government's own

1    interpreter got on the stand, she confessed error, and said:

2    The other side is right.  It does mean "Thursday."

3         Now, I know you would never do such a thing, and I know it

4    was an innocent mistake by the government in that case.  But,

5    they need a fair chance to show that, you know, it's an error.

6    So you've got to let them have that fair chance.

7                 MR. GASNER:  Your Honor --

8                 MS. KANE:  We have, Your Honor.  We've been

9    exchanging translations with the defense.  And thus far, we

10   have not identified any disputes.

11                THE COURT:  Great.

12                MR. GASNER:  Thank you, Your Honor.  And I think,

13   just by way of clarification on that previous request, less to

14   do with translation and more to do with just being able to

15   track where pieces of information are coming from, the example

16   I would like to give is if there's a long transcript, whether

17   it should be used for impeachment, grand jury testimony or

18   otherwise, sometimes there are snippets or pieces of that

19   transcript or snippets of video that are sought to be

20   introduced from a larger piece of evidence.  And if it's

21   happening in real time, we're just requesting the accommodation

22   that the Bates numbers remain the same as that we've been

23   provided, or that the time on the video be indicated so that we

24   can similarly track --

25                THE COURT:  Isn't that reasonable?  Can't you do

1    that?

2         **MS. KANE:**  Yes, Your Honor.  We have not thus far had

3    any concerns about that.  So I think this is not -- I don't

4    think there is an issue here.

5         **THE COURT:**  All right.

6         **MR. GASNER:**  Thank you.

7         **THE COURT:**  Next, here's something that I urge you

8    both to just agree to, which is a rule that while someone is on

9    cross-examination, or adverse examination sometimes it is, but

10   cross-examination, neither lawyer can talk to them during a

11   break.

12        You can talk about:  Oh, you've got to be back here at

13   7:00 a.m. tomorrow morning.  Scheduling is okay.  But you can't

14   talk to them about the substance of their case while they're on

15   cross.  Now, while they're still on direct, it's okay.  But

16   once they get on cross, even if it's overnight, you can't --

17   you can't go woodshed your FBI agents and say you:  Oh, you

18   screwed up, you made five different mistakes, you've got to fix

19   it tomorrow morning.  No.

20        Now, back east, in Washington and New York, this has been

21   a long-standing rule.  And out here it's not as common, but I

22   have found that in every single criminal case -- in fact, I

23   think even the civil cases, the lawyers have agreed, and

24   honored that.

25        Do you agree to this?

1          **MR. GASNER:**  We agree.

2          **MS. KANE:**  Your Honor, we -- we do agree.  And the

3    one issue that could result from that that I just want to raise

4    now so it doesn't come as a surprise to the Court is that we

5    have the case agent who will testify in this case, and may be

6    subject to cross-examination that could, you know, include an

7    overnight break.

8          We would not talk to him about the subjects of his

9    cross-examination.  But it would be almost impossible for the

10   government to prepare for the next day of trial without

11   speaking with that case agent about the case in some form.

12         So to the extent we get to that point --

13         **THE COURT:**  You better raise it with me, but I'm

14   telling you, it'd be hard to split hairs like that.  And once

15   they're on cross, you shouldn't be trying to say:  Okay, here's

16   what we're going do on redirect examination.

17         It would just not be right, there.  You know, they go down

18   -- the ship goes down, maybe.  So -- maybe not, I don't know.

19   But you shouldn't be talking to them about their redirect

20   examination.

21         **MS. KANE:**  And that we would agree to, certainly,

22   Your Honor.  We have no problem with that.

23         **THE COURT:**  If you're talking about:  Oh -- the case

24   agent -- after your testimony is over, we got to get that

25   witness from Russia to come in here, and can you give him a

1    call, that would be okay.  You could do that.

2        But I'm talking about you can't talk with them about the

3    substance of their testimony, until -- until you're back on

4    redirect.  On redirect.  Then you could do it.

5        All right.  Okay.  How long do you think -- your opening

6    statements, how long do you want to have?

7        (Off-the-Record discussion between counsel)

8        **MR. GASNER:**  Your Honor, the defense will likely open

9    at the beginning.  But I do not anticipate it being lengthy.

10   Thirty minutes or less, certainly.

11       (Off-the-Record discussion between counsel)

12       **THE COURT:**  How about the prosecution?

13       **MS. KANE:**  Your Honor, we would anticipate somewhere

14   under an hour.

15       **THE COURT:**  All right.  That's all fine.  Whatever

16   you take, you get the same amount, if you want it.  So, all

17   right.

18       One-page statement, you've got to give me a one-page

19   statement to read to the jury about what the case is about, so

20   they can tell me if they have any prejudice based on what the

21   case...  So you two agree on what that statement should be, and

22   give it to me on the day of trial.

23       Here is -- I think I screwed this up.  On the days that --

24   I was going to be dark, but then I decided I would give you

25   some of those days back, most of them.  Then I heard maybe you

```
 1   don't want them back.

 2       So -- let me find it again.  We're going to start on --

 3   what day is our trial?

 4                  MS. KANE:  We're starting March 9th, Your Honor.

 5                  THE COURT:  So I was going to be out on Thursday and

 6   Friday.  I can give you back Thursday.

 7                  MR. GASNER:  Your Honor, we -- counsel and I

 8   discussed this, having gotten notice from your clerk.  I

 9   understand counsel may be working on some witness

10   re-accommodation.  I made a -- some plans in conflict, in

11   reliance on the Court's notice.

12                  THE COURT:  All right.  It's my fault.  I'm not

13   blaming anybody.

14                  MR. GASNER:  I know you're not.

15                  THE COURT:  I'm offering it back to you.  So you tell

16   me --

17                  MR. GASNER:  I'm trying to work it out, but I can't

18   tell the Court right now whether I'm available or could be

19   available.  My preference is that we remain dark on the 12 and

20   the 13th.

21                  THE COURT:  How about the following week?

22                  MR. GASNER:  Your Honor, I don't have particular

23   plans in conflict.

24                  THE COURT:  So the 16th and 17th, can I give you

25   those days back, and we count on those?
```

1     **MS. KANE:**  Well, Your Honor, we have a number of

2   out-of-town witnesses.  And these are not law enforcement

3   witnesses, these are civilians, including witnesses traveling

4   internationally.  We've booked these people, based on the prior

5   schedule.

6     We are happy to try to get those days back.  But it may

7   take us a day or two determine whether we can do that.

8     **THE COURT:**  That's fine.  Just let me know.  You let

9   me know.  I can hang loose for a bit.

10    Now, here's the thing, though.  By the time we select the

11  jury, I've got to tell them what our schedule is going to be.

12    **MS. KANE:**  And we will certainly know by then,

13  Your Honor.

14    **THE COURT:**  All right.  So, there you go.  That's

15  fine.  And my apologies for the goof.  All right.  Let's see.

16    We -- we will -- in my experience, it's hard -- if we have

17  enough time on the first day, we would go to opening

18  statements.  But it usually just takes most of the day to pick

19  the jury.  So most likely, we will start with the opening

20  statements on Tuesday morning, and then go straight to your

21  first witness.

22    Give me about the -- I don't need more than about the top

23  ten documents.  My mind stops when we get to 11 or 12.  So give

24  me the top ten that each side wants me to have.  And then I'll

25  look at the others as they come, but the ones that I will be

1  looking at the most and studying are probably the top ten.

2  I'll look at the others briefly, as they come into evidence.

3       You probably know that I don't like lawyers to hack and

4  cough.  That's why I keep all these cough drops here.  But

5  there's actually a good reason for it.  And that is, I want the

6  jury to hear the testimony.

7       When I was a lawyer, I only did two or three criminal

8  cases, but I did mostly civil cases.  And I noticed that when I

9  had the other side's best witness on the ropes, and they were

10  going down for the third time, the other side started hacking

11  and coughing and shuffling papers.

12       Has that ever happened to you?

13            **MR. GASNER:**  I take the Fifth.

14            **THE COURT:**  Well, so, I don't let you do that.  I

15  want the jury to have the undivided -- Ms. Kane is making great

16  points, you've got to just sit there and suffer in silence.

17  So, the government's got to sit there and suffer in silence

18  when you two are making great points.  The jury gets -- their

19  undivided attention.

20       And if there's hacking and coughing, I'm going to

21  interrupt and say "Mr. Gasner, do you need a cough drop?"

22       This works great.  And the jury appreciates it too, by the

23  way, that they, that -- that there's -- they get their

24  undivided attention.

25       All right.  Oh.  Are you going to have stipulations?

1          **MS. KANE:**  Your Honor, we do anticipate that there

2     may be some stipulations.  We will discuss those, obviously,

3     with defense counsel.

4          **THE COURT:**  Here's the way -- I only have one ground

5     rule for that, which is simple.  If you have a stipulation,

6     you've got to read it to the jury.  And then I ask the other

7     side:  Is it stipulated?  They say yes.

8          And the reason is I don't want something in writing going

9     into the jury room, because it will get more weight than it

10    deserves.  So it's just read in, like any other evidence.  And

11    I will tell them then that even though the lawyers said it,

12    this is an exception, it does count as evidence.  All right?

13         So it's okay to have stipulations.  You've just got to

14    remember to read it in.

15         Okay I think I've finished, unless you have questions.

16    And we still have to go back to co-conspirator.

17         **MS. KANE:**  Your Honor, the government had planned to

18    deliver a hard copy, not the originals, but the a copy of the

19    exhibits to the Court before starting trial.  When would the

20    Court like those?

21         **THE COURT:**  I just need the top ten.  But you want to

22    give me the entire thing?

23         **MS. KANE:**  Well, that's why I guess I'm asking.  That

24    had been our plan.

25         **THE COURT:**  These are not -- this is just my -- this

```
1   is just a work set.  It's not the official set.

2          MS. KANE:  Yes, Your Honor.

3          THE COURT:  I would rather you just give me the top

4   ten.  And then -- I'll let do you whatever you want.  But I'm

5   not going to be here next week, so it won't do me any good.  It

6   would have to be March 2nd.  Or 3rd.

7          MS. KANE:  So the top ten, March 3rd.

8          THE COURT:  Yeah.

9          MS. KANE:  Okay.

10         MR. GASNER:  Two small questions, Your Honor.

11     Just going back to voir dire, does the Court allow -- when

12  the lawyers are doing voir dire, defense go first?  Or

13  prosecution?

14         THE COURT:  Usually the prosecution goes first.  Is

15  that okay?

16         MR. GASNER:  Um --

17         THE COURT:  Do you want to go first?

18         MR. GASNER:  We -- however this Court usually handles

19  it.  I've had it both ways.

20         THE COURT:  I let the plaintiff go first, and then

21  the defendant.  But if you feel like that's prejudicial to you,

22  then -- why?

23         MR. GASNER:  I don't feel strongly, but I wanted to

24  know.  I've had courts do it both ways.  Judge Breyer --

25         THE COURT:  Well, we can try it as an experiment.  I
```

```
 1   don't -- if you want to go first --

 2              MR. GASNER:  Yeah, I'd like --

 3              THE COURT:  Just remind me.

 4              MR. GASNER:  All right.

 5              THE COURT:  You remind me, and we'll let you go

 6   first.  It may be that halfway through I'll switch and let the

 7   other side go first.

 8              MR. GASNER:  Sounds like an experiment that I'm game

 9   for.

10              THE COURT:  All right.  There's no -- you can't

11   indoctrinate people, you know.  Don't start trying to -- or --

12   and you can't try to figure out which way they're going to vote

13   on some specific issue.  That's not proper.

14       But it's certainly proper to see -- and by the way, it's

15   not enough that they just -- they have an opinion.  Because

16   everybody's going to have an opinion.  Everybody's heard about

17   Russian hacking, so they're going to have an opinion.  But it

18   has to be:  Is that opinion such that they cannot put that to

19   one side, and decide the case fairly on the basis of the...

20       So remember that.  It's got to be more than that they have

21   -- they've got some opinion.  Everyone's going to have an

22   opinion on something to do with this case.  The purpose of

23   voir dire is to find out if they've had a life experience or an

24   opinion that would prevent them from following the instructions

25   and being fair to both sides.  That's the key thing.  So if
```

1   someone's prejudiced against Russians, that would be a big

2   serious problem.

3       But -- you know, in addition to what I'm going to ask, I'm

4   going to let each side have some time.  But you can't -- don't

5   abuse the time and ask improper questions.

6           **MR. GASNER:**  Understood, Your Honor.  And we're

7   hoping the Court might inquire into some of these more

8   sensitive issues to begin with, because I think it will --

9           **THE COURT:**  Yeah.  Give me your list.  You said you

10  haven't given me your list yet.

11          **MR. GASNER:**  Understood.

12          **THE COURT:**  Uh-huh.

13          **MR. GASNER:**  And the other small procedural issue is

14  we're intending on providing Mr. Nikulin with clothing that's

15  appropriate for a trial.

16      And I wanted to know -- usually I work it out with the

17  Marshals but, like, a court order or at least approval that we

18  can provide clothes for them to examine --

19          **THE COURT:**  Of course.

20      Do the marshals need -- do you need me to give a written

21  order?  Or will you just do that automatically?

22          **THE MARSHAL:**  No, just the defense come upstairs, and

23  we'll search the clothing.

24          **THE COURT:**  Yeah.

25          **THE MARSHAL:**  No big deal.

1    **MR. GASNER:**  Okay.

2    **THE COURT:**  Yeah.  Do that.

3    **MR. GASNER:**  Just alerting them to that fact.

4    **THE COURT:**  Uh-huh.

5    **MR. GASNER:**  But I don't -- nothing further on that.

6    **THE COURT:**  Okay.

7    **MS. KANE:**  And Your Honor, I know that previously in

8    this case there's been some issue regarding restraints for the

9    defendant.  It seems today he's appearing without restraints.

10   We're sort of assuming that that won't be an issue at trial.

11   **THE COURT:**  Wait a minute.  Just say to the Marshals:

12   We're going to have a trial.  No restraints.  If you need to

13   get an extra marshal, that's okay.

14   **THE MARSHAL:**  (Nods head)

15   **THE COURT:**  But no restraints on the defendant until

16   -- unless he does something really -- you have to get my

17   permission first.  I -- you understand that.

18   **THE MARSHAL:**  Understood.

19   **THE COURT:**  All right.

20   **MR. GASNER:**  As long as we're going into some of the

21   details with regard to an in-custody defendant at trial, our

22   request is -- and the Marshals are well aware and have done a

23   fabulous job on all occasions for me -- that we do our best to

24   bring the defendant out at all times outside the presence of

25   the jury, and then wait for the jury to be excused -- --

1          **THE COURT:**  Sure.  So he will be out here first, and

2     the jury will never see him being escorted into custody.  And

3     the Marshals will sit at a respectable distance, so there's no

4     suggestion that he's in custody.

5          **MR. GASNER:**  Thank you.

6          **THE COURT:**  Okay.  Are we ready to go to the

7     co-conspirators?

8          **MS. NECHAY:**  Yes.

9          **MS. KANE:**  Yes, Your Honor.

10         **THE COURT:**  I'm going to ask everyone in the room who

11    has no connection to the U.S. Attorney's office or to the

12    defense to leave.  I'm sorry to do this, but for the time

13    being, I have to do that.

14        And I need the lawyers to look back there, and make sure

15    that we have excused the right people.

16        Does she (Indicating) belong here?

17         **MS. KANE:**  Yes, Your Honor.  Remaining in the

18    courtroom are our case agent Special Agent Jeffrey Miller, and

19    our trial paralegal, Helen Yee.

20         **THE COURT:**  Great.

21        (Unsealed portion of proceedings concluded)

22

23

24

25

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_/s/ Belle Ball_

Belle Ball, CSR 8785, CRR, RDR

Wednesday, December 16, 2020